**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **DAVITA M. KEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | **2:19-cv-00767-ECM-SMD** |
| | ) | |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **ALABAMA, LLC, HYUNDAI** | ) | |
| **ENGINEERING AMERICA, INC. and** | ) | |
| **DYNAMIC SECURITY, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## BRIEF IN SUPPORT OF DEFENDANT HMMA'S MOTION FOR SUMMARY JUDGMENT

Plaintiff was employed by Dynamic Security, Inc. ("DSI"), which provided security personnel to Hyundai ENG America, Inc. ("HEA"). HEA provided construction, maintenance, janitorial, and security services to corporate customers, including Hyundai Motor Manufacturing Alabama, LLC ("HMMA"). DSI assigned Plaintiff to its contract with HEA, which was to be performed at HMMA's facility. When Plaintiff refused to modify her hairstyle to meet HEA's standards, an HEA employee requested Plaintiff's assignment be ended, and DSI complied. During her assignment, Plaintiff never interacted with any HMMA employees beyond the individual who photographed her for a badge to access the property. Plaintiff has sued DSI, HEA, and HMMA, alleging the termination of her assignment was discriminatory on account of her race or pregnancy, or retaliatory. HMMA moves this Court to grant it summary judgment on any or all of the following grounds: (i) HMMA was not Plaintiff's employer, (ii) HMMA did not require any policy against dreadlocks be implemented at all and certainly did not require that it be implemented maliciously, (iii) HMMA had no knowledge of Plaintiff's complaint or any

i

protected activity by Plaintiff, and (iv) Plaintiff did not administratively exhaust her Title VII claims against HMMA.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ v

STATEMENT OF UNDISPUTED FACTS .................................................................... 1

I.    ABOUT THE PARTIES ........................................................................................ 1

      A.    About HMMA ............................................................................................ 1

      B.    About Dynamic Security, Inc. (DSI), and its employees ........................ 2

      C.    About Hyundai ENG America, Inc. (HEA), its employees, and its relationship to HMMA ............................................................................................................ 2

      D.    About Plaintiff ........................................................................................... 4

II.   About Plaintiff's Employment with DSI ............................................................ 5

      A.    Plaintiff's employment relationship with DSI generally. ....................... 5

      B.    Specific Events During Plaintiff's Employment with DSI ..................... 6

III.  About Various Grooming Policies and Practices ............................................... 9

      A.    HMMA had no general prohibition on dreadlocks and had no appearance standard at all which applied to Plaintiff. ............................................................. 9

      B.    DSI did not have a general prohibition on dreadlocks ........................... 10

      C.    Cassandra Williams revised and maintained appearance policies prohibiting dreadlocks on behalf of HEA applicable to DSI's employees ........................ 10

IV.   HMMA maintained certain safety and property security rules and performance expectations that would have applied to Plaintiff's assignment at a very baseline level.  11

      A.    HMMA was not responsible for DSI's mail room worker control, supervision, training (other than safety training), or pay. ........................................ 11

      B.    HMMA maintained certain security and other property-related policies for all contractors and their employees ................................................................ 12

      C.    The contract between HMMA and HEA established certain staffing and scheduling baselines, but these could be negotiated or modified by HEA. .......... 12

V.    HMMA had no influence on Plaintiff's assignment or removal by DSI. .......... 13

VI.   Plaintiff did not timely file a Charge against HMMA with the EEOC ............. 14

VII.   Miscellaneous ................................................................................................... 15

ANALYSIS .................................................................................................................... 15

I.   In the absence of a genuine, evidence-based dispute of material fact, summary judgment should be granted. ......................................................................................... 15

II.   Following a period of written discovery and party and other depositions, there is no evidence to support a finding of a joint employment relationship between Plaintiff and HMMA. ........................................................................................................... 17

    A.   Joint Employer Standard ............................................................................. 17

    B.   The vast majority of factors, and the most important factors, dictate a conclusion that HMMA wasn't Plaintiff's employer. ....................................................... 19

    C.   That HMMA initially scheduled mail room hours and manpower, provided the physical space and equipment for the work and the associated safety training to prevent injury in that space, and could indirectly request DSI workers perform additional duties does not dictate a different outcome. ..................................... 21

III.   Not only is there no evidence that HMMA took any employment action with respect to Plaintiff, there is a consequential absence of evidence that HMMA was motivated by race in any respect. ......................................................................................... 24

IV.   Plaintiff has failed to establish that any employee of HMMA knew of her pregnancy or any protected activity on her part. ...................................................................... 25

V.   Additionally, Plaintiff did not exhaust her Title VII claims against HMMA. ................. 26

CONCLUSION .............................................................................................................. 28

CERTIFICATE OF SERVICE ....................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ........................ 16

*Banks v. St. Francis Health Ctr., Inc.*, 2016 U.S. Dist. LEXIS 161229, **54 (D. Kan.)............ 22

*Boutin v. Exxon Mobil Corp.*, 730 F.Supp.2d 660, 681 (S.D. Tex. 2010) ................................... 23

*Cannon v. Canteen Servs. of N. Mich* ........................................................ 28

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ........................................ 16

*Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1234 (11th Cir. 2004) ...................... 18

*Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983)............................ 17

*Diaz v. U.S. Century Bank*, 2013 U.S. Dist. LEXIS 68399 (S.D. Fla.) ........................ 22

*E.E.O.C. v. Skanska USA Bldg., Inc.*, 2011 U.S. Dist. LEXIS 172222, *10 (W.D. Tenn.).......... 22

*EEOC v. Catastrophe Mgmt.*, 852 F.3d 1018, 1029-30 (11th Cir. 2016), *reh'g en banc denied*, 876 F.3d 1273 (11th Cir. 2017) ........................................................ 25

*Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005)................................ 17

*Enterprise Rent-A-Car Wage & Hour Empl. Practices Litig.*, 683 F.3d 462, 471 (3rd Cir. 2012) ........................................................ 20

*Foy v. Pat Donalson Agency*, 946 F.Supp.2d 1250, 1267, 1268 (N.D. Ala. 2013) ...................... 20

*Freeman v. Wal-Mart Stores East, L.P.*, 2009 U.S. Dist. LEXIS 150133, *9 (N.D. Ala.) .......... 26

*Gremillion v. Cox Communs. La.*, 2017 U.S. Dist. LEXIS 50941, **15-16 (E.D. La.).......... 22-23

*Hall v. Arkema, Inc.*, 2020 U.S. Dist. LEXIS 241488, **9-11 (S.D. Tex.)............................ 20, 23

*Horowitz v. AT&T, Inc.*, 2018 U.S. Dist. LEXIS 69161, *40 (D.N.J.)......................................... 23

*Jerome v. Hertz Corp.*, 15 F.Supp.3d 1225, 1237 (M.D. Fla. 2014) ............................................ 20

*Layton v. PERCEPTA, LLC*, 2018 U.S. Dist. LEXIS 108268, **10-11 (M.D. Fla.) .................. 23

*Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1242, 1244-45 (11th Cir. 1998) ............. 19, 20

*Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)............................................................ 21

*Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1211 (11th Cir. 2003) .................. 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) .......................... 16

*McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) ......................... 16

*Mohammed v. GHX Glob. Healthcare Exch. Inc.*, 2022 U.S. App. LEXIS 13847,
   **5-6 (11th Cir.) ........................................................................................................... 25

*Moise v. Miami-Dade Cty.*, 2018 U.S. Dist. LEXIS 143667, **30-31 (S.D. Fla.)...................... 18

*Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1255 (11th Cir. 2004)......................... 22, 24

