IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-CV-767-ECM |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING, ALABAMA, LLC; HYUNDAI ENG AMERICA, INC.; and DYNAMIC SECURITY, INC. | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

# PLAINTIFF'S WITNESS LIST

**Exhibit A – Deposition of Dynamic Security's
30(b)(6) Deponent (Kristal Riddle)**

| Case | Key, Davita |
|---|---|
| Issue Code | Depo Designations |

| RIDDLE, KRISTAL 8/19/22 VOL 1 | | | |
|---|---|---|---|
| 1 | 009:17 - 009:19 | 009:17 | KRISTAL RIDDLE |
| | | 18 | being first duly sworn, was examined |
| | | 19 | and testified as follows: |
| 2 | 009:23 - 010:03 | 009:23 | Q.   All right, Ms. Riddle, we're going to |
| | | 010:01 | get started today.  If you could first just |
| | | 02 | please state your name for the record. |
| | | 03 | A.   My name is Kristal Riddle. |
| 3 | 010:07 - 010:09 | 010:07 | Q.   And who do you work for? |
| | | 08 | A.   I work for Dynamic Security |
| | | 09 | Incorporated. |
| 4 | 013:09 - 015:03 | 013:09 | Q.   Okay.  Can you tell me how large -- |
| | | 10 | how many employees does Dynamic Security have? |
| | | 11 | A.   Company wide, 1300 at this point. |
| | | 12 | Q.   Are those all in Alabama? |
| | | 13 | A.   No. |
| | | 14 | Q.   Okay.  Where does Dynamic Security |
| | | 15 | operate? |
| | | 16 | A.   We have operations in Illinois, |
| | | 17 | Tennessee, Georgia, Florida, Mississippi, North |
| | | 18 | Carolina.  I'm making sure I didn't leave |
| | | 19 | anyone out.  So Alabama, Florida, Georgia, |
| | | 20 | Mississippi, North Carolina, Illinois.  That -- |
| | | 21 | that covers our footprint. |
| | | 22 | Q.   Okay.  And what does Dynamic Security |
| | | 23 | do? |
| | | 014:01 | A.   Dynamic Security places security |
| | | 02 | officers on multiple types of facilities: |
| | | 03 | Manufacturing, retail, hospitals, gated |
| | | 04 | communities.  So any place that requires or |
| | | 05 | desires a human being to monitor the perimeters |
| | | 06 | or the safety or the incoming, outgoing |
| | | 07 | traffic. |
| | | 08 | Q.   Okay.  And are all the security |
| | | 09 | officers armed? |
| | | 10 | A.   No. |
| | | 11 | Q.   But some of them are? |

|   |   |   |   |
|---|---|---|---|
|   |   | 12 | A.   Some. |
|   |   | 13 | Q.   How do you determine who is armed and |
|   |   | 14 | who is not armed? |
|   |   | 15 | A.   It's based on the client's -- the |
|   |   | 16 | client's decision whether they want to go armed |
|   |   | 17 | or not. |
|   |   | 18 | Q.   How long have you worked for Dynamic |
|   |   | 19 | Security? |
|   |   | 20 | A.   I've worked for Dynamic Security |
|   |   | 21 | since 1995. |
|   |   | 22 | Q.   And what is your job title? |
|   |   | 23 | A.   My job title is chief legal officer. |
|   |   | 015:01 | Q.   How long have you been the chief |
|   |   | 02 | legal officer? |
|   |   | 03 | A.   Since 2010. |
| 5 | 015:07 - 017:08 | 015:07 | Q.   What was your position before chief |
|   |   | 08 | legal officer? |
|   |   | 09 | A.   Before chief legal officer, the |
|   |   | 10 | position was roughly the same, but the title |
|   |   | 11 | was legal affairs coordinator. |
|   |   | 12 | Q.   But the duties and responsibilities |
|   |   | 13 | were the same? |
|   |   | 14 | A.   That's correct. |
|   |   | 15 | Q.   And when -- what time period were you |
|   |   | 16 | the legal affairs coordinator? |
|   |   | 17 | A.   2000 -- 2001 to 2010. |
|   |   | 18 | Q.   Okay.  And before you were the legal |
|   |   | 19 | affairs coordinator, what was your position? |
|   |   | 20 | A.   I was -- I was our IT department. |
|   |   | 21 | Q.   Okay.  And was that from '95 until |
|   |   | 22 | you became legal affairs? |
|   |   | 23 | A.   Yes. |
|   |   | 016:01 | Q.   Okay.  And as the chief legal affairs |
|   |   | 02 | officer -- well, let me ask it this way.  Were |
|   |   | 03 | you the chief legal affairs officer in 2017? |
|   |   | 04 | A.   Yes. |
|   |   | 05 | Q.   Okay.  As the chief legal affairs |
|   |   | 06 | officer, what were your duties and |
|   |   | 07 | responsibilities? |
|   |   | 08 | A.   Duties and responsibilities involve |
|   |   | 09 | intercepting EEOC position statement requests, |
|   |   | 10 | investigating the situation, creating and |

