IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DAVITA M. KEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:19-CV-767-ECM |
| ) | |
| HYUNDAI MOTOR ) | |
| MANUFACTURING, ALABAMA, ) | |
| LLC; HYUNDAI ENG AMERICA, ) | |
| INC.; and DYNAMIC SECURITY, ) | |
| INC. ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S WITNESS LIST**

**Exhibit B – Deposition of Dynamic Security's
30(b)(6) Deponent (Sherry Spires)**

| Case | Key, Davita |
|---|---|
| Issue Code | Depo Designations |

| SPIERS, SHERRY 8/19/22 VOL 1 | | |
|---|---|---|
| 1 | 008:16 - 008:18 | 008:16        SHERRY SPIERS<br>17     being first duly sworn, was examined<br>18          and testified as follows: |
| 2 | 008:21 - 009:03 | 008:21    Q.   Ms. Spires, could you please state<br>22  and spell your name for the record?<br>23    A.   Sherry Spires, S-H-E-R-R-Y,<br>009:01  S-P-I-R-E-S.<br>02    Q.   And who do you work for?<br>03    A.   Dynamic Security, INC. |
| 3 | 012:15 - 012:23 | 012:15    Q.   Okay.  And you were identified as one<br>16  of the corporate representatives to speak on a<br>17  number of these topics and documents.  Do you<br>18  understand that that means that you're here<br>19  today speaking on behalf of Dynamic Security?<br>20    A.   Yes.<br>21    Q.   Okay.  And that means that you're the<br>22  voice of the company.<br>23    A.   Yes. |
| 4 | 014:21 - 016:03 | 014:21  things with you.  I want to show you what was<br>22  marked as Plaintiff's Exhibit 29.  Do you<br>23  recognize that document?<br>015:01    A.   I do.<br>02    Q.   And what do you recognize that<br>03  document to be?<br>04    A.   Davita Key's statement that she wrote<br>05  on 8/1/17.<br>06    Q.   Okay.  And when was the first time<br>07  you saw that document?<br>08    A.   I don't remember.<br>09    Q.   Okay.  Would that document have been<br>10  sent to you by the branch, by the Montgomery<br>11  office?<br>12    A.   Yes, it would have been sent to me by<br>13  someone from the Montgomery office.<br>14    Q.   And what would you have done when you<br>15  received it? |

|   |   |   |   |
|---|---|---|---|
|   |   | 16 | A.  I would have read it and put it in |
|   |   | 17 | her file. |
|   |   | 18 | Q.  Did you conduct any investigation |
|   |   | 19 | into Ms. Key's claim? |
|   |   | 20 | A.  I did have numerous e-mails back and |
|   |   | 21 | forth with Ray Cureton, who was the district |
|   |   | 22 | manager in Montgomery at the time, to make sure |
|   |   | 23 | we handled her complaint appropriately. |
|   |   | 016:01 | Q.  Okay.  And what would you consider |
|   |   | 02 | appropriately in the handling of a complaint? |
|   |   | 03 | A.  I'm trying to remember. |
| 5 | 016:21 - 016:22 | 016:21 | A.  That we were abiding by our policies |
|   |   | 22 | and procedures based on what her complaint was. |
| 6 | 017:11 - 018:05 | 017:11 | What determination did you make with |
|   |   | 12 | regard to Ms. Key as to whether everything was |
|   |   | 13 | handled appropriately? |
|   |   | 14 | A.  Her first complaint was that we had |
|   |   | 15 | discriminated because of her hair.  And I |
|   |   | 16 | remember telling or communicating with Ray, |
|   |   | 17 | probably via e-mail, that let's make sure that |
|   |   | 18 | we're abiding by Hyundai's policy as well. |
|   |   | 19 | Because different races, religions |
|   |   | 20 | have different standards sometimes with the |
|   |   | 21 | hair accessories, so it might be different from |
|   |   | 22 | one job site to another.  So I told him that |
|   |   | 23 | let's make sure that her hair style was not in |
|   |   | 018:01 | line with what Hyundai's policy was. |
|   |   | 02 | Q.  Okay.  And what did you do to make |
|   |   | 03 | sure that Dynamic was following Hyundai's |
|   |   | 04 | policy? |
|   |   | 05 | A.  What did I do -- |
| 7 | 018:07 - 018:18 | 018:07 | A.  -- I'm not sure I did exactly |
|   |   | 08 | anything because at some point during that time |
|   |   | 09 | frame, there was an e-mail from Cassandra |
|   |   | 10 | Williams and/or Gloria Robinson that said they |
|   |   | 11 | wanted Ms. Key removed from that job site. |
|   |   | 12 | Q.  Okay.  So did Dynamic then remove her |
|   |   | 13 | in response to that e-mail? |
|   |   | 14 | A.  Yes. |
|   |   | 15 | Q.  Did you direct Ray Cureton, or did |
|   |   | 16 | you personally request a copy of the Hyundai |
|   |   | 17 | policy that Ms. Key was alleged to have |

