IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-CV-767-ECM |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING, ALABAMA, LLC; HYUNDAI ENG AMERICA, INC.; and DYNAMIC SECURITY, INC. | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S WITNESS LIST

## Exhibit E – Deposition of Ray Cureton

| Case | Key, Davita |
|---|---|
| Issue Code | Depo Designations |

| CURETON, RAY 8/30/22 VOL 1 | | | |
|---|---|---|---|
| 1 | 008:21 - 008:23 | 008:21<br>22<br>23 | RAY CURETON,<br>being first duly sworn, was examined<br>and testified as follows: |
| 2 | 009:18 - 009:21 | 009:18<br>19<br>20<br>21 | Q.    Mr. Cureton, could you please state<br>and spell your name for the record?<br>A.    Yes, my name is Ray H. Cureton, last<br>name C-u-r-e-t-o-n. |
| 3 | 014:19 - 015:15 | 014:19<br>20<br>21<br>22<br>23<br>015:01<br>02<br>03<br>04<br>05<br>06<br>07<br>08<br>09<br>10<br>11<br>12<br>13<br>14<br>15 | Q.    Okay.  All right.  Let's talk about<br>your employment with Dynamic Security since<br>that's why we're here today.  When did you start<br>with Dynamic Security?<br>A.    I think it was August 1st of 2016, I<br>think.<br>Q.    Okay.  And what was your position?<br>A.    I was a manager down in Montgomery.<br>I want to say operations manager at first.  I<br>started out as the operations manager.<br>Q.    Okay.  And you say at first.<br>A.    Uh-huh (positive response).<br>Q.    Did that change?<br>A.    It did.  I was promoted part way<br>through, and I don't know the dates about when<br>that happened, but -- and I was made the -- I'm<br>trying to think, remember what it was called.  It<br>was district manager.  I think that was right.<br>Q.    Okay.  I'm going to give you some<br>documents to look at through this.  They've been |
| 4 | 015:18 - 015:19 | 015:18<br>19 | This one is Plaintiff's Exhibit 60.<br>A.    Okay. |
| 5 | 016:09 - 016:23 | 016:09<br>10<br>11<br>12<br>13<br>14<br>15 | Q.    Okay.  This is from your personnel<br>file as represented by Dynamic Security to us,<br>and it shows your start date is 8/1/16, so that's<br>in line with what we've talked about.<br>A.    Yeah.<br>Q.    And your job title is operations<br>manager.  I want to point your attention down to |

|   |   |   | 16 | the box around Justification for Position.  In |
|---|---|---|---|---|
|   |   |   | 17 | the parentheses there, it says, Operations |
|   |   |   | 18 | Manager is required for Hyundai contract.  Do you |
|   |   |   | 19 | see that? |
|   |   |   | 20 | A.    Yes. |
|   |   |   | 21 | Q.    Okay.  Do you know what that means, |
|   |   |   | 22 | the operations manager required for Hyundai |
|   |   |   | 23 | contract? |
| 6 | 017:07 - 017:12 | 017:07 | | A.    Would you repeat the question, |
|   |   | 08 | | please? |
|   |   | 09 | | Q.    Yes, sir.  The line that I pointed |
|   |   | 10 | | you to there, that operations manager is required |
|   |   | 11 | | for Hyundai contract, do you know what that's in |
|   |   | 12 | | reference to? |
| 7 | 017:16 - 017:18 | 017:16 | | A.    As far as I understand, that part of |
|   |   | 17 | | my responsibility would be supervising the major |
|   |   | 18 | | contract at the time, which was at Hyundai. |
| 8 | 020:22 - 021:19 | 020:22 | | Q.    Okay.  What were your job duties at |
|   |   | 23 | | Dynamic Security? |
|   |   | 021:01 | | A.    Well, as an operations manager, I was |
|   |   | 02 | | responsible for ensuring the manning and |
|   |   | 03 | | operations of several sites that -- at the time |
|   |   | 04 | | that Dynamic was responsible for, providing |
|   |   | 05 | | security and making sure the leadership was in |
|   |   | 06 | | place, making sure that individuals are showing |
|   |   | 07 | | up for work, making sure that resources were |
|   |   | 08 | | properly used.  And hiring was also a part of my |
|   |   | 09 | | responsibilities, hiring new officers, at least |
|   |   | 10 | | overseeing that. |
|   |   | 11 | | And then also disciplinary actions |
|   |   | 12 | | came through my desk for review, and sometimes I |
|   |   | 13 | | initiated them depending on the situation.  So |
|   |   | 14 | | just normal operations type duties. |
|   |   | 15 | | Q.    Okay.  When did your employment end? |
|   |   | 16 | | A.    I want to say September 2017. |
|   |   | 17 | | Q.    And what were the terms of the end of |
|   |   | 18 | | your employment?  Why did you stop working for |
|   |   | 19 | | Dynamic Security? |
| 9 | 021:22 - 022:19 | 021:22 | | A.    I was let go. |
|   |   | 23 | | Q.    Okay.  Who terminated you? |
|   |   | 022:01 | | A.    That's really a good question.  I was |
|   |   | 02 | | -- the district manager of the Birmingham office |

| | | |
|---|---|---|
| | | 03   came down to Montgomery and asked me to remove my |
| | | 04   things from the site and that I was being let go. |
| | | 05       **Q.**   **And what was the district manager's** |
| | | 06   **name?** |
| | | 07       A.   I can tell you. Hang on a minute. |
| | | 08   Marshay Webb. |
| | | 09       **Q.**   **Did Marshay Webb tell you why you** |
| | | 10   **were being let go?** |
| | | 11       A.   He did not. |
| | | 12       **Q.**   **Did you have any idea that it was** |
| | | 13   **coming?** |
| | | 14       A.   I did not. |
| | | 15       **Q.**   **Had you ever been disciplined for** |
| | | 16   **anything?** |
| | | 17       A.   I had not. |
| | | 18       **Q.**   **Do you have any idea what -- in your** |
| | | 19   **mind, what would you think it would be?** |
| 10 | 022:23 - 024:03 | 022:23       A.   I really don't know. Honestly, the |
| | | 023:01   week before they let me go, I had been assured by |
| | | 02   -- and I do not know his name, because he hadn't |
| | | 03   been there very long -- my original boss's |
| | | 04   replacement that everything was fine and that I |
| | | 05   would -- if he lost his job, I would be fine and |
| | | 06   wouldn't lose mine, and then I lost it. |
| | | 07       So I don't know what their thinking |
| | | 08   was. I never heard from anybody in any kind of |
| | | 09   authority under -- you know, above me about that, |
| | | 10   either before or after, and that is the gospel |
| | | 11   truth. |
| | | 12       **Q.**   **Okay. So the person who assured you,** |
| | | 13   **that was your old boss's replacement?** |
| | | 14       A.   Uh-huh (positive response), yeah, I |
| | | 15   think so. It's -- yes, that's who it was, yeah. |
| | | 16       **Q.**   **Do you remember his name?** |
| | | 17       A.   I do not. I really do not. |
| | | 18       **Q.**   **What was your old boss's name?** |
| | | 19       A.   Mike Keller. |
| | | 20       **Q.**   **And do you remember when Mike Keller** |
| | | 21   **left?** |
| | | 22       A.   It was right around the time of this |
| | | 23   incident, because I think he left a month before |
| | | 024:01   I did. So I think he probably left in August and |

