# EXHIBIT B

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4    CASE NUMBER

5    2:19-CV-767-ECM-SMD

6

7  DAVITA M. KEY,

8    Plaintiff,

9  V.

10  HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC;

11  HYUNDAI ENGINEERING AMERICA, INC.; and DYNAMIC

12  SECURITY, INC.,

13    Defendants.

14

15

16    VIDEO DEPOSITION TRANSCRIPT OF

17    RAY CURETON

18

19

20    AUGUST 30, 2022

21    9:16 A.M.

22

23

Page 2

1    The video deposition of RAY CURETON

2  was taken before Tanya D. Cornelius, CCR,

3  on August 30, 2022 by Leslie Palmer, commencing

4  at approximately 9:16 a.m., at Palmer Law, LLC,

5  104 23rd Street South, Suite 100, Birmingham,

6  Alabama pursuant to the stipulations set forth

7  herein.

8

9    S T I P U L A T I O N

10    IT IS STIPULATED AND AGREED by and

11  between the parties through their respective

12  counsel that the video deposition of RAY CURETON

13  may be taken before Tanya D. Cornelius, CCR and

14  Notary Public, State of Alabama at Large, at the

15  law offices of Palmer Law, LLC, 104 23rd Street

16  South, Suite 100, Birmingham, Alabama, on August

17  30, 2022, commencing at approximately 9:16 a.m.

18    IT IS FURTHER STIPULATED AND AGREED

19  that the signature to and the reading of the

20  by the witness is waived, the deposition to have

21  the same force and effect as if full compliance

22  had been had with all laws and rules of Court

23  relating to the taking of depositions.

Page 3

1    IT IS FURTHER STIPULATED AND AGREED

2  that it shall not be necessary for any

3  objections to be made by counsel to any

4  questions, except as to form or leading

5  questions and that counsel for the parties may

6  make objections and assign grounds at the time

7  of trial or at the time said deposition is

8  offered in evidence, or prior thereto.

9    IT IS FURTHER STIPULATED AND AGREED

10  that notice of filing of the deposition by the

11  Commissioner is waived.

12

13

14

15

16

17

18

19

20

21

22

23

Page 4

1    A P P E A R A N C E S

2

3

4  APPEARING ON BEHALF OF THE PLAINTIFF:

5    PALMER LAW, LLC

6    BY:  Leslie Palmer, Esq.

7    104 23rd Street South, Suite 100

8    Birmingham, Alabama  35223

9

10

11  APPEARING ON BEHALF OF THE DEFENDANTS:

12    LEHR MIDDLEBROOKS VREELAND & THOMPSON, PC

13    BY:  Whitney R. Brown, Esq.

14    P.O. Box 11945

15    Birmingham, Alabama  35202-1945

16

17

18    FORD HARRISON, LLC

19    BY:  Wesley C. Redmond, Esq.

20    420 20th Street North, Suite 2560

21    Birmingham, Alabama  35203

22

23

Page 13

1 That's a very -- you know, couple of hours a week

2 kind of a thing.

3    Q.   How long have you been a minister

4 with the church down in Clayton, Alabama?

5    A.   Eight and a half years.

6    Q.   And how long have you been mentoring

7 at Columbia International?

8    A.   Three years.

9    Q.   In the past three years, have you

10 held any other employment?

11    A.   I have.  I worked as an operations

12 manager for Dothan Security, Incorporated in

13 Montgomery in the Montgomery office.

14    Q.   When did you hold that position?

15    A.   From April of 2021 to January of

16 2022.

17    Q.   And what did Dothan Security do?

18    A.   They provided contract security.

19    Q.   Similar to Dynamic Security?

20    A.   Yes.

21    Q.   Okay.  What position did you hold

22 before the ops manager at Dothan Security?

23    A.   That's the only position I held at

Page 14

1 Dothan Security.

2    Q.   Where did you work prior to that?

3    A.   I retired, semi-retired.  It's just

4 working at the church.  I've retired from

5 full-time work.

6    Q.   When did you retire?

7    A.   Well, initially, back when I left

8 Dynamic in 2017, and then a friend of mine called

9 me back to work, and I agreed to work temporarily

10 for Dothan Security.  I've got to keep these DSIs

11 straight here, but in Dothan Security.  So I

12 worked for them for a few months.

13    Q.   Okay.  So you went from retirement at

14 Dynamic straight to Dothan and then back to

15 semi-retirement with the church and Columbia?

16    A.   Yes.  Dynamic, retirement, then to,

17 yeah, Dothan, and then back semi-retirement,

18 correct.

19    Q.   Okay.  All right.  Let's talk about

20 your employment with Dynamic Security since

21 that's why we're here today.  When did you start

22 with Dynamic Security?

23    A.   I think it was August 1st of 2016, I

Page 15

1 think.

2    Q.   Okay.  And what was your position?

3    A.   I was a manager down in Montgomery.

4 I want to say operations manager at first.  I

5 started out as the operations manager.

6    Q.   Okay.  And you say at first.

7    A.   Uh-huh (positive response).

8    Q.   Did that change?

9    A.   It did.  I was promoted part way

10 through, and I don't know the dates about when

11 that happened, but -- and I was made the -- I'm

12 trying to think, remember what it was called.  It

13 was district manager.  I think that was right.

14    Q.   Okay.  I'm going to give you some

15 documents to look at through this.  They've been

16 pre-numbered from other depositions, so they're a

17 little out of order.  Just ignore that.

18        This one is Plaintiff's Exhibit 60.

19    A.   Okay.

20    Q.   And this is a Dynamic Security

21 document.  Do you recognize that?

22    A.   If it's -- yeah, it's a Dynamic

23 Security document, that's true.

Page 16

1    Q.   Is this your handwriting on the

2 document?

3    A.   This document?

4    Q.   Yes.

5    A.   No, it's not.

6    Q.   Do you know whose handwriting that

7 is?

8    A.   I do not.

9    Q.   Okay.  This is from your personnel

10 file as represented by Dynamic Security to us,

11 and it shows your start date is 8/1/16, so that's

12 in line with what we've talked about.

13    A.   Yeah.

14    Q.   And your job title is operations

15 manager.  I want to point your attention down to

16 the box around Justification for Position.  In

17 the parentheses there, it says, Operations

18 Manager is required for Hyundai contract.  Do you

19 see that?

20    A.   Yes.

21    Q.   Okay.  Do you know what that means,

22 the operations manager required for Hyundai

23 contract?

Page 17

1        MR. REDMOND:  Object to the form.
2        MS. BROWN:  Object to the form.
3        MR. MILLER:  Same objection.
4     Q.   You can answer.  You'll hear that
5   from time to time.  They just don't like
6   something about the way I asked it.
7     A.   Would you repeat the question,
8   please?
9     Q.   Yes, sir.  The line that I pointed
10  you to there, that operations manager is required
11  for Hyundai contract, do you know what that's in
12  reference to?
13        MR. REDMOND:  Object to the form.
14        MS. BROWN:  Same objection.
15        MR. MILLER:  Same objection.
16    A.   As far as I understand, that part of
17  my responsibility would be supervising the major
18  contract at the time, which was at Hyundai.
19    Q.   Okay.  And then underneath that, it's
20  talking about you get three hundred dollars a
21  month for car allowance, a fuel card, a laptop,
22  and a cellphone; is that right?
23    A.   Correct.

Page 18

1     Q.   So you had a cellphone provided by
2   Dynamic Security?
3     A.   I did.
4     Q.   Did you use that cellphone to text
5   communications with any other employees?
6     A.   I did.
7     Q.   Okay.  Do you know if you used that
8   cellphone to text communications about anything
9   related to this lawsuit or Ms. Key?
10    A.   I did not.
11    Q.   Okay.  What types of texts would you
12  --
13    A.   Let me clarify just a minute, because
14  I didn't -- okay.  Are you asking me if I texted
15  those people back then or are you asking me in
16  connection with the lawsuit?  I don't think I
17  understand.
18    Q.   Yes, sir, I'm sorry, and thank you
19  for clarifying, because that's important.
20        So with that company cellphone that
21  you had back then, did you use that company
22  cellphone to text with other Dynamic employees?
23    A.   Yes.

Page 19

1     Q.   Okay.  And did you have any texts
2   related to Davita Key?
3     A.   I'm going to say the truth, probably,
4   but I don't know that absolutely.
5     Q.   Okay.  If you thought that you did,
6   who would those texts have been with?
7     A.   With Gloria, and I don't remember
8   Gloria's last name, but she was the manager at
9   Hyundai for Dynamic Security that we hired or she
10  actually -- yeah, the one that we hired.
11  Actually, I hired her, so in connection -- in
12  consultation with Cassandra Williams, who was the
13  head of security out there for Hyundai at the
14  time, and still is.
15    Q.   Would you have had any texts with
16  anyone else from Dynamic Security related to
17  Davita Key?
18    A.   If I -- most likely I would have used
19  e-mail to contact HR and also my boss in
20  Birmingham, and possibly -- again, I don't know
21  this for sure, and I'm not saying that it exists,
22  but I would have -- maybe Mike Keller, who was my
23  boss, I could have been texting him, too, but I

Page 20

1   don't know that for sure.
2     Q.   Okay.  What type of cellphone was it?
3   Do you remember?
4     A.   It was an Apple -- it was an iPhone.
5   I don't know what version.
6     Q.   IPhone?  Do you know if Ms. Gloria
7   Robinson had a company provided phone?
8     A.   She did.
9     Q.   And so if you had texts with her,
10  would that have been from your company phone to
11  her company phone?
12    A.   Yes.
13    Q.   And was hers an iPhone as well?
14    A.   Yes, yes.
15    Q.   Did you do anything to preserve any
16  text messages on that phone?
17    A.   I did not.
18    Q.   Do you recall anyone asking you to do
19  anything to preserve any text messages on that
20  phone?
21    A.   No one did.
22    Q.   Okay.  What were your job duties at
23  Dynamic Security?

Ray Cureton

Page 21

1   A.   Well, as an operations manager, I was
2   responsible for ensuring the manning and
3   operations of several sites that -- at the time
4   that Dynamic was responsible for, providing
5   security and making sure the leadership was in
6   place, making sure that individuals are showing
7   up for work, making sure that resources were
8   properly used.  And hiring was also a part of my
9   responsibilities, hiring new officers, at least
10  overseeing that.
11         And then also disciplinary actions
12  came through my desk for review, and sometimes I
13  initiated them depending on the situation.  So
14  just normal operations type duties.
15      Q.   Okay.  When did your employment end?
16      A.   I want to say September 2017.
17      Q.   And what were the terms of the end of
18  your employment?  Why did you stop working for
19  Dynamic Security?
20         MR. REDMOND:  I'm just going to
21  object.  I think that's two questions, but --
22      A.   I was let go.
23      Q.   Okay.  Who terminated you?

Page 22

1   A.   That's really a good question.  I was
2   -- the district manager of the Birmingham office
3   came down to Montgomery and asked me to remove my
4   things from the site and that I was being let go.
5      Q.   And what was the district manager's
6   name?
7      A.   I can tell you.  Hang on a minute.
8   Marshay Webb.
9      Q.   Did Marshay Webb tell you why you
10  were being let go?
11      A.   He did not.
12      Q.   Did you have any idea that it was
13  coming?
14      A.   I did not.
15      Q.   Had you ever been disciplined for
16  anything?
17      A.   I had not.
18      Q.   Do you have any idea what -- in your
19  mind, what would you think it would be?
20         MS. BROWN:  Object to the form.
21         MR. REDMOND:  Object to the form.
22         MR. MILLER:  Object to the form.
23      A.   I really don't know.  Honestly, the

Page 23

1   week before they let me go, I had been assured by
2   -- and I do not know his name, because he hadn't
3   been there very long -- my original boss's
4   replacement that everything was fine and that I
5   would -- if he lost his job, I would be fine and
6   wouldn't lose mine, and then I lost it.
7         So I don't know what their thinking
8   was.  I never heard from anybody in any kind of
9   authority under -- you know, above me about that,
10  either before or after, and that is the gospel
11  truth.
12      Q.   Okay.  So the person who assured you,
13  that was your old boss's replacement?
14      A.   Uh-huh (positive response), yeah, I
15  think so.  It's -- yes, that's who it was, yeah.
16      Q.   Do you remember his name?
17      A.   I do not.  I really do not.
18      Q.   What was your old boss's name?
19      A.   Mike Keller.
20      Q.   And do you remember when Mike Keller
21  left?
22      A.   It was right around the time of this
23  incident, because I think he left a month before

Page 24

1   I did.  So I think he probably left in August and
2   -- or maybe the end of July.  It was right around
3   the time all this was taking place.
4      Q.   Okay.  And the new boss that said he
5   had lost his job, is he talking about Mike Keller
6   or is he talking about himself?
7      A.   I don't think I get your question.
8      Q.   You said that he assured you --
9      A.   That my job --
10      Q.   -- and I'm paraphrasing --
11      A.   Yes, because Mike had been let go, he
12  was reassuring me that my job was safe, and I got
13  that reassurance from Chris Hargrove as well.  I
14  think he was the vice-president or something or
15  he's head of something, I don't know, sales
16  maybe.  I'm not sure.  He's the guy that hired me
17  originally, so yeah.  He assured me.
18      Q.   Do you know why Mike Keller was
19  terminated?
20      A.   No, I don't know.  I don't know why.
21  I won't speculate.
22      Q.   Were you involved in his termination
23  at all?

Page 29

1  So I need to talk to somebody and figure out what
2  those are, okay?
3         So I'm going to show you Plaintiff's
4  Exhibit 20.
5         MR. MILLER:  I'm going to object to
6  the form.
7         Q.   This is HMMA Mailroom Duties and
8  Responsibilities is what the title of the
9  document is.  Would this type of document be
10 included in the post orders?
11        MS. BROWN:  Object to the form.
12        MR. MILLER:  Object to the form.
13        A.   I'm going to say probably so.  I
14 don't know -- I don't remember specifically if
15 this document was part of the mailroom, but it
16 would have been incorporated in some way, because
17 these -- what we would do, we would get with
18 Hyundai, with Ms. Williams specifically, to make
19 sure that the post orders were approved, both by
20 her and by us at Dynamic so that we would be on
21 the same page.
22        So these would be part of what we
23 understood the duties to be.  This is what she

Page 30

1  provided to us.
2         Q.   Do you recall seeing Exhibit 20
3  before?
4         A.   I have seen this.  I've seen these
5  requirements before for sure.
6         Q.   Okay.  And this sets out the duties
7  and responsibilities for employees in the
8  mailroom.  Does that include the hours that they
9  would work?
10        MR. MILLER:  Object to the form.
11        A.   Well, that can vary considerably
12 depending on manning, and the hours would vary.
13 I mean, they're set out when they're going to
14 have people there, but that could -- we might
15 have five people that had to work this position
16 in different times because of, you know, what
17 manning and all that kind of thing and who's
18 qualified and so -- and they change from time to
19 time.
20        I mean, I can promise you, I just was
21 working with the current -- when I worked for
22 Dothan Security, we had this same account.  So it
23 hasn't changed.  They're -- I'm not making any

Page 31

1  sense.  I'm rambling.  Yeah, they have basic
2  hours they're supposed to work.  Okay.
3         Q.   And who set the hours that they would
4  work in the mailroom?
5         MS. BROWN:  Object to the form.
6         MR. MILLER:  Object to the form.
7         A.   HMMA does, yeah.
8         Q.   The pay on this document is listed at
9  thirteen dollars an hour.  Is that something that
10 Dynamic Security came up with or is that set by
11 some other entity?
12        A.   It is negotiated with -- between the
13 two companies, between HMMA and the security
14 company.
15        Q.   And would Ms. Key have been making
16 thirteen dollars an hour the minute she started
17 at the mailroom?
18        A.   No.
19        MR. MILLER:  Object to the form.
20        A.   She would not.  My understanding is
21 that they get training pay the first week until
22 they're up to training status and approved.  Then
23 they would receive the full thirteen dollars at

Page 32

1  that time.
2         Q.   Okay.  All right.  Let's go back to
3  that handbook, which is Exhibit 27.  And flip for
4  me if you will to Dynamic-Key 7.  And I'm looking
5  at the bullet points over on the right-hand
6  column under the topic Covered in Training, and
7  the third one down says Legal Issues I.
8         Do you know what would be included in
9  Legal Issues I training?
10        A.   I do not.
11        Q.   Okay.  Did you participate in the new
12 employee training at all?
13        A.   Toward the end of my time I did.  I
14 had an office manager that did a lot of training,
15 plus Dynamic before -- well, part way through my
16 time there hired a full-time trainer that would
17 come down and do training a lot for folks.
18        But mostly it was handled by the
19 office manager.  All I can remember her name was
20 Zoe is all I can remember, her first name was
21 Zoe, and then a dedicated trainer.
22        Q.   Okay.  The dedicated trainer, was
23 their job to train new employees across the board

Page 37

1  we would notify HR directly.  And I don't
2  remember her name, but we did bring HR on right
3  away.
4        And also, the folks knew they could
5  contact HR directly themselves if they weren't
6  satisfied with our response.
7     Q.   So did you notify Mike Keller and HR
8  or just HR?
9     A.   Both.
10     Q.   Both?  What type of detailed
11  investigation would you conduct?
12     A.   Well, I would talk to the supervisor,
13  which would have been Gloria Robinson in this
14  case, and gotten her -- information from her on
15  the complaint.
16        I would have taken any statements of
17  any kind of witnesses that would have been
18  involved.  I would have talked with Ms. Key about
19  what her perception was on all of this, what was
20  going on, what her complaint was.
21        I would have forwarded all of that to
22  HR, because they're ultimately going to take
23  point on these kinds of things when it gets to

Page 38

1  the place where I'm having to make an
2  investigation.
3        So I just try to get the facts as
4  quickly as I can and get them into the hands of
5  people that can follow up with it.
6     Q.   Okay.  So did you make any decisions
7  related to whether an employee -- and I'm
8  speaking generally, not just Ms. Key, but did you
9  make any decisions as to whether employees had
10  been harassed or discriminated against as part of
11  that investigation?
12        MS. BROWN:  Object to the form.
13        MR. MILLER:  Object to the form.
14        MR. REDMOND:  Same objection to form.
15     A.   I have opinions, but no decisions at
16  this point.  I'm not the one that ultimately
17  would say, You're fired, because -- well, I might
18  be.  They may -- HR may come back and say -- but
19  normally HR would handle that themselves if they
20  find malfeasance going on in any situation like
21  that.
22     Q.   Okay.  All right.  And I'm going to
23  show you Plaintiff's Exhibit 30.

Page 39

1        MR. REDMOND:  Actually, I think this
2  is 31.
3        MS. PALMER:  31.  It is 31.
4     A.   You have to pass it through him
5  first, right?
6     Q.   (BY MS. PALMER:)  Okay.  So this is
7  another Dynamic Security document, and I know
8  it's hard to read, but at the top it says
9  Harassment in the Workplace.  And I believe this
10  one is from Ms. Key's personnel file.
11        Does this document contain any
12  additional policies outside of what we looked at
13  in the handbook or is it just sort of a
14  restatement?
15        MR. REDMOND:  Object to the form.
16     A.   I don't know if -- I mean, I would
17  have to compare the two myself to be able to
18  answer that fully.  I would think it's simply a
19  restatement of the policy.
20     Q.   So if you'll look for me, we've got
21  some headings, and we're under the policy
22  heading, the last paragraph, the second sentence.
23  Let's go four lines down, the first word is Any.

Page 40

1  Do you see that, Any employee?
2     A.   Yes.
3     Q.   So any employee engaging in such
4  conduct will be subject to appropriate
5  disciplinary action, up to and including
6  termination of employment.
7        While you were the operations
8  manager, did you have to discipline or terminate
9  any employee under this policy?
10     A.   Not that I recall.
11     Q.   Would you as a manager go through
12  additional training that the security officers
13  didn't go through?
14     A.   That would be correct.  That's what
15  the training that we talked about before from
16  Dynamic online would be additional training to
17  what a security officer would receive.
18     Q.   Okay.  So what training would the
19  security officers receive related to harassment
20  in the workplace?
21        MS. BROWN:  Object to the form.
22     A.   They would be briefed during their
23  normal training by the trainer on the policies

Page 45

1  other.

2  Q.   So the policy book would not have

3  been provided to the security officers?

4  **A.   No, no.  However, some of the**

5  **information from the policy book would be**

6  **included.  In other words, they didn't get the**

7  **policy book, but they would have gotten a lot of**

8  **information that was in the policy book, if that**

9  **makes sense.**

10  Q.   Okay.  When we were talking earlier

11  about the post instructions, you said that those

12  would be agreed on by both parties?

13  **A.   Yes.**

14  Q.   Would that include attire?

15  **A.   Well, the attire is dictated by the**

16  **client, not by Dynamic Security.  And that's, I**

17  **think, important in this kind of case.**

18  Q.   Do you remember what the attire was

19  for the mailroom at HMMA's property?

20  MS. BROWN:  Object to the form.

21  MR. REDMOND:  Object to the form.

22  MR. MILLER:  Object to the form.

23  **A.   Well, they -- as far as I remember,**

Page 46

1  **they wore the standard -- well, I think HMMA may**

2  **have had them in civilian clothes, but I'm not a**

3  **hundred percent sure about that.  I don't --**

4  **especially back in Dynamic days, I'm not sure.**

5  **At minimum, they would have had the**

6  **uniform that we provided for them, uniforms that**

7  **we provided for them.  And then they -- seems**

8  **like they included a long-sleeved shirt and maybe**

9  **a -- it could have been the receptionist.**

10  **I'm not a hundred percent sure, but**

11  **it -- you know, they would have been subject to**

12  **at least as a minimum the security uniform that**

13  **we provided, and I think that mailroom may have**

14  **had a little more, but I'm not a hundred percent**

15  **sure about that.**

16  **I know that's a fact for the**

17  **receptionist, but I'm not sure about mailroom.**

18  Q.   What is the uniform that Dynamic

19  provided?

20  **A.   It would have been a knit shirt,**

21  **pullover, with the person's name embroidered on**

22  **the shirt, and then the pants would have been**

23  **black pants, and I don't know what color.  I want**

Page 47

1  **to say it was blue, but I could be wrong about**

2  **that, the -- just, you know, a knit pullover**

3  **shirt, and a hat, and that was --**

4  Q.   Do you recall whether the pullover

5  shirt had anything identifying Dynamic Security

6  or Hyundai?

7  MS. BROWN:  Object to the form.

8  **A.   It would have -- it would have**

9  **identified Dynamic Security on the sleeve.**

10  Q.   On the sleeve, like a patch or

11  something?

12  **A.   Yes, a patch with Dynamic Security,**

13  **and then I know the individual's -- but, again,**

14  **I'm just trying to recall, but -- and the**

15  **embroidering of their name on the -- above the**

16  **pocket.**

17  Q.   Did Dynamic Security work with the

18  client to determine appearance standards for post

19  orders?

20  **A.   Yes, in the sense that --**

21  MR. REDMOND:  Object to the form.

22  Sorry.

23  **A.   Yes, in the sense that we discussed**

Page 48

1  **those requirements.  Those requirements were set**

2  **before I came on scene there, but we always made**

3  **sure we understood what the client's desire was**

4  **and tried our best to meet it.**

5  Q.   If a client, and not just Hyundai,

6  but any client, if a client had a specific

7  appearance standard, would Dynamic Security make

8  certain to obtain a written copy of that standard

9  for their own files?

10  **A.   Yes.**

11  MS. BROWN:  Object to the form.

12  MR. MILLER:  Object to the form.

13  **A.   Sorry.  I'm getting head of myself.**

14  MR. REDMOND:  Same objection.

15  Q.   Let me show you Plaintiff's Exhibit

16  9.

17  **A.   Uh-huh (positive response).**

18  Q.   Have you seen this document before?

19  **A.   It certainly looks similar to what**

20  **I've seen before.**

21  Q.   You said similar.  Can you tell me

22  what you've seen before, if it's not this one

23  exactly?

Page 57

1    A.   There's a date on here.  I think this
2  investigation was begun before this date.
3    Q.   Okay.
4    A.   I think this incident happened in the
5  end of July, and this is dated August 1st.
6    Q.   Okay.
7    A.   So we would have -- we've already had
8  information by that time that there was a
9  complaint from her about -- from Ms. Williams
10  about the hair, and so we would have started
11  looking into that immediately once that -- I
12  mean, you know, it's five years ago.  I mean, I
13  don't know for sure.
14    Q.   So if you're looking into Ms.
15  Williams having an issue with Ms. Key's hair, are
16  you investigating Ms. Key's complaint or are you
17  investigating whether Ms. Key is in compliance
18  with work standards?
19    A.   I am investigating whether Ms. Key is
20  in compliance with work standards.  And you know
21  what?  Thinking about this, I'm not -- I knew
22  about this complaint, but I'm going to say I
23  don't recall that particular document, because I

Page 58

1  don't remember Bates on top, the Bates that's on
2  the top.
3         I knew about this, but I don't -- I'm
4  going to change my testimony and have to say I
5  don't recall that specific document.
6    Q.   Okay.
7    A.   But I knew about this.  And the
8  reason I'm saying that is because of that date.
9  I would have -- this date is after we had started
10  looking into this whole situation.
11         And we knew at that point that she
12  was -- Ms. Key was not happy with Hyundai because
13  of what they were asking her to do.  We also knew
14  that Hyundai was not happy with Ms. Key because
15  she wasn't complying with their standards.  So we
16  were looking at both sides at that point.
17    Q.   What do you recall about Ms. Key's
18  pregnancy?  We've talked a little bit about hair,
19  but her pregnancy, what do you recall about that?
20         MS. BROWN:  Object to the form.
21    A.   The only thing I can think of --
22         MR. MILLER:  Object to the form.
23         MR. REDMOND:  Same objection.

Page 59

1    A.   -- is that it came out during the
2  time we were doing this investigation that she
3  was pregnant, which has nothing to do with
4  anything other than whether she would meet the
5  physical requirements to be able to lift the
6  fifty pounds that's required at the mailroom,
7  which I don't think we ever got that far in
8  the -- you know, where we got a doctor's notice
9  that she would be eligible.
10         So it had absolutely nothing to do
11  with the pregnancy itself.  It had to do with the
12  ability to handle the work itself.
13    Q.   Do you recall Ms. Robinson having
14  brought up Ms. Key's pregnancy in e-mails?
15    A.   She may well have brought it up,
16  yeah, I would think so, just as a statement, not
17  as a -- that has nothing to do with hiring or any
18  of that kind of stuff, but it -- I don't know.
19  It became common knowledge.  Everybody knew about
20  it at some point.
21    Q.   I'm going to show you Plaintiff's
22  Exhibit 36.  Okay.
23         MR. REDMOND:  Leslie, and I don't

Page 60

1  know if this helps any.  You can tell me to be
2  quiet at any time, but I think that's an
3  attachment to an e-mail that he or someone sent.
4         MS. PALMER:  Probably.
5         MR. REDMOND:  Okay.  I'm just -- my
6  one helpful hint today.
7    Q.   (BY MS. PALMER:)  Mr. Cureton, the
8  first page there of Exhibit 36, which is page
9  Dynamic-Key 64, it says Employee Disciplinary
10  Report, 64.
11    A.   Uh-huh (positive response), yes.
12    Q.   It says Employee Disciplinary Report
13  at the top.
14    A.   Uh-huh (positive response).
15    Q.   Did you complete this form?
16    A.   I did.
17    Q.   Is that your signature on the bottom?
18    A.   It is.
19    Q.   When did you complete it?
20    A.   In August 2017.
21    Q.   Do you know what time you did this?
22    A.   No.
23    Q.   And what did you mark as the reason

Page 61

1  for Ms. Key's discipline?

2      A.   It simply says here, Other conduct

3  warranting disciplinary action.

4      Q.   And then I see there at the bottom it

5  says, Forwarded to HR for resolution?

6      A.   Correct.

7      Q.   What was the resolution that was

8  reached?

9          MR. REDMOND:  Object to the form.

10     A.   I can't speak for HR.  I don't know

11 what resolution you're looking for.  If you're

12 asking what happened to Ms. Key, that's a

13 different question than what the resolution was

14 in this disciplinary form.

15         I mean, we offered her two other

16 positions, at least, and I think -- I would say

17 after that that we couldn't accommodate what she

18 wanted, and -- because we didn't have a position

19 open that was at the time that she could work,

20 and so she left.

21     Q.   Okay.  So you're not aware of what

22 the ultimate resolution was with regard to Ms.

23 Key's --

Page 62

1      A.   Harassment complaint?

2      Q.   Correct.

3      A.   Well, that's why we're here, I think.

4  That must be why we're here still.  It hasn't

5  been resolved yet.

6      Q.   Are you aware of what the ultimate

7  resolution was with regard to her removal from

8  Hyundai?

9      A.   She was removed --

10         MS. BROWN:  Object to the form.

11         MR. MILLER:  Object to the form.

12     A.   She was removed from Hyundai at the

13 client's request.

14     Q.   Are you aware of whether there were

15 any discussions between Dynamic and the client

16 related to whether her removal was appropriate?

17         MS. BROWN:  Object to the form.

18         MR. MILLER:  Object to the form.

19         MR. REDMOND:  Same objection to the

20 form.

21     A.   I'm going to answer it this way:  The

22 hair standards were -- everyone was very familiar

23 with those hair standards and knew what the

Page 63

1  requirements were.  Ms. Williams ultimately was

2  the one that decided whether or not the hair was

3  acceptable.  Once it was not and she asked us to

4  remove her from the site, we did that.

5          We did not remove Ms. Key as a

6  Dynamic employee.  We offered her other

7  positions.  At the time we had no full-time

8  positions on the shift that she wanted to work,

9  and so we offered her two other positions at, I

10 think, Mobis and Koch Foods.

11         I don't know specifically what times

12 they were, but they were part-time positions, and

13 she was not able to work those times, and left,

14 quit on her own as far as I know.

15     Q.   Why do you believe she quit?

16     A.   Because we couldn't provide for her

17 the schedule that she wanted and because -- well,

18 because there was no position for her to work

19 that she could agree to, that she would agree to.

20     Q.   Let me ask it this way:  What

21 evidence do you have to support your position

22 that Ms. Key quit?

23         MR. REDMOND:  I'm going to object to

Page 64

1  the form of that.

2      A.   The statements that I made in writing

3  around that time that explained that she was

4  offered those positions and refused them.  When

5  you refuse a position, that's quitting.

6      Q.   Have employees at Dynamic when you

7  were employed there, did you ever have anyone

8  turn down a position but accept a later position?

9      A.   Sure.

10     Q.   Okay.

11     A.   And this is standard practice.  If

12 this -- when this happens, we told employees that

13 if something comes open, you know, to come back

14 and check with us in a couple of weeks, check

15 with us in a month or two, because, as you know,

16 security positions rotate considerably.  People

17 come in and out.

18         And so we would encourage a person to

19 check back in with us to make sure, maybe we

20 might have something that she could work.

21     Q.   And if Ms. Key says that she did

22 reach out to Dynamic and did not receive return

23 calls, would you dispute that?

Page 69

1 dispute that?
2        MS. BROWN:  Object to the form.
3        MR. REDMOND:  Same objection, form.
4    **A.   I have no recollection to refute it**
5 **or not.  I don't know.  I don't know what I would**
6 **have said or did say or said mistakenly or not**
7 **mistakenly in that kind of setting.  I don't**
8 **know.**
9    Q.   Okay.  Flip back for me to that
10 Exhibit 36 that you've got.  We're going to skip
11 Page 65 and 66, because that's a little weird
12 misprint where we only ended up with two pages of
13 a three-page document.  And I want to point you
14 to Page 34, Dynamic-Key 34.
15   **A.   Okay.  Gotcha.**
16   Q.   So is this the memo that Gloria
17 Robinson gave to you about the -- about Ms. Key's
18 situation?
19       MS. BROWN:  Object to the form.
20   **A.   Yes, it is.**
21       MR. MILLER:  Object to the form.
22   Q.   And I want to point you to one, two,
23 three, four, five paragraphs down.  It looks like

Page 70

1 a single sentence.  It says, The picture she
2 showed us was acceptable, and she agreed to
3 obtain that style.  Do you see that?
4    **A.   Yes.**
5    Q.   Okay.  Do you recognize this as Ms.
6 Robinson saying that Ms. Key could have styled
7 her hair in an approved way?
8        MS. BROWN:  Object to the form.
9        MR. MILLER:  Object to the form.
10       MR. REDMOND:  Object to form.
11   Q.   Let me ask it this way:  Do you have
12 any recollection about Ms. Key being approved to
13 wear her locked hair in a bun or something
14 similar to a bun?
15       MS. BROWN:  Object to the form.
16       MR. MILLER:  Object to the form.
17   **A.   Okay.  A couple of things.  I never**
18 **saw the picture they're talking about here.  I**
19 **know that for a fact.**
20       **I do recall that there was some**
21 **discussion about going to a hairdresser, about**
22 **getting some changes made and wearing them in a**
23 **certain style.  That did take place between**

Page 71

1 Gloria and Ms. Williams and Ms. Key.
2    Q.   Okay.  And do you recall Ms. Key
3 being authorized to wear a hat until she could
4 style her hair?
5        MS. BROWN:  Object to the form.
6        MR. MILLER:  Object to the form.
7    **A.   I wasn't involved in that, in**
8 **authorizing that one way or the other.  I think**
9 **it's in the statement here somewhere that they**
10 **offered her that.**
11   Q.   Yeah.  It's Page 2, two, three, four
12 -- it starts five lines down.  Does that refresh
13 your memory?
14       MR. MILLER:  Object to the form.
15       MS. BROWN:  Object to the form.
16       MR. REDMOND:  Same objection to the
17 form.
18   **A.   This statement is true to its -- as**
19 **far as I understand it from what I remember.**
20 **What it says here is what we were told at the**
21 **time.  I can't improve on it.**
22   Q.   Okay.  About thirteen lines down Ms.
23 Robinson says that Ms. Howell -- do you know who

Page 72

1 Ms. Howell is?
2    **A.   I think Ms. Howell was one of our**
3 **officers that worked at Hyundai.**
4    Q.   So she says, Ms. Howell entered the
5 security office and asked if we knew when Ms. Key
6 was due.  Do you see that?
7    **A.   Yes.**
8    Q.   Okay.  So is she discussing her
9 pregnancy here?
10       MS. BROWN:  Object to the form.
11       MR. MILLER:  Object to the form.
12       MR. REDMOND:  Same objection to form.
13   **A.   Obviously.**
14   Q.   Why is it important to know when Ms.
15 Key is due?
16       MS. BROWN:  Object to the form.
17       MR. MILLER:  Object to the form.
18       MR. REDMOND:  Object to the form.
19   **A.   As far as I'm concerned, it's not**
20 **important.  She's just -- it sounds like just**
21 **plain old garden variety gossip to me.  It's**
22 **just, you know, security officers talk all the**
23 **time, so it's just -- they're just letting them**

Page 73

1  know.

2  Q.   Was Ms. Robinson aware that Ms. Key

3  was filing a complaint against Ms. Robinson and

4  Ms. Williams?

5       MS. BROWN:  Object to the form.

6       MR. MILLER:  Object to the form.

7       MR. REDMOND:  Object to the form.

8  A.   I believe so, yes.

9  Q.   I'm going to show you some e-mails,

10 and I believe that you are the sender, the

11 recipient, or copied on all of these.  And I know

12 the print is super small, and I apologize about

13 that, but that's how it came to us.

14      MS. BROWN:  Do you have the number

15 for us?

16      MS. PALMER:  39.  Sorry.

17      MS. BROWN:  Thank you.

18 A.   Okay.

19 Q.   (BY MS. PALMER:)  So the bottom part

20 of Exhibit 39, because e-mails go backwards, so

21 this is dated July 31st from Gloria Robinson to a

22 number of people with you copied; is that

23 correct?

Page 74

1  A.   That's what it says, yes, ma'am.

2  Q.   And the e-mail address that Ms.

3  Robinson is using, was that e-mail address

4  provided by Dynamic Security?

5       MS. BROWN:  Object to the form.

6       MR. MILLER:  Object to the form.

7  A.   That looks like an HMMA phone.  You

8  know, and, again, I know with my last employer,

9  we provided them -- we provided the phone

10 ourselves, and it could be that it was HMMA that

11 provided that phone for her back then.  I could

12 have been mistaken earlier.

13      But that address would have been the

14 e-mail address, right?  This is e-mail, right?

15 Q.   Yes, this is e-mail.

16 A.   The e-mail address, that's the e-mail

17 address from her that we would have used.

18 Q.   I want to point you to the second

19 paragraph of Ms. Robinson's e-mail.  She says,

20 Fast forward to today.  She's talking about July

21 31st, and the second sentence there -- well, the

22 whole thing.  She's talking about her -- read

23 over the first couple of sentences, that first

Page 75

1  paragraph for me, please, and let me know when

2  you've read it.

3  A.   Okay.

4  Q.   Do you see there where she's

5  discussing finding out that Ms. Key is pregnant?

6  A.   Uh-huh (positive response).

7       MS. BROWN:  Object to the form.

8  Q.   And she says that, I take issue with

9  her working in the mailroom.  Do you see that?

10      MR. MILLER:  Object to the form.

11      MS. BROWN:  Object to the form.

12      MR. REDMOND:  Same objection.

13 A.   Yes, I do.

14 Q.   As the recipient -- one of the

15 recipients of this e-mail, what was your

16 understanding about the issue with Ms. Key

17 working in the mailroom?

18      MR. MILLER:  Object to the form.

19      MS. BROWN:  Object to the form.

20      MR. REDMOND:  Objection to form.

21 A.   The only issue would have been the

22 lifting of the fifty pounds.  Pregnancy had

23 nothing to do with this.

Page 76

1  Q.   Would -- did Ms. Key say she couldn't

2  lift fifty pounds?

3       MS. BROWN:  Object to the form.

4  A.   No.

5       MR. MILLER:  Object to form.

6  A.   No, she did not say she couldn't lift

7  fifty pounds.  There was a -- it looks like there

8  was a request for a doctor's note to ensure that

9  she would be able to do so.

10 Q.   Okay.  If you'll flip for me two

11 pages, it's going to be Dynamic-Key 80.

12 A.   Okay.

13 Q.   Does that look like a doctor's note?

14 A.   It does.

15 Q.   Okay.  And what's the date on that

16 doctor's note?

17 A.   July 28th, 2017.

18 Q.   Okay.  And does it list that Ms. Key

19 has any restrictions?

20      MS. BROWN:  Object to the form.

21 A.   No restrictions.  No work limitations

22 noted.

23 Q.   And this doctor's note was attached

Page 77

1  to this e-mail, correct?

2      A.   That's what the e-mail states.

3      Q.   All right.  I'm going to point you

4  back to the e-mail, the very last paragraph.  Ms.

5  Robinson says, I'm asking for some assistance

6  here.  What recourse do I have with her?  Did you

7  have any involvement in answering Ms. Robinson

8  about what recourse she had?

9      A.   I don't recall specifically.  I mean,

10 it's always possible, but I can tell you what I

11 would have said, but I'm not sure whether I did

12 or didn't say it to her either in person or on

13 the phone or in e-mail or text or any other way.

14     Q.   What would you have said?

15     A.   Well, the issue here is the hairstyle

16 only, and the only thing you need to be concerned

17 about is the hairstyle.  And if Ms. Williams

18 was -- would not accept the hairstyle and Ms. Key

19 could not -- they could not come to a meeting of

20 the minds on that, then we have no choice but to

21 follow the guidelines that we have and the

22 request from Ms. Williams to remove her from the

23 site.

Page 78

1      Q.   But looking back to this e-mail, it's

2  clear that Ms. Robinson has an issue with the

3  pregnancy.

4           MS. BROWN:  Object to the form.

5           MR. MILLER:  Object to the form.

6           MR. REDMOND:  Object to the form.

7      A.   But Ms. Robinson ultimately didn't

8  make those kind of decisions.  That decision was

9  made by myself or by HMMA, and we would under no

10 circumstances deny someone employment for being

11 pregnant, period, end of story.

12     Q.   Was Ms. Robinson disciplined related

13 to this?

14     A.   She was not.  Not that I know of.  I

15 didn't discipline her over it.  We may have

16 discussed policy and those kinds of things, but

17 it didn't rise to the form of the place of

18 discipline.

19          What I would have done, and did many

20 times with Ms. Robinson over the time that I was

21 with her, was calm her down and explain to her

22 what the facts were, and that's all I needed.

23 You don't need to get excited.  You don't need to

Page 79

1  get bent out of shape.  Let's just see what we're

2  supposed to do based on the policies.  And when

3  she would come around, we would do what we were

4  supposed to do.

5           She never actually supported the idea

6  of having someone leave because they were

7  pregnant, if that's what you're looking for.

8  That's never happened.

9      Q.   But that's what the e-mail says, she

10 takes issue --

11     A.   That's not what it says.

12          MS. BROWN:  Object to the form.

13          MR. MILLER:  Object to the form.

14          MR. REDMOND:  Object to the form.

15     A.   That's open to question, and I would

16 not in any way -- I can tell you right now that

17 no one was ever looked at for leaving because

18 they were pregnant, period, not under my watch,

19 no matter what Ms. Robinson said.

20     Q.   What could Ms. Key have done

21 different for Ms. Robinson to not be concerned

22 with her working in the mailroom?

23          MS. BROWN:  Object to the form.

Page 80

1           MR. MILLER:  Object to the form.

2           MR. REDMOND:  Same objection.

3      A.   I think Ms. Key followed the basic

4  steps.  I will say that -- and I'm not saying

5  this about Ms. Key, but many times attitudes get

6  involved, people don't listen to each other, and

7  we're not always on the same page about things.

8  So I don't know.  I don't remember what happened

9  specifically between Ms. Key other than what's on

10 paper here.

11          But I can tell you this:  She would

12 not have been let go for being pregnant.

13     Q.   But what's on paper here is an

14 accurate depiction of what happened, right?

15          MR. MILLER:  Objection to form.

16          MS. BROWN:  Object to the form.

17          MR. REDMOND:  Objection.

18     A.   It is, but the innuendos that you're

19 bringing out of it are not accurate.

20     Q.   That last sentence there, If she's

21 due in five months, unless I cannot count, which

22 I can't, she is already four months and didn't

23 know it.  Do you see that?

Page 81

1   A.   Okay.  Yeah, I remember reading that
2  and --
3   Q.   So Ms. Robinson's referencing Ms.
4  Key's pregnancy?
5   A.   But it's irrelevant.  I'm telling you
6  it's irrelevant.  Ms. Robinson didn't have the
7  power to let her go, and Ms. Robinson would have
8  been counseled.
9        And I've, like I said, counseled many
10 a supervisor on what their duties are when they
11 get, well, excuse the expression, get their
12 underwear in a wad about something.
13  Q.   But Ms. Robinson was not disciplined
14 that you're aware of?
15  A.   Not that I can remember.  It wouldn't
16 have been a need to.  Ms. Robinson was volatile
17 at times and would say things that once she
18 thought about it, probably shouldn't have said
19 that kind of thing.  We all do it at times.
20        And Ms. Robinson was not advocating
21 that we get rid of Ms. Key for her being
22 pregnant, and she knew better than that.  And I
23 guarantee you, my job was to make sure that

Page 82

1  didn't happen.  So I promise it didn't happen.
2   Q.   But she was ultimately removed from
3  the Hyundai property, right?
4        MS. BROWN:  Object to the form.
5   A.   Ms. Key?  You're talking about Ms.
6  Key?
7   Q.   Yes, Ms. Key.
8   A.   She was ultimately removed at the
9  client's request.
10  Q.   I'm going to show you Plaintiff's
11 Exhibit 38.  And this is another string of
12 e-mails, so, again, it goes from the bottom to
13 the top.
14        I want to point you specifically to
15 the bottom of page Dynamic-Key 73.  This is an
16 e-mail from Sherry Spires to you and others.  Was
17 Sherry Spires human resources?
18  A.   Yes.
19  Q.   And she's asking here to make sure
20 there's a clear written policy from HMMA.  Do you
21 see that?
22  A.   Yes.
23  Q.   Okay.  So before she sent this

Page 83

1  e-mail, before Ms. Spires sent this e-mail, did
2  Dynamic Security have a written policy from HMMA
3  or HEA about hair?
4        MS. BROWN:  Object to the form.
5        MR. MILLER:  Object to the form.
6   A.   Yes.
7   Q.   So if Dynamic has the policy, why is
8  she asking for it?
9   A.   It was kept at the local office.
10        MS. BROWN:  Object to the form.
11        MR. MILLER:  I will object to the
12 form.
13   A.   And she would not have -- necessarily
14 had it at HR, which was up in Muscle Shoals.
15  Q.   Okay.  Did you attach that policy to
16 this e-mail and send it back to her?
17        MS. BROWN:  Object to the form.
18   A.   I do not remember.
19  Q.   If we don't have an e-mail that has
20 that policy attached, would that mean you
21 probably didn't?
22   A.   Well, it's spelled out here in the
23 e-mail, and that would have been a copy of what's

Page 84

1  -- what we knew to be the policy.
2   Q.   Now, the e-mail that you're
3  referencing is the top of Page 73 --
4   A.   Yes.
5   Q.   -- which is an e-mail from Gloria
6  Robinson responding to Ms. Spires, right?
7   A.   Yes.
8   Q.   Okay.  So that also didn't come from
9  a document at Dynamic's office.  This came from
10 something Ms. Robinson put into this e-mail?
11        MS. BROWN:  Object to the form.
12        MR. MILLER:  Object to the form.
13   A.   From HMMA, yes.
14  Q.   And I want to point you to the end of
15 Ms. Spire's e-mail, so Page 074.  Under the
16 section Re:  Pregnancy, the last sentence there
17 says, I'm concerned that she might not have
18 mentioned the amount of weight she might have to
19 lift to her doctor.  Do you see that?
20   A.   Yes.
21  Q.   So Ms. Spires is acknowledging that
22 she has concerns about Ms. Key's pregnancy?
23        MS. BROWN:  Object to the form.

Page 85

1       MR. MILLER:  Object to the form.
2       MR. REDMOND:  Same objection.
3       A.   I would dispute that.  I think that
4   her -- it's clear enough it has to do with the
5   amount of weight she has to lift, and that had
6   nothing to do with her pregnancy.
7       Q.   Okay.  And what's the date on this
8   e-mail?
9       A.   The 2nd of August.
10      Q.   Okay.  And by this time, Ms. Key has
11  already provided a doctor's note that says she
12  has no restrictions, right?
13      A.   She has, from the 28th of July.
14      Q.   Like four days earlier?
15      A.   Yes.  And the concern stated in this
16  e-mail is from Sherry, I'm concerned that she
17  might not have mentioned the amount of weight she
18  might have to lift to her doctor.
19          So that clearly demonstrates that she
20  was concerned about lifting weight, not about the
21  pregnancy.
22      Q.   What would give concern that she
23  would have lied about the weight?

Page 86

1       MS. BROWN:  Object to the form.
2       MR. MILLER:  Object to the form.
3       MR. REDMOND:  Same objection to form.
4       A.   Okay.  What would give -- she who?
5       Q.   What would give Ms. Spires concern
6   that Ms. Key would have lied about the weight to
7   her doctor?
8       MS. BROWN:  Object to the form.
9       MR. MILLER:  Object to the form.
10      MR. REDMOND:  Object to the form.
11      A.   I don't know.  You would have to talk
12  to Ms. Spires about that.  I would think that she
13  was just -- well, my opinion doesn't matter in
14  this situation.  It's --
15      Q.   And then that last paragraph there,
16  Gloria, keep in mind a prospective employee does
17  not have to disclose a medical condition.  Do you
18  see that?
19      A.   Yes.
20      Q.   Is this the only correction Ms.
21  Robinson received?
22      A.   I have no --
23      MS. BROWN:  Object to the form.

Page 87

1       A.   How would I know if that's the only
2   correction she received?
3       Q.   I'm asking aside from being copied on
4   this e-mail -- and thank you for clarifying.
5   Aside from being copied on this e-mail and seeing
6   that Ms. Spires or Spires was reminding Gloria of
7   this, did you do anything additional?
8       A.   I spoke to Ms. --
9       MS. BROWN:  Object to the form.
10      A.   -- Gloria Robinson every week,
11  sometimes multiple times a week about any kind of
12  issue that she was facing and helping to instruct
13  her in the right way she should go as far as a
14  supervisor is concerned.  I can't imagine that I
15  wouldn't have spoken to her about this.
16          Now, whether I did or not, I mean,
17  I'm not going to sit here under oath and say, I
18  absolutely did.  I'm going to say that's
19  something I normally do, yes.
20      Q.   If Ms. Robinson was making decisions
21  about an employee because of their pregnancy,
22  would that be a violation of Dynamic Security's
23  harassment and discrimination policies?

Page 88

1       MS. BROWN:  Object to the form.
2       MR. MILLER:  Object to the form.
3       A.   I suppose it means -- it depends on
4   what you mean by decisions.
5       Q.   If they were -- if Ms. Robinson
6   removed her from a position, removed an employee
7   from a position because of pregnancy.
8       MS. BROWN:  Same objection.
9       A.   Again, that depends on what you mean
10  by removed from a position.  She could change a
11  person from the mailroom to the gate, or she had
12  the responsibility and the ability to change
13  their location of where they worked at Hyundai
14  when she was supervising.
15      Q.   And if she did any of that, any of
16  that that you just mentioned because of an
17  employee's pregnancy, would that be covered under
18  Dynamic Security's harassment and discrimination
19  policies?
20      MS. BROWN:  Object to the form.
21      MR. MILLER:  Object to the form.
22      MR. REDMOND:  Same objection to form.
23      A.   I think you're nitpicking here,

Page 89

1 because the pregnancy has nothing to do with
2 those policies other than it would have to do
3 with her safety or with her ability to lift fifty
4 pounds or to be out in the hot sun or whatever.
5 I don't know.
6       I mean, these policies are about
7 hiring and firing, and within any kind of
8 security site, there are times when certain --
9 there are certain times when people can't meet
10 the physical standards that are met that they
11 could be moved to another -- we've had people
12 that were -- had difficulties breathing, that you
13 wouldn't put in a particular site where there was
14 -- you would move them to a different location so
15 that they could continue to work.
16       I mean, there's a million different
17 scenarios. I mean, I don't know what you're
18 trying to get at, but it's no.
19    Q.   I appreciate that. But if in a
20 situation like this where there is a doctor's
21 note that says no restrictions, okay?
22    A.   Uh-huh (positive response).
23    Q.   And if Ms. Robinson had a doctor's

Page 90

1 note that said no restrictions --
2    A.   Uh-huh (positive response).
3    Q.   -- but then made changes to an
4 employee's work assignment because she was
5 concerned personally about the person's
6 pregnancy --
7    A.   Uh-huh (positive response).
8    Q.   -- would that be a violation of
9 Dynamic's policies?
10       MS. BROWN:  Object to the form.
11       MR. MILLER:  Object to the form.
12    A.   Okay. Now -- look, you're asking a
13 -- that question is just out of bounds, because
14 we're not going to change somebody's position
15 just because they're pregnant, okay?
16       That's not Dynamic's policy to change
17 somebody's position just because they're
18 pregnant, no, it is not their policy to do that.
19    Q.   So if that was done, it would be a
20 violation of Dynamic's policy?
21       MS. BROWN:  Object to form.
22       MR. MILLER:  Object to form.
23       MR. REDMOND:  Objection to form.

Page 91

1    A.   You're comparing apples and oranges.
2 The pregnancy has got nothing to do with it. I
3 mean, a person either has the physical ability to
4 do the job or not, and if Ms. Robinson was
5 concerned about Ms. Key's situation because of a
6 physical situation because she couldn't lift the
7 weight, she would have had the right, probably
8 unquestioned right, to switch her to a different
9 position as long as the pay was the same or
10 similar and as long as the -- as it was discussed
11 with the employee and it was explained to the
12 employee and all -- I mean, it's not -- you know,
13 there's no -- I don't know if there's a written
14 policy about that kind of thing other than what a
15 person can physically handle or not handle.
16    Q.   And is there any indication here that
17 Ms. Key could not have physically handled the
18 requirements of the mailroom at Hyundai?
19       MS. BROWN:  Object to the form.
20       MR. MILLER:  Object to the form.
21    A.   There is nothing that I've seen that
22 says so. But also I'm going to add that that's
23 irrelevant as far as Dynamic Security is

Page 92

1 concerned, because she was let go because Hyundai
2 didn't want her on the site because of
3 hairstyles.
4    Q.   If you will flip for me to Page 75 of
5 that document that you have.
6    A.   Uh-huh (positive response).
7    Q.   This top part is an e-mail from you,
8 right, to Sherry?
9    A.   Uh-huh (positive response), yes.
10    Q.   And that second sentence, Gloria, if
11 you could get a copy of the actual policy.  Do
12 you see that?
13    A.   Yes.
14    Q.   Okay.  So is this -- are you asking
15 for the policy that you said Dynamic already had?
16    A.   I'm asking for the policy from HMMA
17 in writing from them.  Dynamic's policies -- you
18 know, again, I know at Dothan I had the actual --
19 I actually got the policy from HMMA, and I took
20 it with me and used it when I interviewed people
21 to go there.
22       I don't -- I just know we had this
23 written down.  Whether it's Dynamic Security

Page 93

1  forms or not, we had the policies written down.
2  So this is -- what I was asking her for was
3  specifically from Hyundai so there would not be
4  any question about the policies, because they're
5  the current ones.
6          Sometimes policies do change from
7  time to time, so this was the current policy that
8  she was given at the time this situation took
9  place.
10    Q.   Okay.  And aside from providing the
11  text that is at the top of Page 73, did Ms.
12  Robinson provide you anything else in response to
13  you asking for the policy?
14    A.   All I know about is what's here.  I
15  don't know about anything else.
16    Q.   Okay.  Let me show you Plaintiff's
17  Exhibit 40.
18    A.   Okay.  There you go.  I'm sorry.  I
19  did get this Bates statement.
20    Q.   That's okay, and I'm not trying to
21  catch you in any lies.  It's been -- like you
22  said, it's been five years.  I don't think I
23  remember what I had for breakfast yesterday, so

Page 94

1  that's why we've got these documents, so we can
2  try to narrow it down.
3    A.   That's why I'm careful with them to
4  make sure they say what I mean.
5    Q.   Let's look at this document,
6  Plaintiff's Exhibit 40.  And this is an e-mail
7  from you to Ms. Spires, right?
8    A.   That's correct.
9    Q.   Okay.  And then T. Peeples, who is T.
10  Peeples?
11    A.   He was a site supervisor, I think,
12  out at Koch Foods maybe, I think.  Yeah, I think
13  that's right.
14    Q.   Why would he have been copied on this
15  e-mail?
16    A.   If that's who that is, it would have
17  -- he was one of the positions we were looking to
18  move her to.
19    Q.   Okay.
20    A.   I think, if that's the case.  Again,
21  I may be mistaken about that.
22          So I did interview --
23          THE REPORTER:  Say that again.

Page 95

1          THE WITNESS:  I'm sorry.  I know you
2  have to write down everything I say.  I've been
3  mumbling.  I'm sorry.  I did interview Ms. Keys.
4    Q.   (BY MS. PALMER:)  So in this e-mail
5  to Ms. Spires, what was the purpose of this
6  e-mail?  Let me ask it that way.  What was the
7  purpose of you sending this e-mail to Ms. Spires?
8    A.   Keeping HR informed about what was
9  going on.
10    Q.   So would this have been the first
11  e-mail that went out related to Ms. Key's
12  complaint to HR?
13          MR. MILLER:  Object to the form.
14          MS. BROWN:  Object to the form.
15    A.   Concerning the official complaint, I
16  would assume so, because it's August 1st.
17    Q.   Okay.
18    A.   Which is when this complaint is
19  dated, and that same day, I would have sent it to
20  HR.
21    Q.   Okay.  And then the last sentence in
22  that first paragraph, you say that you've
23  interviewed Ms. Keys, and she's repeatedly stated

Page 96

1  that she has no issues with Dynamic Security.  Do
2  you see that?
3    A.   Yes.
4    Q.   What would her issues have been with
5  Dynamic Security?
6          MR. MILLER:  Object to the form.
7          MR. REDMOND:  Same objection to form.
8    Q.   That may have been a bad question.
9  Let me ask it this way.  When they all object
10  like that and then you give me that look, I think
11  I know.
12          Did you ask Ms. Key if she had any
13  issues with Dynamic Security?
14    A.   It came up in the conversation,
15  obviously, or I would not have said that she had
16  no issues with Dynamic Security.
17    Q.   Okay.  Do you recall how it came up?
18    A.   Well, it's just in the idea that she
19  was letting me know that Hyundai was the issue,
20  and Hyundai's policies was the issue, but that
21  in her mind, we were treating her fair.
22    Q.   Okay.  Do you think you would have
23  asked her, Do you have any issues with Dynamic?

Page 101

1  policies that they had agreed to or if they
2  couldn't work a particular site, but not
3  connected with the complaint.  They don't connect
4  it with the complaint.
5       The complaint is never a reason to
6  let somebody go, okay?  Does that answer your
7  question?
8       Q.   Did you receive training from Dynamic
9  Security about how to respond to complaints like
10 this?
11      A.   Yes, of course.
12      Q.   Okay.  And did that training include
13 non-retaliation provisions?
14      A.   Yes, yes, yes.  Of course.
15      Q.   And do you understand from that
16 training that not reassigning someone or not
17 providing someone -- let me ask it this way:  Do
18 you understand from that training that not
19 offering someone another position would be
20 retaliation?
21      A.   It could be -- it could be termed
22 that way, yes.
23      Q.   It could be.  When would it not be?

Page 102

1       A.   I guess ultimately when it didn't
2  happen.  I mean, you could take somebody's word
3  or somebody's statement or somebody's
4  off-the-cuff remark or even a remark like this in
5  this e-mail and make much more of it than it
6  actually was.  We did offer her other positions.
7       Q.   Did you offer --
8       A.   This is part of -- this is part of
9  bringing everyone into the situation.  So HR, who
10 ultimately has responsibility for these things,
11 can advise and give good advice in reference to
12 this so that there's no question about what we do
13 or how we operate.
14      So I simply was asking a question of
15 the HR manager about what it is we're going to
16 do.  So if I misunderstood something or -- I
17 don't know.  But anyway, it's immaterial
18 basically, because it didn't happen.
19      Q.   So in response to your question for
20 guidance or thoughts, do you recall what guidance
21 or thoughts you received?
22      A.   There's probably an e-mail somewhere
23 that gave me the guidance or thoughts.

Page 103

1  Ultimately, what we did was offered her at least
2  two positions.
3       Q.   Did you offer her full-time
4  positions?
5       A.   We didn't have any full-time
6  positions available at the time.
7       Q.   In the entire -- so if this happened
8  August 1st and you left -- when were you
9  terminated, September 1st?
10      A.   September 1st, around September 1st,
11 yeah.
12      Q.   So in that entire thirty days, did
13 you offer Ms. Key a full-time position anywhere?
14      A.   I do not know.  I do not remember.
15      Q.   Let me show you Plaintiff's Exhibit
16 41.
17      MR. REDMOND:  What's the date on
18 that, Mr. Cureton?
19      THE WITNESS:  August 1st.
20      Q.   (BY MS. PALMER:)  Is Exhibit 41 --
21 what was the purpose of your e-mail to Sherry in
22 Exhibit 41?
23      A.   Informing her of the -- of this

Page 104

1  particular case and making sure she was aware of
2  all the information that was necessary for her to
3  advise.
4       Q.   You see down at the very last
5  sentence of Ms. Williams' e-mail, I foresee an
6  issue down the road with this person?
7       A.   Yes.
8       Q.   As the recipient of this e-mail, what
9  did you understand that to mean?
10      MS. BROWN:  Object to the form.
11      MR. MILLER:  Object to the form.
12      MR. REDMOND:  Same objection to form.
13      A.   That was an opinion from Ms. Williams
14 about potential issues.  It didn't -- she didn't
15 specify what those issues were.
16      Typically, she would tell me, Oh, the
17 person has got an attitude or something like
18 that.  But in this specific instance here, I'm
19 sure she was talking about, as she says in the
20 e-mail, about her ability to lift boxes.  And
21 also, as we know, about -- ultimately, about the
22 hair situation, the appearance standards.
23      Q.   And so you've mentioned her lifting

Page 105

1  the boxes and the hair. Do you see there that
2  she's also saying she's being discriminated
3  against because she's pregnant?
4      MR. MILLER: Object to the form.
5      MR. REDMOND: Same objection.
6      MS. BROWN: Same.
7      MR. REDMOND: Which Bates page are
8  you looking at?
9      MS. PALMER: 85, the second
10  paragraph, second sentence.
11      MR. REDMOND: Is there a question
12  pending?
13      Q.  (BY MS. PALMER:) Oh, yeah, I was
14  just asking do you see there that among the list
15  of things that Ms. Williams has provided, she
16  also mentions she's being discriminated against
17  because she's pregnant?
18      MR. MILLER: Object to form.
19      MS. BROWN: Object to form.
20      MR. REDMOND: Same objection to form.
21      A.  Ms. Key is saying that in the e-mail?
22  Is that what you're asking me?
23      Q.  Well, no. The e-mail is from Ms.

Page 106

1  Williams, correct?
2      A.  Yes, it's from Ms. Williams.
3      Q.  So --
4      A.  Okay. So that Ms. Williams
5  understood that Ms. Key was claiming that she was
6  being discriminated against because she's
7  pregnant? Is that what you're saying?
8      MR. MILLER: Object to the form.
9      MS. BROWN: Object to the form.
10      Q.  Yes.
11      A.  Yeah.
12      Q.  And is this the e-mail where Ms.
13  Williams asks that Ms. Key be removed from the
14  site?
15      A.  Yes.
16      Q.  And that was August 1st?
17      A.  Correct.
18      Q.  2017. Flip for me to the next page,
19  Page 86. This is, I think, a continuation of
20  these e-mails. The very last sentence from you,
21  bottom line, If her hair is not up to HMMA
22  standards, you have every right to send her to us
23  for termination or an assignment elsewhere. Do

Page 107

1  you see that?
2      A.  Correct.
3      Q.  Why would Ms. Key have been
4  terminated?
5      A.  Well, if there were other breaking of
6  policies -- all right. To be very careful how I
7  say this, she can request that she be terminated.
8  Gloria had the right to request either
9  termination or reassignment.
10      Q.  Okay.
11      A.  Okay? That doesn't mean that she
12  could do that. That was my job.
13      Q.  But she had the right to request it?
14      A.  She could request it, yes. You never
15  --
16      Q.  Exhibit 28, do you recognize Exhibit
17  28?
18      A.  Yes, that's my handwriting.
19      Q.  So you completed these forms?
20      A.  I did.
21      Q.  On what date?
22      A.  1st of August.
23      Q.  And that's the same date we've been

Page 108

1  talking about on these e-mails?
2      A.  Yes, yes.
3      Q.  Did Ms. Key sign these forms?
4      A.  She did not. There's no place for
5  her to sign them.
6      Q.  And you didn't request that she sign
7  the forms?
8      A.  I don't recall.
9      Q.  Do you recall whether you presented
10  both of these job opportunities to Ms. Key at one
11  time?
12      A.  They were both presented at the same
13  time, I'm sure, yeah.
14      Q.  Okay.
15      A.  I --
16      Q.  Would that have been in person or
17  over the phone?
18      MR. REDMOND: Objection. Asked and
19  answered.
20      A.  I don't remember. Most likely, it
21  would have been in person, though. I mean, I
22  can't imagine -- I don't know. I don't know
23  which I did. I don't know.

Page 121

1  have those, although they could review them, and
2  that's the -- that was the case the whole time I
3  was at Dynamic, and that happened -- that request
4  happened multiple times is probably why I asked
5  the question. People were always asking to take
6  their reports with them.
7  Q.  Plaintiff's 45.
8      MS. BROWN:  45?
9      MS. PALMER:  45.
10  Q.  (BY MS. PALMER:)  Have you seen
11  Plaintiff's Exhibit 45 before?
12  A.  Well, since I sent it, yes, I've seen
13  it, I guess.
14  Q.  Okay.  And what is Plaintiff's 45?
15  Why did you send this e-mail to Ms. Spires and
16  Ms. Riddle?
17  A.  Well, obviously, they asked
18  questions, and so I answered the questions.
19  Q.  Number 4 there, it says, I have
20  included the refusal of assignment forms, but as
21  I stated, I requested, and then it stops.
22  A.  Yeah, that's just the -- you know how
23  you revise a sentence and then part of it stays

Page 122

1  on that you didn't mean to stay on.  I don't know
2  what that means other than, you know, that's just
3  a in a hurry kind of thing.
4  Q.  So you don't have any recollection of
5  what you had intended to put there or what you
6  had changed?
7  A.  Yeah, I don't know.
8  Q.  And then you attached to this e-mail
9  Ms. Key's original complaint.  Do you see that,
10  FYI, I also included?
11  A.  Yes, ma'am.
12  Q.  Why did you send another copy of Ms.
13  Key's original complaint?
14  A.  To make it easier for her.  She
15  didn't have to go looking for anything.  It's
16  right there so she can see it.
17  Q.  Did Ms. Key's complaint have anything
18  to do with her employment case -- unemployment
19  case?
20  A.  No.
21      MR. REDMOND:  Object to the form.
22  A.  No, no.  No.
23  Q.  What's the date on this e-mail?

Page 123

1  A.  August 29th, 2017.
2  Q.  And so as of this e-mail, August
3  29th, we're roughly twenty-nine days after she's
4  been removed from Hyundai.  Were the two offers
5  in the refusal forms that we saw earlier the only
6  positions that had been offered to her at that
7  point that you can recall?
8      MS. BROWN:  Object to the form.
9  A.  Well, I can only recall them because
10  I've got the paperwork, so we could have verbally
11  -- we could have easily verbally talked to her
12  about other things, but I don't know that we did.
13  Q.  If you had verbally offered her
14  another position and she had turned it down,
15  would you have completed an assignment refusal
16  form?
17      MS. BROWN:  Object to the form.
18      MR. REDMOND:  Object to the form.
19      MR. MILLER:  Object to the form.
20  A.  Well, at the time that the situation
21  was going on, things were pretty much in turmoil
22  just across the branch, and there was -- thinking
23  about it now, there were several other sites that

Page 124

1  needed immediate attention.  So I may have been
2  getting ready to do that, and then, like I said,
3  the next week I was gone.  So I can't -- they
4  would be the standard policy to do that, yes.
5  Q.  Okay.  And, again, Ms. Key says that
6  she was not offered any positions.  So you
7  dispute that?
8  A.  Well, she was offered the two
9  positions that are refused on the paperwork, but
10  I don't know about any -- if she was offered
11  anything else or not.  As of the 14th, we didn't
12  have anything else to offer her, and -- well, the
13  paperwork speaks for itself.
14  Q.  You said that the branch was in
15  turmoil.  What was going on at the branch?
16  A.  Well, we had let go several managers
17  in the organization, and so there was a new site
18  out in Selma that was causing a lot of uproar.
19  It was a consuming a lot of time for me trying to
20  find a field supervisor at the time, some things
21  that were going on, just normal security business
22  kind of things that were happening.
23  Q.  What was the new site in Selma?

Page 125

1    A.   It was -- I think it was either Bush
2  Hog or Honda Locks.  I think Honda Locks may have
3  been what it was.
4    Q.   And was Dynamic Security offering
5  security services at that site?
6    A.   Yes.  We had picked up the site just
7  within a few weeks before this whole situation
8  took place, yeah.
9    Q.   Was Dynamic Security offering any
10  other services or just security?
11    A.   Just security.
12    Q.   So I ask, because, you know, Ms. Key
13  was assigned to the mailroom at the Hyundai
14  facility.
15    A.   Uh-huh (positive response).
16    Q.   So were those types of services that
17  would be offered for Bush Hog or Honda Locks --
18    A.   No.
19    Q.   -- or was it just on-site security?
20         MR. MILLER:  Object to the form.
21    A.   It was just on-site security.
22    Q.   Was Ms. Key qualified to work on-site
23  security?

Page 126

1    A.   Yes, she was.
2    Q.   Was she offered any position at Bush
3  Hog or Honda Locks?
4    A.   I do not recall.
5    Q.   The -- after you left -- sorry.
6  After Dynamic terminated you, you took some time
7  off.  You said you semi-retired --
8    A.   Uh-huh (positive response).
9    Q.   -- and then you went to work for
10  Dothan Security, and you mentioned that Dothan
11  then picked up the Hyundai contract.
12    A.   Correct.
13    Q.   So was it the same job, same duties,
14  same positions?
15    A.   Same job, same duties, same people in
16  charge as far as our contacts at Hyundai were
17  concerned, at least at the level of the
18  operations manager.  Ms. Williams was still in
19  charge just like she was back in 2017.
20    Q.   And do you have any recollection of
21  when that happened, when Dothan took the contract
22  for Hyundai?
23    A.   Yeah.  It's just been recently, I

Page 127

1  mean, within --
2         MS. BROWN:  Object to the form.
3    A.   I worked there from April, and I
4  guess it must have been around October, November
5  timeframe that -- and, you know, I could go look
6  it up, but I want to say October, November
7  timeframe that Dothan Security took it over.
8    Q.   Of 2021?
9    A.   Of 2021, yes.
10    Q.   Okay.  Did you participate at all in
11  the EEOC response letter that Dynamic provided?
12         MR. REDMOND:  Object to the form,
13  just participate.
14    A.   I don't recall.
15    Q.   Do you remember if Ms. Riddle asked
16  you specific questions or asked you for specific
17  information to respond to Ms. Key's EEOC charge?
18    A.   I don't know if that's the generation
19  of Exhibit 45 or not.  It might be.  It may have
20  been where that came from.  I see she is copied
21  on that e-mail, so I don't know, on the
22  unemployment rebuttal thing there.  I don't know.
23  I mean, you would have to ask her.  I don't know.

Page 128

1    Q.   Do you recall telling Ms. Riddle or
2  presenting to Ms. Riddle that Ms. Key was
3  uncommunicative?  Does that sound familiar?
4    A.   Well, it does, because I haven't said
5  this the whole time, but sometimes attitudes do
6  come across where people -- I did say earlier
7  they don't listen or they're not interested in
8  conversation.  They're interested in telling you
9  what they think or what they want and not
10  hearing, and it goes both directions, and
11  sometimes that happened.
12         It could have happened in this case.
13  Ms. Key seemed like a pretty intense lady, if I
14  remember properly.
15    Q.   Do you have any recollection of
16  attempting to contact Ms. Key and Ms. Key not
17  responding?
18    A.   I have no recollection.  That didn't
19  mean I didn't do it, but unless I -- unless I
20  stated it somewhere in writing, I don't recall
21  off the top of my head.
22         MS. PALMER:  That's all I have.
23         MR. REDMOND:  I'll let them go first.

Page 145

1  time asking you questions about it, I just want
2  to ask do you have any familiarity with this type
3  of report?
4      **A.    It looks like the assignment report**
5  **for -- yeah, I mean, similar things, yeah.**
6      Q.    Is this a report that you would have
7  authority to run when you were employed by
8  Dynamic, to run or review?
9      **A.    I don't remember -- I don't recall**
10  **ever running one of these.**
11      Q.    Would you ever review a report like
12  this?
13      **A.    No.  This is --**
14      Q.    Because you're a bit equivocal, I'll
15  go ahead and ask my questions.  And I'll admit
16  this as HMMA 5.
17          (Defendant's Exhibit 5 was marked for
18  identification and a copy of same is attached
19  hereto.)
20      Q.    What's your understanding of the
21  purpose of this report?
22      **A.    I'm not a hundred percent sure.  It**
23  **looks like Ms. Williams verifying schedules and**

Page 146

1  hours.
2      Q.    And if you are not familiar with this
3  report, just say so.  Just say, I have no
4  experience with this report, with this type of
5  report.  But if you're not sure, then I'll ask
6  you questions about it.
7      **A.    Let's do it that way, because I'm not**
8  **a hundred percent sure what this is right now.**
9  **At the time I may have known or used it, but I**
10  **don't recall what it was used for at this point.**
11      Q.    Does it appear that the client's name
12  is listed under the date field?
13      **A.    Let's see.  I don't see anything**
14  **under the --**
15      Q.    Under each date field beginning
16  Tuesday, July 18th, 2017?
17      **A.    Oh, Hyundai ENG.  Okay.  I see.**
18  **Okay.  Gotcha.  Hyundai ENG America, Incorporated**
19  **under each one of these, yeah.**
20      Q.    And does this reflect -- are you
21  familiar with James McBride, the Dynamic Security
22  employee?
23      **A.    Yes.**

Page 147

1      Q.    And he was assigned to work under the
2  contract for which Cassandra Williams was your
3  client contact?
4          MR. MILLER:  Object to the form.
5      **A.    That is correct.**
6      Q.    And Ms. -- it appears there that
7  Hyundai Engineering America, Inc. is listed as
8  your client, as Dynamic's client, correct?
9          MS. PALMER:  Object to the form.
10      **A.    That is correct.**
11      Q.    And keeping in mind that no such
12  agreement has been produced or found to exist in
13  this lawsuit, are you specifically aware of any
14  agreement directly between Dynamic and HMMA?
15      **A.    I've never seen anything personally.**
16      Q.    Has anyone ever told you that an
17  agreement between Dynamic and HMMA specifically
18  exists?
19      **A.    Such was assumed by those of us**
20  **underlings who don't rise to the level of getting**
21  **that information.**
22      Q.    Right.  Other than sloppily confusing
23  HEA and HMMA because of their shared first name,

Page 148

1  there's no basis to say that Dynamic ever
2  contracted with HMMA, correct?
3          MS. PALMER:  Object to the form.
4          MR. MILLER:  Object to the form.
5      **A.    I have no idea.**
6      Q.    Other than Ms. Williams, did anyone
7  ever request the removal of Ms. Key from the HMMA
8  site?
9      **A.    Not to my knowledge.**
10      Q.    Every time today that you used the
11  acronym HMMA as determining any term or condition
12  of employment related to DSI's employees assigned
13  there -- let me back up.  Strike that.
14          Any time today where you referenced
15  HMMA as setting pay for the mailroom at HMMA's
16  facility, do you have any evidence that HMMA
17  directly set that pay versus HEA?
18      **A.    I do not.**
19      Q.    Every time you referenced HMMA as
20  setting hours worked in the HMMA mailroom as
21  assigned to Dynamic employees, do you have any
22  evidence that HMMA directly set those hours
23  worked?

Page 153

1  whether a Dynamic employee or applicant would
2  meet the appearance standards for the location?
3      A.   That's correct.
4      MR. MILLER:  That's all I have.
5  Thank you.
6      MR. REDMOND:  I have just a few.
7
8           EXAMINATION
9  BY MR. REDMOND:
10     Q.   Just to follow up on something that
11 Mr. Miller just asked about, was it also your
12 testimony that the client would decide who was
13 going to be assigned by Dynamic to the Hyundai
14 facility?
15     MS. BROWN:  Object to the form.
16     MR. MILLER:  Object to the form.
17     A.   The client would decide whether
18 someone's appearance was acceptable or not, and
19 they would be -- there were specific positions
20 that Ms. Williams would state whether or not the
21 person was acceptable or not acceptable, like the
22 mailroom, a position as a lieutenant or working
23 in the -- the monitoring room.  What did they

Page 154

1  call that position?  She had to interview the
2  people and sign off on their being up to speed
3  for us to hire them for that -- those specific
4  positions.
5      Q.   Let me show you what's already been
6  put into evidence as Plaintiff's Exhibit 28.  If
7  you'll see, there's a date on the bottom.  Can
8  you read for us what that date is?
9      A.   My date that I --
10     Q.   Yes.
11     A.   1 August 2017.
12     Q.   What does that date represent?  Is it
13 the date the position was offered, the date you
14 filled out the form or both?
15     A.   In this case it would have been both.
16 But, again, that's -- this all was -- yeah, it
17 would have been both.  In this particular --
18     Q.   Can I get you to pull up Exhibits 29,
19 40, and 45?  I know 45 was somewhat late in your
20 examination.
21     A.   Okay.  Let's just start from the
22 beginning.  You said 29?
23     Q.   I think all three of them are

Page 155

1  e-mails.  29, 40, and 45.
2      A.   There's 45.  29 and what?
3      Q.   29, 40, and 45.
4      A.   There's 40.
5      Q.   I will tell you 40 I see is -- yeah.
6  29 is an earlier one.
7      MS. BROWN:  And it's not an e-mail.
8      MR. REDMOND:  You're right.
9      Q.   (BY MR. REDMOND:)  29 is the
10 statement of Ms. Key or the -- well, I won't --
11     A.   Oh, the Bates.  29.
12     Q.   That's it.
13     A.   Okay.  There you go.
14     Q.   All right.  Let me show you starting
15 with the last one, which is Exhibit 45, which is
16 an e-mail that you sent to Sherry Spires on
17 August the 29th.
18     A.   Okay.
19     Q.   If you look at the bottom, at the end
20 of that e-mail, the paragraph or sentence that
21 starts out FYI?
22     A.   Uh-huh (positive response).
23     Q.   You refer to her complaint as being a

Page 156

1  complaint of what?
2      A.   A complaint of discrimination against
3  HMMA, Ms. Williams, and Gloria Robinson.
4      Q.   All right.  And when you're
5  referencing that complaint, are you talking about
6  Exhibit 29 here?
7      A.   That is correct.
8      Q.   Okay.  And on Exhibit 40, which is
9  another e-mail from you, if you'll look again at
10 the last sentence, last paragraph, you also make
11 a reference to her complaint there.  Do you see
12 that?
13     A.   Yes, the official complaint of
14 discrimination against Hyundai, Ms. Williams, and
15 Ms. Robinson.
16     Q.   Yes.  And you were reading as what it
17 says there, how you characterize the complaint
18 that Ms. Key had?
19     A.   That is correct.
20     Q.   Correct?
21     A.   Yes, sir.
22     Q.   And, again, are you referring to
23 Exhibit 29 here?

Page 157

1   A.   Yes, sir.

2   Q.   Okay.  And do you recall earlier

3   today when you were shown Exhibit 29, you

4   referred to this as a complaint of

5   discrimination?  Do you remember having said

6   that?

7   A.   That's correct.

8   Q.   All right.  And would that be a

9   correct characterization of what this is, is it's

10  a complaint of discrimination?

11  A.   That's what Ms. Key was doing.

12  Q.   The reason I asked that is at some

13  point today, you said something about a complaint

14  of harassment.  You understand the difference

15  between harassment and discrimination?

16  A.   I do.

17  Q.   All right.  And having looked at

18  those e-mails, et cetera, would it be more

19  accurate to describe Ms. Key's complaint as one

20  of discrimination as opposed to harassment?

21  A.   That is correct.

22      MR. REDMOND:  That's all I've got.

23

Page 158

1          RE-EXAMINATION

2   BY MS. PALMER:

3   Q.   Mr. Cureton, I just want to ask one

4   follow-up here, and that's always our famous last

5   words.

6   A.   Of course.

7   Q.   How long were you employed with

8   Dynamic Security total?

9   A.   A little over a year.

10  Q.   And then when you went to work for

11  Dothan, you still worked with the Hyundai

12  facility, correct?

13  A.   Yes.

14  Q.   And you are just today learning that

15  there's an entity called Hyundai Engineering

16  America or Hyundai HEA; is that right?

17      MR. MILLER:  Object to the form.

18      MS. BROWN:  Object to the form.

19  A.   Everybody else may have realized it.

20  I didn't realize it.  It's as plain as the nose

21  on your face in the paperwork, but I didn't catch

22  it, because we just -- we talked in terms of

23  Hyundai.  That's who we worked for.  That's who

Page 159

1   we talked to.  That's how that works.

2   Q.   Right.  And if you working for the

3   company, working for Dynamic Security for a long

4   period of time, didn't know the difference

5   between HMMA and HEA, is it safe to say that Ms.

6   Key, who was stationed there for I think a total

7   of four hours, wouldn't know the difference?

8      MS. BROWN:  Object to the form.

9      MR. MILLER:  Object to the form.

10  A.   That is an opinion, yeah.  It

11  makes --

12  Q.   Is it a reasonable inference to make?

13      MR. MILLER:  Object to the form.

14      MS. BROWN:  Object to the form.

15  Q.   You can answer.

16  A.   We all thought it was Hyundai.

17      MS. PALMER:  Thank you.  I think

18  we're done.

19      VIDEOGRAPHER:  All right.  That will

20  conclude our deposition then.  The time is 12:24

21  p.m.

22      FURTHER DEPONENT SAITH NOT

23

Page 160

1          C E R T I F I C A T E

2

3   STATE OF ALABAMA  )

4   JEFFERSON COUNTY  )

5

6      I HEREBY CERTIFY that the above

7   and foregoing transcript was taken down by me in

8   stenotype, and the questions and answers thereto

9   were transcribed by means of computer-aided

10  transcription, and that the foregoing represents

11  a true and correct transcript of the testimony

12  given by said witness.

13      I FURTHER CERTIFY that I am

14  neither of counsel, nor of any relation to the

15  parties to the action, nor am I anywise

16  interested in the result of said cause.

17

18      /s/Tanya D. Cornelius

19      /s/Tanya D. Cornelius

20      TANYA D. CORNELIUS

21      CCR No. 378

22      Notary Expires 9/13/2026

23

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3       NORTHERN DIVISION
4           CASE NUMBER
5       2:19-CV-767-ECM-SMD
6
7   DAVITA M. KEY,
8       Plaintiff,
9   V.
10  HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC;
11  HYUNDAI ENGINEERING AMERICA, INC.; and DYNAMIC
12  SECURITY, INC.,
13      Defendants.
14
15
16      DEPOSITION TRANSCRIPT OF
17      ROBERT ANTHONY BURNS
18
19
20          JUNE 22, 2022
21          9:33 A.M.
22
23

Page 2

1       The deposition of ROBERT ANTHONY
2   BURNS was taken before Tanya D. Cornelius, CCR,
3   on June 22, 2022 by Heather Leonard, commencing
4   at approximately 9:33 a.m., at RSA Dexter, 445
5   Dexter Avenue, Suite 405, Montgomery, Alabama
6   pursuant to the stipulations set forth herein.
7
8       S T I P U L A T I O N
9       IT IS STIPULATED AND AGREED by and
10  between the parties through their respective
11  counsel that the deposition of ROBERT ANTHONY
12  BURNS may be taken before Tanya D. Cornelius,
13  CCR and Notary Public, State of Alabama at
14  Large, at RSA Dexter, 445 Dexter Avenue, Suite
15  405, Montgomery, Alabama, on June 22, 2022,
16  commencing at approximately 9:33 a.m.
17      IT IS FURTHER STIPULATED AND AGREED
18  that the signature to and the reading of the
19  by the witness not waived, the deposition to
20  have the same force and effect as if full
21  compliance had been had with all laws and rules
22  of Court relating to the taking of depositions.
23      IT IS FURTHER STIPULATED AND AGREED

Page 3

1   that it shall not be necessary for any
2   objections to be made by counsel to any
3   questions, except as to form or leading
4   questions and that counsel for the parties may
5   make objections and assign grounds at the time
6   of trial or at the time said deposition is
7   offered in evidence, or prior thereto.
8       IT IS FURTHER STIPULATED AND AGREED
9   that notice of filing of the deposition by the
10  Commissioner is waived.
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1       A P P E A R A N C E S
2
3
4   APPEARING ON BEHALF OF THE PLAINTIFF:
5       HEATHER LEONARD, P.C.
6       BY:  Heather Leonard, Esq.
7       2105 Devereux Circle, Suite 111
8       Birmingham, Alabama  35243
9
10      PALMER LAW, LLC
11      BY:  Leslie A. Palmer, Esq.
12      104 23rd Street South, Suite 100
13      Birmingham, Alabama  35233
14
15
16  APPEARING ON BEHALF OF THE DEFENDANTS:
17      LEHR MIDDLEBROOKS VREELAND
18          & THOMPSON, P.C.
19      BY:  David J. Middlebrooks, Esq.
20      P.O. Box 11945
21      Birmingham, Alabama  35202
22
23

Page 5

APPEARANCES (Continued)

1
2
3  FORD HARRISON
4    BY:  Wesley C. Redmond, Esq.
5    2105 Devereux Circle, Suite 111
6    Birmingham, Alabama  35243
7    (Via Zoom)
8
9  BRADLEY ARANT BOULT CUMMINGS LLP
10   BY:  T. Matthew Miller, Esq.
11   1819 5th Avenue North
12   Birmingham, Alabama  35203
13
14
15 ALSO PRESENT:  Chris Whitehead, General Counsel,
16     Hyundai Motor Manufacturing
17     Alabama, LLC
18
19
20
21
22
23

Page 7

EXHIBITS (Continuing)

1
2
3  13 EEOC Charge            252
4  14 Position Statement     260
5  15 Letter                 261
6  16 Letter                 263
7  17 Determination          265
8  18 CV                     14
9  19 Job Description         26
10 20 Mailroom Duties        283
11 21 E-mail                 287
12 22 E-mail                 294
13 23 E-mail                 299
14 24 Invoices               301
15 25 Invoices               301
16
17
18
19
20
21
22
23

Page 6

I N D E X

1
2
3      EXAMINATION INDEX
4  ROBERT ANTHONY BURNS
5    BY MS. LEONARD            9
6
7
8      * * * * * * * * * * * * * *
9
10        EXHIBIT INDEX
11 Plaintiff's Exhibit

12 1  Notice of Deposition       24
13 2  Contract                   40
14 3  Responses to Interrogatories    144
15 4  Diagram                    155
16 5  Handbook                   164
17 6  EEOC Charges & Lawsuits     216
18 7  Pages from Handbook        176
19 8  Dress Code Matrix          228
20 9  Appearance Standards       231
21 10 E-mail                     232
22 11 Response to EEOC           234
23 12 Documents                  248

Page 8

1      I, Tanya D. Cornelius, a Certified
2  Court Reporter, and a Notary Public for the
3  State of Alabama at Large, acting as
4  Commissioner, certify that on this date,
5  pursuant to the Federal Rules of Civil
6  Procedure, and the foregoing stipulation of
7  counsel, there came before me at RSA Dexter, 445
8  Dexter Avenue, Suite 405, Montgomery, Alabama,
9  commencing at approximately 9:33 a.m. on June
10 22, 2022, ROBERT ANTHONY BURNS, witness in the
11 above cause, for oral examination, whereupon the
12 following proceedings were had:
13
14
15      ROBERT ANTHONY BURNS,
16    being first duly sworn, was examined
17    and testified as follows:
18
19      THE REPORTER:  Will this be usual
20 stipulations?
21      MR. MIDDLEBROOKS:  We would like to
22 read and sign, however.
23      MS. LEONARD:  Yes.

Page 41

1  Alabama, LLC and Hyundai AMOCO America, Inc.

2  Dated February 4th, 2013.

3      Q.   What are the dates this contract was

4  active?

5      A.   Let's see here.  I believe it's on

6  the fourth page.  I probably went right by it,

7  because it's all small print.  There it is.  I

8  knew I went right by it.

9          So the dates on Page Number 4 of the

10  document is February 4th, 2013, terminating

11  February 3rd, 2015, with an optional third year

12  at HMMA's discretion.

13      Q.   Was Plaintiff's Exhibit 2 in effect

14  in July and August of 2017?

15      A.   While the document says option third

16  year after February 3rd, 2015, it's my

17  understanding that they continued to apply or

18  operate under the conditions of the contract

19  until the new contract was established at a later

20  date.

21      Q.   When was that new contract

22  established?

23      A.   I don't have a firm date in front of

Page 42

1  me, so I can't answer that question.

2      Q.   Is that new contract the contract

3  that is currently in place?

4      A.   No.  There's a different contract in

5  place to support the security services through

6  Hyundai Engineering.

7      Q.   But you don't know when that contract

8  went into place?

9      A.   I do not.  I don't have that

10  information.

11      Q.   Do you know what, if anything, is

12  different between the current contract and

13  Plaintiff's Exhibit 2?

14      A.   No, because I don't have that

15  document to be able to refer to.  I do not.

16      Q.   Even though the language of Exhibit 2

17  provides that this contract would expire as late

18  as 2016, you said you had an understanding that

19  HEA and HMMA were operating under the conditions

20  of this contract in 2017.  How did you come to

21  have that understanding?

22          MR. MIDDLEBROOKS:  Object to the

23  form.

Page 43

1          THE WITNESS:  I'm sorry.  What?

2          MR. WHITEHEAD:  You can answer.

3      A.   Again, just based on conversations

4  that I've had with counsel, that's how that

5  was --

6          MR. MIDDLEBROOKS:  Well, you don't

7  reveal --

8          THE WITNESS:  I'm sorry.

9          MR. MIDDLEBROOKS:  -- privileged

10  data.

11          THE WITNESS:  Thank you.

12      Q.   (BY MS. LEONARD:)  How would HMMA

13  have the understanding that HEA and HMMA were

14  operating under the terms of this contract in

15  2017?

16      A.   Because to the best of my knowledge,

17  because I've been at the facility, you know, I

18  was working at the facility at that time, that

19  the security and/or contract services were still

20  being provided.

21      Q.   Are there any documents that reflect

22  that this contract was either extended or that

23  the parties agreed to continue to operate under

Page 44

1  its terms despite its explicit expiration through

2  the language of the contract?

3      A.   I don't have access to any specific

4  information other than possibly invoices or what

5  have you that show they were still being billed

6  for the services.

7      Q.   Do you know if there's been any

8  search for any documents that would reflect this

9  contract remained in effect in 2017?

10      A.   I'm not aware of a specific search,

11  no.

12      Q.   Other than the fact that there were

13  security services being provided in 2017, is

14  there anything that shows that there was an

15  agreement between and/or among HMMA, HEA to

16  provide security services in 2017?

17      A.   Again, just based on the document in

18  front of me and the fact that the service was

19  continued to be provided, there must have been

20  some degree of understanding to continue to

21  provide those services under the contract that's

22  dated in this exhibit.

23      Q.   Is it HMMA's position that this

Robert Burns

Page 45

1  contract and its terms were still applicable in
2  2017 despite its expiration through the language
3  of the contract?
4      **A.   That is my understanding, because,**
5  **again, the services were continuing to be**
6  **provided, and they billed HMMA accordingly was my**
7  **understanding.**
8      Q.   And the reason I ask this is I don't
9  want later Hyundai to say, well, that contract
10  wasn't in effect in 2017, so you can't rely on
11  it.
12          Can you think of any reason that HMMA
13  would contend that the terms of this contract
14  were not in effect in 2017?
15     **A.   At this point, I cannot.**
16     Q.   What -- and you say at this point.
17  What could change to where that position would
18  change?
19     **A.   If some other information came to**
20  **light.  But I'm going to say based on the**
21  **information provided to me, that this document**
22  **was considered to be the guides to be able to**
23  **continue to provide the services.**

Page 46

1      Q.   And in preparing for your deposition
2  today, you knew that one of the questions that
3  you would be presented with would have been that
4  the dates that this contract was active, correct?
5      **A.   Yes, that is correct.**
6      Q.   So in terms of preparing to know
7  whether or not we could rely on the terms of this
8  contract for 2017, your preparation would have
9  included knowing whether the terms of this
10  contract applied in 2017?
11     **A.   That is correct, yeah.**
12         MR. MIDDLEBROOKS:  That is certainly
13  possible, but I don't know that the hourly rates
14  could have changed.  I'm sure Mr. Miller and HEA
15  can offer their perspective.
16     Q.   Are there any other documents
17  clarifying the terms to reflect this contract as
18  it existed in July or August of 2017?
19     **A.   Not that I'm aware of.**
20     Q.   Is there anything missing from
21  Plaintiff's Exhibit 2 that was contained in the
22  agreement between Hyundai Motor Manufacturing and
23  HEA?

Page 47

1      **A.   Not that I'm aware of.**
2      Q.   Who prepared Plaintiff's Exhibit 2?
3      **A.   Well, I guess our legal department.**
4          MR. MIDDLEBROOKS:  Don't guess.
5          THE WITNESS:  Thank you for saying
6  that.
7      **A.   Based on the information presented, I**
8  **would say the legal department prepared these**
9  **documents for my deposition today.**
10     Q.   (BY MS. LEONARD:)  Do you know which
11  party to the contract or both parties prepared
12  Plaintiff's Exhibit 2?
13     **A.   I'm going to say the legal department**
14  **prepared this document based on our records.**
15     Q.   And that would be HMMA's legal
16  department?
17     **A.   Yes.  Thank you.  HMMA's legal**
18  **department prepared these documents for the**
19  **deposition today.**
20         MR. MIDDLEBROOKS:  Not for the
21  deposition today.  She's talking about who
22  prepared this way back in 2000 --
23     **A.   Oh, HMMA.  I'm sorry.  I**

Page 48

1  misrepresented that.
2      Q.   That's okay.  That, again, goes back
3  to it's important we have clarity.  Your lawyer
4  understood where my question was going, and so
5  that's exactly it.
6      **A.   Yep.**
7      Q.   So HMMA prepared Plaintiff's Exhibit
8  2, and that's yes?
9      **A.   Yes.  That is yes.**
10     Q.   The contract says it's between HMMA
11  and Hyundai AMOCO America, Inc.  Who or what is
12  Hyundai AMOCO America, Inc.?
13     **A.   Hyundai AMOCO America, Inc. is a**
14  **company that currently, I think, is referred to**
15  **as Hyundai Auto -- Hyundai Engineering.**
16     Q.   Is it your understanding then that
17  Hyundai AMOCO America, Inc. is the same as HEA?
18     **A.   That is my understanding, yes.**
19         MR. MILLER:  Object to the form.
20     Q.   So even though HEA is not identified
21  by name in Plaintiff's Exhibit 2, it is HMMA's
22  understanding that Plaintiff's Exhibit 2 applied
23  to HEA?

Robert Burns

6/22/2022

15 (57 - 60)

Page 57

1  line of questioning is to help understand the
2  relationship between HMMA and HEA.  I think it's
3  a very straightforward question.
4      MR. MILLER:  Object to the form.  I
5  don't testify on the record.  That's just not my
6  practice.  We can talk about it later, though.
7      MS. LEONARD:  Okay.  What was
8  improper with my question so I can rephrase it?
9      MR. MILLER:  All I have to do is
10 object to the form.
11     MS. LEONARD:  I know, but I'm asking
12 you so I can cure your objection.
13     MR. MILLER:  The contract itself.
14 You said the contract between HEA.  The actual
15 contract says it's between a different entity.
16 That's the basis for my objection.
17     Q.   (BY MS. LEONARD:  Mr. Burns, is it
18 HMMA's position that in 2017, HEA was performing
19 services under Plaintiff's Exhibit 2?
20     A.   Based on the document in front of me,
21 which is between Hyundai AMOCO America, Inc. and
22 Hyundai Motor Manufacturing Alabama.
23     Q.   That doesn't answer my question.  My

Page 58

1  question is:  Is it HMMA's position in this
2  lawsuit that in 2017, HEA was performing services
3  for HMMA pursuant to this contract?
4      A.   I'm going to say --
5      MR. MIDDLEBROOKS:  We would stipulate
6  that that's Hyundai's position, HMMA's position,
7  that in 2017, we had an agreement with HEA to
8  provide security services.
9      MS. LEONARD:  And that agreement is
10 Plaintiff's Exhibit 2?
11     MR. MIDDLEBROOKS:  A derivative of
12 that.  Our position is it's a derivative of
13 Plaintiff's Exhibit 2.  We didn't have a separate
14 written contract in place by that time, but we
15 still operated under the same relationship.
16     Q.   (BY MS. LEONARD:)  Did HMMA provide a
17 copy of Plaintiff's Exhibit 2 to HEA prior to
18 2017?
19     A.   I have no knowledge of that.
20     Q.   What documents, if any, exist that
21 show what was communicated to HEA in terms of
22 what the terms of the agreement between it and
23 HMMA were as they would have existed in 2017?  In

Page 59

1  other words, what documents are out there that
2  show the agreement between HEA and HMMA as it
3  existed in 2017?
4      A.   All I have is what's in front of me
5  and the documents that were prepared for today's
6  deposition that tells me what the agreement was
7  or the contract was between the two
8  organizations, and that's all I have in front of
9  me.
10     I don't have any knowledge of any
11 other content -- or, I'm sorry -- any other
12 documents at all.  I have no knowledge of any
13 other documents.
14     MR. WHITEHEAD:  Heather, give us a
15 second.  We can probably clear this thing up.
16     MS. LEONARD:  Okay.  And I'm not
17 trying to be difficult.
18     MR. MIDDLEBROOKS:  No, you're fine.
19     MR. WHITEHEAD:  You're representing
20 your client just like everybody else is.
21     (Whereupon, a brief recess was
22 taken.)
23     MR. MIDDLEBROOKS:  Heather, let me

Page 60

1  give you a bit of information.  When we have a
2  longer break, we'll get the name of the project
3  manager that was redacted.  I imagine my
4  paralegal, since it was not an HMMA executive or
5  manager, she probably automatically did that.
6  We'll get you that.
7      Secondly, and, again, Matt will speak
8  for his client as appropriate, if he feels he
9  needs to, but we have produced to you all, it's
10 in the documents that have been exchanged in this
11 case, the secretary of state report about the
12 entities or defendants in this action.  And
13 you'll see that the predecessor to HEA -- we use
14 that for short, Hyundai Engineering America,
15 Inc., anyway, HEA is Hyundai AMOCO.
16     So our position is this would have
17 continued to be the operating agreement that set
18 the relationship between the parties, and it's
19 our position, HMMA, that until we got another
20 written agreement, we continued to operate under
21 this agreement, possibly changes in pay rates and
22 things of that nature, but this formed the
23 operating relationship.

Robert Burns

Page 61

1  And there continued to be invoices
2  that we continuously got from HEA for security
3  services, as well as some other services they
4  provided, if that helps.
5  MS. LEONARD:  All right.  Is that
6  going to be HEA's position?
7  MR. MILLER:  So I agree that Hyundai
8  AMOCO America, Inc. is the predecessor to HEA,
9  and I think that's what you were trying to do
10  with your question.  And the reason I objected is
11  because you said the contract was between HEA,
12  but technically it's not.  It's with its
13  predecessor entity.  And even though the
14  secretary of state records will show the
15  relationship and AMOCO's predecessor, that was
16  the basis for my objection.
17  MS. LEONARD:  This was ultimately my
18  question:  Is HEA going to contend this contract
19  didn't apply to the services that were being
20  provided in 2017?
21  MR. MILLER:  I don't want to answer
22  that on the record.  I'll let my client.
23  MS. LEONARD:  All right.

Page 62

1  Q.  (BY MS. LEONARD:)  Well, let's go
2  back to Section Number 1.  Does Section Number 1
3  define the services that HMMA expected HEA to
4  provide in 2017?
5  A.  **Yes, it does reflect the security**
6  **services required.**
7  Q.  While the document spells it out more
8  fully, can we agree that Section 1 essentially
9  says that it's HEA's responsibility to deliver
10  workers to the locations described in the
11  contract by HMMA to provide security services?
12  A.  **To Hyundai AMOCO's requirement, yes,**
13  **at that time.**
14  Q.  And so in 2017, per this contract,
15  HMMA would have expected HEA to deliver workers
16  to the locations described by HMMA?
17  A.  **Yes.**
18  Q.  In Section 1, when we go to the end
19  of the third line, it reads:  The scope of work
20  included within the services may be amended only
21  by written directive from HMMA to contractor.
22  Are there any documents that reflect
23  an amendment to the scope of work included within

Page 63

1  the services?
2  A.  **Not that I'm aware of.**
3  Q.  Do you know if the scope of work was
4  ever amended without a written directive?
5  A.  **Not that I'm aware of.**
6  Q.  The next sentence reads:  The
7  services shall be performed by qualified
8  employees or subcontractors of contractor in
9  compliance with HMMA's requests and instructions
10  at such time so as not to interfere with HMMA's
11  business operations.
12  Who made the determination as to
13  whether employees were qualified?
14  A.  **The scope of work.  I'll double**
15  **check.  Yes, I'm double checking.**
16  **The scope of work includes the list**
17  **of summary of services, specifications for each**
18  **one of the jobs, et cetera, et cetera.  So those**
19  **details is what determined whether someone was**
20  **qualified.**
21  Q.  So the term specified by HMMA in the
22  contract determine what is a qualified employee
23  or subcontractor?

Page 64

1  A.  **As provided by the scope of work,**
2  **yes.**
3  Q.  If we go one, two, three, four lines
4  from the bottom of that paragraph, the contract
5  reads:  Contractor shall be liable and
6  responsible for all damages of every kind or
7  nature to HMMA or HMMA's property arising from or
8  relating to any acts, omissions, errors, or
9  negligence of contractor or its employees or
10  subcontractors in the performance of the service
11  herein.
12  Pursuant to that language, has HMMA
13  made a determination as to whether HEA would be
14  liable or responsible to it for any damages it
15  may incur as it arises from the treatment of
16  Davita Key?
17  A.  **I'm going to have to have you repeat**
18  **that.**
19  Q.  Sure.  Since the provision in the
20  services section that we talked about ultimately
21  says the contractor is going to be liable to any
22  injury suffered by HMMA or its property relating
23  from any acts, omissions, errors, or negligence

Robert Burns

Page 65

1 of the contractor, its employees or its
2 subcontractors, has HMMA determined whether HEA
3 is going to be responsible to it if it suffers
4 any injury in this lawsuit as the result of the
5 way Davita Key was treated?
6    A.   Well, we were not -- Davita Key was
7 not an employee of HMMA, so we would not be held
8 accountable for any damages associated with her
9 case before us today.
10    Q.   I'm going to object to your response
11 as being nonresponsive to my question.  And my
12 question may have been confusing, so I'm going to
13 rephrase it.
14         This language seems to imply or state
15 that HMMA is going to hold its subcontractor or
16 its contractor HEA responsible for any injury
17 that Hyundai may experience as a result of
18 something HEA did or didn't do.
19         So to the extent that HMMA suffers an
20 injury as a result of the way Davita Key was
21 treated, in other words, if HMMA were found to be
22 liable, does HMMA contend that HEA is liable to
23 it under this language in its contract?

Page 66

1    A.   Based on that reading, and I think
2 there's also a hold harmless clause in here as
3 well.
4    Q.   I'll rephrase.  Pursuant to the
5 language that I read from Section 1, is HEA
6 liable or responsible to HMMA for any of the
7 treatment or for any injury HMMA may have
8 experienced as the result of what Davita Key
9 alleges in this lawsuit?
10    A.   HMMA will not be liable for any of
11 the damages that may occur, because she's not an
12 employee of HMMA.
13    Q.   And I'm going to object again,
14 because that's -- my question is a little
15 different.
16         MR. MIDDLEBROOKS:  Well, it calls for
17 a bit of a legal analysis, and I don't know that
18 he's able to testify to that.
19    Q.   Do you know if HMMA has made a
20 determination as to whether HEA has any
21 obligation or responsibility to it to pay for any
22 damages HMMA may have suffered as a result of
23 this lawsuit?

Page 67

1    A.   I'm not aware of any determination at
2 this time, no, I am not.
3    Q.   If we can turn to the next page,
4 which is Bates Number HMMA 17 or Page 5 of the
5 contract, if we can look at Section 5, it deals
6 with invoices.
7    A.   I see that.
8    Q.   Okay.  Do you know whether the
9 services performed by Ms. Key on HMMA's property
10 are reflected on any invoices that may have been
11 submitted to HEA pursuant to this section?
12    A.   If she was paid by the contract --
13 the subcontractor with HEA, then it likely would
14 have shown up on an invoice as a line item for
15 the services rendered, not necessarily specific
16 name, okay, just services rendered.  So is it
17 security, mailroom, et cetera, but not by name.
18    Q.   With that understanding, are there
19 any invoices that reflect services performed by
20 Ms. Key at HMMA's property?
21    A.   Again, because there's no line item
22 detailed by individual, I can't confirm whether
23 or not she was included on an invoice for the

Page 68

1 time she worked.
2    Q.   Do you dispute whether she was
3 included on any invoice?
4    A.   I will not dispute that her -- the
5 pay may have been reflective for the services
6 provided in her role, but, again, I don't -- her
7 name would not be specifically shown on the
8 invoice.
9    Q.   Okay.  We can go to the next page,
10 which is Page 6 of the contract or Bates Number
11 HMMA 18.
12    A.   Okay.  I'm on Page 6.
13    Q.   Okay.  I want to look first at
14 Section 6.4.  In this, it reads:  Contractor
15 represents and warrants to HMMA that it will
16 perform background checks on all of the employees
17 and subcontractors and will comply fully with
18 HMMA's supplier/contractor badge policy, which is
19 attached hereto as Attachment 6.4, including all
20 employees of any subcontractors utilized by
21 contractor.
22         Contractor agrees that it shall not
23 employ any employees or subcontract -- or any

Page 69

1 subcontractors whose presence on HMMA's property
2 is objected to by HMMA.
3        Under this provision, does HMMA have
4 the authority and ability to remove from service
5 anybody that HEA or any of its contractors placed
6 on HMMA's property?
7    A.   Yeah, we do have the discretion to
8 ask for individuals to be removed from property,
9 yes, we do.
10   Q.   And the contract and the terms of it
11 that HEA was operating under in 2017 provided in
12 Section 6.4 that HEA could direct HEA -- in 2017,
13 HMMA could direct HEA to remove somebody it had
14 placed on the property, correct?
15   A.   That is correct.
16   Q.   Okay.  Let's look at the next
17 section, which is 6.5.  The first sentence reads:
18 HMMA is committed to the inclusion of
19 minority-owned business enterprises ("MBE") and
20 women-owned business enterprises ("WBE")
21 subcontractors on its project.
22        Why is this included in this
23 contract?

Page 70

1    A.   Included in this contract and other
2 contracts, because HMMA likes for our business
3 partners to make a reasonable effort to access
4 minority-owned business enterprises or
5 women-owned business enterprises as a part of
6 doing business with HMMA.
7    Q.   And why is that something HMMA likes?
8    A.   Because we believe in diversity of
9 sourcing for our services that we need to support
10 our operation.
11   Q.   What is diversity of sourcing?
12   A.   As I -- I'll repeat, the
13 minority-owned business enterprises or
14 women-owned business enterprises that fall in
15 that category.
16   Q.   Why does HMMA believe in having
17 minority-owned business enterprises and
18 women-owned business enterprises?
19   A.   Because, again, we felt like it
20 provided a variety of businesses who could
21 provide services for our operations.
22   Q.   Why would you want a variety of
23 businesses to provide services for your

Page 71

1 operations?
2    A.   Variety creates competition, which
3 also creates possibly better services.
4    Q.   Okay.  What efforts did -- what
5 efforts did HEA make to comply with Section 6.5
6 of this contract?
7    A.   I don't have any specific knowledge
8 how well they adhered to this reasonable practice
9 to be able to provide MBE or WBE contractors.
10   Q.   Does HMMA have any knowledge of any
11 efforts HEA made to comply with Section 6.5 of
12 the contract?
13   A.   I personally don't have any
14 knowledge.  That doesn't mean that there was not
15 a -- some form of a benchmark for them to comply
16 to.
17   Q.   One of the topic areas that was in
18 Plaintiff's Exhibit 1 was what efforts HEA made
19 to comply with Section 6.5 of the contract and
20 what HMMA did to show its commitment to the
21 inclusion of minority-owned business enterprises
22 and women-owned business enterprises.
23        Did you prepare for that topic area?

Page 72

1    A.   I reviewed this section of the
2 contract, that's true.  And as I've stated, that
3 was just a best practice or best past practice of
4 Hyundai Motor Manufacturing Alabama to request
5 all contractors to consider minority-owned
6 business enterprises and women-owned business
7 enterprises while conducting business with HMMA.
8    Q.   Sitting here today speaking as the
9 voice of HMMA, what efforts, if any, did HEA --
10 or what does HMMA know of any efforts HEA made to
11 comply with Section 6.5?
12   A.   As, again, as the voice of the
13 company in 2017, I have no specific knowledge of
14 what -- how they adhered to or attempted to make
15 a reasonable effort to have MBE or WBE
16 subcontractors.
17   Q.   Considering that HMMA states it's
18 committed to the inclusion of MBEs and WBEs and
19 puts it in this contract, what did HMMA do to
20 make sure HEA was including MBEs and WBEs as
21 subcontractors for the performance of services?
22   A.   I'm -- again, not having specific
23 knowledge in 2017, it's hard for me to answer

Robert Burns

Page 81

1 interpretation, and I'm not -- I'm only reading
2 what I'm reading right here.
3   Q.   Who makes a determination as to
4 whether Section 7 was violated?
5   A.   Probably HMMA and -- between HMMA and
6 the contractor.
7   Q.   And would that be the legal team for
8 HMMA to make that determination or someone else?
9   A.   I believe it would be the legal team.
10   Q.   Okay.  I want to skip down to Section
11 9 that talks about insurance, and this is on that
12 same page, Bates Number HMMA 19.
13   A.   Uh-huh (positive response).  I see
14 it, Section 9.1.
15   Q.   And this is going to be married in
16 with topic area 13(a)(vii) from the deposition
17 notice.  Is there employment practices liability
18 insurance -- let me rephrase it.
19       Does this contract require HEA to
20 carry employment practices liability insurance?
21   A.   Yes.
22   Q.   What proof, if any, did HEA provide
23 to HMMA that it was carrying employment practices

Page 82

1 liability insurance that would apply to events in
2 2017?
3   A.   All I can say is that in order for
4 the contractor, HEA or Hyundai AMOCO, to enter in
5 the contract with HMMA, they have to provide a
6 certificate of insurance to be able to do that.
7 That's required as part of the process.
8   Q.   Does HMMA have that certificate of
9 insurance?
10   A.   The legal department likely has a
11 copy of that certificate of insurance.
12   Q.   Do you know if it was provided to
13 HMMA before or after Davita Key's EEOC charge was
14 filed?
15       MR. MIDDLEBROOKS:  Object to the
16 form.
17   Q.   Let me rephrase.  Do you know when
18 that certificate was provided?
19       MR. MIDDLEBROOKS:  Object to the
20 form.  He's answered that.
21   Q.   You can answer.
22       THE WITNESS:  I didn't hear that.  I
23 apologize.

Page 83

1       MR. MIDDLEBROOKS:  I said object to
2 the form.  You answered that already.
3       THE WITNESS:  Yes, okay.
4   Q.   (BY MS. LEONARD:)  And you can answer
5 it again.  Sometimes I may not always hear
6 something, so I might ask a question twice.
7   A.   Say the question again.
8   Q.   Sure.  Do you know when that
9 certificate was provided, if ever, by HEA to
10 HMMA?
11   A.   Okay.  So as I stated earlier, in
12 order for the contractor to enter a contract with
13 HMMA and fully execute the contract, they have to
14 provide a certificate of insurance.
15   Q.   Do you know if that was ever done by
16 HEA?
17   A.   Again, in order for them to provide
18 -- in order to be -- enter into the contract,
19 they had to provide that contract to us.
20   Q.   I understand that's how it's supposed
21 to work.  My question, though, is in actuality,
22 did HEA provide a certificate of insurance to
23 HMMA?

Page 84

1   A.   Again, as I've stated a couple of
2 other times, I wasn't in this role to be able to
3 know exactly what contract.  I didn't sign this
4 contract.  So, therefore, I can't guarantee
5 whether it was provided, but that is part of our
6 process, as I've already stated, as part of being
7 able to enter into a contract with HMMA.
8   Q.   And if HEA provided that certificate
9 of insurance to HMMA, HMMA should still have it?
10       MR. MIDDLEBROOKS:  Object to the
11 form.
12   A.   Yes.
13   Q.   And HMMA should still have any
14 documents that would show when that was
15 transmitted or given to HMMA, correct?
16       MR. MIDDLEBROOKS:  Object to the
17 form.
18   A.   I've already answered it.  Yes, I've
19 answered that.
20   Q.   And so that's something if we were to
21 ask HMMA to provide, it would not be hard or
22 difficult for it to provide it to us?
23       MR. WHITEHEAD:  Well, let me object

Page 85

1 and say this contract was dated in 2013. That's
2 nine years ago. I can't be sure whether or not
3 that's something we'd still retain nine years
4 later, but I'm not saying yes or no. If we've
5 got it, we'll get it.
6        MR. MIDDLEBROOKS: We'll look for it.
7     Q.   (BY MS. LEONARD:) Other than what
8 you've described for me in the process that would
9 have required HEA to provide that certificate of
10 insurance to perform work, is there anything else
11 that HMMA would have done to ensure HEA's
12 compliance with the insurance provision in
13 Section 9?
14     A.   Not that I'm aware of.
15     Q.   If we can turn to Page 9 of the
16 contract or Bates Number HMMA 21, I want to look
17 at Section 10.
18        MR. MIDDLEBROOKS: I meant to tell
19 you the name of the project manager.
20        THE REPORTER: I'm sorry. I didn't
21 hear you.
22        MR. MIDDLEBROOKS: The name of the
23 project manager that she wanted to know that was

Page 86

1 redacted.
2        MR. WHITEHEAD: Jaehong Choi.
3        MS. LEONARD: Do you mind spelling
4 that?
5        MR. WHITEHEAD: Of course, I will.
6 J-a-e-h-o-n-g, all together. Choi is spelled
7 C-h-o-i.
8        MS. LEONARD: Thank you.
9     Q.   (BY MS. LEONARD:) All right. Are
10 you doing good? Do you need a break?
11     A.   I'm good.
12     Q.   I know you're looking going, How many
13 sections are there to this contract. Let's look
14 at Section 10, which talks about compliance with
15 laws and rules.
16     A.   Okay. I'm at Section 10.
17     Q.   Okay. What is required through this
18 section of the contract by the -- what is HMMA
19 requiring through this section of the contract?
20        MR. MIDDLEBROOKS: It speaks for
21 itself, but he can read it for the record if you
22 want to.
23     Q.   In plain English, what is HMMA

Page 87

1 seeking to require? And this is one of the topic
2 areas that's identified in Exhibit 1, the
3 30(b)(6) notice. It was something that you were
4 given an opportunity to prepare for.
5        What is required through Section 10
6 of the contract?
7     A.   So in general terms, the contractor
8 shall comply with federal, state, and local laws,
9 and also Title VII, and whatever Executive Orders
10 12 -- 11246, 11375, which are incorporated
11 herein.
12        And as I mentioned earlier,
13 contractor agrees to save HMMA harmless from and
14 against any and all liabilities, liens, claims,
15 costs, losses, expenses, and judgments arising
16 from or based on actual or asserted violations by
17 the contractor.
18        Of course, also be in compliance with
19 OSHA. Again, that's just a broad term, and
20 that's Section 10.2.
21        And 10.3 is then the contractor being
22 required to comply with the safety rules,
23 regulations, policies, and programs of HMMA as

Page 88

1 may be implemented from time to time by HMMA.
2        And if any contractors -- well,
3 contractor shall comply with all work rules and
4 regulations as well in this agreement.
5     Q.   And would those be HMMA's work rules?
6     A.   Yes, that's correct.
7     Q.   Okay.
8        MR. MIDDLEBROOKS: Read 10.4 also.
9        THE WITNESS: Yes, I'm about to. I'm
10 just catching my breath.
11        MS. LEONARD: I'm not rushing him,
12 David. We're going to talk about it all.
13     A.   Contractor, and all those working for
14 or on behalf of the contractor, shall comply with
15 HMMA rules for business invitees on the premises,
16 including those pertaining to safety, plant
17 protection, security, identification, and the
18 operation and parking of vehicles. And
19 contractor agrees to promptly remove from owner's
20 premises any workers who fail or refuse to comply
21 with owner's rules for business invitees and
22 replace them as -- replace them at contractor's
23 sole cost and expense.

Robert Burns

Page 93

1  be obligated to notify HMMA if it received a
2  charge of discrimination from somebody it had
3  placed on HMMA's property?
4      A.   No, because it's not an employee of
5  HMMA.
6      Q.   Considering that the contract
7  requires compliance with the federal
8  anti-discrimination laws, would HMMA make any
9  request that Dynamic or HEA notify it if it has
10 been accused of violating those federal
11 discrimination laws?
12     A.   They may make that request, but I
13 guess it would determine whether that was a valid
14 charge or not.  I guess at some point when it
15 became valid, then they would be notified.
16     Q.   Who determines if it's valid?
17     A.   I guess the EEO commission.
18     Q.   What makes a charge valid?
19     A.   Whether the EEO commission believes
20 that there's some --
21         MR. MIDDLEBROOKS:  Object to the
22 form.  If you know.
23     A.   I don't -- yeah, I don't really know,

Page 94

1  no.  That's true.
2      Q.   Considering that the contract directs
3  in 10.1 that all services provided herein shall
4  comply with all applicable federal, state, and
5  local codes and goes on to reference some of
6  the -- at least one federal anti-discrimination
7  law, who for HMMA makes the determination as to
8  whether the contractor is complying with those
9  laws?
10     A.   HMMA evaluates if there is some --
11 again, depending on the severity of the issue,
12 whether or not there is a violation of this
13 section.
14     Q.   Who does that?
15     A.   It depends on which group.  What I
16 mean by that is if this -- this particular one is
17 under the general affairs team, oversees -- I'm
18 sorry -- works with Hyundai Engineering on these
19 contracts, but that's the only group I think
20 would evaluate that.
21     Q.   Has anyone evaluated whether this
22 section was violated as it related to the way
23 Davita Key was treated?

Page 95

1      A.   Not to my knowledge.
2      Q.   If we can go to Page 11 of the
3  contract or Bates Number 23.
4      A.   I'm on Page 11.
5      Q.   Okay.  This is outside of some of the
6  specific questions I listed, so this may not be
7  something you can answer.
8          Section 20 uses the term "independent
9  contractor."  What does HMMA mean by the term
10 "independent contractor"?
11     A.   Well, let me read through this
12 section.
13         MR. MIDDLEBROOKS:  I object.  It
14 calls for a legal definition.
15         MS. LEONARD:  I'll rephrase.
16     Q.   (BY MS. LEONARD:)  Do you have any
17 understanding of what this term means as it's
18 used within the contract?
19     A.   Again, let me read through the
20 contract.
21         As I interpret it, I'll just say it's
22 someone who is a subcontractor of the contractor.
23     Q.   What's the difference between a

Page 96

1  subcontractor of a contractor and an employee as
2  you understand that term in this contract?
3          MR. MIDDLEBROOKS:  Again, it calls
4  for a legal conclusion.  Object to the form.
5      A.   I can't -- like I said, I just
6  interpret it as a subcontractor, someone that is
7  not a part of the contractor in this contract
8  with Hyundai AMOCO.
9      Q.   As the vice-president of human
10 resources and the chief administrative officer,
11 do you have an understanding of what the
12 difference is between a contractor and an
13 employee or an independent contractor or
14 subcontractor and an employee?
15         MR. MIDDLEBROOKS:  Object to the
16 form.  It calls for a legal analysis and
17 conclusion.  You can answer if you know.
18     A.   I don't have any -- I gave my
19 interpretation already.
20     Q.   And what is that?
21     A.   Again, as it states in this contract,
22 the subcontractor is basically someone who works
23 for the contractor in the case of this particular

Page 97

1  contract between Hyundai Motor Manufacturing
2  Alabama and Hyundai AMOCO.
3      Q.   And when you say works for, what do
4  you mean by that?
5      A.   Works for Hyundai Engineering.
6      Q.   Exactly.  When you say they work for
7  Hyundai Engineering, what does it mean to work
8  for Hyundai Engineering as opposed to --
9      A.   They're a contractor.  They provide
10  services.
11     Q.   And the services that -- the
12  people HEA placed at HMMA, for what company's
13  benefit were they?
14         MR. MIDDLEBROOKS:  Object to the
15  form.
16         THE WITNESS:  I'm sorry.  I didn't
17  hear what you said.
18         MR. MIDDLEBROOKS:  If I object to the
19  form, you can still answer.
20         THE WITNESS:  Okay.  I'm sorry.
21         MR. MIDDLEBROOKS:  If I say you don't
22  answer, don't answer.  If I object to form, you
23  can answer.

Page 98

1      A.   I'm sorry.  I'm misinterpreting
2  things here.  So, again, please ask the question
3  again.
4      Q.   (BY MS. LEONARD:)  Sure.  The people
5  that HEA would have placed at HMMA, the work
6  those individuals performed, for what company's
7  benefit was that work?
8      A.   Work performed for Hyundai AMOCO or
9  Hyundai Engineering was for the benefit of that
10  company.  That's who the contract was with.
11     Q.   Who derived the benefit of the
12  security services provided at the Hyundai gates?
13     A.   The Hyundai Engineering would have
14  benefited from the services provided, and
15  secondarily, we did, too.  Hyundai Motor
16  Manufacturing Alabama did as well.
17     Q.   What do you mean by secondarily?
18     A.   Because they were not directly
19  employed by Hyundai Motor Manufacturing Alabama.
20     Q.   How did HEA benefit from people
21  guarding HMMA's property?
22     A.   Because they were paying for the
23  services provided by the subcontractor,

Page 99

1  independent contractor on behalf of Hyundai AMOCO
2  or Hyundai Engineering.
3      Q.   How did HEA benefit from people
4  working in HMMA's mailroom?
5         MR. MILLER:  Object to the form.
6      A.   They provided mail services.
7      Q.   For whom?
8      A.   For the -- the mail delivered to the
9  site, which is 700 Hyundai Boulevard, to Hyundai
10  Motor Manufacturing Alabama, or if there was
11  someone else receiving goods -- I'm sorry -- not
12  goods, packages or mail at that site, that's who
13  benefited from the mailroom services.
14     Q.   But it would be fair to say that
15  generally the mail coming into and going out of
16  the mailroom was HMMA's mail?
17         MR. MIDDLEBROOKS:  Object to the
18  form.
19     A.   That's hard to determine, because
20  there are a number of subcontractors and
21  independent contractors that work on our site in
22  general that may say, I need a part or component
23  delivered to Hyundai Motor Manufacturing Alabama,

Page 100

1  700 Hyundai Boulevard with their name on it.
2      Q.   And that would be a part that's
3  ultimately going to be used to benefit the
4  production of HMMA's vehicles?
5      A.   It may be something to repair a part
6  or repair something that's a building, not
7  necessarily building of a vehicle.
8      Q.   But the buildings that are at -- on
9  that property are HMMA's buildings, correct?
10     A.   That is correct.
11     Q.   And the equipment that is -- that is
12  at that property is used ultimately to
13  manufacture vehicles that are HMMA vehicles?
14     A.   There's a wide variety of activities
15  on the site that does include manufacturing
16  vehicles, but there are other activities as well.
17         So it's hard to determine exactly
18  what products were being delivered or what mail
19  was being sent out by a variety of contractors or
20  subcontractors on-site.
21     Q.   If you can turn to Page 15 or Bates
22  Number 27, which is Exhibit A, Scope of Service.
23  Is Exhibit A, Scope of Service, part of this

Page 105

1  prepared?

2    A.  I do not know, that's correct.

3    Q.  And let's look at the next section,

4  Location of Work.

5    A.  All right.  Location of Work.

6    Q.  Let me know when you've had an

7  opportunity to review that paragraph.

8    A.  (Witness reviews document.)  Okay.

9  I've reviewed Location of Work.

10   Q.  What is a federal foreign trade zone?

11   A.  I'm familiar with what a foreign

12  trade zone represents.  It is an area designated

13  by U.S. Customs that allows for certain treatment

14  of duties relative to parts moving in and out of

15  the facility.  That's about all I know, though.

16   Q.  Does that designation affect the way

17  employees are to be treated in any way?

18   A.  No.  It's purely related to the

19  movement of goods in and out of the facility.

20   Q.  I want to talk next about Section C,

21  Projected Staffing Requirements.

22   A.  All right.

23   Q.  Okay.  The first thing I want to look

Page 106

1  at is there is a statement within this that the

2  schedule and manpower is subject to change based

3  on the business needs of HMMA.  What do you

4  understand that to mean?

5    A.  My understanding is that if the

6  facility was operating in a different time,

7  meaning producing vehicles or not producing

8  vehicles, shut down for maintenance, et cetera,

9  that's where it would change.

10   Q.  Okay.  And do you agree that whoever

11  was providing services under this contract, be it

12  HEA or Dynamic, it was to provide protection --

13  or to provide sufficient security personnel and

14  supervision to ensure the protection of team

15  members and the property at HMMA?

16   A.  Yeah, the contract stipulates that --

17  I'm sorry, the security services they would

18  provide for the plant site, yes.

19   Q.  And so the goal of the contract is to

20  ensure the protection of team members and

21  property at HMMA?

22   A.  Yes.

23   Q.  So you would agree then that the

Page 107

1  party that derives the ultimate benefit from the

2  services provided by the people placed by Dynamic

3  or HEA would be the property and team members of

4  HMMA that are being secured?

5        MR. MIDDLEBROOKS:  Object to the

6  form.

7    A.  As I said earlier, the Hyundai

8  Engineering was benefiting from the services

9  provided by whichever security firm they

10  contracted with.  And yes, HMMA benefited,

11  because the property was protected by Hyundai

12  Engineering's subcontractor.

13   Q.  There is a chart below Section C.

14  Does this set the minimum coverage that HMMA is

15  requiring the contractor to provide?

16        MR. MIDDLEBROOKS:  At that time.

17   A.  At the time of this document being

18  prepared, I would say yes.

19   Q.  Did this coverage schedule that we

20  see below -- and I'm calling it a coverage

21  schedule, the chart.  Does this minimum

22  requirement for coverage, did it change by the

23  end of July 2017?

Page 108

1    A.  This coverage chart could change from

2  week to week depending on the operational status

3  of Hyundai Motor Manufacturing Alabama.  As I

4  said earlier, depending on shutdowns, et cetera.

5    Q.  So would there be a chart -- let me

6  rephrase it.

7        So would somebody at HMMA then

8  generate this chart and provide it to HEA or

9  Dynamic to say this is the staffing we need?

10   A.  Based on this scope of work in front

11  of us, that would be, as we've stated, maybe

12  we'll call it the minimum or projected staffing

13  requirements to operate the facility or to

14  provide the services for the facility.

15   Q.  So would there be charts of this

16  nature that I could request either from HMMA,

17  HEA, or Dynamic that would show the minimum

18  staffing requested by HMMA in July and August of

19  2017?

20        MR. MIDDLEBROOKS:  Object to the

21  form.  If you know.

22   A.  I don't know for sure, but I'm sure

23  you could check with Dynamic Security.

Page 117

1  Summary of Services.
2        And we're right at 11:30.  Are you
3  still good to go?
4     A.   I'm still fine for the moment.
5        MR. MIDDLEBROOKS:  I'm good for about
6  another half hour.
7     A.   Yeah, I'm saying we'll shoot for the
8  noon hour.
9     Q.   Okay.
10    A.   I'm looking at D, Summary of
11 Services.
12    Q.   All right.  Does this accurately
13 reflect the services that are to be provided
14 under this contract?
15    A.   It does appear to be an accurate
16 representation of the services provided.
17    Q.   Under Section E where we see
18 specifications, under 1E, we see that contractor
19 shall provide daily, weekly, monthly reports to
20 HMMA manager, safety, security, and medical.
21 What are the contents of those reports to be?
22    A.   I am only aware of the content in a
23 daily report, and that would be all.  And that

Page 118

1  daily report just shows any activities that may
2  have been performed by the security services.
3     Q.   Would it reflect all the activities
4  performed or are there specific types of
5  activities that would be reported?
6     A.   Simple example would be just a
7  parking violation that I would see, that's the
8  only report I see personally.
9     Q.   Do you know what the contents are of
10 the weekly and monthly reports?
11    A.   I do not.  I've never seen those
12 reports.
13    Q.   Do you know if there are any daily,
14 weekly, and monthly reports that were received
15 pursuant to this contract that covered the dates
16 of July 31st and August 1st, 2017?
17    A.   I do not.
18    Q.   Would HMMA have those reports if they
19 had been sent?
20    A.   I don't know.  I've not seen the
21 reports.
22    Q.   Who receives those reports?
23    A.   If I'm reading the contract, it would

Page 119

1  be the HMMA managers, safety, security, and
2  medical.
3     Q.   Do you know if there are any
4  references to Davita Key on any reports, be they
5  daily, weekly, or monthly, that were sent to
6  HMMA?
7     A.   I do not know.
8     Q.   Under Section 2 where we see minimum
9  standards, and this is at the bottom of Page HMMA
10 31, are these the minimum qualifications that we
11 talked about before that HMMA has set for people
12 to be placed to perform work pursuant to this
13 contract?
14       MR. MIDDLEBROOKS:  It goes on to the
15 next page.
16       THE WITNESS:  Thank you.
17    A.   It appears these are the minimum
18 standards that were set forth between HMMA and
19 Hyundai Engineering or Hyundai AMOCO.
20    Q.   (BY MS. LEONARD:)  And, again, we go
21 back to you don't know if HEA had any
22 contribution into this document since it was
23 created in 2010?

Page 120

1     A.   As we talked about earlier, the
2  initials on the bottom right-hand corner indicate
3  that two individuals, which we've now determined
4  represent the project manager, agreed on these
5  minimum standards.
6     Q.   Okay.  And these are standards that
7  HMMA put into the contract?
8     A.   That HMMA and Hyundai AMOCO or
9  Engineering agreed to put into the scope of work
10 or contract.
11    Q.   Well, we know that, again, what we're
12 looking at, the Section A, was created in 2010,
13 correct?
14    A.   Yes.
15    Q.   And you don't know if HEA or any of
16 its predecessors were part of negotiating this
17 document in 2010?
18    A.   No, I do not have any specific
19 knowledge.
20    Q.   And you don't even know if Exhibit A
21 that we're looking at right now was part of a
22 negotiation or something that HMMA created and
23 presented to be part?

Page 125

1  trained on the proper data entry skills necessary
2  to log, key, scan, and otherwise properly handle
3  inbound materials and parts arrival at HMMA.
4        Promptly upon request of HMMA,
5  contractor shall also conduct training sessions
6  to address specific procedures, deficiencies, et
7  cetera, as specified by HMMA.
8     Q.   So the substance of in-service
9  training would be the things that are identified
10 in Numbers 1, 2, and 3 of Section 3C as reflected
11 on Bates Number 33?
12    A.   Yes.
13    Q.   Okay.  When we look at Number 3, it
14 says promptly upon request of HMMA, contractor
15 could have to do these other types of trainings.
16       Did HMMA make any requests to HEA or
17 Dynamic to conduct any training sessions to
18 address specific procedures, deficiencies, et
19 cetera, as specified by HMMA?
20    A.   I have no specific knowledge of HMMA
21 requesting Hyundai Engineering to conduct any
22 training sessions for procedures, deficiencies.
23    Q.   Do you have any general knowledge of

Page 126

1  HMMA making that request to HEA or Dynamic?
2     A.   I have no general knowledge of HMMA
3  making the request to Hyundai Engineering.
4     Q.   So you have no knowledge of HMMA
5  making a request to the contractor to conduct
6  training sessions to address specific procedures,
7  deficiencies, et cetera as specified by HMMA?
8     A.   No, I am not.
9     Q.   Is there any type of documentation
10 that's been provided to HMMA from HEA or Dynamic
11 showing the training it has provided to the
12 people they have placed on HMMA's property?
13    A.   I have no knowledge of the
14 information being provided.
15    Q.   Is that something that is required by
16 HMMA, to see the training materials used by its
17 contractors?
18    A.   I have no knowledge if it's required.
19    Q.   In Section D on Bates Number 33, we
20 see that the contractor is required to provide
21 annual refresher training to recertify the
22 training officers who have been working there for
23 more than twelve months.

Page 127

1        Is that documentation provided to
2  HMMA?
3     A.   I do not have any knowledge that that
4  is provided to HMMA.
5     Q.   In any of the training that the
6  contractor is required to provide through these
7  sections we've looked at, does any of that
8  training relate to avoiding discrimination or
9  retaliation?
10    A.   I do not have any knowledge of
11 exactly what is covered in the refresher
12 training.
13    Q.   Do you have knowledge of anything
14 that is covered in the annual refresher training?
15    A.   I do not have any knowledge of what's
16 covered in the annual refresher training.
17    Q.   Does anything within this contract,
18 Exhibit 2, require the contractor to provide
19 training on federal anti-discrimination laws?
20    A.   I do not see any information --
21       MR. MIDDLEBROOKS:  Take your time and
22 look at the whole contract.
23    A.   Yeah, I've looked through the whole

Page 128

1  thing.  I'm not aware that there's anything
2  specific to that.
3        MR. MIDDLEBROOKS:  The contract
4  speaks for itself.
5     Q.   If you can turn to the next page,
6  which is HMMA 34, I want to look at Section 6
7  that talks about conduct.
8     A.   I see Section 6, Conduct.
9     Q.   When we look at that, under Section
10 A, it says the contractor has to ensure that the
11 security officers carry out their duties and
12 comply with the contract, and then it gives some
13 examples of things that would be noncompliant.
14 And the first thing listed is unacceptable
15 appearance.  What is that?
16    A.   The appearance of the security
17 officer's uniform.
18    Q.   Okay.  Who determines whether the
19 appearance is unacceptable?
20    A.   Hyundai Engineering or the security
21 contractor.
22    Q.   Does HMMA have any input into what is
23 considered unacceptable appearance?

Page 165

1        (Whereupon, Plaintiff's Exhibit 5 was
2    marked for identification and a copy of same is
3    attached hereto.)
4        Q.   And this is a document identified as
5    Contractor Safety, Security, and Fire Protection
6    Handbook.
7        A.   Uh-huh (positive response).  I have
8    it in my hand.
9        Q.   All right.  At the top of all of the
10   pages, we see there's a few bars, and it's got
11   the Hyundai or an H logo and the word Hyundai,
12   and then it says Contractor Handbook, and then
13   next to it HR-AL-EHS-SF-External, do you see
14   that?
15       A.   Yes, I see that.
16       Q.   What does this bar represent?  Why is
17   it on this document?
18       A.   This is what I would term as the
19   standard format for our documents related to the
20   business management system, so there's
21   consistency across all documents and the way that
22   they are presented in that system.  That's the
23   best way I can put it, yeah.

Page 166

1        Q.   And when we see the H logo and then
2    the word Hyundai in the top right corner of that
3    box, what does that represent or who does that
4    identify?
5        A.   It represents, in this case, Hyundai
6    Motor Manufacturing Alabama.
7        Q.   Is that symbol, the H symbol, and the
8    word Hyundai used to refer to any other company
9    other than HMMA?
10       A.   There are a number of Hyundai
11   companies that may use the Hyundai logo or name,
12   but it's not necessarily directly associated with
13   Hyundai Motor Manufacturing Alabama.
14            I hope I'm answering your question
15   right.
16       Q.   Okay.  Does HEA to your knowledge use
17   that H logo or that word "Hyundai" to identify
18   itself?
19       A.   I've not seen their logo, but Hyundai
20   Engineering, that's kind of obvious, they use the
21   word "Hyundai."
22       Q.   I guess where I'm going is:  Like
23   when we went to Ms. Key's deposition on Monday,

Page 167

1    we were in the security building on the Hyundai
2    campus.  And when you walk into that building --
3            MR. MIDDLEBROOKS:  Hyundai Motor
4    Manufacturing Alabama campus.
5        Q.   Right.  And when you walked into that
6    building, there was the big blue wall that had
7    the H that we see here and the word "Hyundai" on
8    it, and that H and that word "Hyundai" was
9    outside of the plant that you can see from I-65.
10            Are you aware of anybody using that H
11   and the word "Hyundai" to brand itself other than
12   Hyundai Motor Manufacturing Alabama?
13       A.   So, again, there's a number of
14   entities that use the word "Hyundai," like
15   Hyundai Motor America.
16            MR. MIDDLEBROOKS:  She's talking
17   about this brand.
18       A.   But this -- so the brand, the Hyundai
19   logo, that's the corporate identity standard for
20   Hyundai as an entity, and we're Hyundai Motor
21   Manufacturing Alabama.
22       Q.   And when you say it's the corporate
23   brand for Hyundai as an entity, what are you

Page 168

1    referring to when you say Hyundai as an entity?
2        A.   In our case, it's Hyundai Motor
3    Manufacturing, LLC.  If it's Hyundai Motor
4    America, they're using it as the Hyundai org
5    company or the overall group that says Hyundai.
6        Q.   Does the word "Hyundai" have a
7    specific meaning in Korean?
8        A.   I believe it -- years ago, and it's
9    still probably true, it would mean Modern.
10   Hyundai means Modern.
11       Q.   And the reason I ask is, like you
12   said, there are other businesses that have the
13   word "Hyundai" in it.  Hyundai Electrical,
14   Hyundai Power Transformers.
15            The fact that they all have the word
16   "Hyundai" in it, is there any connection that
17   allows them to all have the same name?
18       A.   I think they're all standalone
19   entities.
20       Q.   Do you know if HMMA or its parent
21   company have taken any steps to either trademark
22   or to have exclusive use of the word "Hyundai" in
23   branding?

Page 237

1    A.   Inside the security building at
2  Entrance 3 at HMMA.  That's adjacent to Entrance
3  3 at HMMA.
4    Q.   If you turn to the next page, which
5  is Page 54, in the second full paragraph, Dynamic
6  writes to the EEOC:  Ms. Key had then decided she
7  could simply ignore the instructions to restyle
8  her dreads to comply with HMMA policy.
9         And then if you skip down a paragraph
10  below that, it reads:  After reviewing a copy of
11  the HMMA policy regarding the company's grooming
12  standards, Ms. Key was sent home.
13         What policy did HMMA have that would
14  have been communicated to Ms. Key about the
15  company's grooming standards?
16    MR. MIDDLEBROOKS:  Object to the
17  form.
18    A.   I don't know, because it says
19  client's grooming policy.  Well, who's the
20  client?  Hyundai Engineering.  Then it comes back
21  and says HMMA policy.  The only HMMA policy that
22  relates to length of hair is our safety protocol
23  policy.

Page 238

1    Q.   I want to clarify.  You just said,
2  Who's the client?  Hyundai Engineering.  Anywhere
3  in this Exhibit 11 does Dynamic identify the
4  client as HEA?
5    MR. MIDDLEBROOKS:  Object to the
6  form.
7    A.   It doesn't identify HMMA.
8    Q.   Doesn't it identify the grooming
9  policy at issue to be HMMA's grooming policy?
10    A.   They can imply that.  It doesn't make
11  it fact.
12    Q.   Well, doesn't Dynamic state in this
13  document that HMMA's grooming policy is the one
14  that's at issue?
15    A.   If they're referring to our safety
16  protocol, this would not apply to Ms. Key.  It's
17  only for on-site production areas.
18    Q.   You would agree with me this document
19  only makes reference to HMMA's grooming policy?
20    A.   It makes reference to a client's
21  grooming policy first.
22    Q.   And when we look on Page 54, whose
23  grooming policy do they identify?

Page 239

1    A.   Are they implying that the client's
2  grooming policy is HEA's?
3    Q.   That's not my question.  On Page 54,
4  who do they identify to be the one -- who's
5  grooming policy are they --
6    MR. MIDDLEBROOKS:  The document
7  speaks for itself.
8    A.   Yeah.
9    Q.   And what does the document say?
10    A.   It says:  After reviewing a copy of
11  the HMMA policy regarding company's grooming
12  standard.
13    Q.   Do you know what policy that
14  references?
15    A.   No, because I wasn't -- I can't
16  interpret what this individual is referring to,
17  because the only policy that has reference to
18  length of hair is our safety protocol policy.  It
19  has nothing to do with mailroom or security
20  personnel.
21    Q.   Do you have any knowledge as to
22  whether or not HMMA may have communicated a
23  grooming policy to Dynamic as to what it expected

Page 240

1  for people in Ms. Key's role?
2    A.   No.
3    Q.   Let's go to the bottom of the page.
4  And below the bullet points HMMA -- or Dynamic
5  writes to the EEOC:  It was agreed by Dynamic and
6  HMMA management that Ms. Key would be removed
7  from the work site.
8         Who at HMMA management agreed with
9  Dynamic that Ms. Key would be removed from the
10  work site?
11    A.   No one.
12    Q.   Is that an untrue statement?
13    A.   No, it's -- that's an untrue
14  statement?  Are you talking about my statement
15  being untrue?
16    Q.   No, no.  Is Dynamic making an untrue
17  statement to the EEOC when it represented it was
18  agreed by Dynamic and HMMA management that Ms.
19  Key would be removed from the work site?
20    A.   Yes, it must be untrue, because no
21  one at HMMA made this decision to remove Ms. Key
22  from the work site.
23    Q.   Did Dynamic make an untrue statement

Page 241

1  to the EEOC when it said HMMA's grooming
2  policy -- or HMMA had a grooming policy that
3  would have applied to Ms. Key's dreadlocks?
4      A.   I understand what it says in the
5  document here, but I believe there's a
6  misinterpretation of HMMA policy, because, again,
7  the only policy that refers to length of hair is
8  our safety protocols.
9      Q.   So you would say Dynamic's
10 representation to the EEOC that HMMA had a
11 grooming policy relating to Ms. Key's hairstyle
12 is untrue?
13     A.   I would have to say, because we don't
14 have one that applies to the mail clerks.
15     Q.   So it would be HMMA's position then
16 that Dynamic provided untrue information to the
17 EEOC?
18         MR. MIDDLEBROOKS:  Asked and answered
19 numerous times.
20     Q.   You can answer it again.
21         MR. MIDDLEBROOKS:  You're badgering
22 the witness.
23         MS. LEONARD:  Hardly.

Page 242

1      Q.   (BY MS. LEONARD:)  You can answer.
2      A.   Yes, I believe that is an untrue
3  representation.
4      Q.   With respect to any person who was
5  employed or assigned through a contract to HMMA
6  through HEA or Dynamic for the period of 2017 to
7  the present, are you aware of anyone that was
8  accused of having a hairstyle inconsistent with
9  grooming standards?
10     A.   I apologize, but counsel was talking
11 to me, so I wasn't able to give you my --
12         MR. MIDDLEBROOKS:  I was trying to
13 move these exhibits out of the way that you were
14 finished with.
15     Q.   I'm looking at topic area 3 from
16 Exhibit 1, the 30(b)(6) notice.  With respect to
17 any person who is employed by HMMA or assigned to
18 HMMA through HEA or Dynamic for the period of
19 2017 to the present, has anyone been accused of
20 having a hairstyle that was inconsistent with the
21 company's grooming standards for having
22 dreadlocks?
23     A.   Not that I'm aware of.

Page 243

1      Q.   And that's something that you would
2  be aware of since you were prepared on that topic
3  area?
4      A.   That's true, I guess.  Based on
5  information I've been provided, no, there's not
6  been anybody.
7      Q.   Okay.  Would it be fair to say then
8  you're also not aware of anyone who has received
9  discipline for the way that they wore their hair
10 on HMMA property?
11     A.   No.  Are -- we're referring to
12 security personnel?  I just want to clarify that.
13 Is that what you're referring to?
14     Q.   We'll start with security personnel.
15 Are you aware of any security or mailroom
16 personnel that have received any type of
17 discipline, corrective action, or been requested
18 by HMMA to be removed from the site because of
19 their hairstyle?
20     A.   No.
21     Q.   Have there been any employees -- or
22 has HMMA fired or disciplined anyone that worked
23 directly for it for their hairstyle?

Page 244

1      A.   No.
2      Q.   So regardless of their category, HMMA
3  hasn't done anything to anybody about their hair?
4      A.   No.
5          MR. MIDDLEBROOKS:  That's beyond the
6  scope of the 30(b)(6).
7          MR. WHITEHEAD:  Can I just say, I
8  mean, look, if somebody is walking around with a
9  ponytail that fell out of their hat, I'm sure a
10 supervisor is going to say, hey, put it back up
11 in your hat.
12         THE WITNESS:  Yeah, that's not -- you
13 said terminated, or whatever she just said.
14     A.   Yeah, if someone is not following the
15 safety protocols --
16         MR. MIDDLEBROOKS:  That's still
17 beyond the scope of 30(b)(6).
18         MS. LEONARD:  Actually, it's part of
19 topic area 3 that dealt with comparatives.
20         MR. MIDDLEBROOKS:  3?
21         MS. LEONARD:  Yeah.
22         MR. MIDDLEBROOKS:  It says -- okay.
23 He's answered the question.

Page 249

1  any source that Davita Key had complained about

2  discrimination or retaliation?

3  **A.   No.  We had not heard about this case**

4  **prior to this notice.**

5  Q.   Had HEA or Dynamic informed HMMA that

6  Ms. Key had made either a complaint to Dynamic or

7  that Ms. Key had filed an EEOC charge?

8       MR. MIDDLEBROOKS:  Prior to that

9  date?

10      MS. LEONARD:  Yes.

11  **A.   No.**

12  Q.   (BY MS. LEONARD:)  What did you do to

13  determine that HMMA's first notice of Ms. Key's

14  complaint was Plaintiff's Exhibit 12?

15  **A.   Based on conversations with legal and**

16  **compliance, they informed me that they became**

17  **aware of the case once they received this letter**

18  **from the enforcement supervisor.  And once they**

19  **received the information, then they contacted**

20  **Hyundai Engineering to learn more about the**

21  **situation.**

22  Q.   Who in legal and compliance made you

23  aware of that?

Page 250

1  **A.   You mean of what I just described?**

2  Q.   Yes.

3  **A.   Mr. Chris Whitehead.**

4  Q.   Okay.  Considering that general

5  affairs would be the point of contact for the

6  security services contract, in preparing for your

7  deposition, did you make any effort to obtain

8  information from general affairs as to whether

9  they had received notice from HEA, Dynamic, or

10  any other source about Ms. Key's complaints?

11  **A.   No.**

12  Q.   Do you know what efforts, if any,

13  legal and compliance made to determine if any

14  other points of contact at HMMA other than Mr.

15  Whitehead had knowledge of Ms. Key's complaints

16  prior to October 24th?

17  **A.   No.**

18  Q.   Do you know if Plaintiff's Exhibit 12

19  was received by HMMA through the mail or

20  electronically through an e-mail?

21  **A.   The appearance on the document**

22  **doesn't really confirm one way or the other.**

23  Q.   If you turn to the second page of

Page 251

1  Exhibit 12, which is Bates Number Key 58, it

2  appears to be a notice of charge of

3  discrimination, which is referenced as an

4  attachment to the first page, and that appears to

5  bear an e-mail address.  And that's why I was

6  asking is, looking at these, I couldn't tell if

7  this was sent via mail or e-mail.  Does HMMA not

8  have any recollection which way it came through?

9  **A.   I don't have specific knowledge how**

10  **it was delivered, no.**

11  Q.   Okay.  On Page 59 of Exhibit 12 at

12  the top of the page is a preservation of records

13  requirement.  When did HMMA first take steps to

14  preserve information or documents that would

15  relate to Ms. Key's allegation that she

16  experienced discrimination when she was removed

17  from doing work on HMMA's property?

18  **A.   Normal practice, once a charge is**

19  **presented to HMMA, is to require anyone that may**

20  **have connection with the case to do just what you**

21  **said, preserve records.**

22  Q.   Was any type of litigation hold

23  letter sent out to anyone at HMMA relating to Ms.

Page 252

1  Key's claims?

2  **A.   That, I wouldn't know.  I would defer**

3  **to legal and compliance.**

4  Q.   Did HMMA receive any type of

5  litigation hold from Dynamic or from HEA?

6  **A.   I would have to defer to legal and**

7  **compliance.**

8  Q.   On the next page, which is Key 60, it

9  gives direction on a position statement, and it

10  indicates that a position statement should be

11  signed by an officer, agent, or representative of

12  the respondent.

13      Did HMMA understand that that would

14  be what was required when it was responding to

15  the EEOC?

16  **A.   I believe our legal and compliance**

17  **department would follow the directive of the**

18  **EEOC.**

19  Q.   All right.  I want to look next at

20  Exhibit 13, which is Ms. Key's EEOC charge.

21      (Whereupon, Plaintiff's Exhibit 13

22  was marked for identification and a copy of same

23  is attached hereto.)

Page 253

1  Q.   Who did HMMA notify that it had
2  received Ms. Key's EEOC charge, which is Exhibit
3  13 or Bates Number Key 47?
4     **A.   One more time.  Say that one more**
5  **time.**
6  Q.   Sure.  Who did HMMA notify that it
7  had received this charge of discrimination?
8     MR. MIDDLEBROOKS:  You're kind enough
9  to write your question at the top of the
10 document.
11 Q.   Oh, I gave you mine.  You can answer.
12 Go ahead.
13    **A.   I'm a little bit confused about who**
14 **notified who.  I mean, EEO notified HMMA.**
15 Q.   No, no.  When HMMA got this document,
16 who did they tell, Hey, Davita Key has filed an
17 EEOC charge?
18    **A.   Oh, okay.  So as I said earlier, once**
19 **we received the notification, legal and**
20 **compliance contacted Hyundai Engineering to learn**
21 **more information about the charge.**
22 Q.   And do you know who that was?
23    **A.   Who contacted Hyundai Engineering?**

Page 254

1  Q.   Yes.
2     **A.   Maybe it was Chris Whitehead.  That's**
3  **why I said legal and compliance, because I don't**
4  **know exactly who contacted them.**
5  Q.   How did you come to learn that
6  someone from legal and compliance contacted
7  Hyundai Engineering once HMMA received Exhibit
8  13?
9     **A.   Because during my preparation**
10 **yesterday, Mr. Whitehead gave me that information**
11 **about the timing of when they received this**
12 **charge.**
13 Q.   Do you know if there are any
14 documents that reflect communications between
15 HMMA and HEA about Ms. Key's EEOC charge?
16    **A.   I don't know if it was in the form of**
17 **a phone call or what.  I do not -- obviously,**
18 **there was communication, because Mr. Whitehead**
19 **acknowledged that he contacted Hyundai**
20 **Engineering to learn more about it.  I don't know**
21 **exactly how that communication took place.**
22 Q.   So it would be fair to say that HEA
23 had notice of Ms. Key's complaints that she had

Page 255

1  experienced discrimination through her assignment
2  at HMMA, and HEA had that notice before Ms. Key
3  filed her lawsuit.
4     MR. MILLER:  Object to the form.
5     MR. MIDDLEBROOKS:  Object to the
6  form.
7  Q.   Let me rephrase it.  Before Ms. Key
8  filed her lawsuit, it's fair to say that HMMA
9  notified HEA about Ms. Key's EEOC charge?
10    MR. MILLER:  Object to the form.
11    **A.   You're mixing -- you're confusing me**
12 **on who went first, because, again, we received --**
13 Q.   Ms. Key's lawsuit was filed in 2019.
14    **A.   Okay.**
15 Q.   You would agree with me that sometime
16 after October 24th, 2018, HMMA notified HEA about
17 Ms. Key's EEOC charge?
18    MR. MILLER:  Object to the form.
19    **A.   Well, at least now I'm clear on the**
20 **question in the sense that it was at least**
21 **fourteen, fifteen months, whatever it was, after**
22 **the actual termination of the individual that**
23 **HMMA was informed that there was even a case.**

Page 256

1  Q.   That's not my question.  I'm going to
2  move to strike as nonresponsive.
3     **A.   Okay.**
4  Q.   I'll be blunt.  HMMA represented to
5  the Court earlier in this case that it did not
6  know about Ms. Key's charge until it was sued.
7  What I'm hearing from you is to the extent
8  HMMA -- and it's okay if I'm --
9     MR. MILLER:  I'm going to go ahead
10 and object before she even finishes that
11 question.  To the extent that she's claiming that
12 any lawyer made a misrepresentation, I would --
13 you just need to think carefully.  I wasn't
14 involved in the case at that time, but you need
15 to be careful about how -- maybe you should
16 rephrase that for your own good.
17 Q.   You would agree that HMMA sometime in
18 2018 notified -- in 2018 Hyundai Motor
19 Manufacturing Alabama notified Hyundai
20 Engineering about Ms. Key's EEOC charge?
21    MR. MILLER:  Object to the form.
22    **A.   Okay.  So I'll answer it the same way**
23 **I did before, in that once we were notified, then**

Page 257

1  contacted -- Chris Whitehead or someone from
2  legal and compliance contacted Hyundai
3  Engineering to learn what actually -- or learn
4  about the charge, what happened, who -- so that's
5  all I can say.  That's when that contact took
6  place.
7      Q.   Did HMMA provide a copy of Ms. Key's
8  EEOC charge to HEA?
9      A.   That, I did not discuss with Mr.
10 Whitehead, so I cannot answer that.
11     Q.   How could we find that out?
12         MR. MIDDLEBROOKS:  You could ask
13 HMMA.
14         MS. LEONARD:  Or we could ask Mr.
15 Whitehead.  I'm trying to avoid having to do
16 that, which is why I was trying to do a 30(b)(6).
17         MR. MIDDLEBROOKS:  Well, there is an
18 e-mail that we produced.
19         MR. WHITEHEAD:  Heather, if I had a
20 memory off the top of my head, I would tell you.
21 I don't remember off the top of my head, but we
22 don't have any objection to looking to see if
23 that was done.

Page 258

1          MS. LEONARD:  I would really rather
2  avoid taking another lawyer's deposition.
3          MR. WHITEHEAD:  I understand.  And I
4  would not go silently into the night if someone
5  noticed me either.
6          MS. LEONARD:  If you guys are
7  agreeable, I can send an interrogatory that says
8  what information was provided by HMMA to HEA from
9  the period of, you know, for the period leading
10 up to HEA --
11         MR. WHITEHEAD:  I honestly don't
12 think I sent a copy of the actual charge -- and
13 we're talking about Cassandra Williams is who
14 we're talking about, and I honestly don't think I
15 sent a copy of the charge over to her.
16         MS. LEONARD:  And I'm not limiting it
17 just to you if it could have been Chris, anybody
18 in legal.
19         MR. WHITEHEAD:  It would be Chris.
20         MR. MIDDLEBROOKS:  It would be Chris
21 Smith.
22         MR. MILLER:  On behalf of HEA, I'm
23 going to object to this line of questioning.  I

Page 259

1  think it's outside of the scope of this case.
2          MS. LEONARD:  You can, but going back
3  to the motions to dismiss, if one of the
4  representations is if HEA actually knew about
5  this, I think it changes how the Court may have
6  viewed the motion to dismiss, and we may want to
7  revisit the issue with the Court.  So that's part
8  of why I'm proceeding down this line of
9  questioning.
10         MR. MILLER:  Is that a question?
11         MS. LEONARD:  No.  I'm letting you
12 know that's where this is going, why I'm going
13 down this line.
14         MR. MILLER:  And I'm objecting,
15 because that issue is no longer in the case.
16         MS. LEONARD:  It might be, though.
17     Q.   (BY MS. LEONARD:)  Do you know if
18 HMMA shared a copy of Ms. Key's EEOC charge with
19 anyone outside of HMMA, whether it's HEA,
20 Dynamic, or anybody else?
21     A.   I don't have any knowledge.
22         MR. MIDDLEBROOKS:  They did me.
23         MS. LEONARD:  You don't count.

Page 260

1  You're in the bubble.
2          MR. MIDDLEBROOKS:  That's where I
3  want to be.
4      Q.   (BY MS. LEONARD:)  Exhibit 14 is
5  HMMA's submission to the EEOC in response to Ms.
6  Key's EEOC charge, and it's Bates Numbers Key 67
7  through 72.
8          (Whereupon, Plaintiff's Exhibit 14
9  was marked for identification and a copy of same
10 is attached hereto.)
11     Q.   Was Mr. Middlebrooks somebody who was
12 authorized to draft and sign this document on
13 behalf of HMMA?
14     A.   Yes.
15     Q.   And HMMA authorized him to speak to
16 the matters raised in Ms. Key's EEOC charge?
17     A.   Yes.
18     Q.   I want to take a step back.  Do you
19 know if HMMA communicated with Dynamic Security
20 about Ms. Key's EEOC charge?
21     A.   I do not know.
22     Q.   Do you have any knowledge who at HMMA
23 would have provided information to assist counsel

Robert Burns

Page 261

1  in preparing Exhibit 14?

2      A.   Legal and compliance department.

3          MR. WHITEHEAD:  She's referencing the

4  position statement, right?

5          THE WITNESS:  Yes.

6          MS. LEONARD:  I'm just asking who

7  would have helped him.

8      Q.   (BY MS. LEONARD)  Did you

9  participate in the preparation of Exhibit 14?

10     A.   I did not.

11     Q.   Exhibit 15 is Bates Number Key 62,

12 and it's a letter from EEOC to counsel for HMMA.

13         (Whereupon, Plaintiff's Exhibit 15

14 was marked for identification and a copy of same

15 is attached hereto.)

16     Q.   Have you seen this document before?

17     A.   I have seen this document.

18     Q.   When did you first see this document?

19     A.   I saw this document yesterday.

20     Q.   On May 2nd, 2019, the EEOC wrote

21 HMMA's representative that the evidence indicates

22 that charging party was discharged in retaliation

23 for engaging in a protected activity.

Page 262

1          Who outside of HMMA, if anyone, did

2  HMMA notify that the EEOC had made this

3  conclusion?

4      A.   To my knowledge, no one else except

5  counsel.

6      Q.   Do you know if HMMA took any action

7  in response to Exhibit 15 to change anything

8  about how it did business or with whom it did

9  business?

10     A.   Say that very first part again.

11     Q.   Sure.  After HMMA got Exhibit 15, did

12 it do anything in terms of how it followed its

13 policies?  Did it change anything?

14     A.   No.

15     Q.   After getting Exhibit 15, did it

16 change anything about with whom it did business?

17     A.   No.

18     Q.   Did the information from the EEOC

19 that it was -- or that the investigator was going

20 to recommend that a reasonable cause be issued,

21 that Ms. Key had been discharged in retaliation

22 for engaging in protected activity, did HMMA

23 change anything about how it operated or did

Page 263

1  business in response to this letter?

2      A.   No.

3      Q.   I want to look next to Exhibit 16,

4  which is Bates Numbers Key 64 to 66, which is a

5  letter dated May 9th, 2019 from counsel for HMMA

6  to the EEOC.

7          (Whereupon, Plaintiff's Exhibit 16

8  was marked for identification and a copy of same

9  is attached hereto.)

10     Q.   Have you seen this document before?

11     A.   Yes, I quickly glanced at it

12 yesterday.

13     Q.   Okay.  And was Mr. Middlebrooks

14 authorized by HMMA to speak on its behalf about

15 this matter?

16     A.   Yes, he was.

17     Q.   And when this letter was submitted to

18 the EEOC, was it done so by HMMA's agent?

19     A.   When you say agent --

20     Q.   Yeah, was he somebody that -- was Mr.

21 Middlebrooks somebody that HMMA had retained to

22 speak on its behalf about Ms. Key's claims?

23     A.   He's -- yeah, he's representing HMMA

Page 264

1  on behalf of this claim, Mr. Middlebrooks is.

2      Q.   And does Exhibit 16 contain the

3  reasons that HMMA was asking the EEOC to

4  reconsider its decision?

5      A.   It does outline several reasons.  I

6  see here the errors, and there are a total of

7  seven bullets or seven different items outlined

8  in this letter, yes.

9      Q.   And HMMA would have provided the EEOC

10 with all of its reasons that it needed to

11 reconsider its decision in this letter?

12         MR. MIDDLEBROOKS:  Object to the

13 form.

14     A.   It looks like Mr. Middlebrooks

15 provided seven reasons for this -- the error for

16 the charge against HMMA.

17     Q.   There wouldn't be a reason for HMMA

18 to withhold any other reasons it might want a

19 reconsideration for inclusion in this letter, is

20 there?

21         MR. MIDDLEBROOKS:  Object to the

22 form.

23     A.   Just based on the information I'm

Page 265

1  reading here, Mr. Middlebrooks representing HMMA
2  provided the information to say that the charge
3  against HMMA was in error.
4       Q.   And if there was another reason that
5  HMMA wanted the EEOC to reconsider, it would be
6  included in Exhibit 16?
7            MR. MIDDLEBROOKS:  Object to the
8  form.
9       A.   I believe based on the seven items
10  that he's outlined in this letter, that
11  determined why HMMA was not -- should not be
12  charged.
13           MR. MIDDLEBROOKS:  As of the date of
14  the letter.
15      A.   As of the date of the letter.
16      Q.   And I want to look at Exhibit 17
17  next, which is Key 41 through 42.
18           (Whereupon, Plaintiff's Exhibit 17
19  was marked for identification and a copy of same
20  is attached hereto.)
21      Q.   Have you seen this determination
22  issued by the EEOC before?
23      A.   I glanced at it yesterday, yes.

Page 266

1       Q.   When did you first become aware that
2  the EEOC had found that HMMA had engaged in
3  retaliation towards Ms. Key?
4            MR. MIDDLEBROOKS:  Excuse me, and
5  what?
6       Q.   Sure.  How did you -- when did you
7  first learn that the EEOC had made a
8  determination adverse to HMMA?
9       A.   I don't remember the exact date, but
10  to be more general -- and that's what I have to
11  be, because I don't have an exact -- it would
12  have been before this deposition.  I just can't
13  recall an exact date.  I just -- five, six months
14  or more.  I really don't recall, but I was
15  definitely made aware of it X number of months
16  ago.  I don't know an exact date.
17      Q.   And you were in your VP human
18  resources role in June of 2019, correct?
19      A.   Yes.
20      Q.   But despite being VP of human
21  resources in June of 2019 when this determination
22  was issued, you weren't made aware of it until
23  sometime this year in 2022?

Page 267

1       A.   Again, I was speculating on exactly
2  when, but the important point is this does not
3  involve an HMMA team member.
4       Q.   That's not my question.  You're the
5  senior vice-president --
6       A.   I'm giving you the response, because
7  that's why I wouldn't have been informed until it
8  was necessary to be involved with the case.  So I
9  would not have been informed, because it's not an
10  HMMA team member.
11      Q.   You would agree the determination by
12  the EEOC, though, is that HMMA's employment
13  practices, in their view, may be violating
14  statues?
15      A.   Based on the information provided by
16  the equal employment commission letter, maybe,
17  yeah.
18      Q.   And going back to the beginning of
19  your deposition, you said it's their
20  determination that would determine if a complaint
21  was valid, correct?
22           MR. MIDDLEBROOKS:  Excuse me?
23      A.   Yeah, I recall saying something

Page 268

1  whether or not -- the EEO would determine whether
2  or not we were at fault, and then we have a right
3  to defend that, which Mr. Middlebrooks' letter
4  that points out the seven different items that
5  show they were in error.
6       Q.   In your role as vice-president of
7  human resources, should you have been made aware
8  that the EEOC had made a finding adverse to HMMA?
9       A.   If it involved a team member, yes.
10      Q.   What does the EEOC do?  What's your
11  understanding of what they do?
12      A.   They investigate and/or --
13           MR. MIDDLEBROOKS:  That's beyond the
14  30(b)(6), but go ahead.
15      Q.   You can answer.
16      A.   My general understanding is review
17  equal employment opportunity issues.  I'll leave
18  it at that.  Broadly, issues that may come up.
19      Q.   And what laws do you understand the
20  EEOC investigates violations of?
21      A.   I'm not an expert, so I don't know
22  the details.
23           MR. MIDDLEBROOKS:  I object.  It's

Robert Burns

Page 289

1   Q.   And we see Gloria Robinson's e-mail

2   address is what?

3   A.   G -- GloriaRobinson@HMMAUSA.com.

4   Q.   Did anyone from HEA reach out to HMMA

5   and ask them either to preserve e-mails sent to

6   or received -- sent by -- did anybody reach out

7   and say, Hey, preserve Ms. Williams' e-mails on

8   your server?

9   A.   Did anyone from HEA?

10   Q.   Yes.

11   A.   I can't speak for HEA. I don't know.

12   Q.   Are you aware of HMMA ever receiving

13   any requests from either -- from HEA or anyone

14   acting on its behalf to preserve Ms. Williams'

15   e-mails as they may relate to Ms. Key?

16   A.   I don't know for certainty, no, but

17   the past protocol, I would say the odds are good,

18   but I can't definitively say.

19        MR. MIDDLEBROOKS:  Odds are good is

20   not what she's asking.

21        THE WITNESS:  Sorry.

22        MR. WHITEHEAD:  Do you know?

23        THE WITNESS:  I don't know.  I don't

Page 290

1   know.

2   Q.   (BY MS. LEONARD:)  If --

3   A.   I don't.

4   Q.   To the extent HEA sent any direction

5   to HMMA to preserve Ms. Robinson's e-mails that

6   may relate to Ms. Key, does HMMA still have any

7   documents that would reflect when it received

8   that communication?

9        MR. MIDDLEBROOKS:  Object to the

10   form.

11   A.   I don't have any knowledge. I cannot

12   speak on behalf of Hyundai Engineering.

13   Q.   Is that something that HMMA would be

14   able to locate if it exists?

15   A.   I do not know.

16   Q.   Did anyone from Dynamic at any time

17   reach out to HMMA and ask HMMA to preserve Gloria

18   Robinson's e-mails that may relate to Ms. Key?

19   A.   I can't speak on behalf of Dynamic

20   Security.

21   Q.   And that's not my question. My

22   question is:  Did HMMA receive a request?

23   Because you can speak on behalf of HMMA.

Page 291

1   A.   I have no knowledge of that taking

2   place.

3        MR. MIDDLEBROOKS:  I'll tell you

4   we'll stipulate when it comes to Chris Whitehead,

5   he didn't get any such e-mail.

6        MS. LEONARD:  I'm not limiting it to

7   e-mails.  This goes back to figure out who knew

8   what and when.

9        MR. MIDDLEBROOKS:  Any communication.

10        MS. LEONARD:  So HMMA's position is

11   it didn't receive any communications from Dynamic

12   or HEA to preserve e-mails that may have been

13   sent through its server?

14        MR. WHITEHEAD:  Correct.

15        MS. LEONARD:  Okay.

16   Q.   (BY MS. LEONARD:)  If we go down to

17   the bottom of that same e-mail that Ms. Williams

18   was sending on August 1st, 2017 and her signature

19   line, what is her title?

20   A.   Oh, Cassandra Williams?

21   Q.   Yes.

22   A.   Okay.  Manager of security services.

23   That's the line you're referring to?

Page 292

1   Q.   Yes.  And then what business is

2   identified below that?

3   A.   Hyundai ENG America, Inc.

4   Q.   And what business is identified below

5   that?

6   A.   Hyundai Motor Manufacturing Alabama,

7   LLC.

8   Q.   Do you have any knowledge as to why

9   HMMA's name is contained in Ms. Williams'

10   signature for her e-mail?

11   A.   Because that is the template that is

12   set up by AutoEver.  And any individual with an

13   e-mail that has that template, it would

14   automatically populate that, and then the area

15   above that would be populated by the individual.

16        But everything else on Outlook's

17   server would have a template that represents

18   this.  It just basically fills in the blank.

19   Q.   Knowing that Ms. Robinson is sending

20   e-mails through the Outlook server for HMMA

21   e-mail, if we turn to the second page, we don't

22   see that information in her signature line on the

23   e-mail in the top of Page HEA 169.

Robert Burns

Page 297

1   A.   No.

2   Q.   Have you had any interaction with

3   Kristin or Kristal Riddle at Dynamic Security?

4   A.   No, I have not.

5   Q.   Do you know if in this e-mail Ms.

6   Williams was forwarding to HMMA on November 13th,

7   2018 a copy of the EEOC charge that had been

8   filed against Dynamic Security?

9   A.   No, I did not know she was forwarding

10  anything.

11  Q.   Do you know when HMMA first saw a

12  copy of the EEOC charge that Ms. Key filed

13  against Dynamic Security?

14  A.   I suspect it's the same date as

15  wherever that document is that was received by

16  Chris Smith.

17  Q.   And the document that was received by

18  Chris Smith was Ms. Key's complaint against HMMA?

19  A.   Uh-huh (positive response).

20  Q.   When did HMMA first see the complaint

21  Ms. Key filed against Dynamic Security?

22  A.   That, I don't know.

23       MR. MIDDLEBROOKS:  Heather, in this

Page 298

1   e-mail November 13th, that was a copy of the

2   position statement of Dynamic Security and the

3   charge that was shared with Cassandra Williams

4   and eventually came to legal.

5       MS. LEONARD:  Okay.  So on November

6   13th, Ms. Williams is sending to HMMA a copy of

7   the Dynamic response?

8       MR. MIDDLEBROOKS:  And the charge.

9   Q.   (BY MS. LEONARD:)  And back to you,

10  Mr. Burns.

11  A.   Yes.

12  Q.   You don't know, though, whether this

13  was the first time that HMMA learned of Ms. Key's

14  EEOC charge against Dynamic?

15  A.   No.  That was fifteen or whatever

16  months later.

17  Q.   Do you know if this e-mail chain that

18  we're looking at, Plaintiff's Exhibit 22, still

19  lives on HMMA's e-mail server so that we could

20  look at this e-mail and the family of e-mails

21  associated with it?

22  A.   No, I don't have any certainty that

23  it's available, because not knowing how long

Page 299

1   Hyundai -- the AutoEver -- AutoEver, the IT

2   group, retains that Outlook database, I guess

3   we'll call it.  I don't know.

4   Q.   Do you know whether this e-mail was

5   forwarded to anyone else at HMMA?

6   A.   I'm not aware of anybody else getting

7   the e-mail.

8   Q.   Exhibit 23 to your deposition is HEA

9   215 through 216.

10       (Whereupon, Plaintiff's Exhibit 23

11  was marked for identification and a copy of same

12  is attached hereto.)

13  Q.   Have you seen Plaintiff's Exhibit 23

14  before?

15  A.   Yes, I reviewed this briefly

16  yesterday.

17  Q.   Okay.  And when we look at the e-mail

18  at the top of Plaintiff's Exhibit 23, it's an

19  e-mail sent from Chris Whitehead in HMMA's legal

20  compliance department to Kristal Riddle at

21  Dynamic Security and copying Cassandra Williams

22  at HEA, correct?

23  A.   Yes.

Page 300

1   Q.   And what does the subject matter of

2   this e-mail concern?

3   A.   I'm reading it.  Chris says:  We just

4   got a letter from EEOC indicating they intend to

5   recommend a for cause determination against HMMA

6   on the Davita Key charge.  Have you heard

7   anything back regarding the charge submitted

8   against Dynamic Security?

9   Q.   Other than this e-mail exchange, are

10  there any other communications among the three

11  defendants to this lawsuit about Ms. Key's

12  pending EEOC claims?

13  A.   I have no knowledge of any other

14  information being exchanged or e-mails.

15  Q.   Are there any other e-mails in this

16  family of e-mails?

17  A.   I have no knowledge of any other

18  e-mails.

19  Q.   If they are, would they exist on

20  HMMA's server since at least two of the parties

21  to this e-mail exchange have @HMMAUSA.com e-mail

22  addresses?

23  A.   As I stated before, I don't know

Page 301

1   AutoEver IT group's record retention on e-mails.
2   So it's hard to say if there would be any record
3   of these extensive e-mails that you're looking
4   for. I have no knowledge.
5        Q.   The last few things I want to look at
6   are two sets of invoices. And I apologize. I
7   did not print off copies for everyone, so when I
8   mark Exhibits 24 and 25, I want you to give
9   counsel next to you an opportunity to look at
10  them, and he may need to pass them down to Mr.
11  Miller to look at as well.
12       But these are Bates Numbers --
13  Exhibit 24 is Bates Numbers HEA 219 through 224.
14       (Whereupon, Plaintiff's Exhibit 24
15  was marked for identification and a copy of same
16  is attached hereto.)
17       Q.   And Exhibit 25 is Bates Number HEA
18  225 through 230.
19       (Whereupon, Plaintiff's Exhibit 25
20  was marked for identification and a copy of same
21  is attached hereto.)
22       Q.   If you can pass those to your lawyer
23  and let him look at that.

Page 302

1        (Whereupon, a discussion off the
2   record was held.)
3        A.   Again, I've had a chance to look at
4   this as well yesterday.
5        Q.   All right. Looking at Plaintiff's
6   Exhibit 24 and 25, what are they? Oh, I'm sorry.
7   They're still looking at it.
8        MR. WHITEHEAD:  I've seen it.
9        A.   Okay. So, anyway, it looks like this
10  is the invoices submitted to Hyundai Motor
11  Manufacturing Alabama by Hyundai Engineering for
12  the security services provided to HMMA.
13       Q.   Okay. How does this invoice process
14  work, if you know?
15       A.   In general terms, yes, the Hyundai
16  Engineering would submit invoices with, as we can
17  see on the second page of the document, detailing
18  the positions that -- for the services being paid
19  by Hyundai Engineering, that ultimately are
20  billed to HMMA; supervisor, security and
21  administration support, mail, Officer I, Officer
22  II.
23       The person receiving the information

Page 303

1   would review the invoice, confirm that it's
2   accurate, ask questions if they needed to. But
3   after they validated the invoice, then it would
4   be processed for payment to Hyundai Engineering
5   America.
6        (Whereupon, a discussion off the
7   record was held.)
8        Q.   (BY MS. LEONARD:)  Are the entire
9   packets that we see in Exhibits 24 and 25 what
10  are submitted to HMMA?
11       A.   Say that again.
12       Q.   Sure. Are the entire packets that we
13  see like in Exhibit 24, is that what's sent to
14  HMMA?
15       A.   To process the invoice for payment?
16       Q.   Right.
17       A.   On a monthly basis, that seems to be
18  an accurate representation, like Exhibit --
19       MR. MIDDLEBROOKS:  Would everything
20  in there, though, be sent to you, not just the --
21  look at all pages.
22       A.   That's why I'm looking through them.
23  I'm flipping through them, because I just look at

Page 304

1   Exhibit 24 for the month of July 1 through July
2   31, each page represents the charges, and then
3   they have supporting documentation behind it to
4   validate the --
5        MR. MIDDLEBROOK:  From who?
6        A.   From Hyundai Engineering -- that's
7   what I was about to say -- and Dynamic Security
8   who's providing the service to Hyundai
9   Engineering.
10       Q.   If you'll look at Exhibit 24 on Page
11  223 and Exhibit 25 on Page 229, we see something
12  that looks like it may be an invoice that is sent
13  to Cassandra Williams.
14       A.   Okay. I see it on 23, and I see it
15  on 29 now.
16       Q.   Basically, the last two pages of each
17  of these are invoices that look like from
18  Dynamic. So these are also submitted to HMMA by
19  HEA?
20       A.   So, again, this is supporting
21  documentation for review by the person that's
22  going to process the invoice to pay Hyundai
23  Engineering for the services provided to Hyundai

Page 1

1    IN THE UNITED STATES DISTRICT COURT FOR
2         THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4              2:19-CV-767-ECM-SMD
5
6    DAVITA M. KEY,
7         Plaintiff,
8    v.
9    HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC,
10   HYUNDAI ENGINEERING AMERICA, INC., DYNAMIC
11   SECURITY, INC.,
12        Defendants.
13
14
15        DEPOSITION OF KRISTAL RIDDLE
16             AUGUST 19, 2022
17               9:30 a.m.
18
19
20
21
22   COURT REPORTER:
23   Lindsey Seals

Page 3

1    grounds at the time of trial or at the time
2    said deposition is offered in evidence, or
3    prior thereto.
4
5        IT IS FURTHER STIPULATED AND AGREED
6    that notice of filing of the deposition by the
7    Commissioner is waived.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 2

1         S T I P U L A T I O N S
2        IT IS STIPULATED AND AGREED by and
3    between the parties through their respective
4    counsel that the deposition of KRISTAL RIDDLE,
5    may be taken before Lindsey Seals, Notary
6    Public, State of Alabama at large, at the law
7    offices of Palmer Law, LLC, Birmingham,
8    Alabama, on August 19, 2022, commencing at
9    approximately 9:30 a.m.
10
11       IT IS FURTHER STIPULATED AND AGREED that
12   the signature to and the reading of the
13   deposition by the witness is not waived, the
14   deposition to have the same force and effect as
15   if full compliance had been had with all laws
16   and rules of Court relating to the taking of
17   depositions.
18
19       IT IS FURTHER STIPULATED AND AGREED that
20   it shall not be necessary for any objections to
21   be made by counsel to any questions, except as
22   to form or leading questions and that counsel
23   for the parties may make objections and assign

Page 4

1              I N D E X
2
3
4           EXAMINATION INDEX
5                    PAGE
6    EXAMINATION OF KRISTAL RIDDLE

7       BY MS. PALMER            9
8       BY MS. BROWN            183
9       BY MR. MILLER           197
10      BY MR. REDMOND          200
11      FURTHER BY MS. PALMER       204
12
13           EXHIBIT INDEX
14   PLAINTIFF'S              PAGE
15   Exhibit 9               79
16   Exhibit 11              120
17   Exhibit 20              81
18   Exhibit 24              141
19   Exhibit 26              24
20   Exhibit 27              29
21   Exhibit 29              96
22   Exhibit 30              85
23   Exhibit 31              90

Page 5

1  Exhibit 32            122
2  Exhibit 36            101
3  Exhibit 37            125
4  Exhibit 38            111
5  Exhibit 41            176
6  Exhibit 43            129
7  Exhibit 44            133
8  Exhibit 47            142
9  Exhibit 48            143
10 Exhibit 49            145
11 Exhibit 50            155
12 Exhibit 51            159
13 Exhibit 52            136
14 Exhibit 53            153
15 Exhibit 54            163
16 Exhibit 55            147
17 Exhibit 56            67
18 Exhibit 57            160
19 Exhibit 58            164
20 Exhibit 60            150
21 Exhibit 61            169
22 DEFENDANTS' (HMMA)         PAGE
23 Exhibit 1             186

Page 6

1  Exhibit 2             193
2  Plaintiff's 8         191
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 7

1          A P P E A R A N C E S

2

3  APPEARING ON BEHALF OF THE PLAINTIFF:

4      Leslie A. Palmer
       Attorney at Law
5      Palmer Law, LLC
       104 23rd Street South, Suite 100
6      Birmingham, AL  35233
       E-mail: Leslie@palmerlegalservices.com
7

8  APPEARING ON BEHALF OF THE PLAINTIFF:

9      Heather Newsom Leonard
       Attorney at Law
10     Heather Leonard, P.C.
       2105 Devereux Circle, Suite 111
11     Birmingham, AL  35243
       E-mail: Heather@HeatherLeonardPC.com
12

13 APPEARING ON BEHALF OF DYNAMIC SECURITY:

14     Wesley C. Redmond
       Attorney at Law
15     Ford Harrison, LLC
       420 20th Street North, Suite 2560
16     Birmingham, AL  35203
       E-mail: Wredmond@fordharrison.com
17

18 APPEARING ON BEHALF OF HYUNDAI MOTOR
   MANUFACTURING ALABAMA, LLC:
19
       Whitney R. Brown
20     Attorney at Law
       Lehr Middlebrooks Vreeland
21     & Thompson, P.C.
       Po Box 11945
22     Birmingham, AL  35202
       E-mail: Wbrown@lehrmiddlebrooks.com
23

Page 8

1  APPEARING ON BEHALF OF HYUNDAI ENG AMERICA,
   INC:
2
       T. Matthew Miller
3      Attorney at Law
       Bradley, Arant, Boult, Cummings, LLP
4      1819 Fifth Avenue North
       Birmingham, AL  35203
5      E-mail: Mmiller@bradley.com
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 53

1  retaliation, or pregnancy?

2      **A.  I'm not sure what you're asking.**

3      Q.   So Exhibit 52 contains, I think, four

4  separate headings within the document.  Other

5  than those four policies, does Dynamic Security

6  have other policies and procedures that would

7  apply to harassment, retaliation, pregnancy, or

8  other EEOC-type issues, discrimination?

9      **A.   No.  These are our core policies**

10 **regarding issue.**

11     Q.   You said these are the core policies.

12 I just want to be clear, are these the only

13 policies?

14     **A.   They are the only policies.**

15     Q.   Okay.  I just want to make sure we're

16 not going to uncover some other policies

17 somewhere that we should have asked for.  Okay.

18 I'll take this one back because we're going to

19 go back to it later.

20          Okay.  Can you tell me, Mrs. Riddle

21 -- can you tell me what do you understand to be

22 discrimination?  What type of conduct would you

23 define as discrimination?

Page 54

1          MR. REDMOND:  I'm going to object to

2  the form if you're asking her for a legal

3  conclusion.

4          MS. PALMER:  Just for opinion.

5      **A.   Discrimination, in my opinion, is**

6  **when someone takes an action against another**

7  **person which is based on a characteristic that**

8  **the individual doesn't necessarily have -- have**

9  **control over and treating an individual**

10 **differently because of that situation.**

11     Q.   And in your -- in your position as

12 the -- I'm going to say it wrong because I want

13 to say legal affairs coordinator but that's not

14 it -- chief legal officer, how would you

15 determine if someone's complaint was in fact

16 discrimination?

17         MR. REDMOND:  Object to form.

18     Q.  You can answer.

19         MR. REDMOND:  You can answer.

20         MR. MILLER:  I'm going to object to

21 that as well.  Just for the record, an

22 individual can't determine that.  Only a court

23 can determine complaints discrimination.

Page 55

1          MS. PALMER:  Actually, jury

2  determines that which would be people.

3          MR. MILLER:  Well, the Court can

4  determine --

5          MS. PALMER:  Right.  And --

6          MR. MILLER:  Anyway, that's my

7  objection.

8          MS. PALMER:  Right.  Well, we're

9  operating under the usual stipulations here, so

10 speaking objections should not be just object

11 to forms.

12         MR. MILLER:  I just wanted you to

13 know why I was objecting so you would have the

14 chance to rephrase it.  I was just trying to be

15 kind.  So I won't do that anymore.  I'll just

16 object and let y'all figure it out.

17         MS. PALMER:  Yeah.

18     Q.  Mrs. Riddle, let me rephrase.  As the

19 chief legal officer, is it your job to deal

20 with complaints related to discrimination?

21     A.  It is.

22     Q.   And in dealing with those complaints,

23 how would you, as the chief legal officer,

Page 56

1  determine whether discrimination had occurred?

2          MR. REDMOND:  Object to form.

3      **A.   I rely on the reports that I'm**

4  **provided.  I rely upon the -- the statements**

5  **that I'm given from the person who's making the**

6  **complaint.  I rely on the reports from**

7  **investigation that occurred on the ground by**

8  **our local branch management.  I rely on witness**

9  **statements if there are any.  I take -- that's**

10 **what I take into account.**

11     Q.   And in relying on those reports and

12 witness statements, do you also look at other

13 documents or e-mails or communications as they

14 may relate to the events in question?

15     **A.   If they're relevant.**

16     Q.   And with regard to -- what did I ask,

17 discrimination -- with regard to retaliation as

18 the chief legal affairs -- no chief legal

19 officer, how would you make a determination as

20 to whether someone's complaint constituted

21 retaliation?

22     **A.   In much the same manner.**

23     Q.   And with respect to Ms. Key in 2017,

Page 57

1  has Dynamic Security evaluated whether
2  Ms. Key's complaint constituted discrimination
3  or retaliation?
4  **A.   Yes.**
5  Q.   Okay.  And who made that evaluation?
6  **A.  I did.**
7  Q.   Okay.  And what was determined in
8  that evaluation?
9  **A.   The determination in that evaluation**
10 **was that I did not believe that retaliation had**
11 **occurred.  I did not believe discrimination had**
12 **occurred.  It seemed obvious that the problem**
13 **was that she was not following the instructions**
14 **of Cassandra Williams regarding her hairstyle.**
15 Q.   What documents did you review in
16 making that determination with regard to
17 Ms. Key?
18 **A.   I reviewed the e-mail that was sent**
19 **to Ray Cureton by Cassandra.  I also relied on**
20 **the statement by Latunya Howell and the**
21 **statement from Gloria Robinson.**
22 Q.   Which statement are you identifying
23 from Gloria Robinson?

Page 58

1  **A.   This statement.**
2  Q.   Okay.
3       MS. BROWN:  Can she read the Bates
4  number into the record?
5  **A.   Bates number is Dynamic-Key -- do I**
6  **say all the zeros or just the last -- 34 and**
7  **35.**
8       MR. REDMOND:  It's actually three
9  pages, isn't it?
10      MS. PALMER:  Yes.  So the actual --
11 and we'll get to it.  It will be an exhibit.
12 But the actual memorandum is three pages.  At
13 some point, it came across as only two.  I'm
14 assuming it maybe was a front and back.
15 **A.   Oh, okay.**
16      MS. PALMER:  But the full one will be
17 put in as an exhibit.
18 Q.   When did you make this determination
19 with regard to Ms. Key's complaint?
20 **A.   I made the determination during the**
21 **time that I was working on the position**
22 **statement for EEOC.**
23 Q.   When was that, do you remember?

Page 59

1  **A.   I received the statement -- I**
2  **received the request for position statement on**
3  **August 11th -- 11th or 12th, 2017, and spent**
4  **30 days reviewing the documentations and going**
5  **back through them.**
6  Q.   Okay.  And I just want to clarify
7  because we may be talking about two different
8  things.  You said that you reviewed Latunya
9  Howell's statement, Ray Cureton -- did you say
10 Ray Cureton?
11 **A.   I didn't rely on his statement as**
12 **much as -- as regards to what actually happened**
13 **in -- on that day between -- between Keys,**
14 **Robinson, and Williams, but I did take it into**
15 **account.**
16 Q.   Okay.
17 **A.   My primary focus were those three.**
18 Q.   Okay.  And so it sounds to me like
19 you're talking about the incident that
20 occurred, I think as you said, between Key,
21 Robinson, and Williams at Hyundai; is that
22 right?
23      MR. MILLER:  Object to the form.

Page 60

1      MR. REDMOND:  Object to the form.
2  Q.   You can answer.
3  **A.   That is what I --**
4  Q.   Okay.  And so during that time
5  period -- so we're talking, I think,
6  August 1st, 2017, around there -- did you
7  consider Cassandra Williams as an employee for
8  HMMA?
9  **A.   Yes.**
10 Q.   Okay.  And did you understand that
11 she was speaking for HMMA?
12      MS. BROWN:  Object to the form.
13      MR. MILLER:  Object to the form.
14 Q.   Did you understand that Cassandra Williams
15 was acting on behalf of HMMA when she requested
16 Davita Key's removal?
17      MS. BROWN:  Object to the form.
18 Q.   You can answer.
19 **A.   Can you say it again?  I've lost it.**
20 Q.   Did you understand that Ms. Williams
21 was acting for HMMA when she requested Davita
22 Key's removal?
23      MS. BROWN:  Object to the form.

Page 61

1    MR. MILLER:  Object to the form.

2    **A.  Sorry.  You guys got me kind of --**

3    Q.  It's okay.

4    **A.  My brain is just froze.**

5    Q.  It's okay.  Let me ask it this way.

6 So --

7    MR. MILLER:  Your questions are

8 problematic and that's why we're objecting.

9    Q.  Are you aware that Ms. Williams

10 requested Ms. Key's removal?

11   **A.  I am aware.**

12   Q.  Okay.  And who was she --

13   MR. MILLER:  Object to the form.  If

14 you'll pause for just a second because a lot of

15 these questions are objectionable, can call for

16 facts not in evidence.  So I do want to have

17 the chance to object before you answer it.  I

18 hope my objection will be considered an

19 objection before you answer.  Thank you.

20   Q.  Who was Ms. Williams -- where was

21 Ms. Williams requesting Ms. Key be removed

22 from?

23   MR. MILLER:  Object to the form.

Page 62

1    MS. BROWN:  Object to form.

2    **A.  From Hyundai property.**

3    Q.  Okay.  And what company was -- did

4 Dynamic Security understand was the Hyundai

5 property?

6    MS. BROWN:  Object to form.

7    **A.  HMMA.**

8    Q.  You said that you did this

9 investigation while you were responding to the

10 position statement.  Is that position statement

11 in response to the EEOC charge that Dynamic

12 Security received?

13   **A.  I only responded to Dynamic -- the**

14 **requests for Dynamic Security to provide a -- a**

15 **position statement.**

16   Q.  Okay.  And do you recall that one of

17 the allegations that Ms. Key made was that she

18 had been terminated by Dynamic Security?

19   **A.  I do recall that, yes.**

20   Q.  And that would have been after her

21 removal from Hyundai; correct?

22   **A.  She would have stated that she was**

23 **dismissed after she was removed from Hyundai.**

Page 63

1    Q.  Okay.  Did you make any determination

2 with regard to whether her removal from Dynamic

3 Security constituted discrimination or

4 retaliation?

5    **A.  My determination was that it did not**

6 **because we were perfectly willing to continuing**

7 **employing her.  She was offered other positions**

8 **at other clients, and she declined them.**

9    Q.  Okay.  What -- when did you make that

10 determination?

11   **A.  During the same time period.**

12   Q.  And what other positions had she been

13 offered?

14   **A.  I am aware that she had been offered**

15 **a position at Koch Foods, and I am aware that**

16 **she was offered a position at Mobis.**

17   Q.  And that was two positions?

18   **A.  Correct.  Two separate choices.**

19   Q.  Would this have been within that same

20 30-day period that you referenced from the EEOC

21 charge to when you made your determination?

22   MR. REDMOND:  Object to the form.

23 I'll be happy to tell you why.

Page 64

1    Q.  So -- so it was a bad question.  So

2 in -- over what period of time was Ms. Key

3 offered these two positions?

4    **A.  My understanding is that Ms. Key was**

5 **offered the two positions almost immediately**

6 **after the situation at HMMA.**

7    Q.  And was she offered anymore positions

8 after that?

9    **A.  Not that I am aware of.**

10   Q.  How did you become aware that she was

11 offered any positions?

12   **A.  By a -- by conversations with Ray**

13 **Cureton.  I believe Nicole Scavella also**

14 **affirmed that positions were offered to her.**

15 **And we have the notations that these positions**

16 **were offered to her.**

17   Q.  Did you check with Ms. Key to see

18 what her position would be?

19   **A.  No.  Ms. Key was uncommunicative.**

20   Q.  How -- tell me what you mean by she

21 was uncommunicative.

22   **A.  She was refusing contact from the**

23 **branch office.**

Kristal Riddle

Page 69

1  A.  We would -- it would be the
2  **responsibility of the employee to tell**
3  **management.**
4  Q.  Would management make any notation in
5  the file so that they didn't offer jobs?
6  **A.  In the file, no.**
7  Q.  You hedged a little bit on that so I
8  just want to make sure, would they make any
9  notations anywhere?
10  **A.  It would really depend on the**
11  **manager, just how they would want to keep those**
12  **records.**
13  Q.  Okay.  Is there any policy or
14  procedure about how to maintain those records?
15  **A.  No, there's not.**
16  Q.  Do you have any knowledge about how
17  -- or if Ray Cureton would have maintained any
18  records?
19  **A.  No.**
20  Q.  Who would have received a copy of
21  Ms. Key's application?
22  **A.  The application would be kept in the**
23  **Montgomery office.**

Page 70

1  Q.  Is that the same for all applications
2  or just Montgomery employees?
3  **A.  Company wide.  The hire packet and**
4  **applications are maintained in the local**
5  **office.**
6  Q.  Okay.  And if you'll look for me on
7  Exhibit 56.  Next to her availability there are
8  two kind of blackened arrows.  Are you aware of
9  who made those marks on this document?
10  **A.  My understanding is that the marks**
11  **were made by Sherry Spiers.**
12  Q.  Is this two-page document that's
13  Bates labeled 294 and 295, is that the entire
14  application Ms. Key would have filled out?
15  **A.  It is.**
16  MR. REDMOND:  You're starting to talk
17  as she is ending her sentence.  Be sure she
18  finishes before you talk.  We don't want the
19  court reporter mad at us.
20  Q.  And you said this document would have
21  been maintained in the Montgomery office.  Is
22  it maintained in paper format, in electronic
23  format, what format would it be maintained?

Page 71

1  A.  Paper.
2  Q.  Okay.  So does every employee have
3  like a paper file, like a folder, at the
4  Montgomery office?
5  **A.  They are supposed to.**
6  Q.  Are you okay?  Do you need a break?
7  **A.  I wouldn't mind a break.  That would**
8  **be nice.**
9  Q.  Okay.  Let's take a little break.
10  (Break.)
11  Q.  So, Ms. Riddle, we took a short
12  break.  Is there anything about the testimony
13  that you've given so far that you need to
14  change at this point?
15  **A.  No.**
16  Q.  So we were discussing how Davita Key
17  came to work at Dynamic Security.  How was
18  she -- once she was hired, how was she assigned
19  to Hyundai?
20  **A.  That was really -- that was what they**
21  **were hiring for.  They had the -- they had**
22  **openings at Hyundai, and so that would have**
23  **been what came up first for her assignment.**

Page 72

1  Q.  And did you say earlier that Gloria
2  Robinson would have been involved in her
3  hiring?
4  **A.  Yes.**
5  Q.  Okay.  How would Gloria have been
6  involved in her hiring?
7  **A.  Gloria would do the initial**
8  **interview.**
9  Q.  And once that initial interview was
10  complete, how would she be hired from that
11  point?
12  **A.  Once the initial interview was**
13  **complete, she would have been instructed to go**
14  **to the local Montgomery office, present to Ray**
15  **Cureton, and at that point, the paperwork would**
16  **begin.**
17  Q.  Okay.  Do you have any knowledge of
18  whether Cassandra Adams -- Cassandra Williams
19  was involved in her initial interview?
20  MR. MILLER:  Object to the form.
21  Q.  You can answer.
22  THE WITNESS:  That's kind of
23  complicated.

Page 73

1      MR. REDMOND:  Huh?

2      THE WITNESS:  I said that's

3  complicated.

4      Q.  Well, tell me what -- tell me --

5      A.  I don't know that she was -- I do not

6  know if Cassandra was present for the initial

7  interview that was conducted between Keys and

8  Robinson.  But Ms. Williams would have the --

9  Ms. Williams would meet with the employees that

10  were being interviewed and considered to be

11  placed at the Hyundai facility.

12     Q.  Okay.  When would she meet with those

13  employees?

14     A.  At the time that it was convenient.

15  I don't know -- I don't know that there was a

16  set schedule for that.

17     Q.  Would that have been before she was

18  offered -- before Davita Key was offered the

19  job?

20     A.  I don't know.

21     Q.  How do you know that Cassandra

22  Williams would meet with the employees?

23        MR. MILLER:  Object to the form.

Page 74

1      A.  It was standard.

2      Q.  What would be the purpose of that

3  meeting?

4      A.  I don't know.

5      Q.  Is that something that the client

6  requested?

7      A.  I believe that is the case.

8      Q.  And we keep saying the client because

9  that's Dynamic's phrase for all their clients;

10  right?  When we're talking about Hyundai, who's

11  the client?

12     A.  The client is Hyundai.  The client is

13  MMA.  Technically we should refer to

14  Ms. Williams as the client contact.

15     Q.  Okay.  So you said MMA, did you mean

16  HMMA?

17     A.  Yes.

18     Q.  Okay.  And Ms. Williams would be the

19  client contact?

20     A.  Correct.

21     Q.  How do you determine who the client

22  contact is?

23     A.  The client assigns -- assigns that

Page 75

1  position.

2      Q.  Is there any documentation that would

3  show HMMA as a client or Ms. Williams as a

4  client contact?

5      A.  No, not to my knowledge.

6      Q.  How would you be aware that HMMA --

7  that Cassandra Williams was the client contact

8  for HMMA?

9      A.  That was established during the

10  initial bidding process.

11     Q.  Okay.  What type of documentation

12  would there be related to the bidding process?

13     A.  The documentation for the bidding

14  process would be -- I don't know specifically

15  for Hyundai, but typically it would be a master

16  proposal which breaks down our company and our

17  abilities and then a pricing -- a proposed

18  pricing and billing schedule.

19     Q.  Okay.  And that would be sent to the

20  potential client?

21     A.  Correct.

22     Q.  Okay.

23        MR. MILLER:  Object to the form.

Page 76

1      Q.  So how would Dynamic determine who to

2  send that billing proposal to -- that bid

3  proposal to for Hyundai?

4      A.  It would either have been established

5  by the sales person who had been pursuing the

6  relationship with the company, or it would have

7  been established via an RFP, request for price.

8      Q.  What is a request for price?

9      A.  It's simply a request for price.

10  It's asking a company to determine what -- if

11  we were to go into service for the client, what

12  would we -- what would we pay the security

13  officers, what would we charge the company.

14  That's really --

15     Q.  Who would create that request for

16  price?  Does that come from Hyundai or from

17  Dynamic to Hyundai?

18        MS. BROWN:  Object to the form.

19        MR. MILLER:  Object to the form.

20     A.  The request for price -- we also

21  refer to it as request for quote -- would come

22  from the potential client to Dynamic.

23     Q.  Okay.  And where would that

Page 93

1  employee handbook.
2     Q.   Okay.  Was there like a script that
3  the trainer would be expected to go by?
4     A.   No.  Each trainer would -- when it
5  came to their oral presentation, they had
6  guidelines, but they were free to make this
7  more of a conversation than a speech.
8     Q.   Do you know who would have been the
9  trainer over Ms. Key in 2017?
10    A.   I don't know for certain.
11    Q.   Who do you think it would be?
12    A.   I think it would be Ray Cureton.
13    Q.   Are you aware of whether Ray Cureton
14 had any written materials related to harassment
15 training?
16    A.   I don't know.
17    Q.   What about retaliation?  Would this
18 Exhibit 31 cover anything related to
19 retaliation?
20       MR. REDMOND:  Object to form.
21    A.   The only time this form touches
22 retaliation is instructions, the last sentence
23 in Section A, "You should not be concerned or

Page 94

1  fearful of retaliation for making a report
2  pursuant to this policy."
3     Q.   Okay.  And would there be any
4  additional training other than what you've
5  already mentioned related to retaliation?
6     A.   No.
7     Q.   Section B there references a written
8  report to the vice president and the president.
9  Is that the same report we've already talked
10 about that Dynamic doesn't utilize anymore?
11    A.   It is.
12    Q.   All right.  You can dump that.  All
13 right.
14       Can you tell me what happened with
15 Davita Key's assignment at Hyundai?
16       MR. REDMOND:  Object to form.
17    A.   My understanding is that, during the
18 interview process when Davita met with
19 Ms. Williams, she was told that her hairstyle
20 was not permitted by the rules and by the
21 policies of HMMA and that she would have to
22 have something done with it because she could
23 not wear dreadlocks on the facility property.

Page 95

1       There was a discussion about what she
2  could do, how this could be taken care of.
3  There was -- to my understanding, there was a
4  discussion, there was a picture that was looked
5  at, and when Ms. Key came to work at the
6  facility on July 31st, she had not had her hair
7  redone as she had been directed to by
8  Ms. Williams.  She was released from the day
9  early and told to do something about her hair
10 because she couldn't be on the facility with
11 her hair in dreadlocks.
12       She returned on August 1st wearing a
13 hat, and I don't really know beyond that other
14 than what's been in the reports.  To our
15 knowledge, there was a confrontation about the
16 hat, about the hair.  She was once again told
17 she had to remove the dreadlocks or she had to
18 find an alternate hairstyle, and she stated
19 that she wanted to file a complaint.  And she
20 was directed to go to the Montgomery office to
21 file a complaint with -- and present it to Ray
22 Cureton.
23    Q.   And are you aware of whether Ms. Key

Page 96

1  was told she could wear a hat?
2     A.   I'm not aware of that.
3     Q.   What documentation did you review
4  related to the reports?
5     A.   Ms. Robinson's report and the e-mail
6  by Cassandra Williams where she requested that
7  Ms. Key be removed from the site.
8     Q.   I'm going to show you Plaintiff's
9  Exhibit Number 29.
10       (Whereupon, Plaintiff's Exhibit 29
11       was marked for identification and
12       copy of same is attached hereto.)
13    Q.   Have you seen that document before?
14    A.   I have seen this document before.
15    Q.   Okay.  What is that?
16    A.   This is the handwritten complaint by
17 Davita Key that was presented in the office --
18 Dynamic Security office in Montgomery on
19 August 1st, 2017.
20    Q.   Okay.  And who knew of this
21 complaint?
22       MR. REDMOND:  Object to the form.
23       MR. MILLER:  Object to the form.

Page 97

1    MS. BROWN:  Object to the form.
2    Q.   Who at Dynamic Security knew that
3  Ms. Key filed this complaint on August 1st,
4  2017?
5    MR. REDMOND:  Same objection.
6    Q.   You can answer.
7    **A.   Ray Cureton was aware that she filed**
8  **the complaint.  Nicole Scavella was in the**
9  **office at the time and would have been aware.**
10  **And then Sherry Spiers was briefed by Ray**
11  **Cureton regarding the making of the complaint.**
12    Q.   Okay.  At what point did you become
13  -- let me ask -- did you become aware of the
14  complaint?
15    **A.   I became aware of the complaint with**
16  **the receipt of EEOC Form 5 on August 11th.**
17    Q.   What is Dynamic Security's policy
18  with regard to receiving and reporting
19  complaints of discrimination?
20    **A.   That once a report of discrimination**
21  **is received, it must be pushed up the chain.**
22  **If it's not made to the local manager, it must**
23  **be brought to the local manager.  The local**

Page 98

1  **manager then briefs Sherry and receives**
2  **instructions on investigations and methods of**
3  **procedure after that.**
4    Q.   Okay.  And I think you identified her
5  position earlier, but what is Sherry Spiers
6  position?
7    **A.   Human resources coordinator.**
8    Q.   At what point would human resources
9  let you, as the chief legal officer, know that
10  they had received a complaint of
11  discrimination?
12    **A.   Typically at the end -- at the end of**
13  **any investigation period.**
14    Q.   So is it the duty of human resources
15  to investigate the complaint?
16    **A.   Human resources oversees the**
17  **investigation.  It is the duty of the**
18  **individuals who are local to the incident to**
19  **perform investigations, conduct interviews, and**
20  **report this material to human resources.**
21    Q.   Okay.  And what investigation was
22  completed with regard to Ms. Key's complaint in
23  Exhibit 29?

Page 99

1    **A.   I don't know.**
2    MS. PALMER:  Wes, she was identified
3  as that topic.  Is Sherry going to be able to
4  cover that or --
5    MR. REDMOND:  You can certainly ask
6  her that, yes.  I don't have any objection with
7  you asking her that, but I think she's going to
8  know as much as anybody does.
9    MS. PALMER:  Okay.
10    MR. REDMOND:  And I don't want to say
11  anything more since we're on the record.
12    MS. PALMER:  You're fine.
13    Q.   Okay.  So the investigation would be
14  completed at the branch; is that correct?
15    **A.   Correct.**
16    Q.   Okay.  And then they would report
17  their findings to human resources?
18    **A.   Correct.**
19    Q.   Okay.  And then once human resources
20  received those findings, is that when they
21  would provide them to you and the legal?
22    **A.   Yes.**
23    Q.   Who would make the decisions as to

Page 100

1  whether or not a complaint was validated -- a
2  valid complaint?
3    **A.   It would typically fall on me.**
4    Q.   Okay.  What training would the folks
5  in the local offices have to be able to
6  determine if a complaint needed to be
7  investigated and advanced to human resources?
8    **A.   I think I know what you're asking,**
9  **but could you ask it again --**
10    Q.   Yeah.
11    **A.   -- because I want to make sure.**
12    Q.   So what training would the local
13  offices receive so that they would know when
14  they received a complaint that it was in fact a
15  complaint and it should be investigated and
16  advanced to human resources?
17    **A.   The branches are trained that anytime**
18  **anything is brought to them as a complaint,**
19  **whether it's referencing sexual harassment,**
20  **discrimination, it automatically has to be --**
21  **it automatically has to go -- and eventually**
22  **and ultimately -- to Sherry.  But it has to be.**
23  **They don't have the option to say this is silly**

Page 117

1    Q.    Aside from the e-mail that was in

2   Exhibit 38 telling Ms. Robinson that she --

3   that Dynamic Security could not ask about

4   medical conditions, would Ms. Robinson after

5   that point have been given any refresher

6   training or additional training about how to

7   handle medical conditions?

8    **A.    That would have been my**

9   **recommendation.  I do not know if that was --**

10  **if that was the case then.**

11   Q.   Okay.  You can pass than along.  When

12  did Dynamic security receive the EEOC charge

13  filed by Ms. Key?

14   **A.   I believe it was delivered to us on**

15  **August 11th, 2017.**

16   Q.   Okay.  Did you maintain a copy of

17  that document?

18   **A.   I did.**

19   Q.   Okay.  How -- how was the complaint

20  received?

21   **A.   The complaint was received through**

22  **e-mail.  It was scanned and e-mailed to me by**

23  **Ray Cureton.**

Page 118

1    Q.   How did Ray receive it?

2    **A.   It was addressed to the Montgomery**

3   **office.**

4    Q.   So an actual paper copy?

5    **A.   An actual paper copy.**

6    Q.   Where is that document now?

7    **A.   In the Muscle Shoal -- my**

8   **apologies --**

9        MR. REDMOND:  Which document are we

10  talking about?  The actual charge?

11       MS. PALMER:  The actual charge.

12   **A.   In my home office.**

13   Q.   Okay.  When the charge was received,

14  did Dynamic Security maintain the envelope that

15  it came in that had the postmark?

16   **A.   For the original, I don't -- I don't**

17  **remember.**

18   Q.   Okay.

19       MS. PALMER:  We don't have that.

20       MR. REDMOND:  I haven't seen it.

21       MS. PALMER:  We don't have the

22  original charge so --

23       MR. REDMOND:  You don't have a copy

Page 119

1   of her original charge?

2        MS. PALMER:  Other than in the FOIA

3   file, no.  And in the -- in the right to sue.

4   It was not produced as a separate, this was

5   received on this day, document.

6        MR. REDMOND:  Okay.

7        MS. PALMER:  So if you can clear that

8   up.

9        MR. REDMOND:  I've got a copy of her

10  charge.

11   Q.   Okay.  So when Ray scanned in the

12  document and e-mailed it to you, are you aware

13  of whether that e-mail was on the same date

14  that Ray received it?

15   **A.   Yes, it was.**

16   Q.   And you believe that date to be

17  August 11th, 2017?

18   **A.   I do.**

19   Q.   Okay.  And do you recall preparing a

20  position statement in response to that

21  complaint?

22   **A.   I do.**

23   Q.   Okay.  Let me show you what's been

Page 120

1   marked as Exhibit 11.

2        (Whereupon, Plaintiff's Exhibit 11

3        was marked for identification and

4        copy of same is attached hereto.)

5    Q.   If you'll look over that document,

6   and tell me if that is in fact your position

7   statement.

8    **A.    This is the position statement I**

9   **admitted to EEOC.**

10   Q.   Okay.  And just for clarity, that's

11  your signature on the last page which is

12  HEA056?

13   **A.   That is my signature.**

14   Q.   Okay.  And what --

15       MR. REDMOND:  This may just be a copy

16  issue, but my copy does not have an HEA number

17  on it.  I don't know if that just happened when

18  we copied that offer.  Yours -- does yours?

19       MS. PALMER:  Uh-huh.

20       MR. REDMOND:  Okay.  Maybe when we

21  copied it at our office or something, it just

22  didn't print or something.

23       MS. PALMER:  Yeah.

Kristal Riddle

Page 125

1   A.   No, there's not.

2   Q.   Let me show you Exhibit 37.

3        (Whereupon, Plaintiff's Exhibit 37

4        was marked for identification and

5        copy of same is attached hereto.)

6   Q.   Are you familiar with the e-mails

7   contained in Exhibit 37?

8   A.   Yes.  I have seen these e-mails

9   before.

10  Q.   Okay.  And when would you have seen

11  these e-mails?

12  A.   I would have read through them at the

13  time I was producing the EEOC position

14  statement.

15  Q.   Okay.  And in these e-mails, there's

16  a discussion about providing personnel files to

17  Ms. Key; is that correct?

18  A.   That does appear to be what the --

19  what the conversation --

20  Q.   Okay.  And is it stated in these

21  e-mails that it's Dynamic Security's policy to

22  not provide copies of any personnel file

23  documents to an employee?

Page 126

1   A.   That is correct.

2   Q.   Why is that Dynamic Security's

3   policy?

4   A.   Because these documents are our

5   property.

6   Q.   So Dynamic Security doesn't allow an

7   employee to maintain a copy of their

8   disciplinary records?

9   A.   No.

10       MR. REDMOND:  I'm going to object to

11  the form of that, just a little late.

12  Q.   Do you see in these e-mails

13  Mr. Cureton saying that he doesn't think it's

14  advisable to place Ms. Key?

15       MR. REDMOND:  Object to the form.

16  Q.   If you'll look for me, the very last

17  sentence on page 70.

18  A.   I do see that.

19  Q.   Okay.  And is that -- is that what

20  you understand that to be, is Mr. Cureton

21  asking if it's advisable to place Ms. Key?

22       MS. BROWN:  Object to the form.

23       MR. REDMOND:  Object to the form.

Page 127

1        MR. MILLER:  Object to form.

2   A.   I see that he -- what I see is him

3   reaching out to Sherry to ask for advice on

4   whether -- on how we should proceed.

5   Q.   And would not placing Ms. Key be

6   considered a form of retaliation?

7        MS. BROWN:  Object to the form.

8        MR. REDMOND:  Object to the form.

9        MR. MILLER:  Object to the form.

10  Q.   In your capacity as the individual

11  who determines whether Dynamic Security has

12  retaliated against an individual in your

13  investigations, is it your understanding that

14  not placing her because she made a complaint

15  would be retaliation?

16       MR. REDMOND:  Object to form.

17  A.   That would be retaliation.

18  Q.   And was Mr. Cureton provided any

19  refresher training at this point about

20  retaliation and appropriate or inappropriate

21  conduct?

22  A.   He was provided further training.  I

23  believe that would have been at the December

Page 128

1   meeting.

2   Q.   Okay.  And this e-mail was August?

3   A.   Correct.

4   Q.   What type of training was he provided

5   in December of 2017?

6   A.   The EEOC trainings that I use that

7   are standard.

8   Q.   When did Mr. Cureton leave Dynamic

9   Security?

10  A.   I don't have a specific date but

11  2018.

12  Q.   What was the reason for him leaving?

13       MR. REDMOND:  I'm going to object to

14  the form of that only because you're asking to

15  speculate about why he left.  Well, let me --

16  are you asking did he resign or was he

17  terminated, or are you asking something further

18  than that?  And I'll be quiet and just let you

19  ask your questions.

20  Q.   Are you aware of why Mr. Cureton is

21  no longer with Dynamic Security?

22  A.   No.

23  Q.   Okay.  So you don't know whether he

Kristal Riddle

8/19/2022

40 (157 - 160)

Page 157

1 references certain folks being "cherry picked"

2 and one person being an alleged predator. Do

3 you know what she's talking about there?

4 **A.   I'm sorry.  I'm trying to find the**

5 **section.**

6 Q.   Sorry.  It's the -- like the second

7 to the last sentence on the very last page.

8 She's saying -- calling some person a predator.

9 Do you know what that's in reference to?

10 MR. REDMOND:  And you said that's in

11 the second-to-last sentence?

12 MS. PALMER:  Yeah, the very last.

13 MR. REDMOND:  On Bates page 252?

14 MS. PALMER:  258.

15 MR. REDMOND:  Oh, sorry.

16 Q.   Let me ask it this way.  Is there any

17 allegation against Dynamic Security that an

18 employee, at this time in 2017, may have been a

19 predator?

20 **A.   No.  No.**

21 Q.   Do you know who she's talking about

22 when she says this?

23 MR. REDMOND:  Object to form.  I'll

Page 158

1 withdraw that, I guess, if you're asking her if

2 she knows.  That's okay.  So I'll withdraw.

3 **A.   I don't know -- I don't know for a**

4 **fact who she's talking about here.**

5 Q.   Okay.  Did you look into that issue

6 at all?  Did you investigate who a predator may

7 be?

8 **A.   Not really, no.  There was --**

9 Q.   I'm sorry.  I didn't mean to cut you

10 off.

11 **A.   Just, I feel then like I do now.**

12 **There just wasn't really a hundred, you know --**

13 **she just didn't provide us with enough to know**

14 **what she was talking about was my feeling at**

15 **the time and continues to be my feeling now.**

16 Q.   She referenced that she was going to

17 file an EEOC charge.  Did you receive any EEOC

18 charge related to Ms. Scavella?

19 **A.   No.**

20 Q.   If Ms. Scavella said that she had

21 filed a charge, would you have any reason to

22 dispute that?

23 **A.   No.  No.**

Page 159

1 Q.   I'll show you Exhibit 51.

2 (Whereupon, Plaintiff's Exhibit 51

3 was marked for identification and

4 copy of same is attached hereto.)

5 Q.   This is Ms. Scavella's, I guess,

6 like, personnel form; is that right?

7 **A.   This is a company standard**

8 **termination form.**

9 Q.   Okay.  And if you'll look for me it

10 says, "Nicole voluntarily resigned," about

11 mid-page.

12 **A.   Uh-huh.**

13 Q.   It looks to me like the -- I don't

14 know, like the document's been altered; do you

15 see that?  Like the -- where resigned -- it

16 looks like maybe something was there because

17 it's over the line, but we don't see the line.

18 **A.   I see that.**

19 Q.   Are you aware of where the original

20 to this document may be?

21 **A.   No.**

22 Q.   Okay.  Are you aware of whether this

23 document was altered or corrected?

Page 160

1 **A.   I'm not aware of that.**

2 Q.   Okay.  Exhibit 57.  And this is Bates

3 labels 420 through 21, 428 through 31, and 464

4 through 72.

5 (Whereupon, Plaintiff's Exhibit 57

6 was marked for identification and

7 copy of same is attached hereto.)

8 Q.   Exhibit 57 is some documents from

9 Gloria Robinson's personnel file.

10 Are you aware -- well, first, if

11 you'll look for me on the first page which is

12 Bates labeled 420.  Do you agree that it shows

13 that she resigned?

14 **A.   I agree.**

15 Q.   Okay.  And are you aware of why she

16 resigned?

17 **A.   No.**

18 Q.   And if you'll flip over to page

19 428 -- Bates labeled 428.  This appears to be

20 Ms. Robinson's resume.  Would this have been

21 maintained as part of her personnel file?

22 **A.   No, it wouldn't have.  We have many**

23 **people who provide resumes when they're first**

Page 161

1  hired.

2    Q.   If it's included in this production

3  from Dynamic Security, is that -- would you

4  agree that this particular document was

5  maintained in her personnel file?

6    A.   It's indicative that it was in her

7  personnel file.

8    Q.   Okay.  And reviewing her experience

9  here, 2015 to present -- which obviously we

10  don't know what that present day is.  But 2015

11  to present indicates, Hyundai Motors slash

12  Dynamic Security Services, Shift Commander; do

13  you see that?

14    A.   I see.

15    Q.   Okay.  And then prior to that, 2013

16  to '15, Hyundai Motors slash Allied Barton; do

17  you see that?

18    A.   I see that.

19    Q.   And then underneath that, Hyundai

20  Motors, American Citadel Guard; is that

21  correct?

22    A.   Yes, it reads American Citadel Guard.

23    Q.   Okay.  And it looks like we're

Page 162

1  ranging in a time period here from 2008 to

2  sometime after 2015, would you agree?

3    A.   I agree.

4    Q.   Okay.  Is -- when Dynamic Security

5  hired Ms. Robinson, did they take into

6  consideration her experience with Hyundai

7  Motors in these other security positions?

8        MR. REDMOND:  Object to form.

9    A.   I don't know.

10    Q.   If you'll flip over to Bates labels

11  464 through the end of this exhibit.  I just

12  want to confirm if you're aware -- or can you

13  confirm that this is the -- these documents

14  from 464 to the end of Exhibit 57 are the only

15  disciplinary actions contained in

16  Ms. Robinson's personnel file?

17        And I guess maybe this is the easier

18  way to do it.  I'm not going to mark this as an

19  exhibit, but this is Bates labeled Dynamic 420

20  through 509.  And if you can flip through that

21  and confirm for me that that document, 420

22  through 509, is Ms. Robinson's entire personnel

23  file as maintained by Dynamic Security.

Page 163

1        MS. PALMER:  And, Wes, if it matters

2  at all, this is what you purported to us was

3  the personnel file and these Bates numbers.

4    A.   Yes.  This would be her personnel

5  file.

6    Q.   And then the same with regard to

7  Bates labels 384 -- Dynamic 384 through 418.

8  Is that the personnel file of Mr. Cureton?

9  And, I'm sorry, it's front and back.  There's

10  two copies --

11    A.   Oh, okay.

12    Q.   -- one for Wes and for whoever wants

13  one.

14    A.   Yes.

15    Q.   Would you agree with me that if

16  Mr. Cureton or Ms. Robinson had received

17  disciplinary actions at Dynamic Security, that

18  it would be maintained within these full

19  personnel files?

20    A.   That is correct.

21        MS. PALMER:  That was not an exhibit.

22    Q.   Exhibit 54.

23        (Whereupon, Plaintiff's Exhibit 54

Page 164

1        was marked for identification and

2        copy of same is attached hereto.)

3    Q.   This is an envelope with a -- from

4  the EEOC with a postmark on it.  Can you tell

5  me what was in that envelope?

6    A.   This would have been the notification

7  from EEOC regarding Davita Keys and their

8  findings in the situation.

9    Q.   So that dismissal and notice of

10  rights --

11    A.   Would have been in this envelope.

12    Q.   -- was it that envelope?

13    A.   Yes.

14    Q.   And that was received by

15  Ms. Vandiver?

16    A.   Yes, Ms. Vandiver.

17    Q.   And Exhibit 58.

18        (Whereupon, Plaintiff's Exhibit 58

19        was marked for identification and

20        copy of same is attached hereto.)

21    Q.   This is Dynamic Security's discovery

22  responses.  Do you recognize that?

23    A.   I do.

Page 169

1  aware of any pregnant employees since providing
2  this response?
3      A.   No, I haven't become aware of any.
4      Q.   Okay.  Number five identifies the HEA
5  and/or HMMA hair policy and the response.  Is
6  that the policy that we've already referenced
7  that was in Ms. Robinson's e-mail?
8           MR. MILLER:  Object to the form.
9      A.   Yes.
10     Q.   And then number six identifies
11 Jasmine -- or Jazemene Baxter as Ms. Key's
12 replacement; is that correct?
13     A.   She was the next person who was hired
14 and assigned to the mail room.
15          MS. PALMER:  What was the number on
16 the exhibit that I gave you that I said I
17 added?
18          MR. REDMOND:  Sixty.
19          MS. PALMER:  Okay.
20     Q.   I'll show you Plaintiff's Exhibit 61.
21          (Whereupon, Plaintiff's Exhibit 61
22          was marked for identification and
23          copy of same is attached hereto.)

Page 170

1      Q.   These are some e-mails purportedly
2  from Ms. Baxter including Cassandra Williams
3  and Gloria Robinson.  If you'll flip for me to
4  page HEA210 back towards the end.
5           Do you see there towards the
6  bottom -- the last string from Ms. Jazemene
7  there on the bottom it says, "Also for work
8  purposes, are my locks completely banned, or do
9  they have to be styled"; do you see that?
10     A.   I see that.
11     Q.   And above that, do you see what Ms.
12 Robinson's response was?
13     A.   I see.
14     Q.   And what was Ms. Robinson's response
15 to whether locks were completely banned?
16     A.   Her response is, "The locks have to
17 be styled," and requests to look at pictures
18 that she -- that she -- she sees that she
19 considers, I guess.
20     Q.   Okay.
21     A.   But anyways, she asks for -- yeah.
22 She asks for pictures.
23     Q.   And when Ms. Robinson sent this

Page 171

1  e-mail, was she still the operation -- what
2  would you call it, a project manager at
3  Hyundai?
4      A.   She was.
5      Q.   What evidence do you have that
6  Ms. Key did not file her lawsuit within 90 days
7  of receiving the right to sue?
8      A.   That the EEOC mailed the -- mailed
9  the response on March 1st, roughly.  It's dated
10 28th, 1st.  And the lawsuit was not filed until
11 October of 2019.
12     Q.   What evidence do you have that the
13 EEOC mailed the notice to Ms. Key?
14     A.   I have -- I would have no knowledge
15 that they did.
16     Q.   Ms. Key says that she did not receive
17 a copy of the right to sue until it was filed
18 in this lawsuit.  Do you have any evidence to
19 dispute that?
20     A.   No.
21     Q.   Do you have any individuals to
22 identify as having information in this lawsuit
23 other than those individuals already identified

Page 172

1  in Dynamic Security's initial disclosures?
2      A.   No, there's no one else.
3      Q.   And if I were -- we talked about how
4  you were testifying for the company today;
5  right?
6      A.   Uh-huh.
7      Q.   If I were to be deposing you today in
8  your individual capacity, not as the voice of
9  the company but as Kristal Riddle, would that
10 change your answer or your testimony with
11 regard to anything we've discussed here today?
12     A.   It would not.
13          MS. PALMER:  Can we have just a
14 minute?  Off the record.
15          (Whereupon, an off-the-record
16          discussion was held.)
17     Q.   Okay.  Ms. Riddle, when we first
18 started this deposition, you were talking about
19 your job duties as the chief legal officer, and
20 it seemed like a large portion of that was
21 responding to EEOC complaints; is that right?
22 Is that a fair assessment?
23     A.   That's a fair assessment.

Page 173

1   Q.   Okay.  How many EEOC complaints does
2   Dynamic Security receive?
3        MR. REDMOND:  Ever?  Within a year?
4   Q.   Like for a large portion of your job
5   to be responding to the EEOC, does Dynamic
6   Security receive a lot of EEOC charges?
7   A.   I'm not really sure what a large
8   number are.  It's cyclical.  There are times
9   when we will receive two charges within two
10  weeks of each other.  There are times when I've
11  gone five or six months without having
12  something.  I just -- I really don't know how
13  to calculate that.
14  Q.   Could you give me an average, like
15  over a year?
16  A.   I think it would be fair to say that
17  we probably get an average of eight -- eight to
18  ten a year.
19  Q.   And since 2017 -- from 2017 to
20  current, how many of that -- can you give me a
21  percentage or a number of how many of those
22  would be claims for retaliation?
23  A.   As a percentage, maybe five percent.

Page 174

1   For every -- I'd say that retaliation comes up
2   probably -- if we're going on an average of ten
3   a year, retaliation probably comes up out of
4   two of them, maybe three.
5   Q.   What about race discrimination, what
6   would be the average number there?
7   A.   Race discrimination, the average
8   number there would -- about the same.
9   Q.   Since 2017, have you received any
10  EEOC complaints other than Ms. Key's related to
11  hair?
12  A.   Ms. Key's is the only one I've ever
13  received related -- related to hair.
14  Q.   What about pregnancy?
15  A.   Pregnancy, not since this.  What was
16  that one?  I think since -- since 2017 with
17  this, I have received one other complaint that
18  mentioned pregnancy.
19  Q.   What determination did you make with
20  regard to that complaint?
21  A.   That we didn't -- we didn't know she
22  was pregnant.  She had worked on a site and had
23  -- had basically just stopped showing up to

Page 175

1   work one day, and -- which is not uncommon.
2   And then she -- she called and after about --
3   let's see, I think she left in about August or
4   September.  She reported to EEOC that she had
5   had a due date in December, but she had left
6   much before that.  She had not filed for FMLA,
7   and she had filed an EEOC because when she
8   called back, we didn't have her job to put her
9   at.  The client had moved on to another
10  company.
11  Q.   Do you recall what client that was?
12  A.   I don't remember.
13  Q.   Was it Hyundai?
14  A.   No, it wasn't.
15  Q.   What notice was given to Ms. Key that
16  she could take her complaints to the EEOC?
17  A.   I don't know that any notice was
18  given to her.
19  Q.   When Ms. Key was reporting to work
20  after that initial training, where would she
21  report?
22  A.   I'm not -- oh, after the initial
23  training, she would have reported to the work

Page 176

1   site at HMMA.
2   Q.   The discrimination policies that we
3   discussed that are in the three-ring binder,
4   why does Dynamic Security not provide those to
5   employees?
6   A.   We do now.  This was -- in 2017, we
7   did not have those as -- as well distributed as
8   we do now.  At this point, one of the things
9   that we've done with the harassment policy is
10  we've made it part of the post orders on each
11  site so that any time they need to see what the
12  policy is, it's right there for them.
13  Q.   And the post orders, did we talk
14  about what are the -- what are the post orders,
15  or what were the post orders in 2017 for
16  Hyundai?
17  A.   I don't have that knowledge.
18  Q.   But currently Dynamic Security
19  provides those harassment policies with those
20  post orders?
21  A.   Correct.
22  Q.   I'm going to show you Exhibit 41.
23       (Whereupon, Plaintiff's Exhibit 41

Kristal Riddle

Page 185

1 that this is your response -- Dynamic's
2 response to Ms. Key's charge --
3     **A.   That is correct.**
4     Q.   -- against Dynamic.  And in your
5 response, you do identify Ms. Cassandra
6 Williams as an HMMA employee.
7         What evidence do you have to support
8 that she is an employee of HMMA?
9     **A.   That was -- that's been my**
10 **understanding since the beginning of the client**
11 **relationship.**
12     Q.   It's just your inference?
13     **A.   Correct.**
14     Q.   If Ms. William's testified under oath
15 that at all relevant times in 2017 she was an
16 employee exclusively of Hyundai Engineering
17 America, would you dispute that?
18         MS. PALMER:  Object to form.
19     Q.   You can answer.
20     **A.   I would not be able to refute that.**
21     Q.   Okay.
22         MS. BROWN:  How shall I number
23 exhibits that I have?

Page 186

1         MS. PALMER:  However you want.
2         MS. BROWN:  Thank you.
3         MS. LEONARD:  If you want to do it
4 consecutively, I can go back and see if we've
5 got how y'all did it in Ms. Key's, but I'm not
6 positive I've got that on my computer.  You
7 just let me know.
8         MS. BROWN:  I'll just call it HMMA-1.
9     Q.   I'll show you what I'm marking as
10 HMMA's ==Exhibit 1==.
11         (Whereupon, Defendant's ==Exhibit 1== was
12         marked for identification and copy of
13         same is attached hereto.)
14     Q.   This is a declaration of Cassandra
15 Williams executed on May 8, 2019.  And she
16 testifies that she was exclusively employed by
17 Hyundai Engineering America in 2017.  Do you
18 have any basis to dispute that this is Ms.
19 Williams' signature?
20     **A.   I have no basis.**
21     Q.   Do you have any basis to dispute that
22 Ms. Williams was exclusively an employee of HEA
23 in 2017?

Page 187

1     **A.   I have no reason.**
2     Q.   Did you ever ask anyone for
3 clarification about who Ms. Williams worked
4 for?
5     **A.   No.**
6     Q.   Have you ever spoken to Ms. Williams?
7     **A.   Yes.**
8     Q.   About how many times?
9     **A.   We generally visited the facility**
10 **three times a year, so somewhere between six**
11 **and eight times.**
12     Q.   Did anyone ever tell you specifically
13 that Ms. Williams worked for HMMA?
14     **A.   I don't recall.**
15     Q.   Have you ever seen any document that
16 specifically identifies Ms. Williams as an HMMA
17 employee?
18     **A.   Not that I recall.**
19     Q.   Then if you'll look at Plaintiff's
20 Exhibit 41 which was the last exhibit that
21 plaintiff's counsel introduced.  And if you
22 will look on the first page, the second
23 message, the from line.

Page 188

1         Could you read the from line in full,
2 please?
3     **A.   I'm sorry.  Could you say that again?**
4     Q.   Yeah.  Where it says, "From:
5 Williams, Cassandra."
6     **A.   It says, "Hyundai ENG America," and**
7 **then, "CWilliams@hmmausa.com."**
8     Q.   Right.  And then you had -- on the to
9 line, who was the first addressee right there?
10     **A.   Gloria Robinson, Dynamic Security,**
11 **Gloriarobinson@hmmausa.**
12     Q.   And you would agree with me that
13 Ms. Robinson was exclusively Dynamic Security's
14 employee; correct?
15         MS. PALMER:  Object to form.
16     **A.   I'm sorry.  Could you --**
17     Q.   Was Ms. Robinson employed by Dynamic
18 Security?
19     **A.   Yes.**
20     Q.   And she was exclusively your
21 employee; correct?
22     **A.   Yes.**
23     Q.   Despite having an hmmausa address?

Page 197

1 HMMA?

2 **A.   I have no knowledge of that.**

3 Q.   And you would agree that HMMA's

4 Exhibit 2 identifies HEA as Dynamic's client;

5 correct?

6 **A.   It does.**

7 Q.   And for the record, Ms. Key was

8 directly employed by Dynamic; correct?

9 **A.   Correct.**

10 Q.   And you've specifically not

11 identified any requests for price proposal or

12 whatever you call it from HMMA; correct?

13 **A.   I don't have any -- I have no**

14 **knowledge of that.**

15 Q.   I have no further questions for the

16 witness.

17           EXAMINATION

18 BY MR. MILLER:

19 Q.   Hi, I'm Matt Miller.  I'm an attorney

20 for defendant HEA in the case.  I just have a

21 few questions for you.

22       Today you were asked by plaintiff's

23 counsel about certain documents which referred

Page 198

1 to Davita Key; correct?

2 **A.   Correct.**

3 Q.   Did you ever meet Ms. Key?

4 **A.   No.**

5 Q.   Did you ever talk with her?

6 **A.   No.**

7 Q.   Okay.  Other than the position

8 statement that you submitted on behalf of

9 Dynamic to the EEOC, did you prepare,

10 personally, any of the documents which refer to

11 Ms. Key which you were shown today?

12 **A.   I'm not sure I understand.**

13 Q.   You were shown a number of documents,

14 e-mails, that type of thing, which refer to

15 Ms. Key?

16 **A.   Correct.**

17 Q.   Some statements, some e-mails, some

18 other documents; correct?

19 **A.   Correct.**

20 Q.   Okay.  Did you prepare any of those

21 documents yourself other than the EEOC charge

22 response which references her?

23 **A.   The EEOC position statement is the**

Page 199

1 only creation by me.

2 Q.   Do you have any first-hand knowledge

3 of any of the events pertaining to Ms. Key or

4 her employment?

5 **A.   No.**

6 Q.   Okay.  So today when you were

7 testifying, you were asked about these

8 documents which refer to Ms. Key, and you

9 testified in response to questions about those

10 documents.  You were simply reading the

11 document stating what you think it said based

12 on the text of the document or offering your

13 opinion; correct?

14 **A.   That is correct.**

15 Q.   Your testimony wasn't based on any of

16 your own personal knowledge about what was

17 meant in the document or what any of the people

18 who were drafting the documents saw or meant;

19 correct?

20 **A.   That is Correct.**

21 Q.   Okay.  That's all I have.  Thank you.

22       MR. REDMOND:  I just have a couple.

23           EXAMINATION

Page 200

1 BY MR. REDMOND:

2 Q.   If you need Gloria Robinson's memo

3 back to answer this, we can get it.  You may be

4 able to answer otherwise.

5       From looking at Ms. Robinson's memo,

6 is it correct that Cassandra Williams

7 participated in part of the initial interview

8 just in terms of expressing her opinion about

9 the hair --

10 **A.   Yes.**

11 Q.   -- correct?

12 **A.   That is correct.**

13 Q.   All right.  So after Gloria Robinson

14 finished her interview, Ms. Williams came in

15 and was involved in that discussion about the

16 hair; correct?

17       MS. BROWN:  Object to the form.

18       MR. MILLER:  Object to the form.

19 **A.   Yes.  Ms. Williams came in after the**

20 **interview and --**

21 Q.   Since they object, let me answer

22 this.  And we know this is not based on your

23 first-hand knowledge.  But based on what you've

Page 201

1  seen, what was Ms. Williams' role in that
2  initial interview with Ms. Key that Ms.
3  Robinson had?
4       MS. BROWN:  Object to the form.
5       MR. MILLER:  Object to the form.  She
6  said she was not in the initial interview.
7  This is the testimony of the document.
8       **A.   The document seems to -- the document**
9  **seems to indicate that the purpose of**
10 **Ms. Williams coming in was to -- was to discuss**
11 **the hairstyle that Ms. Key was wearing.**
12      Q.   And just so we can clarify, at what
13 part during the discussions that day did
14 Ms. Williams participate?
15      MS. BROWN:  Object to the form.
16      MR. MILLER:  Object to the form.
17      **A.   It seems to indicate that it was**
18 **after the initial interview with Ms. Robinson.**
19      Q.   And are you familiar with the EEOC
20 posters?
21      **A.  I am.**
22      Q.   And does Dynamic Security post those
23 posters?

Page 202

1       **A.  We do.**
2       Q.   And are they posted at each
3  individual branch?
4       **A.   They are.**
5       Q.   And do you know in 2017, would those
6  posters have been posted at the Montgomery
7  branch?
8       **A.   They would have, yes.**
9       MR. REDMOND:  Can we look up -- can
10 we pull out Exhibit 54?  This is the last
11 question I've got.
12      MS. PALMER:  Do you know what it is?
13      MR. REDMOND:  Yeah, it's that
14 envelope.  I've got another one here that I
15 guess we should use.  You don't have 54 in
16 front of you still, do you?
17      THE WITNESS:  I don't think so.
18      MS. PALMER:  It's just a single page
19 so that's why.
20      MR. REDMOND:  Tell you what, she may
21 be able to answer this without even taking a
22 look at it.
23      Q.   Let me ask you, do you remember

Page 203

1  seeing Exhibit 54 earlier which was the
2  envelope in which Dynamic Security received the
3  notice of right to sue?
4       **A.  Yes.**
5       Q.   Did it indicate on what date that was
6  mailed to Dynamic Security?
7       **A.   The post stamp was February 28th of**
8  **2019.**
9       Q.   And had the Montgomery office at
10 Dynamic Security moved sometime during this
11 time period?
12      **A.   Yes.  The move had been between the**
13 **time that I -- that the EEOC claim was filed**
14 **and when the right to sue letter was sent out.**
15      Q.   And is there some notation on that
16 envelope that indicates that that might have
17 delayed the delivery of the right to sue notice
18 to the Dynamic office?
19      **A.   Yes.  It contains the kind of**
20 **forwarding sticker that the -- that the post**
21 **office prints out when an address has been**
22 **forwarded.**
23      Q.   Meaning that the post office had

Page 204

1  originally sent it to Dynamic's old address and
2  it had to be rerouted to the new?
3       **A.   Correct.**
4       Q.   That's all I've got.
5       FURTHER EXAMINATION
6  BY MS. PALMER:
7       Q.   When you were testifying earlier
8  about the documents and the e-mails, your
9  testimony was as the voice of Dynamic Security;
10 correct?
11      MR. MILLER:  Object to the form.
12      **A.   Correct.**
13      Q.   And speaking for Dynamic Security, is
14 it your understanding that the documents that I
15 showed you are maintained by Dynamic Security,
16 that they were Dynamic Security documents?
17      **A.  Yes.**
18      Q.   Did you understand that Ms. Williams
19 was acting on behalf of HMMA at HMMA's
20 discretion?
21      MR. MILLER:  Object to the form.
22      MS. BROWN:  Object to the form.
23      Q.   You can answer.

Page 205

1   A.   I believed that -- at the time when
2  all of this was put together, I did not know
3  that Cassandra Williams was not an MMA. I
4  believed -- until five minutes ago, I believed
5  that Cassandra was representing MM -- at HMMA.
6   Q.   And was that because she was working
7  at the Hyundai facility?
8   A.   Yes. That was the only place I had
9  ever seen her, so I just thought that was where
10  she -- that was her work.
11   Q.   Did she wear any kind of uniform or
12  anything like that?
13   A.   She would wear a standard shirt that
14  just had a Hyundai emblem, just the name -- the
15  name of the company, I think.
16   Q.   Did it say HMMA, or did it say
17  Hyundai?
18   A.   As I recall, just -- I recall it
19  saying Hyundai.
20   Q.   And those e-mails that we looked at
21  earlier, the e-mail addresses, do you recall
22  what those e-mail addresses were?
23   A.   The e-mail addresses were hmmausa.

Page 206

1        MS. PALMER:  Do you have 41 still?
2   Q.   If you'll look for me, Exhibit 41,
3  down where Ms. Williams' signature is. Do you
4  see there's like an image below her signature?
5   A.   I see an image beside her signature.
6   Q.   Okay. Let me see. Her signature
7  there where it says -- yeah, you're right, it's
8  beside her signature. Where it says Cassandra
9  Williams, what does it say underneath her name?
10   A.   It reads, "Cassandra Williams." The
11  next line is, "Manager of Security Services,
12  Hyundai ENG America, Inc., Hyundai Motor
13  Manufacturing Alabama, LLC."
14   Q.   All right. That's it.
15        MR. REDMOND:  I have a copy of 54 if
16  you want to take mine.
17        MS. PALMER:  It's here somewhere.
18  I'm going to get them in order.
19        MR. REDMOND:  So, Ms. Court Reporter,
20  you may end up with two copies of 54. They're
21  not mis-numbered or anything.
22        MS. PALMER:  Good? Okay.
23   Q.   We are done with you, Ms. Riddle.

Page 207

2        (At which time, the deposition
3        concluded at 2:35 p.m. Central.)

Page 208

1   C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  AT LARGE
5
6      I hereby certify that the above and
   foregoing deposition of KRISTAL RIDDLE
7  was taken down by me in stenotype and the
   questions and answers thereto were transcribed
8  by means of computer-aided transcription;
   transcribed by me or overseen by me, and that
9  the foregoing represents a true and correct
   transcript of the testimony given by said
   witness upon said hearing.
10
11      I further certify that I am neither of
   counsel, nor of kin to the parties to the
12  action, nor am I in anywise interested in the
   result of said cause.
13
14      So certified on this date, August 19,
   2022.
15        Lindsey Seals
16
17        /s/ Lindsey Seals
   Lindsey Seals, ABCR # TL2073,
18  Expires 9/21/2023
   Commissioner for the State of
19  Alabama at Large
   My Commission Expires 01/28/26
20
21
   /s/ Jessica Pitts, CCR
22  Jessica Pitts, CCR
   ACCR #635, Expires 9/30/2022
23  Commissioner for the State
   Of Alabama at Large

Page 1

1     IN THE UNITED STATES DISTRICT COURT FOR
2         THE MIDDLE DISTRICT OF ALABAMA
3             NORTHERN DIVISION
4             CIVIL ACTION NUMBER
5             2:19-cv-767-ECM-SMD
6
7   DAVITA M. KEY,
8       Plaintiff,
9   v.
10  HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC;
    HYUNDAI ENGINEERING AMERICA, INC.;
11  AND DYNAMIC SECURITY, INC.,
12      Defendants.
13
14      DEPOSITION OF CASSANDRA WILLIAMS
15          SEPTEMBER 6, 2022
16              9:36 A.M.
17
18      The deposition of Cassandra Williams was
19  taken before Jordan Groves, CCR, on September 6,
20  2022, by the plaintiff, commencing at 9:36 a.m.,
21  at the offices of Bradley Arant, 445 Dexter
22  Avenue, Suite 9075, Montgomery, Alabama, pursuant
23  to the stipulations set forth herein.

Page 2

1       S T I P U L A T I O N S
2       IT IS STIPULATED AND AGREED by and between
3   the parties through their respective counsel that
4   the deposition of Cassandra Williams may be taken
5   before Jordan C. Groves, Certified Court Reporter,
6   Notary Public, State of Alabama at large, at the
7   offices of Bradley Arant, 445 Dexter Avenue,
8   Suite 9075, Montgomery, Alabama, on
9   September 6, 2022, commencing at approximately
10  9:36 a.m.
11
12      IT IS FURTHER STIPULATED AND AGREED that
13  the signature to and the reading of the deposition
14  by the witness is not waived, the deposition to
15  have the same force and effect as if full
16  compliance had been had with all laws and rules of
17  Court relating to the taking of depositions.
18
19      IT IS FURTHER STIPULATED AND AGREED that it
20  shall not be necessary for any objections to be
21  made by counsel to any questions, except as to
22  form or leading questions and that counsel for the
23  parties may make objections and assign grounds at

Page 3

1   the time of trial or at the time said deposition
2   is offered in evidence, or prior thereto.
3
4       IT IS FURTHER STIPULATED AND AGREED that
5   the notice of filing of the deposition by the
6   Commissioner is waived.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1               I N D E X
2
3           EXAMINATION INDEX
4                   PAGE
5   EXAMINATION OF CASSANDRA WILLIAMS
6       BY MS. LEONARD           8
7       BY MR. REDMOND             137
8       BY MS. BROWN            144
9       FURTHER BY MS. LEONARD      151
10      FURTHER BY MR. REDMOND      156
11
12
13          EXHIBIT INDEX
14  PLAINTIFF'S                 PAGE
15  61 -   (Notice of Deposition)        12
16  62 -   (HEA AL FM Organization Chart)   18
17  63 -   (Hyundai ENG America, Inc.,    37
        Appearance Standards for Security
18      Contractors)
19  64 -   (Photograph)            69
20  65 -   (Email Chain, Subject:  Pay Raises   72
        for Contract Period 2015-2017)
21
    66 -   (Email, Subject:  Key's Unemployment  114
22      Rebuttal)
23  67 -   (Email Chain, Subject:  EEOC      119
        Complaint)



Page 5

1                EXHIBIT INDEX (Cont.)
2  PLAINTIFF'S                    PAGE
3  68 -  (Email Chain, Subject: EEOC        124
          Complaint)
4
5  69 -  (Email Chain)              129
6
   DEFENDANTS'                    PAGE
7
   1 -  (Declaration of Cassandra Williams)  145
8
9
10
             PREVIOUSLY MARKED EXHIBITS
11
   PLAINTIFF'S                    PAGE
12
   9 -  (Appearance Standards of Security    37
13        Personnel)
14 20 -  (Duties and Responsibilities)      59
15
16
17
18
19
20
21
22
23

Page 7

1        I, Jordan C. Groves, a Certified Court
2   Reporter and a Notary Public for the State of
3   Alabama at Large, acting as Commissioner, certify
4   that on this date, pursuant to the Federal Rules
5   of Civil Procedure and Rules of Civil Procedure
6   and the foregoing stipulation of counsel, there
7   came before me at the offices of Bradley Arant,
8   445 Dexter Avenue, Suite 9075, Montgomery,
9   Alabama, commencing at approximately 9:36 a.m. on
10  September 6, 2022, Cassandra Williams, witness in
11  the above cause, for oral examination, whereupon
12  the following proceedings were had:
13        COURT REPORTER:  Usual stipulations?
14        MS. LEONARD:  Yes, please.
15        MR. REDMOND:  Yes.
16        MR. MILLER:  We'd like her to have the
17  opportunity to read and sign.
18
19        CASSANDRA WILLIAMS,
20        being first duly sworn, was examined
21          and testified as follows:
22
23

Page 6

1
2            A P P E A R A N C E S
3  APPEARING ON BEHALF OF THE
   PLAINTIFF:
4
5     Ms. Heather Newsom Leonard
      HEATHER LEONARD, PC
      2105 Deveraux Circle, Suite 111
6     Birmingham, Alabama 35243
7     Ms. Heather Palmer
      PALMER LAW, LLC
8     104 23rd Street South, Suite 100
      Birmingham, Alabama 35233
9
10 APPEARING ON BEHALF OF THE
   DEFENDANT HYUNDAI ENG AMERICA, INC.:
11
12    Mr. T. Matthew Miller
      BRADLEY ARANT BOULT CUMMINGS, LLP
      1819 Fifth Avenue North
13    Birmingham, Alabama 35203
14
   APPEARING ON BEHALF OF THE
15 DEFENDANT HYUNDAI MOTOR MANUFACTURING
   ALABAMA, LLC:
16
      Ms. Whitney R. Brown
17    LEHR, MIDDLEBROOKS, VREELAND &
      THOMPSON, PC
18    1914 4th Avenue North
      Birmingham, Alabama 35203
19
20 APPEARING ON BEHALF OF THE
   DEFENDANT DYNAMIC SECURITY, INC.:
21
      Mr. Wesley C. Redmond
22    FORD HARRISON, LLC
      420 20th Street North, Suite 2560
23    Birmingham, Alabama 3503

Page 8

1                EXAMINATION
2  BY MS. LEONARD:
3      **Q.  Will you please state your full legal name**
4  **for the record.**
5      A.  Cassandra Williams.
6      **Q.  Have you ever legally changed your name?**
7      A.  No.
8      **Q.  Have you gone by any other names other**
9  **than Cassandra Williams?**
10     A.  Just given a nickname, a variation of my
11 first name.
12     **Q.  Have you ever given a deposition before?**
13     A.  I have years ago.
14     **Q.  How many times?**
15     A.  Just once.
16     **Q.  What type of case was it?**
17     A.  It was gender discrimination.
18     **Q.  All right.  Who was your employer when you**
19 **gave the deposition?**
20     A.  City of Montgomery.
21     **Q.  And when you say "it was gender**
22 **discrimination," what was the person who brought**
23 **the lawsuit saying it was gender discrimination?**



Page 33

1 of?
2   A.  B.J. McCullough, Neal McMann, Gloria
3 Robinson, and Malinda Williams.
4   **Q.  Do you know why Ms. Robinson is no longer**
5 **an account manager at HMMA?**
6     MS. BROWN: Object to form.
7     MR. MILLER: Object to form.
8   A.  She was relocated -- I'm sorry.
9   **Q.  It's okay.**
10   A.  She requested to step down from that
11 position.
12   **Q.  What do you know about that?**
13   A.  She told her manager -- and I don't know
14 what his position was -- that she wanted to step
15 down, and she recommended someone else to take her
16 position.
17   **Q.  How did you come to have this knowledge?**
18   A.  She told me as well as her
19 then-supervisor.
20   **Q.  Did Ms. Robinson tell you why she was**
21 **requesting to step down?**
22   A.  She said she was getting burned out.
23   **Q.  How long had she been there?**

Page 34

1   A.  At HMMA?
2   **Q.  Yes, ma'am.**
3   A.  Maybe 2007. I'm not sure.
4   **Q.  And did she tell you why she was being**
5 **burned out or what was causing her to be burned**
6 **out?**
7   A.  She did not.
8   **Q.  Did you have the ability or the power to**
9 **request that somebody from Dynamic Security's work**
10 **assignment at HMMA be terminated?**
11     MR. REDMOND: Object to form.
12     MR. MILLER: Object to form.
13   A.  Their work assignment, yes, at HMMA.
14   **Q.  Tell me about that, that authority that**
15 **you had. What was your ability?**
16   A.  If, for whatever reason, the person's
17 service was not up to par or if they violated a
18 policy, which includes criminal or just a basic
19 policy, I could request that they be reassigned.
20   **Q.  Could anyone at HMMA request that the**
21 **services of one of the Dynamic Security employees**
22 **be terminated or that they be reassigned?**
23     MS. BROWN: Object to form.

Page 35

1   **Q.  In other words, could HMMA say, "Hey, I**
2 **want this person removed from working on our**
3 **property"?**
4     MS. BROWN: Object to form.
5   A.  Directly to me or to the security company?
6   **Q.  Either.**
7   A.  Not to the security company, no.
8   **Q.  Could they make that -- could HMMA request**
9 **to you that somebody from Dynamic Security no**
10 **longer be assigned to work on the HMMA property?**
11     MS. BROWN: Object to form.
12     MR. MILLER: Object to form.
13   A.  They could if they chose to.
14   **Q.  Did HMMA ever make any requests to you to**
15 **remove somebody from Dynamic Security from the**
16 **property?**
17   A.  Not that I recall.
18   **Q.  You said that one of the reasons that you**
19 **could request somebody's services at HMMA be ended**
20 **or they be reassigned would be violation of**
21 **policy.**
22     **Whose policies?**
23   A.  HMMA's policies.

Page 36

1   **Q.  What HMMA policies applied to people**
2 **placed on the property through Dynamic Security?**
3     MS. BROWN: Object to form.
4   A.  Repeat.
5   **Q.  Sure. What policies applied to the**
6 **Dynamic Security placements?**
7     MS. BROWN: Object to form.
8     MR. MILLER: Object to form.
9   A.  (No response.)
10   **Q.  What policies are you talking about? You**
11 **said --**
12   A.  Violation -- I mean, which it -- it will
13 not just include securities but any contractor
14 violates. So are you asking me what policies they
15 could --
16   **Q.  Yes.**
17   A.  -- be removed on?
18   **Q.  Yes, ma'am.**
19   A.  Which is -- some that come to mind:
20 violating their badge policy, their workplace
21 violence policy, their sexual harassment policy,
22 criminal activity, drug screen violation policy,
23 weapons policy, alcohol policy. And all three of



Page 41

1    Q.  You go on.
2    A.  2010 was not my first day of -- in
3  September was not my first day of employment at
4  HMMA.
5    Q.  When was your first day of employment at
6  HMMA?
7      MR. MILLER:  Let me object to form.
8  She's --
9      MS. LEONARD:  You're objecting to her
10  answer?
11     MR. MILLER:  I'm -- yeah, and then you --
12  then you repeated the question.
13     Because she's asking about your employment
14  at HMMA.
15     THE WITNESS:  My employment at HMMA?
16     MR. MILLER:  At the location, is that what
17  you --
18     THE WITNESS:  Yes.
19     MR. MILLER:  Okay.
20    Q.  (BY MS. LEONARD)  When you said
21  September 1, 2010, was not your first date of
22  employment, what did you mean?
23    A.  With HEA.

Page 42

1    Q.  Okay.  What was your first date of
2  employment with HEA?
3    A.  It was May, and I don't know the exact
4  date, of 2004.
5    Q.  Okay.  So from 2004 to 2010, what did you
6  do for HEA?
7    A.  I wasn't working for HEA at that time.
8    Q.  Who were you working for from 2004 to
9  2010?
10    A.  2004 to December 2006, I was working for
11  DTA, known as Don Terry and Associates, Security.
12  And from December 2006 until August 31, 2010, I
13  was working for American Citadel Guard security.
14    Q.  Okay.  So when did you first start
15  performing work on HMMA campus?
16    A.  May 2004.
17    Q.  Okay.  So when you say that the
18  "Appearance Standards for Security Personnel"
19  document was taken -- the bulk of the content was
20  taken from an HMMA policy when you started working
21  out there, the policy you're referring to, when
22  was it in place, the HMMA policy?
23      MS. BROWN:  Object to form.

Page 43

1    A.  It was in place when I started.
2    Q.  And that's where I'm trying to go.
3      Are you saying when you started at the
4  HMMA facility in 2004?  When you started at one of
5  those subsequent employers between 2004 and 2010?
6  Are you talking about in 2010 with HEA?
7    A.  I started at HMMA in May 2004 with DTA,
8  and it was in place at that time.
9    Q.  Okay.  Do you remember what the name of
10  that policy was?
11    A.  I don't.  I don't know exactly what it
12  says.
13    Q.  When we look at the first page of
14  Exhibit 9, HEA, and we look under "Female
15  Officers" where it says "Hair" and we see the last
16  three bullets, and it says, "Braids are permitted
17  but must be well groomed and kept.  Dreads or
18  dreadlocks hair style are prohibited.  Hair
19  ribbons are not permissible."
20      Did any of that information come from the
21  HMMA policy?
22      MS. BROWN:  Object to form.
23    A.  The last bullet?

Page 44

1    Q.  The hair ribbons?
2    A.  Yes.
3    Q.  Who made the decision that the "Appearance
4  Standards for Security Personnel" would say that
5  dreads or dreadlock hair style are prohibited?
6      MS. BROWN:  Object to form.
7    A.  Although HMMA's policy didn't specifically
8  say dreads or dreadlocks, braids was noted, and
9  the dreads were in the braids family.  That's the
10  way we interpreted it.
11    Q.  Okay.  Did anyone from HMMA review the
12  "Appearance Standards for Security Personnel" to
13  ensure that it was consistent with what they
14  wanted?
15      MR. MILLER:  Object to form.
16      MS. BROWN:  Object to form.
17      MR. REDMOND:  Same objection.
18    A.  Not with me.
19    Q.  Do you know if anybody -- if anybody from
20  HMMA reviewed on behalf of the company the
21  "Appearance Standards for Security Personnel"?
22      MS. BROWN:  Object to form.
23      MR. MILLER:  Object to form.



Page 45

1    A.  This?  Exhibit 9?
2    Q.  Yes, ma'am.
3    A.  No one reviewed with HMMA -- HMMA reviewed
4  it.
5    Q.  Why are dreads or dreadlocks prohibited
6  under Exhibit 9?
7    A.  My document?
8    Q.  Yes, ma'am.
9    A.  Keeping with HMMA's policy, I decided to
10  continue it because for grooming and professional
11  appearance, I didn't think they met those
12  guidelines.
13    Q.  So based on your understanding of HMMA's
14  policies, you felt that dreads or dreadlocks hair
15  styles would be prohibited for people who would be
16  in a visible uniformed position?
17    MR. MILLER:  Object to form.
18    MS. BROWN:  Object to form.
19    A.  Every security person, regardless of
20  position, are in a uniform.
21    Q.  But you felt the prohibition of dreads or
22  dreadlocks was consistent or what was required
23  under the HMMA policy?

Page 46

1    MS. BROWN:  Object to form.
2    MR. MILLER:  Object to form.
3    MR. REDMOND:  Same objection.
4    A.  Yes.
5    Q.  Did anyone tell you why it would be okay
6  for HMMA to prohibit dreads or dreadlocks?  In
7  other words, did anyone say, "Yeah, this is a
8  nondiscriminatory policy"?
9    MR. MILLER:  Object to form.
10    MS. BROWN:  Object to form.
11    A.  No.
12    Q.  Were there ever any deviations from the
13  "Appearance Standards for Security Personnel"
14  where somebody with dreads or dreadlocks was
15  permitted to work under the security contract?
16    A.  Repeat.
17    Q.  Sure.  Was anybody permitted to work under
18  the security contract with dreads or dreadlocks?
19    A.  At what point?
20    Q.  At any point.
21    A.  Not prior to 2017.
22    Q.  After 2017 has anyone with dreads or
23  dreadlocks been permitted to work under the

Page 47

1  security contract?
2    A.  Yes.
3    Q.  Who would that be?
4    A.  One young lady.  Her last name was Howard.
5  I don't remember.  But I wasn't a part of her
6  hiring so...
7    Another young lady.  Her last name was
8  Walton, I believe.  She was allowed to wear dreads
9  as long as they were styled in a different manner.
10    Q.  When was Ms. Walton permitted to wear
11  dreads as long as they were styled in a certain
12  manner?
13    A.  I believe she started maybe late 2017.
14    Q.  Why was she permitted to wear dreads?
15    A.  Because she agreed to style them in a
16  different manner.
17    Q.  Who made the decision to allow her to wear
18  dreads?
19    A.  Myself and -- I don't know -- I don't
20  remember at the time whether it was Gloria
21  Robinson or Malinda Williams.
22    Q.  At the time the decision was made to
23  permit Ms. Walton to wear her hair in dreads as

Page 48

1  long as they were styled in a certain manner, were
2  you aware that Davita Key had made a complaint
3  that she felt she was being discriminated against?
4    A.  I can't say because --
5    MR. MILLER:  Object to form.
6    Go ahead.  You can answer.
7    A.  I can't say because I don't remember when
8  Ms. Walton came to work there.
9    Q.  And we're going to go through some
10  documents specific to Ms. Key in a little bit.
11  But one of the things that we're going to see
12  through those documents is basically upon her last
13  day -- you know, on July 31, 2017 -- she was
14  complaining about you and about the hair policy.
15    When did you first become aware of those
16  internal complaints?
17    MR. MILLER:  Object to form.
18    A.  Her first day of work.
19    Q.  Okay.  So if she started in July of 2017
20  and you were aware of her complaints on her first
21  day of work, is it reasonable, then, to assume if
22  Ms. Walton was hired in late 2017, you were at a
23  minimum aware of Ms. Key's internal complaints



Page 49

1  about the dreadlock -- prohibition of dreadlocks?
2      A.  Ms. Key didn't start in July of 2017.
3      Q.  When did she start?
4      A.  Let me think.  Let me correct myself.  She
5  started July 31st.  That was her first day of
6  work.  July 31, 2017.  So I'm sorry.
7      Repeat the last part.
8      Q.  If Ms. Walton started in late 2017 and
9  Ms. Key started on July 31, 2017, and it's your
10  testimony that you're aware of her complaints
11  about the prohibition of dreadlocks being
12  discriminatory --
13      MR. MILLER:  Object to form.
14      Q.  -- on her first day of employment, would
15  it be fair, then, to say that you're aware of
16  Ms. Key's complaint by the time Ms. Walton
17  started?
18      MR. MILLER:  Object to form.
19      A.  I don't know when Ms. Walton started, so I
20  can't say yes or no.
21      Q.  Well, your testimony earlier was she
22  started in late 2017.  If that's true, you would
23  agree, then, you would have to have been aware of

Page 50

1  Ms. Key's complaint by the time Ms. Walton
2  started?
3      MS. BROWN:  Object to form.
4      MR. MILLER:  Object to form.
5      MR. REDMOND:  Same objection.
6      A.  I know her -- okay.  Her verbal complaint,
7  yes.  I'm aware of that, yes.
8      Q.  How did Ms. Walton agree to style her
9  hair?
10      A.  To she agreed to pull it back.  And I
11  can't -- I'm trying to visualize, but I can't.
12  But it was pulled back in a much neater
13  appearance, and she agreed to maintain that
14  appearance.
15      Q.  And you said "much neater appearance."
16  Neater than what?
17      A.  Than what it was on the day that she
18  interviewed.
19      Q.  Okay.  And Ms. Howard -- when was she
20  hired?
21      A.  I don't know.
22      Q.  And who made the decision to permit her to
23  wear dreadlocks?

Page 51

1      A.  The security account manager.
2      Q.  What company would that have been?
3      A.  I don't remember.
4      Q.  Do you know why Ms. Howard was permitted
5  to wear her hair in dreads?
6      MR. MILLER:  Object to form.
7      A.  I do not.  I saw her when I arrived for
8  work one day, that she had dreads.  And so that
9  was my first time knowing about it.
10      Q.  What was Ms. Howard's race?
11      A.  Black.
12      Q.  An what was Ms. Walton's race?
13      A.  Miss who?
14      Q.  Walton.
15      A.  Black.
16      Q.  Is there still an "Appearance Standards
17  for Security Personnel" policy?
18      A.  Yes.
19      Q.  And under that are dreads or dreadlocks
20  prohibited for women?
21      A.  Yes.  For women?
22      Q.  Yes.
23      A.  For all.

Page 52

1      Q.  Was Ms. Key working on the HMMA campus
2  through a contractual agreement between HEA and
3  HMMA?
4      MR. MILLER:  Object to form.
5      A.  The agreement was with Dynamic Security.
6      Q.  What relationship, if any, exists between
7  HMMA and HEA?
8      MS. BROWN:  Object to form.
9      A.  HEA is a subsidiary of HMMA.
10      Q.  Okay.  Do you know if there are any common
11  owners among HMMA and HEA?
12      A.  I don't.
13      Q.  When you say "HEA is a subsidiary of
14  HMMA," what does that mean?
15      A.  It's like an organization or --
16      MR. MILLER:  Do you know what that word
17  means?  Do you know what "subsidiary" means?
18      THE WITNESS:  Corporation, organization of
19  another -- or entity of another company maybe?
20  I'm just thinking off the top of my head.
21      Q.  (BY MS. LEONARD)  Are there any common
22  policies that HMMA and HEA have?
23      A.  Say that again.



Cassandra Williams

53..56

Page 53

1    Q.  Sure.  Are there any shared or common
2  policies between HMMA and HEA?
3    A.  Shared policies?
4    Q.  Yes, ma'am.
5    A.  Such...
6    Q.  Like, at HEA do you guys use or operate
7  under any HMMA policies?
8    A.  The -- some of the same policies -- well,
9  those same policies I repeated earlier in addition
10  to others.
11    Q.  Okay.  Can you think of any others beyond
12  the ones you've already shared with me?
13    A.  Their PPE, which is personal protection.
14  Parking policies.  Badging policy.  Those are
15  the...
16    Q.  Are you aware of any contracts between HEA
17  and HMMA?
18    A.  Currently?
19    Q.  Yes, ma'am.
20    A.  Yes.
21    Q.  What contract or contracts exist between
22  the companies?
23    A.  We have a security contract and janitorial

Page 54

1  contract and landscaping.
2    Q.  How long has the security contract been in
3  place?
4    A.  Currently?
5    Q.  Yes, ma'am.
6    A.  It was signed, I believe, December of last
7  year.
8    Q.  So December of 2020?
9    A.  Last year.  '21.
10    Q.  That's right.  All the years have blurred
11  together since basically the beginning of 2020 in
12  my mind, so thank you.
13    Prior to December of 2021, was there any
14  contractual relationship between HEA and HMMA?
15  And really I'm focusing in on when Ms. Key was
16  there.
17    Was there a contractual relationship in
18  2017?
19    A.  No.
20    Q.  What relationship, if any, existed between
21  HEA and HMMA in 2017?  Like, I guess where I'm
22  trying to go is if there wasn't a contract, why
23  was HEA -- why were you out on the HMMA property

Page 55

1  doing anything in 2017?
2    A.  There was a scope of service that we were
3  operating under.
4    Q.  And what does that mean?
5    A.  It outlined the work that HMMA wanted HEA
6  to provide as far as security is concerned.  I
7  don't know about that other.
8    Q.  And what was that work?
9    A.  Provide security services.
10    Q.  And would you agree that the work that HEA
11  was providing in terms of providing security
12  services was for the benefit of HMMA?
13    MR. MILLER:  Object to form.
14    MS. BROWN:  Object to form.
15    A.  Yes.
16    Q.  And did HMMA, through that scope of
17  services agreement, empower you to act on its
18  behalf to make contracts to provide security
19  services on the HMMA property?
20    MS. BROWN:  Object to form.
21    MR. MILLER:  Object to form.
22    A.  I would not say on their behalf.  The
23  contract would have been between HEA and the

Page 56

1  security vendor.
2    Q.  And who was getting the benefit of the
3  security services?
4    MS. BROWN:  Object to form.
5    MR. MILLER:  Object to form.
6    A.  The services are being provided at HMMA's
7  site.
8    Q.  And who is deriving the benefit -- or
9  whose property is being secured?
10    MR. MILLER:  Object to form.
11    A.  HMMA's property.
12    Q.  Ms. Key worked in a mail room capacity.
13    What scope of services agreement or
14  contract or whatever -- where did that fall, mail
15  room duties?
16    A.  Under the scope of work in the -- for the
17  security.
18    Q.  Okay.  In Mr. Cureton's deposition last
19  week, there was some discussion about post orders.
20    Have you ever heard that phrase, "post
21  order"?
22    A.  I have.
23    Q.  What is a post order?



Cassandra Williams                                                          69..72

Page 69

1    A.  They made the selection.

2

3        (Whereupon, Plaintiff's Exhibit 64 was
4        marked for identification and copy of
5        same is attached hereto.)

6

7    Q.  I'm going to show you what's been marked
8  as Exhibit 64, which is HEA 205.
9        Does this photograph represent the shirt
10  that Ms. Key would have been required to wear?
11    A.  Yes.
12    Q.  When we see on the shirt where it says
13  "Hyundai Alabama," what does Hyundai Alabama refer
14  to.
15        MS. BROWN:  Object to form.
16        MR. MILLER:  Object to form.
17    A.  Hyundai Alabama.
18    Q.  What is Hyundai Alabama?
19        MS. BROWN:  Object to form.
20    A.  So this particular shirt, like I said, you
21  can purchase out of the gift shop, so Hyundai
22  Alabama would be HMMA.
23    Q.  And I notice today you're wearing a shirt

Page 70

1  that's a little different.  Yours is a black shirt
2  with embroidery that says "Hyundai Engineering" --
3  I can't read all of it, and I don't want to be
4  staring too much at your shirt.
5        But your shirt is badged with Hyundai
6  Engineering America, Inc.?
7    A.  Yes.
8    Q.  Why would Ms. Key be wearing a shirt
9  that's Hyundai Alabama versus a shirt like the one
10  that you're wearing that says Hyundai Engineering?
11        MS. BROWN:  Object to form.
12    A.  She's not a Hyundai Engineering -- or was
13  not a Hyundai Engineering employee.
14    Q.  Why would she wear any shirt that
15  identifies her with the word "Hyundai"?
16        MS. BROWN:  Object to form.
17        MR. MILLER:  Object to form.
18        MR. REDMOND:  Same objection.
19    A.  HMMA selected that shirt.
20    Q.  All right.  Do you ever wear shirts at
21  work that are like what we just saw in Plaintiff's
22  Exhibit 63 that say "Hyundai Alabama"?
23    A.  No.

Page 71

1    Q.  So you always wear a shirt that says
2  "Hyundai Engineering"?
3    A.  Yes.
4    Q.  Was that the case in 2017?
5    A.  Yes.
6        MS. BROWN:  Isn't the photograph 64?
7        MS. LEONARD:  Yeah.  I'm sorry if I
8  misspoke.
9    Q.  (BY MS. LEONARD)  What were the dates of
10  Ms. Key's assignment?
11    A.  Best I remember, she started July 31,
12  ended August 1.
13    Q.  Who set Ms. Key's rate of pay?
14    A.  Dynamic Security.
15    Q.  When we look at Plaintiff's Exhibit 20, it
16  says in here the pay is $13 per hour.
17        If Dynamic Security set that rate of pay,
18  why did you put that in Plaintiff's Exhibit 20?
19    A.  This is a job announcement.
20    Q.  Okay.  Is the rate of pay for the position
21  set through -- was it controlled by the scope of
22  services agreement?
23    A.  It was in their bid.

Page 72

1    Q.  Okay.  And who accepted the bid?
2    A.  HEA accepted the bid.
3    Q.  Did you ever have the ability to recommend
4  or request pay increases for anyone?
5    A.  Yes.  Based on their bid.
6    Q.  Did you ever recommend specific pay
7  increases for any employees of Dynamic Security?
8    A.  I believe so.
9    Q.  And why did you do that?
10    A.  Because I felt they were due and entitled
11  to a raise based on their performance.
12    Q.  Was Latunya Howell one of the people you
13  requested a raise for?
14    A.  I believe so.
15    Q.  And that would have been sometime in 2016?
16    A.  I don't remember when.
17    Q.  I don't have copies of this for everyone,
18  so I'm going to let -- so let your lawyer look at
19  it first.  This is Dynamic 289 through 293 that
20  I'm marking as 65.
21
22        (Whereupon, Plaintiff's Exhibit 65 was
23        marked for identification and copy of


ALABAMA COURT REPORTING

Page 73

1    same is attached hereto.)

2

3    MS. LEONARD: I think this has been an
4 exhibit to a prior deposition.

5    **Q. If you can give Mr. Miller a chance to**
6 **look on that with you.**

7    MR. MILLER: This is 65?

8    MS. LEONARD: Yes.

9    MR. REDMOND: I'm just going to come look
10 over Matt's shoulder to speed things up. I think
11 I know which one it is.

12    MS. BROWN: Can you tell me the numbers
13 one more time?

14    MS. LEONARD: They've got it.

15    Will you guys read the Bates numbers out
16 again for Whitney?

17    MR. MILLER: Dynamic Key 289 through 293.

18    MS. BROWN: Got it. Thank you.

19    MS. PALMER: It was previously
20 Plaintiff's 55.

21    A. Okay. Yes, I did. December 2016.

22    **Q. All right. Do you know if that raise went**
23 **into effect for Ms. Howell that you recommended?**

Page 74

1    A. According to the email, it went into
2 effect on December 3.

3    **Q. Okay.**

4    A. For all of them.

5    **Q. If you look to Bates number 291, which is**
6 **part of your email that you were sending to Chris**
7 **Hargrove at Dynamic Security, one of the things**
8 **you write about Ms. Howell is "Just so you know,**
9 **one of HMMA's onsite vendors is trying to hire**
10 **Latunya."**

11    **Who is that?**

12    A. I believe it was Aerotek.

13    **Q. Okay. And you said, "I've been contacted**
14 **by the company."**

15    **Tell me about that. What contact had you**
16 **received?**

17    A. They just called just as a reference
18 request.

19    **Q. Why would they be calling for a reference**
20 **request on a Dynamic employee?**

21    A. Because she put me down as a reference.

22    **Q. Okay. What's --**

23    MR. MILLER: Do you want to clarify who

Page 75

1 the company is?

2    MS. LEONARD: She said Aerotek.

3    MR. MILLER: Okay.

4    MS. LEONARD: Keep up, Matt. She said
5 Aerotek.

6    **Q. (BY MS. LEONARD) What supervision, if**
7 **any, did you have over Ms. Howell?**

8    A. No direct supervision. I just kept close
9 eye on the mail room.

10    **Q. What did you do to keep a close eye on the**
11 **mail room?**

12    A. Just to check to make sure they were doing
13 what they were supposed to be doing. If I
14 received a complaint from an HMMA manager or team
15 member stating that they had issues with packages
16 being delivered or sent out, I would go down and
17 check. Every now and again, I had to go and fill
18 in the mail room myself if there was -- if they
19 were short or no one in there at all.

20    **Q. Who provided supervision to the mail room?**

21    A. Direct supervision would have been the
22 first shift security supervisor followed by Gloria
23 Robinson or whomever the account manager for the

Page 76

1 security company.

2    **Q. Did you provide indirect supervision for**
3 **the mail room?**

4    MR. MILLER: Object to form.

5    MS. BROWN: Object to form.

6    A. As far as the duties, I did.

7    **Q. Okay. Other than what you explained about**
8 **keeping a close eye on the mail room or you**
9 **filling in if there was a need, what else, if**
10 **anything, did you do to provide indirect**
11 **supervision?**

12    MR. MILLER: Object to form.

13    A. That's basically it.

14    **Q. Okay. Did anyone at HMMA or HEA object to**
15 **Ms. Key's appearance?**

16    MS. BROWN: Object to form.

17    A. I don't know if anybody at HMMA ever saw
18 or met Ms. Key.

19    **Q. My question is different.**

20    **Did anyone at HMMA or HEA object to**
21 **Ms. Key's appearance, her hairstyle?**

22    MR. MILLER: Object to form.

23    MS. BROWN: Object to form.



Page 77

1  A.  Not that --
2     MR. MILLER:  She asked HMMA or HEA.
3     THE WITNESS:  Oh.  I'm sorry.
4     MR. MILLER:  That's why I objected.
5     You can answer.
6     THE WITNESS:  Okay.
7  A.  Okay.  After -- prior to her being hired?
8  After she was hired?  Which?  Or both?
9  **Q.  Any time.  And I'll make the question**
10 **broader.**
11 **    Are you aware of anyone, including**
12 **yourself, who objected to Ms. Key's appearance?**
13    MS. BROWN:  Object to form.
14 A.  On the date that Ms. Key interviewed, I
15 saw her hair.  On the date that she started, I saw
16 her hair, and at that time I made an objection
17 about her hair.
18 **Q.  And so you made an objection after she had**
19 **started?**
20    MR. REDMOND:  Object to form.
21    MR. MILLER:  Object to form.
22 A.  Yes.  Because on the date of the
23 interview, an agreement was made how she would

Page 78

1  wear her hair.
2  **Q.  Were you present for Ms. Key's interview?**
3  A.  I was not.
4  **Q.  Who interviewed her?**
5  A.  Gloria Robinson and Maurice Chambliss.
6  **Q.  The day that Ms. Key interviewed, you said**
7  **you saw her hair.**
8  **    How did you come to see her hair on the**
9  **date of her interview?**
10 A.  I was asked to come into the conference
11 room where they were interviewing her.
12 **Q.  Tell me about how that came to be.**
13 A.  Gloria Robinson approached me at my desk
14 and stated that they were interviewing someone for
15 the mail room, that the young lady had dreads in
16 her hair.  She mentioned that she said that she
17 could style it in a way that would be, like, more
18 presentable, and she asked me if I would come in
19 to look at her hair and how she was going to style
20 it.
21 **Q.  So then what happened?**
22 A.  I went in, I saw -- confirmed that, you
23 know, she was wearing dreads.  And she said that

Page 79

1  she had a photo.  I -- well, let me back up.
2     I said, you know, "No, they're not
3  permitted."  And she said that "There's a way that
4  I can style it."  And she produced a photo on her
5  phone.
6  **Q.  What did her hair look like in the**
7  **interview?**
8  A.  All I can tell you it was in dreads.
9  **Q.  Long dreads?  Short dreads?  Medium?  How**
10 **long were they?**
11 A.  I believe they may have been shoulder
12 length.
13 **Q.  Okay.  Were they thin?  Thick?**
14 A.  Thick?  As...
15 **Q.  Well, I'm just trying to get an idea --**
16 A.  Okay.  They weren't thick like Whoopi
17 Goldberg dreads are but -- and I don't know how
18 to -- as far as a size, I don't know what to say
19 because I don't know.  But I can just tell you
20 they were in dreads.  They were noticeable dreads.
21 **Q.  Were they neat?**
22    MR. REDMOND:  Object to form.
23 A.  They --

Page 80

1  **Q.  Sure.  Let me rephrase.**
2  **    What, if anything, was unacceptable or**
3  **unpresentable about her hair?**
4     MR. MILLER:  Object to form.
5     MS. BROWN:  Object to form.
6     MR. REDMOND:  Same objection.
7  **Q.  Because you said she showed you a picture**
8  **that would be a lot more presentable.**
9  **    What, if anything, was unpresentable about**
10 **her appearance in her interview?**
11    MS. BROWN:  Object to form.
12 A.  Her hair was in dreads --
13    MR. MILLER:  Object to form.
14 A.  -- and they were a little --
15    MR. MILLER:  Go ahead.  Sorry.
16 A.  -- frayed.
17 **Q.  And what do you mean by "frayed"?**
18 A.  Like, they weren't neat and -- so I don't
19 know if you've seen dreads when they're first
20 done, but it's like, I guess, braids.  They're
21 pulled together and the ends and -- there's no
22 wild hairs sticking out.  So it was -- it was like
23 that.  So I could tell that she had had them for a



Cassandra Williams

Page 81

1 while.  So they just didn't have that neat
2 appearance like freshly done.
3    Q.  And the picture that she showed that you
4 said was a lot more presentable, what did that
5 look like?
6    A.  It was pulled back.  And all I can tell
7 you is I could no longer tell that they were --
8 that they were dreads.
9    Q.  Other than the fact that -- well, why are
10 dreads unpresentable?
11        MS. BROWN:  Object to form.
12        MR. MILLER:  Object to form.
13    Q.  Or why are they not acceptable from an
14 appearance standpoint?
15        MS. BROWN:  Object to form.
16        MR. MILLER:  Object to form.
17    A.  Are you asking my personal opinion?
18    Q.  Why, for purposes of holding this job in
19 the mail room, are dreads unacceptable?
20    A.  Dreads aren't accepted for mail room,
21 security post, regardless.
22    Q.  And that's my question:  Why?
23    A.  Although I know some dreads once -- and I

Page 82

1 don't know how they're done, but some dreads --
2 they can be worn very neatly.  But I know that
3 some officers will not maintain their hair to keep
4 that neat appearance.  And just for appearance,
5 professional grooming appearance, I wanted us to
6 maintain the policy that no dreads are allowed.
7    Q.  Why would it matter what somebody's hair
8 in the mail room looks like?
9        MS. BROWN:  Object to form.
10        MR. MILLER:  Object to form.
11    Q.  Why does the appearance of somebody in the
12 mail room matter?
13    A.  They're a part --
14        MS. BROWN:  Object --
15
16        (Unreportable cross-talk, followed by
17        reporter interruption.)
18
19    Q.  (BY MS. LEONARD)  Are people in the mail
20 room visible?
21        MS. BROWN:  Object to form.
22        MR. MILLER:  Object to form.
23    A.  Yes.

Page 83

1    Q.  And because of the visibility of the
2 people working in the mail room, is that part of
3 why there are appearance or grooming standards
4 applicable to them?
5        MR. MILLER:  Object to form.
6        She can answer if she can.
7    A.  They're a part of the security force.
8    Q.  That wasn't my question.
9        My question is:  Because of their
10 visibility, is that why their appearance matters?
11        MR. MILLER:  Object to form.
12        MS. BROWN:  Object to form.
13        MR. MILLER:  She can answer.
14        MR. REDMOND:  Same objection.
15    Q.  You can answer.
16    A.  My answer is going to be the same.
17    Q.  Is the security force visible?
18    A.  Yes.
19    Q.  Why do you care what the security force
20 looks like?
21        MS. BROWN:  Object to form.
22        MR. MILLER:  Object to form.
23    A.  Professional appearance.

Page 84

1    Q.  What happened after Ms. Key showed you the
2 photograph in her interview of how she could style
3 her dreads?
4    A.  She showed it to Gloria Robinson.  I don't
5 know if she had actually seen it prior to me and
6 we were looking at it again.  And I said, "Okay.
7 That's fine" and walked out because the
8 understanding was that's the way she would style
9 her hair when she returned to work.
10    Q.  Okay.  You said an agreement was reached.
11 Were you a party to this agreement
12 concerning how Ms. Key would style her hair?
13    A.  Yes.  I was in there when she agreed to do
14 it.
15    Q.  Tell me what you know of that agreement.
16    A.  It was a verbal agreement.  She stated --
17 after I said "Yes, this is acceptable" and she
18 stated that's the way she would have her hair done
19 when she returned.
20    Q.  Okay.  Was Ms. Key visibility pregnant in
21 her interview?
22    A.  I didn't look at her to say -- to notice
23 either way.



Cassandra Williams

Page 93

1       MS. BROWN:  Object to form.
2       Q.   You said "all the time"?
3       A.   Yes.
4       Q.   How about foreign officers?
5       A.   Yes.
6       Q.   Is it important, then, that the appearance
7   of people in the administration building promote
8   the most professional appearance possible?
9       A.   It's important regardless of where they're
10  posted.
11      Q.   But at least for people in the
12  administration building, it's anticipated that
13  they may cross the path of a VIP?
14      MR. MILLER:  Object to form.
15      A.   Yes.  But they could cross the path at
16  other locations as well because the VIPs will
17  visit throughout the facility depending on, I
18  guess, what their visit entails.  But they just
19  all the time are not just in the administrative
20  building and don't go other places.  They may take
21  a tour.  Depending on who the VIP is, they may end
22  up at Gate 2 or even in the security building.
23      Q.   Where did Gloria Robinson keep an office?

Page 94

1       A.   In the security building.
2       Q.   Who made the decision that Ms. Key would
3   no longer be working on HMMA's property?
4       A.   I don't know who made the initial decision
5   with Dynamic.  I know I echoed the decision in an
6   email -- well, also verbally to Gloria and sent an
7   email after.
8       Q.   When you say "echo," that implies
9   something that was said to you before.  Tell me
10  what happened.
11      A.   So her second day of work, the decision
12  was made to reassign her, and I backed that up
13  because I just was not pleased with what was going
14  on with her at the time.
15      Q.   Who made the decision to reassign Ms. Key?
16      A.   I echoed the reassignment.  I don't know
17  whether their intentions were going to be reassign
18  or terminate her.  But the termination, that's on
19  them.  But I asked also that she be removed from
20  site.
21      Q.   To whom did you ask that she be removed?
22      A.   I put it in an email.  I also mentioned it
23  to Gloria Robinson.

Page 95

1       Q.   Which came first, the email or the verbal
2   communication to Gloria Robinson?
3       A.   So Gloria Robinson and I had a
4   conversation after -- at some point after Ms. Key
5   left the office, and it was followed up by an
6   email.
7       Q.   On Ms. Key's second day of work, August 1,
8   did Latunya Howell tell you that Ms. Key felt you
9   and Ms. Robinson were discriminating against her?
10      A.   Yes, she did make that statement.
11      Q.   Tell me about that.
12      A.   So I think, if I remember correctly,
13  Ms. Key had been in the office, and she went back
14  to the mail room.  Latunya Howell called my desk
15  phone and told me that Ms. Key was asking her for
16  an HMMA handbook, asking where she could get an
17  HMMA handbook.  She was talking about the -- I
18  guess the hair policy, the appearance policy.  And
19  I guess at some point she mentioned she felt that
20  she was discriminated against.
21      Q.   After Ms. Howell told you that, what, if
22  anything, did you do?
23      A.   I told Ms. Howell that I was going to

Page 96

1   notify Gloria Robinson and Lieutenant Maurice
2   Chambliss, who was the first shift supervisor, to
3   have her brought over and let Gloria address it.
4       I mentioned it to Gloria, and I told her
5   that -- basically what Ms. Thomas said, that she
6   felt she was being discriminated against and she
7   needed to get ahead of it.
8       Q.   Do you know why Latunya Howell came to you
9   to tell you that Ms. Key was saying that she was
10  feeling she had been discriminated against?
11      MS. BROWN:  Object to the form.
12      MR. MILLER:  Object to the form.
13      MR. REDMOND:  Object to the form.
14      A.   I can't answer why she came to me, no.
15      Q.   When you called Gloria Robinson, did she
16  communicate in any way that she was already aware
17  of Ms. Key's complaint?
18      A.   No.  Because Gloria was sitting in the
19  office at the time.
20      Q.   Do you know why Ms. Howell chose to come
21  to you over Gloria Robinson?
22      A.   I don't know.
23      Q.   There's a handwritten statement that's



Page 97

1  been produced by HEA in this case from Latunya
2  Howell.
3        Do you know whose idea -- like, how did
4  that statement come to be?  And I'll show it to
5  you.  I'm not going to make it an exhibit, but
6  it's HEA 60.
7        MS. BROWN:  Object to form.
8     A.   Personally, I don't know how it came to
9  be.
10    Q.   Do you know who asked Ms. Howell to write
11  that statement?
12    A.   I don't know who asked her to write it.
13    Q.   Do you know why that statement was
14  created?
15    A.   To say with certainty why it was created,
16  I -- I don't know.
17    Q.   How did that statement come to be in HEA's
18  possession?  Because I'll represent to you this is
19  a document HEA gave to us in this lawsuit, and so
20  I'm trying to find out how did HEA come to have
21  it.
22    A.   It was probably -- I -- it was probably
23  given -- a copy motive may have been given to me

Page 98

1  in a package.  I don't know.  I don't recall at
2  this point.
3     Q.   Okay.  When you say it was given to you in
4  a package, do you -- what sort of package would
5  you have received that contained that statement?
6     A.   So if Gloria did a statement, if Chambliss
7  did a statement, which I don't know that they --
8  that he did, I would have received this.
9     Q.   Okay.
10        MR. MILLER:  Do you know, or are you
11  guessing?
12        THE WITNESS:  I'm guessing.  And I know I
13  shouldn't guess so -- I'm guessing.
14    Q.   Okay.  And look, "I don't know" and "I
15  don't recall" are perfectly acceptable answers.  A
16  lot of times I'm asking questions to find out if
17  the answer exists.  And if you don't know, that's
18  why we talk to other people.
19    A.   Okay.
20    Q.   So don't feel like you -- if you don't
21  know, don't feel like you've got to stretch to
22  give me that answer.
23        I'm just trying to figure out if this was

Page 99

1  something that like -- if HEA was responding and
2  saying "We're doing an investigation today" and
3  that's how this came out to be or if it was
4  something that Dynamic chose to do.  If you know.
5     A.   Okay.  I didn't request it on HEA's part.
6     Q.   Okay.  The conversation that you mentioned
7  that you had with Gloria Robinson about where it
8  was determined that Ms. Key would need to be
9  reassigned, was that before or after Ms. Howell
10  let you know that Ms. Key had complained of
11  discrimination?
12    A.   It was after.
13    Q.   How long did that conversation with
14  Ms. Robinson last?
15        MR. REDMOND:  Object to form.
16    A.   I have no idea.
17    Q.   Okay.  Have you told me everything that
18  you remember about that conversation?
19    A.   With Gloria?
20    Q.   Yes.
21    A.   I basically discussed with her all of the
22  issues that we had encountered since Ms. Key came
23  in on the 31st.  Just revisited those issues.

Page 100

1     Q.   All right.  I'm going to show you what's
2  been previously marked as Plaintiff's Exhibit 41,
3  which is Dynamic 85 through 87.
4        MR. REDMOND:  What number is that?
5        MS. LEONARD:  It was 41.
6        MR. REDMOND:  Okay.
7     A.   Okay.
8        MR. MILLER:  Take your time and look at
9  it.
10    Q.   Have you seen this email chain before?
11    A.   Yes.
12    Q.   I want to look at the email on the first
13  page of the exhibit, which is on Bates number 85.
14  It appears to be an email from you to Gloria
15  Robinson dated Tuesday, August 1, 2017, 8:50 a.m.
16       Is this the email that you referenced
17  where you confirmed the conversation that you had
18  with her about reassigning Ms. Key?
19        MR. MILLER:  Object to form.
20        MR. REDMOND:  Same objection to form.
21    A.   Yes.
22    Q.   All right.
23        MS. BROWN:  Object to form.



Page 101

1    Q.   Who were you -- why were you sending this
2    email?
3        A.   I was asked by someone to submit the
4    email.
5        Q.   Do you remember who that was?
6        A.   I don't know exactly.
7        Q.   What was your intent in sending this email
8    to Gloria Robinson, Ray Cureton, and Chris
9    Hargrove?
10       A.   When Gloria and I discussed Ms. Key and,
11   like I said, we echoed -- I echoed her decision to
12   remove her from the site, I was asked to send an
13   email to them, which is not something uncommon,
14   that I had done in the past.
15       Q.   When did you first learn Ms. Key was
16   pregnant?
17           MR. MILLER:  I'm going to object to
18   questions regarding pregnancy because that is not
19   a claim against HEA.  And if you'll agree to let
20   me have a standing objections on those questions,
21   I won't continue to interrupt you.
22           MS. LEONARD:  That's fine.
23           MR. MILLER:  Okay.

Page 102

1        Q.   (BY MS. LEONARD) When did you first learn
2    Ms. Key was pregnant?
3        A.   I believe the day before the 31st.
4        Q.   Okay.  When you wrote in your email about
5    Ms. Key "I foresee an issue down the road with
6    this person," what issue did you foresee down the
7    road?
8        A.   The compliance with her hair issue and
9    being able to be properly trained in the mail
10   room.
11       Q.   What was the issue with training?
12       A.   She was being difficult.
13       Q.   What was she being difficult about?  How
14   was she being difficult?
15       A.   As reported to me, instead of cooperating,
16   trying to learn what is being taught her, she was
17   continuously questioning Ms. Howell about HMMA's
18   handbook, speaking of her hair, and then also
19   questioning her about why she had reported that --
20   she had mentioned that she was being discriminated
21   against.
22       Q.   And what was the issue you foresaw down
23   the road with compliance with her hair?

Page 103

1        A.   Well, she had not complained in the two or
2    three weeks that -- following her interview, she
3    did not comply -- was not in compliance when she
4    arrived to work on the 31st and, of course, she
5    was not in compliance on the 1st.
6        Q.   Weren't you willing to look past that?
7        A.   I was.
8        Q.   What made you not -- what made you stop
9    being willing to look past that?
10       A.   Because I felt she had no intentions of
11   changing her hair and also her -- just the way she
12   was behaving -- well, I was told she was behaving
13   in the mail room.
14       Q.   Who told you how she was behaving?
15       A.   Ms. Howell.
16       Q.   And what did she say that -- what did
17   Ms. Howell tell you about the way she was behaving
18   in the mail room that made you unwilling to look
19   past?
20       A.   That she was not cooperating, not
21   listening, not trying to listen or learn anything.
22   And Ms. Howell stated that she was not going to
23   train her.

Page 104

1        Q.   Why did you say that you felt Ms. Key had
2    no intent on changing her hair?  Did you ask her?
3        A.   No, I didn't ask her.  But she had had
4    every opportunity to change it.
5        Q.   Do you know if she had an appointment that
6    she had set coming up to have her hair styled?
7        A.   Do I personally know?
8        Q.   Yeah.
9        A.   No.
10       Q.   When you said "Rather than let it fester,
11   I'm asking that she be moved to another site,"
12   what other site were your referring to?
13       A.   I didn't have one in mind.  I don't know
14   all of their sites.
15       Q.   When we look at this, is your email
16   address CWilliams@HMMAUSA.com?
17       A.   At the time it was.
18       Q.   Is that still your email address?
19       A.   There's some variations in it.  It changed
20   maybe about a month ago or less.
21       Q.   When we had Ms. Key's deposition, there
22   was an email that was taped up on the door that
23   looked like from you where you still using that



Page 105

1  email address.
2      **What is your current email address?**
3      A.  Cassandra.Williams.CTR@HEA -- I'm sorry.
4  I'm sorry.
5      **Q.  That's okay.**
6      A.  Let's do this again because it's still new
7  to me.
8      **Q.  Take your time.**
9      A.  Cassandra.Williams.CTR.HEA@HMMAUSA.com.
10     **Q.  Why did your email address change?**
11     A.  It was changed --
12        MS. BROWN:  Object to form.
13     A.  I -- I don't know.  I honestly don't know.
14  It was changed by HMMA.  All contractors that have
15  an email address on site, their emails have
16  changed -- are being changed.
17     **Q.  But at least from 2010, when you started**
18  **working for HEA, through sometime in July or**
19  **August of 2022, your email address was**
20  **CWilliams@HMMAUSA.com?**
21        MS. BROWN:  Object to form.
22     A.  Correct.
23     **Q.  And who issued you that email address?**

Page 106

1        MS. BROWN:  Object to form.
2      A.  The IT department.
3      **Q.  And would that HMMA's IT department?**
4      A.  It's Hyundai AutoEver America IT
5  department.
6      **Q.  Okay.  Were there any rules or guidelines**
7  **that applied to the way you could use that email**
8  **address?**
9        MR. MILLER:  Object to form.
10     A.  Not that I'm aware.  I don't know.
11     **Q.  Do you know why you did not have an HEA**
12  **email address but rather had an HMMAUSA.com email**
13  **address?**
14        MS. BROWN:  Object to form.
15        MR. MILLER:  Object to form.
16     A.  I was not -- so when HEA, which was Amco
17  at the time when they first started.  I had an
18  HMMA email address.  When I started working for
19  Amco, I was not assigned an H- -- or Amco email
20  address/HEA email address because I already had
21  one.  When I say "had one," I meant I had an HMMA
22  email address.
23     **Q.  Who set up your signature for your**

Page 107

1  **HMMAUSA.com email address?**
2      A.  I did.
3      **Q.  If we look in that signature line, we see**
4  **the "Team Built, Team Strong" logo.**
5        **What does it say below that?**
6      A.  My signature?
7      **Q.  Yes, ma'am.**
8      A.  "Cassandra Williams, manager of security
9  services."  Is that what you're referencing?
10     **Q.  Next to that we see a logo that says "Team**
11  **Built, Team Strong."**
12     A.  Yes, I put that in there.
13     **Q.  Okay.**
14     A.  I mean, it was their logo, and I put it
15  there.
16     **Q.  And that's an HMMA-used logo; correct?**
17     A.  It was at the time, team -- the team -- I
18  mean not -- in 2010 it was not.  But I think at
19  some point I believe the "Team Built, Team Strong"
20  came about.
21     **Q.  But it says -- but the words below "Team**
22  **Built, Team Strong" says "Hyundai Motor**
23  **Manufacturing Alabama"?**

Page 108

1      A.  Next to it?
2      **Q.  Or below it.**
3        MR. MILLER:  If you can read it.  It's
4  really small.
5      A.  I can't read it.  I don't know if I can
6  read it with a magnifying glass.
7      **Q.  Do you remember where you got the "Team**
8  **Built, Team Strong" logo?**
9      A.  I'm pretty sure I got it off another
10  email.
11     **Q.  Is that something you got from HMMA?**
12        MS. BROWN:  Object to form.
13     A.  It would have been off an email -- an HMMA
14  email.
15     **Q.  Okay.  Were there any guidelines or**
16  **instructions from HMMA as to what you could or**
17  **could not have in your signature line?**
18     A.  If there was, it wasn't shared with me.
19     **Q.  Okay.  And in your signature line, we see**
20  **below your name, it says "Manager of security**
21  **services" and then it says "Hyundai Engineering**
22  **America, Inc.," and then below that "Hyundai Motor**
23  **Manufacturing Alabama LLC."**



Page 109

1      What do those words mean?  Why are those
2  companies in your signature line?
3      MS. BROWN:  Object to form.
4  A.  Well, of course, Hyundai Engineering
5  America, Inc., is my employer.  Hyundai Motor
6  Manufacturing Alabama is where my assignment is.
7  Q.  Why would you put the Hyundai Motor
8  Manufacturing Alabama, LLC, in your signature
9  line?
10     MS. BROWN:  Object to form.
11 A.  Because it's where my assignment is.
12 Q.  Did anyone tell you to put in there where
13 your assignment was?
14 A.  No.  I chose to do it.
15 Q.  Did anyone tell you to use the "Team
16 Built, Team Strong" HMMA logo --
17 A.  No.
18 Q.  -- in your signature?
19 A.  That was my decision.
20 Q.  Did you have any concerns that using that
21 logo or identifying the place of your assignment
22 would give the appearance that you were working
23 for HMMA?

Page 110

1      MS. BROWN:  Object to the form.
2      MR. MILLER:  Object to the form.
3  A.  No.  Because it clearly states under my
4  signature who my employer is.
5  Q.  Does it clarify that Hyundai Motor
6  Manufacturing Alabama, LLC, is not your employer?
7      MS. BROWN:  Object to form.
8      MR. MILLER:  Object to the form.
9  A.  It doesn't.
10 Q.  How in reading that would somebody infer
11 that Hyundai Motor Manufacturing Alabama, LLC, was
12 not your employer?
13     MS. BROWN:  Object to the form.
14     MR. MILLER:  Object to the form.
15 A.  I can only answer to my thinking.  I don't
16 know what anybody would think.  But being that
17 Hyundai Engineering was the first name, I would
18 look at it as that's who the employer is.
19 Q.  Would you agree to the fact that your
20 email address is your name @HMMAUSA.com could
21 leave someone to believe that you work for HMMA?
22     MS. BROWN:  Object to the form.
23     MR. MILLER:  Object to the form.

Page 111

1  A.  I can't speak to someone's state of mind.
2  Q.  Would you agree that using the logo in
3  your signature line that says "Hyundai Motor
4  Manufacturing of Alabama" could leave the
5  impression that you worked for HMMA?
6      MR. MILLER:  Object to the form.
7      MS. BROWN:  Object to the form.
8  A.  I can't speak to their state of mind.
9  Q.  Has anyone instructed you that you should
10 remove the Hyundai logo -- or the HMMA logo or the
11 word "Hyundai Motor Manufacturing Alabama, LLC"
12 from your signature line?
13     MS. BROWN:  Object to the form.
14 A.  At that time or since?
15 Q.  Since.
16 A.  Yes.  All contractors have been instructed
17 to remove it.
18 Q.  And where did that instruction come from?
19 A.  My instruction came from general affairs.
20 I don't know -- each department, whomever the
21 contractor supported, it would come from them.
22 But since I support general affairs, that's where
23 my instruction came.

Page 112

1  Q.  Do you know if the instruction to remove
2  those things from your signature line had anything
3  to do with this lawsuit?
4      MS. BROWN:  Object to form.
5  A.  I don't know.
6  Q.  Okay.  After you sent the email on
7  August 1, 2017, about Ms. Key saying that she is
8  absolutely not going to work out, what happened
9  next, if anything, as it relates to Ms. Key
10 performing work at HMMA?
11     MS. BROWN:  Object to the form.
12     MR. MILLER:  Object to the form.
13 A.  I was told by Gloria that she was being
14 sent to the office.
15 Q.  When you say "sent to the office," do you
16 mean the Dynamic office?
17 A.  Yes, Dynamic.  Sorry.
18 Q.  That's okay.  There are a lot of offices.
19 Just got to make -- see which one -- where people
20 are going.
21     Did Ms. Key perform any work at HMMA after
22 August 1, 2017?
23 A.  None that I'm aware of.



Page 117

1  agreement to provide security at Mobis?
2  A.  No.
3  Q.  Does HMMA have -- does HEA have a contract
4  or a service agreement to provide security
5  services at Glovis?
6  A.  Which -- well, both Glovises, yes.
7  Q.  Are the hair standards for Glovis the same
8  as they are at HMMA?
9  A.  They are because we use the same manpower.
10  Q.  Okay.  Did Glovis have any input into
11  those hair standards?
12  A.  No.
13  Q.  In this email at the end Mr. Cureton
14  writes to Ms. Spires, "FYI, I also included a copy
15  of Ms. Key's original complaint where she makes a
16  formal complaint of discrimination against HMMA,
17  Ms. Williams, and Ms. Robinson."
18      Did anybody from Dynamic contact you in an
19  effort to investigate Ms. Key's original complaint
20  or formal complaint?
21  A.  No.
22  Q.  Are you aware of Dynamic doing anything to
23  investigate Ms. Key's complaint or formal

Page 118

1  complaint that she made against HMMA, you, and
2  Ms. Robinson?
3  A.  I'm not aware.
4  Q.  Under the terms of any agreement between
5  Dynamic and HEA, is that something Dynamic should
6  have reported?
7      MR. REDMOND:  Object to form.
8      MR. MILLER:  Object to form.
9  A.  Should have reported to HEA?
10  Q.  Yes, ma'am.
11  A.  That they were following up on her
12  complaint?
13  Q.  Correct.  In other words, if Ms. Key is
14  making a complaint that you and an HEA employee
15  have done something that she felt was
16  discriminatory, is that something Dynamic should
17  have reported to HEA?
18      MR. MILLER:  Object to form.
19  A.  Since it involved me, I would say so.
20  Q.  Did you hear from anybody at HEA who might
21  have been in a supervisory role over you that
22  Ms. Key had filed a formal complaint of
23  discrimination based on things you may have done?

Page 119

1      MR. MILLER:  Object to form.
2      MR. REDMOND:  Same objection.
3  A.  So the complaint that I received from
4  Chris Whitehead I forwarded to my supervisor in
5  our California office.
6  Q.  What complaint did you get from Chris
7  Whitehead?
8  A.  The EEO- -- a copy of the EEOC.
9      MR. MILLER:  The one against HMMA?
10      THE WITNESS:  The one against HMMA, yes.
11
12      (Whereupon, Plaintiff's Exhibit 67 was
13      marked for identification and copy of
14      same is attached hereto.)
15
16  Q.  I'm going to show you what I'm marking as
17  Exhibit 67, which is Dynamic Key 3280 to 3282.
18      MS. LEONARD:  Matt, I'm giving you three.
19  If you can take one and pass the others down.
20  Q.  Have you seen this email chain before?
21  A.  Yes.
22  Q.  And this appears to be an exchange between
23  you, Sherry Spires, and Malinda Williams; correct?

Page 120

1  A.  Correct.
2  Q.  Who is Malinda Williams?
3  A.  Malinda Williams was the person that took
4  over Gloria Robinson's position.
5  Q.  So she's somebody who worked for Dynamic
6  Security?
7  A.  Yes.
8  Q.  Do you know why she has an @HMMAUSA.com
9  email address?
10      MS. BROWN:  Object to form.
11  A.  She was a security person.  She was
12  assigned that email address once she became a
13  supervisor, which she was a supervisor prior to
14  taking Gloria Robinson's position.
15  Q.  Okay.  If we look at the last page of this
16  email -- because, you know, email chains tend to
17  go backwards in chronological order, so we're
18  going to start with the earliest email.  On
19  page 3282 we see an email from you to Tracy
20  Peoples and Sherry Spires.
21      Who is Tracy Peoples?
22  A.  So Tracy was -- and I'm not sure what
23  his -- at this point what his position was.  But



ALABAMA
COURT REPORTING

Page 149

1    Q.  And so when you talked about him reporting
2  to various HMMA offices, you were talking about
3  contractual reports he needed to give, early in
4  your deposition?
5    A.  Yes.  Any information or whatever related
6  to the contracts that HEA manage.
7    Q.  To your knowledge does HMMA drug screen
8  Dynamic's employees?
9    A.  Dynamic drug screens their own employees.
10   Q.  Okay.  You mentioned earlier that
11  Dynamic's employees would be subject to HMMA's
12  drug policies, and I wanted to clarify that HMMA
13  has no role in drug screening their employee.
14   A.  It depends.  So for preemployment home has
15  no role in it.  If there's an accident on site,
16  they are -- as with all other contractors, are
17  taken to the clinic and drug screened.  That's a
18  part of the requirement.
19   Q.  Okay.  The policies you identified as
20  applying to contractor employees, would you agree
21  that they're all ultimately part of safe property
22  management?
23      MS. LEONARD:  Object to form.

Page 150

1    A.  All of the --
2    Q.  Those HMMA policies that apply to
3  contractors, that they're all ultimately safe
4  property management?
5      MS. LEONARD:  Object to form.
6    A.  They are.
7    Q.  You testified that you expanded the hours
8  of operation of the mail room and that you
9  informed HMMA of that.
10      Did you do that because the expansion of
11  the hours of the mail room would result in
12  additional billing to HMMA?
13   A.  Additional billing?
14   Q.  Right.
15   A.  Oh, no.  No.
16   Q.  Okay.  It was just your decision to change
17  the mail room hours?
18   A.  Well, just based on feedback I was getting
19  from HMMA team members as related -- them trying
20  to send mail, send packages.  And there were times
21  that HMMA's finance department was late getting
22  out payroll checks or the W-2s, and it would
23  require the mail room staff to stay past their

Page 151

1  normal hours.  So just the various feedback, it
2  was just best that we modified it, yes.
3    Q.  You changed the hours?
4    A.  Yes.
5      MS. BROWN:  All right.  I don't have any
6  further questions.
7      MS. LEONARD:  Do you have any, Matt?
8      MR. MILLER:  I don't have any.
9      MS. LEONARD:  I just have a few
10  follow-ups.
11
12           REEXAMINATION
13  BY MS. LEONARD:
14   Q.  In response to Mr. Redmond's question, you
15  mentioned that Ms. Robinson had expressed some
16  dissatisfaction with Ms. Key on July 31st.
17      Do you know when Gloria Robinson learned
18  that Ms. Key was pregnant?
19      MS. BROWN:  Object to form.
20      MR. REDMOND:  Object to form.
21      MR. MILLER:  Object to form.
22   A.  She told me she learned on the 31st.
23   Q.  Okay.  At the time that Ms. Robinson

Page 152

1  expressed to you on the 31st that she didn't think
2  Ms. Key would work out, do you know if at that
3  time Ms. Robinson knew Ms. Key was pregnant?
4      MR. REDMOND:  Object to form.
5      MR. MILLER:  Object to the form.
6      MS. BROWN:  Object to the form.
7    A.  She did.
8    Q.  Did Ms. Robinson express any frustration
9  or anything that would lead you to conclude she
10  was upset that Ms. Key had not told her that she
11  was pregnant before she was hired?
12      MS. BROWN:  Object to the form.
13      MR. MILLER:  Object to the form.
14      MR. REDMOND:  Same objection.
15   A.  Repeat.
16   Q.  Sure.  Did Ms. Robinson express anything
17  to you that led you to conclude Ms. Robinson was
18  unhappy that Ms. Key had not disclosed her
19  pregnancy prior to being hired?
20      MS. BROWN:  Object to the form.
21      MR. MILLER:  Object to the form.
22      MR. REDMOND:  Same objection.
23   A.  Just her concern is all.



Page 153

1    Q.  And what was her concern?

2    A.  That she wasn't told, and she was
3  concerned that -- whether she would be able to
4  lift packages and deliver the mail in her stated
5  condition.

6    Q.  Do you know if there have ever been
7  pregnant employees who worked in the mail room?

8    A.  Prior or since?

9    Q.  Prior to Ms. Key.

10   A.  Not in with the security.  And I can't say
11  with 100 percent accuracy, but I -- so one of the
12  team members -- HMMA team members that was
13  assigned to the mail room -- I just can't remember
14  whether she was pregnant during that time or after
15  it got turned over to security.

16   Q.  Okay.  Since Ms. Key, has there been
17  anybody that was pregnant that's worked in the
18  mail room?

19   A.  Yes.

20   Q.  And who employed them?

21   A.  IPSC for one young lady.  And the current
22  person -- let me see.  The current person is
23  employed with DSI, but I just -- I can't

Page 154

1  remember -- I believe she was with -- well, I know
2  for a fact she was IPSC when we learned she was
3  pregnant.  And then the contract was awarded to
4  DSI, so, of course, she transferred over.

5    Q.  And that's actually a good point.  I was
6  going to ask -- you know, Dynamic is -- no longer
7  holds the contract to provide security out there.

8    When the new company came in, did they
9  continue the employment of the people from Dynamic
10  who had been working out there?  Like, did they
11  transfer over to the new company?

12   A.  "Transfer" wasn't a good word.  Hired on.
13  Those that we wanted them to maintain, yes, and
14  those that wanted to stay.

15   Q.  And so I guess where I'm going is, you
16  know, if Ms. Key had not been removed from her
17  assignment and continued, when Dynamic stopped
18  being out at HMMA, would she have had the ability
19  to apply for continued employment with whoever got
20  the contract after Dynamic?

21   MR. MILLER:  Object to the form.

22   MS. BROWN:  Object to the form.

23   MR. REDMOND:  Same objection.

Page 155

1    A.  If she chose to.  If she chose to.

2    Q.  Were there any people that weren't carried
3  over that applied after Dynamic lost the contract?

4    MS. BROWN:  Object to form.

5    A.  Yes.  But I can't say who.

6    Q.  Okay.  In response to Ms. Brown's question
7  about the declaration that you signed, which would
8  have been Plaintiff's Exhibit 69.  It uses the
9  word "employed."  In paragraph one it says, "I am
10  currently employed with Hyundai Engineering
11  America.  I was also employed with Hyundai
12  Engineering America, Inc., in July and August of
13  2017."  In paragraph two it reads, "I am not now
14  nor have I ever been employed by Hyundai Motor
15  Manufacturing Alabama, LLC."

16   What did you understand the word
17  "employed" to mean as it was used in those two
18  photographs?

19   MS. BROWN:  Object to form.

20   A.  A direct employee for HMMA.

21   Q.  And what does that mean to be a direct
22  employee?

23   MS. BROWN:  Object to form.

Page 156

1    A.  That I am their employee.  They sign my
2  paycheck or pay me.  I receive benefits.

3    MS. LEONARD:  That is all that I have.

4    MR. REDMOND:  I just have one or two.

5

6         REEXAMINATION

7  BY MR. REDMOND:

8    Q.  Can you recall anything more specific that
9  Ms. Robinson said about Ms. Key's pregnancy other
10  than generally that she was concerned about her
11  ability to do the lifting in the mail room?

12   A.  That's basically it.

13   MR. REDMOND:  Okay.  Thank you.  That's
14  all I've got.

15   MS. LEONARD:  Nothing further from me.  We
16  are done.

17

18   (At which time, the deposition concluded
19   at approximately 12:51 p.m., Central.)

20

21

22

23



Page 157

C E R T I F I C A T E

1
2
3   STATE OF ALABAMA
4   AT LARGE
5
6          I hereby certify that the above and
     foregoing deposition of Cassandra Williams was
7    taken down by me in stenotype and the questions
     and answers thereto were transcribed by means of
8    computer-aided transcription; transcribed by me or
     overseen by me, and that the foregoing represents
9    a true and correct transcript of the testimony
     given by said witness upon said hearing.
10          I further certify that I am neither of
     counsel, nor of kin to the parties to the action,
11   nor am I in anywise interested in the result of
     said cause.
12
13          I further certify that I am duly licensed
     by the Alabama Board of Court Reporting as a
14   Certified Court Reporter as evidenced by the ACCR
     number following my name found below.
15          So certified on this date, September 20,
     2023.
16
17
18
19
20
          /s/ Jordan C. Groves, CCR
21          Jordan C. Groves, CCR
          ACCR #642, Expires 9/30/2022
22          Commissioner for the State
          Of Alabama at Large
23          My Commission Expires 3/19/2023



Page 1

1  IN THE UNITED STATES DISTRICT COURT FOR
2      THE MIDDLE DISTRICT OF ALABAMA
3          NORTHERN DIVISION
4          2:19-CV-767-ECM-SMD
5
6  DAVITA KEY,
7      Plaintiff,
8  v.
9  HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC,
10 HYUNDAI ENGINEERING AMERICA, INC., DYNAMIC
11 SECURITY, INC.,
12     Defendants.
13
14
15     DEPOSITION OF SHERRY SPIERS
16        AUGUST 19, 2022
17           3:00 p.m.
18
19
20
21
22 COURT REPORTER:
23 Lindsey Seals

Page 2

1      S T I P U L A T I O N S
2      IT IS STIPULATED AND AGREED by and
3  between the parties through their respective
4  counsel that the deposition of SHERRY SPIERS,
5  may be taken before Lindsey Seals, Notary
6  Public, State of Alabama at large, at the law
7  offices of Palmer Law, LLC, Birmingham,
8  Alabama, on August 19, 2022, commencing at
9  approximately 3:00 p.m.
10
11     IT IS FURTHER STIPULATED AND AGREED that
12 the signature to and the reading of the
13 deposition by the witness is not waived, the
14 deposition to have the same force and effect as
15 if full compliance had been had with all laws
16 and rules of Court relating to the taking of
17 depositions.
18
19     IT IS FURTHER STIPULATED AND AGREED that
20 it shall not be necessary for any objections to
21 be made by counsel to any questions, except as
22 to form or leading questions and that counsel
23 for the parties may make objections and assign

Page 3

1  grounds at the time of trial or at the time
2  said deposition is offered in evidence, or
3  prior thereto.
4
5      IT IS FURTHER STIPULATED AND AGREED
6  that notice of filing of the deposition by the
7  Commissioner is waived.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1          I N D E X
2      EXAMINATION INDEX
3              PAGE
4  EXAMINATION OF SHERRY SPIERS
5      BY MS. PALMER          8
6      BY MS. BROWN          75
7      BY MR. REDMOND          81
8      FURTHER BY MS. PALMER      84
9
10        EXHIBIT INDEX
11 PLAINTIFF'S          PAGE
12 Exhibit 26          11
13 Exhibit 28          44
14 Exhibit 33          49
15 Exhibit 34          51
16 Exhibit 35          52
17 Exhibit 36          21
18 Exhibit 37          56
19 Exhibit 38          31
20 Exhibit 39          23
21 Exhibit 40          35
22 Exhibit 41          41
23 Exhibit 42          65

Sherry Spiers                                                    8/19/2022
                                                                2 (5 - 8)

| | Page 5 |
|---|---|
| 1 | Exhibit 45          60 |
| 2 | Exhibit 46          64 |
| 3 | Exhibit 50          69 |
| 4 | Exhibit 51          72 |
| 5 | Exhibit 59          62 |

**Page 7**

1  APPEARING ON BEHALF OF HYUNDAI ENG AMERICA,
   INC:
2
3      T. Matthew Miller
       Attorney at Law
       Bradley, Arant, Boult, Cummings, LLP
4      1819 Fifth Avenue North
       Birmingham, AL  35203
5      E-mail: Mmiller@bradley.com

**Page 6**

1          A P P E A R A N C E S

2

3  APPEARING ON BEHALF OF THE PLAINTIFF:

4      Leslie A. Palmer
       Attorney at Law
5      Palmer Law, LLC
       104 23rd Street South, Suite 100
6      Birmingham, AL  35233
       E-mail: Leslie@palmerlegalservices.com
7

8  APPEARING ON BEHALF OF THE PLAINTIFF:

9      Heather Newsom Leonard
       Attorney at Law
10     Heather Leonard, P.C.
       2105 Devereux Circle, Suite 111
11     Birmingham, AL  35243
       E-mail: Heather@HeatherLeonardPC.com
12

13  APPEARING ON BEHALF OF DYNAMIC SECURITY, INC:

14     Wesley C. Redmond
       Attorney at Law
15     Ford, Harrison, LLC
       420 20th Street North, Suite 2560
16     Birmingham, AL  35203
       E-mail: Wredmond@fordharrison.com
17

18  APPEARING ON BEHALF OF HYUNDAI MOTOR
    MANUFACTURING ALABAMA, LLC:
19
       Whitney R. Brown
20     Attorney at Law
       Lehr, Middlebrooks, Vreeland
21     & Thompson, PC
       PO Box 11945
22     Birmingham, AL  35202
       E-mail: Wbrown@lehrmiddlebrooks.com
23

**Page 8**

1          I, Lindsey Seals, a Notary Public for

2  the State of Alabama at Large, acting as

3  Commissioner, certify that on this date,

4  pursuant to the Federal Rules of Civil

5  Procedure, and the foregoing stipulation of

6  counsel, there came before me at the law

7  offices of Palmer Law, LLC, Birmingham,

8  Alabama, commencing at approximately 3:00 p.m.

9  on August 19, 2022, SHERRY SPIERS, witness in

10  the above cause, for oral examination,

11  whereupon the following proceedings were had:

12          THE COURT REPORTER:  Usual

13  stipulations?

14          MR. REDMOND:  She would like to read

15  and sign, yes.

16          SHERRY SPIERS

17  being first duly sworn, was examined

18      and testified as follows:

19          EXAMINATION

20  BY MS. PALMER:

21      Q.   Ms. Spires, could you please state

22  and spell your name for the record?

23      A.   Sherry Spires, S-H-E-R-R-Y,

Sherry Spiers

Page 17

1  make with regard to Davita Key?
2      MS. BROWN:  Object to the form.
3      MR. REDMOND:  Same objection.
4      MR. MILLER:  Object to the form.
5  Q.   You can answer.
6  A.   That's throwing me off.  Rephrase the
7  question.
8  Q.   So you said that you had
9  communications with Ray to make sure that
10 everything was handled appropriately.
11     What determination did you make with
12 regard to Ms. Key as to whether everything was
13 handled appropriately?
14 A.   Her first complaint was that we had
15 discriminated because of her hair.  And I
16 remember telling or communicating with Ray,
17 probably via e-mail, that let's make sure that
18 we're abiding by Hyundai's policy as well.
19     Because different races, religions
20 have different standards sometimes with the
21 hair accessories, so it might be different from
22 one job site to another.  So I told him that
23 let's make sure that her hair style was not in

Page 18

1  line with what Hyundai's policy was.
2  Q.   Okay.  And what did you do to make
3  sure that Dynamic was following Hyundai's
4  policy?
5  A.   What did I do --
6      MS. BROWN:  Object to the form.
7  A.   -- I'm not sure I did exactly
8  anything because at some point during that time
9  frame, there was an e-mail from Cassandra
10 Williams and/or Gloria Robinson that said they
11 wanted Ms. Key removed from that job site.
12 Q.   Okay.  So did Dynamic then remove her
13 in response to that e-mail?
14 A.   Yes.
15 Q.   Did you direct Ray Cureton, or did
16 you personally request a copy of the Hyundai
17 policy that Ms. Key was alleged to have
18 violated?
19     MS. BROWN:  Object to the form.
20     MR. MILLER:  Object to the form.
21 A.   Not that I recall.
22 Q.   Who else would have been aware of
23 Ms. Key's complaint contained in Exhibit 29?

Page 19

1      MR. REDMOND:  Object to form.
2      MS. BROWN:  Object to form.
3  Q.   Who employed with Dynamic Security
4  would have received a copy of Exhibit 29?
5  A.   I don't know of anyone other than
6  myself, Ray Cureton, Cassandra Williams, and
7  Gloria Robinson.
8  Q.   And do you have any knowledge as to
9  what Ray Cureton would have done to investigate
10 the complaint?
11 A.   He would have communicated with me.
12 Q.   What direction did you give him with
13 regard to the investigation?
14 A.   There was such a short time frame
15 because she was only there a couple of days.
16 And it was determined at the -- on the second
17 day that they -- I guess it was the second day
18 that they were going -- she was not going to
19 work out at Hyundai and to remove her from the
20 job site.
21 Q.   What's your understanding as to why
22 she wasn't going to work out at Hyundai?
23     MS. BROWN:  Object to form.

Page 20

1  A.   Because she refused to follow their
2  grooming policy.
3  Q.   Do you have any knowledge as to
4  whether they were concerned about her
5  pregnancy?
6      MS. BROWN:  Object to form.
7      MR. MILLER:  Object to form.
8  A.   I don't know.  I know that she made
9  it known that she was pregnant, but the action
10 that was taken to remove her from her job site
11 had nothing to do with her pregnancy.
12 Q.   How did the investigation into the
13 complaint contained in Exhibit 29 conclude?
14 A.   We're still talking about this
15 (indicating)?
16 Q.   Yes.  Exhibit 29.
17 A.   It concluded that she was going to be
18 removed from the job site.
19 Q.   And what did Dynamic Security do with
20 Ms. Key after she was removed from the Hyundai
21 job site?
22 A.   They offered her two other job sites.
23 Q.   I'm going to show you Exhibit 36.

Page 21

1    (Whereupon, Plaintiff's Exhibit 36

2    was marked for identification and

3    copy of same is attached hereto.)

4    Q.    Do you recognize Exhibit 36?

5    **A.    Yes.**

6    Q.    Okay.  And what do you recognize that

7  document to be?

8    **A.    It is -- it's entitled employee**

9  **disciplinary report, and it's signed by Ray**

10 **Cureton.  And under details, it has removal**

11 **from HMMA site.**

12   Q.    Okay.  And is this the form that

13 Dynamic Security would complete after requested

14 to remove an employee from the Hyundai site?

15   MS. BROWN:  Object to form.

16   MR. MILLER:  Object to the form.

17   **A.    It was put on a wrong form.  This**

18 **would not have been the correct form, but these**

19 **are used for disciplinary actions.**

20   **But what Ray did do was put removal**

21 **from job site.  That's not a disciplinary**

22 **action, so he actually did not use the correct**

23 **form.**

Page 22

1    Q.    What would the correct form have

2  looked like?

3    **A.    I don't think we have an actual form,**

4  **removal from job site.  It would have just been**

5  **done in a standard memo to file probably.**

6    Q.    Does that removal happen a lot?  Does

7  Dynamic often remove employees from job sites?

8    MR. REDMOND:  Object to form.

9    **A.    I'm sure we do, but I don't know.  I**

10 **can't pull any that I know for a fact that we**

11 **do.**

12   Q.    Can you recall any other employees

13 that were removed specifically from the Hyundai

14 job site?

15   MS. BROWN:  Object to the form.

16   **A.    I don't remember any.**

17   Q.    Exhibit 36 says on the bottom,

18 "Forwarded to HR;" do you see that?

19   **A.    Okay.  We're still looking at this?**

20   Q.    Yes.  Is that you?  Forwarded to HR,

21 would you be considered HR?

22   **A.    Yes.**

23   Q.    Okay.  And is the date on the bottom

Page 23

1  of that document when you would have received

2  that?

3    **A.    I don't know.  I don't know if he**

4  **would have sent it on August 1 or if he would**

5  **have sent it later when I might have requested**

6  **it.**

7    Q.    Okay.  And it says, "Forwarded for

8  resolution."  Who would have decided the

9  resolution?

10   **A.    In some cases I decide resolutions,**

11 **but in this case, it had already been resolved.**

12   Q.    I'm going to show you Exhibit 39.

13   (Whereupon, Plaintiff's Exhibit 39

14   was marked for identification and

15   copy of same is attached hereto.)

16   Q.    And I know that's really small print.

17 I'm sorry.  All right, 39 is, on the reference,

18 what we call Bates labels.

19   If you'll look on the bottom corner,

20 you'll see it says Dynamic dash Key and then a

21 series of numbers.  That's so we can identify

22 the document for the record since sometimes

23 they go more than one page.

Page 24

1    So this document, which is Exhibit

2  Number 39, is Bates labeled 78, 79, 80 and 81.

3  Do you recognize this document?

4    **A.    Yes.**

5    Q.    Okay.  And what do you recognize it

6  to be?

7    **A.    It's the e-mail that originated from**

8  **Gloria Robinson, who was the account manager.**

9  **Dynamic Security's account manager at Hyundai.**

10 **It was sent to Chris Hargrove with Dynamic, Ray**

11 **Cureton with Dynamic, and Cassandra Williams**

12 **with Hyundai.**

13   Q.    Okay.  And do you see there -- look

14 for me in the text of this e-mail on the

15 bottom.  Let's look at the second paragraph.

16 And, like, a sentence in it says, "I take issue

17 with her working in the mail room"; do you see

18 that?

19   **A.    Yes.**

20   Q.    If you'll read for me that -- just

21 read it to yourself, the sentence before that

22 and then that sentence, and let me know when

23 you've completed it.

Sherry Spiers                                                                    8/19/2022
                                                                                7 (25 - 28)

Page 25

1   A.   Okay.
2   Q.   What issue would there be with
3   Ms. Williams working in the -- or Ms. Key
4   working in the mail room?
5       MR. REDMOND:  Object to form.
6   **A.   It appears she was concerned because**
7   **Ms. Key had made it known that she was**
8   **pregnant, and they were not allowing lifting**
9   **more than 50 pounds.  Oh, and -- yeah.  And**
10  **then the next sentence, Ms. Key had provided**
11  **the doctor's note, which is attached to this**
12  **e-mail, that she could return to work with no**
13  **restrictions.**
14  Q.   So if she could return without
15  restrictions, what would the concern be about
16  her working in the mail room?
17      MR. REDMOND:  Same objection.
18      MS. BROWN:  Object to the form.
19      MR. MILLER:  Object to the form.
20  **A.   Well, I can't speak for Gloria**
21  **Robinson, but, you know, with me, you've got**
22  **return to -- did the doctor sign this work**
23  **limitations with no restrictions, was the**

Page 26

1   **doctor -- did he or she know what her job**
2   **duties were going to be?  Which might have**
3   **involved heavy lifting.**
4   Q.   Did you ask Ms. Key what her job duty
5   -- if she had explained to her doctors what her
6   job duties may be?
7   **A.   I don't think I ever had a**
8   **conversation with Ms. Key.**
9   Q.   Do you know if Gloria asked her?
10  **A.   I don't know.**
11  Q.   Did you instruct Ray to ask her if
12  she had told her doctor?
13  **A.   I don't remember.**
14  Q.   If you'll look for me, the last
15  paragraph on that page.  The last sentence or
16  the second to the last sentence where it says,
17  "She was also given the option to wear a hat";
18  do you see that?
19  **A.   Yes.**
20  Q.   So, do you understand that Gloria
21  Robinson, in her capacity as the project
22  manager at Hyundai, was telling Davita Key that
23  she could wear a hat to the site?

Page 27

1       MR. MILLER:  Object to form.
2       MS. BROWN:  Object to form.
3       MR. REDMOND:  Object to form.
4   **A.   I would not have known anything about**
5   **it until I saw this e-mail.**
6   Q.   Okay.  And -- but this e-mail was
7   sent to Dynamic Security employees from a
8   Dynamic Security employee; correct?
9   **A.   Yes.  But I was not copied on this**
10  **particular e-mail.**
11  Q.   How did you get a copy of this
12  e-mail?
13  **A.   I don't remember.  It would have been**
14  **e-mailed to me at some point.**
15  Q.   Okay.  So up at the top of this --
16  kind of going in reverse since that's how
17  e-mails work sometimes -- from Tracey Peoples
18  to Chris Hargrove and with a copy to you; do
19  you see that?
20  **A.   Yes.  Okay.**
21  Q.   Okay.
22  **A.   But that's when I got it.**
23  Q.   So who is Tracey Peoples at this

Page 28

1   time?
2   **A.   In 2017 -- I don't remember without**
3   **looking back at records.  Tracey Peoples was**
4   **our regional manager in Atlanta.**
5       **And then at some point, he**
6   **transferred to the corporate office as our**
7   **vice-president of operations.  So, I'm not sure**
8   **when Tracey moved.  I don't know.**
9   Q.   Okay.  I think we can clear that up.
10  If you'll look under his signature right there
11  for me.  If you'll look under his signature
12  right there for me that's located on --
13  **A.   Okay.  There you go.  He had already**
14  **moved.**
15  Q.   So he was the vice-president of
16  operations?
17  **A.   Yes.**
18  Q.   What does the vice-president of
19  operations do?
20  **A.   He oversees all the operations of the**
21  **company.**
22  Q.   Who would he report to in that
23  position?

Page 29

1    A.   Scott Riddle.
2    Q.   And who would be under him in that
3  position?
4         MR. REDMOND:  Him, being Tracey
5  Peoples, not Scott Riddle?
6         MS. PALMER:  Yes, yes.
7         MR. REDMOND:  Okay.
8         MS. PALMER:  Him being Tracey
9  Peoples.  Thank you.
10   A.   All the regional managers and
11  district managers.
12   Q.   Okay.  What would Tracey Peoples'
13  relationship as vice-president of operations be
14  to human resources?
15   A.   A coworker.
16   Q.   If we were looking at like a
17  reporting structure, to say Tracey reports to
18  Scott, would human resources be beside Tracey
19  or under Tracey or above Tracey?
20   A.   I would be below.
21   Q.   Below Tracey.  Would human resources
22  report to Tracey?
23   A.   No.

Page 30

1    Q.   Okay.  Who would human resources
2  report to?
3    A.   Our chief financial officer.
4    Q.   What role would Tracey, as the
5  vice-president of operations, have over HR
6  functions -- any HR functions?
7    A.   Depending what the issue is, we would
8  be dealing with -- although I don't report
9  directly to Tracey, I may have interactions
10  with him, depending on what the issue is at
11  hand.
12   Q.   Would Tracey have any authority to
13  make an HR decision?
14        MS. BROWN:  Object to form.
15   A.   Yes.
16   Q.   And then this e-mail from Tracey to
17  Chris Hargrove with a copy to you, that is a
18  Dynamic Security e-mail; right?
19   A.   Yes.
20   Q.   Okay.  Did you have any concerns when
21  you saw this e-mail originally?
22   A.   I'm sure I did just due to the
23  circumstances.

Page 31

1    Q.   Did you reach out to Tracey or reach
2  out to Chris Hargrove about any concerns you
3  may have?
4         MR. REDMOND:  Object to the form.
5    A.   I don't remember.  If I did, it would
6  have been via e-mail.
7    Q.   Look at Exhibit 38.
8         (Whereupon, Plaintiff's Exhibit 38
9         was marked for identification and
10        copy of same is attached hereto.)
11   Q.   And we have pages -- Dynamic-Key 73
12  through 77.  Do you recognize this document?
13   A.   Yes.
14   Q.   And are you identified as a recipient
15  of these e-mails --
16   A.   Yes.
17   Q.   -- in exhibit 38?
18   A.   Yes.
19   Q.   Okay.  Let's go down to the bottom of
20  -- let's go to page 74, so the next page.  Is
21  that your signature at the bottom of that
22  e-mail?
23   A.   Yes.

Page 32

1    Q.   Okay.  So if you'll go back up to the
2  page before it.  Did you send this -- the
3  original e-mail?
4    A.   Yes.
5    Q.   Okay.  And who did you send it to?
6    A.   Ray Cureton, Gloria Robinson, and I
7  copied Tracey Peoples and Chris Hargrove.
8    Q.   Okay.  And what were you referencing
9  in this e-mail?
10   A.   I was referencing Davita Key's
11  complaint.
12   Q.   Okay.  And it says, "Let's make sure
13  there's a clear written policy from HMMA"; do
14  you see that?
15   A.   Yes.
16   Q.   What did you do to make sure there
17  was a clear written policy from HMMA?
18   A.   I don't remember.  Unless it's in
19  e-mails what came after I said that.  That
20  let's make sure there is a policy.  Well -- but
21  then -- okay.  Here's the -- here's the answer.
22   Q.   Okay.  So you're pointing to the text
23  at the top of Exhibit 38.  Aside from seeing

Sherry Spiers

Page 33

1  this text, did you do anything to make sure
2  there was a clear written policy?  Did you
3  request a hard copy or a photograph of a
4  policy?
5      A.   No.
6      Q.   At the bottom of that page and
7  running into the next page, you're talking
8  about, "If this move takes place, make sure she
9  understands it's because of her unwillingness
10 to abide by that written policy," all caps,
11 "not because she is pregnant"; do you see that?
12     A.   Yes.
13     Q.   Why is it important to make sure that
14 she knew that it wasn't because she was
15 pregnant?
16     A.   **Because at that point, she had**
17 **already disclosed the fact that she was**
18 **pregnant, and we do not discriminate against**
19 **women who are pregnant.**
20         **And I did not want her to think**
21 **that's why she's being removed from that job**
22 **site.  It's clearly because she -- of her**
23 **unwillingness to abide by the grooming policy.**

Page 34

1      Q.   So would transferring or removing an
2  employee from a job site, could that be
3  considered pregnancy discrimination, if you --
4  if they were pregnant?
5          MR. MILLER:  Object to the form.
6          MS. BROWN:  Object to the form.
7          MR. REDMOND:  Object to the form.
8      A.   **We would not do that based on a**
9  **pregnancy, unless it had to do with job**
10 **restrictions from her doctor.  And I'm saying,**
11 **"if."**
12     Q.   Was there any evidence here that
13 Ms. Key had any job restrictions?
14     A.   **Yes.**
15         THE WITNESS:  Was it the one before?
16     A.   **According to her doctor, she had no**
17 **job restrictions.**
18     Q.   You said that Dynamic does not
19 discriminate.  How do you know Dynamic does not
20 discriminate?
21     A.   **I know our practices.  We do not.  If**
22 **there's any cases out there, I'm not aware of**
23 **it.**

Page 35

1      Q.   What do you do -- what does Dynamic
2  do -- let me rephrase it that way.  What does
3  Dynamic do to ensure that it's employees do not
4  discriminate?
5      A.   **They should receive training.**
6      Q.   What type of training?
7      A.   **I'm not sure what type of training**
8  **each individual manager gets, but that -- I'm**
9  **assuming.**
10     Q.   If -- if an employee -- if you
11 received an e-mail that raised some concerns,
12 what would you do to ensure that the sender
13 knew you had concerns about that e-mail?
14         MR. MILLER:  Object to the form.
15         MS. BROWN:  Object to the form.
16         MR. REDMOND:  Object to the form.
17     A.   **I don't understand your question.**
18     Q.   Okay.  We'll get to that.  Well, let
19 me just go ahead and show you Exhibit 40.
20         (Whereupon, Plaintiff's Exhibit 40
21         was marked for identification and
22         copy of same is attached hereto.)
23     Q.   Do you recognize that document?

Page 36

1      A.   **Yes.**
2      Q.   Okay.  And this is an e-mail from Ray
3  Curaton to you; correct?
4      A.   **Yes.**
5      Q.   Okay.  So at the -- one of his last
6  sentences there, he says, talking about
7  reassigning her, "But I don't think that is
8  advisable at this time.  Especially if she is
9  to carry through with her stated, quote,
10 official complaint, end quote, of
11 discrimination against Hyundai, Ms. Williams
12 and Ms. Robinson"; do you see that?
13     A.   **I do.**
14     Q.   Okay.  So does that statement by
15 Mr. Cureton that he doesn't think it's
16 advisable to reassign her raise any issue with
17 you?
18     A.   **That was his opinion.**
19     Q.   Okay.  What action did you take in
20 response to this e-mail?
21     A.   **To offer her another job site.**
22     Q.   You told him to offer her another job
23 site?

Sherry Spiers

Page 37

1    A.   Yes.

2    Q.   Okay.  What did you do to ensure that

3 he did that?

4    A.   It's in an e-mail from me to him

5 to let's make sure we offer her another job

6 site.

7    Q.   Okay.  Did you instruct him that it

8 was discriminatory to not place her at another

9 job site?

10       MR. MILLER:  Object to the form.

11    A.   I don't think I would have used those

12 words.  I would have just put in the e-mail,

13 let's make sure we offer her other job sites.

14    Q.   Do you, in your functions as human

15 resources, see not placing Ms. Key because

16 she's made a complaint as discriminatory

17 conduct?

18       MR. REDMOND:  Object to the form.

19       MS. BROWN:  Object to the form.

20       MR. MILLER:  Object to the form.

21    A.   I'm not understanding the question,

22 because we did offer her.  So we didn't

23 discriminate against her and not offer her any

Page 38

1 job sites.  We did.

2    Q.   Okay.  But just looking to

3 Mr. Cureton's statement here that he doesn't

4 think it's advisable to place her especially if

5 she's going to carry through with the stated

6 official complaint.  Do you see that as

7 discriminatory?

8       MR. MILLER:  Object to form.

9       MS. BROWN:  Object to form.

10       MR. REDMOND:  Same object to form.

11    A.   Well, discriminatory, I would say,

12 yes, just because she has made -- she has made

13 a complaint.  But that's about -- which was

14 about her hair and her pregnancy.

15    Q.   Did you instruct Mr. Cureton that

16 that statement was discriminatory?

17    A.   I don't remember.

18       MR. REDMOND:  Object to the form.

19       MR. MILLER:  Object to the form.

20    Q.   Did -- are you aware of whether Mr.

21 Cureton received any sort of refresher training

22 or comment about his statement that it wasn't

23 advisable to place her?

Page 39

1    A.   I don't remember.

2    Q.   Is there any document that you can

3 think of that would refresh your memory as to

4 whether Mr. Cureton was advised that his

5 conduct may be discriminatory?

6    A.   I don't remember.

7    Q.   How do you know that the training

8 that you referenced earlier is effective with

9 Dynamic employees?

10    A.   I don't have anything documented to

11 show the -- to rate the effectiveness of it.

12    Q.   What type of information would you

13 look for -- if you were trying to determine if

14 your policies were effective, what would you

15 consider?

16    A.   I don't actively look for anything.

17       MS. PALMER:  Did I give you Number 39

18 already?

19       MR. REDMOND:  Yeah, I've got marked

20 Number 39.

21       MS. PALMER:  And 38.  Did I give you

22 38?  Let me see that one.

23    Q.   Okay.  This is ==Exhibit 38== again.  If

Page 40

1 you'll look for me on page Bates labeled 76.

2 Do you see there your note to Gloria?

3    A.   Yes.

4    Q.   Okay.  And it says, "Keep in mind, a

5 prospective employee does not have to disclose

6 medical conditions, such as pregnancy"; do you

7 see that?

8    A.   Yes.

9    Q.   Other than making this comment to

10 Gloria, did you do anything to ensure that

11 Gloria had any sort of refresher training

12 related to requesting medical condition?

13    A.   I don't remember.

14    Q.   Are you aware of any documents in

15 existence with Dynamic Security that would help

16 you remember?

17    A.   Not -- not right now.

18       MR. REDMOND:  Do you need some water?

19       THE WITNESS:  Water would be great.

20    Q.   I'm going to show you Exhibit --

21 wait.  Let's go back.  Let's go back to Number

22 40, which I've already given you.  If you can

23 find Number 40 for me.

Page 77

1    THE WITNESS:  Oh.  Is it here?
2    MS. PALMER:  It should be somewhere
3  in this stack.
4    THE WITNESS:  38.
5    MR REDMOND:  Which one is it,
6  Whitney?
7    MS. BROWN:  It's Plaintiff's Exhibit
8  Number 38.
9    REDMOND:  I know.  But do you
10 know what it is?  It might help with --
11   MS. BROWN:  Sorry.  The Bates numbers
12 are 73 --
13   MR. REDMOND:  Yeah.  But do you --
14   MS. BROWN:  It's an e-mail.
15   MR. REDMOND:  Okay.
16   THE WITNESS:  I can actually see the
17 exhibit numbers better than the --
18   MR. REDMOND:  Okay.  I was going to
19 say, if you knew what it was --
20   THE WITNESS:  Because they're in
21 those pretty little boxes.
22   MS. BROWN:  Sorry.  Yeah.  It's the
23 one with the -- Gloria Robinson typed down some

Page 78

1  policy concerns.
2    MR. REDMOND:  Gotcha.
3    THE WITNESS:  Here we go.  I have it.
4    MS. BROWN:  Okay.  Thank you.
5    Q.   And in Exhibit 38, in your e-mail at
6  the bottom of Page 73, you write, "Let's make
7  sure there is a clear written policy from HMMA
8  dot, dot, dot."
9    At the time you wrote that e-mail,
10 were you aware of the existence of Hyundai ENG
11 America?
12   A.   No.  I would've just used HMMA just
13 because someone else -- I saw someone else
14 using the acronym for it rather than typing out
15 Hyundai.  That's the only reason I would have
16 used that.
17   Q.   And then with respect to the policy
18 that Ms. Robinson writes or rewrites or types
19 in response to your e-mail, Ms. Robinson never
20 expressly says that this is HMMA's policy, does
21 she?
22   A.   No.  I don't see it on this e-mail.
23   Q.   And, in fact, she describes it as

Page 79

1  this is an excerpt from something that's posted
2  on a bulletin board; correct?
3    A.   Correct.
4    Q.   And so sitting here today as
5  Dynamic's representative, you have no idea who
6  posted that policy; correct?
7    A.   Correct.
8    Q.   Do you know of anyone, other than
9  Cassandra Williams, who requested that Ms. Key
10 not return to the Hyundai facility?
11   MR. MILLER:  Object to the form.
12   A.   I know of no one else other than
13 Cassandra.
14   Q.   Have you ever personally seen any
15 policy regarding hair style that is clearly
16 coming from Hyundai Motor Manufacturing
17 Alabama?
18   A.   No.
19   Q.   Do you have any role in preparing
20 bids or contracts?
21   A.   No.
22   Q.   With DSI?
23   A.   No.

Page 80

1    Q.   Do you have any role in collecting
2  invoices for DSI seeking payment from your
3  clients?
4    A.   No.
5    Q.   Do you have any basis to say that
6  HMMA is a client of Dynamic?
7    A.   Repeat --
8    Q.   Sorry.  Do you have any basis -- is
9  there any document evidence that would support
10 any conclusion that HMMA is a direct client of
11 Dynamic Security?
12   A.   I'm unsure how to answer that
13 because --
14   Q.   It's outside your scope?
15   A.   -- the difference.  Yes.  And the
16 difference in the two companies --
17   Q.   Is unknown to you?
18   A.   -- with me -- right.  It was just
19 Hyundai.  I -- it never occurred to me that
20 there were two different entities.
21   Q.   So as far as your knowledge goes,
22 Hyundai Engineering or Hyundai ENG America
23 might be Dynamic's client --

**Page 1**

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                 NORTHERN DIVISION

4

5          CASE NUMBER:  2:19-CV-767-ECM

6

7   DAVITA M. KEY,

8          Plaintiff,

9   v.

10  HYUNDAI MOTOR MANUFACTURING, ALABAMA, LLC;

11  HYUNDAI ENG, AMERICA, INC.; and DYNAMIC

12  SECURITY, INC.,

13          Defendants.

14

15              DEPOSITION OF

16              DAVITA M. KEY

17             June 20, 2022

18               9:27 a.m.

19

20          The deposition of DAVITA M. KEY was

21  taken before Sabrina Lewis, CCR, RDR, CRR, on

22  June 20, 2022, by the defendants, commencing at

23  approximately 9:27 a.m., at Hyundai Motor

24  Manufacturing, Montgomery, Alabama, pursuant to

25  the stipulations set forth herein.

**Page 2**

1          S T I P U L A T I O N S

2

3          IT IS STIPULATED AND AGREED by and

4   between the parties through their respective

5   counsel that the deposition of DAVITA M. KEY may

6   be taken before Sabrina Lewis, Certified Court

7   Reporter, Notary Public, State of Alabama at

8   Large, at the law offices of Hyundai Motor

9   Manufacturing, Montgomery, Alabama, on June 20,

10  2022, at 9:27 a.m.

11          IT IS FURTHER STIPULATED AND AGREED

12  that the signature to and reading of the

13  deposition by the witness is not waived, the

14  deposition to have the same force and effect as

15  if full compliance had been had with all laws

16  and rules of court relating to the taking of

17  depositions.

18          IT IS FURTHER STIPULATED AND AGREED

19  that it shall not be necessary for any

20  objections to be made by counsel to any

21  questions, except as to form or leading

22  questions, and that counsel for the parties may

23  make objections and assign grounds at the time

24  of trial, or at the time said deposition is

25  offered in evidence, or prior thereto.

**Page 3**

1          IT IS FURTHER STIPULATED AND AGREED

2   that notice of filing of the deposition by the

3   Commissioner is waived.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1          A P P E A R A N C E S

2

3   APPEARING ON BEHALF OF THE PLAINTIFF:

4       Leslie Ann Palmer, Esq.

5       Palmer Law, LLC

6       104 23rd Street South, Suite 100

7       Birmingham, Alabama 35233

8       205-285-3050

9       leslie@palmerlegalservices.com

10

11      Heather Newsom Leonard, Esq.

12      Heather Leonard P.C.

13      2105 Devereux Circle, Suite 111

14      Birmingham, Alabama 35243

15      205-977-5421

16      heather@heatherleonardpc.com

17

18  APPEARING ON BEHALF OF THE DEFENDANT, HYUNDAI

19  MOTOR MANUFACTURING ALABAMA, LLC:

20      David J. Middlebrooks, Esq.

21      Lehr Middlebrooks Vreeland & Thompson, P.C.

22      P.O. Box 11945

23      Birmingham, Alabama 35202-1945

24      205-326-3002

25      dmiddlebrooks@lehrmiddlebrooks.com



Page 5

```
1         A P P E A R A N C E S (continued)

2

3    APPEARING ON BEHALF OF THE DEFENDANT,

4    HYUNDAI ENG, AMERICA, INC.:

5         T. Matthew Miller, Esq.

6         Bradley Arant Boult Cummings LLP

7         One Federal Place

8         1819 Fifth Avenue North

9         Birmingham, Alabama 35203-2119

10        205-521-8000

11        mmiller@bradley.com

12

13   APPEARING ON BEHALF OF THE DEFENDANT, DYNAMIC

14   SECURITY, INC.:

15        Wesley C. Redmond, Esq.

16        Ford Harrison LLP

17        420 20th Street North, Suite 2560

18        Birmingham, Alabama 35203

19        205-244-5905

20        wredmond@fordharrison.com

21

22   OTHERS PRESENT:

23        Chris Whitehead, Esq.

24        In-house Counsel, Hyundai Motor

25        Manufacturing, Alabama, Inc.
```

Page 6

```
1          E X A M I N A T I O N
2    WITNESS:  DAVITA M. KEY                      PAGE
3    BY MR. MIDDLEBROOKS                            11
     BY MR. REDMOND                                 84
4    BY MR. MILLER                                 230
     BY MS. PALMER                                 280
5    BY MR. MIDDLEBROOKS                           285
6
7            E X H I B I T S
8    Defendants' Exhibits                         PAGE
9    Exhibit Number 1                               17
     First Amended Complaint
10
     Exhibit Number 2                               23
11   Pre-Application Screening Form, Bates
     Dynamic-Key 000028 and Key 000013
12
     Exhibit Number 3                               27
13   Paycheck and stub to Key from Dynamic
     Security, Inc., Bates Key 000001
14
     Exhibit Number 4                               28
15   7/21/21 email to Key from Robinson re:
     Mailroom Position, Bates Key 000254 through
16   000255
17   Exhibit Number 5                               32
     Plaintiff's Amended Initial Disclosures
18
     Exhibit Number 6                               41
19   Diagram of the first floor of the
     Administration Building
20
     Exhibit Number 7                               44
21   Decision on Unemployment Compensation
     Claim, Bates Key 000129 through 000130
22
     Exhibit Number 8                               51
23   "Appearance Standards for Security
     Personnel," Bates HEA 0001 through 003
24
25
```

Page 7

```
1           E X H I B I T S
2    Defendants' Exhibits                         PAGE
3    Exhibit Number 9                               52
     Hyundai Motor Manufacturing, Alabama PPE &
4    Dress Code Matrix, Bates HMMA 0000003
5    Exhibit Number 10                              53
     Dynamic Security, Inc., Acknowledgment and
6    Receipt of Employee Handbook, Bates
     Dynamic-Key 000041 through 000042; Dynamic
7    Security Officer's Handbook, Bates
     Key 000332 through 000382
8

     Exhibit Number 11                              56
9    CONFIDENTIAL, Hyundai Engineering
     America, Inc., Employee Handbook, Bates
10   HEA0004 through 0005
11   Exhibit Number 12                              56
     Hyundai Motor Manufacturing, Alabama
12   Safety, Security and Fire Protection
     Handbook, Bates 000277 through 000331
13

     Exhibit Number 13                              60
14   U.S. Equal Employment Opportunity
     Commission Intake Questionnaire, Bates
15   Key 000049 through 000056
16   Exhibit Number 14                              67
     EEOC Charge of Discrimination, Bates
17   Dynamic-Key 000046 through 000047
18   Exhibit Number 15                              69
     EEOC Charge of discrimination Bates
19   Key 000047
20   Exhibit Number 16                              72
     Plaintiff's Response to Defendant HMMA's
21   Interrogatories and Plaintiff's Response to
     Defendant HMMA's Request for Production of
22   Documents
23   Exhibit Number 17                              82
     8/8/17 handwritten notes by Key, Bates
24   Dynamic-Key 000058 through 000063
25
```

Page 8

```
1           E X H I B I T S
2    Defendants' Exhibits                         PAGE
3    Exhibit Number 18                             170
     8/1/17 handwritten note by Key
4

     Exhibit Number 19                             179
5    7/21/17 signed document re: Dynamic
     Security security officer's manual, Bates
6    Dynamic-Key 000040
7    Exhibit Number 20                             180
     7/21/17 signed document re: Dynamic
8    Security's harassment policy, Bates
     Dynamic-Key 000042
9

     Exhibit Number 21                             180
10   7/21/17 signed document re: Dynamic
     Security rules and regulations, Bates
11   Dynamic-Key 000038 through 000039
12   Exhibit Number 22                             185
     U.S. Equal Employment Opportunity
13   Commission Dismissal and Notice of Rights
14   Exhibit Number 23                             188
     U.S. Equal Employment Opportunity
15   Commission determination letter mailed
     6/10/19
16

     Exhibit Number 24                             189
17   U.S. Equal Employment Opportunity
     Commission letter mailed 7/12/19
18

     Exhibit Number 25                             190
19   U.S. Equal Employment Opportunity
     Commission Notice of Right to Sue
20   (Conciliation Failure)
21   Exhibit Number 26                             219
     10/4/17 Key rebuttal to EEOC charge
22

     Exhibit Number 27                             228
23   Photos
24
25
```



Page 157

1   away from you enough so that she can communicate
2   that to Gloria Robinson?  Or did she do it while
3   the two of you were together?
4       A.  I don't know.  I don't know.
5       Q.  How long did you and your trainer stay
6   in the mail room?
7       A.  I don't -- I mean, I don't know.  I
8   don't know.
9       Q.  What did you do next?  What did the two
10  of you do next after you left the mail room?
11      A.  We didn't leave the mail room.
12      Q.  Okay.  You at some point left the mail
13  room; right?
14      A.  Yes.
15      Q.  Right.  What happened that caused you
16  to leave the mail room?
17      A.  Maurice Chambliss told me that Gloria
18  Robinson wanted to see me.
19      Q.  Okay.  So you've been working for the
20  company for two days, and this is your second
21  time to -- that Maurice has come and told you
22  that Gloria Robinson wants to talk to you?
23      A.  Yes.
24      Q.  You and Maurice ride over again in the
25  truck?  Or the car?

Page 158

1       A.  Yes.
2       Q.  What conversations did you and Maurice
3   have?
4       A.  I asked him what did she want, and he
5   said he didn't know.
6       Q.  Do you think he was being truthful with
7   you?  Or do you know?
8       A.  I don't know.
9       Q.  All right.  Did you speak with anyone
10  else before you talked to Ms. Robinson?
11      A.  No.
12      Q.  All right.  Was Ms. Robinson by herself
13  or was Cassandra Williams with her during this
14  conversation?
15      A.  She was by herself.
16      Q.  Okay.  Tell me what happened during
17  this conversation.
18      A.  She asked me had I felt discriminated
19  against, and I didn't respond to her question.
20  And then she asked me.  I said, "No comment."
21          And she said that, you know, I
22  shouldn't have asked Cassandra Williams to see
23  the policy; that she understood why I did it but
24  I shouldn't have and that the Koreans were a
25  different breed of animals and that they send

Page 159

1   little memos and they don't want African
2   Americans, you know, wearing their hair like
3   this because of the clientele they have.
4           And she specifically named Mayor Todd
5   Strange, who was the mayor at that time; that he
6   may not want to see me with my hair like this.
7           And she said that she has to have her
8   male counterparts at times speak with the Korean
9   higher-ups because they won't talk to her
10  because she's a female.
11      Q.  And what had you done about your hair
12  on August 1?
13      A.  I wore a hat and I -- that completely
14  covered my head.
15      Q.  Do you have a picture -- do you happen
16  to have a picture of --
17      A.  Of --
18      Q.  -- of the hat that day with you --
19      A.  No.
20      Q.  -- wearing it?  Do you still have the
21  hat?
22      A.  I do.
23      Q.  If you'd hold on to it.
24          All right.  Anything else you can
25  recall her saying during that conversation?

Page 160

1       A.  I asked her -- I -- you know, I said,
2   "Well, I wore a hat, you know, as you guys said
3   I should," and she said, "This is not about
4   that."
5           And she said, "Are you going to be this
6   way until" -- and she pointed to my stomach.
7           And then I -- she said -- like she
8   started inching forward towards me.  She was
9   sitting in the chair I'm currently sitting in,
10  and I was sitting in the chair where the court
11  reporter's sitting in --
12      Q.  Y'all were in this room?
13      A.  Yes.
14      Q.  Okay.
15      A.  And she said, "Have you been
16  discriminated against," in like a loud, hostile
17  voice.  And I said, "I wore a hat, you know, as
18  you guys asked me to."
19          She said, "This is not about that.
20  This is going to be a problem."
21      Q.  Was it your understanding that she was
22  referring to your pregnancy?
23      A.  Yes.
24      Q.  And I know you were asked some
25  questions and you were shown, I think it was in



Page 285

1 they tell you that they had dismissed the charge
2 against Dynamic Security?
3    A.  No.
4        MS. PALMER:  That's all I have.
5        FURTHER EXAMINATION
6 BY MR. MIDDLEBROOKS:
7    Q.  Ms. Key, you had talked about there
8 being some files in your -- journal entries on
9 your cell phone.  Do you recall any specific
10 journal entries relating to Hyundai Motor
11 Manufacturing, Alabama?
12   A.  I don't know.  I'd have to look at what
13 I wrote because it was about how the whole --
14 what was going on, so I don't know exactly what
15 it says in the -- what the journal entries say.
16   Q.  You don't know what they say?
17   A.  No.
18   Q.  You answered questions from Mr. Redmond
19 about damages, both monetary and nonmonetary.
20 If I asked you the same question as related to
21 Hyundai Motor Manufacturing, Alabama, would your
22 answer be any different than those you gave
23 Mr. Redmond?
24   A.  No.
25       MR. MIDDLEBROOKS:  That's all.

Page 286

1        MR. REDMOND:  Nothing further.
2        MR. MILLER:  Nothing further.
3        THE COURT REPORTER:  Does anybody want
4 a transcript?
5        MS. LEONARD:  Yes.
6        MR. MIDDLEBROOKS:  Yes.
7        MR. REDMOND:  Electronic.
8        MR. MILLER:  Electronic.
9        THE COURT REPORTER:  Ms. Leonard, do
10 you want a paper copy or electronic only?
11       MS. LEONARD:  Electronic is fine.
12       (The deposition was concluded at
13          4:21 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 287

1              C E R T I F I C A T E
2
3
  STATE OF ALABAMA
4 AT LARGE
5
6         I hereby certify that the above and
  foregoing deposition of DAVITA M. KEY was taken
7 down by me in stenotype and the questions and
  answers thereto were transcribed by means of
8 computer-aided transcription, and that the
  foregoing represents a true and correct
9 transcript of the testimony given by said
  witness upon said hearing.
10
         I further certify that I am neither of
11 counsel, nor of kin to the parties to the
  action, nor am I in anywise interested in the
12 result of said cause.
13       I further certify that I am duly
  licensed by the Alabama Board of Court Reporting
14 as a Certified Court Reporter as evidenced by
  the ACCR number following my name found below.
15
16
  So certified on this date, July 5, 2022
17
18
19
20
21
22
23  /s/Sabrina Lewis, CCR, RDR, CRR
  ACCR #165, Expires 9/30/22
24  Commissioner for the State of
  Alabama at Large
25  My commission expires 5/17/23

Page 288

1 Reference No.: 8044773
2
3 Case:  DAVITA M. KEY vs HYUNDAI MOTOR MANUFACTURING
4
   DECLARATION UNDER PENALTY OF PERJURY
5
      I declare under penalty of perjury that
6 I have read the entire transcript of my Depo-
  sition taken in the captioned matter or the
7 same has been read to me, and the same is
  true and accurate, save and except for
8 changes and/or corrections, if any, as indi-
  cated by me on the DEPOSITION ERRATA SHEET
9 hereof, with the understanding that I offer
  these changes as if still under oath.
10
11     _____
12     Davita M. Key
13
14     NOTARIZATION OF CHANGES
15          (If Required)
16
17 Subscribed and sworn to on the _____ day of
18
19 _____, 20____ before me,
20
21 (Notary Sign)_____
22
23 (Print Name)                Notary Public,
24
25 in and for the State of _____