# *EXHIBIT C*

# *Dynamic's Objections to Deposition Designations for Cassandra Williams*

Cassandra Williams                                                    33

1  of?
2      A.   B.J. McCullough, Neal McMann, Gloria
3  Robinson, and Malinda Williams.
4      Q.   Do you know why Ms. Robinson is no longer
5  an account manager at HMMA?
6           MS. BROWN:  Object to form.
7           MR. MILLER:  Object to form.
8      A.   She was relocated -- I'm sorry.
9      Q.   It's okay.
10     A.   She requested to step down from that
11 position.
12     Q.   What do you know about that?
13     A.   She told her manager -- and I don't know
14 what his position was -- that she wanted to step
15 down, and she recommended someone else to take her
16 position.
17     Q.   How did you come to have this knowledge?
18     A.   She told me as well as her
19 then-supervisor.
20     Q.   Did Ms. Robinson tell you why she was
21 requesting to step down?
22     A.   She said she was getting burned out.
23     Q.   How long had she been there?


ALABAMA COURT REPORTING

Cassandra Williams                                                    45

```
 1      A.   This?  Exhibit 9?
 2      Q.   Yes, ma'am.
 3      A.   No one reviewed with HMMA -- HMMA reviewed
 4   it.
 5      Q.   Why are dreads or dreadlocks prohibited
 6   under Exhibit 9?
 7      A.   My document?
 8      Q.   Yes, ma'am.
 9      A.   Keeping with HMMA's policy, I decided to
10   continue it because for grooming and professional
11   appearance, I didn't think they met those
12   guidelines.
13      Q.   So based on your understanding of HMMA's
14   policies, you felt that dreads or dreadlocks hair
15   styles would be prohibited for people who would be
16   in a visible uniformed position?
17           MR. MILLER:  Object to form.
18           MS. BROWN:  Object to form.
19      A.   Every security person, regardless of
20   position, are in a uniform.
21      Q.   But you felt the prohibition of dreads or
22   dreadlocks was consistent or what was required
23   under the HMMA policy?
```



ALABAMA COURT REPORTING

 1              MS. BROWN:  Object to form.
 2              MR. MILLER:  Object to form.
 3              MR. REDMOND:  Same objection.
 4         A.   Yes.
 5         Q.   Did anyone tell you why it would be okay
 6    for HMMA to prohibit dreads or dreadlocks?  In
 7    other words, did anyone say, "Yeah, this is a
 8    nondiscriminatory policy"?
 9              MR. MILLER:  Object to form.
10              MS. BROWN:  Object to form.
11         A.   No.
12         Q.   Were there ever any deviations from the
13    "Appearance Standards for Security Personnel"
14    where somebody with dreads or dreadlocks was
15    permitted to work under the security contract?
16         A.   Repeat.
17         Q.   Sure.  Was anybody permitted to work under
18    the security contract with dreads or dreadlocks?
19         A.   At what point?
20         Q.   At any point.
21         A.   Not prior to 2017.
22         Q.   After 2017 has anyone with dreads or
23    dreadlocks been permitted to work under the



ALABAMA COURT REPORTING

```
 1  long as they were styled in a certain manner, were
 2  you aware that Davita Key had made a complaint
 3  that she felt she was being discriminated against?
 4       A.    I can't say because --
 5             MR. MILLER:  Object to form.
 6             Go ahead.  You can answer.
 7       A.    I can't say because I don't remember when
 8  Ms. Walton came to work there.
 9       Q.    And we're going to go through some
10  documents specific to Ms. Key in a little bit.
11  But one of the things that we're going to see
12  through those documents is basically upon her last
13  day -- you know, on July 31, 2017 -- she was
14  complaining about you and about the hair policy.
15             When did you first become aware of those
16  internal complaints?
17             MR. MILLER:  Object to form.
18       A.    Her first day of work.
19       Q.    Okay.  So if she started in July of 2017
20  and you were aware of her complaints on her first
21  day of work, is it reasonable, then, to assume if
22  Ms. Walton was hired in late 2017, you were at a
23  minimum aware of Ms. Key's internal complaints
```



