# *EXHIBIT D*

# *Dynamic's Objections to Deposition Designations for Ray Cureton*

Ray Cureton                                                    8/30/2022
                                                                     17

1                     MR. REDMOND:  Object to the form.

2                     MS. BROWN:  Object to the form.

3                     MR. MILLER:  Same objection.

4          Q.     You can answer.  You'll hear that

5     from time to time.  They just don't like

6     something about the way I asked it.

7          A.     Would you repeat the question,

8     please?

9          Q.     Yes, sir.  The line that I pointed

10    you to there, that operations manager is required

11    for Hyundai contract, do you know what that's in

12    reference to?

13                    MR. REDMOND:  Object to the form.

14                    MS. BROWN:  Same objection.

15                    MR. MILLER:  Same objection.

16         A.     As far as I understand, that part of

17    my responsibility would be supervising the major

18    contract at the time, which was at Hyundai.

19         Q.     Okay.  And then underneath that, it's

20    talking about you get three hundred dollars a

21    month for car allowance, a fuel card, a laptop,

22    and a cellphone; is that right?

23         A.     Correct.

1      Q.    So you had a cellphone provided by

2 Dynamic Security?

3      A.    I did.

4      Q.    Did you use that cellphone to text

5 communications with any other employees?

6      A.    I did.

7      Q.    Okay.  Do you know if you used that

8 cellphone to text communications about anything

9 related to this lawsuit or Ms. Key?

10     A.    I did not.

11     Q.    Okay.  What types of texts would you

12 --

13     A.    Let me clarify just a minute, because

14 I didn't -- okay.  Are you asking me if I texted

15 those people back then or are you asking me in

16 connection with the lawsuit?  I don't think I

17 understand.

18     Q.    Yes, sir, I'm sorry, and thank you

19 for clarifying, because that's important.

20           So with that company cellphone that

21 you had back then, did you use that company

22 cellphone to text with other Dynamic employees?

23     A.    Yes.

Ray Cureton                                           8/30/2022
                                                           22

1        A.     That's really a good question.  I was

2   -- the district manager of the Birmingham office

3   came down to Montgomery and asked me to remove my

4   things from the site and that I was being let go.

5        Q.     And what was the district manager's

6   name?

7        A.     I can tell you.  Hang on a minute.

8   Marshay Webb.

9        Q.     Did Marshay Webb tell you why you

10  were being let go?

11       A.     He did not.

12       Q.     Did you have any idea that it was

13  coming?

14       A.     I did not.

15       Q.     Had you ever been disciplined for

16  anything?

17       A.     I had not.

18       Q.     Do you have any idea what -- in your

19  mind, what would you think it would be?

20             MS. BROWN:  Object to the form.

21             MR. REDMOND:  Object to the form.

22             MR. MILLER:  Object to the form.

23       A.     I really don't know.  Honestly, the

1  week before they let me go, I had been assured by

2  -- and I do not know his name, because he hadn't

3  been there very long -- my original boss's

4  replacement that everything was fine and that I

5  would -- if he lost his job, I would be fine and

6  wouldn't lose mine, and then I lost it.

7          So I don't know what their thinking

8  was.  I never heard from anybody in any kind of

9  authority under -- you know, above me about that,

10  either before or after, and that is the gospel

11  truth.

12       Q.    Okay.  So the person who assured you,

13  that was your old boss's replacement?

14       A.    Uh-huh (positive response), yeah, I

15  think so.  It's -- yes, that's who it was, yeah.

16       Q.    Do you remember his name?

17       A.    I do not.  I really do not.

18       Q.    What was your old boss's name?

19       A.    Mike Keller.

20       Q.    And do you remember when Mike Keller

21  left?

22       A.    It was right around the time of this

23  incident, because I think he left a month before

1          And the dispute got to the place

2    where HMMA did not want her on the site.  And,

3    ultimately, in the security business, and this is

4    across the board in any security company I've

5    ever worked with, when the client says, Remove

6    somebody from the site, that's what security

7    companies do, period.

