IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DAVITA M. KEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:19-CV-767-ECM |
| ) | |
| HYUNDAI MOTOR ) | |
| MANUFACTURING, ALABAMA, ) | |
| LLC; HYUNDAI ENG AMERICA, ) | |
| INC.; and DYNAMIC SECURITY, ) | |
| INC. ) | |
| ) | |
| Defendants. ) | |

**EXHIBIT "B" TO**

**PLAINTIFF'S OBJECTIONS TO DYNAMIC SECURITY INC.'S DEPOSITION DESIGNATIONS**

**SHERRY SPIRES**

| Case | Key, Davita |
|---|---|
| Issue Code | Dynamic Designation |

| SPIERS, SHERRY 8/19/22 VOL 1 | | |
|---|---|---|
| 1 | 008:20 - 020:22 | 008:20 BY MS. PALMER:
21   Q.   Ms. Spires, could you please state
22 and spell your name for the record?
23   A.   Sherry Spires, S-H-E-R-R-Y,
009:01 S-P-I-R-E-S.
02   Q.   And who do you work for?
03   A.   Dynamic Security, INC.
04   Q.   My name is Leslie Palmer, and I
05 represent, along with Heather Leonard, Davita
06 Key, in her lawsuit again Dynamic Security,
07 Hyundai Motor Manufacturing, and Hyundai
08 Engineering America.
09        So we have called you here today to
10 provide testimony in this case, and I'm going
11 to show you -- well, first, let's go over some
12 of the background stuff.
13        Have you ever given a deposition
14 before?
15   A.   Yes.
16   Q.   How many times?
17   A.   Three or four.
18   Q.   Were all of those related to your
19 employment with Dynamic Security?
20   A.   All but one.
21   Q.   Okay.  Let's talk about the ones that
22 were related to Dynamic Security.  What can you
23 tell me about those depositions?
010:01   A.   Well, the last one was a few weeks
02 ago, and it had to do with a worker's comp
03 claim.
04   Q.   Okay.  And what about the one before
05 that?
06   A.   It was last summer, and I honestly
07 cannot remember.
08   Q.   Was it a worker's comp claim or a
09 discrimination claim?
10   A.   I believe it was worker's comp. |

