IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-CV-767-ECM |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING, ALABAMA, LLC; HYUNDAI ENG AMERICA, INC.; and DYNAMIC SECURITY, INC. | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**EXHIBIT "C" TO**

**PLAINTIFF'S OBJECTIONS TO DYNAMIC SECURITY INC.'S
DEPOSITION DESIGNATIONS**

**RAY CURETON**

| Case | Key, Davita |
|------|-------------|
| Issue Code | Dynamic Designation |

| CURETON, RAY 8/30/22 VOL 1 | | |
|---|---|---|
| 1 | 009:18 - 009:21 | 009:18    Q.    Mr. Cureton, could you please state<br>19  and spell your name for the record?<br>20        A.    Yes, my name is Ray H. Cureton, last<br>21  name C-u-r-e-t-o-n. |
| 2 | 012:12 - 012:17 | 012:12    Q.    Where do you currently work?<br>13        A.    I am a minister of the Presbyterian<br>14  Church of America, and I have a part-time church<br>15  where I preach on Sundays down in Clayton,<br>16  Alabama, which is about an hour and a half south<br>17  of Montgomery. |
| 3 | 014:19 - 015:13 | 014:19    Q.    Okay.  All right.  Let's talk about<br>20  your employment with Dynamic Security since<br>21  that's why we're here today.  When did you start<br>22  with Dynamic Security?<br>23        A.    I think it was August 1st of 2016, I<br>015:01  think.<br>02        Q.    Okay.  And what was your position?<br>03        A.    I was a manager down in Montgomery.<br>04  I want to say operations manager at first.  I<br>05  started out as the operations manager.<br>06        Q.    Okay.  And you say at first.<br>07        A.    Uh-huh (positive response).<br>08        Q.    Did that change?<br>09        A.    It did.  I was promoted part way<br>10  through, and I don't know the dates about when<br>11  that happened, but -- and I was made the -- I'm<br>12  trying to think, remember what it was called.  It<br>13  was district manager.  I think that was right. |
| 4 | 017:01 - 017:03 | 017:01              MR. REDMOND:  Object to the form.<br>02              MS. BROWN:  Object to the form.<br>03              MR. MILLER:  Same objection. |
| 5 | 017:09 - 017:18 | 017:09    Q.    Yes, sir.  The line that I pointed<br>10  you to there, that operations manager is required<br>11  for Hyundai contract, do you know what that's in<br>12  reference to?<br>13              MR. REDMOND:  Object to the form. |

| | | | |
|---|---|---|---|
| | | 14 | MS. BROWN:  Same objection. |
| | | 15 | MR. MILLER:  Same objection. |
| | | 16 | A.    As far as I understand, that part of |
| | | 17 | my responsibility would be supervising the major |
| | | 18 | contract at the time, which was at Hyundai. |
| 6 | 019:12 - 019:14 | 019:12 | consultation with Cassandra Williams, who was the |
| | | 13 | head of security out there for Hyundai at the |
| | | 14 | time, and still is. |
| 7 | 034:22 - 043:20 | 034:22 | Q.    Okay.  And over on to the next page, |
| | | 23 | at the top right after the phone number, it says, |
| | | 035:01 | You should not be concerned, threatened, or |
| | | 02 | fearful of retaliation for making a report |
| | | 03 | pursuant to this policy.  Do you see that? |
| | | 04 | A.    Yes. |
| | | 05 | Q.    So did you as an operations manager |
| | | 06 | receive any type of training related to accepting |
| | | 07 | complaints? |
| | | 08 | A.    Yes. |
| | | 09 | Q.    Okay.  Did you receive any type of |
| | | 10 | training related to retaliation for complaints? |
| | | 11 | A.    Yes. |
| | | 12 | Q.    What type of training did you |
| | | 13 | receive? |
| | | 14 | A.    Well, it was actually online training |
| | | 15 | that was provided by Dynamic Security.  I don't |
| | | 16 | remember the name of it.  I mean, it's been five |
| | | 17 | years.  I don't remember.  Six years since I had |
| | | 18 | that training probably. |
| | | 19 | But it's pretty standard.  I mean, |
| | | 20 | I've worked all my life with these kind of |
| | | 21 | things, and it's pretty standard training on the |
| | | 22 | subject that we're talking about. |
| | | 23 | Q.    Is that one of those like click |
| | | 036:01 | through trainers? |
| | | 02 | A.    Yes, it is. |
| | | 03 | Q.    Did they ask you questions that you |
| | | 04 | have to answer? |
| | | 05 | A.    Yes. |
| | | 06 | Q.    How often would you complete that |
| | | 07 | training? |
| | | 08 | A.    Annually. |
| | | 09 | Q.    Did you -- so you started with |

10    Dynamic in 2016 and left in 2017.  Did you do the
11    training twice or just once while you were there?
12         A.    I don't remember.  I don't remember
13    if it was twice or once.
14         Q.    And then back to the handbook, the
15    next sentence down says, Any supervisor to whom a
16    report of alleged harassment is made should
17    immediately notify their manager and conduct a
18    full and detailed investigation.
19              So when you received complaints, did
20    you immediately notify the manager?
21         A.    Yes, of course.
22         Q.    Who was your manager?
23         A.    Mike Keller was my manager, but also
037:01    we would notify HR directly.  And I don't
02    remember her name, but we did bring HR on right
03    away.
04              And also, the folks knew they could
05    contact HR directly themselves if they weren't
06    satisfied with our response.
07         Q.    So did you notify Mike Keller and HR
08    or just HR?
09         A.    Both.
10         Q.    Both?  What type of detailed
11    investigation would you conduct?
12         A.    Well, I would talk to the supervisor,
13    which would have been Gloria Robinson in this
14    case, and gotten her -- information from her on
15    the complaint.
16              I would have taken any statements of
17    any kind of witnesses that would have been
18    involved.  I would have talked with Ms. Key about
19    what her perception was on all of this, what was
20    going on, what her complaint was.
21              I would have forwarded all of that to
22    HR, because they're ultimately going to take
23    point on these kinds of things when it gets to
038:01    the place where I'm having to make an
02    investigation.
03              So I just try to get the facts as
04    quickly as I can and get them into the hands of
05    people that can follow up with it.
06         Q.    Okay.  So did you make any decisions

