IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY,<br><br>Plaintiff,<br><br>v.<br><br>HYUNDAI MOTOR MANUFACTURING, ALABAMA, LLC; HYUNDAI ENG AMERICA, INC.; and DYNAMIC SECURITY, INC.<br><br>Defendants. | ) | Case No. 2:19-CV-767-ECM |

---

**EXHIBIT A TO**

**PLAINTIFF'S OBJECTIONS TO HYUNDAI MOTOR MANUFACTURING, ALABAMA, LLC'S DEPOSITION DESIGNATIONS**

**ROBERT BURNS**

---

| Case | Key, Davita |
|---|---|
| Issue Code | HMMA Designation |

| ANTHONY, ROBERT 6/22/22 VOL 1 | | |
|---|---|---|
| 1 | 002:01 - 002:16 | The deposition of ROBERT ANTHONY BURNS was taken before Tanya D. Cornelius, CCR, on June 22, 2022 by Heather Leonard, commencing at approximately 9:33 a.m., at RSA Dexter, 445 Dexter Avenue, Suite 405, Montgomery, Alabama pursuant to the stipulations set forth herein.<br>S T I P U L A T I O N<br>IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of ROBERT ANTHONY BURNS may be taken before Tanya D. Cornelius, CCR and Notary Public, State of Alabama at Large, at RSA Dexter, 445 Dexter Avenue, Suite 405, Montgomery, Alabama, on June 22, 2022, commencing at approximately 9:33 a.m. |
| 2 | 014:22 - 015:02 | **Q. To whom do you report in your current roles?**<br>A. My current role, I report to the president of HMMA, Ernie Kim. |
| 3 | 016:05 - 016:09 | **Q. So it's Hyundai Motor Company, a company that has been incorporated in Delaware?**<br>A. No, Hyundai Motor Manufacturing Alabama incorporated in Delaware. Hyundai Motor Company is based in Seoul, Korea. |
| 4 | 016:23 - 017:05 | **Q. (BY MS. LEONARD:) Is there a business relationship in terms of ownership affiliation between HEA and either HMMA or Hyundai Motor Company?**<br>A. Not between HMMA and Hyundai Engineering, no, no. |
| 5 | 017:12 - 017:19 | **Q. In your role as -- in your current roles as VP of HR and chief administrative officer, who do you have direct supervisory responsibility over? In other words, who are your direct reports?** |

| | | |
|---|---|---|
| | | A. So, again, the heads of department for general affairs, team relations, environment, health and safety, and human resources. |
| 6 | 020:08 - 020:22 | **Q. Would the training responsibilities that HR had include training on avoiding discriminatory conduct?**<br>A. The -- any training of that variety was coordinated and/or prepared by the legal department, and then HR and/or our team relations group would help make sure that the team members would be able to participate in that training by scheduling the training. So HR is more of a scheduling function in that case.<br>**Q. And when you say scheduling the training, was this live training or was it computer-based learning?**<br>A. It was a combination of live and/or video presentations. |
| 7 | 039:15 - 039:18 | **Q. Did you have any personal involvement with anything related to Davita Key's assignment to work at HMMA?**<br>A. I did not. |
| 8 | 067:08 - 068:08 | **Q. Okay. Do you know whether the services performed by Ms. Key on HMMA's property are reflected on any invoices that may have been submitted to HEA pursuant to this section?**<br>A. If she was paid by the contract -- the subcontractor with HEA, then it likely would have shown up on an invoice as a line item for the services rendered, not necessarily specific name, okay, just services rendered. So is it security, mailroom, et cetera, but not by name.<br>**Q. With that understanding, are there any invoices that reflect services performed by Ms. Key at HMMA's property?**<br>A. Again, because there's no line item detailed by individual, I can't confirm whether or not she was included on an invoice for the time she worked.<br>**Q. Do you dispute whether she was included on any invoice?**<br>A. I will not dispute that her -- the |

