IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:19-cv-767-ECM |
| | ) | (WO) |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION and ORDER

## I.  INTRODUCTION

Now pending before the Court are motions for summary judgment filed by Defendants Hyundai Motor Manufacturing Alabama, LLC ("HMMA") (doc. 66), Hyundai Engineering America, Inc. ("HEA") (doc. 69), and Dynamic Security, Inc. ("Dynamic") (doc. 73).  Plaintiff Davita M. Key ("Key") brings five claims against all three Defendants: pregnancy discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (Count I), race discrimination pursuant to Title VII and 42 U.S.C. § 1981 (Counts II and III), and race retaliation pursuant to Title VII and § 1981 (Counts IV and V).[1]  Her claims arise out of two days of employment at the Hyundai car manufacturing plant in Montgomery, Alabama, spanning from July 31, 2017, until August 1, 2017.  Based

---

[1]  The Court previously dismissed Key's Title VII claims (Counts I, II, and IV) against HEA. *See Key v. Hyundai Motor Mfg., Ala., LLC*, 2021 WL 3909663, at *5 (M.D. Ala. Aug. 31, 2021).  Therefore, the only claims against HEA to be discussed on summary judgment are her claims for race discrimination (Count III) and race retaliation (Count V) brought pursuant to § 1981.

on a thorough review of the record, the briefs, and the applicable law, for the reasons to be discussed, HMMA's and HEA's motions for summary judgment are due to be GRANTED, and Dynamic's motion for summary judgment is due to be GRANTED in part and DENIED in part.

## II. JURISDICTION

The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(4).  The parties do not contest personal jurisdiction or venue, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  A "genuine" dispute of fact exists "if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996).  An issue of fact is "material" if it could "affect the outcome of the case under the governing law." *Id.*  The movant bears the initial burden to identify evidence showing no genuine dispute of material fact remains, or that the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If the movant satisfies this burden, then the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts,"

2

and they do so by citing to particular parts of the record or by showing the cited materials do not establish the presence or absence of a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); FED. R. CIV. P. 56(c)(1). If the non-movant fails to support their version of the facts or to properly address the movant's version of the facts as required by Rule 56(c), then the court may "consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e)(2).

At the summary judgment stage, the Court must view all evidence in the light most favorable to the non-movant and draw all justifiable inferences from the evidence in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Sprowl v. Mercedes-Benz U.S. Int'l, Inc.*, 815 F. App'x 473, 478 (11th Cir. 2020) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987)).

## IV. FACTS

### A. Corporate Relationship Between HMMA, HEA, and Dynamic

This case involves three distinct corporate entities. HMMA is an automotive assembly plant that produces vehicles in Montgomery, Alabama, for Hyundai's North American automobile market—Hyundai is a company based out of South Korea. HMMA employed HEA to provide it with various services—e.g., security, janitorial, landscaping, and general contracts.[2] Though the two companies share "Hyundai" in their names, there

---

[2] HEA went by "AMCO America, Inc." at the time of Key's employment by Dynamic, and Key referred to HEA as "AMCO" in her EEOC intake questionnaire.

is no shared ownership affiliation between the two. HEA turned to various subcontractors to fulfill the services it provided HMMA, one being Dynamic. Dynamic equipped HEA with the manpower necessary to fulfill its security contract with HMMA. While the three entities were distinct, HMMA could ask the HEA director of security at its plant to request Dynamic to remove a Dynamic employee from an assignment there, though no request was ever made relevant to this case. HEA informed Dynamic employees that they had to abide by HMMA's company policies while at the plant.

## B.    Grooming Policies

HEA had an "Appearance Standard[] for Security Personnel" at the plant created by HEA's Manager of Security Services, Cassandra Williams ("Williams"), a black female. The appearance standard stated that well-groomed braids were permitted for female uniformed officers but "[d]reads or dreadlocks hairstyle [were] prohibited." (Doc. 71-3 at 5). Williams decided to prohibit dreadlocks altogether for HEA because she believed they did not appear professional and well-kempt.

In 2017, the time of the plaintiff's employment at the plant, HMMA had a "Dress Code Matrix" that did not discuss dreadlocks but required "hair longer than collar length" to be "tied back or tucked in [a] hat." (*Id.* at 8). HMMA's dress code only applied to production areas, not administrative buildings like the mailroom, where the plaintiff was stationed.

Dynamic had a "Personal Appearance" standard in its employee handbook. It stated that female officers "[s]hall maintain a neat hairstyle that keeps long hair away from the

4

face and the hair should not extend more than two inches below the top of the collar. If hair extends more than two inches below the top of the collar, then it must be worn up when on duty." (Doc. 75-7 at 19).

HEA permitted two black female Dynamic security employees stationed at the HMMA plant to wear their hair in dreadlocks, albeit in a tight pulled-up bun style in compliance with HEA's and Dynamic's appearance standards. There is no evidence that any white employees at HMMA, HEA, or Dynamic wore their hair in dreadlocks.

## C.     Key's Interview with Dynamic

Key responded to a job advertisement by Dynamic for a security position in the mailroom at the HMMA plant. She interviewed for the position on July 19, 2017, in the plant's security building. Gloria Robinson ("Robinson") and Maurice Chambliss ("Chambliss"), both black Dynamic employees, conducted the interview. Chambliss was a District Manager for Dynamic. Robinson was Dynamic's Account Manager at the HMMA plant. During the interview, Robinson told Key, "Oh, your hair might be a problem." (Doc. 68-12 at 6). Key wore her hair in shoulder length dreadlocks.

Key offered a photograph example on her phone of an "up-do" hairstyle, where the dreadlocks were pulled up tight in a bun. Robinson left the room to speak with Williams, who was in her office nearby. Robinson told Williams that an interviewee for the mailroom position wore dreadlocks, and asked Williams if Key could put her dreadlocks in an "up-do" style to meet HEA's appearance standard. Williams entered the interview room and confirmed that Key's dreadlocks were not permitted by HEA but said that if Key could get

them styled in the "up-do" style, then she could maintain her dreadlocks.  In Williams'

view, the style in which Key wore her dreadlocks appeared "frayed" and not "neat."  Key

indicated she would contact her stylist to put her hair in the "up-do" style.  Robinson

offered Key the mailroom security position two days later.

### D.    Events on July 31, 2017

When Key arrived at her first day of work at the HMMA plant on July 31, 2017, her

dreadlocks remained shoulder-length, as they appeared at her interview.  Key did not style

her dreadlocks in the "up-do" style because Dynamic's Office Manager, Nicole Scavella

("Scavella"), a black female, told Key during Dynamic's orientation on July 21, 2017, that

her dreadlocks did not violate Dynamic's personal appearance standard.

At the HMMA plant on July 31, 2017, Dynamic employee LaTonya Howell

("Howell") was assigned as Key's trainer and Chambliss was her direct supervisor.  Key

first went to HMMA's training center for a safety class, where she received an HMMA

safety handbook—the only handbook she received from HMMA.  An HMMA employee

at the security building—the only HMMA employee Key met during her employment—

gave Key a "Hyundai" badge with her name written on it.  The only HEA employee with

whom Key interacted was Williams.  Williams set the schedule for when Dynamic

personnel were to manage the mailroom according to the basic shift hours provided to her

by HMMA.  Based on this schedule, Dynamic informed Key when she was to report to the

mailroom and paid her according to the number of hours reported.

