# Exhibit 88

# Transcript of unemployment compensation hearing

# Unemployment Hearing

## September 23, 2022

## State of Alabama Hearings and Appeals Unit



866.993.0207
info@citedepos.com
www.citedepos.com

Key 00105

Page 1

```
 6              TRANSCRIPTION OF
 7        RECORDED UNEMPLOYMENT HEARING
 8         BEFORE DONNA FOSHEE BUDLONG
 9   STATE OF ALABAMA HEARINGS AND APPEALS UNIT
10              September 19, 2017
```

17  Transcribed from prerecorded audio
18  Deborah B. Braden, CCR
19  September 22, 2022

Page 2

1   MS. BUDLONG:  Donna Foshee Budlong,
2   State of Alabama Hearings and Appeals Unit.  Who am I
3   speaking with, please?
4           MR. CURETON:  This is Ray Cureton
5   with Dynamic Security.
6           MS. BUDLONG:  Spell your last name,
7   sir.
8           MR. CURETON:  C-U-R-E-T-O-N.
9           MS. BUDLONG:  Mr. Cureton, what
10  would be a good phone number to call you back on if we
11  were disconnected during this call?
12          MR. CURETON:  (334)395-7722.
13          MS. BUDLONG:  Do you plan on having
14  anyone else on the call with you today?
15          MR. CURETON:  I do not.
16          MS. BUDLONG:  And I show the mailing
17  address for the company, sir, is P.O. Box 451,
18  Tuscumbia, Alabama  35674.
19          MR. CURETON:  That is correct.
20          MS. BUDLONG:  Thank you, sir.  I'm
21  going to place you on hold one moment and see if
22  Ms. Key is on the other line --
23          MR. CURETON:  Okay.

Page 3

1           MS. BUDLONG:  -- if you'll hold one
2   moment, please.
3           MR. CURETON:  Thank you.
4           MS. BUDLONG:  Okay.  Mr. Cureton,
5   can you hear me?
6           MR. CURETON:  I can.
7           MS. BUDLONG:  Ms. Key, can you hear
8   me?
9           MS. KEY:  Yes.
10          MS. BUDLONG:  Great.  At this time,
11  we will begin the hearing.  This is a telephone
12  hearing for Case Number 07549-AT-17.  Today is
13  September the 19th, 2017.  I am Donna Foshee Budlong,
14  the administrative hearing officer.  The parties
15  present today, I have the claimant on the line,
16  Ms. Key.  The employer, Dynamic Security, is the
17  appellant in this case and is being represented by
18  Mr. Cureton.
19          Now, the reason we are here today, the
20  claimant was allowed benefits under an examiner's
21  determination.  The claimant -- I apologize.  The
22  employer disagreed with that and filed an appeal.
23          The section of law involved today, we do

Page 4

1   have two sections of law.  The first is 25-4-78(3) --
2   (3)(c) of the law, which provides for a
3   disqualification if an individual -- strike that for
4   one moment and let me just get back to -- hang on one
5   second for me here.
6           Okay.  The actual -- we still do have two
7   sections of law, but the actual correct separating
8   section of law that should be on the record right now
9   is going to be 25-4-78(2) Code of Alabama 1975,
10  whether the claimant voluntarily left most recent bona
11  fide work voluntarily without good cause connected
12  with the work.
13          So in the hearing today, I would need to
14  determine did the claimant leave their job
15  voluntarily.  If so, was it for a work-connected
16  reason, and was it for a good work-connected reason.
17  And the other section of law would be 25-4-77(a)(3),
18  Code of Alabama, 1975, whether the claimant is able,
19  available, and seeking suitable, full-time work and
20  available for all hours and shifts in her normal trade
21  or occupation.
22          So for that section of law, I would need
23  to determine is there any reason the claimant cannot

Page 5

1  accept suitable, full-time work and will take
2  testimony on if there are any barriers to the claimant
3  accepting suitable, full-time work.
4        Now, before I get you each under oath and
5  get your testimony in this case, do either of you have
6  a question about anything I've said so far?
7        MR. CURETON:  No, ma'am.
8        MS. BUDLONG:  Any questions from
9  you, Ms. Key?
10       MS. KEY:  No.
11       MS. BUDLONG:  All right.  Thank you.
12 The procedures, then, that we will follow, I will
13 place you both under oath.  I'm going to start with
14 Mr. Cureton's testimony, and, Ms. Key, you could have
15 questions of his testimony.  We would then get your
16 testimony, Ms. Key.  Then Mr. Cureton could have
17 questions of your testimony.  I could have questions
18 of either of you throughout the hearing today.  Any
19 questions about those procedures?
20       MR. CURETON:  No, ma'am.
21       MS. KEY:  No.
22       MS. BUDLONG:  Okay.  Thank you.
23 Let's go ahead, then, and get each of you under oath.