*Parker v. Esper*, 2020 U.S. Dist. LEXIS 139342, *12 (N.D. Fla.)................................... 18, 20, 22

*Parks v. Lyash*, 2022 U.S. Dist. LEXIS 165892, n. 3 (E.D. Tenn.)............................................ 23

*Peppers v. Cobb County*, 835 F.3d 1289, 1297 (11th Cir. 2016) .......................................... 17, 19

*Quintanilla v. A&R Demolition, Inc.*, 2005 U.S. Dist. LEXIS 34033,
   **26-27, 33-35 (S.D. Tex.)............................................................................................ 22

*Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996).............. 16

*Rodgers v. Horsley*, 39 F.3d 308, 309 (11th Cir. 1994)................................................................. 1

*Roper v. Verizon Communs., Inc.*, 2020 U.S. Dist. LEXIS 227766, n. 18 ................................. 23

*Scott v. Sarasota Doctors Hosp., Inc.*, 673 Fed. Appx. 878, 887 (11th Cir. 2017) ..................... 18

*Shaffer v. Wexford Health Sources, Inc.*, 2018 U.S. Dist. LEXIS 115983, *12 (W.D. Penn.)..... 22

*Sims v. EQT Corp.*, 2014 U.S. Dist. LEXIS 122894, **13-14 (W.D. Penn.)............................... 22

*Tuck v. Off Shore Inland Marine & Oilfield Co.*, 2013 U.S. Dist.
   LEXIS 1764, **7-8 (S.D. Ala.) ..................................................................................... 27

*U.S. v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) ................................................................. 19

*Virgo v. Riviera Beach Assocs. Ltd.*, 30 F.3d 1350, 1358 (11th Cir. 1994)................................. 27

*Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)......................... 16

*Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995).................................................................. 17

*Williams v. Hoover City Bd. of Educ.*, 2019 U.S. Dist. LEXIS 84076, *15 (N.D. Ala.).............. 18

*Williamson v. Adventist Health Systems/Sunbelt, Inc.*, 372 Fed. Appx. 936, 939 (11th Cir. 2010) (acknowledging both NLRB and economic realities test apply), *adopted at* 2020 U.S. Dist. LEXIS 138445 (N.D. Fla.), *aff'd at* 856 Fed. Appx. 807 (11th Cir. 2021) .............................. 18

**Statutes**

Fed. R. Civ. P. 12(b)(6) .......................................................................... 17

Fed. R. Civ. P. 56 ..................................................................................... 16

Fed. R. Civ. P. 56(a) ........................................................................... 15, 17

Fed. R. Civ. P. 56(c)(1)(A) ...................................................................... 16

Fed. R. Civ. P. 56(c)(1)(B) ...................................................................... 16

**Other Authorities**

11th Cir. Pattern Jury Instr. 4.25 (2020) ................................................. 18

## STATEMENT OF UNDISPUTED FACTS[1]

### I.   ABOUT THE PARTIES

A.   About HMMA

1.    In 2017, HMMA operated an automobile manufacturing facility in Montgomery, Alabama, that produced the Hyundai Sonata, Elantra, and Santa Fe automobiles.   HMMA's facility included a Stamping Shop, a Welding Shop, a Paint Shop, a General Assembly Shop, three Engine Shops, and a two-mile test track. (Burns Dec., Exh. 1, ¶2).

2.    HMMA currently employs approximately 3,000 Team Members.[2] (Burns Dep., Exh. 2, 174:8-11).  HMMA has robust non-discrimination, non-harassment, and non-retaliation policies, and it is committed to not discriminating against employees due to protected statuses, including race and pregnancy, and not retaliating against employees who engaged in protected conduct. (Burns Dep., Exh. 2, 190:19-192:12, 195:10-23, exh. 7).

3.    Some services at HMMA's campus are provided by contractors, including security (which includes mailroom), electrical, plumbing, and construction contractors. (Burns Dep., Exh. 2, 173:4-10, 175:5-10).

4.    Contractors and their employees are not HMMA Team Members. (Burns Dep., Exh. 2, 182:15-21).

5.    HMMA expects its contractors to adhere to federal law, including principles of non-discrimination and non-retaliation with respect to their employees. (Burns Dep., Exh. 2, 87:5-11, exh. 2, §10.1 (HMMA000021)).

---

[1] For purposes of summary judgment, Defendant states facts in the light most favorable to Plaintiff.  *Rodgers v. Horsley*, 39 F.3d 308, 309 (11th Cir. 1994) ("As a result, the 'facts' for purposes of reviewing rulings on summary judgment motions may not, in reality, be the facts.").

[2] HMMA refers to its employees as Team Members.

B.    <u>About Dynamic Security, Inc. (DSI), and its employees.</u>

6.    DSI operates in seven states and has about 1,300 employees. (Riddle Dep., Exh. 3, 13:9-21).

7.    DSI's business is providing security officers at the facilities of other businesses. (*Id*., 14:1-7).

8.    HMMA has never had direct business dealings with DSI. (Burns Dep., Exh. 2, 155:5-11).

9.    DSI has no contract or proposal with HMMA to provide security services; its contract is with HEA and it invoices HEA. (Riddle Dep., Exh. 3,  193:19-197:14, exh. 2; Spiers Dep., Exh. 4, 75:17-21).

10.    DSI employed Gloria Robinson as its on the ground manager at the HMMA facility servicing the HEA contract. (Riddle Dep., Exh. 3, 78:3-8).

11.    Ms. Robinson is Black. (Robinson Dec., Exh. 5, ¶14).

12.    HMMA never employed Ms. Robinson. (Burns Dep., Exh. 2, 280:21-281:11).

C.    <u>About Hyundai[3] ENG America, Inc. (HEA), its employees, and its relationship to HMMA.</u>

13.    HEA is a contractor used by HMMA to provide various services. (Burns Dep., Exh. 2, 16:10-15).

14.    HEA provides construction, security, janitorial, landscaping, and perhaps other services to multiple customers, including HMMA and Kia. (Williams Dep., Exh. 6, 14:6-15:4).

---

[3] *Hyundai* means *modern* in Korean. (Burns Dep., Exh. 2, 168:6-10). The word Hyundai is used in approximately 77 current and prior business names registered with the Alabama Secretary of State. (Exh. 11, Sec. of State records, word search "Hyundai") (accessed Oct. 7, 2022).

15.     HEA was previously known as Hyundai AMCO America, Inc. (Exh. 7, HEA's response to Plaintiff's Requests for Admission, RFA #2 (Doc. 726897); Exh. 8, Sec. of State Records for Hyundai ENG America, Inc., p. 3).

16.     HEA is headquartered in California. (Exh. 9, Sec. of State Records for HEA).

17.     HMMA is headquartered in Montgomery, Alabama. (Exh. 10, Sec. of State Records for Hyundai Motor Manufacturing Alabama, LLC).

18.     There is no common ownership between HMMA and HEA. (Burns Dep., Exh. 2, 16:23-17:5, 154:13-16).

19.     There are no common policies between HMMA and HEA. (Burns Dep., Exh. 2, 154:17-20).

20.     There are no shared bank accounts between HMMA and HEA. (Burns Dep., Exh. 2, 154:21-22).

21.     Since August 2010, HEA has employed Cassandra Williams as a manager in the Facilities Management Department. (Williams Dep., Exh. 6, 40:3-8).

22.     Ms. Williams also manages contracts for security services between HEA and Glovis Alabama and Glovis America. (Williams Dec., Exh. 13, ¶2).