| | | | |
|---|---|---|---|
| | | 11 | producing the position statement, and |
| | | 12 | coordinating attorney interactions in any |
| | | 13 | lawsuits that were filed against the company. |
| | | 14 | Q.    Okay.  Is there anything else that |
| | | 15 | you would do as your duties and |
| | | 16 | responsibilities outside of responding to |
| | | 17 | lawsuits and EEOC charges? |
| | | 18 | A.    I'm not sure.  Could you rephrase |
| | | 19 | that?  Restate that please. |
| | | 20 | Q.    Yeah.  So you identified EEOC charges |
| | | 21 | and lawsuits as part of your duties.  Would |
| | | 22 | those duties keep you occupied full time, or |
| | | 23 | were there other things that you would do as |
| | | 017:01 | the chief legal officer? |
| | | 02 | A.    I'm still involved in the IT |
| | | 03 | department. |
| | | 04 | Q.    Okay.  Were you involved at all in |
| | | 05 | conducting EEOC training? |
| | | 06 | A.    Yes. |
| | | 07 | Q.    Would that be for training new hires |
| | | 08 | or just upon receipt of complaints? |
| 6 | 017:18 - 018:17 | 017:18 | A.    My training involves upper management |
| | | 19 | and middle management specifically. |
| | | 20 | Q.    What type of training would you |
| | | 21 | provide to upper and middle management? |
| | | 22 | A.    Generalizations on EEOC.  I always |
| | | 23 | use a PowerPoint.  But it's basic overviews of |
| | | 018:01 | the EEOC, what is -- what is covered under |
| | | 02 | Title Seven, and the other laws that come into |
| | | 03 | play such as ADA, GINA -- the GINA Act.  And |
| | | 04 | then I also specifically train regarding |
| | | 05 | harassment and with a emphasis on sexual |
| | | 06 | harassment. |
| | | 07 | Q.    How often would you conduct this |
| | | 08 | training with upper and middle management? |
| | | 09 | A.    Annually. |
| | | 10 | Q.    Annually.  Was -- is this -- tell me |
| | | 11 | how the training takes place.  Like, is |
| | | 12 | everybody in a room together, do you go office |
| | | 13 | to office, how does that work? |
| | | 14 | A.    We have two meetings per year for |
| | | 15 | upper management and middle management and |

| | | | |
|---|---|---|---|
| | | 16 | includes branch management as well.  We gather |
| | | 17 | in one place, and I present at that time. |
| 7 | 018:22 - 020:13 | 018:22 | Q.    Okay.  When would that be? |
| | | 23 | A.    We have a meeting in June, and we |
| | | 019:01 | also have a meeting in December. |
| | | 02 | Q.    And do you do the EEOC-type training |
| | | 03 | at the June and December meetings? |
| | | 04 | A.    Typically this is done at the |
| | | 05 | December meeting. |
| | | 06 | Q.    Okay. |
| | | 07 | A.    But I am flexible and I have done it |
| | | 08 | in the June meetings and I have done it more |
| | | 09 | than once a year. |
| | | 10 | Q.    How do you handle if an upper or |
| | | 11 | middle manager is hired in between those time |
| | | 12 | periods?  How do they obtain the training? |
| | | 13 | A.    I'll send the EEOC PowerPoints so |
| | | 14 | that they can review those. |
| | | 15 | Q.    Okay.  So you -- you send those by |
| | | 16 | e-mail? |
| | | 17 | A.    Typically. |
| | | 18 | Q.    Do you offer to go over those with |
| | | 19 | them?  Do you send a questionnaire? |
| | | 20 | A.    I make it known that I am available |
| | | 21 | at any time to sit down and discuss the |
| | | 22 | presentation. |
| | | 23 | Q.    Do they have to acknowledge that |
| | | 020:01 | they've received it and reviewed it in any way? |
| | | 02 | A.    No. |
| | | 03 | Q.    Okay.  As the chief legal affairs |
| | | 04 | officer, who do you report to? |
| | | 05 | A.    I report to the executive |
| | | 06 | vice-president of Dynamic Security. |
| | | 07 | Q.    And who is that? |
| | | 08 | A.    The executive vice-president is named |
| | | 09 | Scott Riddle. |
| | | 10 | Q.    Can you spell the last name? |
| | | 11 | A.    R-I-D-D-L-E. |
| | | 12 | Q.    Any relation? |
| | | 13 | A.    My husband. |
| 8 | 021:02 - 021:17 | 021:02 | Q.    Who -- as the executive |
| | | 03 | vice-president, who does Scott report to? |