| | | | |
|---|---|---|---|
| | | 18 | violated? |
| 8 | 018:21 - 018:21 | 018:21 | A.    Not that I recall. |
| 9 | 019:08 - 019:20 | 019:08 | Q.    And do you have any knowledge as to |
| | | 09 | what Ray Cureton would have done to investigate |
| | | 10 | the complaint? |
| | | 11 | A.    He would have communicated with me. |
| | | 12 | Q.    What direction did you give him with |
| | | 13 | regard to the investigation? |
| | | 14 | A.    There was such a short time frame |
| | | 15 | because she was only there a couple of days. |
| | | 16 | And it was determined at the -- on the second |
| | | 17 | day that they -- I guess it was the second day |
| | | 18 | that they were going -- she was not going to |
| | | 19 | work out at Hyundai and to remove her from the |
| | | 20 | job site. |
| 10 | 020:19 - 020:22 | 020:19 | Q.    And what did Dynamic Security do with |
| | | 20 | Ms. Key after she was removed from the Hyundai |
| | | 21 | job site? |
| | | 22 | A.    They offered her two other job sites. |
| 11 | 021:04 - 021:14 | 021:04 | Q.    Do you recognize Exhibit 36? |
| | | 05 | A.    Yes. |
| | | 06 | Q.    Okay.  And what do you recognize that |
| | | 07 | document to be? |
| | | 08 | A.    It is -- it's entitled employee |
| | | 09 | disciplinary report, and it's signed by Ray |
| | | 10 | Cureton.  And under details, it has removal |
| | | 11 | from HMMA site. |
| | | 12 | Q.    Okay.  And is this the form that |
| | | 13 | Dynamic Security would complete after requested |
| | | 14 | to remove an employee from the Hyundai site? |
| 12 | 021:17 - 022:05 | 021:17 | A.    It was put on a wrong form.  This |
| | | 18 | would not have been the correct form, but these |
| | | 19 | are used for disciplinary actions. |
| | | 20 |        But what Ray did do was put removal |
| | | 21 | from job site.  That's not a disciplinary |
| | | 22 | action, so he actually did not use the correct |
| | | 23 | form. |
| | | 022:01 | Q.    What would the correct form have |
| | | 02 | looked like? |
| | | 03 | A.    I don't think we have an actual form, |
| | | 04 | removal from job site.  It would have just been |

| | | | |
|---|---|---|---|
| | | 05 | done in a standard memo to file probably. |
| 13 | 022:17 - 023:12 | 022:17 | Q.   Exhibit 36 says on the bottom, |
| | | 18 | "Forwarded to HR;" do you see that? |
| | | 19 | A.   Okay.  We're still looking at this? |
| | | 20 | Q.   Yes.  Is that you?  Forwarded to HR, |
| | | 21 | would you be considered HR? |
| | | 22 | A.   Yes. |
| | | 23 | Q.   Okay.  And is the date on the bottom |
| | | 023:01 | of that document when you would have received |
| | | 02 | that? |
| | | 03 | A.   I don't know.  I don't know if he |
| | | 04 | would have sent it on August 1 or if he would |
| | | 05 | have sent it later when I might have requested |
| | | 06 | it. |
| | | 07 | Q.   Okay.  And it says, "Forwarded for |
| | | 08 | resolution."  Who would have decided the |
| | | 09 | resolution? |
| | | 10 | A.   In some cases I decide resolutions, |
| | | 11 | but in this case, it had already been resolved. |
| | | 12 | Q.   I'm going to show you Exhibit 39. |
| 14 | 024:03 - 025:04 | 024:03 | Do you recognize this document? |
| | | 04 | A.   Yes. |
| | | 05 | Q.   Okay.  And what do you recognize it |
| | | 06 | to be? |
| | | 07 | A.   It's the e-mail that originated from |
| | | 08 | Gloria Robinson, who was the account manager. |
| | | 09 | Dynamic Security's account manager at Hyundai. |
| | | 10 | It was sent to Chris Hargrove with Dynamic, Ray |
| | | 11 | Cureton with Dynamic, and Cassandra Williams |
| | | 12 | with Hyundai. |
| | | 13 | Q.   Okay.  And do you see there -- look |
| | | 14 | for me in the text of this e-mail on the |
| | | 15 | bottom.  Let's look at the second paragraph. |
| | | 16 | And, like, a sentence in it says, "I take issue |
| | | 17 | with her working in the mail room"; do you see |
| | | 18 | that? |
| | | 19 | A.   Yes. |
| | | 20 | Q.   If you'll read for me that -- just |
| | | 21 | read it to yourself, the sentence before that |
| | | 22 | and then that sentence, and let me know when |
| | | 23 | you've completed it. |
| | | 025:01 | A.   Okay. |