|    |                 |        |                                                            |
|----|-----------------|--------|------------------------------------------------------------|
|    |                 | 02     | -- or maybe the end of July.  It was right around          |
|    |                 | 03     | the time all this was taking place.                        |
| 11 | 025:18 - 025:19 | 025:18 | Q.    (BY MS. PALMER:)  I'm going to show                   |
|    |                 | 19     | you Plaintiff's Exhibit 27.                                 |
| 12 | 025:22 - 026:09 | 025:22 | Q.    (BY MS. PALMER:)  And this is a                       |
|    |                 | 23     | Dynamic Security officer's handbook.  Have you             |
|    |                 | 026:01 | seen this document before?                                  |
|    |                 | 02     | A.    I have.                                               |
|    |                 | 03     | Q.    Okay.  Is this handbook something                     |
|    |                 | 04     | that all new employees are given when they're              |
|    |                 | 05     | hired?                                                      |
|    |                 | 06     | A.    They are.                                             |
|    |                 | 07     | Q.    Were you also given a copy of this                    |
|    |                 | 08     | handbook?                                                   |
|    |                 | 09     | A.    I was.                                                |
| 13 | 030:02 - 030:09 | 030:02 | Q.    Do you recall seeing Exhibit 20                       |
|    |                 | 03     | before?                                                     |
|    |                 | 04     | A.    I have seen this.  I've seen these                    |
|    |                 | 05     | requirements before for sure.                              |
|    |                 | 06     | Q.    Okay.  And this sets out the duties                   |
|    |                 | 07     | and responsibilities for employees in the                  |
|    |                 | 08     | mailroom.  Does that include the hours that they          |
|    |                 | 09     | would work?                                                 |
| 14 | 030:11 - 031:04 | 030:11 | A.    Well, that can vary considerably                      |
|    |                 | 12     | depending on manning, and the hours would vary.           |
|    |                 | 13     | I mean, they're set out when they're going to             |
|    |                 | 14     | have people there, but that could -- we might             |
|    |                 | 15     | have five people that had to work this position           |
|    |                 | 16     | in different times because of, you know, what             |
|    |                 | 17     | manning and all that kind of thing and who's              |
|    |                 | 18     | qualified and so -- and they change from time to          |
|    |                 | 19     | time.                                                       |
|    |                 | 20     | I mean, I can promise you, I just was                      |
|    |                 | 21     | working with the current -- when I worked for             |
|    |                 | 22     | Dothan Security, we had this same account.  So it         |
|    |                 | 23     | hasn't changed.  They're -- I'm not making any            |
|    |                 | 031:01 | sense.  I'm rambling.  Yeah, they have basic               |
|    |                 | 02     | hours they're supposed to work.  Okay.                     |
|    |                 | 03     | Q.    And who set the hours that they would                |
|    |                 | 04     | work in the mailroom?                                       |
| 15 | 031:07 - 031:14 | 031:07 | A.    HMMA does, yeah.                                      |

| | | |
|---|---|---|
| | | 08    Q.    The pay on this document is listed at<br>09  thirteen dollars an hour.  Is that something that<br>10  Dynamic Security came up with or is that set by<br>11  some other entity?<br>12    A.    It is negotiated with -- between the<br>13  two companies, between HMMA and the security<br>14  company. |
| 16 | 034:03 - 034:21 | 034:03    Q.    And if you will flip for me to<br>04  Dynamic-Key 26.<br>05    A.    Okay.<br>06    Q.    And I'm looking at the part where it<br>07  says Harassment in the Workplace Policy.  The<br>08  last paragraph of that page, Any employee who<br>09  believes that he/she has been subjected to<br>10  harassment is required to report the activity to<br>11  his/her supervisor immediately.  Do you see that?<br>12    A.    I do.<br>13    Q.    As your role as operations manager,<br>14  would you take in complaints of harassment?<br>15    A.    Yes.  They would be forwarded to me<br>16  eventually.  They usually would start at the site<br>17  supervisor, which would be Gloria Robinson in<br>18  this place, in this particular case.<br>19    If there was a complaint against --<br>20  directly against her, I would be the next person<br>21  in the chain that they would talk to. |
| 17 | 036:14 - 038:05 | 036:14    Q.    And then back to the handbook, the<br>15  next sentence down says, Any supervisor to whom a<br>16  report of alleged harassment is made should<br>17  immediately notify their manager and conduct a<br>18  full and detailed investigation.<br>19    So when you received complaints, did<br>20  you immediately notify the manager?<br>21    A.    Yes, of course.<br>22    Q.    Who was your manager?<br>23    A.    Mike Keller was my manager, but also<br>037:01  we would notify HR directly.  And I don't<br>02  remember her name, but we did bring HR on right<br>03  away.<br>04    And also, the folks knew they could<br>05  contact HR directly themselves if they weren't<br>06  satisfied with our response. |

| | | | |
|---|---|---|---|
| | | 07 | Q.  So did you notify Mike Keller and HR |
| | | 08 | or just HR? |
| | | 09 | A.  Both. |
| | | 10 | Q.  Both?  What type of detailed |
| | | 11 | investigation would you conduct? |
| | | 12 | A.  Well, I would talk to the supervisor, |
| | | 13 | which would have been Gloria Robinson in this |
| | | 14 | case, and gotten her -- information from her on |
| | | 15 | the complaint. |
| | | 16 | I would have taken any statements of |
| | | 17 | any kind of witnesses that would have been |
| | | 18 | involved.  I would have talked with Ms. Key about |
| | | 19 | what her perception was on all of this, what was |
| | | 20 | going on, what her complaint was. |
| | | 21 | I would have forwarded all of that to |
| | | 22 | HR, because they're ultimately going to take |
| | | 23 | point on these kinds of things when it gets to |
| | | 038:01 | the place where I'm having to make an |
| | | 02 | investigation. |
| | | 03 | So I just try to get the facts as |
| | | 04 | quickly as I can and get them into the hands of |
| | | 05 | people that can follow up with it. |
| 18 | 045:18 - 045:19 | 045:18 | Q.  Do you remember what the attire was |
| | | 19 | for the mailroom at HMMA's property? |
| 19 | 046:18 - 047:06 | 046:18 | Q.  What is the uniform that Dynamic |
| | | 19 | provided? |
| | | 20 | A.  It would have been a knit shirt, |
| | | 21 | pullover, with the person's name embroidered on |
| | | 22 | the shirt, and then the pants would have been |
| | | 23 | black pants, and I don't know what color.  I want |
| | | 047:01 | to say it was blue, but I could be wrong about |
| | | 02 | that, the -- just, you know, a knit pullover |
| | | 03 | shirt, and a hat, and that was -- |
| | | 04 | Q.  Do you recall whether the pullover |
| | | 05 | shirt had anything identifying Dynamic Security |
| | | 06 | or Hyundai? |
| 20 | 047:08 - 047:16 | 047:08 | A.  It would have -- it would have |
| | | 09 | identified Dynamic Security on the sleeve. |
| | | 10 | Q.  On the sleeve, like a patch or |
| | | 11 | something? |
| | | 12 | A.  Yes, a patch with Dynamic Security, |
| | | 13 | and then I know the individual's -- but, again, |

| | | | |
|---|---|---|---|
| | | 14 | I'm just trying to recall, but -- and the |
| | | 15 | embroidering of their name on the -- above the |
| | | 16 | pocket. |
| 21 | 051:20 - 053:03 | 051:20 | **Q.      Would a new hire come to Dynamic** |
| | | 21 | **Security first for interviews or would they go** |
| | | 22 | **direct to Ms. Robinson?** |
| | | 23 | A.    A little bit of both actually.  We |
| | | 052:01 | would interview people that -- and if we thought |
| | | 02 | they could work out to go to Hyundai, we would |
| | | 03 | send them to Ms. Robinson for a second interview, |
| | | 04 | and she would interview them.  And often she |
| | | 05 | would bring Ms. Williams in to assist with those, |
| | | 06 | depending on the position that they were |
| | | 07 | interviewing for. |
| | | 08 | If they were coming in as a |
| | | 09 | lieutenant or a sergeant or mailroom, for |
| | | 10 | instance, then Ms. Williams would be the one that |
| | | 11 | ultimately would decide who was going to be |
| | | 12 | acceptable to be hired.  So Ms. Williams made |
| | | 13 | that decision. |
| | | 14 | Q.    Okay. |
| | | 15 | A.    Just to further that a little bit, |
| | | 16 | when we started with somebody, we would explain |
| | | 17 | the basics about what this policy, the appearance |
| | | 18 | standard was, then we would send them over to |
| | | 19 | Hyundai, and Ms. Robinson and Ms. Williams would |
| | | 20 | further explain what that policy actually looked |
| | | 21 | like. |
| | | 22 | And Ms. Williams made -- I can tell |
| | | 23 | you this for a fact.  Ms. Williams made the final |
| | | 053:01 | decision about who was accepted -- which |
| | | 02 | hairstyle was acceptable, for instance, or which |
| | | 03 | wasn't. |
| 22 | 054:02 - 054:03 | 054:02 | **Q.    But can you tell me what you recall** |
| | | 03 | **about Ms. Key's hiring?** |
| 23 | 054:05 - 055:13 | 054:05 | A.    Well, there was a problem, as far as |
| | | 06 | I understand it, going back and looking at some |
| | | 07 | of the documents and remembering what was going |
| | | 08 | on then, there was a problem with her hair.  Ms. |
| | | 09 | Williams asked us to remove her from the site |
| | | 10 | because her hair did not meet the Hyundai |
| | | 11 | standards. |

|  |  | 12 | So we did bring her in, and I know |
|--|--|----|-----------------------------------|

12          So we did bring her in, and I know
13     Gloria Robinson tried to work with her to try to
14     get the hairstyle the way it was supposed to be
15     and that they had had conversations about this,
16     even with Ms. Williams, to see what was -- what
17     would be acceptable and what wouldn't.
18          And then there were -- I mean,
19     there's a statement from Gloria that kind of goes
20     through all of that, explains in writing how that
21     worked where Ms. Key was trying to get her hair
22     in the proper respect for Hyundai, and then
23     ultimately didn't.
055:01          And the dispute got to the place
02     where HMMA did not want her on the site.  And,
03     ultimately, in the security business, and this is
04     across the board in any security company I've
05     ever worked with, when the client says, Remove
06     somebody from the site, that's what security
07     companies do, period.
08          And now, we can go back for our
09     person to try to get them rehired, try to get --
10     depending on what's going on, and in this
11     situation, there was enough there.  We did not
12     fire her or remove her from Dynamic Security.  We
13     simply removed her from the Hyundai site.