1  about the dreadlock -- prohibition of dreadlocks?
2      A.   Ms. Key didn't start in July of 2017.
3      Q.   When did she start?
4      A.   Let me think.  Let me correct myself.  She
5  started July 31st.  That was her first day of
6  work.  July 31, 2017.  So I'm sorry.
7           Repeat the last part.
8      Q.   If Ms. Walton started in late 2017 and
9  Ms. Key started on July 31, 2017, and it's your
10 testimony that you're aware of her complaints
11 about the prohibition of dreadlocks being
12 discriminatory --
13          MR. MILLER:  Object to form.
14     Q.   -- on her first day of employment, would
15 it be fair, then, to say that you're aware of
16 Ms. Key's complaint by the time Ms. Walton
17 started?
18          MR. MILLER:  Object to form.
19     A.   I don't know when Ms. Walton started, so I
20 can't say yes or no.
21     Q.   Well, your testimony earlier was she
22 started in late 2017.  If that's true, you would
23 agree, then, you would have to have been aware of



```
 1   Ms. Key's complaint by the time Ms. Walton
 2   started?
 3          MS. BROWN:  Object to form.
 4          MR. MILLER:  Object to form.
 5          MR. REDMOND:  Same objection.
 6      A.  I know her -- okay.  Her verbal complaint,
 7   yes.  I'm aware of that, yes.
 8      Q.  How did Ms. Walton agree to style her
 9   hair?
10      A.  To she agreed to pull it back.  And I
11   can't -- I'm trying to visualize, but I can't.
12   But it was pulled back in a much neater
13   appearance, and she agreed to maintain that
14   appearance.
15      Q.  And you said "much neater appearance."
16          Neater than what?
17      A.  Than what it was on the day that she
18   interviewed.
19      Q.  Okay.  And Ms. Howard -- when was she
20   hired?
21      A.  I don't know.
22      Q.  And who made the decision to permit her to
23   wear dreadlocks?
```


ALABAMA COURT REPORTING

```
 1   security company.
 2       Q.   Did you provide indirect supervision for
 3   the mail room?
 4            MR. MILLER:  Object to form.
 5            MS. BROWN:  Object to form.
 6       A.   As far as the duties, I did.
 7       Q.   Okay.  Other than what you explained about
 8   keeping a close eye on the mail room or you
 9   filling in if there was a need, what else, if
10   anything, did you do to provide indirect
11   supervision?
12            MR. MILLER:  Object to form.
13       A.   That's basically it.
14       Q.   Okay.  Did anyone at HMMA or HEA object to
15   Ms. Key's appearance?
16            MS. BROWN:  Object to form.
17       A.   I don't know if anybody at HMMA ever saw
18   or met Ms. Key.
19       Q.   My question is different.
20            Did anyone at HMMA or HEA object to
21   Ms. Key's appearance, her hairstyle?
22            MR. MILLER:  Object to form.
23            MS. BROWN:  Object to form.
```



1    A.   Not that --
2         MR. MILLER:  She asked HMMA or HEA.
3         THE WITNESS:  Oh.  I'm sorry.
4         MR. MILLER:  That's why I objected.
5         You can answer.
6         THE WITNESS:  Okay.
7    A.   Okay.  After -- prior to her being hired?
8    After she was hired?  Which?  Or both?
9    Q.   Any time.  And I'll make the question
10   broader.
11        Are you aware of anyone, including
12   yourself, who objected to Ms. Key's appearance?
13        MS. BROWN:  Object to form.
14   A.   On the date that Ms. Key interviewed, I
15   saw her hair.  On the date that she started, I saw
16   her hair, and at that time I made an objection
17   about her hair.
18   Q.   And so you made an objection after she had
19   started?
20        MR. REDMOND:  Object to form.
21        MR. MILLER:  Object to form.
22   A.   Yes.  Because on the date of the
23   interview, an agreement was made how she would



Cassandra Williams                                                                 78

```
 1  wear her hair.
 2      Q.   Were you present for Ms. Key's interview?
 3      A.   I was not.
 4      Q.   Who interviewed her?
 5      A.   Gloria Robinson and Maurice Chambliss.
 6      Q.   The day that Ms. Key interviewed, you said
 7  you saw her hair.
 8           How did you come to see her hair on the
 9  date of her interview?
10      A.   I was asked to come into the conference
11  room where they were interviewing her.
12      Q.   Tell me about how that came to be.
13      A.   Gloria Robinson approached me at my desk
14  and stated that they were interviewing someone for
15  the mail room, that the young lady had dreads in
16  her hair.  She mentioned that she said that she
17  could style it in a way that would be, like, more
18  presentable, and she asked me if I would come in
19  to look at her hair and how she was going to style
20  it.
21      Q.   So then what happened?
22      A.   I went in, I saw -- confirmed that, you
23  know, she was wearing dreads.  And she said that
```