8          And now, we can go back for our

9    person to try to get them rehired, try to get --

10   depending on what's going on, and in this

11   situation, there was enough there.  We did not

12   fire her or remove her from Dynamic Security.  We

13   simply removed her from the Hyundai site.

14       Q.    We've been going just about an hour.

15   Do you want to take a short break?

16       A.    I do not.  I want to get done with

17   this if y'all are amicable to continuing.

18             MR. REDMOND:  I'm good.

19       Q.    I am going to show you Plaintiff's

20   Exhibit 29.  All right.  Mr. Cureton, do you

21   recognize Plaintiff's Exhibit 29?

22       A.    I do.

23       Q.    And what do you recognize that to be?

1         A.     That is a statement from Ms. Key

2    alleging discrimination by Hyundai, specifically

3    Ms. Williams and Ms. Cory Robinson, who was our

4    employee.

5         Q.     And did you receive a copy of this?

6         A.     I did.

7         Q.     Okay.  Can you tell me the

8    circumstances under which you received this

9    complaint?

10         A.     I don't know what you're asking me.

11    I mean, it came -- I'm sure it was given to me

12    in -- from Ms. Robinson most likely.  I don't

13    know that for sure, but it would have come from

14    them to me as a complaint for me to handle.

15         Q.     Do you have any recollection of

16    sitting down with Ms. Key --

17         A.     I do not.

18         Q.     -- to receive this?

19         A.     I'm sorry.  I do not have that

20    recollection of that.

21         Q.     When you received this complaint that

22    is Plaintiff's Exhibit 29, did you begin an

23    investigation?

1  for Ms. Key's discipline?

2       A.    It simply says here, Other conduct

3  warranting disciplinary action.

4       Q.    And then I see there at the bottom it

5  says, Forwarded to HR for resolution?

6       A.    Correct.

7       Q.    What was the resolution that was

8  reached?

9            MR. REDMOND:  Object to the form.

10      A.    I can't speak for HR.  I don't know

11  what resolution you're looking for.  If you're

12  asking what happened to Ms. Key, that's a

13  different question than what the resolution was

14  in this disciplinary form.

15           I mean, we offered her two other

16  positions, at least, and I think -- I would say

17  after that that we couldn't accommodate what she

18  wanted, and -- because we didn't have a position

19  open that was at the time that she could work,

20  and so she left.

21      Q.    Okay.  So you're not aware of what

22  the ultimate resolution was with regard to Ms.

23  Key's --

Ray Cureton                                                    8/30/2022
                                                                    72

```
 1   Ms. Howell is?

 2         A.    I think Ms. Howell was one of our

 3   officers that worked at Hyundai.

 4         Q.    So she says, Ms. Howell entered the

 5   security office and asked if we knew when Ms. Key

 6   was due.  Do you see that?

 7         A.    Yes.

 8         Q.    Okay.  So is she discussing her

 9   pregnancy here?

10              MS. BROWN:  Object to the form.

11              MR. MILLER:  Object to the form.

12              MR. REDMOND:  Same objection to form.

13         A.    Obviously.

14         Q.    Why is it important to know when Ms.

15   Key is due?

16              MS. BROWN:  Object to the form.

17              MR. MILLER:  Object to the form.

18              MR. REDMOND:  Object to the form.

19         A.    As far as I'm concerned, it's not

20   important.  She's just -- it sounds like just

21   plain old garden variety gossip to me.  It's

22   just, you know, security officers talk all the

23   time, so it's just -- they're just letting them
```

Ray Cureton                                          8/30/2022
                                                          73

1   know.

2        Q.    Was Ms. Robinson aware that Ms. Key

3   was filing a complaint against Ms. Robinson and

4   Ms. Williams?

5              MS. BROWN:  Object to the form.

6              MR. MILLER:  Object to the form.

7              MR. REDMOND:  Object to the form.

8        A.    I believe so, yes.

9        Q.    I'm going to show you some e-mails,

10  and I believe that you are the sender, the

11  recipient, or copied on all of these.  And I know

12  the print is super small, and I apologize about

13  that, but that's how it came to us.