11   Q.   Okay.  And then you said three or
12   four.  Is there another one you can recall?
13   A.   I think the other one that I'm trying
14   to remember -- oh, I remember the other one
15   now.  It was a discrimination.  It was a lady
16   that worked in our Knoxville, Tennessee office.
17   A deposition in Muscle Shoals.
18   Q.   When was that deposition with the
19   discrimination claim?
20   A.   Two to three years ago, I'm guessing.
21   Q.   And what was her claim of
22   discrimination?
23   A.   Her claim was -- I can't remember if
011:01 hers was that she was a different nationality
02   or the fact that she was gay.  One or the
03   other.
04   Q.   Something under --
05   A.   I believe.  If I'm remembering
06   correctly.
07   Q.   Something under Title 7?
08   A.   I don't remember.
09   Q.   Okay.  Do you recall if there was an
10   EEOC charge in that case or if it was just...
11   A.   I don't remember.
12   Q.   So you've given a couple of
13   depositions, so you're probably familiar with
14   the rules.  But we have a court reporter here
15   taking your testimony today, so we need you to
16   answer out loud.
17   A.   Okay.
18   Q.   Let's try not to talk over each
19   other.  It's really hard sometimes in natural
20   conversation, but it makes it easier for her if
21   we don't do that.  Can we agree that if you
22   don't understand a question, you'll ask me to
23   rephrase it or ask it again?
012:01 A.   Yes.
02   Q.   And by that, can we agree that if you
03   answer a question that means that you
04   understood the question?
05   A.   Yes.
06   Q.   I'm going to show you what has been
07   marked as Plaintiff's Exhibit 26.

```
08              (Whereupon, Plaintiff's Exhibit 26
09              was marked for identification and
10              copy of same is attached hereto.)
11       Q.    This is the deposition notice for the
12   corporate representative of Dynamic Security.
13   Have you seen this document?
14       A.    Yes.
15       Q.    Okay.  And you were identified as one
16   of the corporate representatives to speak on a
17   number of these topics and documents.  Do you
18   understand that that means that you're here
19   today speaking on behalf of Dynamic Security?
20       A.    Yes.
21       Q.    Okay.  And that means that you're the
22   voice of the company.
23       A.    Yes.
013:01   Q.    Did you bring any documents with you
02   today responsive to this deposition notice?
03       A.    No.
04       Q.    What documents did you use to prepare
05   for your testimony today?
06       A.    The e-mails and everything that I --
07   well, I did -- actually did not have a file.  I
08   had to go back and retrieve e-mails to remember
09   the circumstances and what all took place.
10       Q.    Okay.  Did you meet with counsel to
11   prepare today?
12       A.    Yes.
13       Q.    Okay.  When did you meet with him?
14       A.    Day before yesterday and yesterday.
15       Q.    How long?
16       A.    Maybe four hours on Wednesday and
17   maybe an hour yesterday.
18       Q.    What else did you do to prepare?
19       A.    Nothing.
20       Q.    The file that you recreated to
21   prepare today, how did you recreate that file?
22       A.    I printed off all e-mails.  I did a
23   search for Davita Key's name.
014:01   Q.    Okay.  Just Davita's name?
02       A.    Yes.
03       Q.    Okay.  Do you feel adequately
04   prepared to testify today?
```

```
05   A.   Yes.
06        MS. PALMER:  She was a little
07   hesitant there.
08        MR. REDMOND:  She hesitated just a
09   little more than I would have liked.
10   A.   May I add, I may be fuzzy on some
11   because it has been quite some time ago.
12   Q.   Okay.  And we do have a number of
13   documents here today, so if you believe there's
14   a document that may help refresh your memory --
15   A.   Okay.
16   Q.   -- if you can just point that out,
17   we'll be sure to provide it to you.  Okay?
18   A.   Okay.
19   Q.   You are lucky because you're going
20   second.  So we don't have to cover a lot of the
21   things with you.  I want to show you what was
22   marked as Plaintiff's Exhibit 29.  Do you
23   recognize that document?
015:01 A.   I do.
02   Q.   And what do you recognize that
03   document to be?
04   A.   Davita Key's statement that she wrote
05   on 8/1/17.
06   Q.   Okay.  And when was the first time
07   you saw that document?
08   A.   I don't remember.
09   Q.   Okay.  Would that document have been
10   sent to you by the branch, by the Montgomery
11   office?
12   A.   Yes, it would have been sent to me by
13   someone from the Montgomery office.
14   Q.   And what would you have done when you
15   received it?
16   A.   I would have read it and put it in
17   her file.
18   Q.   Did you conduct any investigation
19   into Ms. Key's claim?
20   A.   I did have numerous e-mails back and
21   forth with Ray Cureton, who was the district
22   manager in Montgomery at the time, to make sure
23   we handled her complaint appropriately.
016:01 Q.   Okay.  And what would you consider
```

```
02  appropriately in the handling of a complaint?
03      A.   I'm trying to remember.
04           THE WITNESS:  Is this the first one?
05           MR. REDMOND:  I'm going to object to
06  the form of that.
07      Q.   You can answer.
08           MR. REDMOND:  Oh, yeah.  I'm sorry.
09  I should have told you.
10      A.   Oh, okay.
11           MR. REDMOND:  You can still answer.
12  There's no judge here to rule so...
13      A.   Repeat your question again, please.
14      Q.   You said that --
15           MS. PALMER:  Can you reread it?
16           THE COURT REPORTER:  "And what would
17  you consider appropriately in the handling of a
18  complaint?"
19           Do I need to read before that?
20           MS. PALMER:  No.  That's okay.
21      A.   That we were abiding by our policies
22  and procedures based on what her complaint was.
23      Q.   Okay.  And what determination did you
017:01  make with regard to Davita Key?
02           MS. BROWN:  Object to the form.
03           MR. REDMOND:  Same objection.
04           MR. MILLER:  Object to the form.
05      Q.   You can answer.
06      A.   That's throwing me off.  Rephrase the
07  question.
08      Q.   So you said that you had
09  communications with Ray to make sure that
10  everything was handled appropriately.
11           What determination did you make with
12  regard to Ms. Key as to whether everything was
13  handled appropriately?
14      A.   Her first complaint was that we had
15  discriminated because of her hair.  And I
16  remember telling or communicating with Ray,
17  probably via e-mail, that let's make sure that
18  we're abiding by Hyundai's policy as well.
19           Because different races, religions
20  have different standards sometimes with the
21  hair accessories, so it might be different from
```

```
          22  one job site to another.  So I told him that
          23  let's make sure that her hair style was not in
     018:01  line with what Hyundai's policy was.
          02       Q.    Okay.  And what did you do to make
          03  sure that Dynamic was following Hyundai's
          04  policy?
          05       A.    What did I do --
          06             MS. BROWN:  Object to the form.
          07       A.    -- I'm not sure I did exactly
          08  anything because at some point during that time
          09  frame, there was an e-mail from Cassandra
          10  Williams and/or Gloria Robinson that said they
          11  wanted Ms. Key removed from that job site.
          12       Q.    Okay.  So did Dynamic then remove her
          13  in response to that e-mail?
          14       A.    Yes.
          15       Q.    Did you direct Ray Cureton, or did
          16  you personally request a copy of the Hyundai
          17  policy that Ms. Key was alleged to have
          18  violated?
          19             MS. BROWN:  Object to form.
          20             MR. MILLER:  Object to form.
          21       A.    Not that I recall.
          22       Q.    Who else would have been aware of
          23  Ms. Key's complaint contained in Exhibit 29?
     019:01             MR. REDMOND:  Object to form.
          02             MS. BROWN:  Object to form.
          03       Q.    Who employed with Dynamic Security
          04  would have received a copy of Exhibit 29?
          05       A.    I don't know of anyone other than
          06  myself, Ray Cureton, Cassandra Williams, and
          07  Gloria Robinson.
          08       Q.    And do you have any knowledge as to
          09  what Ray Cureton would have done to investigate
          10  the complaint?
          11       A.    He would have communicated with me.
          12       Q.    What direction did you give him with
          13  regard to the investigation?
          14       A.    There was such a short time frame
          15  because she was only there a couple of days.
          16  And it was determined at the -- on the second
          17  day that they -- I guess it was the second day
          18  that they were going -- she was not going to
```