07  related to whether an employee -- and I'm
08  speaking generally, not just Ms. Key, but did you
09  make any decisions as to whether employees had
10  been harassed or discriminated against as part of
11  that investigation?
12          MS. BROWN:  Object to the form.
13          MR. MILLER:  Object to the form.
14          MR. REDMOND:  Same objection to form.
15      A.   I have opinions, but no decisions at
16  this point.  I'm not the one that ultimately
17  would say, You're fired, because -- well, I might
18  be.  They may -- HR may come back and say -- but
19  normally HR would handle that themselves if they
20  find malfeasance going on in any situation like
21  that.
22      Q.   Okay.  All right.  And I'm going to
23  show you Plaintiff's Exhibit 30.
039:01          MR. REDMOND:  Actually, I think this
02  is 31.
03          MS. PALMER:  31.  It is 31.
04      A.    You have to pass it through him
05  first, right?
06      Q.   (BY MS. PALMER:)  Okay.  So this is
07  another Dynamic Security document, and I know
08  it's hard to read, but at the top it says
09  Harassment in the Workplace.  And I believe this
10  one is from Ms. Key's personnel file.
11          Does this document contain any
12  additional policies outside of what we looked at
13  in the handbook or is it just sort of a
14  restatement?
15          MR. REDMOND:  Object to the form.
16      A.    I don't know if -- I mean, I would
17  have to compare the two myself to be able to
18  answer that fully.  I would think it's simply a
19  restatement of the policy.
20      Q.   So if you'll look for me, we've got
21  some headings, and we're under the policy
22  heading, the last paragraph, the second sentence.
23  Let's go four lines down, the first word is Any.
040:01  Do you see that, Any employee?
02      A.    Yes.
03      Q.   So any employee engaging in such

```
04   conduct will be subject to appropriate
05   disciplinary action, up to and including
06   termination of employment.
07            While you were the operations
08   manager, did you have to discipline or terminate
09   any employee under this policy?
10       A.   Not that I recall.
11       Q.   Would you as a manager go through
12   additional training that the security officers
13   didn't go through?
14       A.   That would be correct.  That's what
15   the training that we talked about before from
16   Dynamic online would be additional training to
17   what a security officer would receive.
18       Q.   Okay.  So what training would the
19   security officers receive related to harassment
20   in the workplace?
21            MS. BROWN:  Object to the form.
22       A.   They would be briefed during their
23   normal training by the trainer on the policies
041:01   for the company and what their options were and
02   always told what the chain of command is, who
03   they can call, the fact that they can call HR
04   directly, and there's always a hotline for them
05   to call so that they don't have to go through the
06   chain.  They can go directly to HR, but they know
07   who they can contact.
08            And as far as what the -- what
09   constitutes harassment, they are told about that
10   as well, and several other items in that realm,
11   yeah.
12       Q.   Were they told what constituted
13   discrimination?
14       A.   Yes.
15       Q.   And retaliation?
16       A.   Yes.
17       Q.   Were they told to ask for the
18   policies?
19       A.   I really don't know what -- I mean,
20   they were given the policies.  I mean, they were
21   given the handbook.  They were given the
22   training.  So I don't know what you mean by that.
23       Q.   Okay.  So they were given that
```

042:01    handbook that we looked at?

02       A.   Yes.

03       Q.   And they were -- the training that

04    they were given, was that just verbal?

05       A.   Well, it was, I think, for Dynamic,

06    we had videos that they showed for the training,

07    and I don't know if they still do, but they did

08    at that time.  And, of course, you would have

09    this paper that explains the policy that they

10    sign.

11       Q.   Okay.  I'm going to show you

12    Plaintiff's Exhibit 44.

13          MS. PALMER:  I'm sorry, Wes.

14          MR. REDMOND:  I'm familiar with it.

15       Q.   (BY MS. PALMER:)  If you'll flip

16    through that for me, real quick.  I just have a

17    couple of questions for you.

18       A.   Okay.  Uh-huh (positive response).

19       Q.   So Exhibit 44 is a printout of an

20    EEOC PowerPoint.  Have you seen that PowerPoint

21    before?

22          MS. BROWN:  Object to the form.

23       A.   I think so, yes.  It looks familiar.

043:01       Q.   Would that have been included in that

02    manager training that you were talking about?

03       A.   It would have been.  This -- I'm

04    trying to think if this may have even been

05    included as part of the officers' training at

06    some point.  I don't know that for sure.  I don't

07    know.  I don't know for sure, but, yeah, this is

08    very familiar, and I have seen it before.

09       Q.   And it may have been provided to

10    officers?  You're just not sure?

11       A.   Yeah.  I don't know, because like I

12    said, I didn't do the training for the officers

13    fully.  That wasn't my place or position at the

14    time.  I oversaw the whole operation to make sure

15    it was done, and it may be where I've seen it is

16    just going through that material with them.