| | | |
|---|---|---|
| | | pay may have been reflective for the services provided in her role, but, again, I don't -- her name would not be specifically shown on the invoice. |
| 9 | 076:10 - 076:15 | A. Hyundai Motor Manufacturing Alabama, yes. It's owned by Hyundai Motor Company.<br>**Q. And its parent company is located in Seoul, Korea, correct?**<br>A. That is correct, located in Seoul, Korea. |
| 10 | 088:08 - 088:23 | **MR. MIDDLEBROOKS: Read 10.4 also.**<br>THE WITNESS: Yes, I'm about to. I'm just catching my breath.<br>MS. LEONARD: I'm not rushing him, David. We're going to talk about it all.<br>A. Contractor, and all those working for or on behalf of the contractor, shall comply with HMMA rules for business invitees on the premises, including those pertaining to safety, plant protection, security, identification, and the operation and parking of vehicles. And contractor agrees to promptly remove from owner's premises any workers who fail or refuse to comply with owner's rules for business invitees and replace them as -- replace them at contractor's sole cost and expense. |
| 11 | 098:04 - 098:19 | **Q. (BY MS. LEONARD:) Sure. The people that HEA would have placed at HMMA, the work those individuals performed, for what company's benefit was that work?**<br>A. Work performed for Hyundai AMOCO or Hyundai Engineering was for the benefit of that company. That's who the contract was with.<br>**Q. Who derived the benefit of the security services provided at the Hyundai gates?**<br>A. The Hyundai Engineering would have benefited from the services provided, and secondarily, we did, too. Hyundai Motor Manufacturing Alabama did as well.<br>**Q. What do you mean by secondarily?**<br>A. Because they were not directly employed by Hyundai Motor Manufacturing Alabama. |

| | | |
|---|---|---|
| 12 | 104:02 - 104:22 | 104:02 A. Yeah, I'm reading it. It just says contractor shall provide all management, supervision, labor, training, equipment, et cetera.<br>**Q. And towards the end of it, it says it's going to provide what's necessary to, quote, fulfill all aspects of the contract to provide uniform security services as herein outlined and specified, close quote. Did I read that correctly?**<br>A. Yes, you've read it correctly.<br>**Q. And HMMA defines what is necessary to fulfill those terms of the contract, correct?**<br>A. The description of work says what is required for the contract.<br>**Q. And that's what's required by HMMA?**<br>A. Jointly prepared, I guess, between HMMA and the contractor.<br>**Q. But you don't know who prepared this document?**<br>A. I do not. |
| 13 | 107:19 - 113:16 | 107:19 **Q. Did this coverage schedule that we see below -- and I'm calling it a coverage schedule, the chart. Does this minimum requirement for coverage, did it change by the end of July 2017?**<br>108:01 A. This coverage chart could change from week to week depending on the operational status of Hyundai Motor Manufacturing Alabama. As I said earlier, depending on shutdowns, et cetera.<br>**Q. So would there be a chart -- let me rephrase it.**<br>**So would somebody at HMMA then generate this chart and provide it to HEA or Dynamic to say this is the staffing we need?**<br>A. Based on this scope of work in front of us, that would be, as we've stated, maybe we'll call it the minimum or projected staffing requirements to operate the facility or to provide the services for the facility.<br>**Q. So would there be charts of this nature that I could request either from HMMA,** |

**HEA, or Dynamic that would show the minimum staffing requested by HMMA in July and August of 2017?**

**MR. MIDDLEBROOKS: Object to the form. If you know.**

A. I don't know for sure, but I'm sure you could check with Dynamic Security.

**Q. Well, when you say this changes, what documents would show that there have been any changes in the minimum staffing other than what is in this chart on Bates Number 30?**

A. So let me just clarify. Projected staffing requirements sets probably the baseline, whoever developed this document, and then if there was a change because of a shutdown or whatever, maybe this would not be the staffing requirement on that day or that week. That's what I'm referring to.

So there's probably this baseline, but it may fluctuate based on operating conditions.

**Q. Was the baseline that we see on Bates Number 30 in place at the end of July 2017, beginning of August of 2017?**

A. I do not have specific knowledge if this was in place at that time other than what's in front of me.

**Q. How could I find out what the baseline was then?**

**MR. MIDDLEBROOKS: Object to the form.**

A. You're welcome to touch base with Dynamic Security.

**Q. Doesn't HMMA set the baseline of what it needs?**

**MR. MIDDLEBROOKS: Object to the form.**

A. So, again, this was in the scope of work, but you would have to check with Dynamic Security what the actual staffing was at the time that you just specified.

**Q. And I apologize, and I think we're saying the same thing, but we may just not be**

**communicating.**

**Would you agree that the chart we're saying basically says this is what HMMA sets as the minimum of what we think we're going to need in terms of --**

**MR. MIDDLEBROOKS: The record speaks for itself.**

**Q. You can answer.**

A. And I'm repeating what I said. The projected staffing requirements at the time was in this document, so that's all I can reference.