After Key received her badge, she waited in the security building for Howell to pick her up to begin training.  As she waited, Robinson and Chambliss greeted her.  At that point Key told Robinson and Chambliss for the first time that she was pregnant by handing them a doctor's note that specified Key had no work restrictions.  Robinson later informed Williams about the pregnancy.  About ten to twenty minutes after Key gave the doctor's note to Robinson—who had since returned to the office she shared with Williams— Williams came out of the office, and asked Key, "What's wrong with your hair?" (Doc. 68-12 at 30).  Williams then returned to her office without saying more.  Eventually, Howell met Key, and they began their training.

About an hour into the training, Chambliss retrieved Key from the mailroom to meet with Robinson in her office.  When Key arrived, Williams and Robinson began questioning Key about her hairstyle.  Key explained that she did not change her dreadlock style because the Dynamic handbook only said it had to be neat and groomed, a standard she felt her hair met.  Williams and Robinson responded that while it might comply with Dynamic's personal appearance standard, her hair did not comply with HEA's standard.  Upon Key's request, Williams showed her HEA's appearance standard policy.

Williams told Key that she could only wear her dreadlocks if she wore a hat until she could get her hair styled in the "up-do" manner.  Because Key would have had to return home to retrieve a hat, Robinson instructed her to go home and not return to work that day.  Key never spoke with Williams again after that meeting.  After she left work, Key got in contact with her stylist to schedule a hair appointment for the upcoming weekend.  Also,

after Key left the plant, Robinson called Key to ask when her baby was due and whether her doctor was aware of her job requirements.

After this conversation on the phone, Robinson emailed her superiors at Dynamic. In her email, Robinson outlined various issues she had with Key on her first day of employment. Specifically, she noted that Key had not changed her hair as they had agreed at her interview. Robinson complained that Key, four months into her pregnancy, did not inform her or Chambliss during the interview that she was pregnant. Robinson expressed concern about having a pregnant woman working in the mailroom, where she had to be able to lift up to fifty pounds. Tracy Peoples, Dynamic's Vice President of Operations, responded to Robinson's email, "[I]f the officer they hired is not a fit (because she was pregnant) when they hired her[,] the only way I can see her being removed is if she does not comply with rules and regs regarding hair." (Doc 81-20 at 2).

## E.    Events on August 1, 2017

The next day, on August 1, 2017, Key returned to the Hyundai plant wearing a hat covering her hair. Howell met Key in the morning at the security office to bring her to the mailroom. As they drove to the mailroom, Howell asked Key why she went home early the previous day. Key responded that there was something wrong with her hair and that she did not think she was being treated fairly. Thereafter, Howell informed Williams that Key wanted to see the HMMA handbook to review the hair and appearance policy because Key felt as though she was being discriminated against. Williams notified Robinson and Chambliss about the request to let them "get ahead of" Key's complaint. (Doc. 71-13

at 27).  Williams "did not construe [Key's] complaints about hairstyle to be about race."
(Doc. 71-14 at 5).

Robinson summoned Key from the mailroom and asked her if she felt discriminated
against.  Key responded, "[N]o comment." (Doc. 68-12 at 41).  Robinson then said that
Key should not have asked Williams to see HEA's appearance policy.  According to Key,
Robinson said "that the Koreans were a different breed of animals and that they send little
memos and they don't want African Americans . . . wearing their hair [in dreadlocks]
because of the clientele they have." (*Id.*).

Robinson and Williams later conferred about whether to continue Key's assignment
at the plant.  They concluded that Key should be reassigned to a new site by Dynamic.
Williams memorialized this decision in an email sent to Ray Cureton ("Cureton"),
Dynamic's District Manager, a white male.  In the email, Williams wrote: "I foresee an
issue down the road with [Key].  Rather than let it fester I'm asking that she be moved to
another site." (Doc. 81-8 at 2).  Williams highlighted the following concerns: "After the
issue with her hair yesterday she returns this morning with a hat, not necessarily what I
thought was appropriate"; Key "asked to see a copy of our policy regarding dreads"; "she
didn't bother to speak when she entered our office;" "we hear from our mailroom employee
Latunya Howell that [Key] is already stating that she can't lift boxes"; and "she's asking
to see a HMMA handbook and that the issue is not about her hair, she is being discriminated
against because she is pregnant." (*Id.*).  After Williams sent this email, Robinson informed
Williams that Key had been sent to Dynamic's off-plant office to meet with Cureton.

When Key first arrived at Dynamic's office, Key informed Cureton about the events that took place at the HMMA plant and submitted a signed, handwritten complaint to Cureton.  Specifically, Key's complaint was against "Hyundai," Williams, and Robinson.  Key wrote, "I believe that I have been discriminated against on the basis of my current hairstyle (dreadlocks), and also because I told Ms. Gloria Robinson that I was pregnant on Mon., July 31, 2017." (Doc. 75-14 at 2).  According to Key, Scavella, Dynamic's Office Manager, sat in on Key's meeting with Cureton and later told her not to file a complaint because, given that she was not called the "n-word," Key was fighting a losing battle and had not really been discriminated against.

At her meeting with Cureton, Key first learned that Dynamic was not going to send her back to the HMMA plant.  Cureton told her that Robinson made the request "[b]ecause of [her] hair and something else"; though he said he did not want to get into what the "something else" was at that moment. (Doc. 68-12 at 12).  After Key turned in her Hyundai badge, Cureton told her that he would try to send her to another job site when one came available.  Key contends that Dynamic never reached out to offer her another assignment, even after she inquired in person on August 8, 2017.  Dynamic maintains, however, that it did offer Key other assignments, but they only had available part-time or second or third-shift positions, which Key was unwilling to work.  Cureton sent an email to Sherry Spires ("Spires"), Dynamic's Human Resources Coordinator, on August 1, 2017, stating, "I can attempt to reassign Ms. Key to a different site, but I don't think that's advisable at this time, especially if she has to carry through with the stated 'official complaint' of discrimination

against Hyundai, Ms. Williams, and Ms. Robinson." (Doc. 75-25 at 26–27).  Moreover, on August 6, 2017, he asked Spires in another email, "[I]s it advisable to try to move her to a different site when she is making threats to sue HMMA over the appearance standards?" (Doc. 75-33 at 25).

## F.    EEOC Procedural History

On August 2, 2017, the day after she submitted her written complaint to Dynamic, Key visited the U.S. Equal Employment and Opportunity Commission ("EEOC") office. She followed the instructions of EEOC representatives and filled out an EEOC Intake Questionnaire.  In the Questionnaire, signed by Key that day, she asserted her belief that "Hyundai," "Ms. Cassandra Williams, AMCO," and "Ms. Gloria Robinson" discriminated against her. (Doc. 75-12 at 2, 3).  She listed the HMMA plant address and Ray Cureton at Dynamic Security as the human resources director of contact.  On the Questionnaire, Key selected "race," "retaliation," and "pregnancy" as the bases for her claims, writing that Robinson told her that "the Koreans who own the company didn't want Blks wearing their hair a certain way." (*Id.* at 3).

Page four of the Questionnaire provided, "If you would like to file a charge of job discrimination, you must do so . . . within 180 days from the day you knew about the discrimination . . . . If you want to file a charge, you should check Box 2." (*Id.* at 5).  Key checked Box 2, which read, "I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above.  I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination

information about the charge, including my name." (Doc. 75-12 at 5).  After this box, in the section labeled "PRIVACY ACT STATEMENT," the Questionnaire listed its principal purpose: "This questionnaire may serve as a charge if it meets the elements of a charge." (*Id.*).  Key attached to the Questionnaire details of the events spanning from her interview on July 19, 2017, until her termination on August 1, 2017, indicating that she "wish[ed] to file a charge of discrimination for race and gender, pregnancy discrimination and retaliation due to [her] exercise of protected activity by filing a complaint of discrimination with [her] employer . . . Hyundai (Dynamic Security)." (*Id.* at 6).