Page 6

1  Do you solemnly swear or affirm the testimony that you
2  will give in this case will be the whole truth and
3  nothing but the truth.
4        Ms. Key?
5        MS. KEY:  Yes.
6        MS. BUDLONG:  Mr. Cureton?
7        MR. CURETON:  Yes.
8        MS. BUDLONG:  All right.  Thank you.
9        EXAMINATION OF MR. CURETON
10 BY MS. BUDLONG:
11    Q.   Okay.  Sir, for the record, what is your
12 job title?
13    A.   I'm a district manager for Dynamic
14 Security, Montgomery office.
15    Q.   And what was Ms. Key's job title?
16    A.   She worked at the mailroom in Hyundai
17 as -- as -- well, a mailroom attendant.
18    Q.   And what was her hire date?
19    A.   Hire date was -- let me see here.  Sorry
20 for this.
21    Q.   No problem.  Take your time, sir.
22    A.   The information is usually on top of the
23 folder, but it's not.  So let me -- let me find it

Page 7

1  here.
2     Q.   No problem, sir.  I've got that she
3  worked there a couple of days, and it was July 31 of
4  '17 to August 1 of '17.  Does that sound about
5  correct, Mr. Cureton?
6     A.   That is correct.  Those are the two days.
7     Q.   Okay.  And what happened?  Why -- why
8  didn't she -- why -- why was it only two days?  What
9  happened?
10    A.   Well, the situation was this:  There was
11 an issue with the standards for appearance out at
12 Hyundai, which are very rigid, where there was some
13 dreadlocks.  And the -- the account -- the -- our
14 account manager, Gloria Robinson, and also Cassandra
15 Williams, who is our client contact at Hyundai, talked
16 with Ms. Key and informed her that dreadlocks were not
17 allowed.  And, eventually, it got to the point where
18 Ms. Williams asked her -- ask could she be removed
19 from the site because of the appearance standards not
20 being met.
21       At that time, when she was removed from the
22 site, we brought her into the office and tried to find
23 some other place.  She was not discharged from our

Page 8

1  company at all.  She was -- we attempted to find some
2  other places for her to work.  I didn't have any full-
3  time positions available at the time, so I offered her
4  some part-time positions.  She said she had to think
5  about it, which we -- she was looking -- during that
6  week that we were looking for a position for her, it
7  came back to us that she was looking for first shift
8  only.  And I didn't have any first shifts at that
9  time.  And --
10    Q.   How did -- how was it determined she was
11 available for first shift only?
12    A.   She -- she stated that she was available
13 for first shift but not for any -- any of the other
14 shifts.  Excuse me.  I'm sorry.  The -- the initial
15 conversation, she was going to think about it, whether
16 she was available for other shifts or not.  And,
17 eventually, it was determined that she was not
18 available for first [sic] shift, but she told to -- I
19 think it's an exhibit in the -- in the paperwork.  She
20 told that specifically to our office manager.  And we
21 tried to find -- you know, offer her another position
22 at a -- at second or third shift.  I just didn't have
23 any first shifts available.

Page 9

1  Q.  Yes, sir. Okay. Now -- so when she was
2  first placed at this assignment, were you not aware
3  that her dreadlocks were going to be a problem,
4  Mr. Cureton?
5      A.  Well, the way the system works at
6  Hyundai, what we do is we send potential applicants to
7  the site, and our account manager out there, Gloria
8  Robinson, interviews them and explains all of those
9  kinds of things to them as she interviews them. And
10 if they're willing to abide by the -- you know, by the
11 standards that -- that are out there, then that's
12 dealt with and, you know -- with -- with the applicant
13 and arrangements are made for that to take place.
14     And I -- you know, so I -- I didn't actually
15 see her initially. That was done through the --
16 through Gloria Robinson at the site. So this came
17 back to me after she was asked to leave the site and
18 removed by the -- by our client --
19 Q.  Okay.
20 A.  -- their (indiscernible).
21 Q.  So are you saying somewhere upon -- in
22 the -- in the hiring process, Ms. Key would have had
23 to have agreed to -- to do something about her