23.     Ms. Williams is Black. (Pltf. Dep., Exh. 12, 37:16-17).

24.     Prior to working for HEA, Ms. Williams worked for two other agencies that provided security services at HMMA, Don Terry Associates and American Citadel Guard Security. (Williams Dep., Exh. 6, 41:5-42:16).

25.     Ms. Williams reports to HEA Project Manager, Ki Sung Kim. (Williams Dep., Exh. 6, 16:21-17:12).

3

26.     Mr. Kim is supervised by other HEA employees; at times relevant to this action, his direct supervisor was Mr. Kwak. (Williams Dep., Exh. 6, 148:8-23).

27.     HEA provides Ms. Williams with a company cell phone. (Williams Dep., Exh. 6, 25:21-26:5).

28.     HMMA provided a desk phone line to Ms. Williams. (*Id.*, 26:6-8).

29.     Hyundai Autoever America, Inc. (HAEA) provides IT services for HMMA and it issued an hmmausa.com email address to Ms. Williams prior to her working for HEA, which she kept after she began working for HEA. (*Id.*, 105:17-106:22).

30.     Ms. Williams designed her email signature independently, and it reflected her role as an HEA Manager and assignment to HMMA, with "Manager of Security Services/Hyundai Engineering America, Inc." appearing immediately below her name, and "Hyundai Motor Manufacturing Alabama, LLC" appearing in smaller font beneath that. (*Id.*, 108:15-110:18, exh. 41).

31.     HMMA never employed Ms. Williams. (Burns Dep., Exh. 2, 280:5-13; Riddle Dep., Exh. 3, 185:7-21, 186:21-187:1; Spiers Dep., Exh. 4, 76:12-17; Williams Dep. Exh.6, 146:8-10, DX-1).

32.     HEA was DSI's client, not HMMA. DSI invoiced HEA exclusively. (Riddle Dep., Exh. 3, 193:16-194:23).

D.     <u>About Plaintiff</u>

33.     Plaintiff is a Black woman. (Amended Complaint, Doc. 28, ¶2).

34.     Plaintiff chose to style her hair in dreadlocks beginning when she was about 18 years old. (Pltf. Dep., Exh. 12, 243:7-9).

35.     Plaintiff has a Bachelor's Degree in Humanities and Social Sciences from Auburn University and a Master's Degree from Troy University in Social Sciences, both obtained before working at DSI. (*Id.*, 85:11-86:8).

36.     Plaintiff was pregnant at all times relevant to this action. (*Id.*, 115:1-9, 277:21-25).

## II.     About Plaintiff's Employment with DSI

### A.     Plaintiff's employment relationship with DSI generally.

37.     Plaintiff initiated an application to obtain a mailroom job with DSI through Indeed, knowing she was applying to work for DSI. (Pltf. Dep., Exh. 12, 19:10-24). She never applied for employment with HMMA. (*Id.*, 23:16-26:7, exh. 2).

38.     Gloria Robinson, a DSI employee, assigned Plaintiff to the mail room. (*Id.*, 40:18-41:6).

39.     DSI provided Plaintiff with information about the pay and benefits that it would provide her. (*Id.*, 21:24-22:7).

40.     Plaintiff's immediate supervisor was Maurice Chambliss, a DSI employee who is Black. (*Id.*, 18:23-24, 31:10-13, 37:14-15).

41.     Plaintiff always reported to Gloria Robinson, another DSI employee. (*Id.*, 31:20-23, 41:4-6).

42.     When Plaintiff wanted Human Resources support, she went to Ray Cureton, a DSI employee, at DSI's offices. (*Id.*, 32:25-33:15).

43.     Plaintiff was paid exclusively by DSI and was not paid by any other entity for her assignment relevant to this Complaint. (*Id.*, 27:12-21, 28:1-4, exh. 3).

44.     When Plaintiff filed for unemployment, she identified DSI as her employer. (*Id.*, 44:10-12).

45.     HMMA did not employ Plaintiff. (Burns Dep., Exh. 2, 279:20-21).

B.     Specific Events During Plaintiff's Employment with DSI

46.     Plaintiff went to work for DSI at HMMA's plant on two days: July 31 and August 1, 2017. (Pltf. Dep., Exh. 12, 17:21-18:1).

47.     As part of the application process, Plaintiff was interviewed by Ms. Robinson and Mr. Chambliss, DSI employees, on July 19. (*Id.*, 18:15-24).

48.     Ms. Williams was consulted at that time, in Plaintiff's presence, about Plaintiff's hair, which was styled in dreadlocks. (*Id.*, 127:1-25). Plaintiff showed Ms. Robinson an up-do hairstyle and they agreed she would wear her hair like that. (*Id.*, 128:19-25).

49.     Plaintiff attended an orientation session at DSI's Montgomery office prior to beginning her assignment at HMMA. (*Id.*, 135:2-20).

50.     When Plaintiff reported to work the first day, she did not wear her hair in that up-do style because she had consulted with DSI's office manager at that orientation, who told her that her hair was not in an issue and in compliance with DSI's grooming policy. (*Id.*, 129:1-11). Plaintiff also believed her hair complied with DSI's handbook. (*Id.*, 129:12-16).

51.     On July 31, Plaintiff told Ms. Robinson and Mr. Chambliss that she was pregnant and showed her a doctor's note that she did not have any restrictions. (*Id.*, 115:18-25, 116:8-12, 117:14-20).

52.     After Plaintiff told them about her pregnancy, Ms. Robinson went to her office, and then Ms. Williams confronted Plaintiff about her hair. (*Id.*, 116:15-117:5, 140:16-141:8, 141:25-143:4).

53.     Following this confrontation, LaTunya[4] Howell, a DSI employee who is Black, trained Plaintiff. (*Id*., 23:10-13, 35:24-25, 138:13-139:18, 141:9-12).

54.     After about an hour, Mr. Chambliss picked up Plaintiff to meet with Ms. Robinson. (*Id*., 144:4-145:2).

55.     Plaintiff met with Ms. Robinson and Ms. Williams, who told her hair was not acceptable. Plaintiff asked to see the policy, and Ms. Williams initially refused, then showed her an HEA policy on her computer. (*Id*., 145:3-146:4, exh. 8 (51:6-13)).

56.     Ms. Robinson told Plaintiff to go home for the day, and they agreed she could wear a hat the next day. (*Id*., 118:13-21, 147:20-148:6, 150:5-151:1).

57.     After Plaintiff went home, Ms. Robinson called Plaintiff to find out when her due date was and if her doctor was aware of her job requirements. (*Id*., 119:20-120:2).

58.     On August 1, Plaintiff returned to work and waited for her trainer, Ms. Howell, and Plaintiff told Ms. Howell she thought she was being treated unfairly because of her hair. (*Id*., 151:25-154:6).

59.     After that, also on August 1, Ms. Robinson aggressively asked her if she was going to continue to act this way until—and then pointed to her stomach, asked her if she felt discriminated against, and stated that "this" was going to be a problem, though Plaintiff does not know what Ms. Robinson was referring to, said that Koreans were a different breed of animals that sent memos that they did not want Black employees wearing hair like hers. (*Id*., 119:13-17, 120:13-122:3, 158:21-160:20).

---

[4] Ms. Howell is occasionally referred to as LaTunya, Tonya, LaTonya, and Tunya in various documents and depositions. HMMA believes, based on documents produced by DSI as Ms. Howell's personnel file, that LaTunya is the correct spelling and so uses that.