|   |   |   |   |
|---|---|---|---|
|   |   | 04 | A.   Scott reports to the president and |
|   |   | 05 | CEO of the company. |
|   |   | 06 | Q.   And who is that? |
|   |   | 07 | A.   That is John Riddle. |
|   |   | 08 | Q.   And what is your relation to John? |
|   |   | 09 | I'm just going to assume there is one. |
|   |   | 10 | A.   He is my father-in-law. |
|   |   | 11 | Q.   Okay.  And how long has he been the |
|   |   | 12 | president and CEO? |
|   |   | 13 | A.   Since the company was incorporated in |
|   |   | 14 | 1971. |
|   |   | 15 | Q.   Do you guys have any ownership |
|   |   | 16 | interest in the company? |
|   |   | 17 | A.   No. |
| 9 | 022:05 - 022:14 | 022:05 | Q.   Okay.  Is there anyone, what I'll |
|   |   | 06 | call linear to you, that also reports to Scott? |
|   |   | 07 | A.   The vice-president of operations. |
|   |   | 08 | Q.   And who is that? |
|   |   | 09 | A.   His name's Tracey Peoples. |
|   |   | 10 | Q.   Okay.  And how long has Tracey been |
|   |   | 11 | the vice-president of op's? |
|   |   | 12 | A.   Three -- four years now. |
|   |   | 13 | Q.   Was Tracey VP of op's in 2017? |
|   |   | 14 | A.   No. |
| 10 | 050:03 - 051:07 | 050:03 | Q.   Okay.  So in Exhibit 27, throughout |
|   |   | 04 | all of the handbook, do you see anything in |
|   |   | 05 | there -- can you identify for me if there is a |
|   |   | 06 | policy regarding pregnancy discrimination? |
|   |   | 07 | A.   There is not a policy discrimination |
|   |   | 08 | statement in the handbook. |
|   |   | 09 | Q.   Okay.  Does Dynamic Security have a |
|   |   | 10 | policy regarding pregnancy discrimination? |
|   |   | 11 | A.   We do. |
|   |   | 12 | Q.   Okay.  Where would that policy be? |
|   |   | 13 | A.   The policy is in our policy and |
|   |   | 14 | procedure manual. |
|   |   | 15 | Q.   And who would receive a copy of the |
|   |   | 16 | policy and procedure manual? |
|   |   | 17 | A.   The policy and procedural manual is |
|   |   | 18 | kept in the branch office in a three-ring |
|   |   | 19 | binder. |
|   |   | 20 | Q.   Is this policy and procedure manual |

|    |                   |        |                                                              |
|----|-------------------|--------|--------------------------------------------------------------|
|    |                   | 21     | something that is reviewed with all new hires?               |
|    |                   | 22     | A.    No.                                                    |
|    |                   | 23     | Q.    Okay.  How would an employee know                      |
|    |                   | 051:01 | about the policy and procedure manual?                       |
|    |                   | 02     | A.    During training, the policy and                        |
|    |                   | 03     | procedure manual is referenced, and the person               |
|    |                   | 04     | who's going through the training is given the                |
|    |                   | 05     | opportunity to look through and see if they                  |
|    |                   | 06     | have anything that makes them ask -- want to                 |
|    |                   | 07     | ask a question.                                              |
| 11 | 051:13 - 052:01   | 051:13 | Q.    With regard to retaliation in                          |
|    |                   | 14     | Exhibit 27, is there a policy or procedure that              |
|    |                   | 15     | references retaliation?                                      |
|    |                   | 16     | A.    There is not a reference to                            |
|    |                   | 17     | retaliation in this particular handbook.                     |
|    |                   | 18     | Q.    Okay.  But does Dynamic Security have                  |
|    |                   | 19     | a policy and procedure with regard to                        |
|    |                   | 20     | retaliation?                                                 |
|    |                   | 21     | A.    Yes.                                                   |
|    |                   | 22     | Q.    And would that also be in the policy                   |
|    |                   | 23     | and procedure manual?                                        |
|    |                   | 052:01 | A.    Yes.                                                   |
| 12 | 052:11 - 053:14   | 052:11 | Q.    I'm going to show you Exhibit 52.                      |
|    |                   | 12     | And we're not going to go into this right now                |
|    |                   | 13     | but I just want to identify.  If you'll flip                 |
|    |                   | 14     | through that and tell me, are the documents                  |
|    |                   | 15     | contained in Exhibit 52 documents that would                 |
|    |                   | 16     | have come from the policy and procedure manual?              |
|    |                   | 17     | A.    These are policies that would have                     |
|    |                   | 18     | come from the Dynamic Security policy and                    |
|    |                   | 19     | procedures manual.                                           |
|    |                   | 20     | Q.    Other than the policies listed in                      |
|    |                   | 21     | Exhibit 52, are there additional policies and                |
|    |                   | 22     | procedures related -- for Dynamic Security                   |
|    |                   | 23     | related to harassment, EEO policies,                         |
|    |                   | 053:01 | retaliation, or pregnancy?                                   |
|    |                   | 02     | A.    I'm not sure what you're asking.                       |
|    |                   | 03     | Q.    So Exhibit 52 contains, I think, four                  |
|    |                   | 04     | separate headings within the document.  Other                |
|    |                   | 05     | than those four policies, does Dynamic Security              |
|    |                   | 06     | have other policies and procedures that would                |
|    |                   | 07     | apply to harassment, retaliation, pregnancy, or              |