|    |                 |        |                                                          |
|----|-----------------|--------|----------------------------------------------------------|
|    |                 | 02     | Q.   What issue would there be with                      |
|    |                 | 03     | Ms. Williams working in the -- or Ms. Key                |
|    |                 | 04     | working in the mail room?                                |
| 15 | 025:06 - 025:16 | 025:06 | A.   It appears she was concerned because                |
|    |                 | 07     | Ms. Key had made it known that she was                   |
|    |                 | 08     | pregnant, and they were not allowing lifting             |
|    |                 | 09     | more than 50 pounds.  Oh, and -- yeah.  And              |
|    |                 | 10     | then the next sentence, Ms. Key had provided             |
|    |                 | 11     | the doctor's note, which is attached to this             |
|    |                 | 12     | e-mail, that she could return to work with no            |
|    |                 | 13     | restrictions.                                            |
|    |                 | 14     | Q.   So if she could return without                      |
|    |                 | 15     | restrictions, what would the concern be about            |
|    |                 | 16     | her working in the mail room?                            |
| 16 | 025:20 - 026:08 | 025:20 | A.   Well, I can't speak for Gloria                      |
|    |                 | 21     | Robinson, but, you know, with me, you've got             |
|    |                 | 22     | return to -- did the doctor sign this work               |
|    |                 | 23     | limitations with no restrictions, was the                |
|    |                 | 026:01 | doctor -- did he or she know what her job                |
|    |                 | 02     | duties were going to be?  Which might have               |
|    |                 | 03     | involved heavy lifting.                                  |
|    |                 | 04     | Q.   Did you ask Ms. Key what her job duty               |
|    |                 | 05     | -- if she had explained to her doctors what her          |
|    |                 | 06     | job duties may be?                                       |
|    |                 | 07     | A.   I don't think I ever had a                          |
|    |                 | 08     | conversation with Ms. Key.                               |
| 17 | 035:01 - 035:09 | 035:01 | Q.   What do you do -- what does Dynamic                 |
|    |                 | 02     | do -- let me rephrase it that way.  What does            |
|    |                 | 03     | Dynamic do to ensure that it's employees do not          |
|    |                 | 04     | discriminate?                                            |
|    |                 | 05     | A.   They should receive training.                       |
|    |                 | 06     | Q.   What type of training?                              |
|    |                 | 07     | A.   I'm not sure what type of training                  |
|    |                 | 08     | each individual manager gets, but that -- I'm            |
|    |                 | 09     | assuming.                                                |
| 18 | 035:18 - 035:19 | 035:18 | Q.   Okay.  We'll get to that.  Well, let                |
|    |                 | 19     | me just go ahead and show you Exhibit 40.                |
| 19 | 035:23 - 037:09 | 035:23 | Q.   Do you recognize that document?                     |
|    |                 | 036:01 | A.   Yes.                                                |
|    |                 | 02     | Q.   Okay.  And this is an e-mail from Ray               |
|    |                 | 03     | Curaton to you; correct?                                 |

|    |                 |        |                                                          |
|----|-----------------|--------|----------------------------------------------------------|
|    |                 | 04     | A.   Yes.                                                |
|    |                 | 05     | Q.   Okay.  So at the -- one of his last                 |
|    |                 | 06     | sentences there, he says, talking about                  |
|    |                 | 07     | reassigning her, "But I don't think that is              |
|    |                 | 08     | advisable at this time.  Especially if she is            |
|    |                 | 09     | to carry through with her stated, quote,                 |
|    |                 | 10     | official complaint, end quote, of                        |
|    |                 | 11     | discrimination against Hyundai, Ms. Williams             |
|    |                 | 12     | and Ms. Robinson"; do you see that?                      |
|    |                 | 13     | A.   I do.                                               |
|    |                 | 14     | Q.   Okay.  So does that statement by                    |
|    |                 | 15     | Mr. Cureton that he doesn't think it's                   |
|    |                 | 16     | advisable to reassign her raise any issue with           |
|    |                 | 17     | you?                                                     |
|    |                 | 18     | A.   That was his opinion.                               |
|    |                 | 19     | Q.   Okay.  What action did you take in                  |
|    |                 | 20     | response to this e-mail?                                 |
|    |                 | 21     | A.   To offer her another job site.                      |
|    |                 | 22     | Q.   You told him to offer her another job               |
|    |                 | 23     | site?                                                    |
|    |                 | 037:01 | A.   Yes.                                                |
|    |                 | 02     | Q.   Okay.  What did you do to ensure that               |
|    |                 | 03     | he did that?                                             |
|    |                 | 04     | A.   It's in an e-mail from me to him                    |
|    |                 | 05     | to let's make sure we offer her another job              |
|    |                 | 06     | site.                                                    |
|    |                 | 07     | Q.   Okay.  Did you instruct him that it                 |
|    |                 | 08     | was discriminatory to not place her at another           |
|    |                 | 09     | job site?                                                |
| 20 | 037:11 - 037:13 | 037:11 | A.   I don't think I would have used those               |
|    |                 | 12     | words.  I would have just put in the e-mail,             |
|    |                 | 13     | let's make sure we offer her other job sites.            |
| 21 | 038:02 - 038:07 | 038:02 | Q.   Okay.  But just looking to                          |
|    |                 | 03     | Mr. Cureton's statement here that he doesn't             |
|    |                 | 04     | think it's advisable to place her especially if          |
|    |                 | 05     | she's going to carry through with the stated             |
|    |                 | 06     | official complaint.  Do you see that as                  |
|    |                 | 07     | discriminatory?                                          |
| 22 | 038:11 - 038:17 | 038:11 | A.   Well, discriminatory, I would say,                  |
|    |                 | 12     | yes, just because she has made -- she has made           |
|    |                 | 13     | a complaint.  But that's about -- which was              |
|    |                 | 14     | about her hair and her pregnancy.                        |