24   055:19 - 058:19

055:19          Q.    I am going to show you Plaintiff's
20     Exhibit 29.  All right.  Mr. Cureton, do you
21     recognize Plaintiff's Exhibit 29?
22          A.    I do.
23          Q.    And what do you recognize that to be?
056:01          A.    That is a statement from Ms. Key
02     alleging discrimination by Hyundai, specifically
03     Ms. Williams and Ms. Cory Robinson, who was our
04     employee.
05          Q.    And did you receive a copy of this?
06          A.    I did.
07          Q.    Okay.  Can you tell me the
08     circumstances under which you received this
09     complaint?
10          A.    I don't know what you're asking me.
11     I mean, it came -- I'm sure it was given to me
12     in -- from Ms. Robinson most likely.  I don't

13  know that for sure, but it would have come from

14  them to me as a complaint for me to handle.

15          Q.     Do you have any recollection of

16  sitting down with Ms. Key --

17          A.     I do not.

18          Q.     -- to receive this?

19          A.     I'm sorry.  I do not have that

20  recollection of that.

21          Q.     When you received this complaint that

22  is Plaintiff's Exhibit 29, did you begin an

23  investigation?

057:01          A.     There's a date on here.  I think this

02  investigation was begun before this date.

03          Q.     Okay.

04          A.     I think this incident happened in the

05  end of July, and this is dated August 1st.

06          Q.     Okay.

07          A.     So we would have -- we've already had

08  information by that time that there was a

09  complaint from her about -- from Ms. Williams

10  about the hair, and so we would have started

11  looking into that immediately once that -- I

12  mean, you know, it's five years ago.  I mean, I

13  don't know for sure.

14          Q.     So if you're looking into Ms.

15  Williams having an issue with Ms. Key's hair, are

16  you investigating Ms. Key's complaint or are you

17  investigating whether Ms. Key is in compliance

18  with work standards?

19          A.     I am investigating whether Ms. Key is

20  in compliance with work standards.  And you know

21  what?  Thinking about this, I'm not -- I knew

22  about this complaint, but I'm going to say I

23  don't recall that particular document, because I

058:01  don't remember Bates on top, the Bates that's on

02  the top.

03          I knew about this, but I don't -- I'm

04  going to change my testimony and have to say I

05  don't recall that specific document.

06          Q.     Okay.

07          A.     But I knew about this.  And the

08  reason I'm saying that is because of that date.

09  I would have -- this date is after we had started

|    |                   |        |                                                                                      |
|----|-------------------|--------|--------------------------------------------------------------------------------------|
|    |                   | 10     | looking into this whole situation.                                                   |
|    |                   | 11     | And we knew at that point that she                                                   |
|    |                   | 12     | was -- Ms. Key was not happy with Hyundai because                                    |
|    |                   | 13     | of what they were asking her to do.  We also knew                                    |
|    |                   | 14     | that Hyundai was not happy with Ms. Key because                                      |
|    |                   | 15     | she wasn't complying with their standards.  So we                                    |
|    |                   | 16     | were looking at both sides at that point.                                            |
|    |                   | 17     | **Q.    What do you recall about Ms. Key's**                                         |
|    |                   | 18     | **pregnancy?  We've talked a little bit about hair,**                                |
|    |                   | 19     | **but her pregnancy, what do you recall about that?**                                |
| 25 | 058:21 - 058:21   | 058:21 | A.    The only thing I can think of --                                               |
| 26 | 059:01 - 059:22   | 059:01 | A.    -- is that it came out during the                                              |
|    |                   | 02     | time we were doing this investigation that she                                       |
|    |                   | 03     | was pregnant, which has nothing to do with                                           |
|    |                   | 04     | anything other than whether she would meet the                                       |
|    |                   | 05     | physical requirements to be able to lift the                                         |
|    |                   | 06     | fifty pounds that's required at the mailroom,                                        |
|    |                   | 07     | which I don't think we ever got that far in                                          |
|    |                   | 08     | the -- you know, where we got a doctor's notice                                      |
|    |                   | 09     | that she would be eligible.                                                          |
|    |                   | 10     | So it had absolutely nothing to do                                                   |
|    |                   | 11     | with the pregnancy itself.  It had to do with the                                    |
|    |                   | 12     | ability to handle the work itself.                                                   |
|    |                   | 13     | **Q.    Do you recall Ms. Robinson having**                                          |
|    |                   | 14     | **brought up Ms. Key's pregnancy in e-mails?**                                       |
|    |                   | 15     | A.    She may well have brought it up,                                               |
|    |                   | 16     | yeah, I would think so, just as a statement, not                                     |
|    |                   | 17     | as a -- that has nothing to do with hiring or any                                    |
|    |                   | 18     | of that kind of stuff, but it -- I don't know.                                       |
|    |                   | 19     | It became common knowledge.  Everybody knew about                                    |
|    |                   | 20     | it at some point.                                                                    |
|    |                   | 21     | **Q.    I'm going to show you Plaintiff's**                                          |
|    |                   | 22     | **Exhibit 36.  Okay.**                                                               |
| 27 | 060:15 - 061:08   | 060:15 | **Q.    Did you complete this form?**                                                |
|    |                   | 16     | A.    I did.                                                                          |
|    |                   | 17     | **Q.    Is that your signature on the bottom?**                                      |
|    |                   | 18     | A.    It is.                                                                          |
|    |                   | 19     | **Q.    When did you complete it?**                                                  |
|    |                   | 20     | A.    In August 2017.                                                                 |
|    |                   | 21     | **Q.    Do you know what time you did this?**                                        |
|    |                   | 22     | A.    No.                                                                             |
|    |                   | 23     | **Q.    And what did you mark as the reason**                                        |

|    |                 | 061:01 | for Ms. Key's discipline? |
|----|-----------------|--------|---------------------------|
|    |                 | 02 | A.    It simply says here, Other conduct |
|    |                 | 03 | warranting disciplinary action. |
|    |                 | 04 | Q.    And then I see there at the bottom it |
|    |                 | 05 | says, Forwarded to HR for resolution? |
|    |                 | 06 | A.    Correct. |
|    |                 | 07 | Q.    What was the resolution that was |
|    |                 | 08 | reached? |
| 28 | 061:10 - 062:09 | 061:10 | A.    I can't speak for HR.  I don't know |
|    |                 | 11 | what resolution you're looking for.  If you're |
|    |                 | 12 | asking what happened to Ms. Key, that's a |
|    |                 | 13 | different question than what the resolution was |
|    |                 | 14 | in this disciplinary form. |
|    |                 | 15 | I mean, we offered her two other |
|    |                 | 16 | positions, at least, and I think -- I would say |
|    |                 | 17 | after that that we couldn't accommodate what she |
|    |                 | 18 | wanted, and -- because we didn't have a position |
|    |                 | 19 | open that was at the time that she could work, |
|    |                 | 20 | and so she left. |
|    |                 | 21 | Q.    Okay.  So you're not aware of what |
|    |                 | 22 | the ultimate resolution was with regard to Ms. |
|    |                 | 23 | Key's -- |
|    |                 | 062:01 | A.    Harassment complaint? |
|    |                 | 02 | Q.    Correct. |
|    |                 | 03 | A.    Well, that's why we're here, I think. |
|    |                 | 04 | That must be why we're here still.  It hasn't |
|    |                 | 05 | been resolved yet. |
|    |                 | 06 | Q.    Are you aware of what the ultimate |
|    |                 | 07 | resolution was with regard to her removal from |
|    |                 | 08 | Hyundai? |
|    |                 | 09 | A.    She was removed -- |
| 29 | 062:12 - 062:16 | 062:12 | A.    She was removed from Hyundai at the |
|    |                 | 13 | client's request. |
|    |                 | 14 | Q.    Are you aware of whether there were |
|    |                 | 15 | any discussions between Dynamic and the client |
|    |                 | 16 | related to whether her removal was appropriate? |
| 30 | 062:21 - 063:22 | 062:21 | A.    I'm going to answer it this way:  The |
|    |                 | 22 | hair standards were -- everyone was very familiar |
|    |                 | 23 | with those hair standards and knew what the |
|    |                 | 063:01 | requirements were.  Ms. Williams ultimately was |
|    |                 | 02 | the one that decided whether or not the hair was |
|    |                 | 03 | acceptable.  Once it was not and she asked us to |