ALABAMA COURT REPORTING

1      Q.    Sure.  Let me rephrase.
2            What, if anything, was unacceptable or
3  unpresentable about her hair?
4            MR. MILLER:  Object to form.
5            MS. BROWN:  Object to form.
6            MR. REDMOND:  Same objection.
7      Q.    Because you said she showed you a picture
8  that would be a lot more presentable.
9            What, if anything, was unpresentable about
10 her appearance in her interview?
11           MS. BROWN:  Object to form.
12     A.    Her hair was in dreads --
13           MR. MILLER:  Object to form.
14     A.    -- and they were a little --
15           MR. MILLER:  Go ahead.  Sorry.
16     A.    -- frayed.
17     Q.    And what do you mean by "frayed"?
18     A.    Like, they weren't neat and -- so I don't
19 know if you've seen dreads when they're first
20 done, but it's like, I guess, braids.  They're
21 pulled together and the ends and -- there's no
22 wild hairs sticking out.  So it was -- it was like
23 that.  So I could tell that she had had them for a



Cassandra Williams 83

```
1      Q.    And because of the visibility of the
2   people working in the mail room, is that part of
3   why there are appearance or grooming standards
4   applicable to them?
5            MR. MILLER:  Object to form.
6            She can answer if she can.
7      A.    They're a part of the security force.
8      Q.    That wasn't my question.
9            My question is:  Because of their
10  visibility, is that why their appearance matters?
11           MR. MILLER:  Object to form.
12           MS. BROWN:  Object to form.
13           MR. MILLER:  She can answer.
14           MR. REDMOND:  Same objection.
15     Q.    You can answer.
16     A.    My answer is going to be the same.
17     Q.    Is the security force visibile?
18     A.    Yes.
19     Q.    Why do you care what the security force
20  looks like?
21           MS. BROWN:  Object to form.
22           MR. MILLER:  Object to form.
23     A.    Professional appearance.
```



Cassandra Williams                                                           95

1    Q.   Which came first, the email or the verbal
2    communication to Gloria Robinson?
3    A.   So Gloria Robinson and I had a
4    conversation after -- at some point after Ms. Key
5    left the office, and it was followed up by an
6    email.
7    Q.   On Ms. Key's second day of work, August 1,
8    did Latunya Howell tell you that Ms. Key felt you
9    and Ms. Robinson were discriminating against her?
10   A.   Yes, she did make that statement.
11   Q.   Tell me about that.
12   A.   So I think, if I remember correctly,
13   Ms. Key had been in the office, and she went back
14   to the mail room.  Latunya Howell called my desk
15   phone and told me that Ms. Key was asking her for
16   an HMMA handbook, asking where she could get an
17   HMMA handbook.  She was talking about the -- I
18   guess the hair policy, the appearance policy.  And
19   I guess at some point she mentioned she felt that
20   she was discriminated against.
21   Q.   After Ms. Howell told you that, what, if
22   anything, did you do?
23   A.   I told Ms. Howell that I was going to


ALABAMA COURT REPORTING

1  notify Gloria Robinson and Lieutenant Maurice
2  Chambliss, who was the first shift supervisor, to
3  have her brought over and let Gloria address it.
4          I mentioned it to Gloria, and I told her
5  that -- basically what Ms. Thomas said, that she
6  felt she was being discriminated against and she
7  needed to get ahead of it.
8      Q.  Do you know why Latunya Howell came to you
9  to tell you that Ms. Key was saying that she was
10 feeling she had been discriminated against?
11         MS. BROWN:  Object to the form.
12         MR. MILLER:  Object to the form.
13         MR. REDMOND:  Object to form.
14     A.  I can't answer why she came to me, no.
15     Q.  When you called Gloria Robinson, did she
16 communicate in any way that she was already aware
17 of Ms. Key's complaint?
18     A.  No.  Because Gloria was sitting in the
19 office at the time.
20     Q.  Do you know why Ms. Howell chose to come
21 to you over Gloria Robinson?
22     A.  I don't know.
23     Q.  There's a handwritten statement that's