14             MS. BROWN:  Do you have the number

15  for us?

16             MS. PALMER:  39.  Sorry.

17             MS. BROWN:  Thank you.

18       A.    Okay.

19       Q.    (BY MS. PALMER:)  So the bottom part

20  of Exhibit 39, because e-mails go backwards, so

21  this is dated July 31st from Gloria Robinson to a

22  number of people with you copied; is that

23  correct?

Ray Cureton                                          8/30/2022
                                                            75

1    paragraph for me, please, and let me know when

2    you've read it.

3          A.    Okay.

4          Q.    Do you see there where she's

5    discussing finding out that Ms. Key is pregnant?

6          A.    Uh-huh (positive response).

7                MS. BROWN:  Object to the form.

8          Q.    And she says that, I take issue with

9    her working in the mailroom.  Do you see that?

10               MR. MILLER:  Object to the form.

11               MS. BROWN:  Object to the form.

12               MR. REDMOND:  Same objection.

13         A.    Yes, I do.

14         Q.    As the recipient -- one of the

15   recipients of this e-mail, what was your

16   understanding about the issue with Ms. Key

17   working in the mailroom?

18               MR. MILLER:  Object to the form.

19               MS. BROWN:  Object to the form.

20               MR. REDMOND:  Objection to form.

21         A.    The only issue would have been the

22   lifting of the fifty pounds.  Pregnancy had

23   nothing to do with this.

Ray Cureton                                              8/30/2022
                                                              76

1          Q.    Would -- did Ms. Key say she couldn't

2    lift fifty pounds?

3               MS. BROWN:  Object to the form.

4          A.    No.

5               MR. MILLER:  Object to form.

6          A.    No, she did not say she couldn't lift

7    fifty pounds.  There was a -- it looks like there

8    was a request for a doctor's note to ensure that

9    she would be able to do so.

10         Q.    Okay.  If you'll flip for me two

11   pages, it's going to be Dynamic-Key 80.

12         A.    Okay.

13         Q.    Does that look like a doctor's note?

14         A.    It does.

15         Q.    Okay.  And what's the date on that

16   doctor's note?

17         A.    July 28th, 2017.

18         Q.    Okay.  And does it list that Ms. Key

19   has any restrictions?

20              MS. BROWN:  Object to the form.

21         A.    No restrictions.  No work limitations

22   noted.

23         Q.    And this doctor's note was attached

Ray Cureton                                      8/30/2022
                                                      78

1          Q.     But looking back to this e-mail, it's
2     clear that Ms. Robinson has an issue with the
3     pregnancy.
4                 MS. BROWN:  Object to the form.
5                 MR. MILLER:  Object to the form.
6                 MR. REDMOND:  Object to the form.
7          A.     But Ms. Robinson ultimately didn't
8     make those kind of decisions.  That decision was
9     made by myself or by HMMA, and we would under no
10    circumstances deny someone employment for being
11    pregnant, period, end of story.
12         Q.     Was Ms. Robinson disciplined related
13    to this?
14         A.     She was not.  Not that I know of.  I
15    didn't discipline her over it.  We may have
16    discussed policy and those kinds of things, but
17    it didn't rise to the form of the place of
18    discipline.
19                What I would have done, and did many
20    times with Ms. Robinson over the time that I was
21    with her, was calm her down and explain to her
22    what the facts were, and that's all I needed.
23    You don't need to get excited.  You don't need to

Ray Cureton                                              8/30/2022
                                                              79

1   get bent out of shape.  Let's just see what we're

2   supposed to do based on the policies.  And when

3   she would come around, we would do what we were

4   supposed to do.

5                   She never actually supported the idea

6   of having someone leave because they were

7   pregnant, if that's what you're looking for.