|   |   |   |   |
|---|---|---|---|
|   |   | 19 | work out at Hyundai and to remove her from the |
|   |   | 20 | job site. |
|   |   | 21 | Q.    What's your understanding as to why |
|   |   | 22 | she wasn't going to work out at Hyundai? |
|   |   | 23 | MS. BROWN:  Object to form. |
|   |   | 020:01 | A.    Because she refused to follow their |
|   |   | 02 | grooming policy. |
|   |   | 03 | Q.    Do you have any knowledge as to |
|   |   | 04 | whether they were concerned about her |
|   |   | 05 | pregnancy? |
|   |   | 06 | MS. BROWN:  Object to form. |
|   |   | 07 | MR. MILLER:  Object to form. |
|   |   | 08 | A.    I don't know.  I know that she made |
|   |   | 09 | it known that she was pregnant, but the action |
|   |   | 10 | that was taken to remove her from her job site |
|   |   | 11 | had nothing to do with her pregnancy. |
|   |   | 12 | Q.    How did the investigation into the |
|   |   | 13 | complaint contained in Exhibit 29 conclude? |
|   |   | 14 | A.    We're still talking about this |
|   |   | 15 | (indicating)? |
|   |   | 16 | Q.    Yes.  Exhibit 29. |
|   |   | 17 | A.    It concluded that she was going to be |
|   |   | 18 | removed from the job site. |
|   |   | 19 | Q.    And what did Dynamic Security do with |
|   |   | 20 | Ms. Key after she was removed from the Hyundai |
|   |   | 21 | job site? |
|   |   | 22 | A.    They offered her two other job sites. |
| 2 | 021:15 - 021:16 | 021:15 | MS. BROWN:  Object to form. |
|   |   | 16 | MR. MILLER:  Object to the form. |
| 3 | 023:03 - 023:11 | 023:03 | A.    I don't know.  I don't know if he |
|   |   | 04 | would have sent it on August 1 or if he would |
|   |   | 05 | have sent it later when I might have requested |
|   |   | 06 | it. |
|   |   | 07 | Q.    Okay.  And it says, "Forwarded for |
|   |   | 08 | resolution."  Who would have decided the |
|   |   | 09 | resolution? |
|   |   | 10 | A.    In some cases I decide resolutions, |
|   |   | 11 | but in this case, it had already been resolved. |
| 4 | 025:05 - 025:05 | 025:05 | MR. REDMOND:  Object to form. |
| 5 | 025:17 - 025:19 | 025:17 | MR. REDMOND:  Same objection. |
|   |   | 18 | MS. BROWN:  Object to the form. |