17          And sometimes I'd go in and sit in on

18    the sessions to see that they were covering

19    everything they're supposed to.  But I can't give

| | | |
|---|---|---|
| | | 20  you any more than that on that.  I don't know. |
| 8 | 044:04 - 045:19 | 044:04      Q.     (BY MS. PALMER:)  Have you seen the<br>05  documents included in Exhibit 52, Mr. Cureton?<br>06      A.     I have not seen these specific ones.<br>07  But, of course, this is a June 2020 revision, so<br>08  what I would have seen would have been older.<br>09  But we had a policy book that had lots of these<br>10  kinds of policies in them.<br>11      Q.     If you'll flip for me, I think the<br>12  older ones are included in there.<br>13      A.     Okay.  All right.  Yes, then I would<br>14  have seen -- yep, that looks correct as to form.<br>15  Now, you know, they would have been in that<br>16  policy book.<br>17      Q.     What is the policy book?<br>18      A.     Well, it's a Dynamic Security<br>19  publication that was sent to all managers that<br>20  explains what the policies are for various and<br>21  sundry items that we're responsible for.<br>22          You know, at the time it was -- it<br>23  included these kinds of policies of the EEOC and<br>045:01  other.<br>02      Q.     So the policy book would not have<br>03  been provided to the security officers?<br>04      A.     No, no.  However, some of the<br>05  information from the policy book would be<br>06  included.  In other words, they didn't get the<br>07  policy book, but they would have gotten a lot of<br>08  information that was in the policy book, if that<br>09  makes sense.<br>10      Q.     Okay.  When we were talking earlier<br>11  about the post instructions, you said that those<br>12  would be agreed on by both parties?<br>13      A.     Yes.<br>14      Q.     Would that include attire?<br>15      A.     Well, the attire is dictated by the<br>16  client, not by Dynamic Security.  And that's, I<br>17  think, important in this kind of case.<br>18      Q.     Do you remember what the attire was<br>19  for the mailroom at HMMA's property? |
| 9 | 048:15 - 049:04 | 048:15      Q.     Let me show you Plaintiff's Exhibit<br>16  9. |

| | | | |
|---|---|---|---|
| | | 17 | A.    Uh-huh (positive response). |
| | | 18 | Q.    Have you seen this document before? |
| | | 19 | A.    It certainly looks similar to what |
| | | 20 | I've seen before. |
| | | 21 | Q.    You said similar.  Can you tell me |
| | | 22 | what you've seen before, if it's not this one |
| | | 23 | exactly? |
| | | 049:01 | MR. REDMOND:  Let me see it.  What |
| | | 02 | number is that? |
| | | 03 | MS. PALMER:  9. |
| | | 04 | THE WITNESS:  9, yeah. |
| 10 | 049:09 - 051:19 | 049:09 | A.    This is the policy that I understood |
| | | 10 | was in place at the time I was supervising our |
| | | 11 | personnel at Hyundai, if that answers your |
| | | 12 | question. |
| | | 13 | Q.    So I understand that you understood a |
| | | 14 | policy to be in place.  This -- my question is a |
| | | 15 | little more specific than that.  This particular |
| | | 16 | printed document that says Page 1, Page 2, Page 3 |
| | | 17 | with these headings and broken out exactly like |
| | | 18 | this, have you seen this document? |
| | | 19 | MR. MILLER:  Object to the form. |
| | | 20 | A.    I don't recall. |
| | | 21 | Q.    Are you aware of whether this |
| | | 22 | document was maintained at Dynamic Security? |
| | | 23 | MR. REDMOND:  Object to the form. |
| | | 050:01 | A.    A document was maintained at Dynamic |
| | | 02 | Security referenced to the appearance standards |
| | | 03 | for HMMA. |
| | | 04 | Q.    Okay.  Where would that document have |
| | | 05 | been maintained? |
| | | 06 | A.    In files that had to do with HMMA. |
| | | 07 | It would have been a part of the interview |
| | | 08 | process, so there would have been copies there |
| | | 09 | when people did interviews so that we knew what |
| | | 10 | the policy was and you could tell potential hires |
| | | 11 | about the policy. |
| | | 12 | Q.    Would Dynamic Security provide a copy |
| | | 13 | of that policy to new hires? |
| | | 14 | A.    I do not know. |
| | | 15 | Q.    Did you provide a copy of that policy |
| | | 16 | to new hires? |

17        A.    I do not recall.  We definitely went
18    over the policies with them.
19        Q.    **Were you involved in Ms. Key's**
20    **hiring?**
21        A.    Probably.
22        Q.    **Did you interview her?**
23        A.    Probably.  I interviewed hundreds and
051:01    hundreds of people when I was there.
02        Q.    **Do you recall going over this policy**
03    **with Ms. Key?**
04        A.    Again, probably.  Specifically, I
05    can't think, well, I was sitting over in this
06    desk, and we talked about this and that.  I don't
07    know.  I mean, I did this with everybody.
08            I can tell you what I told everybody,
09    which would have included Ms. Key, when it came
10    to what the policy was at Hyundai.  We always
11    explained, because Hyundai was -- well, I'll just
12    stop at that.
13        Q.    **Please, continue.  You always**
14    **explained because Hyundai was what?**
15            MS. BROWN:  Object to the form.
16        A.    Hyundai was -- had some very specific
17    policies that they wanted to make sure that we
18    provided people that would meet those policies.
19    So -- and they were different than other places.