**Q. And would the projected -- the projected staffing requirements, how could I find out what HMMA projected the staffing requirements to be under this contract as it would have been implemented or as it would have been followed in July, August of 2017?**

**MR. MIDDLEBROOKS: Object to the form.**

A. I've already answered that you could check with Dynamic Security.

**Q. And how would they know what the minimum staffing requirements were?**

**MR. MIDDLEBROOKS: Calls for speculation. Object to the form.**

A. I'm just saying that's who you need to check with.

**Q. Well, would Hyundai communicate to Dynamic, This is how many people we think we'll need?**

A. The scope of work that's outlined here set the projected staffing requirements at that time, and that's all I can say. I don't know.

**Q. Okay. So was Dynamic free to send over however many people they wanted to?**

**MR. MIDDLEBROOKS: Object to the form. He's asked and answered your question.**

**Q. You can answer.**

A. I have. I don't have any other information besides what's in front of me to determine what the projected staffing was at that time.

| | | |
|---|---|---|
| | | **Q. Yes or no, was Dynamic free in July and August of 2017 to send over whatever number of people it wanted?**<br>**MR. MIDDLEBROOKS: Dynamic wasn't their contractor.**<br>**Q. You need to answer.**<br>A. I'm confused anyway, but all I'm saying is this -- I don't know what staffing they had on any particular day or any particular month other than what the projected staffing requirements that are in front of me right now.<br>**Q. Would you agree the projected staffing requirements would have been created by HMMA?**<br>A. I can only say that they were probably determined in conjunction with the Hyundai Engineering team or Hyundai AMOCO at the time the scope of work was prepared.<br>**Q. And this was in 2010, correct?**<br>A. This has 2010 on the front of the document.<br>**Q. And you don't know if there was any agreement in 2010 between HEA or any of its predecessors and HMMA?**<br>A. I do not.<br>**Q. So you have no knowledge of HEA having any input into the projected staffing requirements?**<br>A. I do not have specific knowledge, no. |
| 14 | 116:02 - 116:21 | **Q. Here where we see each day is broken into three eight-hour shifts, do you know what the hours are that are defined by the shifts in this chart?**<br>A. I do not have any specific details of when their start time and end time for the security staffing. That would be determined by Dynamic and Hyundai Engineering, not by HMMA.<br>**Q. Are you aware of any documents that would say those hours are set by Dynamic or HEA?**<br>A. No.<br>**Q. What is your basis then for saying that Dynamic or HEA would set those hours?** |

| | | |
|---|---|---|
| | | A. Because I don't have any knowledge of their shift change schedules at all.<br>**Q. Do you know if HMMA has ever communicated to HEA or Dynamic what it would want the shift hours to be for the people identified on this chart?**<br>A. Nope. |
| 15 | 123:15 - 123:19 | **Q. You got it. Do you know what training, if any, was provided by HEA and/or Dynamic to the people they placed at HMMA?**<br>A. I have no specific knowledge of what training was provided, no. |
| 16 | 128:05 - 129:21 | **Q. If you can turn to the next page, which is HMMA 34, I want to look at Section 6 that talks about conduct.**<br>A. I see Section 6, Conduct.<br>**Q. When we look at that, under Section** A, it says the contractor has to ensure that the security officers carry out their duties and comply with the contract, and then it gives some examples of things that would be noncompliant. And the first thing listed is unacceptable appearance. What is that?<br>A. The appearance of the security officer's uniform.<br>**Q. Okay. Who determines whether the appearance is unacceptable?**<br>A. Hyundai Engineering or the security contractor.<br>**Q. Does HMMA have any input into what is considered unacceptable appearance?**<br>A. No. I'm not aware of any guidelines or anything on unacceptable appearance, no.<br>**Q. If HMMA has no input into what is determined unacceptable appearance, then why is this a provision within the contract in terms of conduct where the contractor is responsible for making sure that the employer maintains acceptable appearance?**<br>A. I believe, and I do not -- there it is. I had to find here, I believe -- yes. So going to Section 5, Uniforms, this is -- it |