The EEOC investigator assigned to Key's case compiled Key's information, prepared a Formal Charge of Discrimination against "Dynamic Security Incorporated" and had Key sign it on August 3, 2017. (Doc. 75-11 at 2).  Dynamic received a copy of this Charge by August 11, 2017.  It then submitted a position statement in opposition to Key's assertions of race and pregnancy discrimination and retaliation.

Over a year later, in October of 2018, a new EEOC investigator assigned to Key's case asked her to sign a separate Charge of Discrimination against HMMA; Key signed the Charge on October 16, 2018.  Key assumed her Intake Questionnaire filed on August 2, 2017, qualified as her Formal Charge against both Dynamic and HMMA, so she thought the 2018 Charge against HMMA was merely a formality.  She also assumed that the EEOC had consolidated her Charges against Dynamic and HMMA, handling both as one case.

The EEOC sent a letter to "HMMA Hyundai" on October 24, 2018, writing:

> Due to administrative error, our staff failed to serve the Notice on Hyundai within ten days.  We received Charging Party's intake questionnaire on

12

August 3, 2017.  On the intake questionnaire, she indicated her intention to file a Charge of Discrimination against Hyundai.  Consequently, the original filing date will reflect as the date of the Commission's receipt of her original communication, the intake questionnaire.

(Doc. 81-14 at 2).  The EEOC's investigation determined an employment relationship existed between Key and HMMA and recommended a for-cause determination, believing discrimination and retaliation did occur.  Key and HMMA took part in conciliation efforts, but the efforts failed.  The EEOC thereafter "determine[d] that further conciliation efforts would be futile or non-productive," and decided to "not bring a lawsuit against [HMMA]" on Key's behalf. (Doc. 71-10 at 9).  On July 12, 2019, Key received from the EEOC its notice of conciliation failure and her right to sue HMMA.

Key listed the same home address on her Intake Questionnaire and on her two EEOC Charges.  The EEOC gave notice to Dynamic of Key's Charge against it on August 11, 2017, and Dynamic subsequently wrote a position statement in opposition to the Charge. At her provided home address, Key received from the EEOC a mailed copy of Dynamic's position statement, experiencing no problem in the mailing process.  Additionally, Key received three mailings from the EEOC—one sent on or about June 10, 2019; two sent on or about July 12, 2019—pertaining to her charge against HMMA, again with no problem. On March 1, 2019, the EEOC mailed to the address provided by Key a Dismissal and Notice of Rights to Sue ("right-to-sue letter") as to her Charge against Dynamic, issuing a "no cause" determination.  The notice stated that if she chose to pursue a civil action against Dynamic under Title VII, then the "lawsuit must be filed within 90 days of [her] receipt of this notice." (Doc. 75-18 at 2).  By March 20, 2019, at the latest, Dynamic received a copy

of Key's right-to-sue letter; the delay was due to Dynamic forwarding mail from a previous address to a new office.

Key, on the other hand, claims she never received the Dynamic right-to-sue letter from the EEOC. The letter was properly addressed, Key had no issues with the mail before or after that time, and she or her husband retrieved mail from the mailbox regularly. According to Key, the first time she saw the Dynamic right-to-sue letter was when Dynamic attached it to its motion to dismiss this lawsuit.

After she undisputedly received her right-to-sue letter as to her Charge against HMMA, Key filed suit in this Court on October 10, 2019, ninety days after the HMMA right-to-sue letter was mailed.

## V.  DISCUSSION

### A.    Evidentiary Objections

The Court first addresses Dynamic's motion to strike certain portions of Key's declaration submitted in support of her opposition to summary judgment. (Doc. 88). Dynamic asserts that paragraph twenty-seven of Key's declaration contains her account of statements made by Cureton during an unemployment hearing and statements made by the EEOC in a written rebuttal. Dynamic argues that this paragraph should be stricken because it is not based on personal knowledge, it is conclusory and speculative, it is hearsay, and is not the best evidence. In addition to the objection as to this specific paragraph, Dynamic objects to "all other inadmissible portions of the Plaintiff's Declaration on which she relies to oppose Defendant Dynamic's Motion for Summary Judgment." (*Id.* at 4).

First, to the extent Dynamic objects on the basis of hearsay, the Court finds that the statements could be reduced to admissible form at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." (citation omitted)). Further, Dynamic's specific objections to paragraph twenty-seven go more to the weight of the evidence than its admissibility. Finally, the last "catch-all" objection lacks sufficient clarity, and the Court will not guess as to which portions of the Declaration Dynamic finds "inadmissible." Accordingly, for good cause, Dynamic's motion to strike (doc. 88) is due to be DENIED.

**B.     Count I – Title VII Pregnancy Discrimination**

Key claims that Dynamic and HMMA discriminated against her based on her pregnancy in violation of Title VII. Title VII, as amended by the Pregnancy Discrimination Act, prohibits discrimination based on pregnancy, childbirth, or related medical conditions. 42 U.S.C. § 2000e(k) (amending 42 U.S.C. § 2000e-2). To survive summary judgment on a pregnancy discrimination claim, a plaintiff must provide evidence that the defendant took an adverse employment action against her because of her pregnancy. *See Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1254–55 (11th Cir. 2012); *Holland v. Gee*, 677 F.3d 1047, 1054–55 (11th Cir. 2012) ("The analysis for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." (citation omitted)).

A plaintiff may rely on "either direct or indirect evidence to show that her employer discriminated against her because of her pregnancy." *Chapter 7 Tr.*, 683 F.3d at 1255. Direct evidence is evidence that, if believed, "proves the existence of a fact without inference or presumption." *Id.* (citation omitted). "Indirect evidence is circumstantial evidence." *Id.* (citation omitted). "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001). Therefore, when evaluating a charge of pregnancy discrimination, courts "must focus on the actual knowledge and actions of the decision-maker." *Walker v. Prudential Prop. and Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002).

### 1.   *HMMA*

HMMA asserts that it cannot be found liable for intentional pregnancy discrimination against Key because there is no evidence that it either knew of her pregnancy or took an adverse action against her. To survive a motion for summary judgment, Key must present evidence demonstrating that HMMA actually knew she was pregnant—otherwise it could not be held accountable for acting on that basis. *See Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002) ("[W]hen we evaluate a charge of disparate treatment employment discrimination, we must focus on the actual knowledge and actions of the decision-maker."); *see also Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580–82 (3d Cir. 1996) (cited approvingly by *Lubetsky*) (holding plaintiff failed to establish a prima facie case of pregnancy discrimination even though she told six

16

co-workers she was pregnant but could not provide any evidence the defendant decision-maker knew she was pregnant).  Likewise, Key must present evidence that HMMA was the actual decision-maker in her termination. *Walker*, 286 F.3d at 1274.

Key has not presented sufficient evidence that anyone at HMMA knew of Key's pregnancy or was a decision-maker in her termination.  No evidence indicates that Key, HEA, or Dynamic informed an HMMA employee about Key's pregnancy.  Key argues that HMMA is nevertheless liable because Williams' knowledge is imputable to HMMA, and thus "notice to Williams was . . . notice to HMMA." (Doc. 82 at 68).  Key contends that HMMA intentionally discriminated against her due to her pregnancy based on its constructive knowledge of her pregnancy, imputed from Williams, an HEA employee.  The Eleventh Circuit, however, has declined to find discriminatory intent based on constructive notice.