Page 10

1  dreadlocks?
2  A.  That is correct.
3  Q.  Okay. All right. I -- to -- and do you
4  know who that she may have spoke with regarding that?
5  A.  Yes. It would have been Gloria Robinson
6  and Cassandra Williams. Gloria Robinson is our
7  account manager. Cassandra Williams is the client
8  representative that works for Hyundai.
9  Q.  Okay. And did you speak to either one of
10 them prior to this hearing, sir, regarding, you know,
11 this -- this situation?
12 A.  Yes, ma'am. I've spoken with both of
13 them at length on this situation.
14 Q.  Okay. And did they say that during her
15 interview process, that they did discuss the -- the --
16 the strict appearance standards with her?
17 A.  They did. They did, yes.
18 Q.  And what was -- what did they say to you
19 that -- that Ms. Key said to them about -- about
20 her -- you know, her willingness to conform to
21 Hyundai's strict appearance standards?
22 A.  That there was a question about that --
23 that -- whether or not she would be willing. They --

Page 11

1  Ms. Robinson specifically told me that those issues
2  were discussed, and that she had agreed to make those
3  changes. But when she came in the next day, they
4  weren't made. And that's part of what happened.
5  That's what -- that's --
6  Q.  Okay.
7  A.  Now, I also understand that she had said
8  she was willing to do so but that it would take her
9  some time to get that done. And --
10 Q.  Uh-huh.
11 A.  So it -- it just de-escalated, really,
12 from there. There was a -- there was a dispute about
13 that between --
14 Q.  Okay.
15 A.  -- all the parties involved, and it got
16 sent to my desk.
17 Q.  Okay. Then did you interview Ms. Key
18 regarding this situation, Mr. Cureton?
19 A.  I did.
20 Q.  And kind of take me through what happened
21 with that.
22 A.  Well, she -- as far as I can recall, she
23 stated that she was willing to change her -- her hair

Page 12

1  appearance. However, that did not happen. As -- and
2  by that time, once a client requests an officer be
3  removed from the site, we're obligated to do so, you
4  know, by contract.
5      And so what I did is we did not terminate her
6  from Dynamic Security. In fact, she said to me at the
7  time she had no problem with Dynamic Security. The
8  problem was with what was going on at Hyundai. And so
9  I said, Well, let me find you something else. And we
10 attempted to -- to find other positions, but we
11 couldn't -- we couldn't come to an agreement on where
12 she could go to work at what times. Didn't have any
13 full-time positions then, and I did not have a first
14 shift available, which is where we ended up.
15 Q.  Okay.
16 A.  So --
17 Q.  Okay. So the -- the biggest issue, then,
18 sir, you have with -- with Ms. -- with Ms. Key is that
19 she was not making herself available for the normal
20 shifts and hours of -- of -- of a security officer?
21 A.  That's correct. And -- and, like I said,
22 we did not -- we did not discharge her and wasn't much
23 time given for us to find a position until, you

Page 13

1  know, we heard about this unemployment claim and other
2  things. So --
3       Q.   Okay.
4       A.   That's where we ended up.
5       Q.   Okay. Now, the -- the claim was not
6  filed until -- and let me get this exact date in front
7  of me here just to make sure. The unemployment claim
8  was filed on August 17th. So you attempted about two
9  weeks to try to find her something, but, like you
10 said, during that time, she had alerted you that she
11 was only available for first-shift work. Is that
12 correct, Mr. Cureton?
13      A.   That is correct. That -- I think there
14 was an exhibit there from Nicole Scavella stating that
15 the last time she talked to her about this was on the
16 11th of August, and -- and told her that we -- you
17 know, we were still looking. And we still --
18      Q.   Okay.
19      A.   -- were. We still were. We were, you
20 know, trying to --
21      Q.   Right.
22      A.   -- to deal with this --
23      Q.   Yes, sir.

Page 14

1       A.   -- but --
2       Q.   Yes, sir. Okay. All right. And is
3  there anything else you want -- or strike that.
4       Do you know what day she was interviewed for
5  the position, Mr. Cureton.
6       A.   That would -- I think -- I think it would
7  have been around July 21st, thereabouts.
8       Q.   Okay.
9       A.   The last time. Maybe a little --
10      Q.   Okay.
11      A.   -- maybe a little -- few days before.
12      Q.   Okay. Just somewhere around July 21st?
13 That's fine.
14      A.   Yes.
15      Q.   Okay. And then she actually began the
16 assignment on July 31st?
17      A.   Correct.
18      Q.   Okay. And then she was sent home from
19 Hyundai on August 1st?
20      A.   Right.
21      Q.   Or sent back to you for --
22      A.   That sounds correct.
23      Q.   -- for her reassignment.