60.    Plaintiff does not know what Koreans Ms. Robinson was referring to. (Pltf. Dep., Exh. 12, 63:24-65:1, 78:9-79:7).

61.    No evidence of such an alleged memo has been produced, and neither Ms. Robinson, Ms. Williams, nor HMMA is aware of such a memo. (Robinson Dec., Exh. 5, ¶¶11-12; Williams Dec., Exh. 13, ¶5; Burns Dec., Exh. 1, ¶10).

62.    Plaintiff has never seen such a memo. (Pltf. Dep., Exh. 12, 67:8-10).

63.    Ms. Robinson dismissed Plaintiff and Mr. Chambliss took her back to the mail room for more training. (*Id.*, 162:4-12).

64.    Mr. Chambliss later returned to the mailroom and Plaintiff told him she wanted to speak to someone in human resources. (*Id.*, 164:17-23).

65.    Ms. Robinson then told Mr. Chambliss to have Plaintiff speak with Ray Cureton, the Montgomery DSI branch manager, who is white. (*Id.*, 35:22-23, 165:10-20; Riddle Dep., Exh. 3, 78:10-13).

66.    Plaintiff left the job site to go to DSI's office in Montgomery. (Pltf. Dep., Exh. 12, 166:14-17, 167:8-13).

67.    The first thing Mr. Cureton asked Plaintiff was if she was going to sue DSI. (*Id.* 168:11-14). Plaintiff responded she just wanted to talk to someone in HR. (*Id.*, 168:15-18).

68.    Plaintiff told Mr. Cureton everything that had happened on July 31 and August 1. (*Id.*, 168:18-24).

69.    At the end of the meeting, Mr. Cureton asked for her badge, saying that they or Ms. Robinson did not want her there because of her hair "and something else." (*Id.*, 41:24-42:18, 174:11-22, 226:16-227:3). Mr. Cureton may have also relayed Ms. Williams did not want Plaintiff on site. (*Id.*, 125:13-126:6, 227:4-6).

8

70.     To Plaintiff's knowledge, the only individuals working at HMMA's site who were aware of her pregnancy were Ms. Howell, Ms. Robinson, Mr. Chambliss, and Ms. Williams. She is not aware of any HMMA employee who knew she was pregnant. (*Id.*, 29:8-17, 48:16-23).

71.     DSI states it removed Plaintiff from her assignment to HEA based on the request of Ms. Williams. (Riddle Dep., Exh. 3, 192:3-193:5; Spiers Dep., Exh. 4, 79:8-13).

72.     No one from HMMA requested Ms. Williams ask that Plaintiff be removed. (Williams Dep., Exh. 6, 146:11-13).

**III.     About Various Grooming Policies and Practices**

    A.     <u>HMMA had no general prohibition on dreadlocks and had no appearance standard at all which applied to Plaintiff.</u>

73.     HMMA did not maintain any appearance or grooming policies other than a PPE safety matrix, which did not apply to the area where Plaintiff was assigned. (Burns Dep., Exh. 2, 149:19-22, 237:21-23, 238:15-17, 239:17-20).

74.     HMMA's matrix does not prohibit dreadlocks. (Burns Dep., Exh. 2, exh 8;  Pltf. Dep., Exh. 12, 52:11-53:22, exh. 9).

75.     HMMA Team Members and other contractors' employees at HMMA wear their hair in dreadlocked styles. (Williams Dec., Exh. 13, ¶4).

76.     No one has ever been accused by an HMMA employee of or disciplined for violating a (nonexistent) ban on dreadlocks. (Burns Dep., Exh. 2, 242:15-244:15).

77.     No one has been disciplined by or with knowledge of HMMA for wearing their hair a certain way unless the style didn't follow safety rules, such as having long hair not beneath a cap in a production area. (Burns Dep., Exh. 2, 243:7-244:15).

B.    <u>DSI did not have a general prohibition on dreadlocks.</u>

78.    DSI did not have a company-wide appearance standard prohibiting dreadlocks. (Riddle Dep., Exh. 3, 39:18-40:4, 86:11-16).

C.    <u>Cassandra Williams revised and maintained appearance policies prohibiting dreadlocks on behalf of HEA applicable to DSI's employees.</u>

79.    Williams created HEA's (and her prior employers') appearance policies for security personnel in effect at HMMA, including the policy in effect during Plaintiff's assignment. (Williams Dep., Exh. 6, 39:17-22).

80.    In doing this, she relied on an HMMA policy in effect when she began working at Don Terry and Associates Security in 2004. (*Id*., 42:10-43:8).

81.    That 2004-and-before policy did not contain an explicit prohibition against dreadlocks, though Ms. Williams interpreted it as such. (*Id*., 43:13-44:10).

82.    No one from HMMA reviewed Ms. Williams' various edits to the Appearance Standards. (*Id*., 44:11-45:4, 147:11-148:7).

83.    No one ever told Ms. Williams that HMMA had an issue with Black people wearing dreadlocks. (*Id*., 147:2-6).

84.    The City of Montgomery (Ms. Williams' former employer) prohibited dreadlocks on its police force. (*Id*., 146:21-147:1).

85.    Dreadlocks had also been prohibited by the U.S. Army until January 2017, when the prohibition was lifted with respect to dreadlocks of uniform dimension, of no more than ½" in diameter, and presenting a neat appearance. https://www.army.mil/article/181080/turbans_beards_dreadlocks_now_permissible_for_some_s oldiers (accessed Oct. 6, 2022).

**IV.    HMMA maintained certain safety and property security rules and performance expectations that would have applied to Plaintiff's assignment at a very baseline level.**

A.    HMMA was not responsible for DSI's mail room worker control, supervision, training (other than safety training), or pay.

86.    Other than HMMA's safety training and safety handbook, all of Plaintiff's instruction for how to her job and orientation training were provided by DSI. (Pltf. Dep., Exh. 12, 135:2-20, and ¶¶49, 53, 58, 63 above).

87.    Plaintiff received a DSI employee handbook at her orientation. (*Id*., 135:18-20).

88.    HMMA doesn't investigate the actions of contractor's employees or specify disciplinary responses a contractor ought to impose; such employee management belongs to the employing contractor itself. (Burns Dec., Exh. 1, ¶11; Burns Dep., Exh. 2, 181:15-21, 182:1-22).

89.    HMMA did not set the wage rate for mail room workers who were DSI employees. HMMA's contract with HEA sets an hourly rate of pay from HMMA to HEA intended to include "all costs to Contractor for every aspect of the Services including without limitation, materials, labor, equipment, testing, clean-up…, insurance, fees, taxes, travel, transportation, and import fees or duties." (Burns Dec., Exh. 1, ¶12; Burns Dep., Exh. 2, exh. 2, section 3 and exh. B (HMMA0000016 and 39)).

90.    HMMA did not issue paychecks or provide any benefits (including but not limited to leave, vacation, insurances, worker's compensation) to mail room workers who were DSI employees. (Burns Dec., Exh. 1, ¶14; Pltf. Dep., Exh. 12, 21:24-22:7, 27:10-21, exh. 3).

91.    HMMA didn't pay taxes for DSI workers or receive tax benefits from their employment. (Burns Dec., Exh. 1, ¶15).

92.    HMMA has never maintained any type of employee file or employee report for Ms. Key. (Burns Dec., Exh. 1, ¶16).

93.     HMMA did not supervise, evaluate, or discipline DSI's employees. (Burns Dec., Exh. 1, ¶17).

94.     No HMMA manager provided ongoing hands-on instruction or day-to-day supervision to DSI employees. (Burns Dec., Exh. 1, ¶18).

95.     HMMA didn't impose any sort of non-compete on any DSI employees or try to restrict them from other jobs or opportunities. (Burns Dec., Exh. 1, ¶19).