| | | | |
|---|---|---|---|
| | | 08 | other EEOC-type issues, discrimination? |
| | | 09 | A.    No.  These are our core policies |
| | | 10 | regarding issue. |
| | | 11 | Q.    You said these are the core policies. |
| | | 12 | I just want to be clear, are these the only |
| | | 13 | policies? |
| | | 14 | A.    They are the only policies. |
| 13 | 053:20 - 053:23 | 053:20 | Okay.  Can you tell me, Mrs. Riddle |
| | | 21 | -- can you tell me what do you understand to be |
| | | 22 | discrimination?  What type of conduct would you |
| | | 23 | define as discrimination? |
| 14 | 054:05 - 054:10 | 054:05 | A.    Discrimination, in my opinion, is |
| | | 06 | when someone takes an action against another |
| | | 07 | person which is based on a characteristic that |
| | | 08 | the individual doesn't necessarily have -- have |
| | | 09 | control over and treating an individual |
| | | 10 | differently because of that situation. |
| 15 | 055:18 - 056:01 | 055:18 | Q.    Mrs. Riddle, let me rephrase.  As the |
| | | 19 | chief legal officer, is it your job to deal |
| | | 20 | with complaints related to discrimination? |
| | | 21 | A.    It is. |
| | | 22 | Q.    And in dealing with those complaints, |
| | | 23 | how would you, as the chief legal officer, |
| | | 056:01 | determine whether discrimination had occurred? |
| 16 | 056:03 - 057:21 | 056:03 | A.    I rely on the reports that I'm |
| | | 04 | provided.  I rely upon the -- the statements |
| | | 05 | that I'm given from the person who's making the |
| | | 06 | complaint.  I rely on the reports from |
| | | 07 | investigation that occurred on the ground by |
| | | 08 | our local branch management.  I rely on witness |
| | | 09 | statements if there are any.  I take -- that's |
| | | 10 | what I take into account. |
| | | 11 | Q.    And in relying on those reports and |
| | | 12 | witness statements, do you also look at other |
| | | 13 | documents or e-mails or communications as they |
| | | 14 | may relate to the events in question? |
| | | 15 | A.    If they're relevant. |
| | | 16 | Q.    And with regard to -- what did I ask, |
| | | 17 | discrimination -- with regard to retaliation as |
| | | 18 | the chief legal affairs -- no chief legal |
| | | 19 | officer, how would you make a determination as |
| | | 20 | to whether someone's complaint constituted |

| | | | |
|---|---|---|---|
| | | 21 | retaliation? |
| | | 22 | A.   In much the same manner. |
| | | 23 | Q.   And with respect to Ms. Key in 2017, |
| | | 057:01 | has Dynamic Security evaluated whether |
| | | 02 | Ms. Key's complaint constituted discrimination |
| | | 03 | or retaliation? |
| | | 04 | A.   Yes. |
| | | 05 | Q.   Okay.  And who made that evaluation? |
| | | 06 | A.   I did. |
| | | 07 | Q.   Okay.  And what was determined in |
| | | 08 | that evaluation? |
| | | 09 | A.   The determination in that evaluation |
| | | 10 | was that I did not believe that retaliation had |
| | | 11 | occurred.  I did not believe discrimination had |
| | | 12 | occurred.  It seemed obvious that the problem |
| | | 13 | was that she was not following the instructions |
| | | 14 | of Cassandra Williams regarding her hairstyle. |
| | | 15 | Q.   What documents did you review in |
| | | 16 | making that determination with regard to |
| | | 17 | Ms. Key? |
| | | 18 | A.   I reviewed the e-mail that was sent |
| | | 19 | to Ray Cureton by Cassandra.  I also relied on |
| | | 20 | the statement by Latunya Howell and the |
| | | 21 | statement from Gloria Robinson. |
| 17 | 058:18 - 059:05 | 058:18 | Q.   When did you make this determination |
| | | 19 | with regard to Ms. Key's complaint? |
| | | 20 | A.   I made the determination during the |
| | | 21 | time that I was working on the position |
| | | 22 | statement for EEOC. |
| | | 23 | Q.   When was that, do you remember? |
| | | 059:01 | A.   I received the statement -- I |
| | | 02 | received the request for position statement on |
| | | 03 | August 11th -- 11th or 12th, 2017, and spent |
| | | 04 | 30 days reviewing the documentations and going |
| | | 05 | back through them. |
| 18 | 060:04 - 060:09 | 060:04 | Q.   Okay.  And so during that time |
| | | 05 | period -- so we're talking, I think, |
| | | 06 | August 1st, 2017, around there -- did you |
| | | 07 | consider Cassandra Williams as an employee for |
| | | 08 | HMMA? |
| | | 09 | A.   Yes. |
| 19 | 062:16 - 063:18 | 062:16 | Q.   Okay.  And do you recall that one of |

| | | | |
|---|---|---|---|
| | | 17 | the allegations that Ms. Key made was that she |
| | | 18 | had been terminated by Dynamic Security? |
| | | 19 | A.    I do recall that, yes. |
| | | 20 | Q.    And that would have been after her |
| | | 21 | removal from Hyundai; correct? |
| | | 22 | A.    She would have stated that she was |
| | | 23 | dismissed after she was removed from Hyundai. |
| | | 063:01 | Q.    Okay.  Did you make any determination |
| | | 02 | with regard to whether her removal from Dynamic |
| | | 03 | Security constituted discrimination or |
| | | 04 | retaliation? |
| | | 05 | A.    My determination was that it did not |
| | | 06 | because we were perfectly willing to continuing |
| | | 07 | employing her.  She was offered other positions |
| | | 08 | at other clients, and she declined them. |
| | | 09 | Q.    Okay.  What -- when did you make that |
| | | 10 | determination? |
| | | 11 | A.    During the same time period. |
| | | 12 | Q.    And what other positions had she been |
| | | 13 | offered? |
| | | 14 | A.    I am aware that she had been offered |
| | | 15 | a position at Koch Foods, and I am aware that |
| | | 16 | she was offered a position at Mobis. |
| | | 17 | Q.    And that was two positions? |
| | | 18 | A.    Correct.  Two separate choices. |
| 20 | 064:02 - 064:09 | 064:02 | in -- over what period of time was Ms. Key |
| | | 03 | offered these two positions? |
| | | 04 | A.    My understanding is that Ms. Key was |
| | | 05 | offered the two positions almost immediately |
| | | 06 | after the situation at HMMA. |
| | | 07 | Q.    And was she offered anymore positions |
| | | 08 | after that? |
| | | 09 | A.    Not that I am aware of. |
| 21 | 066:08 - 066:18 | 066:08 | Q.    Can you tell me what knowledge you |
| | | 09 | have about the circumstances of Ms. Key's |
| | | 10 | hiring by Dynamic Security? |
| | | 11 | A.    My knowledge of the hiring of |
| | | 12 | Ms. Keys by Dynamic Security is that she |
| | | 13 | responded to an Indeed ad.  Which through the |
| | | 14 | information there, she contacted Gloria |
| | | 15 | Robinson and arranged an interview. |
| | | 16 | Q.    And what was the substance of the ad |