| | | | |
|---|---|---|---|
| | | 15 | Q.   Did you instruct Mr. Cureton that |
| | | 16 | that statement was discriminatory? |
| | | 17 | A.   I don't remember. |
| 23 | 038:20 - 039:01 | 038:20 | Q.   Did -- are you aware of whether Mr. |
| | | 21 | Cureton received any sort of refresher training |
| | | 22 | or comment about his statement that it wasn't |
| | | 23 | advisable to place her? |
| | | 039:01 | A.   I don't remember. |
| 24 | 039:07 - 039:16 | 039:07 | Q.   How do you know that the training |
| | | 08 | that you referenced earlier is effective with |
| | | 09 | Dynamic employees? |
| | | 10 | A.   I don't have anything documented to |
| | | 11 | show the -- to rate the effectiveness of it. |
| | | 12 | Q.   What type of information would you |
| | | 13 | look for -- if you were trying to determine if |
| | | 14 | your policies were effective, what would you |
| | | 15 | consider? |
| | | 16 | A.   I don't actively look for anything. |
| 25 | 039:23 - 040:17 | 039:23 | Q.   Okay.  This is Exhibit 38 again.  If |
| | | 040:01 | you'll look for me on page Bates labeled 76. |
| | | 02 | Do you see there your note to Gloria? |
| | | 03 | A.   Yes. |
| | | 04 | Q.   Okay.  And it says, "Keep in mind, a |
| | | 05 | prospective employee does not have to disclose |
| | | 06 | medical conditions, such as pregnancy"; do you |
| | | 07 | see that? |
| | | 08 | A.   Yes. |
| | | 09 | Q.   Other than making this comment to |
| | | 10 | Gloria, did you do anything to ensure that |
| | | 11 | Gloria had any sort of refresher training |
| | | 12 | related to requesting medical condition? |
| | | 13 | A.   I don't remember. |
| | | 14 | Q.   Are you aware of any documents in |
| | | 15 | existence with Dynamic Security that would help |
| | | 16 | you remember? |
| | | 17 | A.   Not -- not right now. |
| 26 | 043:06 - 044:14 | 043:06 | Q.   When an assignment is offered to a |
| | | 07 | security officer, how is that assignment |
| | | 08 | offered? |
| | | 09 | A.   It should be on a standard assignment |
| | | 10 | form. |
| | | 11 | Q.   Okay.  And is that a Dynamic Security |

```
        12   form?
        13        A.   Yes.
        14        Q.   And what type of information would
        15   that form provide?
        16        A.   It would have the job site, the rate
        17   of pay, and the schedule, as in hours, whether
        18   it's 8:00 to 5:00, 5:00 to 11:00.
        19        Q.   And if an employee turns, or if a
        20   security officer turns down a job offer or an
        21   assignment, how would that turn-down be noted?
        22        A.   It would either be noted on the job
        23   assignment form, or it would be noted on a
    044:01  different form called a job refusal form.
        02        Q.   Would the employee who turned down
        03   the assignment notate that document?  Would
        04   they sign that document or be given a copy of
        05   that document?
        06        A.   They would not be given a copy, and I
        07   do not know if they sign it or not.
        08        Q.   Have you seen any documents like that
        09   signed by the employee who turned down an
        10   assignment?
        11        A.   I have seen them in the past.
        12        Q.   Where the employee that turned it
        13   down signed it?
        14        A.   I don't remember.
```