|  |  |  |
|---|---|---|
|  |  | 04  remove someone from the site, we did that. |
|  |  | 05          We did not remove Ms. Key as a |
|  |  | 06  Dynamic employee.  We offered her other |
|  |  | 07  positions.  At the time we had no full-time |
|  |  | 08  positions on the shift that she wanted to work, |
|  |  | 09  and so we offered her two other positions at, I |
|  |  | 10  think, Mobis and Koch Foods. |
|  |  | 11          I don't know specifically what times |
|  |  | 12  they were, but they were part-time positions, and |
|  |  | 13  she was not able to work those times, and left, |
|  |  | 14  quit on her own as far as I know. |
|  |  | 15      Q.    **Why do you believe she quit?** |
|  |  | 16      A.    Because we couldn't provide for her |
|  |  | 17  the schedule that she wanted and because -- well, |
|  |  | 18  because there was no position for her to work |
|  |  | 19  that she could agree to, that she would agree to. |
|  |  | 20      Q.    **Let me ask it this way:  What** |
|  |  | 21  **evidence do you have to support your position** |
|  |  | 22  **that Ms. Key quit?** |
| 31 | 064:02 - 064:09 | 064:02      A.    The statements that I made in writing |
|  |  | 03  around that time that explained that she was |
|  |  | 04  offered those positions and refused them.  When |
|  |  | 05  you refuse a position, that's quitting. |
|  |  | 06      Q.    **Have employees at Dynamic when you** |
|  |  | 07  **were employed there, did you ever have anyone** |
|  |  | 08  **turn down a position but accept a later position?** |
|  |  | 09      A.    Sure. |
| 32 | 064:11 - 065:09 | 064:11      A.    And this is standard practice.  If |
|  |  | 12  this -- when this happens, we told employees that |
|  |  | 13  if something comes open, you know, to come back |
|  |  | 14  and check with us in a couple of weeks, check |
|  |  | 15  with us in a month or two, because, as you know, |
|  |  | 16  security positions rotate considerably.  People |
|  |  | 17  come in and out. |
|  |  | 18          And so we would encourage a person to |
|  |  | 19  check back in with us to make sure, maybe we |
|  |  | 20  might have something that she could work. |
|  |  | 21      Q.    **And if Ms. Key says that she did** |
|  |  | 22  **reach out to Dynamic and did not receive return** |
|  |  | 23  **calls, would you dispute that?** |
|  |  | 065:01      A.    I would dispute that only as far as |
|  |  | 02  my situation is concerned.  If she had reached |

|   |   |   |
|---|---|---|
|   |   | 03 out to me, I would definitely have spoken with<br>04 her.<br>05         Now, again, I was only there for less<br>06 than a month, I guess, or about a month after all<br>07 this went down, and then I was let go.  So I<br>08 can't say what happened after around the first<br>09 week in September when I was let go. |
| 33 | 065:14 - 068:02 | 065:14       Q.    Okay.  And if Ms. Key -- if Ms. Key<br>**15 says that she never told you she was unavailable**<br>**16 for first shift, but instead said she preferred**<br>**17 first shift, would you dispute that?**<br>18       A.    I would go with what I wrote in my<br>19 paperwork, which I think says that we didn't have<br>20 the first shift, which she wanted, is what I<br>21 think is what's written in the documents, and I<br>22 signed my name to it.  So I would -- I will stand<br>23 by my statements at the time.<br>066:01       Q.    Okay.  And I just want to make sure<br>**02 we're not mincing words here.  You said first**<br>**03 shift is what she wanted.  Is it your**<br>**04 understanding that wanting first shift is the**<br>**05 same as saying I can only work first shift?**<br>06       A.    It's not the same.  And, again,<br>07 having done this for a while, I understand that<br>08 people don't always get what they want, but they<br>09 are willing to compromise and work elsewhere.<br>10         If I put on the paperwork that she<br>11 did not want to work those things, then that's --<br>12 those other jobs that we offered part-time, if<br>13 that's what I stated in my statement, then I'll<br>14 stand by that.<br>15         And that was normal.  It was very<br>16 normal for that to happen, not just at Hyundai,<br>17 but in other places as well.  Well, I can only<br>18 work six hours on this day and five hours on this<br>19 day, but I need somebody that's going to work,<br>20 you know, all sixteen hours.<br>21         Well, what can I do?  You know, I've<br>22 got to have the people work the hours that are<br>23 required to work.  So I offered what was<br>067:01 available, and what was available, she declined<br>02 those positions for whatever reason. |

| | | | |
|---|---|---|---|
| | | 03 | Q.    Do you remember how you offered her |
| | | 04 | those?  Was it in person or over the phone? |
| | | 05 | A.    I'm pretty sure it was in person, and |
| | | 06 | I would have had a witness.  I would have had an |
| | | 07 | office manager there in this situation, too, |
| | | 08 | because there's a lot of paperwork on this thing. |
| | | 09 | So the time that I took to describe |
| | | 10 | what was happening, I'm very careful with my |
| | | 11 | words in writing, especially, about what I say, |
| | | 12 | and I mean what I say.  And so the statements are |
| | | 13 | here, I'm sure, and that's what happened. |
| | | 14 | Q.    Have you ever had an employee sign |
| | | 15 | acknowledging that they've turned down a |
| | | 16 | position? |
| | | 17 | A.    Yes. |
| | | 18 | Q.    Okay.  Why did you not do that in |
| | | 19 | this case? |
| | | 20 | A.    Sometimes they refuse to sign. |
| | | 21 | Normally, I would mark on there refused to sign |
| | | 22 | or something to that effect.  Again, I'm not a |
| | | 23 | hundred -- I mean, you know, I don't know.  It's |
| | | 068:01 | been five years ago, and I'm old.  I don't |
| | | 02 | remember. |
| 34 | 069:09 - 069:10 | 069:09 | Q.    Okay.  Flip back for me to that |
| | | 10 | Exhibit 36 that you've got.  We're going to skip |
| 35 | 069:16 - 069:18 | 069:16 | Q.    So is this the memo that Gloria |
| | | 17 | Robinson gave to you about the -- about Ms. Key's |
| | | 18 | situation? |
| 36 | 069:20 - 069:20 | 069:20 | A.    Yes, it is. |
| 37 | 071:22 - 072:09 | 071:22 | Q.    Okay.  About thirteen lines down Ms. |
| | | 23 | Robinson says that Ms. Howell -- do you know who |
| | | 072:01 | Ms. Howell is? |
| | | 02 | A.    I think Ms. Howell was one of our |
| | | 03 | officers that worked at Hyundai. |
| | | 04 | Q.    So she says, Ms. Howell entered the |
| | | 05 | security office and asked if we knew when Ms. Key |
| | | 06 | was due.  Do you see that? |
| | | 07 | A.    Yes. |
| | | 08 | Q.    Okay.  So is she discussing her |
| | | 09 | pregnancy here? |
| 38 | 072:13 - 072:15 | 072:13 | A.    Obviously. |

|    |                   |        |                                                       |
|----|-------------------|--------|-------------------------------------------------------|
|    |                   | 14     | Q.    Why is it important to know when Ms.            |
|    |                   | 15     | Key is due?                                           |
| 39 | 072:19 - 073:04   | 072:19 | A.    As far as I'm concerned, it's not               |
|    |                   | 20     | important.  She's just -- it sounds like just         |
|    |                   | 21     | plain old garden variety gossip to me.  It's          |
|    |                   | 22     | just, you know, security officers talk all the        |
|    |                   | 23     | time, so it's just -- they're just letting them       |
|    |                   | 073:01 | know.                                                 |
|    |                   | 02     | Q.    Was Ms. Robinson aware that Ms. Key             |
|    |                   | 03     | was filing a complaint against Ms. Robinson and       |
|    |                   | 04     | Ms. Williams?                                         |
| 40 | 073:08 - 073:08   | 073:08 | A.    I believe so, yes.                              |
| 41 | 073:19 - 074:01   | 073:19 | Q.    (BY MS. PALMER:)  So the bottom part            |
|    |                   | 20     | of Exhibit 39, because e-mails go backwards, so       |
|    |                   | 21     | this is dated July 31st from Gloria Robinson to a     |
|    |                   | 22     | number of people with you copied; is that             |
|    |                   | 23     | correct?                                              |
|    |                   | 074:01 | A.    That's what it says, yes, ma'am.                |
| 42 | 075:04 - 075:06   | 075:04 | Q.    Do you see there where she's                    |
|    |                   | 05     | discussing finding out that Ms. Key is pregnant?      |
|    |                   | 06     | A.    Uh-huh (positive response).                     |
| 43 | 075:08 - 075:09   | 075:08 | Q.    And she says that, I take issue with            |
|    |                   | 09     | her working in the mailroom.  Do you see that?        |
| 44 | 075:13 - 075:17   | 075:13 | A.    Yes, I do.                                      |
|    |                   | 14     | Q.    As the recipient -- one of the                 |
|    |                   | 15     | recipients of this e-mail, what was your              |
|    |                   | 16     | understanding about the issue with Ms. Key            |
|    |                   | 17     | working in the mailroom?                              |
| 45 | 075:21 - 076:02   | 075:21 | A.    The only issue would have been the              |
|    |                   | 22     | lifting of the fifty pounds.  Pregnancy had           |
|    |                   | 23     | nothing to do with this.                             |
|    |                   | 076:01 | Q.    Would -- did Ms. Key say she couldn't          |
|    |                   | 02     | lift fifty pounds?                                    |
| 46 | 076:04 - 076:04   | 076:04 | A.    No.                                             |
| 47 | 076:06 - 076:19   | 076:06 | A.    No, she did not say she couldn't lift           |
|    |                   | 07     | fifty pounds.  There was a -- it looks like there     |
|    |                   | 08     | was a request for a doctor's note to ensure that      |
|    |                   | 09     | she would be able to do so.                           |
|    |                   | 10     | Q.    Okay.  If you'll flip for me two                |
|    |                   | 11     | pages, it's going to be Dynamic-Key 80.               |