ALABAMA COURT REPORTING

Cassandra Williams                                              100

```
1      Q.   All right.  I'm going to show you what's
2   been previously marked as Plaintiff's Exhibit 41,
3   which is Dynamic 85 through 87.
4           MR. REDMOND:  What number is that?
5           MS. LEONARD:  It was 41.
6           MR. REDMOND:  Okay.
7      A.   Okay.
8           MR. MILLER:  Take your time and look at
9   it.
10     Q.   Have you seen this email chain before?
11     A.   Yes.
12     Q.   I want to look at the email on the first
13  page of the exhibit, which is on Bates number 85.
14  It appears to be an email from you to Gloria
15  Robinson dated Tuesday, August 1, 2017, 8:50 a.m.
16          Is this the email that you referenced
17  where you confirmed the conversation that you had
18  with her about reassigning Ms. Key?
19          MR. MILLER:  Object to form.
20          MR. REDMOND:  Same objection to form.
21     A.   Yes.
22     Q.   All right.
23          MS. BROWN:  Object to form.
```


ALABAMA COURT REPORTING

1   complaint that she made against HMMA, you, and
2   Ms. Robinson?
3       A.   I'm not aware.
4       Q.   Under the terms of any agreement between
5   Dynamic and HEA, is that something Dynamic should
6   have reported?
7            MR. REDMOND:  Object to form.
8            MR. MILLER:  Object to form.
9       A.   Should have reported to HEA?
10      Q.   Yes, ma'am.
11      A.   That they were following up on her
12  complaint?
13      Q.   Correct.  In other words, if Ms. Key is
14  making a complaint that you and an HEA employee
15  have done something that she felt was
16  discriminatory, is that something Dynamic should
17  have reported to HEA?
18           MR. MILLER:  Object to form.
19      A.   Since it involved me, I would say so.
20      Q.   Did you hear from anybody at HEA who might
21  have been in a supervisory role over you that
22  Ms. Key had filed a formal complaint of
23  discrimination based on things you may have done?



ALABAMA COURT REPORTING

Cassandra Williams                                                  151

```
 1   normal hours.  So just the various feedback, it
 2   was just best that we modified it, yes.
 3        Q.   You changed the hours?
 4        A.   Yes.
 5             MS. BROWN:  All right.  I don't have any
 6   further questions.
 7             MS. LEONARD:  Do you have any, Matt?
 8             MR. MILLER:  I don't have any.
 9             MS. LEONARD:  I just have a few
10   follow-ups.
11
12                       REEXAMINATION
13   BY MS. LEONARD:
14        Q.   In response to Mr. Redmond's question, you
15   mentioned that Ms. Robinson had expressed some
16   dissatisfaction with Ms. Key on July 31st.
17             Do you know when Gloria Robinson learned
18   that Ms. Key was pregnant?
19             MS. BROWN:  Object to form.
20             MR. REDMOND:  Object to form.
21             MR. MILLER:  Object to form.
22        A.   She told me she learned on the 31st.
23        Q.   Okay.  At the time that Ms. Robinson
```



```
 1  expressed to you on the 31st that she didn't think
 2  Ms. Key would work out, do you know if at that
 3  time Ms. Robinson knew Ms. Key was pregnant?
 4          MR. REDMOND:  Object to form.
 5          MR. MILLER:  Object to the form.
 6          MS. BROWN:  Object to the form.
 7      A.  She did.
 8      Q.  Did Ms. Robinson express any frustration
 9  or anything that would lead you to conclude she
10  was upset that Ms. Key had not told her that she
11  was pregnant before she was hired?
12          MS. BROWN:  Object to the form.
13          MR. MILLER:  Object to the form.
14          MR. REDMOND:  Same objection.
15      A.  Repeat.
16      Q.  Sure.  Did Ms. Robinson express anything
17  to you that led you to conclude Ms. Robinson was
18  unhappy that Ms. Key had not disclosed her
19  pregnancy prior to being hired?
20          MS. BROWN:  Object to the form.
21          MR. MILLER:  Object to the form.
22          MR. REDMOND:  Same objection.
23      A.  Just her concern is all.
```



ALABAMA COURT REPORTING