8   That's never happened.

9        Q.    But that's what the e-mail says, she

10   takes issue --

11       A.    That's not what it says.

12             MS. BROWN:  Object to the form.

13             MR. MILLER:  Object to the form.

14             MR. REDMOND:  Object to the form.

15       A.    That's open to question, and I would

16   not in any way -- I can tell you right now that

17   no one was ever looked at for leaving because

18   they were pregnant, period, not under my watch,

19   no matter what Ms. Robinson said.

20       Q.    What could Ms. Key have done

21   different for Ms. Robinson to not be concerned

22   with her working in the mailroom?

23             MS. BROWN:  Object to the form.

Ray Cureton                                          8/30/2022
                                                          80

1              MR. MILLER:  Object to the form.

2              MR. REDMOND:  Same objection.

3         A.    I think Ms. Key followed the basic

4    steps.  I will say that -- and I'm not saying

5    this about Ms. Key, but many times attitudes get

6    involved, people don't listen to each other, and

7    we're not always on the same page about things.

8    So I don't know.  I don't remember what happened

9    specifically between Ms. Key other than what's on

10   paper here.

11             But I can tell you this:  She would

12   not have been let go for being pregnant.

13        Q.    But what's on paper here is an

14   accurate depiction of what happened, right?

15             MR. MILLER:  Objection to form.

16             MS. BROWN:  Object to the form.

17             MR. REDMOND:  Objection.

18        A.    It is, but the innuendos that you're

19   bringing out of it are not accurate.

20        Q.    That last sentence there, If she's

21   due in five months, unless I cannot count, which

22   I can't, she is already four months and didn't

23   know it.  Do you see that?

Ray Cureton                                          8/30/2022
                                                          81

1        A.      Okay.  Yeah, I remember reading that

2   and --

3        Q.      So Ms. Robinson's referencing Ms.

4   Key's pregnancy?

5        A.      But it's irrelevant.  I'm telling you

6   it's irrelevant.  Ms. Robinson didn't have the

7   power to let her go, and Ms. Robinson would have

8   been counseled.

9            And I've, like I said, counseled many

10  a supervisor on what their duties are when they

11  get, well, excuse the expression, get their

12  underwear in a wad about something.

13       Q.      But Ms. Robinson was not disciplined

14  that you're aware of?

15       A.      Not that I can remember.  It wouldn't

16  have been a need to.  Ms. Robinson was volatile

17  at times and would say things that once she

18  thought about it, probably shouldn't have said

19  that kind of thing.  We all do it at times.

20           And Ms. Robinson was not advocating

21  that we get rid of Ms. Key for her being

22  pregnant, and she knew better than that.  And I

23  guarantee you, my job was to make sure that

Ray Cureton                                              8/30/2022
                                                              82

```
 1  didn't happen.  So I promise it didn't happen.
 2       Q.   But she was ultimately removed from
 3  the Hyundai property, right?
 4            MS. BROWN:  Object to the form.
 5       A.   Ms. Key?  You're talking about Ms.
 6  Key?
 7       Q.   Yes, Ms. Key.
 8       A.   She was ultimately removed at the
 9  client's request.
10       Q.   I'm going to show you Plaintiff's
11  Exhibit 38.  And this is another string of
12  e-mails, so, again, it goes from the bottom to
13  the top.
14            I want to point you specifically to
15  the bottom of page Dynamic-Key 73.  This is an
16  e-mail from Sherry Spires to you and others.  Was
17  Sherry Spires human resources?
18       A.   Yes.
19       Q.   And she's asking here to make sure
20  there's a clear written policy from HMMA.  Do you
21  see that?
22       A.   Yes.
23       Q.   Okay.  So before she sent this
```

Ray Cureton                                    8/30/2022
                                                      84

1   -- what we knew to be the policy.