| | | | | |
|---|---|---|---|---|
| | | 19 | | MR. MILLER:  Object to the form. |
| 6 | 026:09 - 026:13 | 026:09 | Q. | Do you know if Gloria asked her? |
| | | 10 | A. | I don't know. |
| | | 11 | Q. | Did you instruct Ray to ask her if |
| | | 12 | she had told her doctor? | |
| | | 13 | A. | I don't remember. |
| 7 | 031:07 - 034:11 | 031:07 | Q. | Look at Exhibit 38. |
| | | 08 | | (Whereupon, Plaintiff's Exhibit 38 |
| | | 09 | | was marked for identification and |
| | | 10 | | copy of same is attached hereto.) |
| | | 11 | Q. | And we have pages -- Dynamic-Key 73 |
| | | 12 | through 77.  Do you recognize this document? | |
| | | 13 | A. | Yes. |
| | | 14 | Q. | And are you identified as a recipient |
| | | 15 | of these e-mails -- | |
| | | 16 | A. | Yes. |
| | | 17 | Q. | -- in exhibit 38? |
| | | 18 | A. | Yes. |
| | | 19 | Q. | Okay.  Let's go down to the bottom of |
| | | 20 | -- let's go to page 74, so the next page.  Is | |
| | | 21 | that your signature at the bottom of that | |
| | | 22 | e-mail? | |
| | | 23 | A. | Yes. |
| | | 032:01 | Q. | Okay.  So if you'll go back up to the |
| | | 02 | page before it.  Did you send this -- the | |
| | | 03 | original e-mail? | |
| | | 04 | A. | Yes. |
| | | 05 | Q. | Okay.  And who did you send it to? |
| | | 06 | A. | Ray Cureton, Gloria Robinson, and I |
| | | 07 | copied Tracey Peoples and Chris Hargrove. | |
| | | 08 | Q. | Okay.  And what were you referencing |
| | | 09 | in this e-mail? | |
| | | 10 | A. | I was referencing Davita Key's |
| | | 11 | complaint. | |
| | | 12 | Q. | Okay.  And it says, "Let's make sure |
| | | 13 | there's a clear written policy from HMMA"; do | |
| | | 14 | you see that? | |
| | | 15 | A. | Yes. |
| | | 16 | Q. | What did you do to make sure there |
| | | 17 | was a clear written policy from HMMA? | |
| | | 18 | A. | I don't remember.  Unless it's in |
| | | 19 | e-mails what came after I said that.  That | |

|   |   |   |   |
|---|---|---|---|
|   |   | 20 | let's make sure there is a policy.  Well -- but |
|   |   | 21 | then -- okay.  Here's the -- here's the answer. |
|   |   | 22 | Q.    Okay.  So you're pointing to the text |
|   |   | 23 | at the top of Exhibit 38.  Aside from seeing |
|   |   | 033:01 | this text, did you do anything to make sure |
|   |   | 02 | there was a clear written policy?  Did you |
|   |   | 03 | request a hard copy or a photograph of a |
|   |   | 04 | policy? |
|   |   | 05 | A.    No. |
|   |   | 06 | Q.    At the bottom of that page and |
|   |   | 07 | running into the next page, you're talking |
|   |   | 08 | about, "If this move takes place, make sure she |
|   |   | 09 | understands it's because of her unwillingness |
|   |   | 10 | to abide by that written policy," all caps, |
|   |   | 11 | "not because she is pregnant"; do you see that? |
|   |   | 12 | A.    Yes. |
|   |   | 13 | Q.    Why is it important to make sure that |
|   |   | 14 | she knew that it wasn't because she was |
|   |   | 15 | pregnant? |
|   |   | 16 | A.    Because at that point, she had |
|   |   | 17 | already disclosed the fact that she was |
|   |   | 18 | pregnant, and we do not discriminate against |
|   |   | 19 | women who are pregnant. |
|   |   | 20 | And I did not want her to think |
|   |   | 21 | that's why she's being removed from that job |
|   |   | 22 | site.  It's clearly because she -- of her |
|   |   | 23 | unwillingness to abide by the grooming policy. |
|   |   | 034:01 | Q.    So would transferring or removing an |
|   |   | 02 | employee from a job site, could that be |
|   |   | 03 | considered pregnancy discrimination, if you -- |
|   |   | 04 | if they were pregnant? |
|   |   | 05 | MR. MILLER:  Object to the form. |
|   |   | 06 | MS. BROWN:  Object to the form. |
|   |   | 07 | MR. REDMOND:  Object to the form. |
|   |   | 08 | A.    We would not do that based on a |
|   |   | 09 | pregnancy, unless it had to do with job |
|   |   | 10 | restrictions from her doctor.  And I'm saying, |
|   |   | 11 | "if." |
| 8 | 034:18 - 035:05 | 034:18 | Q.    You said that Dynamic does not |
|   |   | 19 | discriminate.  How do you know Dynamic does not |
|   |   | 20 | discriminate? |
|   |   | 21 | A.    I know our practices.  We do not.  If |