11 | 052:22 - 053:19

052:22            And Ms. Williams made -- I can tell
23    you this for a fact.  Ms. Williams made the final
053:01    decision about who was accepted -- which
02    hairstyle was acceptable, for instance, or which
03    wasn't.
04        Q.    **And if Ms. Key said that she did not**
05    **interview with you, she went straight to Ms.**
06    **Robinson and everything was handled there, would**
07    **you have any reason to dispute that?**
08        A.    I would not, because that did happen
09    from time to time, really a good bit of the time,
10    because we had plenty of sites that we had to
11    supervise and hire for, and so sometimes Hyundai
12    would do referrals within themselves, and they
13    would do that.
14            Of course, she would always let me

| | | | |
|---|---|---|---|
| | | 15 | know, because ultimately they had to come through |
| | | 16 | our training at the office before they were hired |
| | | 17 | fully.  So we were still involved in that |
| | | 18 | process, even if they started out there, and we |
| | | 19 | would still be involved at some level. |
| 12 | 054:02 - 055:13 | 054:02 | Q.    But can you tell me what you recall |
| | | 03 | about Ms. Key's hiring? |
| | | 04 | MS. BROWN:  Object to the form. |
| | | 05 | A.    Well, there was a problem, as far as |
| | | 06 | I understand it, going back and looking at some |
| | | 07 | of the documents and remembering what was going |
| | | 08 | on then, there was a problem with her hair.  Ms. |
| | | 09 | Williams asked us to remove her from the site |
| | | 10 | because her hair did not meet the Hyundai |
| | | 11 | standards. |
| | | 12 | So we did bring her in, and I know |
| | | 13 | Gloria Robinson tried to work with her to try to |
| | | 14 | get the hairstyle the way it was supposed to be |
| | | 15 | and that they had had conversations about this, |
| | | 16 | even with Ms. Williams, to see what was -- what |
| | | 17 | would be acceptable and what wouldn't. |
| | | 18 | And then there were -- I mean, |
| | | 19 | there's a statement from Gloria that kind of goes |
| | | 20 | through all of that, explains in writing how that |
| | | 21 | worked where Ms. Key was trying to get her hair |
| | | 22 | in the proper respect for Hyundai, and then |
| | | 23 | ultimately didn't. |
| | | 055:01 | And the dispute got to the place |
| | | 02 | where HMMA did not want her on the site.  And, |
| | | 03 | ultimately, in the security business, and this is |
| | | 04 | across the board in any security company I've |
| | | 05 | ever worked with, when the client says, Remove |
| | | 06 | somebody from the site, that's what security |
| | | 07 | companies do, period. |
| | | 08 | And now, we can go back for our |
| | | 09 | person to try to get them rehired, try to get -- |
| | | 10 | depending on what's going on, and in this |
| | | 11 | situation, there was enough there.  We did not |
| | | 12 | fire her or remove her from Dynamic Security.  We |
| | | 13 | simply removed her from the Hyundai site. |
| 13 | 062:06 - 067:13 | 062:06 | Q.    Are you aware of what the ultimate |
| | | 07 | resolution was with regard to her removal from |

08  Hyundai?

09      A.    She was removed --

10          MS. BROWN:  Object to the form.

11          MR. MILLER:  Object to the form.

12      A.    She was removed from Hyundai at the

13  client's request.

14      Q.    Are you aware of whether there were

15  any discussions between Dynamic and the client

16  related to whether her removal was appropriate?

17          MS. BROWN:  Object to the form.

18          MR. MILLER:  Object to the form.

19          MR. REDMOND:  Same objection to the

20  form.

21      A.    I'm going to answer it this way:  The

22  hair standards were -- everyone was very familiar

23  with those hair standards and knew what the

063:01  requirements were.  Ms. Williams ultimately was

02  the one that decided whether or not the hair was

03  acceptable.  Once it was not and she asked us to

04  remove someone from the site, we did that.

05          We did not remove Ms. Key as a

06  Dynamic employee.  We offered her other

07  positions.  At the time we had no full-time

08  positions on the shift that she wanted to work,

09  and so we offered her two other positions at, I

10  think, Mobis and Koch Foods.

11          I don't know specifically what times

12  they were, but they were part-time positions, and

13  she was not able to work those times, and left,

14  quit on her own as far as I know.

15      Q.    Why do you believe she quit?

16      A.    Because we couldn't provide for her

17  the schedule that she wanted and because -- well,

18  because there was no position for her to work

19  that she could agree to, that she would agree to.

20      Q.    Let me ask it this way:  What

21  evidence do you have to support your position

22  that Ms. Key quit?

23          MR. REDMOND:  I'm going to object to

064:01  the form of that.

02      A.    The statements that I made in writing

03  around that time that explained that she was

04  offered those positions and refused them.  When

05  you refuse a position, that's quitting.

06      Q.    **Have employees at Dynamic when you**
07  **were employed there, did you ever have anyone**
08  **turn down a position but accept a later position?**

09      A.    Sure.

10      Q.    **Okay.**

11      A.    And this is standard practice.  If
12  this -- when this happens, we told employees that
13  if something comes open, you know, to come back
14  and check with us in a couple of weeks, check
15  with us in a month or two, because, as you know,
16  security positions rotate considerably.  People
17  come in and out.

18          And so we would encourage a person to
19  check back in with us to make sure, maybe we
20  might have something that she could work.

21      Q.    **And if Ms. Key says that she did**
22  **reach out to Dynamic and did not receive return**
23  **calls, would you dispute that?**

065:01      A.    I would dispute that only as far as
02  my situation is concerned.  If she had reached
03  out to me, I would definitely have spoken with
04  her.

05          Now, again, I was only there for less
06  than a month, I guess, or about a month after all
07  this went down, and then I was let go.  So I
08  can't say what happened after around the first
09  week in September when I was let go.

10      Q.    **If Ms. Key says that she was not**
11  **offered any other jobs, including those two**
12  **part-time jobs, would you dispute that?**

13      A.    I would.

14      Q.    **Okay.  And if Ms. Key -- if Ms. Key**
15  **says that she never told you she was unavailable**
16  **for first shift, but instead said she preferred**
17  **first shift, would you dispute that?**

18      A.    I would go with what I wrote in my
19  paperwork, which I think says that we didn't have
20  the first shift, which she wanted, is what I
21  think is what's written in the documents, and I
22  signed my name to it.  So I would -- I will stand
23  by my statements at the time.