| | | |
|---|---|---|
| | | specifically states about the contractors will provide uniforms. Let's see. Uniforms shall be worn at all times by security officer engaged in the performance of their duties. The uniform shall be the same color and style.<br>That's where I believe they're referring to appearance, that they have the right uniform on with all the right specific appearance, meaning same color, same style, patches, et cetera. |
| 17 | 136:10 - 136:14 | **Q. Is there any document that you're aware of from HMMA that delineates what is acceptable appearance from someone working in the mailroom?**<br>A. No. I'm not aware. |
| 18 | 136:21 - 138:10 | Okay. I'm looking at Page 16 or HMMA 39. Fee schedule.<br>**Q. Does that hourly rate represent what would be paid to somebody working -- like if we look at mailroom and it shows the hourly rate is sixteen seventy-six, does that represent what is paid to someone working in the mailroom, what HMMA pays to the contractor under the contract for someone working in the mailroom or something else? What does that represent?**<br>A. I don't have the details of what encompasses this total amount. So it would be hard to determine if I'm going to be accurate in my statement.<br>So let me be very clear. It could possibly be the amount plus a fee from the Hyundai AMOCO or Hyundai Engineering for the services provided in the mailroom or shift supervisor or rover officer.<br>**Q. Do you know what these hourly rates represent on Schedule B or on Exhibit B, Fee Schedule, which is Bates Number 39?**<br>A. They're an hourly rate for each one of the services provided.<br>**Q. I understand that. I guess where I'm going is: Do you understand if that's the hourly rate to the employee, is that the hourly rate for** |

| | | |
|---|---|---|
| | | **billing, or is it something else?**<br>**MR. MIDDLEBROOKS: Object to the form. Asked and answered.**<br>A. So, again, just based on limited information that's in front of me, I can't determine how much is the rate for the individual or is it a rate plus a markup fee by the Hyundai AMOCO or Hyundai Engineering at the time of the contract. |
| 19 | 148:06 - 149:22 | **What grooming policy or policies were in effect in 2017?**<br>A. The policies in '17 likely reflected requirements related to safety protocols in our production areas.<br>**Q. Is that policy in writing anywhere?**<br>A. Yes.<br>MR. MIDDLEBROOKS: It addresses you to it.<br>A. Yes, I was going to say HMMA 00003, wherever that document is, yes, it's outlined as a matrix. It shows what we call personal protective equipment and other safety protocols for the specific production shops.<br>**Q. Are there any other documents that reflect what HMMA found to be acceptable appearance in 2017?**<br>A. Not that I'm aware of, no.<br>**Q. Is that something that you looked for?**<br>A. I'm sorry. One more time?<br>**Q. Is that something that you looked for?**<br>A. No, I didn't look for it, because I had the matrix that showed the safety protocols for each one of the shops.<br>**Q. Did you look to see if there were documents beyond what you already had in your possession?**<br>A. No, I did not.<br>**Q. Is it possible there may be documents that reflect what may have been considered to be acceptable grooming in 2017 other than what you** |

| | | |
|---|---|---|
| | | **already had in your possession?**<br>A. No.<br>**Q. Why do you say that?**<br>A. Because the only related grooming, we call it grooming policies, by your terms is related to safety protocols. There's no other grooming requirements at HMMA. |
| 20 | 154:13 - 154:22 | **Q. All right. Are there any common owners between HEA and HMMA?**<br>A. Not -- no, not that I'm aware of, nope.<br>**Q. Are there any shared policies?**<br>A. Shared?<br>**Q. Policies.**<br>A. No.<br>**Q. Shared bank accounts?**<br>A. No. |
| 21 | 155:05 - 155:11 | **Q. Does HMMA have any business dealings with Dynamic Security?**<br>A. No.<br>**Q. Has HMMA ever had any business dealings with Dynamic Security?**<br>A. No, no direct business dealings, nope. |
| 22 | 161:09 - 161:13 | **Q. And who provides that badge?**<br>A. The Hyundai Engineering in conjunction with the security service issues those badges to these contractors or subcontractors. |
| 23 | 163:20 - 164:03 | **Q. Does HMMA provide a paycheck to anybody that works in the mailroom?**<br>A. No.<br>**Q. Typically, how many people work in the mailroom, if you know?**<br>A. Based on the document we reviewed earlier, it looked like there was two. |
| 24 | 168:11 - 168:19 | **Q. And the reason I ask is, like you said, there are other businesses that have the word "Hyundai" in it. Hyundai Electrical, Hyundai Power Transformers.**<br>**The fact that they all have the word** |