In *Silvera*, for example, the Circuit held that a district court erred by imputing knowledge of one school board member to the board as a whole. 244 F.3d at 1261.  In that case, a school board fired a school employee based on a newly discovered prior arrest. *Id.* at 1256–57.  The fired employee sued the board, claiming that his firing was pretext for race discrimination because one board member was aware of his arrest before the board hired him. *Id.* at 1257.  The district court found a conflict of evidence as to whether the board had knowledge of the arrest, thus calling into question whether the firing was pretextual. *Id.* at 1261.  Because one board member had knowledge of the arrest, the district court "reason[ed] that if the Board constructively knew of" the arrest through imputed

knowledge, then a jury could find that the stated reason for the employee's firing was pretext. *Silvera*, 244 F.3d at 1261–62.

The Circuit in *Silvera* reversed the district court, holding it erred by "simply imputing the knowledge" of one board member to the board as a whole, while there was "no evidence at all that [the one board member] actually told the Board anything about [the employee's] arrest." *Id.* at 1262. Discrimination, the Circuit held, must be based on "actual knowledge, and real intent, not constructive knowledge and assumed intent." *Id.*

Key maintains that HMMA discriminated against her due to her pregnancy based solely on Williams' knowledge of the pregnancy and Williams' decision to terminate her employment at the HMMA plant. As the court held in *Silvera*, however, a discrimination claim cannot rely solely on "constructive knowledge and assumed intent," but instead must be based on evidence of *actual* knowledge and intent. 244 F.3d at 1262; *cf. Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 800 (11th Cir. 2000) (declining to impute knowledge to a corporation in a retaliation case because "the fact the employer is a corporation does not relieve a plaintiff of the burden of showing a causal connection between the protected conduct and the decision to take the adverse employment action"); *Pressley v. Haeger*, 977 F.2d 295, 297 (7th Cir. 1992) (stating that "[r]acial discrimination is an intentional wrong. An empty head means no discrimination. There is no 'constructive intent,' and constructive knowledge does not show actual intent"). Key fails to present evidence that anyone at HMMA actually knew that Key was pregnant and intended to take an adverse action against her based on that pregnancy. Therefore, no genuine dispute of

18

fact remains as to Key's pregnancy discrimination claim against HMMA, and its motion for summary judgment is due to be GRANTED as to Count I.

### 2. *Dynamic*

Dynamic contends that all Key's Title VII claims against it must be dismissed because Key failed to file her complaint in this Court within the prescribed statutory period after receiving her Dynamic right-to-sue letter from the EEOC.  Title VII provides, "Within ninety days after the giving of . . . notice [of dismissal of the charge] a civil action may be brought against the respondent named in the charge . . . by the person claiming to be aggrieved." 42 U.S.C § 2000e-5(f)(1).  When a defendant contests whether the complaint was timely filed, the plaintiff bears the burden of showing she has met the timeliness requirement. *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005); *Green v. Union Foundry Co.*, 281 F.3d 1229, 1233–34 (11th Cir. 2002).  Determinations on when notice was received—and thus the start of the ninety-day limitation period—are to be considered "on a case-by-case basis to fashion a fair and reasonable rule for the circumstances of each case, one that would require plaintiffs to assume some minimum responsibility without conditioning a claimant's right to sue on fortuitous circumstances or events beyond her control." *Kerr*, 427 F.3d at 952 (alternations adopted).

When there is a dispute about when the plaintiff received her right-to-sue letter, the Eleventh Circuit has applied a "presumption of three days for receipt by mail." *Id.* at 953 n.9; *Zillyette v. Cap. One Fin. Corp.*, 179 F.3d 1337, 1342 (11th Cir. 1999).  This presumption, however, "does not apply if the plaintiff can show that receipt of the notice

was delayed 'through no fault of [her] own.'" *Robbins v. Vonage Bus., Inc.*, 819 F. App'x 863, 867 (11th Cir. 2020) (quoting *Lewis v. Conners Steel Co.*, 673 F.2d 1240, 1243 (11th Cir. 1982)).  To establish no fault, a plaintiff must show that she took "reasonable steps to ensure delivery of the notice to [her] current address." *Id.* (quoting *Lewis*, 673 F.2d at 1243); *see also Stallworth v. Wells Fargo Armored Servs. Corp.*, 936 F.2d 522, 524 (11th Cir. 1991) ("[A] plaintiff 'should not be heard to complain' unless the plaintiff has . . . [taken] reasonable steps to ensure delivery of the notice to [her] current address.").

The parties dispute when Key received her right-to-sue letter, but there is no dispute as to when the EEOC mailed the letter:  March 1, 2019.  If the time for Key's Title VII claims against Dynamic began running on March 4, 2019—when Key presumably received her right-to-sue letter as to Dynamic—then Key's Title VII claims against Dynamic are time-barred.  If, however, the time ran from the date that Key received the letter attached to Dynamic's motion to dismiss in this case, then her claims were timely filed with this Court.

On March 1, 2019, the EEOC mailed Key the notice of her right to sue Dynamic.  Given the disputed receipt date, the Circuit's "three-day presumption" applies.  Therefore, unless Key can show delay in receipt was caused through no fault of her own, the Court presumes that she received her right-to-sue letter by March 4, 2019.  Key had ninety days from that date to file a lawsuit in federal court—June 2, 2019.  However, Key did not file suit until October 10, 2019—one hundred and thirty days after the presumed June 2 deadline.  Dynamic argues that Key does not carry her burden to present sufficient evidence

20

that she never received the right-to-sue letter due to no fault of her own within the presumed three days.

Key asserts, on the other hand, that she did not receive the Dynamic right-to-sue letter until it was attached to a filing by Dynamic in this case. She also maintains that she and her husband alone resided, and regularly checked the mailbox, at the address to which the EEOC sent mail. Key further contends that she thought her Charge against Dynamic was consolidated with her Charge against HMMA, and thus was included in the right-to-sue letter as to HMMA. These facts, according to Key, are sufficient evidence to overcome the presumption of timely mailing and receipt.

A similar argument was made, and rejected, in *Kerr*. The parties in *Kerr* disputed the exact date on which the plaintiffs received their right-to-sue letters in the mail, and thus when the clock began ticking on when they could bring a Title VII claim against their employer. 427 F.3d at 951. There was no dispute as to whether the right-to-sue letters were mailed. *Id.* at 951–52. The employer produced evidence that the EEOC followed the same procedures mailing the right-to-sue letters as it did other mailings that had reached the plaintiffs' addresses. *Id.* at 952. Evidence also demonstrated that the defendant employer received a copy of the right-to-sue letters in the mail with no unusual delay. *Id.* The court held that the employer sufficiently raised the "presumption that the notices were properly mailed," and the plaintiffs did not present sufficient evidence to rebut that presumption. *Id.*

The circumstances in this case are similar to the circumstances in *Kerr*, such that they raise a presumption that the EEOC properly mailed notice of Key's right to sue

21

Dynamic on March 1, 2019.  Key received three mailings from the EEOC regarding her charge against HMMA at the same address listed on her Dynamic right-to-sue letter. Additionally, Dynamic provided evidence that it received a copy of the notice on or before March 20, 2022.[3]  Key has not identified any evidence demonstrating there may have been a flaw in the mailing procedure.  Like the employer in *Kerr*, Dynamic has presented sufficient evidence to "raise a presumption that the notices were properly mailed." 427 F.3d at 952.