Page 15

1       A.   For reassignment, yes.
2       Q.   Her reassignment. Okay.
3       A.   And that was at the request of Cassandra
4  Williams, the, you know --
5       Q.   Okay.
6       A.   -- client contact.
7       Q.   Right. Okay. All right. Anything
8  further right now, Mr. Cureton?
9       A.   Well, I -- you know, I like Ms. Key. I
10 didn't have a problem with her at all. I still don't.
11 I -- you know, I -- I would love to have had her
12 working for us and finding a position. But, at the
13 same time, it got to the point to where, you know, we
14 didn't hear from her -- hear back from her until this,
15 you know, employment claim.
16      So, you know, it's -- it's just -- it's
17 unfortunate and I hate this kind of thing, but it is
18 what it is. And I'm -- you know, she worked for us
19 for three and a half hours, three hours, and -- three
20 and a quarter hours, I think, is what the -- what the
21 paperwork says. And we just didn't think that an
22 unemployment claim was appropriate at this point.
23      Q.   Yes, sir. Yes, sir. I understand.

Page 16

1            MS. BUDLONG: Now, Ms. Key, I'm not
2  quite ready for your -- your testimony just yet,
3  ma'am, but is there a question, a direct question,
4  you'd like to ask Mr. Cureton at this time?
5            MS. KEY: No.
6            MS. BUDLONG: Okay, ma'am.
7            EXAMINATION OF MS. KEY
8  BY MS. BUDLONG:
9       Q.   So, first of all, Ms. Key, do you agree
10 that the -- the two days that you actually were at the
11 Hyundai facility was July the 31st of '17 and August
12 1st of '17?
13      A.   Yes.
14      Q.   Okay. And that you were brought in as a
15 mailroom attendant?
16      A.   Yes.
17      Q.   Have you worked anywhere since August the
18 1st, ma'am?
19      A.   No.
20      Q.   Okay. Thank you.
21      Now, Ms. Key, if you would, tell me a little
22 bit about the hiring conversation that you had, your
23 interview with Ms. Robinson and Ms. Cassandra. When

Page 17

1  you were interviewed and -- what did they tell you
2  about the, you know, very specific or very strict
3  rules of Hyundai when it comes to appearance, ma'am?
4       A.   Okay.  I was interviewed on July 19th,
5  and I interviewed with Gloria Robinson and Maurice
6  Chambliss.  Ms. Cassandra Williams wasn't a part of
7  the interview.
8       Q.   Okay.
9       A.   And in that interview, Ms. Gloria
10 Robinson emphasized throughout the entire interview
11 that I was to go by the rules and regulations of
12 Dynamic Security, because that's who I essentially
13 worked for.  And, in her words, that's who signed my
14 paycheck.  And so she -- at the end of the interview,
15 she said that she was not sure if I could wear my hair
16 as it was, and she asked me could I take it down.  And
17 I said, well, I couldn't, because it's my natural hair
18 and I would have to cut it off.
19      So she asked Ms. Cassandra Williams, which she
20 said was her supervisor, to come into the room.  And
21 the first thing Ms. Cassandra Williams said was, What
22 is Dynamic's policy?  Like, deferred to Dynamic
23 Security's policy.  And Ms. Robinson said that she

Page 18

1  thought Dynamic's policy said that I could not wear my
2  hair in its natural state.  And I submitted an exhibit
3  which shows you there on page 6 of the Dynamic
4  handbook, it simply says that a female officer's hair
5  has to be neat.
6       And when I went to my training on July 27th at
7  the Dynamic office, I talked to Nicole, who's the
8  office manager, and I asked her was my hair okay for
9  the position.  And she said that it was nothing wrong
10 with my hair, and that it fit -- she looked in the
11 handbook, and she said it fit what it said.  It was
12 away from my face, and she said the length was okay.
13      And so when I went to work on the 31st,
14 Ms. Williams and Ms. Robinson saw me on more than one
15 occasion, and they didn't say anything about my hair.
16 When -- you know, and Ms. -- Ms. Robinson was, you
17 know, telling me what to do and things like that and
18 letting me know my trainer was going to come and get
19 me.  And, I mean, this was 30, 45 minutes into me
20 being there.  And neither one of them said anything
21 about my hair.
22      I pulled Ms. Robinson aside and informed her
23 that I was pregnant, and after that is when