96.     Plaintiff never received an employee handbook from HMMA. (Pltf. Dep., Exh. 12, 47:10-16, 58:16-18).

B.      <u>HMMA maintained certain security and other property-related policies for all contractors and their employees.</u>

97.     HMMA provides to all contractors and their employees a safety handbook. (Burns Dep., Exh. 2, 172:11-173:3).

98.     Plaintiff received a safety handbook from HMMA at a safety training session it conducted. (Pltf. Dep., Exh. 12, 29:20-25, 47:10-22).

C.      <u>The contract between HMMA and HEA established certain staffing and scheduling baselines, but these could be negotiated or modified by HEA.</u>

99.     HEA performed its work at HMMA under contracts or scope of service agreements. (Williams Dep., Exh. 6, 53:16-54:1, 54:20-55:7).

100.    In 2017, HEA was providing services to HMMA under the terms of a 2013 agreement. (Burns Dep., Exh. 2, 44:12-45:7, 46:6-11, 48:10-18).

101.    HEA agreed to follow HMMA's rules for business invitees pertaining to safety, security, identification, vehicles, and parking; and to comply with employment laws, including Title VII. (Burns Dep., Exh. 2, 86:12-90:19).

12

102.   HMMA, with HEA's input, established standards for projected manpower in its agreement with HEA. (Williams Dep., Exh. 6, 20:16-21; Burns Dep., Exh. 2, 107:19-113:16).

103.   HMMA establishes the shifts for security personnel. (Williams Dep., Exh. 6, 21:15-22:5; *but see* Burns Dep., Exh. 2, 116:2-16).

104.   HMMA established an initial schedule for mail room personnel (a single shift operation), but Ms. Williams changed it on her own and informed HMMA of the change. (Williams Dep., Exh. 6, 57:10-13, 63:13-64:9, 150:16-151:4).

105.   HMMA also provided basic directions on mail processing and delivery. (Williams Dep., Exh. 6, 57:10-15).

**V.   HMMA had no influence on Plaintiff's assignment or removal by DSI.**

106.   No HMMA employee ever objected to Plaintiff's appearance or hairstyle. (Burns Dep., Exh. 2, 247:1-6).

107.   HMMA does not know who decided to remove Plaintiff from its property, but HMMA was not involved in that decision whatsoever. (Burns Dep., Exh. 2, 245:4-18; Williams Dep., Exh. 6, 146:11-13).

108.   HMMA could not have directly requested DSI remove a DSI employee; it would have gone through Williams (HEA's manager) to do that. (Williams Dep., Exh. 6, 35:14-17).

109.   If HMMA needed additional tasks from mail room workers, it would not assign those directly, but would bring the request to HEA. (Burns Dep., Exh. 2, 285:5-21).

110.   In Plaintiff's opinion, the individuals responsible for discriminating against her were Ms. Robinson, Ms. Williams, and their employers. (Pltf. Dep., Exh. 12, 62:5-17).

111.   Plaintiff is not aware of anyone other than Ms. Robinson (DSI), Ms. Williams (HEA), Mr. Cureton (DSI), Ms. Howell (DSI), Mr. Chambliss (DSI), or Ms. Scavella (DSI's

Office Manager), being involved in the termination of her assignment. (Pltf. Dep., Exh. 12, 75:1-15, exh. 16).

112.     Plaintiff believed they may have been carrying out an HMMA hairstyle policy, but she has no basis to say that any such policy exists; she only saw an HEA policy and Dynamic's policy and she cannot dispute that HMMA's PPE matrix allowed dreadlocks. (Pltf. Dep., Exh. 12, 48:24-53:22, 57:1-3, 76:15-77:11, exhs. 8 and 9).

**VI.     Plaintiff did not timely file a Charge against HMMA with the EEOC.**

113.     Plaintiff completed an intake questionnaire at the EEOC on August 2, 2017, one day after her assignment ended. (Pltf. Dep., Exh. 12, exh. 13).

114.     In the Intake Questionnaire, she twice identified Ms. Williams as "Ms. Cassandra Williams, AMCO." (*Id.*).

115.     She indicated that Ms. Williams and Ms. Robinson and their employers were the only individuals responsible for the conduct she complained of. (*Id.*, 62:2-17).

116.     As a result of that intake process, Plaintiff signed a Charge against DSI only on August 3, 2017. (*Id.*, exh. 14).

117.     Plaintiff filed her Charge against HMMA in October 2018, over 14 months after DSI ended her assignment at HMMA. (*Id.*, 69:11-70:12, exh. 15).

118.     Plaintiff had not specifically asked the EEOC to initiate a charge against HMMA at that time; the investigator just told her there was an additional document she needed to sign. (Pltf. Dep., Exh. 12, 70:16-19, 184:11-25).

119.     Prior to that, HMMA had been unaware of Plaintiff's EEOC Charge against DSI. (Burns Dep., Exh. 2, 248:20-249:11).

14

**VII.    Miscellaneous**

120.    Plaintiff is not aware of any males or white people wearing dreadlocks at HMMA. (Pltf. Dep., Exh. 12, 270:21-271:3).

121.    Following Plaintiff's separation, Ms. Williams and DSI allowed the assignment of two other Black females with dreadlocked hairstyles to HMMA. (Williams Dep., Exh. 6, 46:17-51:15).

122.    Other than saying hello to the person who took her badge picture, Plaintiff never spoke to anyone other than Ms. Robinson, Ms. Howell, Mr. Chambliss, and Ms. Williams at the HMMA plant. (Pltf. Dep., Exh. 12, 39:18-40:4). Since Ms. Howell, Ms. Robinson, and Mr. Chambliss were employed by DSI and Ms. Williams was employed by HEA, this means that Plaintiff never even spoke to any HMMA employee, except the person who took her badge picture.

123.    Plaintiff couldn't even name anyone employed by HMMA. (Pltf. Dep., Exh. 12, 40:31-17).

124.    No documents support any relationship between Ms. Key and HMMA. (Exh. 14, Plaintiff's Second Supplemental Responses to HMMA's Requests for Production, #8).

<u>**ANALYSIS**</u>

**I.    In the absence of a genuine, evidence-based dispute of material fact, summary judgment should be granted.**

Under Fed. R. Civ. P. 56(a), a reviewing court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56). This responsibility includes identifying those portions of the record illustrating an absence of a genuine dispute of material fact, or, for a movant who does not bear the burden of production of evidence at trial, to show that the nonmovant "cannot produce admissible evidence to support" a requisite material fact. *Id.*; Fed. R. Civ. P. 56(c)(1)(B) and advisory committee notes thereto. A dispute of fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).

Once the movant has satisfied this burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must support its assertion as to the existence of a genuine dispute of material fact by citing to the record or showing that the materials cited do not actually establish the absence of a genuine dispute of fact or that there is no admissible evidence that supports the movant's key factual allegations. Fed. R. Civ. P. 56(c)(1)(A) & (B). All evidence should be viewed in the light most favorable to the nonmovant, with all inferences drawn in their favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *Anderson*, 477 U.S. at 255. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture

16

and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (internal quotation omitted); *see also Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

**II.     Following a period of written discovery and party and other depositions, there is no evidence to support a finding of a joint employment relationship[5] between Plaintiff and HMMA.**

HMMA previously moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiff's claims against it due to the lack of a plausible employment relationship between it and Plaintiff. (Docs. 11 and 30). Following Plaintiff's first amended complaint, the Court denied HMMA's second motion, finding that such decisions are generally determined at the summary judgment stage and that, at the pleading stage, "Plaintiff pleads enough facts—barely—to plausibly show that HMMA had enough control of her employment to support an employment relationship." (Doc. 39-1, pp. 18-19). Not only are Plaintiff's claims now subject to Fed. R. Civ. P. 56's burden of propounding admissible evidence, and not just allegations, to support her claims, but the completion of discovery has only eroded Plaintiff's joint employer theory, not strengthened it.