| | | | |
|---|---|---|---|
| | | 17 | that she responded to? |
| | | 18 | A.   I don't know. |
| 22 | 067:10 - 067:13 | 067:10 | Q.   You said she responded to an Indeed |
| | | 11 | ad.  Who would she have been responding to? |
| | | 12 | A.   I believe she responded directly to |
| | | 13 | Gloria Robinson. |
| 23 | 071:16 - 072:19 | 071:16 | Q.   So we were discussing how Davita Key |
| | | 17 | came to work at Dynamic Security.  How was |
| | | 18 | she -- once she was hired, how was she assigned |
| | | 19 | to Hyundai? |
| | | 20 | A.   That was really -- that was what they |
| | | 21 | were hiring for.  They had the -- they had |
| | | 22 | openings at Hyundai, and so that would have |
| | | 23 | been what came up first for her assignment. |
| | | 072:01 | Q.   And did you say earlier that Gloria |
| | | 02 | Robinson would have been involved in her |
| | | 03 | hiring? |
| | | 04 | A.   Yes. |
| | | 05 | Q.   Okay.  How would Gloria have been |
| | | 06 | involved in her hiring? |
| | | 07 | A.   Gloria would do the initial |
| | | 08 | interview. |
| | | 09 | Q.   And once that initial interview was |
| | | 10 | complete, how would she be hired from that |
| | | 11 | point? |
| | | 12 | A.   Once the initial interview was |
| | | 13 | complete, she would have been instructed to go |
| | | 14 | to the local Montgomery office, present to Ray |
| | | 15 | Cureton, and at that point, the paperwork would |
| | | 16 | begin. |
| | | 17 | Q.   Okay.  Do you have any knowledge of |
| | | 18 | whether Cassandra Adams -- Cassandra Williams |
| | | 19 | was involved in her initial interview? |
| 24 | 072:22 - 072:23 | 072:22 | THE WITNESS:  That's kind of |
| | | 23 | complicated. |
| 25 | 073:05 - 073:22 | 073:05 | A.   I don't know that she was -- I do not |
| | | 06 | know if Cassandra was present for the initial |
| | | 07 | interview that was conducted between Keys and |
| | | 08 | Robinson.  But Ms. Williams would have the -- |
| | | 09 | Ms. Williams would meet with the employees that |
| | | 10 | were being interviewed and considered to be |
| | | 11 | placed at the Hyundai facility. |

| | | | |
|---|---|---|---|
| | | 12 | Q.   Okay.  When would she meet with those |
| | | 13 | employees? |
| | | 14 | A.   At the time that it was convenient. |
| | | 15 | I don't know -- I don't know that there was a |
| | | 16 | set schedule for that. |
| | | 17 | Q.   Would that have been before she was |
| | | 18 | offered -- before Davita Key was offered the |
| | | 19 | job? |
| | | 20 | A.   I don't know. |
| | | 21 | Q.   How do you know that Cassandra |
| | | 22 | Williams would meet with the employees? |
| 26 | 074:01 - 075:05 | 074:01 | A.   It was standard. |
| | | 02 | Q.   What would be the purpose of that |
| | | 03 | meeting? |
| | | 04 | A.   I don't know. |
| | | 05 | Q.   Is that something that the client |
| | | 06 | requested? |
| | | 07 | A.   I believe that is the case. |
| | | 08 | Q.   And we keep saying the client because |
| | | 09 | that's Dynamic's phrase for all their clients; |
| | | 10 | right?  When we're talking about Hyundai, who's |
| | | 11 | the client? |
| | | 12 | A.   The client is Hyundai.  The client is |
| | | 13 | MMA.  Technically we should refer to |
| | | 14 | Ms. Williams as the client contact. |
| | | 15 | Q.   Okay.  So you said MMA, did you mean |
| | | 16 | HMMA? |
| | | 17 | A.   Yes. |
| | | 18 | Q.   Okay.  And Ms. Williams would be the |
| | | 19 | client contact? |
| | | 20 | A.   Correct. |
| | | 21 | Q.   How do you determine who the client |
| | | 22 | contact is? |
| | | 23 | A.   The client assigns -- assigns that |
| | | 075:01 | position. |
| | | 02 | Q.   Is there any documentation that would |
| | | 03 | show HMMA as a client or Ms. Williams as a |
| | | 04 | client contact? |
| | | 05 | A.   No, not to my knowledge. |
| 27 | 089:15 - 089:19 | 089:15 | Q.   Are you aware of whether Dynamic |
| | | 16 | Security disciplined Ms. Key for anything while |
| | | 17 | she was with Dynamic Security? |