|    |                 |         |                                                              |
|----|-----------------|---------|--------------------------------------------------------------|
|    |                 | 12      | A.    Okay.                                                   |
|    |                 | 13      | Q.    Does that look like a doctor's note?                   |
|    |                 | 14      | A.    It does.                                               |
|    |                 | 15      | Q.    Okay.  And what's the date on that                     |
|    |                 | 16      | doctor's note?                                               |
|    |                 | 17      | A.    July 28th, 2017.                                       |
|    |                 | 18      | Q.    Okay.  And does it list that Ms. Key                   |
|    |                 | 19      | has any restrictions?                                        |
| 48 | 076:21 - 078:03 | 076:21  | A.    No restrictions.  No work limitations                  |
|    |                 | 22      | noted.                                                       |
|    |                 | 23      | Q.    And this doctor's note was attached                    |
|    |                 | 077:01  | to this e-mail, correct?                                     |
|    |                 | 02      | A.    That's what the e-mail states.                         |
|    |                 | 03      | Q.    All right.  I'm going to point you                     |
|    |                 | 04      | back to the e-mail, the very last paragraph.  Ms.            |
|    |                 | 05      | Robinson says, I'm asking for some assistance                |
|    |                 | 06      | here.  What recourse do I have with her?  Did you            |
|    |                 | 07      | have any involvement in answering Ms. Robinson               |
|    |                 | 08      | about what recourse she had?                                 |
|    |                 | 09      | A.    I don't recall specifically.  I mean,                  |
|    |                 | 10      | it's always possible, but I can tell you what I              |
|    |                 | 11      | would have said, but I'm not sure whether I did              |
|    |                 | 12      | or didn't say it to her either in person or on               |
|    |                 | 13      | the phone or in e-mail or text or any other way.             |
|    |                 | 14      | Q.    What would you have said?                              |
|    |                 | 15      | A.    Well, the issue here is the hairstyle                  |
|    |                 | 16      | only, and the only thing you need to be concerned            |
|    |                 | 17      | about is the hairstyle.  And if Ms. Williams                 |
|    |                 | 18      | was -- would not accept the hairstyle and Ms. Key            |
|    |                 | 19      | could not -- they could not come to a meeting of             |
|    |                 | 20      | the minds on that, then we have no choice but to             |
|    |                 | 21      | follow the guidelines that we have and the                   |
|    |                 | 22      | request from Ms. Williams to remove her from the             |
|    |                 | 23      | site.                                                        |
|    |                 | 078:01  | Q.    But looking back to this e-mail, it's                  |
|    |                 | 02      | clear that Ms. Robinson has an issue with the                |
|    |                 | 03      | pregnancy.                                                   |
| 49 | 078:07 - 079:08 | 078:07  | A.    But Ms. Robinson ultimately didn't                     |
|    |                 | 08      | make those kind of decisions.  That decision was             |
|    |                 | 09      | made by myself or by HMMA, and we would under no             |
|    |                 | 10      | circumstances deny someone employment for being              |
|    |                 | 11      | pregnant, period, end of story.                              |

| | | 12 | Q.   Was Ms. Robinson disciplined related |
|---|---|---|---|
| | | 13 | to this? |
| | | 14 | A.   She was not.  Not that I know of.  I |
| | | 15 | didn't discipline her over it.  We may have |
| | | 16 | discussed policy and those kinds of things, but |
| | | 17 | it didn't rise to the form of the place of |
| | | 18 | discipline. |
| | | 19 | What I would have done, and did many |
| | | 20 | times with Ms. Robinson over the time that I was |
| | | 21 | with her, was calm her down and explain to her |
| | | 22 | what the facts were, and that's all I needed. |
| | | 23 | You don't need to get excited.  You don't need to |
| | | 079:01 | get bent out of shape.  Let's just see what we're |
| | | 02 | supposed to do based on the policies.  And when |
| | | 03 | she would come around, we would do what we were |
| | | 04 | supposed to do. |
| | | 05 | She never actually supported the idea |
| | | 06 | of having someone leave because they were |
| | | 07 | pregnant, if that's what you're looking for. |
| | | 08 | That's never happened. |
| 50 | 079:20 - 079:22 | 079:20 | Q.   What could Ms. Key have done |
| | | 21 | different for Ms. Robinson to not be concerned |
| | | 22 | with her working in the mailroom? |
| 51 | 080:03 - 080:14 | 080:03 | A.   I think Ms. Key followed the basic |
| | | 04 | steps.  I will say that -- and I'm not saying |
| | | 05 | this about Ms. Key, but many times attitudes get |
| | | 06 | involved, people don't listen to each other, and |
| | | 07 | we're not always on the same page about things. |
| | | 08 | So I don't know.  I don't remember what happened |
| | | 09 | specifically between Ms. Key other than what's on |
| | | 10 | paper here. |
| | | 11 | But I can tell you this:  She would |
| | | 12 | not have been let go for being pregnant. |
| | | 13 | Q.   But what's on paper here is an |
| | | 14 | accurate depiction of what happened, right? |
| 52 | 080:18 - 082:03 | 080:18 | A.   It is, but the innuendos that you're |
| | | 19 | bringing out of it are not accurate. |
| | | 20 | Q.   That last sentence there, If she's |
| | | 21 | due in five months, unless I cannot count, which |
| | | 22 | I can't, she is already four months and didn't |
| | | 23 | know it.  Do you see that? |
| | | 081:01 | A.   Okay.  Yeah, I remember reading that |

```
          02    and --
          03         Q.    So Ms. Robinson's referencing Ms.
          04    Key's pregnancy?
          05         A.    But it's irrelevant.  I'm telling you
          06    it's irrelevant.  Ms. Robinson didn't have the
          07    power to let her go, and Ms. Robinson would have
          08    been counseled.
          09         And I've, like I said, counseled many
          10    a supervisor on what their duties are when they
          11    get, well, excuse the expression, get their
          12    underwear in a wad about something.
          13         Q.    But Ms. Robinson was not disciplined
          14    that you're aware of?
          15         A.    Not that I can remember.  It wouldn't
          16    have been a need to.  Ms. Robinson was volatile
          17    at times and would say things that once she
          18    thought about it, probably shouldn't have said
          19    that kind of thing.  We all do it at times.
          20         And Ms. Robinson was not advocating
          21    that we get rid of Ms. Key for her being
          22    pregnant, and she knew better than that.  And I
          23    guarantee you, my job was to make sure that
       082:01    didn't happen.  So I promise it didn't happen.
          02         Q.    But she was ultimately removed from
          03    the Hyundai property, right?
```
```
 53   082:05 - 082:18   082:05       A.    Ms. Key?  You're talking about Ms.
          06    Key?
          07         Q.    Yes, Ms. Key.
          08         A.    She was ultimately removed at the
          09    client's request.
          10         Q.    I'm going to show you Plaintiff's
          11    Exhibit 38.  And this is another string of
          12    e-mails, so, again, it goes from the bottom to
          13    the top.
          14         I want to point you specifically to
          15    the bottom of page Dynamic-Key 73.  This is an
          16    e-mail from Sherry Spires to you and others.  Was
          17    Sherry Spires human resources?
          18         A.    Yes.
```
```
 54   084:14 - 084:22   084:14       Q.    And I want to point you to the end of
          15    Ms. Spire's e-mail, so Page 074.  Under the
          16    section Re:  Pregnancy, the last sentence there
```