2        Q.    Now, the e-mail that you're

3   referencing is the top of Page 73 --

4        A.    Yes.

5        Q.    -- which is an e-mail from Gloria

6   Robinson responding to Ms. Spires, right?

7        A.    Yes.

8        Q.    Okay.  So that also didn't come from

9   a document at Dynamic's office.  This came from

10  something Ms. Robinson put into this e-mail?

11            MS. BROWN:  Object to the form.

12            MR. MILLER:  Object to the form.

13       A.    From HMMA, yes.

14       Q.    And I want to point you to the end of

15  Ms. Spire's e-mail, so Page 074.  Under the

16  section Re:  Pregnancy, the last sentence there

17  says, I'm concerned that she might not have

18  mentioned the amount of weight she might have to

19  lift to her doctor.  Do you see that?

20       A.    Yes.

21       Q.    So Ms. Spires is acknowledging that

22  she has concerns about Ms. Key's pregnancy?

23            MS. BROWN:  Object to the form.

Ray Cureton                                              8/30/2022
                                                              85

1               MR. MILLER:  Object to the form.

2               MR. REDMOND:  Same objection.

3       A.    I would dispute that.  I think that

4  her -- it's clear enough it has to do with the

5  amount of weight she has to lift, and that had

6  nothing to do with her pregnancy.

7       Q.    Okay.  And what's the date on this

8  e-mail?

9       A.    The 2nd of August.

10      Q.    Okay.  And by this time, Ms. Key has

11  already provided a doctor's note that says she

12  has no restrictions, right?

13      A.    She has, from the 28th of July.

14      Q.    Like four days earlier?

15      A.    Yes.  And the concern stated in this

16  e-mail is from Sherry, I'm concerned that she

17  might not have mentioned the amount of weight she

18  might have to lift to her doctor.

19               So that clearly demonstrates that she

20  was concerned about lifting weight, not about the

21  pregnancy.

22      Q.    What would give concern that she

23  would have lied about the weight?

Ray Cureton                                          8/30/2022
                                                         89

```
 1   because the pregnancy has nothing to do with

 2   those policies other than it would have to do

 3   with her safety or with her ability to lift fifty

 4   pounds or to be out in the hot sun or whatever.

 5   I don't know.

 6               I mean, these policies are about

 7   hiring and firing, and within any kind of

 8   security site, there are times when certain --

 9   there are certain times when people can't meet

10   the physical standards that are met that they

11   could be moved to another -- we've had people

12   that were -- had difficulties breathing, that you

13   wouldn't put in a particular site where there was

14   -- you would move them to a different location so

15   that they could continue to work.

16               I mean, there's a million different

17   scenarios.  I mean, I don't know what you're

18   trying to get at, but it's no.

19        Q.    I appreciate that.  But if in a

20   situation like this where there is a doctor's

21   note that says no restrictions, okay?

22        A.    Uh-huh (positive response).

23        Q.    And if Ms. Robinson had a doctor's
```

Ray Cureton                                          8/30/2022
                                                          90

```
 1   note that said no restrictions --

 2         A.    Uh-huh (positive response).

 3         Q.    -- but then made changes to an

 4   employee's work assignment because she was

 5   concerned personally about the person's

 6   pregnancy --

 7         A.    Uh-huh (positive response).

 8         Q.    -- would that be a violation of

 9   Dynamic's policies?

10              MS. BROWN:  Object to the form.

11              MR. MILLER:  Object to the form.

12         A.    Okay.  Now -- look, you're asking a

13   -- that question is just out of bounds, because

14   we're not going to change somebody's position

15   just because they're pregnant, okay?

16              That's not Dynamic's policy to change

17   somebody's position just because they're

18   pregnant, no, it is not their policy to do that.

19         Q.    So if that was done, it would be a

20   violation of Dynamic's policy?

21              MS. BROWN:  Object to form.

22              MR. MILLER:  Object to form.

23              MR. REDMOND:  Objection to form.
```

Ray Cureton                                          8/30/2022
                                                          91