| | | | | |
|---|---|---|---|---|
| | | | 22 | there's any cases out there, I'm not aware of |
| | | | 23 | it. |
| | | 035:01 | Q. | What do you do -- what does Dynamic |
| | | | 02 | do -- let me rephrase it that way.  What does |
| | | | 03 | Dynamic do to ensure that it's employees do not |
| | | | 04 | discriminate? |
| | | | 05 | A.   They should receive training. |
| 9 | 035:20 - 038:01 | 035:20 | | (Whereupon, Plaintiff's Exhibit 40 |
| | | | 21 | was marked for identification and |
| | | | 22 | copy of same is attached hereto.) |
| | | | 23 | Q.   Do you recognize that document? |
| | | 036:01 | A.   Yes. |
| | | | 02 | Q.   Okay.  And this is an e-mail from Ray |
| | | | 03 | Curaton to you; correct? |
| | | | 04 | A.   Yes. |
| | | | 05 | Q.   Okay.  So at the -- one of his last |
| | | | 06 | sentences there, he says, talking about |
| | | | 07 | reassigning her, "But I don't think that is |
| | | | 08 | advisable at this time.  Especially if she is |
| | | | 09 | to carry through with her stated, quote, |
| | | | 10 | official complaint, end quote, of |
| | | | 11 | discrimination against Hyundai, Ms. Williams |
| | | | 12 | and Ms. Robinson"; do you see that? |
| | | | 13 | A.   I do. |
| | | | 14 | Q.   Okay.  So does that statement by |
| | | | 15 | Mr. Cureton that he doesn't think it's |
| | | | 16 | advisable to reassign her raise any issue with |
| | | | 17 | you? |
| | | | 18 | A.   That was his opinion. |
| | | | 19 | Q.   Okay.  What action did you take in |
| | | | 20 | response to this e-mail? |
| | | | 21 | A.   To offer her another job site. |
| | | | 22 | Q.   You told him to offer her another job |
| | | | 23 | site? |
| | | 037:01 | A.   Yes. |
| | | | 02 | Q.   Okay.  What did you do to ensure that |
| | | | 03 | he did that? |
| | | | 04 | A.   It's in an e-mail from me to him |
| | | | 05 | to let's make sure we offer her another job |
| | | | 06 | site. |
| | | | 07 | Q.   Okay.  Did you instruct him that it |
| | | | 08 | was discriminatory to not place her at another |