066:01      Q.    **Okay.  And I just want to make sure**

02   we're not mincing words here.  You said first
03   shift is what she wanted.  Is it your
04   understanding that wanting first shift is the
05   same as saying I can only work first shift?
06        A.    It's not the same.  And, again,
07   having done this for a while, I understand that
08   people don't always get what they want, but they
09   are willing to compromise and work elsewhere.
10            If I put on the paperwork that she
11   did not want to work those things, then that's --
12   those other jobs that we offered part-time, if
13   that's what I stated in my statement, then I'll
14   stand by that.
15            And that was normal.  It was very
16   normal for that to happen, not just at Hyundai,
17   but in other places as well.  Well, I can only
18   work six hours on this day and five hours on this
19   day, but I need somebody that's going to work,
20   you know, all sixteen hours.
21            Well, what can I do?  You know, I've
22   got to have the people work the hours that are
23   required to work.  So I offered what was
067:01  available, and what was available, she declined
02   those positions for whatever reason.
03        Q.    Do you remember how you offered her
04   those?  Was it in person or over the phone?
05        A.    I'm pretty sure it was in person, and
06   I would have had a witness.  I would have had an
07   office manager there in this situation, too,
08   because there's a lot of paperwork on this thing.
09            So the time that I took to describe
10   what was happening, I'm very careful with my
11   words in writing, especially, about what I say,
12   and I mean what I say.  And so the statements are
13   here, I'm sure, and that's what happened.

14 | 069:22 - 071:01 | 069:22        Q.    And I want to point you to one, two,
23   three, four, five paragraphs down.  It looks like
070:01  a single sentence.  It says, The picture she
02   showed us was acceptable, and she agreed to
03   obtain that style.  Do you see that?
04        A.    Yes.
05        Q.    Okay.  Do you recognize this as Ms.

```
                    06   Robinson saying that Ms. Key could have styled
                    07   her hair in an approved way?
                    08            MS. BROWN:  Object to the form.
                    09            MR. MILLER:  Object to the form.
                    10            MR. REDMOND:  Object to form.
                    11       Q.     Let me ask it this way:  Do you have
                    12   any recollection about Ms. Key being approved to
                    13   wear her locked hair in a bun or something
                    14   similar to a bun?
                    15            MS. BROWN:  Object to the form.
                    16            MR. MILLER:  Object to the form.
                    17       A.     Okay.  A couple of things.  I never
                    18   saw the picture they're talking about here.  I
                    19   know that for a fact.
                    20            I do recall that there was some
                    21   discussion about going to a hairdresser, about
                    22   getting some changes made and wearing them in a
                    23   certain style.  That did take place between
                   071:01 Gloria and Ms. Williams and Ms. Key.
```
```
15   079:09 - 080:12   079:09       Q.     But that's what the e-mail says, she
                       10   takes issue --
                       11       A.     That's not what it says.
                       12            MS. BROWN:  Object to the form.
                       13            MR. MILLER:  Object to the form.
                       14            MR. REDMOND:  Object to the form.
                       15       A.     That's open to question, and I would
                       16   not in any way -- I can tell you right now that
                       17   no one was ever looked at for leaving because
                       18   they were pregnant, period, not under my watch,
                       19   no matter what Ms. Robinson said.
                       20       Q.     What could Ms. Key have done
                       21   different for Ms. Robinson to not be concerned
                       22   with her working in the mailroom?
                       23            MS. BROWN:  Object to the form.
                      080:01            MR. MILLER:  Object to the form.
                       02            MR. REDMOND:  Same objection.
                       03       A.     I think Ms. Key followed the basic
                       04   steps.  I will say that -- and I'm not saying
                       05   this about Ms. Key, but many times attitudes get
                       06   involved, people don't listen to each other, and
                       07   we're not always on the same page about things.
                       08   So I don't know.  I don't remember what happened
```

| | | |
|---|---|---|
| | | 09  specifically between Ms. Key other than what's on |
| | | 10  paper here. |
| | | 11       But I can tell you this:  She would |
| | | 12  not have been let go for being pregnant. |
| 16 | 082:02 - 082:09 | 082:02      **Q.    But she was ultimately removed from** |
| | | 03  **the Hyundai property, right?** |
| | | 04       MS. BROWN:  Object to the form. |
| | | 05       A.    Ms. Key?  You're talking about Ms. |
| | | 06  Key? |
| | | 07       **Q.    Yes, Ms. Key.** |
| | | 08       A.    She was ultimately removed at the |
| | | 09  client's request. |
| 17 | 082:19 - 083:06 | 082:19      **Q.    And she's asking here to make sure** |
| | | 20  **there's a clear written policy from HMMA.  Do you** |
| | | 21  **see that?** |
| | | 22       A.    Yes. |
| | | 23       **Q.    Okay.  So before she sent this** |
| | | 083:01  **e-mail, before Ms. Spires sent this e-mail, did** |
| | | 02  **Dynamic Security have a written policy from HMMA** |
| | | 03  **or HEA about hair?** |
| | | 04       MS. BROWN:  Object to the form. |
| | | 05       MR. MILLER:  Object to the form. |
| | | 06       A.    Yes. |
| 18 | 091:16 - 092:03 | 091:16      **Q.    And is there any indication here that** |
| | | 17  **Ms. Key could not have physically handled the** |
| | | 18  **requirements of the mailroom at Hyundai?** |
| | | 19       MS. BROWN:  Object to the form. |
| | | 20       MR. MILLER:  Object to the form. |
| | | 21       A.    There is nothing that I've seen that |
| | | 22  says so.  But also I'm going to add that that's |
| | | 23  irrelevant as far as Dynamic Security is |
| | | 092:01  concerned, because she was let go because Hyundai |
| | | 02  didn't want her on the site because of |
| | | 03  hairstyles. |
| 19 | 094:20 - 094:21 | 094:20      A.    I think, if that's the case.  Again, |
| | | 21  I may be mistaken about that. |
| 20 | 095:04 - 095:22 | 095:04      **Q.    (BY MS. PALMER:)  So in this e-mail** |
| | | 05  **to Ms. Spires, what was the purpose of this** |
| | | 06  **e-mail?  Let me ask it that way.  What was the** |
| | | 07  **purpose of you sending this e-mail to Ms. Spires?** |
| | | 08       A.    Keeping HR informed about what was |