| | | |
|---|---|---|
| | | **"Hyundai" in it, is there any connection that allows them to all have the same name?**<br>A. I think they're all standalone entities. |
| 25 | 172:11 - 173:15 | 172:11 **Q. Do all contractors receive Plaintiff's Exhibit 5?**<br>A. I can't confirm if all do, but I know that's -- past practice is to provide this to those contractors so, again, they understand roles, responsibilities, protocols, et cetera, if they're going to operate on our site.<br>**Q. Other than the people that would be provided pursuant to the contract we looked at earlier, Exhibit 2, are there any other contractors who perform work at HMMA that would receive Exhibit 5?**<br>A. I would say it is practice that all<br>173:01 contractors who perform any kind of work on our site follow this handbook for safety, security, and fire protection.<br>**Q. Other than the people HMMA identifies as the security contractors, what other contractors, if any, work at HMMA?**<br>A. You could have electrical contractors, pipe fitters, construction contractors. Just any kind of work that may be done on-site.<br>**Q. Are there any contractors other than the people who are working pursuant to the security contract that are at HMMA for a period of six months or longer?**<br>A. It's possible that there may be. |
| 26 | 181:02 - 181:21 | 181:02 **Q. Does the team member handbook have any information in it that is applicable to the conduct expected from contractors?**<br>A. No, it does not. Based on my recollection of the content, because it is several pages, but it is focused on team member related policies, procedures, et cetera.<br>**Q. Does HMMA expect -- are there any differences in HMMA's expectations in the conduct of its employees when they're at work on the HMMA** |

| | | |
|---|---|---|
| | | **campus compared to what is expected from the conduct of contractors performing work on the HMMA campus?**<br>A. Well, HMMA's handbook is specifically addressing team members who are employed by HMMA. This does not apply to contractors who are employed by some other entity who has their own, I assume -- sorry. I shouldn't use that word. Has a handbook or other guidelines to manage their individual employees. |
| 27 | 182:01 - 182:22 | 182:01 **Q. (BY MS. LEONARD:) My question is a little different. In terms of the conduct that HMMA finds to be acceptable or its expectations on how people will conduct themselves while they are performing work on its property, does HMMA have different expectations for the people that it directly employs as compared to those who are performing work through a contract?**<br>A. So there are expectations, yes, for conduct while working on HMMA property, performing their daily duties, et cetera. And if a contractor, whoever that may be, whose conduct is not acceptable, then we do have the right to make the decision to or recommend, rather, that they be removed from property or something like that, but that's about it.<br>We don't control them. We do have the right to make a complaint known to the contractor, and they can follow up with the complaint that's been raised and then get back to us and see if that has been addressed properly or not been addressed properly. |
| 28 | 184:10 - 184:20 | 184:10 **Q. When you say that individuals performing work through a contract are expected to follow the directions of their employer, does HMMA communicate to that employer what is expected in terms of what is acceptable and unacceptable conduct on HMMA property?**<br>A. No, no. We don't direct the contractor or their subcontractors. We only acknowledge when something has occurred, whatever that may be, that it's considered unacceptable |

| | | |
|---|---|---|
| | | and ask the contractor to address the issue. |
| 29 | 185:10 - 186:01 | **Q. (BY MS. LEONARD:) And I want to clarify. I'm not asking like HMMA tells security, Go get rid of this person. I'm basically saying has HMMA communicated to HEA or to Dynamic, You've sent this person to perform work here, and we don't want them here anymore?**<br>A. I'm going to say I don't have specific knowledge of that, but it's consistent with what I said just a moment ago.<br>If someone were -- and I'm just using an example, workplace threat or violence occurred, then we would recommend to HEA or any contractor that they investigate the situation and then find a remedy that they would present to us. |
| 30 | 195:10 - 195:23 | A. Yeah. I kind of misinterpreted on my part, but the key thing is, as I was saying before, orientation, it turns out -- as I was corrected, 2012ish is when we transitioned from handbook to a video that actually goes through all the EEO policy and has a wide variety of topics related to what should not take place relative to harassment and discrimination, et cetera, and that video has been in place since 2012 as part of orientation.<br>And as I was saying before, we do refresher training every two years with a similar content. And it's updated on a regular basis based on current law. |
| 31 | 227:15 - 228:03 | **Q. Is that something that you prepared to testify to today?**<br>A. Yes, I was prepared to testify, and I'm not aware of any complaints from HMMA team members for grooming policy.<br>**Q. And I'm not trying to parse words, but for lawyers, sometimes there's a difference between not that I'm aware of and no --**<br>**MR. MIDDLEBROOKS: There have been none.**<br>A. And I'll be glad to say there have been none. |