Key contends that her sworn testimony that she never received the right-to-sue letter should overcome the three-day presumption of receipt.  However, this testimony alone is insufficient to defeat the presumption of proper mailing and receipt within three days. *See Sevillano v. Orange County*, 2021 WL 2431847, at *3 (M.D. Fla. May 26, 2021) (finding self-serving testimony alone not sufficient to defeat the presumption of timely mailing and receipt).  Without pointing to specific evidence of who or what could be at fault besides herself, Key fails to present a genuine dispute of fact as to when she received the Dynamic right-to-sue letter.

In *Bloom v. Shinseki*, for example, the only evidence to overcome the presumption of timely receipt was the plaintiff's own declaration that he and his wife did not receive the right-to-sue notices in their mailbox. 2012 WL 4009751, at *4 (M.D. Ala. Sept. 12, 2012). The court found that this declaration alone was insufficient evidence to "demonstrate a

---

[3]  The delay in Dynamic's receipt of the mailed copy of Key's right-to-sue letter was due to Dynamic forwarding mail from a previous address to a new office.  Even if the ninety-day period began running three days after Dynamic received the letter on March 20, 2019, Key still failed to meet that filing deadline, which would have been June 21, 2019.

basis for" finding that the plaintiff never received the notices, "and it [did] not refute the [defendant's] evidence" to the contrary. *Bloom*, 2012 WL 4009751, at *4. Similarly, Key's only evidence to overcome the presumption of proper delivery is her sworn testimony that neither she nor her husband received the notice in their mailbox, though they regularly checked it.

Key bears the burden to present evidence to overcome the three-day presumption of receipt. *Green*, 281 F.3d at 1233–34. There is insufficient evidence in this case that the mail failed to make it to her through "fortuitous circumstances or events beyond her control." *Kerr*, 427 F.3d at 952. The cases cited by Key either were decided at the motion to dismiss stage or had some type of *affirmative evidence* that an event out of the complainant's control occurred to keep her from noticing the right-to-sue letter. *See, e.g.*, *McAllister v. Metro. Transit Auth.*, 2013 WL 4519795, at *1 (E.D.N.Y. Aug. 26, 2013) (occurring at the motion to dismiss stage); *Stallworth*, 936 F.2d at 525 (resting fault with the EEOC for not sending the notice to plaintiff's attorney as directed); *Franks v. Bowman Transp. Co.*, 495 F.2d 398, 404–05 (5th Cir. 1974) (plaintiff's nine-year-old nephew, "through no fault of" plaintiff, "lost the letter"). Key speculates that the problem could lay with the postal service. However, this speculation does constitute evidence giving rise a reasonable inference either that the EEOC did not actually mail the right-to-sue letter or that the letter was never delivered by the postal service. Key, therefore, does not affirmatively demonstrate that her "failure to receive [a right-to-sue] letter was in no way her fault"; thus, "[r]eceipt is presumed." *Kerr*, 427 F.3d at 952.

Because receipt was presumed to be within three days of the March 1, 2019 mailing—March 4, 2019—the last day in which Key could file a Title VII claim against Dynamic for these events was June 2, 2019.  Key fails to overcome this presumption, so her October 10, 2019, Title VII complaint against Dynamic was untimely, and Dynamic's motion for summary judgment is due to be GRANTED as to all Title VII claims against it.

## C.      Counts II and III – Title VII and § 1981 Race Discrimination

Key brings race discrimination claims against Dynamic[4] and HMMA pursuant to Title VII, and against all three defendants pursuant to § 1981.[5]  Title VII prohibits discrimination on the basis of race. 42 U.S.C. § 2000e-2(a)(1).  Section 1981 provides, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  In their motions for summary judgment, the Defendants analyze Key's race discrimination claims under the familiar *McDonnell Douglas* burden shifting analysis. *See* 411 U.S. 792 (1973).  They highlight that Key fails to present evidence of a valid comparator, and thus her claims would fail the *McDonnell Douglas* test.

Key argues, however, that the lack of a valid comparator does not doom her claims because *McDonnell Douglas* does not apply in this case.  Instead, she asserts for the first

---

[4]  Because Key's Title VII claims against Dynamic were untimely filed, *see supra*, the only remaining discrimination claim against Dynamic falls under § 1981.  Dynamic's motion for summary judgment as to Key's Title VII race discrimination claim against it is therefore due to be GRANTED.

[5]  Because, as will be discussed, the Court finds that Key cannot survive summary judgment on her race discrimination claims against all three defendants, the Court aggregates its discussion of her claims against individual defendants and refers to Dynamic, HEA, and HMMA in this Part collectively as "the Defendants."

24

time in her response to summary judgment that this is a mixed motive case, and that *Quigg v. Thomas County School District* should apply because "*McDonnell Douglas* is inappropriate for evaluating mixed-motive claims." 814 F.3d 1227, 1239 (11th Cir. 2016).[6] A discrimination claim may survive summary judgment "where both legitimate and illegitimate reasons motivated the decision." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93 (2003); *Quigg*, 814 F.3d at 1239.  If a plaintiff alleges such a mixed-motive claim, then "the court must determine whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that her protected characteristic was a motivating factor for [an] adverse employment decision." *Quigg*, 814 F.3d at 1239 (alteration adopted) (quotation and citation omitted).  Specifically, courts assess whether "(1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was *a* motivating factor for the defendant's adverse employment action." *Id.* (emphasis in original) (alteration adopted) (citation omitted).  The second element requires the plaintiff to demonstrate that she would not have been terminated if not for her protected characteristic. *See Lewis v. Metro. Atlanta Rapid Transit Auth.*, 343 F. App'x 450, 455 (11th Cir. 2009).

---

[6] HMMA argues that Key waived her mixed-motive claim because she did not affirmatively plead it in her complaint. (Doc. 85 at 25).  Decisions on waiver in this context have varied. *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n.12 (1989) ("Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a 'pretext' case or a 'mixed-motives' case from the beginning in the District Court."), *superseded by statute on other grounds as recognized by Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1017 (2020); *Robinson v. Alexander City*, 2021 WL 4134054, at *6 (M.D. Ala. Sept. 10, 2021) (finding waiver where plaintiff did not plead a mixed-motive claim or put the defendants on notice during the discovery process of a claim under that theory, which "highlight[s] the problem with parties failing to plainly articulate the nature of their claims in their complaints").  The Court does not reach the question of waiver because Key's claims fail on the merits.

Even if *McDonnell Douglas* did apply in this case, Key argues that it "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); (Doc. 82 at 72).  Rather than rely on the more stringent *McDonnell Douglas* burden shifting analysis, Key asserts that her race discrimination claim survives summary judgment based on a convincing mosaic of discrimination. Indeed, Key analyzes her race discrimination claims under the less demanding convincing mosaic theory, and so the Court does the same.[7]

A plaintiff can "survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).  There remains a genuine dispute of fact "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (citation omitted).  A plaintiff establishes a "convincing mosaic" by pointing to evidence demonstrating, among other things, "(1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Id.* (quotations and citation omitted).

---

[7] Key provides her convincing mosaic argument also in support of her mixed-motive theory.  Therefore, the Court will address her convincing mosaic argument, understanding that its analysis applies also to her argument for a mixed-motive theory.

26

Key argues that she presents sufficient evidence to establish a convincing mosaic of discrimination from which a reasonable jury could infer discrimination. Specifically, she claims this mosaic includes the following circumstantial evidence: (1) HEA's appearance standard was not applied uniformly, (2) the Defendants permitted at least two other black employees to wear dreadlocks that were "styled," indicating Key's dreadlocks were problematic because they were worn naturally; (3) the Defendants authorized Key to wear dreadlocks if she styled them differently from their natural appearance by putting them in a bun or covering them with a hat so that the dreadlocks were not visible; (4) the intention of the appearance standard was to prevent black persons from wearing their hair in natural dreadlocks; and (5) the appearance standard was not applied to all races because there is no evidence that a white employee attempted to wear dreadlocks.