Page 19

1  Ms. Williams approached me and talked -- like, said
2  that I was inappropriate with my hair.  And I asked
3  Ms. Williams could I see the policy, and she told me
4  that she was not -- like, she did not have to show me
5  the policy.  And Ms. Robinson said that I was out of
6  line for even questioning her and asking to see the
7  policy.  Because I had never got anything in writing
8  saying that that was the rule.  Like, I never got
9  anything.  I was told to defer to the handbook for
10 Dynamic Security.
11      And then after that, Ms. Robin- -- Ms. Williams
12 said that if I wore a hat, that I could -- like, I had
13 to have all my hair covered up.  I offered to go home
14 to get a hat, and that's when Ms. Robinson sent me
15 home.
16      Then on the 1st is when I returned and I wore a
17 hat where all my hair was covered.  And Ms. Robinson
18 and Ms. Williams saw me during the morning, and they
19 didn't say anything to me.  Maybe 30 minutes after
20 they saw me, they sent for me to come to the office,
21 and that is when it was, like -- began to be, like, an
22 issue.
23      So I asked could I go -- I felt like they were

Page 20

1  just -- because I informed them that I was pregnant, I
2  felt like they were just trying to basically harass me
3  about something that was not really -- that wasn't an
4  issue before they found out I was pregnant.  So I
5  asked if I could go speak with someone in their human
6  resources to file a complaint, because I felt that's
7  what it was.
8       Q.   Uh-huh.
9       A.   And they sent -- they sent me -- they
10 said, Well, you can go speak to Ray Cureton, which I
11 thought was a human resource person.  But I found out
12 he was the district manager.
13      Q.   Right.
14      A.   And I went and spoke with him.  And by
15 the time I got there and I spoke with him -- I mean, I
16 guess between the time I had transported there, they
17 told him they didn't want me back at the site.
18      Q.   Okay.  Okay.  All right.  Now, let's see
19 here.  I've got a copy of the -- the -- the policy
20 here in front of me, Ms. Key, for the  -- for Dynamic
21 Security.  And I just want to make sure if this is
22 Dynamic or if this is Hyundai.  So let me check with
23 Mr. Cureton before I read this.

Page 21

1  MS. BUDLONG: Now, sir, I've got an
2  email here, Mr. Cureton, from -- from Ms. Robinson to
3  you and a few other people on --
4          MR. CURETON: Yes. I'm familiar
5  with it.
6          MS. BUDLONG: -- Wednesday, August
7  2nd.
8          MR. CURETON: Yes.
9          MS. BUDLONG: And it says here, you
10 know, about where it says dreads are not allowed.
11 Now, is that -- whose policy is that?
12         MR. CURETON: That is a quote from
13 Hyundai's policy --
14         MS. BUDLONG: Okay.
15         MR. CURETON: -- for personnel
16 working out there.
17         MS. BUDLONG: Okay. So that's
18 Hyundai's policy. I just wanted to make sure before
19 I -- I quoted this. And was this policy ever -- to
20 your knowledge, Mr. Cureton, was this policy made
21 aware to Ms. Key?
22         MR. CURETON: Cassandra Williams
23 told me that she showed her the policy.

Page 22

1          MS. BUDLONG: Okay. Okay. And --
2  and that was sometime during the two days that she was
3  on site?
4          MR. CURETON: Yes, ma'am.
5          MS. BUDLONG: Okay.
6  BY MS. BUDLONG:
7      Q.  All right. Ms. Key, now, this -- like I
8  said, this is a policy that is -- it says here it's
9  posted on the board in the roll call room. Are you
10 familiar with where the roll call room was while you
11 were there for those first couple of days?
12     A.  No.
13     Q.  Okay. It says here that females -- it
14 says here, It -- it has been approved for female
15 personnel to wear braids. Only microbraids, tree
16 braids, and whatever the size that is a tad longer
17 than micros are acceptable. The kinky twist-style,
18 bob braids, cornrows, and dreads are not allowed.
19     Were you ever showed that policy, Ms. Key?
20     A.  I was showed this policy after I was
21 approached about my hair on two -- on -- on the 31st.
22 But prior to that, I'd never seen it. And then -- and
23 I -- and I wasn't -- I was only shown it because I

Page 23

1  asked to see it. If I had not asked, I was not going
2  to be shown, because when I asked, Ms. Williams said
3  twice that she didn't have to show it to me.
4      Q.  Okay. All right. Thank you.
5      Now, so when you -- all right. So you went
6  back, and you sat down and talked to Mr. Cureton. Was
7  that on August the 1st, Ms. Key?
8      A.  Yes.
9      Q.  All right. Kind of take me through that
10 meeting, if you would, ma'am.
11     A.  I went to the meeting because -- you
12 know, I told Mr. Cureton that I wanted to file a
13 complaint because I felt that -- well, I told him I
14 was -- you know, when I went to work on Monday
15 morning, both Ms. Williams and Ms. Robinson saw me.
16 And they saw --
17     Q.  Uh-huh.
18     A.  -- my hair was the same as it was when I
19 had my initial interview. And neither one of them
20 said anything to me about my hair.
21     Q.  Yes, ma'am.
22     A.  As soon as I informed Ms. Robinson that I
23 was pregnant --