A.     Joint Employer Standard

To be considered a joint employer, an entity must exercise sufficient control over the terms and conditions of the plaintiff's employment. Courts examine "(1) how much control the alleged employer exerted on the employee, and (2) whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment." *Peppers v. Cobb County*, 835 F.3d 1289, 1297 (11th Cir. 2016) (citing *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995)). Factors that may be considered include: interrelations of operations;

---

[5] The Court has already found that Plaintiff had not pleaded that HMMA was an integrated employer with HEA. (Doc. 39-1, p. 17, n. 4).

centralized control of labor relations; common management; common ownership or financial control; the nature and degree of control over the worker and who exercises that control; the degree of supervision over the worker's work and who exercises that supervision; who exercises the power to determine the worker's pay rate or method of payment; who has the right to hire, fire, or modify the employment relationship; who prepares payroll and pays wages; who pays taxes; who provides employee benefits; who invests in the equipment and facilities the worker uses; who can profit or loss from the worker's work; the worker's permanence or exclusiveness; the degree of skill the job requires; who owns the property where the worker works; whether the alleged employer can assign the worker other work; who decides when or how long to work; whether the worker's work is integral to the alleged employer's core business; whether the contractor can hire or pay others to do the work; and whether the work to be performed by the contractor is part of its regular business. *Parker v. Esper*, 2020 U.S. Dist. LEXIS 139342, *12 (N.D. Fla.) (quoting *Scott v. Sarasota Doctors Hosp., Inc.*, 673 Fed. Appx. 878, 887 (11th Cir. 2017) (quoting 11th Cir. Pattern Jury Instr. 4.25 (2020))); *Williamson v. Adventist Health Systems/Sunbelt, Inc.*, 372 Fed. Appx. 936, 939 (11th Cir. 2010) (acknowledging both NLRB and economic realities test apply), *adopted at* 2020 U.S. Dist. LEXIS 138445 (N.D. Fla.), *aff'd at* 856 Fed. Appx. 807 (11th Cir. 2021); *see also Moise v. Miami-Dade Cty.*, 2018 U.S. Dist. LEXIS 143667, **30-31 (S.D. Fla.) (applying a hybrid economic realities test to Title VII claims); *Williams v. Hoover City Bd. of Educ.*, 2019 U.S. Dist. LEXIS 84076, *15 (N.D. Ala.) (citing *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1234 (11th Cir. 2004) (finding economic realities test was appropriate to apply to Title VII claims)). The joint employment inquiry

focuses on the employment decision at issue. *Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1242, 1244-45 (11th Cir. 1998).[6]

  B. <u>The vast majority of factors, and the most important factors, dictate a conclusion that HMMA wasn't Plaintiff's employer.</u>

   DSI and HMMA were not interrelated, did not have centralized labor relations, had no common management, and no common ownership or financial control. HMMA supervisors didn't provide day-to-day management of DSI staff (Burns Dec., Exh. 1, ¶¶17-18), and Plaintiff in fact attested that she never even met an HMMA employee other than the person who took her photograph for a badge. (Pltf. Dep., Exh. 12, 39:18-40:4). HMMA couldn't directly request Plaintiff or any DSI employee to perform their job differently or take on additional tasks; any such request had to be mediated at least through HEA and Ms. Williams. (Burns Dep., Exh. 2, 285:5-210). Plaintiff received a general orientation from DSI at its offices and received on-the-job training by Ms. Howell, a DSI employee, at HMMA's plant. (*See*, Facts, ¶¶¶¶49, 53, 58, 63). HMMA didn't determine her rate of pay. (Burns Dec., Exh. 1, ¶12; Burns Dep., Exh. 2, exh. 2, section 3 and exh. B (HMMA0000016 and 39)). HMMA didn't pay Plaintiff or any DSI employee, and it didn't provide Plaintiff or any DSI employee any benefits. (Burns Dec., Exh. 1, ¶14; Pltf. Dep., Exh. 12, 21:24-22:7, 27:10-21, exh. 3). It didn't pay taxes for DSI's employees or receive tax benefits from their employment. (Burns Dec., Exh. 1, ¶15) Because DSI controlled Plaintiff's rate of pay and benefits, it was in the best position to profit—or not—from providing

---

[6] In *Peppers*, *supra.*, the Eleventh Circuit held that in a joint employment inquiry, the focus should be on "which entity or entities controlled the fundamental and essential aspects of the employment relationship when taken as a whole." 835 F.3d at 1300. Where two panel decisions are in conflict, the earlier decision controls. *U.S. v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (*en banc*). So, we should indeed look to these factors with particular focus on Plaintiff's assignment. However, because it is undisputed that HMMA had no influence on Plaintiff's termination of assignment by DSI, we also analyze the record of HMMA's purported control over DSI employees assigned to its mail room generally. Whichever viewpoint is used, the outcome is the same: HMMA was not in an employment relationship with Plaintiff.

Plaintiff's labor to HEA, and then HEA had an opportunity for profit or loss based on its negotiations with DSI before billing HMMA. Also, that HEA had the ability to use a staffing agency, DSI, to fulfill its contractual obligation to HMMA also speaks to HMMA's lack of interest in controlling these workers. HMMA had no authority to select DSI's employees. (Burns Dec., Exh. 1, ¶17). Nor could it fire or discipline those employees. HMMA enjoyed no authority to evaluate DSI's employees. (*Id*.).  It didn't impose any sort of non-compete on any DSI employees or try to restrict them from other jobs or opportunities. (Burns Dec., Exh. 1, ¶19). And, DSI was a large company with many other placements that Plaintiff could have qualified for, over which HMMA had not even a scintilla of influence. Finally, in the mail room, Plaintiff was not directly engaged in the line work to build HMMA's primary product, automobiles.

Where a single entity provides all compensation and benefits of employment, and exclusively monitors, evaluates, and disciplines employee performance, then that weighs against finding that any other entity is also the worker's employer. *Parker*, 2020 U.S. Dist. LEXIS 139342 at \*\*17-18 (citing *In re Enterprise Rent-A-Car Wage & Hour Empl. Practices Litig.*, 683 F.3d 462, 471 (3rd Cir. 2012) and *Foy v. Pat Donalson Agency*, 946 F.Supp.2d 1250, 1267, 1268 (N.D. Ala. 2013)). This is especially true where the second entity has no authority to hire or fire the first entity's workers. *Id*. at \*18 (citing *Jerome v. Hertz Corp.*, 15 F.Supp.3d 1225, 1237 (M.D. Fla. 2014)); *see also Hall v. Arkema, Inc.*, 2020 U.S. Dist. LEXIS 241488, \*\*9-11 (S.D. Tex.). It is even more true when the second entity actually took no action with respect to the contested employment decision. *Llampallas*, 163 F.3d 1236, 1242, 1244-45.

C.     That HMMA initially scheduled mail room hours and manpower, provided the physical space and equipment for the work and the associated safety training to prevent injury in that space, and could indirectly request DSI workers perform additional duties does not dictate a different outcome.