| | | | |
|---|---|---|---|
| | | 18 | A.    Dynamic did not discipline Ms. Key |
| | | 19 | for anything while she was with Dynamic. |
| 28 | 094:14 - 094:15 | 094:14 | **Can you tell me what happened with** |
| | | 15 | **Davita Key's assignment at Hyundai?** |
| 29 | 094:17 - 095:22 | 094:17 | A.    My understanding is that, during the |
| | | 18 | interview process when Davita met with |
| | | 19 | Ms. Williams, she was told that her hairstyle |
| | | 20 | was not permitted by the rules and by the |
| | | 21 | policies of HMMA and that she would have to |
| | | 22 | have something done with it because she could |
| | | 23 | not wear dreadlocks on the facility property. |
| | | 095:01 | There was a discussion about what she |
| | | 02 | could do, how this could be taken care of. |
| | | 03 | There was -- to my understanding, there was a |
| | | 04 | discussion, there was a picture that was looked |
| | | 05 | at, and when Ms. Key came to work at the |
| | | 06 | facility on July 31st, she had not had her hair |
| | | 07 | redone as she had been directed to by |
| | | 08 | Ms. Williams.  She was released from the day |
| | | 09 | early and told to do something about the hair |
| | | 10 | because she couldn't be on the facility with |
| | | 11 | her hair in dreadlocks. |
| | | 12 | She returned on August 1st wearing a |
| | | 13 | hat, and I don't really know beyond that other |
| | | 14 | than what's been in the reports.  To our |
| | | 15 | knowledge, there was a confrontation about the |
| | | 16 | hat, about the hair.  She was once again told |
| | | 17 | she had to remove the dreadlocks or she had to |
| | | 18 | find an alternate hairstyle, and she stated |
| | | 19 | that she wanted to file a complaint.  And she |
| | | 20 | was directed to go to the Montgomery office to |
| | | 21 | file a complaint with -- and present it to Ray |
| | | 22 | Cureton. |
| 30 | 096:08 - 096:09 | 096:08 | Q.    **I'm going to show you Plaintiff's** |
| | | 09 | **Exhibit Number 29.** |
| 31 | 096:13 - 096:19 | 096:13 | Q.    **Have you seen that document before?** |
| | | 14 | A.    I have seen this document before. |
| | | 15 | Q.    **Okay.  What is that?** |
| | | 16 | A.    This is the handwritten complaint by |
| | | 17 | Davita Key that was presented in the office -- |
| | | 18 | Dynamic Security office in Montgomery on |

| | | | |
|---|---|---|---|
| | | 19 | August 1st, 2017. |
| 32 | 097:02 - 097:04 | 097:02 | Q.   Who at Dynamic Security knew that |
| | | 03 | Ms. Key filed this complaint on August 1st, |
| | | 04 | 2017? |
| 33 | 097:07 - 099:01 | 097:07 | A.   Ray Cureton was aware that she filed |
| | | 08 | the complaint.  Nicole Scavella was in the |
| | | 09 | office at the time and would have been aware. |
| | | 10 | And then Sherry Spiers was briefed by Ray |
| | | 11 | Cureton regarding the making of the complaint. |
| | | 12 | Q.   Okay.  At what point did you become |
| | | 13 | -- let me ask -- did you become aware of the |
| | | 14 | complaint? |
| | | 15 | A.   I became aware of the complaint with |
| | | 16 | the receipt of EEOC Form 5 on August 11th. |
| | | 17 | Q.   What is Dynamic Security's policy |
| | | 18 | with regard to receiving and reporting |
| | | 19 | complaints of discrimination? |
| | | 20 | A.   That once a report of discrimination |
| | | 21 | is received, it must be pushed up the chain. |
| | | 22 | If it's not made to the local manager, it must |
| | | 23 | be brought to the local manager.  The local |
| | | 098:01 | manager then briefs Sherry and receives |
| | | 02 | instructions on investigations and methods of |
| | | 03 | procedure after that. |
| | | 04 | Q.   Okay.  And I think you identified her |
| | | 05 | position earlier, but what is Sherry Spiers |
| | | 06 | position? |
| | | 07 | A.   Human resources coordinator. |
| | | 08 | Q.   At what point would human resources |
| | | 09 | let you, as the chief legal officer, know that |
| | | 10 | they had received a complaint of |
| | | 11 | discrimination? |
| | | 12 | A.   Typically at the end -- at the end of |
| | | 13 | any investigation period. |
| | | 14 | Q.   So is it the duty of human resources |
| | | 15 | to investigate the complaint? |
| | | 16 | A.   Human resources oversees the |
| | | 17 | investigation.  It is the duty of the |
| | | 18 | individuals who are local to the incident to |
| | | 19 | perform investigations, conduct interviews, and |
| | | 20 | report this material to human resources. |
| | | 21 | Q.   Okay.  And what investigation was |