| | | |
|---|---|---|
| | | 17   says, I'm concerned that she might not have |
| | | 18   mentioned the amount of weight she might have to |
| | | 19   lift to her doctor.  Do you see that? |
| | | 20         A.    Yes. |
| | | 21         Q.    So Ms. Spires is acknowledging that |
| | | 22   she has concerns about Ms. Key's pregnancy? |

| 55 | 085:03 - 085:21 | 085:03        A.    I would dispute that.  I think that |
|---|---|---|
| | | 04   her -- it's clear enough it has to do with the |
| | | 05   amount of weight she has to lift, and that had |
| | | 06   nothing to do with her pregnancy. |
| | | 07         Q.    Okay.  And what's the date on this |
| | | 08   e-mail? |
| | | 09         A.    The 2nd of August. |
| | | 10         Q.    Okay.  And by this time, Ms. Key has |
| | | 11   already provided a doctor's note that says she |
| | | 12   has no restrictions, right? |
| | | 13         A.    She has, from the 28th of July. |
| | | 14         Q.    Like four days earlier? |
| | | 15         A.    Yes.  And the concern stated in this |
| | | 16   e-mail is from Sherry, I'm concerned that she |
| | | 17   might not have mentioned the amount of weight she |
| | | 18   might have to lift to her doctor. |
| | | 19              So that clearly demonstrates that she |
| | | 20   was concerned about lifting weight, not about the |
| | | 21   pregnancy. |

| 56 | 089:23 - 090:01 | 089:23        Q.    And if Ms. Robinson had a doctor's |
|---|---|---|
| | | 090:01   note that said no restrictions -- |

| 57 | 090:03 - 090:06 | 090:03        Q.    -- but then made changes to an |
|---|---|---|
| | | 04   employee's work assignment because she was |
| | | 05   concerned personally about the person's |
| | | 06   pregnancy -- |

| 58 | 090:08 - 090:09 | 090:08        Q.    -- would that be a violation of |
|---|---|---|
| | | 09   Dynamic's policies? |

| 59 | 090:12 - 090:20 | 090:12        A.    Okay.  Now -- look, you're asking a |
|---|---|---|
| | | 13   -- that question is just out of bounds, because |
| | | 14   we're not going to change somebody's position |
| | | 15   just because they're pregnant, okay? |
| | | 16              That's not Dynamic's policy to change |
| | | 17   somebody's position just because they're |
| | | 18   pregnant, no, it is not their policy to do that. |
| | | 19         Q.    So if that was done, it would be a |

|    |                   |        |                                                                       |
|----|-------------------|--------|-----------------------------------------------------------------------|
|    |                   | 20     | violation of Dynamic's policy?                                        |
| 60 | 091:01 - 091:18   | 091:01 | A.    You're comparing apples and oranges.                            |
|    |                   | 02     | The pregnancy has got nothing to do with it.  I                       |
|    |                   | 03     | mean, a person either has the physical ability to                     |
|    |                   | 04     | do the job or not, and if Ms. Robinson was                            |
|    |                   | 05     | concerned about Ms. Key's situation because of a                      |
|    |                   | 06     | physical situation because she couldn't lift the                      |
|    |                   | 07     | weight, she would have had the right, probably                        |
|    |                   | 08     | unquestioned right, to switch her to a different                      |
|    |                   | 09     | position as long as the pay was the same or                           |
|    |                   | 10     | similar and as long as the -- as it was discussed                     |
|    |                   | 11     | with the employee and it was explained to the                         |
|    |                   | 12     | employee and all -- I mean, it's not -- you know,                     |
|    |                   | 13     | there's no -- I don't know if there's a written                       |
|    |                   | 14     | policy about that kind of thing other than what a                     |
|    |                   | 15     | person can physically handle or not handle.                           |
|    |                   | 16     | Q.    And is there any indication here that                           |
|    |                   | 17     | Ms. Key could not have physically handled the                         |
|    |                   | 18     | requirements of the mailroom at Hyundai?                              |
| 61 | 091:21 - 092:03   | 091:21 | A.    There is nothing that I've seen that                            |
|    |                   | 22     | says so.  But also I'm going to add that that's                       |
|    |                   | 23     | irrelevant as far as Dynamic Security is                              |
|    |                   | 092:01 | concerned, because she was let go because Hyundai                     |
|    |                   | 02     | didn't want her on the site because of                                |
|    |                   | 03     | hairstyles.                                                           |
| 62 | 093:16 - 093:19   | 093:16 | Q.    Okay.  Let me show you Plaintiff's                              |
|    |                   | 17     | Exhibit 40.                                                           |
|    |                   | 18     | A.    Okay.  There you go.  I'm sorry.  I                             |
|    |                   | 19     | did get this Bates statement.                                         |
| 63 | 094:06 - 094:19   | 094:06 | Plaintiff's Exhibit 40.  And this is an e-mail                        |
|    |                   | 07     | from you to Ms. Spires, right?                                        |
|    |                   | 08     | A.    That's correct.                                                 |
|    |                   | 09     | Q.    Okay.  And then T. Peeples, who is T.                           |
|    |                   | 10     | Peeples?                                                              |
|    |                   | 11     | A.    He was a site supervisor, I think,                             |
|    |                   | 12     | out at Koch Foods maybe, I think.  Yeah, I think                      |
|    |                   | 13     | that's right.                                                         |
|    |                   | 14     | Q.    Why would he have been copied on this                           |
|    |                   | 15     | e-mail?                                                               |
|    |                   | 16     | A.    If that's who that is, it would have                           |
|    |                   | 17     | -- he was one of the positions we were looking to                     |
|    |                   | 18     | move her to.                                                          |

| | | | |
|---|---|---|---|
| | | 19 | Q.    Okay. |
| 64 | 096:12 - 097:13 | 096:12 | Did you ask Ms. Key if she had any |
| | | 13 | issues with Dynamic Security? |
| | | 14 | A.    It came up in the conversation, |
| | | 15 | obviously, or I would not have said that she had |
| | | 16 | no issues with Dynamic Security. |
| | | 17 | Q.    Okay.  Do you recall how it came up? |
| | | 18 | A.    Well, it's just in the idea that she |
| | | 19 | was letting me know that Hyundai was the issue, |
| | | 20 | and Hyundai's policies were the issue, but that |
| | | 21 | in her mind, we were treating her fair. |
| | | 22 | Q.    Okay.  Do you think you would have |
| | | 23 | asked her, Do you have any issues with Dynamic? |
| | | 097:01 | A.    Of course, yeah. |
| | | 02 | Q.    Would you have asked her if she was |
| | | 03 | going to sue Dynamic? |
| | | 04 | A.    No, I would not. |
| | | 05 | Q.    And if Ms. Key says that you did, |
| | | 06 | would you dispute that? |
| | | 07 | A.    If I asked if she was going to sue? |
| | | 08 | Q.    Right. |
| | | 09 | A.    Yeah, I would -- I don't know.  I |
| | | 10 | mean, I would not normally have asked that |
| | | 11 | question.  Could I have said something off the |
| | | 12 | top of my head somewhere running out the door, I |
| | | 13 | mean, who knows. |
| 65 | 097:18 - 098:06 | 097:18 | Q.    Okay.  The last two paragraphs or |
| | | 19 | sentences there, you said, I can attempt to |
| | | 20 | reassign Ms. Key to a different site, but I don't |
| | | 21 | think that's advisable at this time, especially |
| | | 22 | if she has to carry through -- especially if she |
| | | 23 | is to carry through with the stated, quote, |
| | | 098:01 | official complaint, end quote, of discrimination |
| | | 02 | against Hyundai, Ms. Williams, and Ms. Robinson. |
| | | 03 | Do you see that? |
| | | 04 | A.    I do. |
| | | 05 | Q.    So why would it not be advisable to |
| | | 06 | reassign Ms. Key? |
| 66 | 098:08 - 099:03 | 098:08 | A.    Okay.  The last question on this |
| | | 09 | e-mail says, Any guidance or thoughts.  So what I |
| | | 10 | was doing was going to HR asking them to advise |
| | | 11 | me on how to act or what to do next, what would |

```
              12   be the best policy.
              13            I was concerned that if she was
              14   bringing forth the official complaint, what was
              15   the policy of Dynamic in reference to keeping a
              16   person working if they are going through the
              17   official complaint like this.  That's all I was
              18   asking.
              19            I didn't have an opinion about it one
              20   way or the other, just trying to find out what
              21   Dynamic's policy was.  Just I wondered does it
              22   make sense to keep somebody on.  I'm wondering as
              23   a manager, asking my bosses, Does that make sense
          099:01   to keep somebody on who has an official complaint
              02   going?  And they advised me, and I followed
              03   through with what they said.
```