 1        A.    You're comparing apples and oranges.

 2   The pregnancy has got nothing to do with it.   I

 3   mean, a person either has the physical ability to

 4   do the job or not, and if Ms. Robinson was

 5   concerned about Ms. Key's situation because of a

 6   physical situation because she couldn't lift the

 7   weight, she would have had the right, probably

 8   unquestioned right, to switch her to a different

 9   position as long as the pay was the same or

10   similar and as long as the -- as it was discussed

11   with the employee and it was explained to the

12   employee and all -- I mean, it's not -- you know,

13   there's no -- I don't know if there's a written

14   policy about that kind of thing other than what a

15   person can physically handle or not handle.

16        Q.    And is there any indication here that

17   Ms. Key could not have physically handled the

18   requirements of the mailroom at Hyundai?

19             MS. BROWN:  Object to the form.

20             MR. MILLER:  Object to the form.

21        A.    There is nothing that I've seen that

22   says so.  But also I'm going to add that that's

23   irrelevant as far as Dynamic Security is

Ray Cureton                                          8/30/2022
                                                          98

1    official complaint, end quote, of discrimination

2    against Hyundai, Ms. Williams, and Ms. Robinson.

3    Do you see that?

4         A.    I do.

5         Q.    So why would it not be advisable to

6    reassign Ms. Key?

7               MR. REDMOND:  Object to form.

8         A.    Okay.  The last question on this

9    e-mail says, Any guidance or thoughts.  So what I

10   was doing was going to HR asking them to advise

11   me on how to act or what to do next, what would

12   be the best policy.

13              I was concerned that if she was

14   bringing forth the official complaint, what was

15   the policy of Dynamic in reference to keeping a

16   person working if they are going through the

17   official complaint like this.  That's all I was

18   asking.

19              I didn't have an opinion about it one

20   way or the other, just trying to find out what

21   Dynamic's policy was.  Just I wondered does it

22   make sense to keep somebody on.  I'm wondering as

23   a manager, asking my bosses, Does that make sense

Ray Cureton                                        8/30/2022
                                                        99

1   to keep somebody on who has an official complaint

2   going?  And they advised me, and I followed

3   through with what they said.

4        Q.    As a manager that deals with that and

5   just asking, you know --

6        A.    Yeah, yeah.

7        Q.    -- I wonder, did you have a leaning

8   one way or the other as to whether you would

9   think it was advisable or not?

10            MR. REDMOND:  You're talking about

11   back then?

12            MS. PALMER:  Yes.

13       A.    Yes, back then.  I would say I didn't

14   know, and that's why I was asking the question.

15   My personal leaning would have been to keep them

16   on unless there's a material reason not to,

17   because that's really what the policy boils down

18   to.

19            So this was a question just asked

20   more out of curiosity than out of, you know, I'm

21   planning on not doing anything with it, I'm going

22   to get rid of her, no, that was not what was in

23   my mind, I can guarantee that, or what I was

Ray Cureton                                          8/30/2022
                                                         101

1   policies that they had agreed to or if they

2   couldn't work a particular site, but not

3   connected with the complaint.  They don't connect

4   it with the complaint.

5           The complaint is never a reason to

6   let somebody go, okay?  Does that answer your

7   question?

8       Q.   Did you receive training from Dynamic

9   Security about how to respond to complaints like

10  this?

11      A.   Yes, of course.

12      Q.   Okay.  And did that training include

13  non-retaliation provisions?

14      A.   Yes, yes, yes.  Of course.

15      Q.   And do you understand from that

16  training that not reassigning someone or not

17  providing someone -- let me ask it this way:  Do

18  you understand from that training that not

19  offering someone another position would be

20  retaliation?

21      A.   It could be -- it could be termed

22  that way, yes.

23      Q.   It could be.  When would it not be?

Ray Cureton                                          8/30/2022
                                                         104

1   particular case and making sure she was aware of

2   all the information that was necessary for her to

3   advise.