|    |                   |        |                                                                 |
|----|-------------------|--------|-----------------------------------------------------------------|
|    |                   | 09     | job site?                                                       |
|    |                   | 10     | MR. MILLER:  Object to the form.                                |
|    |                   | 11     | A.   I don't think I would have used those                      |
|    |                   | 12     | words.  I would have just put in the e-mail,                    |
|    |                   | 13     | let's make sure we offer her other job sites.                   |
|    |                   | 14     | Q.   Do you, in your functions as human                         |
|    |                   | 15     | resources, see not placing Ms. Key because                      |
|    |                   | 16     | she's made a complaint as discriminatory                        |
|    |                   | 17     | conduct?                                                        |
|    |                   | 18     | MR. REDMOND:  Object to the form.                               |
|    |                   | 19     | MS. BROWN:  Object to the form.                                 |
|    |                   | 20     | MR. MILLER:  Object to the form.                                |
|    |                   | 21     | A.   I'm not understanding the question,                        |
|    |                   | 22     | because we did offer her.  So we didn't                         |
|    |                   | 23     | discriminate against her and not offer her any                  |
|    |                   | 038:01 | job sites.  We did.                                             |
| 10 | 038:08 - 038:10   | 038:08 | MR. MILLER:  Object to form.                                    |
|    |                   | 09     | MS. BROWN:  Object to form.                                     |
|    |                   | 10     | MR. REDMOND:  Same object to form.                              |
| 11 | 038:18 - 038:19   | 038:18 | MR. REDMOND:  Object to the form.                               |
|    |                   | 19     | MR. MILLER:  Object to the form.                                |
| 12 | 043:06 - 044:07   | 043:06 | Q.   When an assignment is offered to a                         |
|    |                   | 07     | security officer, how is that assignment                        |
|    |                   | 08     | offered?                                                        |
|    |                   | 09     | A.   It should be on a standard assignment                      |
|    |                   | 10     | form.                                                           |
|    |                   | 11     | Q.   Okay.  And is that a Dynamic Security                      |
|    |                   | 12     | form?                                                           |
|    |                   | 13     | A.   Yes.                                                       |
|    |                   | 14     | Q.   And what type of information would                         |
|    |                   | 15     | that form provide?                                              |
|    |                   | 16     | A.   It would have the job site, the rate                       |
|    |                   | 17     | of pay, and the schedule, as in hours, whether                  |
|    |                   | 18     | it's 8:00 to 5:00, 5:00 to 11:00.                               |
|    |                   | 19     | Q.   And if an employee turns, or if a                          |
|    |                   | 20     | security officer turns down a job offer or an                   |
|    |                   | 21     | assignment, how would that turn-down be noted?                  |
|    |                   | 22     | A.   It would either be noted on the job                        |
|    |                   | 23     | assignment form, or it would be noted on a                      |
|    |                   | 044:01 | different form called a job refusal form.                       |
|    |                   | 02     | Q.   Would the employee who turned down                         |
|    |                   | 03     | the assignment notate that document?  Would                     |

| | | | |
|---|---|---|---|
| | | 04 | they sign that document or be given a copy of |
| | | 05 | that document? |
| | | 06 | A.   They would not be given a copy, and I |
| | | 07 | do not know if they sign it or not. |
| 13 | 044:15 - 045:21 | 044:15 | Q.   Is stating a shift preference the |
| | | 16 | same as turning down a job? |
| | | 17 | A.   No. |
| | | 18 | Q.   Let me show you Exhibit 28. |
| | | 19 | (Whereupon, Plaintiff's Exhibit 28 |
| | | 20 | was marked for identification and |
| | | 21 | copy of same is attached hereto.) |
| | | 22 | Q.   Is that the assignment refusal forms |
| | | 23 | that you were referencing? |
| | | 045:01 | A.   Yes. |
| | | 02 | Q.   Okay.  But you said there could be |
| | | 03 | another one called -- |
| | | 04 | A.   Job refusal form. |
| | | 05 | Q.   Or the offer -- job offer?  Is there |
| | | 06 | one that's a job offer? |
| | | 07 | A.   Well, maybe.  I've got assignment |
| | | 08 | refusal and job refusal.  I'm probably thinking |
| | | 09 | the same form. |
| | | 10 | Q.   Okay.  So you're not aware of another |
| | | 11 | form that would be completed? |
| | | 12 | A.   No.  No. |
| | | 13 | Q.   On Exhibit 28, whose assignment |
| | | 14 | refusal form is this? |
| | | 15 | A.   Davita Key. |
| | | 16 | Q.   And who completed this document? |
| | | 17 | A.   Ray Cureton. |
| | | 18 | Q.   Okay.  And it's two pages, so do I |
| | | 19 | take that to mean that there were two offers |
| | | 20 | refused? |
| | | 21 | A.   Yes. |
| 14 | 046:02 - 046:16 | 046:02 | Q.   Okay.  And her -- the current |
| | | 03 | assignment that Ms. Key would have been leaving |
| | | 04 | on both of these forms was identified as HMMA; |
| | | 05 | is that correct? |
| | | 06 | A.   Correct. |
| | | 07 | Q.   Okay.  And both of those were first |
| | | 08 | shift 40 hours? |
| | | 09 | A.   Yes. |