|    |                   | 09 | going on. |
|----|-------------------|----|-----------|
|    |                   | 10 | Q.   So would this have been the first |
|    |                   | 11 | e-mail that went out related to Ms. Key's |
|    |                   | 12 | complaint to HR? |
|    |                   | 13 | MR. MILLER:  Object to the form. |
|    |                   | 14 | MS. BROWN:  Object to the form. |
|    |                   | 15 | A.   Concerning the official complaint, I |
|    |                   | 16 | would assume so, because it's August 1st. |
|    |                   | 17 | Q.   Okay. |
|    |                   | 18 | A.   Which is when this complaint is |
|    |                   | 19 | dated, and that same day, I would have sent it to |
|    |                   | 20 | HR. |
|    |                   | 21 | Q.   Okay.  And then the last sentence in |
|    |                   | 22 | that first paragraph, you say that you've |
| 21 | 096:01 - 096:03 | 096:01 | that she has no issues with Dynamic Security.  Do |
|    |                   | 02 | you see that? |
|    |                   | 03 | A.   Yes. |
| 22 | 097:14 - 100:09 | 097:14 | Q.   Right, but you don't have any -- |
|    |                   | 15 | A.   I don't have any recall.  I promise |
|    |                   | 16 | you I don't remember ever asking her that |
|    |                   | 17 | question. |
|    |                   | 18 | Q.   Okay.  The last two paragraphs or |
|    |                   | 19 | sentences there, you said, I can attempt to |
|    |                   | 20 | reassign Ms. Key to a different site, but I don't |
|    |                   | 21 | think that's advisable at this time, especially |
|    |                   | 22 | if she has to carry through -- especially if she |
|    |                   | 23 | is to carry through with the stated, quote, |
|    |                   | 098:01 | official complaint, end quote, of discrimination |
|    |                   | 02 | against Hyundai, Ms. Williams, and Ms. Robinson. |
|    |                   | 03 | Do you see that? |
|    |                   | 04 | A.   I do. |
|    |                   | 05 | Q.   So why would it not be advisable to |
|    |                   | 06 | reassign Ms. Key? |
|    |                   | 07 | MR. REDMOND:  Object to form. |
|    |                   | 08 | A.   Okay.  The last question on this |
|    |                   | 09 | e-mail says, Any guidance or thoughts.  So what I |
|    |                   | 10 | was doing was going to HR asking them to advise |
|    |                   | 11 | me on how to act or what to do next, what would |
|    |                   | 12 | be the best policy. |
|    |                   | 13 | I was concerned that if she was |
|    |                   | 14 | bringing forth the official complaint, what was |
|    |                   | 15 | the policy of Dynamic in reference to keeping a |

16  person working if they are going through the
17  official complaint like this.  That's all I was
18  asking.
19          I didn't have an opinion about it one
20  way or the other, just trying to find out what
21  Dynamic's policy was.  Just I wondered does it
22  make sense to keep somebody on.  I'm wondering as
23  a manager, asking my bosses, Does that make sense
099:01  to keep somebody on who has an official complaint
02  going?  And they advised me, and I followed
03  through with what they said.
04      Q.    As a manager that deals with that and
05  just asking, you know --
06      A.    Yeah, yeah.
07      Q.    -- I wonder, did you have a leaning
08  one way or the other as to whether you would
09  think it was advisable or not?
10          MR. REDMOND:  You're talking about
11  back then?
12          MS. PALMER:  Yes.
13      A.    Yes, back then.  I would say I didn't
14  know, and that's why I was asking the question.
15  My personal leaning would have been to keep them
16  on unless there's a material reason not to,
17  because that's really what the policy boils down
18  to.
19          So this was a question just asked
20  more out of curiosity than out of, you know, I'm
21  planning on not doing anything with it, I'm going
22  to get rid of her, no, that was not what was in
23  my mind, I can guarantee that, or what I was
100:01  thinking.
02          I was just trying to figure out what
03  Emmett was going to say, because I hadn't been
04  involved in this situation where this kind of
05  official complaint was being brought.  So it's a
06  way of asking the question.
07          I probably could have asked it better
08  than the way it sounds on the piece of paper, but
09  that's all I was trying to get at.

| 23 | 100:12 - 101:07 | 100:12      **You said something about unless there**<br>13  **was a material reason not to.  What can you think** |

14  of that would be a material reason to not

15  reassign somebody that had a complaint?

16       A.    You really like to ask questions that

17  have --

18            MR. REDMOND:  Object to the form.

19       A.    -- other possibilities.  Yeah, there

20  probably aren't any real ones that anybody would

21  follow through with.  It's just a -- I'm just

22  trying to -- there are reasons why someone would

23  not continue in work if they violated our

101:01  policies that they had agreed to or if they

02  couldn't work a particular site, but not

03  connected with the complaint.  They don't connect

04  it with the complaint.