| | | |
|---|---|---|
| 32 | 228:17 - 229:18 | **Q. And this is a document identified as PPE and Dress Code Matrix.**<br>A. Yes, I have it in front of me.<br>**Q. Was this document in use in July or August of 2017?**<br>A. Based on revision date of 2013, based on the document in front of me, and it looks consistent with what our policies for PPE and dress code are today, so I'll say yes.<br>**Q. To whom does this document apply?**<br>A. It applies to anyone entering the production areas at HMMA.<br>**Q. What are considered the production areas at HMMA?**<br>A. Consistent with what's on this matrix, stamping, weld, paint, general assembly, and engine shops.<br>**Q. The area where the mailroom is, is that considered a production area?**<br>A. It is not. It is a part of the administration building.<br>**Q. Is there any type of dress code matrix or guidelines as it relates to appearance for people who work in that area?**<br>A. No. |
| 33 | 232:20 - 233:12 | **Q. And this appears to be an e-mail exchange among Gloria Robinson and Ray Cureton. The reason why I ask you about it is there's some reference here to HMMA.**<br>**If you look at the bottom of the page, which appears to be an e-mail sent Monday, July 31st from Ray Cureton to Gloria Robinson, in the second paragraph he makes a reference to: However, the hair standards at HMMA are non-negotiable. And in the last paragraph he writes: Bottom line, if her hair is not up to HMMA standards.**<br>**Looking at this, are you aware of any HMMA standards or do you have any knowledge of what HMMA standards Mr. Cureton may be referring to in this e-mail?** |
| 34 | 234:09 - 234:16 | A. So I've read it. So ask your |

| | | |
|---|---|---|
| | | question again.<br>**Q. (BY MS. LEONARD:) Sure. Do you have any knowledge about what HMMA standards Mr. Cureton is referring to in his e-mail sent on July 31st, 2017 at 3:20 p.m.?**<br>A. I do not have any idea what standards he's referring to, not at all. |
| 35 | 235:21 - 236:21 | **Q. (BY MS. LEONARD:) On the first page of Exhibit 11, which is Bates Number HEA 53, in the second to the last paragraph, right above where we see some italicized words --**<br>A. I see that.<br>**Q. -- it says: The client's grooming policy is posted in the security officer roll call room. Is there a security officer roll call room on the HMMA property?**<br>A. There is a security officer roll call room.<br>**Q. Is there a grooming policy posted in the security officer roll call room?**<br>A. I do not know. I've not been in that room to be able to see that document or how it was posted. I've never seen it.<br>**Q. Do you know if in 2017 there was a grooming policy posted in a security officer roll call room?**<br>A. I do not know.<br>**Q. Does HMMA have a copy of any grooming policy that may have been posted in the security officer roll call room in its facilities?**<br>A. No. |
| 36 | 237:04 - 237:23 | **Q. If you turn to the next page, which is Page 54, in the second full paragraph, Dynamic writes to the EEOC: Ms. Key had then decided she could simply ignore the instructions to restyle her dreads to comply with HMMA policy.**<br>**And then if you skip down a paragraph below that, it reads: After reviewing a copy of the HMMA policy regarding the company's grooming standards, Ms. Key was sent home.**<br>**What policy did HMMA have that would have been communicated to Ms. Key about the** |

| | | |
|---|---|---|
| | | **company's grooming standards?**<br>**MR. MIDDLEBROOKS: Object to the form.**<br>A. I don't know, because it says client's grooming policy. Well, who's the client? Hyundai Engineering. Then it comes back and says HMMA policy. The only HMMA policy that relates to length of hair is our safety protocol policy. |
| 37 | 238:07 - 238:21 | A. It doesn't identify HMMA.<br>**Q. Doesn't it identify the grooming policy at issue to be HMMA's grooming policy?**<br>A. They can imply that. It doesn't make it fact.<br>**Q. Well, doesn't Dynamic state in this document that HMMA's grooming policy is the one that's at issue?**<br>A. If they're referring to our safety protocol, this would not apply to Ms. Key. It's only for on-site production areas.<br>**Q. You would agree with me this document only makes reference to HMMA's grooming policy?**<br>A. It makes reference to a client's grooming policy first. |
| 38 | 239:09 - 239:20 | **Q. And what does the document say?**<br>A. It says: After reviewing a copy of the HMMA policy regarding company's grooming standard.<br>**Q. Do you know what policy that references?**<br>A. No, because I wasn't -- I can't interpret what this individual is referring to, because the only policy that has reference to length of hair is our safety protocol policy. It has nothing to do with mailroom or security personnel. |
| 39 | 240:08 - 240:22 | **Who at HMMA management agreed with Dynamic that Ms. Key would be removed from the work site?**<br>A. No one.<br>**Q. Is that an untrue statement?**<br>A. No, it's -- that's an untrue |