This circumstantial evidence, however, does not demonstrate a convincing mosaic of racial discrimination. To Key's first three pieces of the mosaic, evidence that HEA's appearance standard was not applied uniformly because other employees were permitted to wear dreadlocks actually strikes against her convincing mosaic theory. The other employees permitted to wear dreadlocks here were also black. The only distinguishing factors that Key identifies between herself and these employees is that she wore her dreadlocks at shoulder length, while they wore dreadlocks pulled up in a tight bun, in keeping with HEA's appearance standard. This evidence does not reasonably lead to an inference that the Defendants engaged in disparate enforcement based on racial animus. Rather, it reveals that Williams and Robinson took issue with Key's dreadlocks due to the

style in which she wore her dreadlocks, which was not in keeping with HEA's facially race-neutral appearance policy. *Cf. Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084, 1092 (5th Cir. 1975)[8] (holding a grooming policy based on "something other than immutable or protected characteristics do not inhibit employment opportunity").

Simply because dreadlocks were permitted in a tight bun does not raise the inference that HEA's appearance standard was being enforced in a racially discriminatory manner. Absent evidence of discriminatory application of restrictions on dreadlocks, the Eleventh Circuit treats race neutral no-dreadlocks grooming policies as nondiscriminatory. *E.E.O.C. v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030 (11th Cir. 2016). The court in *Catastrophe Management* held that dreadlocks are a hairstyle, not "an immutable characteristic of race," even though they "are a 'natural outgrowth' of the texture of black hair." *Id.*

Key contends that her style of dreadlocks was racially targeted due to their natural, un-styled appearance, as opposed to the permitted "styled" dreadlocks worn by two other black employees. This argument reveals, however, that Key's dreadlocks—which the Eleventh Circuit holds is a style in which one wears her hair, not an immutable characteristic—were not styled in as professional a manner as were the other two employees' dreadlocks. *Cf. Willingham*, 507 F.2d at 1092. These pieces of evidence, therefore, do not support the inference that Williams and Robinson disapproved of Key's

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.

dreadlocks based on intentional race discrimination. *See Catastrophe Mgmt. Sols.*, 852 F.3d at 1030 (rejecting plaintiff's argument that a race-neutral grooming policy to prohibit dreadlocks, without evidence of racially discriminatory application, constitutes intentional race discrimination).[9]

To her fourth piece of the mosaic, Key presents evidence that Robinson told her "that the Koreans were a different breed of animals and that they send little memos and they don't want African Americans . . . wearing their hair [in dreadlocks] because of the clientele they have." (Doc. 68-12 at 41). Robinson, however, denies ever making this statement, and the only evidentiary support for the memos from unidentified "Koreans" is Key's own testimony as to Robinson's statement. No documentary evidence corroborating this claim was ever submitted.

The Defendants argue that Key's testimony about Robinson's comment cannot be considered as part of a convincing mosaic because it is inadmissible hearsay. Even if Key's testimony on this point could be reduced to admissible form at trial, it could not support an inference on which a reasonable jury could find a convincing mosaic of intentional race discrimination. Absent evidence of unequal application of the appearance standard on the basis of race in this situation, Key fails to show that the statement, even if it was made,

---

[9] Key claims, without evidentiary support from the record, that HEA's appearance standard was not race neutral because it "require[ed] Key to chemically treat her hair." (Doc. 82 at 71). As HMMA points out, however, there is nothing in the record to suggest that any Defendant had a grooming policy in which Key was forced to chemically treat her hair to comply. (Doc. 58 at 13). The record indicates that Key's dreadlocks, worn at shoulder-length at the time of her interview, did not comply with HEA's appearance standard, and when Key showed Williams a style in which she could wear her dreadlocks pulled up in a tight bun, Williams agreed that the style in the photo was acceptable under HEA's standard. Nothing from this evidence implies that Key was *required* to chemically treat her hair to comply.

reveals intentional racial animus.  Even when viewed in the light most favorable to Key, her factual showing does not create a triable claim of race discrimination.

To the fifth and final piece of evidence, Key contends that it is mere speculation and conjecture that the appearance standard was applied race-neutrally because the Defendants cannot point to any white employee that attempted to wear dreadlocks.  Key, however, bears the burden of weaving a convincing mosaic of intentional race discrimination, and she has offered no evidence that the Defendants have permitted a white person to wear dreadlocks but prohibited a black person from doing so.  To infer racial animus from this lack of evidence would relieve Key of her burden to present sufficient evidence from which a reasonable jury could find intentional race discrimination. *See Holland*, 677 F.3d at 1056 (noting plaintiff bears the burden to establish a "reasonable inference that the employer engaged in the alleged discrimination" (quoting *Smith*, 644 F.3d at 1326)); *cf. Catastrophe Mgmt. Sols.*, 852 F.3d at 1030 (holding that being "historically, physiologically, and culturally associated with [a black person's] race . . . does not make [dreadlocks] an immutable characteristic of race" such that a no-dreadlock grooming policy in and of itself is racially discriminatory).  That no white employee has attempted to wear dreadlocks is insufficient to transform a race-neutral appearance standard into evidence of intentional discrimination, particularly where there is evidence that black employees were permitted to wear dreadlocks in professional styles.

Viewing the evidence in the light most favorable to Key, the Court concludes that Key's circumstantial evidence does not present questions of material fact as to intentional

race discrimination in enforcing an appearance standard sufficient to submit those claims to a jury. Key has not carried her "ultimate burden" of demonstrating that a "trier of fact" could reasonably be persuaded that the Defendants "intentionally discriminated against [her]" under either a convincing mosaic theory or a mixed-motive theory. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019) (en banc). Thus, no genuine dispute of material fact remains as to Key's race discrimination claims, and summary judgment on these claims is warranted.

**D.      Counts IV and V – Title VII and § 1981 Race Retaliation**

Key brings retaliation claims against Dynamic and HMMA pursuant to Title VII, and against all three defendants pursuant to § 1981. She maintains that all three defendants fired her in retaliation for filing a complaint about race discrimination. Retaliation claims brought under § 1981 are analyzed under the same framework as their Title VII counterparts, and they therefore are subject to the *McDonnell Douglas* burden-shifting analysis. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc).[10]

A prima facie case of retaliation requires a plaintiff to show that (1) "she engaged in statutorily protected activity," (2) "she suffered an adverse action," and (3) "the adverse action was causally related to the protected activity." *Id.* (citation omitted). Statutory

---

[10] The Court addresses Key's § 1981 race retaliation claims with the understanding that the same analytic framework applies to her Title VII race retaliation claims.

protections are not limited to those who file formal complaints; they also extend to those who voice informal complaints "to their superiors or who use their employers' internal grievance procedures." *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam).

A plaintiff can show that she engaged in a statutorily protected activity if her complaint "explicitly or implicitly communicate[s] a belief that the practice constitutes unlawful employment discrimination." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (citation omitted). A plaintiff must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Id.* (citing *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). Her burden includes both a subjective and an objective component—"[t]hat is, the plaintiff must not only show that she subjectively (i.e., in good faith) believed the defendant was engaged in unlawful employment practices, but also that her belief was *objectively* reasonable in light of the facts and record present." *Id.* (emphasis in original) (quotations and citation omitted). The plaintiff, however, "is not required to prove that the discriminatory conduct complained of was actually unlawful" for the retaliation claim to succeed. *Id.* The conduct need only "be close enough to support an objectively reasonable belief that it is." *Id.* (citation omitted). Whether the offensive conduct is "close enough" to an unlawful employment practice is "measured by reference to controlling substantive law" at that time. *Id.*

A materially adverse employment action is an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations and citation omitted).