Page 24

1      Q.  Yes, ma'am. And you -- and you've
2  been --
3      (Simultaneous conversation.)
4  BY MS. BUDLONG:
5      Q.  And you've -- and you've told me that
6  already. I've got that.
7      A.  Well, I'm --
8      Q.  Okay.
9      A.  I'm saying this is what I told
10 Mr. Cureton.
11     Q.  Oh, okay. I apologize. Go ahead, ma'am.
12     A.  This is what I told Mr. Cureton. I said,
13 As soon as I presented her with a doctor's note, that
14 is when Ms. -- she went to their office, because her
15 and Ms. Williams shared an office. And I told him, I
16 said, that is when Ms. Williams came out and
17 approached me about my hair. And --
18     Q.  Well, what did the doctor's note say?
19     A.  It just said that I was cleared to do
20 work; that I had no restrictions to work.
21     Q.  Oh, okay. All right. Go ahead. All
22 right. Thank you, ma'am.
23     A.  And so after that, maybe like 45 minutes

Page 25

1  had passed before -- I -- I told him, I said, you
2  know, my trainer came and got me and probably, like,
3  45 minutes passed before Ms. Williams or Ms. Robinson
4  spoke with me after that.  And that's when they
5  brought me into the office, and that's when
6  Ms. Williams was like, I couldn't have my hair like it
7  was, and I -- she said that that's not Dynamic's
8  policy.
9         And I said, Well, they -- and I told her that I
10 spoke with Nicole.  Like, this is what I was telling
11 him.  I said, I spoke with Nicole, and I asked her
12 about my hair.  She said that it was okay.  It met --
13 meets the policy according to the handbook.
14        And Ms. Williams said, Well, Dynamic can place
15 you somewhere else, like -- they -- they don't have
16 to -- like, you don't have to work here.  And that's
17 when I told him I asked Ms. Williams could I see the
18 policy for myself.  And I told him that's when she
19 told me, I don't have to show you anything.
20    Q.   Yes, ma'am.
21    A.   And then I told -- and then he
22 interjected and told me that maybe, like, it could --
23 it could appear that they only approached after I told

Page 26

1  them I was pregnant, but he's known Ms. Robinson for
2  years, and she wouldn't do anything like that.
3     Q.   Right.  Uh-huh.
4     A.   And then I told him that -- I told him --
5  I told him that I offered to go home and get a hat,
6  but they sent me home instead, and that on -- I told
7  him that I came back the next day with a hat to
8  comply --
9     Q.   Uh-huh.
10    A.   -- and all my hair was covered.  And they
11 didn't say anything to me again when they first saw
12 me, but maybe 20 minutes after they saw me, they sent
13 for me.  And Ms. Robinson was -- because another
14 employee had said something to her, and she was
15 approaching me, asking did I -- like, in a threatening
16 way, did I feel discriminated against or, like, I --
17 was telling me I was going to be a problem.  And this
18 is everything I was telling Mr. Cureton.
19        And I asked --
20    Q.   Okay.
21    A.   That's when I asked her -- I went back
22 and asked could I go speak with the human resource --
23    Q.   Yes.

Page 27

1     A.   -- and that's when I spoke with him.
2     Q.   Okay.
3     A.   And, I mean, that's basically --
4     Q.   Okay.
5     A.   -- everything.
6     Q.   So when -- so did you -- in that meeting,
7  did you tell Mr. Cureton that you could really only
8  work first shift?
9     A.   No.  I told Mr. Cureton that I would
10 prefer to work a first shift, but that I was available
11 for anything because -- and my -- my exact words were,
12 beggars can't be choosers.  And I said I was available
13 for anything.  But he told me that he didn't have
14 anything that was available and that he would let me
15 know when something became available.
16    Q.   Okay.  So when's the first -- so when did
17 he have something available he talked to you about?
18    A.   I mean, he just -- he didn't give me
19 exact dates.  He just said, like, We'll have something
20 coming soon.  And then Nicole, the office manager, she
21 said, Well, will you go to Selma?  Like, will you
22 drive to Selma?
23        And I said, Yes, I'll drive to Selma.