In denying HMMA's motion to dismiss, the Court relied on the following factors in determining that Plaintiff had "barely" cleared Rule 12's lenient pleading standard: HMMA's ownership of the site, HMMA's provision of its safety manual, Ms. Williams' apparent use of HMMA's email system, a multiple-hearsay statement that unidentified Koreans wrote memos that they didn't like certain hairstyles, and the fact that HMMA's name was somewhere on Plaintiff's paycheck. (Doc. 39-1, pp. 19-20). These factors entitled Plaintiff to further discovery on the joint employment issue, but that discovery has turned up no meaningful support that an employment relationship existed between HMMA and Plaintiff. So, following discovery,[7] Plaintiff is left with HMMA's ownership of the physical plant and equipment, reasonable safety rules and orientation to that plant and equipment, initial projections for manpower and scheduling (though Ms. Williams changed these unilaterally without prior approval or pushback by HMMA), Ms. Williams' use of HMMA's email system, and DSI's unilateral decision to write "HMMA" as the customer ID on Plaintiff's paycheck. Presumably Plaintiff will also contend that HMMA could have theoretically requested the removal of a DSI employee, though there's no evidence that's ever actually occurred, and it is undisputed that such a request would have been mediated through HEA as well as DSI. Moreover, it's undisputed that no one from HMMA ever requested Plaintiff's particular removal. This simply isn't enough to establish that HMMA was the joint employer of Plaintiff specifically or DSI's mail room workers generally.

---

[7] The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999).

21

First, the customer's provision of a physical workspace is a constant in nearly all disputed joint-employment cases, and is thus a weak and non-determinative factor. *See Shaffer v. Wexford Health Sources, Inc.*, 2018 U.S. Dist. LEXIS 115983, *12 (W.D. Penn.) ("an entity's control over its own premises does not, by itself, translate into control over *the employees* that happen to work on the premises."). Issuing safety standards for visitors and contractors in the safe operation of that site is another weak factor. *Quintanilla v. A&R Demolition, Inc.*, 2005 U.S. Dist. LEXIS 34033, **26-27, 33-35 (S.D. Tex.) (general contractor's safety oversight of subcontractor did not create joint employment relationship); *Banks v. St. Francis Health Ctr., Inc.*, 2016 U.S. Dist. LEXIS 161229, **54 (D. Kan.) ("Supervision that is limited and focuses on workplace safety issues typically will not be considered the type of supervision indicating joint employers."); *E.E.O.C. v. Skanska USA Bldg., Inc.*, 2011 U.S. Dist. LEXIS 172222, *10 (W.D. Tenn.) (general contractor may implement policies to ensure the safety of a job site without becoming a joint employer); *Sims v. EQT Corp.*, 2014 U.S. Dist. LEXIS 122894, **13-14 (W.D. Penn.) (maintaining safety standards for job site didn't make property owner a joint employer). HMMA's potential authority to request that DSI employees perform additional duties is not the type of control to render it Plaintiff's employer. Similar exercises or reservations of such rights have not been found adequate to establish a joint employment relationship. *Parker*, 2020 U.S. Dist. LEXIS 139342, *17 (citing *Diaz v. U.S. Century Bank*, 2013 U.S. Dist. LEXIS 68399 (S.D. Fla.) ("infrequent assertions of minimal oversight do not constitute the requisite degree of supervision") (quoting *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1211 (11th Cir. 2003))). Nor could HMMA's theoretical ability to pressure HEA or DSI into discontinuing Plaintiff's assignment render it her employer. *Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1255 (11th Cir. 2004); *Gremillion v. Cox Communs. La.*, 2017 U.S. Dist. LEXIS 50941,

**15-16 (E.D. La.) (the customer's ability to deauthorize a contractor's employees from working on the customer's project was not tantamount to the authority to terminate, even where the contractor had no other customers in the state); *Parks v. Lyash*, 2022 U.S. Dist. LEXIS 165892, n. 3 (E.D. Tenn.). Ms. Williams' HMMA email address was a matter of convenience, and not an exercise of control. *See Layton v. PERCEPTA, LLC*, 2018 U.S. Dist. LEXIS 108268, **10-11 (M.D. Fla.) (finding use of Ford's domain name and logo on worker's email account, among other factors, wasn't adequate to render Ford the worker's joint employer at the motion to dismiss stage), *adopted and confirmed*, 2018 U.S. Dist. LEXIS 107126; *Roper v. Verizon Communs., Inc.*, 2020 U.S. Dist. LEXIS 227766, n. 18 ("'Courts have found that common marketing image, common branding, common email domain, and joint use of trademark logs, fail to render entities' joint employers 'if they maintain completely separate day-to-day activities.'") (quoting *Horowitz v. AT&T, Inc.*, 2018 U.S. Dist. LEXIS 69161, *40 (D.N.J.)). Finally, DSI could have written "Disney World" on Plaintiff's paychecks, and it wouldn't have changed the fact that DSI issued those paychecks, nor would it have made Disney World Plaintiff's employer. DSI's unilateral categorizations can't create a genuine issue of material fact as to what HMMA actually did, or didn't, do. *See Hall*, *supra.*, at **12-13 (where there was no evidence that alleged joint employer actually controlled pay or benefits, that undermined the contention that a joint employment relationship existed) (citing *Boutin v. Exxon Mobil Corp.*, 730 F.Supp.2d 660, 681 (S.D. Tex. 2010) (where alleged joint employer's supervisor reviewed and approved time sheets, this was not evidence of joint employment because direct employer actually kept records and maintained sole responsibility for paying the worker)); (*See also* Pltf. Dep., Exh. 12, 79:17-23) (Plaintiff doesn't know the significance of "HMMA" being listed as Customer ID on her DSI paycheck).

23

Further, as the Eleventh Circuit held in *Morrison*, that HMMA secured the provision of certain conditions (such as uniforms, or laborers to work a particular schedule) by contract with a service provider does <u>not</u> establish that the service provider's employees are the employees of HMMA. 383 F.3d 1253, 1256 ("Consequently, there is no evidence that [customer] had direct control over [plaintiff], rather than the indirect control over a service provider's employees that a customer may obtain by contracting with that service provider. Such indirect control does not amount to an employment relationship because the customer is in privity of contract with the service provider…and not the service provider's employees."). And, in this case, HMMA (the customer) had any alleged control further diluted by the additional arms-length contractual relationship between HEA and DSI, with whom HMMA had <u>no</u> contract or particular authority whatsoever.

**III.** **Not only is there no evidence that HMMA took any employment action with respect to Plaintiff, there is a consequential absence of evidence that HMMA was motivated by race in any respect.**

Because no HMMA employee played any role in Plaintiff's assignment by DSI to fulfill its contract with HEA to provide security and mailroom services at HMMA, it is difficult to envision how, exactly, Plaintiff even states a prima facie case. There's no evidence of any HMMA decision or request to remove Plaintiff, and therefore there's no HMMA decisionmaker who could harbor any animus against Plaintiff on any basis.

Since no HMMA employee made any particular decision or request with respect to Plaintiff, it seems her only conceivable route forward is to argue that HMMA (i) required the no-dreadlocks policy maintained by HEA and authored by Ms. Williams, and (ii) that HMMA intended this policy to be enforced on a discriminatory basis. There is no evidence that either proposition is true.

24

First, HMMA allows its employees to wear dreadlocks. It doesn't give its contractors instructions to allow or disallow dreadlocks, allowing them to set appropriate appearance standards. Ms. Williams unequivocally stated that she authored the Appearance Policy and has maintained it. HMMA hasn't reviewed or revised it. A ban against dreadlocks is legally appropriate as long as it's enforced fairly. *EEOC v. Catastrophe Mgmt.*, 852 F.3d 1018, 1029-30 (11th Cir. 2016), *reh'g en banc denied*, 876 F.3d 1273 (11th Cir. 2017).