| | | | |
|---|---|---|---|
| | | 22 | completed with regard to Ms. Key's complaint in |
| | | 23 | Exhibit 29? |
| | | 099:01 | A.    I don't know. |
| 34 | 099:13 - 100:03 | 099:13 | Q.    Okay.  So the investigation would be |
| | | 14 | completed at the branch; is that correct? |
| | | 15 | A.    Correct. |
| | | 16 | Q.    Okay.  And then they would report |
| | | 17 | their findings to human resources? |
| | | 18 | A.    Correct. |
| | | 19 | Q.    Okay.  And then once human resources |
| | | 20 | received those findings, is that when they |
| | | 21 | would provide them to you and the legal? |
| | | 22 | A.    Yes. |
| | | 23 | Q.    Who would make the decisions as to |
| | | 100:01 | whether or not a complaint was validated -- a |
| | | 02 | valid complaint? |
| | | 03 | A.    It would typically fall on me. |
| 35 | 110:07 - 110:13 | 110:07 | Q.    Does Dynamic Security review with |
| | | 08 | their employees how to make reports of |
| | | 09 | incidents? |
| | | 10 | A.    Yes.  It's part of the training. |
| | | 11 | Q.    And are they instructed to make |
| | | 12 | accurate reports? |
| | | 13 | A.    Yes. |
| 36 | 115:14 - 116:03 | 115:14 | Q.    All right.  If you'll flip for me to |
| | | 15 | page 76.  We have here Sherry specifically |
| | | 16 | referencing to Gloria that an employee does not |
| | | 17 | have to disclose a medical condition. |
| | | 18 | What type of training would Gloria |
| | | 19 | have received related to the disclosure of |
| | | 20 | medical conditions? |
| | | 21 | A.    I'm not certain. |
| | | 22 | Q.    Would that be -- that type of |
| | | 23 | information be covered in the training that you |
| | | 116:01 | prepare as the chief legal officer? |
| | | 02 | A.    It is covered in what I train on in |
| | | 03 | my presentations. |
| 37 | 117:01 - 117:10 | 117:01 | Q.    Aside from the e-mail that was in |
| | | 02 | Exhibit 38 telling Ms. Robinson that she -- |
| | | 03 | that Dynamic Security could not ask about |
| | | 04 | medical conditions, would Ms. Robinson after |
| | | 05 | that point have been given any refresher |

|    |                 |        |                                                      |
|----|-----------------|--------|------------------------------------------------------|
|    |                 | 06     | training or additional training about how to         |
|    |                 | 07     | handle medical conditions?                           |
|    |                 | 08     | A.   That would have been my                         |
|    |                 | 09     | recommendation.  I do not know if that was --        |
|    |                 | 10     | if that was the case then.                           |
| 38 | 119:23 - 120:01 | 119:23 | Q.   Okay.  Let me show you what's been              |
|    |                 | 120:01 | marked as Exhibit 11.                                |
| 39 | 120:05 - 120:13 | 120:05 | Q.   If you'll look over that document,              |
|    |                 | 06     | and tell me if that is in fact your position         |
|    |                 | 07     | statement.                                           |
|    |                 | 08     | A.   This is the position statement I                |
|    |                 | 09     | admitted to EEOC.                                    |
|    |                 | 10     | Q.   Okay.  And just for clarity, that's             |
|    |                 | 11     | your signature on the last page which is             |
|    |                 | 12     | HEA056?                                              |
|    |                 | 13     | A.   That is my signature.                           |
| 40 | 121:01 - 121:08 | 121:01 | Q.   In this position statement, you                 |
|    |                 | 02     | identified the grooming standard as coming from      |
|    |                 | 03     | HMMA; do you recall that?                            |
|    |                 | 04     | A.   I do recall that.                               |
|    |                 | 05     | Q.   Okay.  What grooming standard are you           |
|    |                 | 06     | referring to?                                        |
|    |                 | 07     | A.   I am referring to the policy that we            |
|    |                 | 08     | were provided in e-mail.                             |
| 41 | 121:21 - 122:02 | 121:21 | Q.   And I know we've talked a little bit            |
|    |                 | 22     | about it already.  Other than what you've            |
|    |                 | 23     | already told me, did you do anything else to         |
|    |                 | 122:01 | investigate or respond to this EEOC charge?          |
|    |                 | 02     | A.   No.                                             |
| 42 | 127:10 - 127:15 | 127:10 | Q.   In your capacity as the individual              |
|    |                 | 11     | who determines whether Dynamic Security has          |
|    |                 | 12     | retaliated against an individual in your             |
|    |                 | 13     | investigations, is it your understanding that       |
|    |                 | 14     | not placing her because she made a complaint         |
|    |                 | 15     | would be retaliation?                                |
| 43 | 127:17 - 127:17 | 127:17 | A.   That would be retaliation.                      |
| 44 | 139:03 - 139:13 | 139:03 | Q.   What do you understand in your                  |
|    |                 | 04     | capacity for Dynamic Security to be the              |
|    |                 | 05     | relationship between Dynamic Security and HEA        |
|    |                 | 06     | or Hyundai Engineering?                              |
|    |                 | 07     | A.   I don't know.                                   |