| 67 | 101:08 - 101:22 | |
|----|-----------------|---|

```
          101:08        Q.    Did you receive training from Dynamic
              09   Security about how to respond to complaints like
              10   this?
              11        A.    Yes, of course.
              12        Q.    Okay.  And did that training include
              13   non-retaliation provisions?
              14        A.    Yes, yes, yes.  Of course.
              15        Q.    And do you understand from that
              16   training that not reassigning someone or not
              17   providing someone -- let me ask it this way:  Do
              18   you understand from that training that not
              19   offering someone another position would be
              20   retaliation?
              21        A.    It could be -- it could be termed
              22   that way, yes.
```

| 68 | 103:03 - 103:16 | |
|----|-----------------|---|

```
          103:03        Q.    Did you offer her full-time
              04   positions?
              05        A.    We didn't have any full-time
              06   positions available at the time.
              07        Q.    In the entire -- so if this happened
              08   August 1st and you left -- when were you
              09   terminated, September 1st?
              10        A.    September 1st, around September 1st,
              11   yeah.
              12        Q.    So in that entire thirty days, did
              13   you offer Ms. Key a full-time position anywhere?
              14        A.    I do not know.  I do not remember.
```

| | | |
|---|---|---|
| | | 15      Q.      Let me show you Plaintiff's Exhibit<br>16  41. |
| 69 | 104:04 - 104:09 | 104:04      Q.      You see down at the very last<br>05  sentence of Ms. Williams' e-mail, I foresee an<br>06  issue down the road with this person?<br>07      A.      Yes.<br>08      Q.      As the recipient of this e-mail, what<br>09  did you understand that to mean? |
| 70 | 104:13 - 104:22 | 104:13      A.      That was an opinion from Ms. Williams<br>14  about potential issues.  It didn't -- she didn't<br>15  specify what those issues were.<br>16          Typically, she would tell me, Oh, the<br>17  person has got an attitude or something like<br>18  that.  But in this specific instance here, I'm<br>19  sure she was talking about, as she says in the<br>20  e-mail, about her ability to lift boxes.  And<br>21  also, as we know, about -- ultimately, about the<br>22  hair situation, the appearance standards. |
| 71 | 107:16 - 107:22 | 107:16      Q.      Exhibit 28, do you recognize Exhibit<br>17  28?<br>18      A.      Yes, that's my handwriting.<br>19      Q.      So you completed these forms?<br>20      A.      I did.<br>21      Q.      On what date?<br>22      A.      1st of August. |
| 72 | 108:03 - 108:13 | 108:03      Q.      Did Ms. Key sign these forms?<br>04      A.      She did not.  There's no place for<br>05  her to sign them.<br>06      Q.      And you didn't request that she sign<br>07  the forms?<br>08      A.      I don't recall.<br>09      Q.      Do you recall whether you presented<br>10  both of these job opportunities to Ms. Key at one<br>11  time?<br>12      A.      They were both presented at the same<br>13  time, I'm sure, yeah. |
| 73 | 108:16 - 108:17 | 108:16      Q.      Would that have been in person or<br>17  over the phone? |
| 74 | 108:20 - 108:23 | 108:20      A.      I don't remember.  Most likely, it<br>21  would have been in person, though.  I mean, I<br>22  can't imagine -- I don't know.  I don't know |

| | | |
|---|---|---|
| | | 23  which I did.  I don't know. |
| 75 | 109:22 - 110:09 | 109:22      Q.    If you'll look for me on Page 30, at |
| | | 23  the bottom just above the reason for refusal, it |
| | | 110:01  says hours per week, sixteen. |
| | | 02      A.    Uh-huh (positive response). |
| | | 03      Q.    Would that mean that -- |
| | | 04      A.    It was sixteen hours, that's correct. |
| | | 05  Yeah, that's all correct. |
| | | 06      Q.    And the next page, sixteen as well? |
| | | 07      A.    Yeah.  That's correct.  They were |
| | | 08  part-time.  That's what I thought at first, they |
| | | 09  were part-time.  I confused myself with looking |
| 76 | 112:10 - 114:02 | 112:10  you Exhibit 33.  If you could look back at that |
| | | 11  document for me. |
| | | 12      A.    I've completed reading it just now. |
| | | 13      Q.    Do you recognize that? |
| | | 14      A.    I do. |
| | | 15      Q.    What do you recognize it to be? |
| | | 16      A.    It is my statement reference to Ms. |
| | | 17  Key's employment at -- with Dynamic Security. |
| | | 18      Q.    Why did you prepare this statement? |
| | | 19      A.    This was prepared to record the |
| | | 20  details of what took place in reference to her |
| | | 21  complaint. |
| | | 22      Q.    Did somebody ask you to prepare it? |
| | | 23      A.    I'm not sure.  It would be something |
| | | 113:01  that I would normally do as a part of being |
| | | 02  involved in the process as part of the |
| | | 03  investigation. |
| | | 04      Q.    And the date on this is August 14th, |
| | | 05  2017, right? |
| | | 06      A.    Correct. |
| | | 07      Q.    So this is a couple of weeks after |
| | | 08  the initial complaint? |
| | | 09      A.    That is correct. |
| | | 10      Q.    Do you have any recollection of |
| | | 11  whether you would have prepared this form in |
| | | 12  response to an EEOC charge? |
| | | 13      A.    This is simply a statement of what |
| | | 14  happened.  I suspect -- I don't remember for |
| | | 15  sure.  I suspect that HR would have asked me for |
| | | 16  something like this, but as you can see, I've |

|    |                  |        |                                                    |
|----|------------------|--------|----------------------------------------------------|
|    |                  | 17     | provided the statement.                            |
|    |                  | 18     | Q.   Okay.  And about midway down the              |
|    |                  | 19     | statement you say, Ms. Key repeatedly stated she   |
|    |                  | 20     | has, quote, no problem with Dynamic Security, end  |
|    |                  | 21     | quote.  Do you see that?                           |
|    |                  | 22     | A.   I do.                                         |
|    |                  | 23     | Q.   And that she intended to file an EEOC         |
|    |                  | 114:01 | complaint against HMMA for discrimination.         |
|    |                  | 02     | A.   Uh-huh (positive response).                   |
| 77 | 114:19 - 115:23  | 114:19 | Q.   Okay.  And then further down, it              |
|    |                  | 20     | says, Dynamic did not have any full-time           |
|    |                  | 21     | positions available at the moment.  Do you see     |
|    |                  | 22     | that?                                              |
|    |                  | 23     | A.   Yes.                                          |
|    |                  | 115:01 | Q.   Is that your recollection --                 |
|    |                  | 02     | A.   That is correct.                             |
|    |                  | 03     | Q.   -- as of August 14th, 2017, there            |
|    |                  | 04     | were no full-time positions to offer Ms. Key?     |
|    |                  | 05     | A.   Yes.  It even says in the statement,          |
|    |                  | 06     | As of the date of the statement, August 14th,      |
|    |                  | 07     | 2017, there are no full-time first shifts          |
|    |                  | 08     | available in the Montgomery district.              |
|    |                  | 09     | Q.   Okay.  And then just a little under           |
|    |                  | 10     | that, it says, Ms. Key was informed that there     |
|    |                  | 11     | may be a part-time first shift available on the    |
|    |                  | 12     | weekend at Koch, but she initially declined that   |
|    |                  | 13     | position.  Do you see that?                        |
|    |                  | 14     | A.   Yes.                                          |
|    |                  | 15     | Q.   Do we have a refusal assignment form          |
|    |                  | 16     | for a first shift part-time weekend position at    |
|    |                  | 17     | Koch?                                              |
|    |                  | 18     | A.   I don't have one.  I do not possess           |
|    |                  | 19     | one.                                               |
|    |                  | 20     | Q.   Okay.  If a position had been                 |
|    |                  | 21     | offered, would that form have been completed?      |
|    |                  | 22     | A.   It's supposed to be completed.                |
|    |                  | 23     | Whether it was or not, I have no idea.             |
| 78 | 116:22 - 117:14  | 116:22 | Q.   Exhibit 35.  All right.  Exhibit 35           |
|    |                  | 23     | is another string of e-mails.  I want to look      |
|    |                  | 117:01 | specifically to the bottom of Page 51, which is    |
|    |                  | 02     | an e-mail from you, again, to Sherry.  What's the  |
|    |                  | 03     | date of that e-mail?                               |

| | | | |
|---|---|---|---|
| | | 04 | A.   August 10th. |

```
04        A.    August 10th.
05             Q.    Okay.  And your second to the last
06   sentence, just before your thanks, it says,
07   Lastly, in light of her current complaint, am I
08   free to offer her a position with Dynamic should
09   we be able to agree on a place for her to work.
10   Do you see that?
11        A.    Yes.
12             Q.    So is this now the second time that
13   you've asked if you can place Ms. Key somewhere
14   else in light of her current complaint?
```