4        Q.    You see down at the very last

5   sentence of Ms. Williams' e-mail, I foresee an

6   issue down the road with this person?

7        A.    Yes.

8        Q.    As the recipient of this e-mail, what

9   did you understand that to mean?

10             MS. BROWN:   Object to the form.

11             MR. MILLER:   Object to the form.

12             MR. REDMOND:   Same objection to form.

13       A.    That was an opinion from Ms. Williams

14   about potential issues.  It didn't -- she didn't

15   specify what those issues were.

16             Typically, she would tell me, Oh, the

17   person has got an attitude or something like

18   that.  But in this specific instance here, I'm

19   sure she was talking about, as she says in the

20   e-mail, about her ability to lift boxes.  And

21   also, as we know, about -- ultimately, about the

22   hair situation, the appearance standards.

23       Q.    And so you've mentioned her lifting

Ray Cureton                                    8/30/2022
                                                    108

```
 1   talking about on these e-mails?
 2        A.    Yes, yes.
 3        Q.    Did Ms. Key sign these forms?
 4        A.    She did not.  There's no place for
 5   her to sign them.
 6        Q.    And you didn't request that she sign
 7   the forms?
 8        A.    I don't recall.
 9        Q.    Do you recall whether you presented
10   both of these job opportunities to Ms. Key at one
11   time?
12        A.    They were both presented at the same
13   time, I'm sure, yeah.
14        Q.    Okay.
15        A.    I --
16        Q.    Would that have been in person or
17   over the phone?
18             MR. REDMOND:  Objection.  Asked and
19   answered.
20        A.    I don't remember.  Most likely, it
21   would have been in person, though.  I mean, I
22   can't imagine -- I don't know.  I don't know
23   which I did.  I don't know.
```

Ray Cureton                                  8/30/2022
                                                  117

```
 1    specifically to the bottom of Page 51, which is
 2    an e-mail from you, again, to Sherry.  What's the
 3    date of that e-mail?
 4         A.    August 10th.
 5         Q.    Okay.  And your second to the last
 6    sentence, just before your thanks, it says,
 7    Lastly, in light of her current complaint, am I
 8    free to offer her a position with Dynamic should
 9    we be able to agree on a place for her to work.
10    Do you see that?
11         A.    Yes.
12         Q.    So is this now the second time that
13    you've asked if you can place Ms. Key somewhere
14    else in light of her current complaint?
15              MR. REDMOND:  Object to the form.
16         A.    Seems like that's true.
17         Q.    All right.  If you'll flip for me to
18    Page 53, which is maybe the beginning-ish of this
19    string, your last sentence there, I'm not sure
20    what action Ms. Key expects us to take, but
21    please advise concerning any other steps you need
22    me to take.  Do you see that?
23         A.    Yes.
```

Ray Cureton                                      8/30/2022
                                                      119

 1          Q.    And was it mostly common for you and

 2   Ms. Spires to communicate by e-mail?

 3          A.    Almost entirely, yeah.

 4          Q.    Let me show you Plaintiff's Exhibit

 5   30 -- 37?

 6                MR. REDMOND:  Yes.

 7          Q.    Everything needs to be 30 today

 8   apparently.

 9          A.    Okay.  Let's see here.

10          Q.    Okay.  I'm going to point you to the

11   second page, so Page 70, Dynamic-Key 70.  What's

12   the date of that e-mail from you to Sherry?

13          A.    August 7th.

14          Q.    Okay.  And first off, the very last

15   sentence, you say, Also, is it advisable to try

16   to move her to a different site when she is

17   making threats to sue HMMA over the appearance

18   standards?  Do you see that?