| | | | | |
|---|---|---|---|---|
| | | 10 | Q. | Okay. Are you aware of what her rate |
| | | 11 | | of pay would have been with Dynamic Security at |
| | | 12 | | HMMA? |
| | | 13 | A. | I don't remember. |
| | | 14 | Q. | And what was the reason listed for |
| | | 15 | | her removal? |
| | | 16 | A. | Per client's request. |
| 15 | 047:04 - 047:06 | 047:04 | Q. | And what's the reason listed there |
| | | 05 | | for her refusal? |
| | | 06 | A. | That she could only work first shift. |
| 16 | 056:08 - 058:01 | 056:08 | Q. | Let me show you Exhibit 37. |
| | | 09 | | (Whereupon, Plaintiff's Exhibit 37 |
| | | 10 | | was marked for identification and |
| | | 11 | | copy of same is attached hereto.) |
| | | 12 | Q. | And we have more e-mails. This is |
| | | 13 | | Dynamic-Key 69 through 72. And the top one |
| | | 14 | | there, is that from Ray Cureton to you? |
| | | 15 | A. | Yes. |
| | | 16 | Q. | And he's -- he's asking you here, |
| | | 17 | | through this series of e-mails, about providing |
| | | 18 | | a copy of documents to an employee from the |
| | | 19 | | personnel file; is that right? Just to kind of |
| | | 20 | | summarize it. |
| | | 21 | A. | Okay. You're at the bottom of this |
| | | 22 | | first page? |
| | | 23 | Q. | Through the whole document. I -- |
| | | 057:01 | | but, yes. The -- I think it references it |
| | | 02 | | there. His request, if you want to look at his |
| | | 03 | | request, is on page 70 is where it starts |
| | | 04 | | because the e-mails kind of go in reverse. |
| | | 05 | A. | Okay. |
| | | 06 | Q. | Okay. And he says that, "We do not |
| | | 07 | | give copies of disciplinary reports when they |
| | | 08 | | are terminated"; do you see that? |
| | | 09 | A. | Yes. |
| | | 10 | Q. | Okay. And then your response to him, |
| | | 11 | | which is on the previous page, says, "We never |
| | | 12 | | give an employee copies of anything from their |
| | | 13 | | employee file"; do you see that? |
| | | 14 | A. | Yes. |
| | | 15 | Q. | Why does Dynamic not provide |
| | | 16 | | employees a copy of anything from their |

| | | | |
|---|---|---|---|
| | | 17 | personnel file? |
| | | 18 | MR. REDMOND:  Wait a minute.  Let me |
| | | 19 | -- I want to make sure I'm following.  Okay. |
| | | 20 | This is the e-mail that's 69? |
| | | 21 | MS. PALMER:  Uh-huh. |
| | | 22 | MR. REDMOND:  Okay.  Got it.  I'm |
| | | 23 | with you. |
| | | 058:01 | A.    The employee file is property of |
| 17 | 059:10 - 059:13 | 059:10 | Q.    It's Dynamic Security's policy to not |
| | | 11 | provide copies of anything from the personnel |
| | | 12 | file; right? |
| | | 13 | A.    Right. |
| 18 | 068:17 - 069:18 | 068:17 | Q.    Okay.  Let me show you Exhibit 56. |
| | | 18 | A.    Okay. |
| | | 19 | Q.    And this was previously introduced in |
| | | 20 | Ms. Riddle's deposition.  I want to point you |
| | | 21 | to the darkened arrows on the document.  She |
| | | 22 | stated that she thought you made those. |
| | | 23 | Do you recall if you made those? |
| | | 069:01 | A.    I did make those. |
| | | 02 | Q.    Okay.  And why did you darken those |
| | | 03 | areas? |
| | | 04 | A.    Because in my response on the |
| | | 05 | unemployment claim, I'm not sure if we have |
| | | 06 | that in -- as an exhibit or will have it, but |
| | | 07 | when I respond, you know, that she was removed, |
| | | 08 | we tried to offer another job site, she |
| | | 09 | wouldn't work the shift she was offered. |
| | | 10 | Although, she stated on the front |
| | | 11 | page of her application, will you work any day |
| | | 12 | of the week, she said yes.  Can you work any |
| | | 13 | shift, she said yes.  So somewhere in my |
| | | 14 | response -- and then I referenced to the |
| | | 15 | application and made the arrows just so their |
| | | 16 | eyes would fall on it -- |
| | | 17 | Q.    Okay. |
| | | 18 | A.    -- when they looked at it. |
| 19 | 079:08 - 079:13 | 079:08 | Q.    Do you know of anyone, other than |
| | | 09 | Cassandra Williams, who requested that Ms. Key |
| | | 10 | not return to the Hyundai facility? |
| | | 11 | MR. MILLER:  Object to the form. |
| | | 12 | A.    I know of no one else other than |