05            The complaint is never a reason to

06  let somebody go, okay?  Does that answer your

07  question?

| 24 | 101:23 - 103:06 | 101:23  Q.    It could be.  When would it not be? |

102:01       A.    I guess ultimately when it didn't

02  happen.  I mean, you could take somebody's word

03  or somebody's statement or somebody's

04  off-the-cuff remark or even a remark like this in

05  this e-mail and make much more of it than it

06  actually was.  We did offer her other positions.

07       Q.    Did you offer --

08       A.    This is part of -- this is part of

09  bringing everyone into the situation.  So HR, who

10  ultimately has responsibility for these things,

11  can advise and give good advice in reference to

12  this so that there's no question about what we do

13  or how we operate.

14            So I simply was asking a question of

15  the HR manager about what it is we're going to

16  do.  So if I misunderstood something or -- I

17  don't know.  But anyway, it's immaterial

18  basically, because it didn't happen.

19       Q.    So in response to your question for

20  guidance or thoughts, do you recall what guidance

21  or thoughts you received?

22       A.    There's probably an e-mail somewhere

23  that gave me the guidance or thoughts.

103:01  Ultimately, what we did was offered her at least

| | | | |
|---|---|---|---|
| | | 02 | two positions. |
| | | 03 | Q.    Did you offer her full-time |
| | | 04 | positions? |
| | | 05 | A.    We didn't have any full-time |
| | | 06 | positions available at the time. |
| 25 | 105:23 - 106:17 | 105:23 | Q.    Well, no.  The e-mail is from Ms. |
| | | 106:01 | Williams, correct? |
| | | 02 | A.    Yes, it's from Ms. Williams. |
| | | 03 | Q.    So -- |
| | | 04 | A.    Okay.  So that Ms. Williams |
| | | 05 | understood that Ms. Key was claiming that she was |
| | | 06 | being discriminated against because she's |
| | | 07 | pregnant?  Is that what you're saying? |
| | | 08 | MR. MILLER:  Object to the form. |
| | | 09 | MS. BROWN:  Object to the form. |
| | | 10 | Q.    Yes. |
| | | 11 | A.    Yeah. |
| | | 12 | Q.    And is this the e-mail where Ms. |
| | | 13 | Williams asks that Ms. Key be removed from the |
| | | 14 | site? |
| | | 15 | A.    Yes. |
| | | 16 | Q.    And that was August 1st? |
| | | 17 | A.    Correct. |
| 26 | 107:23 - 108:02 | 107:23 | Q.    And that's the same date we've been |
| | | 108:01 | talking about on these e-mails? |
| | | 02 | A.    Yes, yes. |
| 27 | 110:10 - 111:11 | 110:10 | at the form wrong, so my apologies. |
| | | 11 | Q.    And then at the bottom there on both |
| | | 12 | documents where you say can only work first |
| | | 13 | shift, we've talked, I think, at length about |
| | | 14 | that.  Ms. Key says that her preference was first |
| | | 15 | shift. |
| | | 16 | Do you have any recollection of her |
| | | 17 | saying, I cannot work anything but first shift? |
| | | 18 | A.    This, as I wrote here, was my |
| | | 19 | understanding at the time, that she can only work |
| | | 20 | first shift.  So yes, this is what I understood |
| | | 21 | at the time. |
| | | 22 | Q.    Okay.  And if she -- if she had a |
| | | 23 | different recollection of that conversation, |
| | | 111:01 | would that be a pretty important dispute between |
| | | 02 | the two of you? |

| | | |
|---|---|---|
| | | 03          MR. REDMOND:  Object to the form. |
| | | 04          MS. BROWN:  Object to the form. |
| | | 05          MR. MILLER:  Object to the form. |
| | | 06     A.    I would stand by what I wrote on this |
| | | 07 piece of paper, because I do understand the |
| | | 08 difference between can and -- but we had no |
| | | 09 full-time positions available anywhere.  But I |
| | | 10 put that down to explain my understanding that |
| | | 11 she could only work first shift. |
| 28 | 114:09 - 114:18 | 114:09     Q.    Let me ask it this way:  Did you ask |
| | | 10 Ms. Key -- aside from that first meeting when she |
| | | 11 gave you her complaint, did you ask her if she |
| | | 12 had any problems with Dynamic Security? |
| | | 13     A.    I don't recall if I asked her, but |
| | | 14 she repeatedly made the statement, obviously, in |
| | | 15 -- and I think in an attempt to reassure us that |
| | | 16 it wasn't about Dynamic Security here.  Her |
| | | 17 complaint was not really Dynamic Security. |
| | | 18 That's how I would have interpreted that. |
| 29 | 116:01 - 116:07 | 116:01     Q.    Do you have any recollection of |
| | | 02 making a formal offer to Ms. Key for a first |
| | | 03 shift weekend part-time position at Koch? |
| | | 04     A.    I actually believe that did take |
| | | 05 place, because I think I remember talking to |
| | | 06 Chris about this at that point.  He was the guy |
| | | 07 that was in charge of Koch Foods. |
| 30 | 123:02 - 124:13 | 123:02     Q.    And so as of this e-mail, August |
| | | 03 29th, we're roughly twenty-nine days after she's |
| | | 04 been removed from Hyundai.  Were the two offers |
| | | 05 in the refusal forms that we saw earlier the only |
| | | 06 positions that had been offered to her at that |
| | | 07 point that you can recall? |
| | | 08          MS. BROWN:  Object to the form. |
| | | 09     A.    Well, I can only recall them because |
| | | 10 I've got the paperwork, so we could have verbally |
| | | 11 -- we could have easily verbally talked to her |
| | | 12 about other things, but I don't know that we did. |
| | | 13     Q.    If you had verbally offered her |
| | | 14 another position and she had turned it down, |
| | | 15 would you have completed an assignment refusal |
| | | 16 form? |
| | | 17          MS. BROWN:  Object to the form. |

| | | | |
|---|---|---|---|
| | | 18 | MR. REDMOND:  Object to the form. |

18      MR. REDMOND:  Object to the form.

19      MR. MILLER:  Object to the form.

20      A.    Well, at the time that the situation

21  was going on, things were pretty much in turmoil

22  just across the branch, and there was -- thinking

23  about it now, there were several other sites that

124:01  needed immediate attention.  So I may have been

02  getting ready to do that, and then, like I said,

03  the next week I was gone.  So I can't -- they

04  would be the standard policy to do that, yes.