| | | |
|---|---|---|
| | | statement? Are you talking about my statement being untrue?<br>**Q. No, no. Is Dynamic making an untrue statement to the EEOC when it represented it was agreed by Dynamic and HMMA management that Ms. Key would be removed from the work site?**<br>A. Yes, it must be untrue, because no one at HMMA made this decision to remove Ms. Key from the work site. |
| 40 | 241:09 - 241:14 | **Q. So you would say Dynamic's representation to the EEOC that HMMA had a grooming policy relating to Ms. Key's hairstyle is untrue?**<br>A. I would have to say, because we don't have one that applies to the mail clerks. |
| 41 | 242:15 - 244:15 | **Q. I'm looking at topic area 3 from Exhibit 1, the 30(b)(6) notice. With respect to any person who is employed by HMMA or assigned to HMMA through HEA or Dynamic for the period of 2017 to the present, has anyone been accused of having a hairstyle that was inconsistent with the company's grooming standards for having dreadlocks?**<br>A. Not that I'm aware of.<br>**Q. And that's something that you would be aware of since you were prepared on that topic area?**<br>A. That's true, I guess. Based on information I've been provided, no, there's not been anybody.<br>**Q. Okay. Would it be fair to say then you're also not aware of anyone who has received discipline for the way that they wore their hair on HMMA property?**<br>A. No. Are -- we're referring to security personnel? I just want to clarify that. Is that what you're referring to?<br>**Q. We'll start with security personnel. Are you aware of any security or mailroom personnel that have received any type of discipline, corrective action, or been requested by HMMA to be removed from the site because of** |

| | | |
|---|---|---|
| | | **their hairstyle?**<br>A. No.<br>**Q. Have there been any employees -- or has HMMA fired or disciplined anyone that worked directly for it for their hairstyle?**<br>244:01 A. No.<br>**Q. So regardless of their category, HMMA hasn't done anything to anybody about their hair?**<br>A. No.<br>MR. MIDDLEBROOKS: That's beyond the scope of the 30(b)(6).<br>MR. WHITEHEAD: Can I just say, I mean, look, if somebody is walking around with a ponytail that fell out of their hat, I'm sure a supervisor is going to say, hey, put it back up in your hat.<br>THE WITNESS: Yeah, that's not -- you said terminated, or whatever she just said.<br>A. Yeah, if someone is not following the safety protocols -- |
| 42 | 245:04 - 245:18 | 245:04 **Q. (BY MS. LEONARD:) Who made the decision that Davita Key would not be performing work on HMMA's property?**<br>A. Someone with Hyundai Engineering or Dynamic Security, not HMMA.<br>**Q. Well, I understand that. Do you know who made the decision?**<br>A. No.<br>**Q. So would it be fair to say HMMA's position is it does not know who made the decision for Ms. Key to stop performing work on HMMA's property?**<br>A. HMMA did not know who made the decision to --<br>**Q. Okay.** |
| 43 | 246:07 - 246:23 | 246:07 **Q. Is there any reason that Ms. Key would be disqualified from working at HMMA? Now, I understand jobs may not be available or she may not be qualified for a job, but other than reasons of qualification or not having a job available, is there any reason she would not be eligible to work at HMMA?** |

| | | |
|---|---|---|
| | | A. Not that I'm aware of.<br>**Q. Is she eligible to seek employment at HMMA?**<br>A. She's -- I don't know why she would not be eligible.<br>**Q. And other than not being the most qualified person for the job for which she applies, is there any other reason she would not be hired at HMMA?**<br>A. No. |
| 44 | 248:20 - 249:11 | **Q. Okay. Prior to HMMA receiving Exhibit 12, which begins with a letter dated October 24th, 2018 from the EEOC to Chris Smith, prior to that point in time, had HMMA heard from any source that Davita Key had complained about discrimination or retaliation?**<br>A. No. We had not heard about this case prior to this notice.<br>**Q. Had HEA or Dynamic informed HMMA that Ms. Key had made either a complaint to Dynamic or that Ms. Key had filed an EEOC charge?**<br>**MR. MIDDLEBROOKS: Prior to that date?**<br>**MS. LEONARD: Yes.**<br>A. No. |
| 45 | 279:20 - 279:21 | **Q. Did HMMA ever employ Ms. Key?**<br>A. No. |
| 46 | 280:02 - 281:20 | A. In preparation for this, did I do any research, no, but there's nothing that I'm aware of that says she was ever a team member for HMMA.<br>**Q. Same question for Cassandra Williams?**<br>A. And the same response. Maybe a slightly different response in that Cassandra Williams has been an employee of some version of Hyundai AMOCO or Engineering for as long as I can remember, which would be in the '8 -- 2008, 2009 realm, something like that. I could be wrong about that tenure, but definitely been an employee of that group for some time.<br>**Q. Where does she keep an office?**<br>A. At the security building on HMMA's -- Gate 3 entrance of HMMA. |