To satisfy the final element of a prima facie retaliation claim, "a plaintiff must show that the relevant decisionmaker was aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1351 (11th Cir. 2022) (citation omitted). A plaintiff generally satisfies the causal link element if she can present circumstantial evidence of "close temporal proximity between" the protected activity and the adverse employment action. *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1295 (11th Cir. 2021).

When the plaintiff establishes a prima facie case of retaliation, there is a "presumption that the adverse action was the product of an intent to retaliate." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). The burden then shifts to the employer to rebut this presumption by "articulating a legitimate, non-[retaliatory] reason for the employment action." *Gogel*, 967 F.3d at 1135. If the employer successfully does so, then the burden shifts back to the plaintiff to demonstrate that the "proffered reason was merely a pretext to mask [retaliatory] actions." *Bryant*, 575 F.3d at 1308. It is at this crucial stage that the plaintiff must establish but-for causation: she must demonstrate that her "protected activity was a but-for cause of the alleged adverse action by the employer," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013), or, in other words, she must show that

33

she would not have been fired if she had not engaged in the protected activity. *Gogel*, 967 F.3d at 1135. The burden of persuasion remains on the employee throughout. *Id.*

### 1. *Dynamic*[11]

Dynamic argues that Key did not engage in a statutorily protected activity and that, if she had, there was no causal relationship between her complaint about discrimination and her being fired for wearing her hair in dreadlocks. Key's burden to establish a prima facie case against Dynamic "is not [an] onerous" one. *Furcron*, 843 F.3d at 1312 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

### a. **Statutorily Protected Activity**

Key asserts that her written complaint submitted to Cureton at Dynamic's office on the afternoon of August 1, 2017, satisfied the first element of her prima facie race retaliation claim. To satisfy this first element, the workplace conduct at issue must not "be viewed in isolation, but rather it is to be viewed cumulatively, and in its social context." *Id.* (citation omitted).

Key complained that she felt discriminated against, in part, "on the basis of [her] current hairstyle (dreadlocks)." (Doc. 75-14 at 2). She made this complaint just hours after Robinson allegedly told her that "the Koreans" "send little memos and they don't want African Americans . . . wearing their hair [in dreadlocks]." (Doc. 68-12 at 41). Taking Key's complaint about being discriminated based on her dreadlocks "in its social

---

[11]  As with Key's other Title VII claims against Dynamic, which were untimely filed, *see supra*, the only remaining retaliation claim against Dynamic falls under § 1981. Dynamic's motion for summary judgment as to Key's Title VII race retaliation claim (Count IV) against it is therefore due to be GRANTED.

context"—with its temporal proximity to the alleged statement about how "the Koreans" do not want "African Americans" wearing dreadlocks—a reasonable jury could find that Key reasonably believed such a complaint was about race discrimination. *See Furcron*, 843 F.3d at 1312.

The proximity of Robinson's alleged statement about "Koreans" not liking "African Americans" wearing their hair in dreadlocks demonstrates that there is a question of fact as to whether Key had both a subjective and objective good faith belief that her employers were "engag[ing] in unlawful employment practices." *Id.* at 1311 (citation omitted). A reasonable jury could find that this fact permits a complainant to both subjectively and objectively believe that complaining about discrimination due to her dreadlocks was the functional equivalent of complaining about race discrimination. Thus, Key's complaint about discrimination due to her dreadlocks, based on the context of Robinson's alleged statement, could have been a statutorily protected activity. *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 n.3 (11th Cir. 2020) ("[Section] 1981 prohibits employers from retaliating against employees for complaining about race discrimination."); *see also Bryant*, 575 F.3d at 1309.

Dynamic argues that Key's complaint was not objectively reasonable given Eleventh Circuit precedent at the time. The Circuit in *Catastrophe Management* held that a no-dreadlock grooming policy was a permissible race-neutral grooming policy, not a proxy for race discrimination. 852 F.3d at 1030. So long as a grooming policy that

prohibits dreadlocks is applied "even handedly," the grooming policy is considered race-neutral and not discriminatory. *Catastrophe Mgmt.*, 852 F.3d at 1032–33 (citation omitted).

There is evidence, however, that Key's discrimination complaint to Cureton was not based on the policy itself, but on the *application* of the policy. Key's complaint specified that she felt discriminated against based on her dreadlocks. This alone may not ordinarily suffice. However, Key filed this complaint after Robinson allegedly made a statement about "the Koreans" not wanting "*African Americans*" to wear their hair in dreadlocks.[12] It would be reasonable, in this context, for Key to believe that the dreadlock prohibition was a race-based policy. Because Key could have believed the policy was not applied "even-handedly," as it was in *Catastrophe Management*, she also could have reasonably believed that complaining about discrimination based on dreadlocks was equivalent to complaining about race discrimination. *See id.* A reasonable jury could find that Key engaged in a protected activity when she complained to Cureton. *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1245 (11th Cir. 2020) ("It is undisputed that [a] complaint of racial discrimination was a protected activity.").

---

[12] Even if Key's testimony as to Robinson's comment could not be reduced to admissible evidence to prove the Defendants' intentional *discrimination*, it is admissible as part of Key's retaliation claim. Rather than proving the truth of the matter asserted, the statement could evidence Key's state of mind when she made her complaint to Cureton, which is relevant to the first element of her retaliation claim. *See United States v. Jeri*, 869 F.3d 1247, 1261 (11th Cir. 2017) (holding that "before a statement that would otherwise be inadmissible hearsay can be admitted under 803(3) to show the declarant's then existing state of mind, the declarant's state of mind must be a relevant issue in the case" (quotations and citation omitted)). Whether Robinson, in fact, made the statement is a question of fact for the jury.

**b.    Adverse Employment Action**

Key presents evidence that, following her complaint of race discrimination to Cureton, Dynamic never reached out to offer a new employment assignment, effectively terminating her employment with Dynamic. Termination certainly satisfies the low "well might have dissuaded" standard for Key's retaliation claim. *See White*, 548 U.S. at 68. Key therefore presents sufficient evidence to meet the adverse action element of her prima facie race retaliation claim.

**c.    Causal Connection**

Key has presented sufficient evidence to raise a question of fact as to a causal connection between her protected activity and the alleged adverse employment action. There was a close temporal proximity between Dynamic's knowledge of Key's race discrimination complaint to Cureton and the adverse employment action it took against her. Cureton and Scavella could have reasonably believed that Key's complaint about being "discriminated against on the basis of [her] current hairstyle (dreadlocks), (doc. 75-14 at 2), was equivalent to a race discrimination complaint. Indeed, there is evidence that Dynamic understood Key's complaint to encompass a race discrimination claim. According to Key, Scavella advised her not to file a complaint because, given that she was not called the "n-word," Key was fighting a losing battle and had not really been discriminated against. Moreover, by August 11, 2017, Dynamic knew that Key filed an EEOC Charge against Dynamic for, in part, "race discrimination." (*See* Doc. 68-3, 27). In its September 1, 2017, position statement on this Charge, Dynamic stated: "[I]t did not

37

discriminate or retaliate in any way against [Key] on the basis of her race, her sex, or on any other basis." (Doc. 81-13 at 2).