Page 28

1        She said, Well, that's not going to be
2  available for another few weeks.
3        They never gave me an exact date.  They just
4  said, We're going to have something available in a few
5  days or a few weeks.  But they never -- I mean, I -- I
6  never was informed on the date or called afterwards to
7  say, Well, something is going to be available on this
8  date.
9     Q.   So you're saying that you were never
10 offered another position, ma'am?
11    A.   No.  I never was.  I was just told the
12 jobs that would be coming open.  Like, they would be
13 coming open, but I never was -- it was never, like,
14 okay, you can get this position, because the -- and
15 Mr. Cureton was saying it wasn't immediately
16 available.  So he wasn't offering.  He was just
17 telling me, Well, we'll have this available or we're
18 going to have this available, but it's not available
19 right now.
20    Q.   Uh-huh.  Okay.  All right, ma'am.  So
21 since -- since August 1st, how many job applications
22 are you trying to put in on a weekly basis, ma'am?
23    A.   Have I tried to put in?

Page 29

1  Q.  No. No. Yeah. How many -- how many
2  do -- do you put in on a weekly basis?
3  A.  At least five to seven.
4  Q.  Okay. And tell me a couple of places,
5  you know, that -- that you've put in for. Where all
6  have you put in applications?
7  A.  I applied at the Hilton Inn hotel. I
8  applied at Children's Place. I applied at Carter's,
9  Walmart, Target. I've applied for an Amazon position.
10 I've applied at the By His Grace Daycare.
11 Q.  Uh-huh.
12 A.  I've applied at the -- the blood -- I
13 can't remember -- it's a blood donor --
14 Q.  Okay.
15 A.  -- center. It's in Opelika, Alabama.
16 Q.  Okay.
17 A.  So, I mean, that's just some of them.
18 Q.  Okay. Now -- so right now, then -- so
19 can -- are there any -- any reasons you could not
20 accept, you know, full-time work right now?
21 A.  No.
22 Q.  Okay. Have you told any of these
23 employers that you have -- you can only work certain

Page 30

1  hours or certain days?
2  A.  No. I -- the only thing I said was that
3  I would prefer to work the first shift. But, like, on
4  my applications, it's the same. I put I'm available
5  any day at any time, and that still stands true to
6  today.
7  Q.  Okay. Okay. Have you checked back with
8  Dynamic to see if they had anything come available,
9  ma'am?
10 A.  Yes. I called Dynamic on August 2nd, but
11 I was informed by Nicole they were closed, and I
12 called on August 3rd and August 4th. And I went up
13 there on -- I believe it was either the -- the Monday
14 after that. So I guess it was the 7th -- it was the
15 8th. I think I went up there on the 8th, and I went
16 up there on the -- on the 11th, I went up there on an
17 unrelated matter. And that is when Nicole told me --
18 she was, like, Oh, yeah. Ray told me to tell you that
19 he has some jobs coming up in -- in a couple of weeks,
20 and he's going to give you a call when they become
21 available.
22    But I have yet to receive that phone call.
23 Q.  Okay. Is that when you decided to file

Page 31

1  your unemployment claim?
2  A.  I actually filed my claim on August 6th,
3  but I don't know what happened. They didn't process
4  it until the 17th.
5  Q.  Okay. I've got that, you know, your --
6  your claim was filed -- I mean, I don't -- I don't
7  know what -- my system shows it was actually, you
8  know, put in on August the -- the 17th. But you're
9  saying that -- that you filed one prior to then,
10 ma'am?
11 A.  I filed on August 6th, and I -- when I
12 called to check on it, they said that something
13 happened with the system. Because on the paper I
14 have, it says the claim date was August 6th.
15 Q.  I do see that now. Yeah. It did fall
16 out of the system. Okay. I'm looking at the notes
17 screen. Yeah. For whatever reason, yeah, it was --
18 yeah. The claim was actually filed on August the 7th,
19 yes, and -- or August 6th. I'm sorry. It was filed
20 on August 6th. It fell out of the system on August
21 7th, and that's why they backdated it to August 6th.
22 Okay. So that -- that is -- I do see documentation of
23 that now, Ms. Key. So you did actually file the claim

Page 32

1  on August the 6th after not -- after -- you know,
2  after speaking with Dynamic those -- those first few
3  days after your assignment had ended.
4  A.  Yes.
5  Q.  Okay. Okay. All right. Filed.
6      MS. BUDLONG: Okay. Now,
7  Mr. Cureton, do you have a question you want to ask
8  Ms. Key at this time?
9      MR. CURETON: I do not.
10     EXAMINATION OF MR. CURETON (continued)
11 BY MS. BUDLONG:
12 Q.  Now -- all right, sir. So since
13 August -- since this -- this assignment, you know,
14 ended, sir, what -- what positions, if any, have been
15 offered to Ms. Key?
16 A.  Well, here's what happened: We did not
17 have full-time positions. And this is what the
18 discussion on August 1st was about, having another
19 full-time position available. It was mentioned that
20 there are always part-time positions available on the
21 weekend, which, you know, as far as -- at the time, we
22 had no first shifts available at that time, and that's
23 the -- the thing she wanted to think about was whether

Page 33

1  or not to -- you know, to take those -- one of those
2  weekend positions at a lesser pay rate.  So those
3  things were mentioned again on August 8th by Nicole
4  when she called her and talked to her about it.  And
5  just nothing else ever came of it at that point.
6      Q.    Okay.  Okay.
7      A.    The one -- can I clarify something that
8  you said as --
9      Q.    Please.  Please.  Go right ahead, sir.
10 No.  Please.
11     A.    Yeah.
12     Q.    Anything you want to add, sir, please.
13     A.    Well, the -- the statement about Nicole
14 saying her hair was fine, Nicole -- I've spoken to her
15 about this repeatedly, and she was not stating it was
16 fine as reference to Dynamic Security policy.  She was
17 just stating that, Oh, it looks fine to me.  She'd
18 been in that position for, like, three weeks, you
19 know, at the most at that point.  So she didn't -- I
20 mean, she was not speaking to the issue that Ms. Key
21 thought she was -- was asking her about.  So that --
22 that -- that is not something that was -- Dynamic
23 Security was not telling her at that point that her

Page 34

1  hair was fine.  That was just a person-to-person
2  thing, "that looks good to me" kind of thing.  So I
3  just want to make sure that's clear.  It wasn't --
4      Q.    Okay.
5      A.    Yeah.
6      Q.    All right, sir.  Now, a moment ago, there
7  was -- there was testimony given that on August the
8  1st, Ms. -- on -- on August 1st, Ms. Key went in
9  wearing a hat.  Okay.  And then there -- there was
10 some discussion about if she was actually going to be
11 able to stay on that position, and while a discussion
12 was going on, Ms. Williams chose to have her not come
13 back.  Did I understand that, sir?
14     A.    That is correct.  That is correct.
15     Q.    Okay.  Okay.  So do you know why -- if
16 there was still ongoing discussion, do you know why
17 Ms. Williams chose just to end the assignment without
18 further discussion?
19     A.    Well, as far as I've been told, it was
20 simply a matter of didn't -- didn't believe that
21 Ms. Key was going to change the hairstyle as had been
22 requested.  And based on the conversation --
23     Q.    Okay.  No -- no matter what had -- was --

Page 35

1  no matter what had happened, Ms. Williams --
2      A.    Right.
3      Q.    -- just didn't feel as though that Ms. --
4  Ms. Key was going to go through with that?
5      A.    That's correct.  That's correct.
6      Q.    Okay.  Okay.  And just told her -- you
7  know, sent her back for reassignment.  Okay.  And then
8  when she -- when she was sent back for reassignment,
9  she expressed to your agency, Mr. Cureton, that she
10 was only interested in full-time, first-shift jobs?
11     A.    Well, she -- she was only interested
12 in -- well, not only.  She was interested in first
13 time -- would prefer -- in full-time, would prefer a
14 first shift, which I didn't have full-time or first
15 shift at that point.
16     Q.    Oh, okay.
17     A.    And I told her that --
18     Q.    Okay.
19     A.    -- you know, she -- at that initial --
20 the initial conversation we had, she did not say to me
21 that she only wanted first shift.  She said --
22     Q.    Okay.
23     A.    I agree with her on that.  She preferred

Page 36

1  first shift and would -- but would want -- and would
2  want full-time, but she would take something else if
3  it was available, which I said, Well, we have part-
4  time available.  And -- and that was, you know, not
5  acceptable.
6        I understand.  If you need a full-time job,
7  part-time is not acceptable at that point.  But we had
8  those part-time positions on second and third shift,
9  which she had to think about some more, which I
10 understand that too.
11       The other things that she did when she came in
12 here that day and told me -- I think I mentioned
13 before she said that there wasn't a problem with
14 Dynamic Security, but she was -- she told me then she
15 was going to file an EEOC complaint against Hyundai
16 for discrimination because she was pregnant.  And I
17 told her --
18     Q.    Uh-huh.
19     A.    -- I didn't think that was -- you
20 know, that that was valid.  At least I know from our
21 perspective, it wasn't a valid thing.  We never asked
22 her about being pregnant or any of that sort of thing.
23 And we've had plenty of pregnant folks working for us.