To that end, no one has identified any instance of this policy being enforced in a discriminatory manner.[8] Two people, both Black females like Plaintiff, have been identified as being permitted by DSI to wear dreadlocks. That doesn't lend any support to Plaintiff's race discrimination claim at all. Thus, Plaintiff's race discrimination claims against HMMA must be dismissed.

## IV. Plaintiff has failed to establish that any employee of HMMA knew of her pregnancy or any protected activity on her part.

Plaintiff's retaliation claims should fail generally because there is no evidence that HMMA took or requested any adverse action against Plaintiff. Further, it is well established that a defendant's decisionmaker must have *actual knowledge* of protected conduct for a retaliation claim to stand. *Mohammed v. GHX Glob. Healthcare Exch. Inc.*, 2022 U.S. App. LEXIS 13847, **5-6 (11th Cir.). Plaintiff made no complaint to HMMA, and no HMMA employee was aware of Plaintiff's internal complaints to DSI or her questions to Ms. Williams about HEA's Appearance Policy at the time DSI discontinued her assignment. It would be absurd to allow Plaintiff's retaliation claim to proceed against an entity that didn't receive any complaint, know of any complaint, or take any action after a complaint.

---

[8] Again, the hearsay about "Koreans" and "little memos" has not been shown to be credible or admissible.

Similarly, a pregnancy claim cannot survive where a defendant is unaware of the pregnancy, and Plaintiff has identified no employee of HMMA whom she told or whom she contends is otherwise aware of her pregnancy. *Freeman v. Wal-Mart Stores East, L.P.*, 2009 U.S. Dist. LEXIS 150133, *9 (N.D. Ala.).

## V.  Additionally, Plaintiff did not exhaust her Title VII claims against HMMA.

On August 2, 2017, Plaintiff went to the EEOC. She completed an intake questionnaire, where she identified Ms. Robinson and "Ms. Cassandra Williams, AMCO," as responsible for all discriminatory events she experienced. (Pltf. Dep., Exh. 12, exh. 13 at Key00050). On August 3, 2017, Plaintiff signed a Charge, listing as the Respondent "Dynamic Security Incorporated." (*Id.*, exh. 14). There is a place for additional respondents to be added, but this is not filled out. The Charge states that Plaintiff was assigned to the "Hyundai Plant," but it does not identify any actions taken by HMMA other than providing safety training. (*Id.*). It names Ms. Robinson, Ms. Williams, Ms. Howell, Mr. Chambliss, Mr. Cureton, and Ms. Scavella, but not any HMMA employees.[9] (*Id.*). Plaintiff never filed a Charge against HEA. (*Id.*, 61:22-62:1). On October 16, 2018, Plaintiff signed a Charge against HMMA because her newly-assigned investigator, Alicia Martin-Schutz, told her there were documents she needed to sign. (*Id.*, 70:6-71:17, 184:11-18, exh. 15). Prior to this, HMMA had no knowledge of Plaintiff's Charge against DSI. (Burns Dep., Exh. 2, 248:20-249:11).

---

[9] The Charge didn't identify the employers of these individuals, though the intake questionnaire had done so. Importantly, at the time the DSI Charge was perfected and up through October 2018, fourteen months after DSI ended her assignment, there was no allegation of wrongdoing by any HMMA employee, no allegation that any HMMA policy was to blame in Plaintiff's assignment ending, and no allegation of joint employment between HMMA and DSI and/or HEA.

While courts are hesitant to penalize a plaintiff for the EEOC's alleged mis-handling[10] of a claim, when a party goes unnamed, a Court is to consider if the charge can be said to have encompassed the unnamed party and put it on notice by considering the following:

> (1) the similarity of interest between the named party and the unnamed party; (2) whether the plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties received adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity to participate in the reconciliation process; and (5) whether the unnamed party actually was prejudiced by its exclusion from the EEOC proceedings.

*Virgo v. Riviera Beach Assocs. Ltd.*, 30 F.3d 1350, 1358 (11th Cir. 1994).

Similarity of interest is determined by looking at commonality of ownership, operations, control or finances, and there is none between HMMA and DSI. *See Tuck v. Off Shore Inland Marine & Oilfield Co.*, 2013 U.S. Dist. LEXIS 1764, **7-8 (S.D. Ala.) (finding that even a contractual relationship on the same project—which was not present as between HMMA and DSI—was insufficient to establish similarity of interest). As to the second factor, it is obvious that Plaintiff, who had already attained a Master's Degree at this time, could easily identify HMMA, and notice its absence on the Charge she signed. As to the third factor, HMMA contends its notice was inadequate, as having occurred over a year after the events complained of. As to the fourth factor, HMMA concedes that after Ms. Martin-Schutz railroaded the late Charge and cause finding against it through its processes, it received the minimum conciliation maneuvering that *Mach Mining* requires of the EEOC. As to the fifth element, HMMA was prejudiced by the lost opportunity to timely investigate Plaintiff's claims.

---

[10] Though it's not at all clear that the initial investigator's decision not to name HMMA as a Respondent was an error.

Additionally, in the absence of evidence of an employment relationship between HMMA and Plaintiff, an adverse action taken by HMMA, or an effective administrative exhaustion of Plaintiff's claims against HMMA, Plaintiff's claims should be dismissed not only because her only timely Charge named only DSI as a Respondent, but also because she failed to timely contend to the EEOC that HMMA had done anything wrong. *See Cannon v. Canteen Servs. of N. Mich*, 657 Fed. Appx. 438, 441 (6th Cir. 2016) (hostile work environment claim was not exhausted against alleged joint employer where plaintiff hadn't alleged to the EEOC that that employer had caused a hostile environment).

## <u>CONCLUSION</u>

At the summary judgment stage, a party must have admissible evidence to support its claims. In this case, there is absolutely no evidence that HMMA had any control of the fundamental aspects of the employment relationship generally or the specific events giving rise to Plaintiff's claim. HMMA provided no compensation to Plaintiff, no benefits, and no job-specific training. It maintained no record of her as an employee. It didn't dictate, draft, or even review the appearance policy that resulted in Plaintiff's end of assignment. It didn't employ any of the decisionmakers in that separation of assignment. Rather than exercising control or supervision over Plaintiff, the simple truth is that HMMA didn't know when she was there and it didn't know when (or why) she was gone, until 14 months later when it received an untimely EEOC Charge. Accordingly, HMMA respectfully requests that it be dismissed from this action, with prejudice.

Respectfully Submitted,

s/ Whitney R. Brown
David J. Middlebrooks ASB- 8553-D58D
Whitney R. Brown ASB-4431-H71B

OF COUNSEL:
LEHR MIDDLEBROOKS VREELAND & THOMPSON, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002
Fax: (205) 326-3008
Email: dmiddlebrooks@lehrmiddlebrooks.com
        wbrown@lehrmiddlebrooks.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Heather Newsom Leonard, Esq.
Heather Leonard, P.C.
2105 Devereux Circle, Suite 1111
Birmingham, AL 35243

Leslie Palmer, Esq.
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233

Wesley C. Redmond, Esq.
Susan W. Bullock, Esq.
FordHarrison LLP
420 20th Street North, Suite 2560
Birmingham, AL 35203

T. Matthew Miller, Esq.
Cortlin Bond, Esq.
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203

Kurt S. Fischer, Esq.
U.S. Equal Employment Opportunity Commission
Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL  35205

s/ Whitney R. Brown
OF COUNSEL

746399.docx

29