| | | | |
|---|---|---|---|
| | | 08 | Q. What about the relationship between |
| | | 09 | Dynamic Security and HMMA? |
| | | 10 | A. The relationship between Dynamic |
| | | 11 | Security and HMMA is to provide security guard |
| | | 12 | services and other services as required by the |
| | | 13 | client. |
| 45 | 141:03 - 141:05 | 141:03 | Who would set the hours that |
| | | 04 | individuals, assigned to Hyundai from Dynamic |
| | | 05 | Security, would work? |
| 46 | 141:07 - 141:08 | 141:07 | A. HMMA or the client establishes the |
| | | 08 | preferred shifts for their facility. |
| 47 | 160:08 - 162:03 | 160:08 | Q. Exhibit 57 is some documents from |
| | | 09 | Gloria Robinson's personnel file. |
| | | 10 | Are you aware -- well, first, if |
| | | 11 | you'll look for me on the first page which is |
| | | 12 | Bates labeled 420. Do you agree that it shows |
| | | 13 | that she resigned? |
| | | 14 | A. I agree. |
| | | 15 | Q. Okay. And are you aware of why she |
| | | 16 | resigned? |
| | | 17 | A. No. |
| | | 18 | Q. And if you'll flip over to page |
| | | 19 | 428 -- Bates labeled 428. This appears to be |
| | | 20 | Ms. Robinson's resume. Would this have been |
| | | 21 | maintained as part of her personnel file? |
| | | 22 | A. No, it wouldn't have. We have many |
| | | 23 | people who provide resumes when they're first |
| | | 161:01 | hired. |
| | | 02 | Q. If it's included in this production |
| | | 03 | from Dynamic Security, is that -- would you |
| | | 04 | agree that this particular document was |
| | | 05 | maintained in her personnel file? |
| | | 06 | A. It's indicative that it was in her |
| | | 07 | personnel file. |
| | | 08 | Q. Okay. And reviewing her experience |
| | | 09 | here, 2015 to present -- which obviously we |
| | | 10 | don't know what that present day is. But 2015 |
| | | 11 | to present indicates, Hyundai Motors slash |
| | | 12 | Dynamic Security Services, Shift Commander; do |
| | | 13 | you see that? |
| | | 14 | A. I see. |
| | | 15 | Q. Okay. And then prior to that, 2013 |

| | | | |
|---|---|---|---|
| | | 16 | to '15, Hyundai Motors slash Allied Barton; do |
| | | 17 | you see that? |
| | | 18 | A.    I see that. |
| | | 19 | Q.    And then underneath that, Hyundai |
| | | 20 | Motors, American Citadel Guard; is that |
| | | 21 | correct? |
| | | 22 | A.    Yes, it reads American Citadel Guard. |
| | | 23 | Q.    Okay.  And it looks like we're |
| | | 162:01 | ranging in a time period here from 2008 to |
| | | 02 | sometime after 2015, would you agree? |
| | | 03 | A.    I agree. |
| 48 | 171:05 - 171:20 | 171:05 | Q.    What evidence do you have that |
| | | 06 | Ms. Key did not file her lawsuit within 90 days |
| | | 07 | of receiving the right to sue? |
| | | 08 | A.    That the EEOC mailed the -- mailed |
| | | 09 | the response on March 1st, roughly.  It's dated |
| | | 10 | 28th, 1st.  And the lawsuit was not filed until |
| | | 11 | October of 2019. |
| | | 12 | Q.    What evidence do you have that the |
| | | 13 | EEOC mailed the notice to Ms. Key? |
| | | 14 | A.    I have -- I would have no knowledge |
| | | 15 | that they did. |
| | | 16 | Q.    Ms. Key says that she did not receive |
| | | 17 | a copy of the right to sue until it was filed |
| | | 18 | in this lawsuit.  Do you have any evidence to |
| | | 19 | dispute that? |
| | | 20 | A.    No. |
| 49 | 173:01 - 173:02 | 173:01 | Q.    Okay.  How many EEOC complaints does |
| | | 02 | Dynamic Security receive? |
| 50 | 173:04 - 173:18 | 173:04 | Q.    Like for a large portion of your job |
| | | 05 | to be responding to the EEOC, does Dynamic |
| | | 06 | Security receive a lot of EEOC charges? |
| | | 07 | A.    I'm not really sure what a large |
| | | 08 | number are.  It's cyclical.  There are times |
| | | 09 | when we will receive two charges within two |
| | | 10 | weeks of each other.  There are times when I've |
| | | 11 | gone five or six months without having |
| | | 12 | something.  I just -- I really don't know how |
| | | 13 | to calculate that. |
| | | 14 | Q.    Could you give me an average, like |
| | | 15 | over a year? |
| | | 16 | A.    I think it would be fair to say that |

| | | | |
|---|---|---|---|
| | | 17 | we probably get an average of eight -- eight to |
| | | 18 | ten a year. |
| 51 | 204:18 - 204:20 | 204:18 | Q. Did you understand that Ms. Williams |
| | | 19 | was acting on behalf of HMMA at HMMA's |
| | | 20 | discretion? |
| 52 | 205:01 - 205:19 | 205:01 | A. I believed that -- at the time when |
| | | 02 | all of this was put together, I did not know |
| | | 03 | that Cassandra Williams was not an MMA. I |
| | | 04 | believed -- until five minutes ago, I believed |
| | | 05 | that Cassandra was representing MM -- at HMMA. |
| | | 06 | Q. And was that because she was working |
| | | 07 | at the Hyundai facility? |
| | | 08 | A. Yes. That was the only place I had |
| | | 09 | ever seen her, so I just thought that was where |
| | | 10 | she -- that was her work. |
| | | 11 | Q. Did she wear any kind of uniform or |
| | | 12 | anything like that? |
| | | 13 | A. She would wear a standard shirt that |
| | | 14 | just had a Hyundai emblem, just the name -- the |
| | | 15 | name of the company, I think. |
| | | 16 | Q. Did it say HMMA, or did it say |
| | | 17 | Hyundai? |
| | | 18 | A. As I recall, just -- I recall it |
| | | 19 | saying Hyundai. |