| 79 | 117:16 - 117:16 | 117:16 | A.    Seems like that's true. |
| 80 | 119:04 - 119:05 | 119:04 | Q.    Let me show you Plaintiff's Exhibit |
| | | 05 | 30 -- 37? |

| 81 | 119:10 - 119:21 | 119:10 | Q.    Okay.  I'm going to point you to the |

```
11   second page, so Page 70, Dynamic-Key 70.  What's
12   the date of that e-mail from you to Sherry?
13        A.    August 7th.
14             Q.    Okay.  And first off, the very last
15   sentence, you say, Also, is it advisable to try
16   to move her to a different site when she is
17   making threats to sue HMMA over the appearance
18   standards?  Do you see that?
19        A.    Still asking the question, am I not?
20             Q.    Does that -- so that's a third time?
21        A.    Yeah, it looks like it.
```

| 82 | 121:10 - 122:16 | 121:10 | Q.    (BY MS. PALMER:)  Have you seen |

```
11   Plaintiff's Exhibit 45 before?
12        A.    Well, since I sent it, yes, I've seen
13   it, I guess.
14             Q.    Okay.  And what is Plaintiff's 45?
15   Why did you send this e-mail to Ms. Spires and
16   Ms. Riddle?
17        A.    Well, obviously, they asked
18   questions, and so I answered the questions.
19             Q.    Number 4 there, it says, I have
20   included the refusal of assignment forms, but as
21   I stated, I requested, and then it stops.
22        A.    Yeah, that's just the -- you know how
23   you revise a sentence and then part of it stays
122:01  on that you didn't mean to stay on.  I don't know
02   what that means other than, you know, that's just
```

| | | | |
|---|---|---|---|
| | | 03 | a in a hurry kind of thing. |
| | | 04 | Q.    So you don't have any recollection of |
| | | 05 | what you had intended to put there or what you |
| | | 06 | had changed? |
| | | 07 | A.    Yeah, I don't know. |
| | | 08 | Q.    And then you attached to this e-mail |
| | | 09 | Ms. Key's original complaint.  Do you see that, |
| | | 10 | FYI, I also included? |
| | | 11 | A.    Yes, ma'am. |
| | | 12 | Q.    Why did you send another copy of Ms. |
| | | 13 | Key's original complaint? |
| | | 14 | A.    To make it easier for her.  She |
| | | 15 | didn't have to go looking for anything.  It's |
| | | 16 | right there so she can see it. |
| 83 | 122:23 - 123:07 | 122:23 | Q.    What's the date on this e-mail? |
| | | 123:01 | A.    August 29th, 2017. |
| | | 02 | Q.    And so as of this e-mail, August |
| | | 03 | 29th, we're roughly twenty-nine days after she's |
| | | 04 | been removed from Hyundai.  Were the two offers |
| | | 05 | in the refusal forms that we saw earlier the only |
| | | 06 | positions that had been offered to her at that |
| | | 07 | point that you can recall? |
| 84 | 123:09 - 123:16 | 123:09 | A.    Well, I can only recall them because |
| | | 10 | I've got the paperwork, so we could have verbally |
| | | 11 | -- we could have easily verbally talked to her |
| | | 12 | about other things, but I don't know that we did. |
| | | 13 | Q.    If you had verbally offered her |
| | | 14 | another position and she had turned it down, |
| | | 15 | would you have completed an assignment refusal |
| | | 16 | form? |
| 85 | 123:20 - 124:04 | 123:20 | A.    Well, at the time that the situation |
| | | 21 | was going on, things were pretty much in turmoil |
| | | 22 | just across the branch, and there was -- thinking |
| | | 23 | about it now, there were several other sites that |
| | | 124:01 | needed immediate attention.  So I may have been |
| | | 02 | getting ready to do that, and then, like I said, |
| | | 03 | the next week I was gone.  So I can't -- they |
| | | 04 | would be the standard policy to do that, yes. |
| 86 | 124:14 - 125:08 | 124:14 | Q.    You said that the branch was in |
| | | 15 | turmoil.  What was going on at the branch? |
| | | 16 | A.    Well, we had let go several managers |
| | | 17 | in the organization, and so there was a new site |

|    |                 |        |                                                       |
|----|-----------------|--------|-------------------------------------------------------|
|    |                 | 18     | out in Selma that was causing a lot of uproar.        |
|    |                 | 19     | It was a consuming a lot of time for me trying to     |
|    |                 | 20     | find a field supervisor at the time, some things      |
|    |                 | 21     | that were going on, just normal security business     |
|    |                 | 22     | kind of things that were happening.                   |
|    |                 | 23     | Q.    What was the new site in Selma?                 |
|    |                 | 125:01 | A.    It was -- I think it was either Bush            |
|    |                 | 02     | Hog or Honda Locks.  I think Honda Locks may have      |
|    |                 | 03     | been what it was.                                     |
|    |                 | 04     | Q.    And was Dynamic Security offering               |
|    |                 | 05     | security services at that site?                       |
|    |                 | 06     | A.    Yes.  We had picked up the site just            |
|    |                 | 07     | within a few weeks before this whole situation        |
|    |                 | 08     | took place, yeah.                                     |
| 87 | 125:22 - 127:01 | 125:22 | Q.    Was Ms. Key qualified to work on-site           |
|    |                 | 23     | security?                                             |
|    |                 | 126:01 | A.    Yes, she was.                                   |
|    |                 | 02     | Q.    Was she offered any position at Bush            |
|    |                 | 03     | Hog or Honda Locks?                                   |
|    |                 | 04     | A.    I do not recall.                                |
|    |                 | 05     | Q.    The -- after you left -- sorry.                 |
|    |                 | 06     | After Dynamic terminated you, you took some time      |
|    |                 | 07     | off.  You said you semi-retired --                    |
|    |                 | 08     | A.    Uh-huh (positive response).                     |
|    |                 | 09     | Q.    -- and then you went to work for                |
|    |                 | 10     | Dothan Security, and you mentioned that Dothan        |
|    |                 | 11     | then picked up the Hyundai contract.                  |
|    |                 | 12     | A.    Correct.                                        |
|    |                 | 13     | Q.    So was it the same job, same duties,            |
|    |                 | 14     | same positions?                                       |
|    |                 | 15     | A.    Same job, same duties, same people in           |
|    |                 | 16     | charge as far as our contacts at Hyundai were         |
|    |                 | 17     | concerned, at least at the level of the               |
|    |                 | 18     | operations manager.  Ms. Williams was still in        |
|    |                 | 19     | charge just like she was back in 2017.                |
|    |                 | 20     | Q.    And do you have any recollection of             |
|    |                 | 21     | when that happened, when Dothan took the contract     |
|    |                 | 22     | for Hyundai?                                          |
|    |                 | 23     | A.    Yeah.  It's just been recently, I               |
|    |                 | 127:01 | mean, within --                                       |
| 88 | 127:03 - 127:09 | 127:03 | A.    I worked there from April, and I                |
|    |                 | 04     | guess it must have been around October, November     |

| | | |
|---|---|---|
| | | 05 timeframe that -- and, you know, I could go look |
| | | 06 it up, but I want to say October, November |
| | | 07 timeframe that Dothan Security took it over. |
| | | 08 **Q.    Of 2021?** |
| | | 09      A.    Of 2021, yes. |
| 89 | 158:07 - 158:16 | 158:07 **Q.    How long were you employed with** |
| | | 08 **Dynamic Security total?** |
| | | 09      A.    A little over a year. |
| | | 10 **Q.    And then when you went to work for** |
| | | 11 **Dothan, you still worked with the Hyundai** |
| | | 12 **facility, correct?** |
| | | 13      A.    Yes. |
| | | 14 **Q.    And you are just today learning that** |
| | | 15 **there's an entity called Hyundai Engineering** |
| | | 16 **America or Hyundai HEA; is that right?** |
| 90 | 158:19 - 159:07 | 158:19      A.    Everybody else may have realized it. |
| | | 20 I didn't realize it.  It's as plain as the nose |
| | | 21 on your face in the paperwork, but I didn't catch |
| | | 22 it, because we just -- we talked in terms of |
| | | 23 Hyundai.  That's who we worked for.  That's who |
| | | 159:01 we talked to.  That's how that works. |
| | | 02 **Q.    Right.  And if you working for the** |
| | | 03 **company, working for Dynamic Security for a long** |
| | | 04 **period of time, didn't know the difference** |
| | | 05 **between HMMA and HEA, is it safe to say that Ms.** |
| | | 06 **Key, who was stationed there for I think a total** |
| | | 07 **of four hours, wouldn't know the difference?** |
| 91 | 159:10 - 159:12 | 159:10      A.    That is an opinion, yeah.  It |
| | | 11 makes -- |
| | | 12 **Q.    Is it a reasonable inference to make?** |
| 92 | 159:16 - 159:16 | 159:16      A.    We all thought it was Hyundai. |