19          A.    Still asking the question, am I not?

20          Q.    Does that -- so that's a third time?

21          A.    Yeah, it looks like it.

22          Q.    Okay.  You said you're still asking

23   the question.  Did they provide you an answer at

Ray Cureton                                         8/30/2022
                                                         123

1        A.      August 29th, 2017.

2        Q.      And so as of this e-mail, August

3    29th, we're roughly twenty-nine days after she's

4    been removed from Hyundai.  Were the two offers

5    in the refusal forms that we saw earlier the only

6    positions that had been offered to her at that

7    point that you can recall?

8                MS. BROWN:  Object to the form.

9        A.      Well, I can only recall them because

10   I've got the paperwork, so we could have verbally

11   -- we could have easily verbally talked to her

12   about other things, but I don't know that we did.

13       Q.      If you had verbally offered her

14   another position and she had turned it down,

15   would you have completed an assignment refusal

16   form?

17               MS. BROWN:  Object to the form.

18               MR. REDMOND:  Object to the form.

19               MR. MILLER:  Object to the form.

20       A.      Well, at the time that the situation

21   was going on, things were pretty much in turmoil

22   just across the branch, and there was -- thinking

23   about it now, there were several other sites that

Ray Cureton                                    8/30/2022
                                                    124

1   needed immediate attention.  So I may have been

2   getting ready to do that, and then, like I said,

3   the next week I was gone.  So I can't -- they

4   would be the standard policy to do that, yes.

5          Q.   Okay.  And, again, Ms. Key says that

6   she was not offered any positions.  So you

7   dispute that?

8          A.   Well, she was offered the two

9   positions that are refused on the paperwork, but

10  I don't know about any -- if she was offered

11  anything else or not.  As of the 14th, we didn't

12  have anything else to offer her, and -- well, the

13  paperwork speaks for itself.

14         Q.   You said that the branch was in

15  turmoil.  What was going on at the branch?

16         A.   Well, we had let go several managers

17  in the organization, and so there was a new site

18  out in Selma that was causing a lot of uproar.

19  It was a consuming a lot of time for me trying to

20  find a field supervisor at the time, some things

21  that were going on, just normal security business

22  kind of things that were happening.

23         Q.   What was the new site in Selma?

Ray Cureton                                    8/30/2022
                                                    126

1           A.     Yes, she was.

2           Q.     Was she offered any position at Bush

3    Hog or Honda Locks?

4           A.     I do not recall.

5           Q.     The -- after you left -- sorry.

6    After Dynamic terminated you, you took some time

7    off.  You said you semi-retired --

8           A.     Uh-huh (positive response).

9           Q.     -- and then you went to work for

10   Dothan Security, and you mentioned that Dothan

11   then picked up the Hyundai contract.

12          A.     Correct.

13          Q.     So was it the same job, same duties,

14   same positions?

15          A.     Same job, same duties, same people in

16   charge as far as our contacts at Hyundai were

17   concerned, at least at the level of the

18   operations manager.  Ms. Williams was still in

19   charge just like she was back in 2017.

20          Q.     And do you have any recollection of

21   when that happened, when Dothan took the contract

22   for Hyundai?

23          A.     Yeah.  It's just been recently, I

```
 1   mean, within --

 2            MS. BROWN:  Object to the form.

 3       A.   I worked there from April, and I

 4   guess it must have been around October, November

 5   timeframe that -- and, you know, I could go look

 6   it up, but I want to say October, November

 7   timeframe that Dothan Security took it over.

 8       Q.   Of 2021?

 9       A.   Of 2021, yes.

10       Q.   Okay.  Did you participate at all in

11   the EEOC response letter that Dynamic provided?

12            MR. REDMOND:  Object to the form,

13   just participate.

14       A.   I don't recall.

15       Q.   Do you remember if Ms. Riddle asked

16   you specific questions or asked you for specific

17   information to respond to Ms. Key's EEOC charge?

18       A.   I don't know if that's the generation

19   of Exhibit 45 or not.  It might be.  It may have

20   been where that came from.  I see she is copied

21   on that e-mail, so I don't know, on the

22   unemployment rebuttal thing there.  I don't know.

23   I mean, you would have to ask her.  I don't know.
```