| | | | |
|---|---|---|---|
| | | 13 | Cassandra. |
| 20 | 081:11 - 082:04 | 081:11 | Q.   Ms. Spiers, you're aware that Dynamic |
| | | 12 | Security has certain written policies relating |
| | | 13 | to employment? |
| | | 14 | A.   Yes. |
| | | 15 | Q.   Is it -- you're aware that Dynamic |
| | | 16 | has a policy -- a written policy prohibiting |
| | | 17 | discrimination based on certain |
| | | 18 | characteristics? |
| | | 19 | A.   Yes. |
| | | 20 | Q.   And you're aware that Dynamic |
| | | 21 | Security has a non-harassment policy? |
| | | 22 | A.   Yes. |
| | | 23 | Q.   And you're aware that Dynamic |
| | | 082:01 | Security has a written policy prohibiting |
| | | 02 | retaliation against people who make complaints |
| | | 03 | about discrimination or harassment? |
| | | 04 | A.   Yes. |
| 21 | 082:09 - 084:09 | 082:09 | Q.   Yes.  Tell us what 33 is.  Just |
| | | 10 | generally.  I don't need you to go into a lot |
| | | 11 | of detail. |
| | | 12 | MS. BROWN:  Are you doing Bates or |
| | | 13 | exhibit? |
| | | 14 | MR. REDMOND:  Exhibit. |
| | | 15 | MS. BROWN:  Okay. |
| | | 16 | A.   That's Ray Cureton's statement. |
| | | 17 | Q.   And what does he indicate in that |
| | | 18 | statement as being done in terms of offering |
| | | 19 | another position outside of Hyundai to Ms. Key? |
| | | 20 | A.   Yes. |
| | | 21 | Q.   Okay.  What does -- what does -- what |
| | | 22 | does he say in there was being done by Dynamic |
| | | 23 | Security? |
| | | 083:01 | A.   We were attempting to place her at |
| | | 02 | two other different job sites after she was |
| | | 03 | removed from Hyundai. |
| | | 04 | Q.   All right.  And it states that she |
| | | 05 | was offered two positions at other job sites? |
| | | 06 | A.   Yes. |
| | | 07 | Q.   All right.  And that's a document |
| | | 08 | indicating that Dynamic Security offered |
| | | 09 | Ms. Key other positions? |

|   |   |     |     |                                                      |
|---|---|-----|-----|------------------------------------------------------|
|   |   | 10  | A.  | Yes.                                                 |
|   |   | 11  | Q.  | And that's a document indicating that                |
|   |   | 12  | Ms. Key turned down those positions?                 |
|   |   | 13  | A.  | Yes.                                                 |
|   |   | 14  | Q.  | All right. Well, tell us, also                       |
|   |   | 15  | generally, what Exhibit 34 is.                       |
|   |   | 16  | A.  | Nicole Scavella was the branch admin                 |
|   |   | 17  | in Montgomery, and this is her statement.            |
|   |   | 18  | Q.  | And in her statement, does she also                  |
|   |   | 19  | address the issue of Ms. Key being offered           |
|   |   | 20  | other positions?                                     |
|   |   | 21  | A.  | Yes.                                                 |
|   |   | 22  | Q.  | And does she talk in there about two                 |
|   |   | 23  | occasions that there were other positions that       |
|   |   | 084:01 | were offered to her?                              |
|   |   | 02  | A.  | Yes.                                                 |
|   |   | 03  | Q.  | And so was that a document indicating                |
|   |   | 04  | that Ms. Key was offered other positions?            |
|   |   | 05  | A.  | Yes.                                                 |
|   |   | 06  | Q.  | And it's also a document indicating                  |
|   |   | 07  | that Ms. Key refused or turned down those other      |
|   |   | 08  | spots?                                               |
|   |   | 09  | A.  | Correct.                                             |