05      Q.    Okay.  And, again, Ms. Key says that

06  **she was not offered any positions.  So you**

07  **dispute that?**

08      A.    Well, she was offered the two

09  positions that are refused on the paperwork, but

10  I don't know about any -- if she was offered

11  anything else or not.  As of the 14th, we didn't

12  have anything else to offer her, and -- well, the

13  paperwork speaks for itself.

---

**31**   **153:10 - 154:17**

153:10      Q.    **Just to follow up on something that**

11  **Mr. Miller just asked about, was it also your**

12  **testimony that the client would decide who was**

13  **going to be assigned by Dynamic to the Hyundai**

14  **facility?**

15      MS. BROWN:  Object to the form.

16      MR. MILLER:  Object to the form.

17      A.    The client would decide whether

18  someone's appearance was acceptable or not, and

19  they would be -- there were specific positions

20  that Ms. Williams would state whether or not the

21  person was acceptable or not acceptable, like the

22  mailroom, a position as a lieutenant or working

23  in the -- the monitoring room.  What did they

154:01  call that position?  She had to interview the

02  people and sign off on their being up to speed

03  for us to hire them for that -- those specific

04  positions.

05      Q.    **Let me show you what's already been**

06  **put into evidence as Plaintiff's Exhibit 28.  If**

07  **you'll see, there's a date on the bottom.  Can**

08  **you read for us what that date is?**

09      A.    My date that I --

|    |               |        |     |                                                 |
|----|---------------|--------|-----|-------------------------------------------------|
|    |               |        | 10  | Q.   Yes.                                       |
|    |               |        | 11  | A.   1 August 2017.                             |
|    |               |        | 12  | Q.   What does that date represent?  Is it      |
|    |               |        | 13  | the date the position was offered, the date you |
|    |               |        | 14  | filled out the form or both?                    |
|    |               |        | 15  | A.   In this case it would have been both.      |
|    |               |        | 16  | But, again, that's -- this all was -- yeah, it  |
|    |               |        | 17  | would have been both.  In this particular --    |
| 32 | 155:14 - 157:21 | 155:14 | Q.   All right.  Let me show you starting      |
|    |               |        | 15  | with the last one, which is Exhibit 45, which is |
|    |               |        | 16  | an e-mail that you sent to Sherry Spires on     |
|    |               |        | 17  | August the 29th.                                |
|    |               |        | 18  | A.   Okay.                                      |
|    |               |        | 19  | Q.   If you look at the bottom, at the end      |
|    |               |        | 20  | of that e-mail, the paragraph or sentence that  |
|    |               |        | 21  | starts out FYI?                                 |
|    |               |        | 22  | A.   Uh-huh (positive response).                |
|    |               |        | 23  | Q.   You refer to her complaint as being a      |
|    |               | 156:01 | complaint of what?                             |
|    |               |        | 02  | A.   A complaint of discrimination against      |
|    |               |        | 03  | HMMA, Ms. Williams, and Gloria Robinson.        |
|    |               |        | 04  | Q.   All right.  And when you're                |
|    |               |        | 05  | referencing that complaint, are you talking about |
|    |               |        | 06  | Exhibit 29 here?                                |
|    |               |        | 07  | A.   That is correct.                           |
|    |               |        | 08  | Q.   Okay.  And on Exhibit 40, which is         |
|    |               |        | 09  | another e-mail from you, if you'll look again at |
|    |               |        | 10  | the last sentence, last paragraph, you also make |
|    |               |        | 11  | a reference to her complaint there.  Do you see |
|    |               |        | 12  | that?                                           |
|    |               |        | 13  | A.   Yes, the official complaint of             |
|    |               |        | 14  | discrimination against Hyundai, Ms. Williams, and |
|    |               |        | 15  | Ms. Robinson.                                   |
|    |               |        | 16  | Q.   Yes.  And you were reading as what it      |
|    |               |        | 17  | says there, how you characterize the complaint  |
|    |               |        | 18  | that Ms. Key had?                               |
|    |               |        | 19  | A.   That is correct.                           |
|    |               |        | 20  | Q.   Correct?                                   |
|    |               |        | 21  | A.   Yes, sir.                                  |
|    |               |        | 22  | Q.   And, again, are you referring to           |
|    |               |        | 23  | Exhibit 29 here?                               |
|    |               | 157:01 | A.   Yes, sir.                                 |

```
02          Q.     Okay.  And do you recall earlier
03   today when you were shown Exhibit 29, you
04   referred to this as a complaint of
05   discrimination?  Do you remember having said
06   that?
07          A.     That's correct.
08          Q.     All right.  And would that be a
09   correct characterization of what this is, is it's
10   a complaint of discrimination?
11          A.     That's what Ms. Key was doing.
12          Q.     The reason I asked that is at some
13   point today, you said something about a complaint
14   of harassment.  You understand the difference
15   between harassment and discrimination?
16          A.     I do.
17          Q.     All right.  And having looked at
18   those e-mails, et cetera, would it be more
19   accurate to describe Ms. Key's complaint as one
20   of discrimination as opposed to harassment?
21          A.     That is correct.
```