| | | |
|---|---|---|
| | | **Q. So Ms. Williams keeps an office on HMMA's campus?**<br>A. That's correct. That's where the security building is located.<br>**Q. What is your knowledge about whether HMMA ever employed Ms. Gloria Robinson?**<br>A. I don't even recognize the name, but I -- to my knowledge, never been employed by HMMA.<br>**Q. And what's the basis of your knowledge?**<br>A. Again, just no formal research, just general awareness.<br>**Q. And where do you get that general awareness? Are you basically saying you haven't seen her working there?**<br>A. Yeah, I just haven't, just no interaction at all.<br>**Q. What is your knowledge about whether Maurice Chambliss worked for HMMA?**<br>A. Same. That name is vaguely familiar, but I don't have much interaction with him at all, so that's probably another reason why I don't recognize it.<br>**Q. Same question for Tunya Howell.**<br>A. No, no interaction, not employed by HMMA to the best of my knowledge. |
| 47 | 285:14 - 285:21 | **Q. Where is there any reference to Hyundai Engineering in Plaintiff's Exhibit 20 other than its initials on the Bates numbers?**<br>A. Only because of past practice that we've had interaction to have made requests to the mailroom or other security personnel through Hyundai Engineering. That's what I base my statement on, past practice. |
| 48 | 286:15 - 286:18 | A. I agree the general affairs department would communicate other duties through Hyundai Engineering, because that's our past practice, and that's what my comment is based on. |
| 49 | 291:16 - 293:21 | **Q. (BY MS. LEONARD:) If we go down to the bottom of that same e-mail that Ms. Williams was sending on August 1st, 2017 and her signature** |

**line, what is her title?**

A. Oh, Cassandra Williams?

**Q. Yes.**

A. Okay. Manager of security services. That's the line you're referring to?

292:01 **Q. Yes. And then what business is identified below that?**

A. Hyundai ENG America, Inc.

**Q. And what business is identified below that?**

A. Hyundai Motor Manufacturing Alabama, LLC.

**Q. Do you have any knowledge as to why HMMA's name is contained in Ms. Williams' signature for her e-mail?**

A. Because that is the template that is set up by AutoEver. And any individual with an e-mail that has that template, it would automatically populate that, and then the area above that would be populated by the individual.

But everything else on Outlook's server would have a template that represents this. It just basically fills in the blank.

**Q. Knowing that Ms. Robinson is sending e-mails through the Outlook server for HMMA e-mail, if we turn to the second page, we don't see that information in her signature line on the e-mail in the top of Page HEA 169.**

293:01 A. So, again, if the individual went in and made that change from the template, then that would be true. She must have made that change, because there is a template, because this -- that example, my e-mail would reflect this very same thing.

**Q. Isn't it true then that for the words Hyundai ENG America, Inc. to be in Ms. Williams' signature line and for her job title to be in there, she would have to go in and modify the template?**

A. No. That's what I'm saying. The individual has the ability to put that information above that, name, title, at that time. So that's what I understand, because

| | | |
|---|---|---|
| | | there's a template.<br>**Q. Can the template be modified?**<br>A. By the individual, if they have administration rights to do so, yeah. Apparently, Ms. Robinson was able to make a change. |
| 50 | 301:17 - 303:05 | **Q. And Exhibit 25 is Bates Number HEA 225 through 230.**<br>**(Whereupon, Plaintiff's Exhibit 25 was marked for identification and a copy of same is attached hereto.)**<br>**Q. If you can pass those to your lawyer and let him look at that.**<br>**(Whereupon, a discussion off the record was held.)**<br>A. Again, I've had a chance to look at this as well yesterday.<br>**Q. All right. Looking at Plaintiff's Exhibit 24 and 25, what are they? Oh, I'm sorry. They're still looking at it.**<br>**MR. WHITEHEAD: I've seen it.**<br>A. Okay. So, anyway, it looks like this is the invoices submitted to Hyundai Motor Manufacturing Alabama by Hyundai Engineering for the security services provided to HMMA.<br>**Q. Okay. How does this invoice process work, if you know?**<br>A. In general terms, yes, the Hyundai Engineering would submit invoices with, as we can see on the second page of the document, detailing the positions that -- for the services being paid by Hyundai Engineering, that ultimately are billed to HMMA; supervisor, security and administration support, mail, Officer I, Officer II.<br>The person receiving the information would review the invoice, confirm that it's accurate, ask questions if they needed to. But after they validated the invoice, then it would be processed for payment to Hyundai Engineering America. |