Key presents evidence that after her complaint to Cureton and after her Formal Charge filed against Dynamic with the EEOC, Dynamic never offered her another assignment. Moreover, on August 1, 2017, Cureton wrote an email to Dynamic human resources, saying, "I can attempt to reassign Ms. Key to a different site, but I don't think that's advisable at this time, especially if she has to carry through with the stated 'official complaint' of discrimination against Hyundai, Ms. Williams, and Ms. Robinson." (Doc. 75-25 at 26–27). This email demonstrates that Dynamic was aware of Key's complaint and that the decision to take an adverse employment action occurred very soon thereafter. *See Tolar*, 997 F.3d at 1295. Therefore, Key satisfies this element of her prima facie case.

### d.    Legitimate, Nonretaliatory Reasons

Because Key has established a prima facie case of retaliation, the burden now shifts to Dynamic to produce legitimate, nonretaliatory reasons for its actions. *See id.* at 1289. Dynamic contends that it offered Key other employment opportunities, but that she refused to take any further job due to her unwillingness to work part-time, or second or third shifts. Key, however, offers contradictory evidence demonstrating she was never offered any more assignments from Dynamic, and that she indicated to Dynamic that she would be willing to work any shift.

At the summary judgment stage, the Court must construe the evidence in the light most favorable to Key. There is a dispute of fact as to whether Key was offered further

employment from Dynamic.  Therefore, the "presumption that the adverse action was the product of an intent to retaliate" remains unrebutted. *Bryant*, 575 F.3d at 1308.  Key has presented sufficient evidence to raise a genuine dispute of fact as to her § 1981 race retaliation claim against Dynamic, and Dynamic's motion for summary judgment on Count V is due to be DENIED.

### 2. *HEA*[13]

HEA does not dispute that Key suffered an adverse action in the form of termination from her work at the HMMA plant, but it does argue that she did not engage in a statutorily protected activity and that, if she had, there was no causal relationship between her complaint about discrimination and her being fired for wearing her hair in dreadlocks.

At issue in Key's retaliation claim against HEA is the complaint she voiced to Howell the morning of August 1, 2017, which was then brought to the attention of Williams.  Key told Howell that she felt discriminated against because she was "being treated unfairly because of [her] hair." (Doc. 68-12 at 40).  After Robinson confronted Key about whether she felt discriminated against, Robinson and Williams concurred that Key should be reassigned to a new site.  Williams memorialized this decision to terminate her assignment at the Hyundai plant in an email to Cureton at 8:50 a.m. on August 1, 2017.  Williams' decision to terminate Key came after her first complaint voiced to Howell but before her written complaint submitted to Cureton at the Dynamic office.

---

[13] The Court previously dismissed Key's Title VII race retaliation claim against HEA, *see Key*, 2021 WL 3909663, at *5, and so only a § 1981 race retaliation claim remains as to HEA.

While Key's race retaliation claim against *Dynamic* satisfies the "objective reasonableness" prong of her statutorily protected activity prima facie element, Key cannot meet this prong in her claim against *HEA*. Key fails to produce evidence that the complaint she made to Howell the morning of August 1, 2017, reasonably referenced unlawful race discrimination. Regardless of whether Key had a good faith subjective belief that complaining about HEA's appearance standard was a complaint about race discrimination, there was no objective basis at that point for her to believe the policy was racially discriminatory. *See Furcron*, 843 F.3d at 1311. The context of Key's complaint to HEA is different from the context of her complaint to Dynamic. When Key complained to Dynamic about discrimination based on her dreadlocks, she had allegedly been told by Robinson that "the Koreans" did not like "African Americans" wearing their hair in dreadlocks. A reasonable jury could find that, in this context, Key's complaint related to race discrimination. There was no such context in Key's earlier complaint to Howell, which was then communicated to HEA. Prior to Robinson's alleged comments, when Key made her complaint to Howell, there was no evidence that Key reasonably believed the appearance standard was being applied disparately to black persons.

The Eleventh Circuit makes it clear that if offensive conduct is not unlawfully discriminatory, opposing that conduct does not constitute protected activity. *See, e.g.*, *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008) ("Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of this Court or of the Supreme Court has called that

precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable."); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1317 (11th Cir. 2002) ("Finally, the plaintiffs may not stand on their ignorance of the substantive law to argue that their belief was reasonable.  As we have stated previously, '[i]f the plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge.'" (citation omitted)).

At the time of Key's employment in this case, the Eleventh Circuit held that a race-neutral grooming policy that prohibited wearing dreadlocks is not racially discriminatory on its face. *See Catastrophe Mgmt.*, 852 F.3d at 1035 (rejecting the argument that a no-dreadlock policy on its face is a proxy for intentional race discrimination, so long as the grooming policy is applied race-neutrally); *cf. Willingham*, 507 F.2d at 1091 (holding that men and women could be subject to different grooming standards because length of hair was "related more closely to the employer's choice of how to run his business than to equality of employment opportunity," and both sexes were subject to grooming policies); *Harper*, 139 F.3d at 1387, 1389 (according to precedent established in *Willingham*, "plaintiffs could not have had an objectively reasonable belief that [defendant] . . . discriminated against them on the basis of their sex" when they complained about a "grooming policy that prohibited men, but not women, from wearing long hair").

Key fails to provide sufficient evidence that she knew or thought the policy was applied in a racially disparate manner when she complained to Howell, and thus she had

no objective belief that she engaged in a protected activity.  Therefore, Key fails to show that her complaint was "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Furcron*, 843 F.3d at 1311 (citation omitted). Additionally, Williams did not perceive Key's "complaints about hairstyle to be about race." (Doc. 71-14 at 5).  So, there could be no causal link between Key's purported protected activity and termination. *See Patterson*, 38 F.4th at 1351 (holding "a plaintiff must show that the relevant decisionmaker was aware of the protected conduct").  Key therefore fails to meet the first element of her prima facie race retaliation claim against HEA, and no genuine dispute of fact remains as to her § 1981 race relation claim against HEA; its motion for summary judgment is due to be GRANTED regarding Count V.

### 3.   *HMMA*

Key asserts that HMMA retaliated against her in violation of Title VII and § 1981 because Williams, acting as HMMA's agent, terminated Key's employment at the plant after she complained about race discrimination.  Even if Williams acted as HMMA's agent, any race retaliation claim against HMMA fails because Key cannot make out a prima facie retaliation case based on Williams' knowledge alone.  As discussed above, because there was no objectively reasonable basis for Key to believe that her complaint voiced to Howell the morning of August 1, 2017—the only complaint that Williams knew about—was a statutorily protected activity, she cannot make out a prima facie retaliation case based on Williams' knowledge alone.  Indeed, Williams' knowledge of her first complaint is the only basis on which Key seeks to hold HMMA liable for retaliation.  Therefore, Key fails

to create a genuine dispute of fact as to a prima facie retaliation case against HMMA as well as HEA, and HMMA's motion for summary judgment is due to be GRANTED as to Counts IV and V.

## VI.  CONCLUSION

Accordingly, and for good cause, it is

ORDERED that:

1) Dynamic's motion to strike the declaration of Davita Key (doc. 88) is DENIED;

2) HMMA's motion for summary judgment (doc. 66) is GRANTED, and all Plaintiff's claims against HMMA are DISMISSED;

3) HEA's motion for summary judgment (doc. 69) is GRANTED, and all Plaintiff's claims against HEA are DISMISSED;

4) Dynamic's motion for summary judgment (doc. 73) is GRANTED, to the extent that Plaintiff's Counts I, II, III, and IV are DISMISSED as to Dynamic; and

5) Dynamic's motion for summary judgment (doc. 73) is DENIED in all other respects.

Done this 10th day of February, 2023.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE