IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVITA M. KEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:19-cv-767-ECM |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT DYNAMIC SECURITY, INC.'S MOTION FOR RENEWED JUDGMENT AS A MATTER OF LAW AS TO LIABILITY AND PUNITIVE DAMAGES; TO VACATE, ALTER OR AMEND THE JUDGMENT; OR, ALTERNATIVELY, FOR A NEW TRIAL OR REMITTITUR OF EMOTIONAL DISTRESS AND PUNITIVE DAMAGES

Pursuant to Rules 50(b), 59, and 60, Fed. R. Civ. P., and the following memorandum of law, Defendant Dynamic Security, Inc. ("Dynamic") requests this Court vacate the jury verdict in favor of Plaintiff Davita Key ("Key") on her retaliation claim pursuant to 42 U.S.C. § 1981 ("§ 1981") as being against the great weight of the evidence and contrary to law and enter judgment in Dynamic's favor on Plaintiff's § 1981 claim or, alternatively,  order a new trial on that claim or remit the amount of emotional distress and punitive damages awarded to Key.

# TABLE OF CONTENTS

**Page**

I.   SUMMARY OF GROUNDS ........................................................................1

II.  LEGAL ARGUMENTS ...........................................................................3

    A.   Standard of Review. ...................................................................3

    B.   Count Five Was Not Asserted against Dynamic.................................4

    C.   The Jury's Finding that Plaintiff Engaged in Protected Activity Is Contrary to the Great Weight of the Evidence Because Key Never Complained about Race or Any Other Unlawful Discrimination. ..........................................................................9

    D.   Insufficient Evidence Exists that Plaintiff Had a Good Faith Belief That She Was Subjected to Unlawful Discrimination as the Only Evidence of the Belief Should Have Been Barred by the Best Evidence Rule. ...................................................................14

    E.   Insufficient Evidence Exists of Causation as No Evidence Exists that the Decision Maker Knew Plaintiff Complained of Race Discrimination or Knew the Reason Plaintiff Thought She Was Subjected to Unlawful Race Discrimination.......................................20

    F.   Dynamic Should Be Awarded A New Trial Due to the Court's Failure to Instruct the Jury Properly on the Elements of a Retaliation Claim and on the Decision in *EEOC v. Catastrophe Mgmt. Sols.* and Due to Improper Comments Made in Closing. .......23

        1.   The Court's jury instruction did not instruct the jury to determine if Key engaged in protected activity by complaining about race discrimination....................................24

        2.   The Court failed to instruct jury that the decision maker must be aware of protected activity. ........................................28

        3.   Lack of proper jury instruction permitted improper, prejudicial, and false closing arguments by Key's attorney.................................................................29

            a.   Arguments that the grooming policy itself is race discrimination. ..............................................31

            b.   Argument that the Hyundai grooming policy may be the memo referenced by Gloria Robinson ...............33

**TABLE OF CONTENTS**
(continued)

**Page**

      c.    Improper statements in closing violated Motion in Limine by arguing that the EEOC Charge was a form of protected activity ...............................................36

G.    Dynamic is Entitled to a New Trial as the Trial Court Improperly Failed to Enforce the Jury Trial Waiver.............................................38

H.    Reversal or Remittitur of Emotional Distress and Punitive Damages. ...........................................................................................42

      1.    Judgment as a matter of law as to punitive damages because the decision-maker was not high enough in the corporate hierarchy, and higher management did not approve the decision…………………………………………… 43

      2.    Reversal, or in the alternative, remittitur of emotional distress damages awarded by the jury……………………………… 51

      3.    Remittitur of punitive damages award………………………61

           a.    Insufficient evidence of punitive damages. ………….62

           b.    Constitutionally excessive punitive damages………...64

## I.    SUMMARY OF GROUNDS

The Court should vacate the jury verdict in Plaintiff's § 1981 claim and enter judgment in favor of Dynamic as a matter of law on several grounds.  Plaintiff's § 1981 claim contained in Count Five of the Plaintiff's Amended Complaint was not asserted against Dynamic.  The jury verdict also is not supported by the evidence and is contrary to the great weight of the evidence.  No evidence exists that Plaintiff engaged in protected activity of complaining about unlawful racial discrimination with all complaints being about her hair.  Also, no evidence exists that the Plaintiff had a good faith belief that she was subjected to race discrimination with the only evidence being inadmissible under Fed. R. Evid. 1002 (the "Best Evidence Rule").  Finally, no evidence of causation as no evidence exists that the decision maker knew about any complaints by Plaintiff of race discrimination. There also is no evidence to support the awards of compensatory and punitive damages, particularly since no upper-level management acted with malice or reckless disregard for Plaintiff's federally protected rights and any actions were contrary to Dynamic's attempts to prevent such unlawful actions.

Alternatively, Dynamic is entitled to a new trial on several grounds.  The Court's incorrect admission of the Plaintiff's testimony that Gloria Robinson told her that memos exist  that say the Koreans do not want African Americans in violation of the Best Evidence Rule entitles Dynamic to a new trial if not to a

1

judgment in its favor.  Dynamic also is entitled to a new trial because the Court failed to provide the correct jury instructions on protected activity, that the decision maker has to be aware of the protected activity, and application of the Eleventh Circuit's decision in *Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030 (11th Cir. 2016).  Dynamic is further entitled to a new trial based on the improper arguments made during closing that (a) the Hyundai grooming policy was racially discriminatory, (b) the grooming policy was possibly the memo referenced by Gloria Robinson, and (c) the Plaintiff's EEOC Charge was a form of protected activity contrary to the Court's ruling on Dynamic's Motion in Limine. (Doc. 160).

Dynamic also renews its motion for judgment as a matter of law with regard to punitive damages because punitive damages are not available when the purported discriminating employee, Ray Cureton, was not high enough in the corporate hierarchy and where higher management did not countenance or approve his behavior. The Court should reverse the jury's award of emotional distress damages because there is no testimony or other evidence, much less sufficient non-conclusory evidence, that Plaintiff suffered harm because of the only challenged adverse employment action at issue in this trial – that she was not reassigned to other jobs. In the alternative, the Court should remit emotional distress damages to an appropriate amount. Finally, the jury's punitive damages award must be reversed due to insufficient evidence of reprehensible conduct sufficient to withstand

constitutional challenge and because the great weight of the evidence shows that Dynamic took steps to prevent illegal retaliation.

## II.   LEGAL ARGUMENTS

### A.   <u>Standard of Review.</u>

A Rule 50(b) motion for judgment as a matter of law as to a particular issue should be granted when "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-movant] on that issue." Fed.R.Civ.P. 50(a)(1); *Wood v. Green*, 323 F.3d 1309, 1312 (11th Cir. 2003); *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002). When the merits of the motion turn on the sufficiency of the evidence, "[t]he court should review all of the evidence in the record, draw all reasonable inferences in favor of the non-moving party, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Akouri v. State of Florida Dept. of Tra*nsp., 408 F.3d 1338, 1343 (11th Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). *See also Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1343 (11th Cir.2003); *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1154 (11th Cir.2002). "Credence should also be given to 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " *Akouri,* 408 F.3d at 1343 (citing *Reeves*, 530 U.S. at 150–51, 120 S.Ct. 2097).

On the other hand, Rule 59 permits the court to grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a). A judge should grant a motion for a new trial when "the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) (internal quotations and punctuation omitted).  The Eleventh Circuit has recognized that " '[n]ew trials granted because (1) a jury verdict is against the weight of the evidence may be sharply distinguished from (2) new trials ordered for other reasons: for example, evidence improperly admitted, prejudicial statements by counsel, an improper charge to the jury or newly discovered evidence.'" *Deas v. PACCAR, Inc.*, 775 F.2d 1498, 1504 (11th Cir. 1985) (quoting *O'Neil v. W.R. Grace & Co.*, 410 F.2d 908, 914 (5th Cir. 1969)).

### B.      Count Five Was Not Asserted against Dynamic.

Count Five of Plaintiff's Amended Complaint did not assert Dynamic retaliated against Plaintiff in violation of § 1981. Count Five alleged Plaintiff complained of race discrimination based on her dreadlock hairstyle and that she suffered retaliation in the form of termination from employment. (Doc. 28 at 24, ¶ 152). Count Five, however, never alleges Dynamic terminated her employment.  The only allegation against Dynamic - which does not amount to an act of retaliation –

is that "Defendant Dynamic made statements demeaning or undermining Plaintiff's complaint and discouraging her from filing a formal complaint." (Id. at 25, ¶158). Count Five specifically states that "Defendants HMMA and HEA terminated Key's employment from the Hyundai Plant August 2, 2017, after she left to file a complaint." (Id. at 25, ¶ 157) (emphasis added). Termination is the only employment action Plaintiff challenges in Counts Five and she asserts only that HMMA and HEA terminated her- and not Dynamic.  Nowhere in Count Five does Plaintiff allege that Dynamic terminated Plaintiff's employment or, more specifically, that it terminated Plaintiff in retaliation for any protective activity.

In contrast, other dismissed Counts (although otherwise deficient as Dynamic has explained) alleged explicitly that Dynamic took specific employment actions against Plaintiff. In Count I, Plaintiff alleged, "Defendant Dynamic did not assign Key to any other assignments upon her Hyundai termination." (*Id.* at 28, ¶103). In Count Two, Plaintiff alleged, "Defendant Dynamic was aware of Hyundai's alleged concern around Key's hair and allowed Hyundai to prevent Key from working." (*Id.* at 28, ¶ 115).  These allegations are distinct from Count Five, which does not identify Dynamic as having taken any employment action or having terminated Plaintiff's employment.  The explicit references in Count Five to HMMA and HEA and the

absence of any explicit references to Dynamic in Count Five[1] permits only one conclusion: that Count Five of the Complaint did not state a retaliation claim against Dynamic.

Further, Plaintiff's conclusory statement in Count Five that "Defendants terminated Plaintiff because she complained of race discrimination and a racially disparate policy" (*id.* at 25, ¶ 159) does not state a valid claim against Dynamic, particularly in light of the specific allegations against Dynamic and the other individual Defendants. See *Clifford v. Federman*, 855 Fed. Appx. 525, 528 (11th Cir. 2021) (dismissal is warranted "where the complaint indiscriminately lumps together multiple defendants without specifying how each is responsible for acts or omissions that give rise to a claim for relief"); *Joseph v. Bernstein*, 612 Fed. Appx. 551, 555 (11th Cir. 2015) ("If the complaint indiscriminately groups the defendants together, it fails to comply with the minimum standard of Rule 8."), cert denied 577 U.S. 1103 (2016*); Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001); *Henry v. Glasscock*, Case No. 2:21-cv-107-WKW-SMD, 2022 WL 1514438 *3 (M.D. Ala. May 25, 2022); *Milner v. Team Health*, Case No. 2:19-cv-2041-GMB, 2020 WL 5658903 *5 (M.D. Ala. September 23, 2020) (lumping all defendants together does not give fair notice); *Hamilton v. Judicial Correction Services LLC*, Case No. 2:18-

---

[1] The allegations in this paragraph were not incorporated into Count Five of the Amended Complaint. (*Id.* at 24, ¶151).

cv-00933-RDP, 2019 WL 5964977 *3 (N.D. Ala. Nov. 13, 2019) (lumping all defendants together without "specifying which Defendant took which actions" is an impermissible pleading); *McCall v, Bank of America*, Case No. 2:16-CV-184-WKW, 2016 WL 5402748 *2 (M.D. Ala. September 26, 2016) ("mere reference to 'Defendants' does not give fair notice").

This collective reference in Count Five to all Defendants, particularly where the same count explicitly states that "HEA and HMMA terminated Plaintiff" (doc. 28 at 25, ¶ 157), is not a factual or legal allegation at all against Dynamic. There is no allegation in the Amended Complaint that Dynamic terminated Plaintiff; there is no allegation that Dynamic's alleged failure to provide any further assignments was effectively a termination (Plaintiff did not allege constructive discharge); and, most importantly, there is no allegation that Dynamic terminated Plaintiff because she made a complaint about race discrimination. The issue before the Court is not whether Count Five fails to meet the Rule 12(b)(6) failure to state a claim standard. The issue is more fundamental than whether a plaintiff sufficiently pled a particular claim. The issue is that the operative Complaint does not even attempt to aim or assert the claim under Count Five against Dynamic. This is a more fundamental issue of Plaintiff stating the termination claim in Count Five against HMMA and HEA, but no such claim being stated against Dynamic. A Court, whether by bench trial or

by jury, cannot rule on a claim or submit a claim to a jury when that claim does not exist.

Dynamic has not waived this issue, but has raised it at every opportunity. Dynamic raised this issue as part of its Motion to Dismiss the Amended Complaint (doc. 32 at 13) (arguing that lumping all Defendants together did not state a claim), in its Answer (doc. 43 at 25); in its Motion for Summary Judgment (docs. 73 at 2 and 74 2 n.1, 25-26), in the Final Pretrial Order (doc. 178 at 2), in the Motion for Judgment as a Matter of Law filed at the end of the Plaintiff's case (doc. 182 at 6), and in the Renewed Motion for Judgment as a Matter of Law filed at the end of all the evidence. (Doc. 183). Yet, despite Dynamic raising this issue throughout these proceedings, Plaintiff never requested the Court to be allowed to amend the pleadings under Rule 15 to include the termination claim against Dynamic. The Court's various Orders refusing to dismiss Count Five against Dynamic is clear error and works a manifest injustice against Dynamic to the extent it required Dynamic to defend against Count Five at trial because the Amended Complaint did not direct Count Five against Dynamic. Plaintiff brought Count Five only against HMMA and HEA, explicitly alleging that those former Co-Defendants terminated Plaintiff but not making the same allegation against Dynamic. Accordingly, the Court should set aside the verdict for Plaintiff and grant to Dynamic a judgment in its favor as a matter of law.

**C.**   **The Jury's Finding that Plaintiff Engaged in Protected Activity is Contrary to the Great Weight of the Evidence Because Key Never Complained about Race or Any Other Unlawful Discrimination.**

To prove a retaliation claim under § 1981, Plaintiff must prove the following elements: (1) she participated in an activity protected by § 1981; (2) she suffered an adverse employment action, and (3) there is a causal relationship between the participation in the protected activity and the adverse action. *Litman v. Sec'y, of the Navy*, 703 F. App'x 766, 770 (11th Cir. 2017) "Statutorily protected activities include opposing an unlawful employment practice, and making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding or hearing related to an unlawful employment practice." *Wright v. Carter & Carter Constr., LLC,* No. 3:16-CV-977-KS-TFM, 2017 WL 2346840, at *1 (M.D. Ala. May 30, 2017) (citing 42 U.S.C. § 2000e-3(a) (2017)). Here, Plaintiff's retaliation claim is based on protesting treatment she received due to her hairstyle.

The first element of a retaliation claim under § 1981 is that the Plaintiff must engage in protected activity.  The protections "only reach individuals who 'explicitly or implicitly communicate [ ] a belief that the practice constitutes unlawful employment discrimination.'" *Furcron v. Mail Centers Plus, LLC,* 843 F.3d 1295. 1311 (11th Cir. 2016) (quoting EEOC Compliance Manual);[2] *see also Coutu v.*

---

[2] *Furcron* is a Title VII case, but has been applied in § 1981 cases.  *Bell v. City of Auburn*, 722 Fed. Appx. 898. 900 (11th Cir. 2018).

*Martin County Board of Cty Comms.*, 47 F.3d 1068, 1074 (11th Cir. 1995) (Plaintiff's grievance was not protected activity since there was no allegation or proof of "race or national origin discrimination").  The Eleventh Circuit's unpublished decisions state it even stronger requiring the plaintiff to complain of a particular form of discrimination in order for it to be protected activity.   *See Mohammed v. GHX Global Healthcare Exchange*, No. 21-10108, 2022 WL 1615925 *3 n.3 (11th Cir, May 23, 2022) ("[T]o the extent the latter complaint only alleged unfair treatment, not discrimination on the basis of race, sex, or national origin, it would hot have constituted protected activity."); *Jeronimus v. Polk Cnty. Opportunity Council*, 145 Fed. App'x 319, 326 (11th Cir. 2005)(per curium) (no protected activity based **on** complaints of being "singled out," subject to "a campaign of harassment," and working in a "hostile environment," but no suggestion that complaint was related to race or sex).

There is no evidence that Plaintiff ever engaged in any protected activity.  As her claim is under § 1981, Plaintiff's complaint would needed to have been one of race discrimination. But Plaintiff never complained about race discrimination.  Her complaints were always about her hair.   Her official complaint referenced discrimination based on her "hairstyle (dreadlocks)." (Tr. Vol. I at 63:14-65:7, 125:2-10; PX 3 ("I believe that I have been discriminated against on the basis of my current hairstyle (dreadlocks)"; PX 4 (same))).  Plaintiff's official complaint does

not say anything about race. (Tr. Vol. 1 at 125:2-10). Plaintiff's rebuttal statement does not mention race or make any complaint related to her race. (PX 6; Tr. Vol. 1 at 125:11-126:2). Plaintiff's complaint to her trainer was only about her hair. (Tr. Vol. I at 77:11-22, 114:25-115:7, 125:20-23 (Plaintiff's testimony that she told her trainer she was sent home "because of my hair")). Every discussion about her complaint stated it was about her hair. (Tr. Vol. I at 69:21-70:1, 88:1-89:6). Every email Plaintiff placed into evidence only talked about her hair. (PX 5 ("recently removed from HMMA because of an issue over her hair" and "threats to sue HMMA over appearance standards"); PX 7 (""Ms. Key is trying to imply that she was removed due to her pregnancy and not just because her hair was out of compliance with the rules")).

Plaintiff's statement to Ray Cureton (Dynamic's District Manager) was that any discrimination was "because of my hair." (Tr. Vol. I at 124:19-23). Plaintiff never told Ray Cureton she had any complaint related to her race or mentioned race. (Tr. Vol. II at 83:5-15; 89:15-17). Plaintiff specifically never told Ray Cureton about the reason she thought this was related to race: the Gloria Robinson statement that the Koreans send around memos stating they do not want African Americans wearing dreadlocks. (Tr. Vol. II at 89:18-21). Ray Cureton always understood this was an issue about Plaintiff's hair. (Tr. Vol. II at 80:6-14, 83:1-23, 98:17-19). Sherry Spires who was employed in Human Resources at Dynamic similarly

11

understood Plaintiff's complaint to be about hair and never about her race. (Tr. Vol. II at 121:9-12, 161:23-162:1, 162:12-163:5, 171:6-8). Plaintiff never complained to Dynamic that white employees were treated better than African American employees, that other races were treated better than African Americans or that she was subjected to any racial slurs. (Tr. Vol. II at 25:12-22). There is no testimony that Plaintiff ever complained internally about race; it was always a complaint about her hairstyle.

Even Plaintiff's testimony about her EEOC Charge she filed was about her hair. Plaintiff testified that her EEOC Charge, including the race part, was related to her hair. (Tr. Vol. II at 2:24-25:1). The evidence that Dynamic received a notice from the EEOC that Plaintiff had filed a race discrimination claim does not save Plaintiff from the lack of any protected activity. The mere notice of a claim of race discrimination is not protected activity when it is not tied to any adverse action. *See Ceus v. City of Tampa*, 803 Fed. Appx. 235, 246=47 (11th Cir. 2020) (allegations of "racist department" were not protected activity as they were not tied to any specific discrimination or adverse action the plaintiff or anyone else suffered); *see also Moore v. City of Atlanta*, CIVIL ACTION FILE NO. 1:20-cv-3380-JPB-JKL, 2022 WL 19517299 *23 (N.D. Ga. December 19, 2022) ("Plaintiff's emails conclusorily asserting that he was subject to discrimination will not amount to protected activity under . . . § 1981.") report and recommendation adopted CIVIL ACTION FILE NO.

1:20-cv-3380-JPB-JKL, 2023 WL 2646300 (N.D. Ga. March 27, 2023); *Johnson v. Birmingham Board of Education*, Case No. 2:18-CV-1262-CLM, 2020 WL 5203979 *5 ((N.D. Ala. September 1, 2020) ("[T]he Eleventh Circuit distinguishes between general complaints of alleged racism and complaints directed to specific, statutorily proscribed  employment practices. . . . , Only the latter can sustain a claim.").  This case demonstrates the rationale for this rule.  Dynamic had received from Plaintiff he official complaint of discrimination due to her "hair (dreadlocks)."  Plaintiff never notified anyone at Dynamic that she considered this a form of race discrimination. Dynamic then receives a mail notice that Plaintiff has filed a charge of race discrimination that contains no details about the nature of the complaint.[3]  There is no evidence that Dynamic knew this Charge related to Plaintiff's earlier claim of hair discrimination; it is pure speculation and conjecture to say that Dynamic knew this mail notice related to Plaintiff's hair discrimination claim.

Moreover, the notice of the EEOC Charge relates to a Charge that is based only on a complaint about the Plaintiff's hair and her treatment due to her hairstyle. That does not state a claim under § 1981.  *See Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030 (11th Cir. 2016).  A Charge that is based on allegations of actions that are not on a protected ground is not a protected

---

[3] The Charge itself was not placed into evidence, and Cureton who Plaintiff claims was the decision maker never saw the Charge.  (Tr. Vol. II at 89:3-5).

13

activity. *See Langford v. Magnolia Advanced Materials, Inc.*, 709 Fed. Appx. 639, 642 (11th Cir. 2017) (EEOC Charge based on unsafe working conditions is not protected activity). Thus, because Plaintiff did not make complaints of race discrimination, she did not engage in protected activity, which is an element of a retaliation claim. The jury verdict in favor of Plaintiff on her retaliation claim is due to be vacated and judgment entered for Dynamic.

### D. Insufficient Evidence Exists that Plaintiff Had a Good Faith Belief That She Was Subjected to Unlawful Discrimination as the Only Evidence of the Belief Should Have Been Barred by the Best Evidence Rule.

To satisfy the first element of a prima facie case, Plaintiff must also demonstrate she held a good faith, reasonable belief that the acts she complained about violated § 1981. *Wright*, at \*1 (quoting *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989)); *see* Doc. 31, ¶ 67. This burden has a subjective and objective component. *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). Thus, a plaintiff must show she subjectively and in good faith believed her employer committed an unlawful employment practice and also that her belief was objectively reasonable. *Id*. A sincere, though mistaken, belief that her employer violated § 1981 is not enough. *Id.*

The Court is required to "measure 'against existing substantive law' the objective reasonableness of [a plaintiff's] belief that [her employer] engaged in an unlawful employment practice." *Nickson v. Jackson Hospital & Clinic Inc.*, No.

2:15CV00953-SRW, 2017 WL 4366735, at *8 (M.D. Ala. Sept. 29, 2017) (finding subjective belief of racially disparate treatment was not objectively reasonable) (quoting *Tatt v. Atlanta Gas Light Co*., 138 Fed. Appx. 145, 147 (11th Cir. 2005)) (internal citations omitted)). To constitute protected activity, Plaintiff must have adduced facts that are objectively "close enough" to what would be the basis of a successful discrimination claim. *Brown v. Florida Atlantic University*, No. 16-cv-80251-MIDDLEBROOKS/BRAN, 2016 U.S. Dist. LEXIS 146853, at *35 (S.D. Fla. Oct. 24, 2016) (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *see also Howard v. Walgreen Co.*, 605 F.3d 1239, 1244-45 (11th Cir. 2010) (element of Plaintiff's prima facie case is that she must show she had a good faith, reasonable belief the employer engaged in an unlawful employment practice); and *Little*, 103 F.3d at 960.

Plaintiff must not only show that she had a good faith belief that the employer was engaged in unlawful employment practices, but also "that [her] belief was *objectively* reasonable in light of the facts and record presented." *Butler v. Alabama Dept. of Transportation*, 536 F.3d 1209, 1213 (11th Cir. 2008) (emphasis in original). Moreover, "where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer [. . .] an employee's contrary belief that the practice is unlawful is unreasonable." *See Id.* at 1214 (citing *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 and n.2 (11th Cir. 1998)).The

15

complaint Plaintiff made that is the subject of the retaliation claim is that she was discriminated against due to her "hair (dreadlocks)."  PX 3, PX 4.  Following the Eleventh Circuit's decision in *Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018 (11th Cir. 2016) that a neutral grooming policy that prohibits dreadlocks is not a form of race discrimination, the Plaintiff cannot meet that standard.

The only evidence Plaintiff offered to support that she believed her claim of discrimination due to her hair was because of her race was the statement Plaintiff testified Gloria Robinson made to her "the Koreans there – she said they send these memos, and they don't want African Americans wearing their hair like this."  (Tr. Vol. I at 57:11-25).  Plaintiff further testified that is the only basis for her belief that she was subjected to race discrimination. (*Id*. at 65:24-66:9, 116:9-117:13).  No evidence was presented at trial that such memos even exist.  Plaintiff testified she never saw the alleged memos and has no information such memos exist separate from Gloria Robinson's statement.  (*Id*. at 118:1-119:5).

Dynamic filed a Motion in Limine to have the Court exclude the evidence of the statement by Gloria Robinson as being in violation of Rule 1002, Fed. R. Evid., which prohibits oral testimony of the contents of a document.  (Doc. 156). The trial court denied the motion, stating that Plaintiff was not attempting to prove the contents of a document.  (Oral Order of March 28, 2023, denying doc. 156).  Thus,

during the trial Plaintiff was able to testify concerning the Gloria Robinson statement exactly as Dynamic predicted in its Motion in Limine.

The trial court abused its discretion by allowing the Gloria Robinson statement regarding the contents of the "Koreans'" memos and without that evidence there is no evidence for a reasonable juror to find that Plaintiff had a good faith belief she was subjected to unlawful race discrimination. Plaintiff's counsel and the trial court treated Rule 1002 too narrowly. Rule 1002 (the "Best Evidence Rule") applies not only when a party is attempting to prove the contents of a document. The Best Evidence Rule applies whenever a party attempts to testify regarding or introduce evidence of the contents of a document and prohibits admission of such testimony. *Roundtree v. Bowers*, No. 22-11557, 2022 WL 17986182 *3 (11th Cir. December 29, 2022) ("This rule applies when a witness seeks to testify about the contents of a recording when the witness was not privy to the events described.");[4] *Benjamin v. Thomas,* 766 Fed. Appx. 834, 837 (11th Cir. 2019) ("[T]he best evidence rule thus applies 'when a witness seeks to testify about the contents of a writing, recording or photograph without producing the physical item itself - particularly when the witness was not privy to the events those contents describe."); In *re Lynch*, 755 Fed. Appx. 929 (11th Cir. 2018) ("if, however, a witness testifies about the contents of a

---

[4] The Eleventh Circuit found the district court correctly sustained an objection to admission of an internal report where the investigator stated that he had seen a video and that the plaintiff was struck 16 times.

documents that have not been separately admitted into evidence, that testimony may be excluded under Federal Rule of Evidence 1002, provided that an exception to the so-called 'best-evidence rule' does not apply.").[5]

The purpose of the Best-Evidence Rule is to prevent inaccurate information when describing documents while the actual documents accurately reflect the information. *Gordon v. United States,* 344 U.S. 414, 420 (1953)) ("The elementary wisdom of the best evidence rule rests on the fact that the [recording itself] is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description [of it]."); *United States v. Ross*, 33 F.3d 1507. 1513 (11th Cir. 1994) ("the purpose of the best-evidence rule is to prevent inaccuracy and fraud when attempting to prove the contents of a writing.")  This case demonstrates the purpose of the Rule.  The description of the memos is not supported by any proof of

---

[5]  See also *Henderson v. Waxxpot Group, LLC,* Case No. 2:20-cv-153, 2022 WL 2980531 *3 (S.D. Ohio July 28, 2022) ("[T]he Court agrees with Plaintiff that the original text messages and documents must be introduced before the parties introduce evidence of the text messages and documents."); *Adams v. Memorial Hermann,* Civil Action No. 4:15-CV-01270, 2018 WL 5886800 *4 (S.D. Tex. November 19, 2018) ("Plaintiffs and/or Patterson purport to testify to the contents of certain documents which they claim to have seen but which they do not possess.  This testimony . . . clearly violates the Best Evidence Rule."); *Smallwood v. T&A Farms*, CIVIL ACTION NO.:5:14-cv-86, 2017 WL 5904673 *3 (S.D. Ga. June 15, 2017) ("Here, the best evidence rule is implicated because Plaintiff's proposed testimony pertains to the contents of a document."); *Wilkins v. Cascadia Behavioral Healthcare, Inc*., No. CV-06-195-ST., 2008 WL 44648 *5 (D.C. Or. January 2, 2008) ("[FRE 1002] applies where 'the witness's testimony concerning these facts is based on the writing's contents, not on knowledge independent of those contents.") (quoting Charles A. WRIGHT & VICTOR J. GOLD, FEDERAL PRACTICE & PROCEDURE § 7184, P. 381 (2000)); *United States v. Finkielstain,* 718 F.Supp. 1187, 1192 (S.D .N.Y .1989) ("As to the best evidence rule, that canon requires the production of a document to prove its content when a witness testifies on the issue of what that document contains.").

the documents themselves or proof that the documents exist.  The lack of the actual documents allowed Plaintiff's counsel to argue to the jury in closing that the Hyundai grooming policy that was in evidence could be the memos Robinson described, although that policy clearly does not apply only to African Americans. (Tr. Vol. III at 83:12-19).

This is not a case where the party does not have to produce the document because he or she is testifying about information that is in a document but of which the party also has personal knowledge.  *Allstate Ins. Co. v. Swann,* 27 F.3d 1539, 1543 (11th Cir. 1994).  The Robinson statement was solely a recitation of what was in the alleged document and was not purported to be based on her personal knowledge.  The testimony was not offered to show that a memo existed as that did not prove any portion of Plaintiff's case.  The Plaintiff offered and needed the testimony of the contents of the documents to demonstrate she held a reasonable good faith belief that her hairstyle complaint was related to her race.  The only source of the fact that the "Koreans" send out memos stating that they do not want African Americans to wear dreadlocks is Robinson's description of the content of the documents.  That fact (and Plaintiff's sole basis for claiming her hairstyle claim is related to her race) is not based on any other evidence than the description of the contents of the documents. In *Grange Mutual Casualty Co. v. Slaughter*, 958 F.3d 1050, 1058 (11th Cir, 2020), the defendants "needed to prove the content of the lease"

to show what entity had exclusive use at the time of the accident. The Eleventh Circuit ruled that the problem for the defendants was the best evidence rule as "[t]he best evidence of the content of the lease is the writing itself."  Similarly, in this case, the Plaintiff needed to prove she had a good faith basis for believing she was subjected to race discrimination with the only evidence being a description of the contents of a writing.  That evidence is barred by the best evidence rule.  Since that inadmissible evidence is the only evidence of that critical element of a retaliation claim, the verdict on Plaintiff's retaliation claim must be vacated and judgment entered for Dynamic or a new trial ordered due to this erroneous admission of the evidence.

### E.   Insufficient Evidence Exists of Causation as No Evidence Exists that the Decision Maker Knew Plaintiff Complained of Race Discrimination or Knew the Reason Plaintiff Thought She Was Subjected to Unlawful Race Discrimination.

In order to establish the causation required to prevail on a retaliation claim under § 1981, Plaintiff must produce enough proof that the decision maker was aware that Plaintiff complained of unlawful discrimination.  In this case, that would involve sufficient evidence that the Dynamic decision maker knew Plaintiff complained of unlawful race discrimination.  It is not enough that the decision maker knew Plaintiff made some complaint; the decision maker must know the complaint was about race discrimination.  *Duncan v. Alabama*, 734 F. App'x 637, 641 (11th Cir. 2018) (unpublished) ("Although the record indicates the decision maker had

actual knowledge that [the plaintiff] filed some type of complaint with the [defendant], there is no evidence in the record that [the decision-maker] was actually aware the internal complaint raised any allegations of race discrimination, such that it constituted a protected expression.") (citing *Clover v. Total Sys. Servs., Inc*., 176 F.3d 1346, 1354 (11th Cir. 1999)); *Clover v. Total Sys. Servs., Inc*., 176 F.3d 1346, 1355–56 (11th Cir. 1999) ("In sum, because [the plaintiff] failed to present sufficient evidence either that: (1) Miller was aware of her protected conduct or (2) anyone other than Miller was a decision-maker, we conclude she did not present sufficient evidence to permit a jury to reasonably find the requisite causal connection between her protected activity and her termination"; and, "[b]ecause [the plaintiff] was required to establish that causal connection in order to prevail on her retaliation claim, the district court erred in denying [the defendant's] motion for judgment as a matter of law."); *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty*., Fla., 256 F.3d 1095, 1119 (11th Cir. 2001) ("[i]t is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression); *Fields v. S. Union State Cmty. Coll*., No. 3:18-CV-1053-JTA, 2022 WL 403283, at *11 (M.D. Ala. Feb. 9, 2022) (where the plaintiff presented no evidence showing that the decision-maker "knew or was informed of" the plaintiff's complaints of race

discrimination to other employees, the plaintiff failed to establish the causal link element of a prima facie case, requiring dismissal of her retaliation claim).

Similar to the argument in the preceding section that Plaintiff has failed to establish she complained of race discrimination, no evidence exists that the decision maker **knew** Plaintiff complained of race discrimination. All of the complaints and conversations Ray Cureton had with Plaintiff related to her allegations she was discriminated against due to her hair. Plaintiff's statement to Ray Cureton (Dynamic's District Manager) was that any discrimination was "because of my hair." (Tr. Vol. I at 124:19-23). Plaintiff never told Ray Cureton she had any complaint related to her race or mentioned race. (Tr. Vol. II at 83:5-15; 89:15-17). Plaintiff specifically never told Ray Cureton about the reason she thought this was related to race: the Gloria Robinson statement that the Koreans send around memos stating they do not want African Americans wearing dreadlocks. (Tr. Vol. II at 89:18-21). Ray Cureton always understood this was an issue about Plaintiff's hair. (Tr. Vol. II at 80:6-14, 83:1-23, 98:17-19).

As discussed previously, the August 11, 2017, notice from the EEOC (PX 10) does not establish that Cureton knew Plaintiff was complaining of race discrimination. The conclusory statement of "race" based on a charge that does not state any action protected by § 1981 (the EEOC Charge was based on hair discrimination and not race) is not protected activity. *See Ceus v. City of Tampa*,

22

803 Fed. Appx. at 246-47 (11th Cir. 2020) (allegations of "racist department" were not protected activity as they were not tied to any specific discrimination or adverse action the plaintiff or anyone else suffered); *Langford v. Magnolia Advanced Materials, Inc.*, 709 Fed. Appx. at 642 (EEOC Charge based on unsafe working conditions is not protected activity).

Finally, no evidence exists that the Plaintiff made any attempt to be further assigned after the August 11, 2017, notice. The last date Plaintiff contacted Dynamic at all was on August 11, 2017, and that was to have Dynamic fill out a form relating to her employment status. (Tr. Vol. I at 71:18-72:12, 78:1-6). Dynamic could not have retaliated against Plaintiff based on the notice received on August 11, 2017, when that was the last time Plaintiff contacted Dynamic.

F.   **Dynamic Should Be Awarded A New Trial Due to the Court's Failure to Instruct the Jury Properly on the Elements of a Retaliation Claim and on the Decision in *EEOC v. Catastrophe Mgmt. Sols.* and Due to Improper Comments Made in Closing.**

The trial court denied Dynamic's request for jury instructions on the basic elements of a retaliation claim under § 1981 and for an instruction that a neutral grooming policy that prohibits dreadlocks is not a form of race discrimination. *Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018 (11th Cir. 2016). The Court's failure to do so presented a misleading view of the law of the jury and allowed Plaintiff's counsel to make certain arguments during closing that were prejudicial to Dynamic and misleading.

23

1.  The Court's jury instruction did not instruct the jury to determine if Key engaged in protected activity by complaining about race discrimination.

The first error in the jury instructions related to the instructions defining protected activity.  The trial court gave the following instruction:

> For the first element, protected activity, Ms. Key claims that she engaged in protected activity when she complained to Dynamic that she felt discriminated against based on her race. That action is "protected activity" if it was based on Ms. Key's good-faith, reasonable belief that she was discriminated against because of her race. Ms. Key had a "good faith" belief if she honestly believed that she was discriminated against because of her race. Ms. Key had a "reasonable" belief if a reasonable person would, under the circumstances, believe that she was discriminated against because of her race. Ms. Key does not have to prove that she was actually discriminated against because of her race. But she must prove that she had a good-faith, reasonable belief that discrimination occurred.

(Doc. 184 at 6-7).  Dynamic objected to this instruction.  Through its proposed jury instructions (doc. 161 at 17) and during the Charge Conference(s) (Tr. Vol. I at 155:11-13, 161:16-23; Vol. II at 227:4-229:16; Vol. III 3:24-12:9),  Dynamic requested the Court to provide a jury instruction that set forth the requirement that the protected activity requirement for a retaliation claim under § 1981 requires the Plaintiff to establish that she complained she was subjected to race discrimination. As set forth earlier, the Eleventh Circuit law is clear that the protections "only reach individuals who 'explicitly or implicitly communicate [ ] a belief that the practice constitutes unlawful employment discrimination.'" *Furcron v. Mail Centers Plus,*

24

*LLC,* 843 F.3d at 1311; *Coutu v. Martin County Board of Cty Comms.*, 47 F.3d at 1074 (Plaintiff's grievance was not protected activity since there was no allegation of "race or national origin discrimination"): *See Mohammed v. GHX Global Healthcare Exchange*, No. 21-10108, 2022 WL 1615925 *3 n.3  ("[T]o the extent the latter complaint only alleged unfair treatment, not discrimination on the basis of race, sex, or national origin, it would not have constituted protected activity."); *Jeronimus v. Polk Cnty. Opportunity Council*, 145 Fed. App'x at 326 (no protected activity based on complaints of being "singled out," subject to "a campaign of harassment," and working in a "hostile environment," but no suggestion that complaint was related to race or sex)).

A jury instruction that stated only that the Plaintiff has engaged in protected activity if the Plaintiff has a good faith reasonable belief that she was subjected to race discrimination eliminates entirely a basic requirement for her actions to be protected activity.  That instruction is misleading because it states only a portion of the requirements for a complaint to be protected activity in a retaliation claim. Particularly considering the facts and Dynamic's contentions in this case that Plaintiff's complaints about her hair were not complaints about race discrimination, it was an abuse of discretion for the Court to refuse to provide an instruction consistent with the Eleventh Circuit's decisions in *Furcron v. Mail Centers Plus, LLC,* 843 F.3d at 1311 and *Coutu v. Martin County Board of Cty Comms.*, 47 F.3d

at 1074 that the Plaintiff must engage in protected activity by complaining of race discrimination.  The Court relied on the Eleventh Circuit pattern instructions, but the pattern instructions are not controlling. *United States v. Davis*, 779 F.3d 1305, 1311 (11th Cir. 2015) ("The standard instructions of course are not controlling.") The abuse of discretion considers if the instructions "fairly and adequately addressed the issue and correctly stated the law." *Christopher v. Cutter Laboratories*, 53 F.3d 1184, 1190 (11th Cir. 1995).  An instruction that left out the necessary component that the Plaintiff must have complained of unlawful race discrimination does not correctly state the law.  Dynamic was clearly injured by this as it allowed Plaintiff's counsel to make statements in its closing, not supported by the law, that all Plaintiff has to prove was that she believed she was subjected to unlawful race discrimination. (Tr. Vol. III at 47:5-9) ("We don't have to prove that Ms. Key actually experienced race discrimination.  **We just have to show you that she believed in good faith that she had experienced discrimination.**  And once she makes that complaint she is protected.") (emphasis added); (*Id*. at 82:6-11) ("We heard a lot about this being about hair, not race.  The bottom line is that we don't have to use any special words, any magic words.  Ms. Key didn't have to use any magic words when she made the complaint.  **All she had to do was have a reasonable belief that she was complaining about race discrimination**.") (emphasis added).

26

Compounding the problem from refusing to provide any instruction that the Plaintiff must have complained of race discrimination was the Court's refusal to provide an instruction that under the Eleventh Circuit's decision in *Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 at 1030, dreadlocks are a hairstyle, not "an immutable characteristic of race," even though they "are a 'natural outgrowth' of the texture of black hair" and that a race-neutral grooming policy to prohibit dreadlocks, without evidence of racially discriminatory application, is not race discrimination.  Dynamic specifically requested such an instruction based on the decision in *Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 at 1030, but it was denied by the Court. (Doc. 161 at 18; 184 at 6-10.; Tr. Vol. I at 154:17-155:10; Vol. II at 218:25-219:12, 25:1-224:4).  This permitted the jury to believe a complaint about the policy not permitting dreadlocks was inherently a complaint about race discrimination, did not allow the jury to differentiate between a complaint about race discrimination and hairstyle, and did not adequately inform the jury that complaining about a policy prohibiting dreadlocks is not protected activity.  By denying that request Plaintiff's counsel was allowed to make the argument during closing that the policy itself was unlawful contrary to *Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 at 1030.  Considering Dynamic's position that a complaint about the grooming policy was not a complaint about race discrimination, the Court's failure to instruct the jury on the holding in C

*Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 at 1030 did not

adequately address the issues or correctly state the law. *Christopher v. Cutter*

*Laboratories*, 53 F.3d at 1190.

>  2.   Court failed to instruct jury that the decision maker must be aware of protected activity.

The Court also denied Dynamic's request for an instruction that the decision

maker has to be aware of the protected activity and has to be aware of the reason

plaintiff thought it was race discrimination. (Doc. 161 at 25-26) (Dynamic's

requested instructions) (Doc. 184 at 7) (Court's final instructions).   Dynamic

objected to the Court's proposed charge (Tr. Vol. I at 155:15-18; Vol.  II at 218:25-

219:12, 230:10-12) and wanted an instruction that complied with the basic element

of causation that the decision maker must be aware of the complaint of race

discrimination.  *See Bass v. Bd. of Cnty. Comm'rs, Orange Cnty.*, Fla., 256 F.3d at

1119 (plaintiff must show that the person taking the adverse action was aware of the

protected expression); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d at 1355–56 ("In

sum, because [the plaintiff] failed to present sufficient evidence either that: (1)

Miller was aware of her protected conduct or (2) anyone other than Miller was a

decision-maker, we conclude she did not present sufficient evidence to permit a jury

to reasonably find the requisite causal connection between her protected activity and

her termination"; and, "[b]ecause [the plaintiff] was required to establish that causal

connection in order to prevail on her retaliation claim, the district court erred in

28

denying [the defendant's] motion for judgment as a matter of law."); s*ee also Duncan v. Alabama*, 734 F. App'x at 641 ("[T]here is no evidence in the record that [the decision-maker] was actually aware the internal complaint raised any allegations of race discrimination, such that it constituted a protected expression.")

Instead of instructing the jury on this element of causation for a retaliation claim, the Court simply instructed the jury as follows on causation:

> For the third element, if you find that Ms. Key engaged in protected activity and that Dynamic took an adverse employment action against her, you must decide whether Dynamic took that action because of Ms. Key's protected activity. Put another way, you must decide whether Ms. Key's protected activity was the main reason for Dynamic's decision.

> To determine that Dynamic took an adverse employment action because of Ms. Key's protected activity, you must decide that Dynamic would not have taken the action had Ms. Key not engaged in the protected activity but everything else had been the same.

(Doc. 184 at 7). Again, considering Dynamic's position that Plaintiff never complained of race discrimination, this is an important element in its defense. Failure to instruct the jury on this element was an abuse of discretion because it did not adequately address the issues or correctly state the law. *Christopher v. Cutter Laboratories*, 53 F.3d at 1190.

3.   Lack of proper jury instruction permitted improper, prejudicial, and false closing arguments by Key's attorney.

Plaintiff's counsel made improper and unfairly prejudicial comments to the jury during her closing arguments including (a) an incorrect factual statement that

the "grooming policy" prevents African Americans from wearing dreadlocks when that policy on its face applies to all individuals working at the Hyundai plant (see DX 5); (b) an incorrect factual statement that HEA's grooming policy prohibiting dreadlocks is itself an act of race discrimination, which directly contradicts the Eleventh Circuit's opinion in *Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 at 1030; and (c) a statement that the EEOC Charge was another form of protected activity, which clearly violated the Court's ruling on Dynamic's Motion in Limine. It appears Plaintiff's counsel took liberties to make these improper arguments due in part to the jury instructions that Dynamic requested and that the Court rejected in favor of more general standard instructions that did not provide the jury with guidance as to the legality of a grooming policy that prohibits all employees from wearing dreadlocks.

The reasons justifying a new trial include, among other reasons, "improper opening statements or closing arguments." *Rosa v. City of Fort Myers*, No. 2:05–cv–481–FtM–29SPC, 2008 WL 398975, at *2 (M.D.Fla. Feb. 12, 2008) (internal citations omitted). Counsel's comments exacted such injurious influence that these comments alone warrant a new trial. *Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261 (11th Cir. 2008) (counsel's comments were "plainly unwarranted and clearly injurious" thus justifying a new trial). The comments in this case were enough to influence improperly the jury. The Eleventh Circuit has granted new trials

based on improper closing arguments in circumstances just such as the ones made by Key's counsel. *See Christopher v. Florida*, 449 F.3d 1360, 1365 (11th Cir. 2006) (affirming district court's grant of new trial where, among other factors, "Plaintiff's counsel's improper closing argument prejudiced the substantial rights of Defendants by taking away from Defendants the benefits of the partial summary judgment they had won before trial and by incorrectly expanding the grounds for liability at trial to include grounds ruled out by the court."); *McWhorter v. City of Birmingham*, 906 F.2d 674 (11th Cir. 1990) (same, where counsel argued an excluded theory "in the rebuttal portion of [his] argument, immediately before the jury began to deliberate; defense counsel had no opportunity to respond to these claims; and the jury noticed that" a document referenced during closing, which was based on the excluded theory and not admitted into evidence, "was not included in the exhibits.")

        a.   Arguments that the grooming policy itself is race discrimination.

The first improper arguments were Plaintiff's counsel's repeated statements that hair discrimination violates § 1981, that Plaintiff's complaints about hair discrimination that did not reference race was activity protected by § 1981, and that the Hyundai grooming policy prohibiting dreadlocks discriminated against African Americans in violation of § 1981. This is problematic and unfairly prejudicial because this Court held that the grooming policy is not racially discriminatory and does not violate § 1981. The Court dismissed at summary judgment Plaintiff's race

discrimination claim against Dynamic on the same grounds Plaintiff's counsel

promoted in closing arguments. Those comments are as follows:

> So basically what had happened was Hyundai has this grooming policy that more or less prohibits hairstyles that black women typically wear if their hair is in its natural state: Dreadlocks, braids, things of that nature.
>
> ***************************
>
> She comes back to work the next day on August 1st, and that's when the wheels come off. The morning of August 1st, what we see happen is she meets with her trainer, LaTunya Howell, who asks her, "Why were you sent home yesterday?" She said, "They had an issue with my hair, the way I was wearing my hair in the dreads, and sent me home."
>
> So Ms. Howell **recognizes that as a claim of race discrimination** and contacts Cassandra Williams at HEA and says, "Ms. Key is complaining of discrimination." (emphasis added).[6]
>
> ****************************
>
> When the company told her she couldn't wear her hair that way, she saw it as **race discrimination and felt it was an attack on her as a black woman, because it was a policy that basically said black ladies couldn't wear their hair in a way that was common to black women**. (emphasis added).

(Tr. Vol. III at 48:21-24, 49:21-50:4, and 56:18-22).  These statements represent to

the jury that Hyundai's written grooming policy targeted black women, which is

---

[6] Howell never testified at the trial, and no evidence exists that Howell ever told anyone at Dynamic that Plaintiff complained of race discrimination or that she understood it as such.

abjectly false; and that any grooming policy that prohibits employees from wearing dreadlocks is an act of racial discrimination, which is contrary to both the decision in *Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 at 1030 and this Court's decision granting summary judgment as to the § 1981 race discrimination claim against Dynamic. Since Dynamic's arguments throughout this case and during trial that a complaint about a hairstyle policy does not equate to a complaint about race discrimination (consistent with *Catastrophe Mgmt. Sols.*, 852 at 1030) and that § 1981 does not prohibit "hair discrimination," Plaintiff's arguments that the grooming policy and her complaints about the grooming policy violate § 1981 are particularly prejudicial and injurious and violate Dynamic's substantial rights by denying it the Court's prior ruling on its motion for summary judgment. *See Christopher v. Florida*, 449 F.3d at 1365.

                b.    Argument that the Hyundai grooming policy may be the memo referenced by Gloria Robinson

The second improper comment, which is pure speculation not supported by the facts or the law, is the argument Plaintiff's counsel made regarding the "memos" Plaintiff testified that Gloria Robinson referenced (and Robinson denied). After Dynamic's closing, which gave Dynamic's counsel no opportunity to respond, Plaintiff's counsel improperly stated as follows:

> Do the memos exist? I don't know. It's a distraction. I personally don't doubt that they do. I don't think a memo has to be in writing and be titled memo across the top.

33

> And you guys heard Ms. Williams testify today that she's
> been at the Hyundai plant since the nineties, and she drafted
> that policy based on something she received from them
> when she first started there.[7] Could that be a memo? Maybe.

(Tr. Vol. III at 83:12-19).  Plaintiff's counsel represented that the grooming policy

(and/or the prior policy on which it was based) that prohibited personal grooming

practices, including dreadlocks, could in fact be the memo from the "Koreans."

Plaintiff testified Robinson referenced as memos containing racially discriminatory

statements about African Americans wearing dreadlocks. Plaintiff's statements to the

jury that the grooming policy (and/or the prior policy on which it was based) are a

direct misrepresentation of evidence. No witness at trial even suggested that the "little

memos" Plaintiff testified that Robinson referenced was in fact the HEA grooming

policy prohibiting dreadlocks and/or any preceding grooming policy. .Moreover, the

grooming policy itself reflects that it is not applicable only to African Americans.  DX

5.[8]  Plaintiff's statements also amount to an erroneous statement of law.  Plaintiff's

counsel took every opportunity to lead the jury to believe that a grooming policy

prohibiting dreadlocks is inherently   racially discriminatory. Plaintiff's counsel was

motivated to lead the jury to this inference because, if the jury assumed such a

_____

[7] Williams testified that she drafted the grooming policy "from an existing [HMMA security]
policy." (Tr. Vol. III, 19:19-20:15).
[8] If the Hyundai grooming policy (DX 5) is the memo referenced then Plaintiff could not have
had a good faith belief that she was subjected to race discrimination since the policy by its clear
terms does not apply only to African Americans.

grooming policy is per se racially discriminatory, it would be very easy for the jury to conclude that any African American person's complaints about such a grooming policy amounted to protected activity without any mention of race.[9] This statement unfairly skewed the jury's deliberation process toward Plaintiff because it permitted the jury to assume that an African American woman protesting a grooming policy about dreadlocks or complaining about "hair discrimination" is protected activity under § 1981 without even reaching a credibility determination as to the only context Plaintiff provided as to race – Robinson's purported statements about the little memos and whether they confirm that the Koreans applied the grooming policy in a discriminatory fashion. In other words, if it is possible that the grooming policy prohibiting dreadlocks that the jury had in its exhibit binder could have been the memo to which Robinson referred as communicating racially discriminatory intent, the jury could reasonably infer that any grooming policy prohibiting dreadlocks communicated racially discriminatory intent and that any complaint about such a grooming policy automatically qualified as protected activity.

Further, the grooming policy does not state or imply as such. Again, this is another attempt to evade the summary judgment ruling provided to Dynamic to its

---

[9] This demonstrates again the reason the best evidence rule and its rationale should apply to the testimony about the memos. Plaintiff's counsel would not be able to engage in such speculation if Plaintiff had been required to produce the memos instead of offering second-hand testimony that described the contents.

prejudice. *Christopher v. Florida*, 449 F.3d at 1365.  Ms. Key testified that the only basis for her believing what occurred to her was due to her race was Ms. Robinson's statement about the memos.  To argue that the Hyundai grooming policy – which makes no distinctions based on race – is the discriminatory memo is improper.

              c.     Improper statements in closing violated Motion in Limine by arguing that the EEOC Charge was a form of protected activity

Dynamic filed a Motion in Limine to "remove any reference to Plaintiff filing an EEOC Charge against Dynamic Security, Inc. as part of Plaintiff's allegations of protected activity" (doc. 160 at 1) and requested an "Order precluding the admission of, or reference to the Plaintiff's EEOC Charge or any contention that Dynamic retaliated against Plaintiff due to her filing of an EEOC Charge against Dynamic." (*Id*. at 6).  The Court granted in part Dynamic's motion (Oral Order of March 28, 2023, granting in part and denying in part doc. 160). holding that it would not be considered a separate protected activity for which Plaintiff could make a claim and receive damages.  Despite a clear ruling that the Plaintiff could not argue that the EEOC Charge was a form of protected activity, Plaintiff's counsel argued that the EEOC Charge was a form of protected activity, stating as follows:

> **Did she engage in protected activity? Yes. She also went to the EEOC.** You saw that just a couple – two days later.
>
> The time line here is very important. If Dynamic Security wants to take the position that they didn't know that it was about race,

they sure can't do that once they got that EEOC charge. It's a continuation of the same complaint, and they knew it.

(Tr. Vol. III at 84:2-8) (emphasis added). This argument was made during Plaintiff's rebuttal part, so Dynamic had no opportunity to comment. Dynamic's counsel requested a curative instruction, which the Court denied, ruling that Plaintiff's counsel argued only that the EEOC Charge was a continuation of the internal complaint. (*Id.* at 89:4-90:9). But the transcript shows clearly that Plaintiff was attempting to convince the jury that the EEOC Charge was a protected activity. It is improper for Plaintiff to argue a theory that has been excluded, particularly during Plaintiff's rebuttal part of the case.

Counsel also engaged in a more egregious violation of the Motion in Limine by arguing that Dynamic did not reassign Plaintiff because she filed her EEOC Charge, a clear violation of the Court's Order on the Motion in Limine that the EEOC Charge could not be argued to be a separate instance of protected activity:

They knew she engaged in protected activity.

We also know that there has been no reassignment. You have seen she can work a shift, and they haven't offered her anything. She's received no job offers because of these complaints.

Cureton expressed reservation of reassigning her because of her complaints. **Spires admitted that they haven't reassigned her since she filed her EEOC charge because she filed an EEOC charge**

37

**complaining of race discrimination.** You have that
straight from the horse's mouth.

(Tr. Vol. III at 57:17-58:2) (emphasis added).[10]  By these arguments Plaintiff was

able to resurrect a claim the Court had already ruled could not be pursued.  Such

arguments are unwarranted and injurious to Dynamic since it had no opportunity to

prepare for this claim and these arguments.  I relates to issues of protected activity

and causation that Dynamic has stressed throughout this trial.

These improper arguments all go the very heart of Dynamic's defenses that:

Plaintiff never complained of race discrimination and, therefore, never engaged in

protected activity; and that Plaintiff had no good faith belief that application of the

neutral grooming policy was race discrimination.  Plaintiff avoided the law and this

Court's prior rulings and made improper arguments that were unwarranted and

injurious to Dynamic.

### G.   Dynamic is Entitled to a New Trial as the Trial Court Improperly Failed to Enforce the Jury Trial Waiver.

This Court's February 21, 2023, Order denied Dynamic's motion to strike

Plaintiff's jury demand. (Doc. 147). The Court issued the Order without opinion. At

---

[10] This also appears to be a misstatement of Spire's testimony.  The testimony Plaintiff appears to rely on is at the end of Spire's direct examination when she gives a nonresponsive and incomplete answer to counsel's question.  Counsel was attempting to have Spires admit that Dynamic was not reassigning Plaintiff because "she had made an official complaint of race discrimination." (Tr. Vol II at 150:9-10).  Spires simply responded: "Well, the fact that we had received the EEOC Charge." (*Id*. at 150:11).  That testimony is neither an affirmative agreement nor a responsive answer, but is only an incomplete response stating merely the fact that Dynamic had received the EEOC Charge.

the hearing on the motion, the Court articulated two reasons for denying the motion. First, while the Court recognized the evidence that Plaintiff had signed an acknowledgement that she received and read the employee handbook contained an explicit written jury trial waiver, it determined the Plaintiff's handbook acknowledgement was not a "knowing and voluntary" waiver because the page she signed did not also include the waiver language contained in the handbook, and no page containing the Plaintiff's signature referenced the jury trial waiver. Second, this Court found it problematic that, while Plaintiff testified in deposition that she had read the explicit jury waiver contained in the employee handbook and that she understood its meaning, Dynamic did not elicit through Plaintiff's testimony the date on which Plaintiff read and understood it.

At the trial, Plaintiff testified that she read some portions of the Security Officer's Handbook containing the jury trial waiver policy before beginning work and skimmed through the rest, but she was unable to identify when she read the jury trial waiver. (Tr. Vol. I at 106:17-107:1, 107:9-108:5; Tr. Vol. II at 23:4-7). Plaintiff again testified that she understood it was a jury trial waiver. (Tr. Vol. I at 107:12-14). By that testimony, Plaintiff is unable to call into question the issue that she was not aware of the jury waiver when she began employment. More importantly, courts in this circuit have stated that, ". . . regardless of where the burden lies, the plaintiff must come forward with some proof which calls into question whether the waiver

was knowing and knowing and voluntarily given." *Rob-Wal Inv. Co. v. Jacobsen*, No. 2:09-CV-00055-HGD, 2009 WL 10689142, at *1 (N.D. Ala. Aug. 6, 2009) (enforcing jury-trial waiver located on "page 10 of the 11-page" agreement) (quoting *Bank of America v. Florida Glass*, Case No. 8:16-cv-02104-27AAS, 2017 WL 11017883 * 3 (M.D. Fla. August 8. 2017) (quoting *Krinks v. Suntrust Bank*, No. 8:09-cv-909-T-27EAJ, 2010 WL 11479157 *1 (M.D. Fla. January 11, 2010)); *Panarella v. Citimortgage, Inc*., 2011 WL 12848536 (M.D. Fla. 2011) ("Plaintiffs must come forward with some proof that calls into question whether the waiver was knowingly and voluntarily given," granting defendant's motion to strike jury trial demand that was included in the body of a mortgage agreement) (quoting *Murphy v. Cimarron Mortg. Co.*, 2007 WL 294229 *1 (M.D. Fla. Jan. 29, 2007). Under those decisions the employee must put forth some evidence that the waiver was not knowing and voluntary before the burden shifts to the employer, and Plaintiff cannot satisfy that burden based on her trial testimony.

The other requirement of this Court, which was that the employee's signature page be on the same page as the jury trial waiver (or a reference to the jury trial waiver) is not a requirement found by other courts. *Madura v. BAC Home Loans Servicing L.P.*, 851 F. Supp. 2d at 1294-95 (waiver was conspicuous where contained in a separate paragraph on the eleventh page of a twelve-page mortgage, was in a typeface and style consistent with the rest of the document, was not

obscured by other language, was not hidden in a footnote, and where it was on the page preceding signatures and not on the signature page); *Collins v Countrywide Home Loans, Inc.*, 680 F. Supp. 2d 1287, 1295 (M.D. Fla. 2010)[11] (jury trial waiver was conspicuous where the waiver provision was "present in a separate paragraph, printed in a font that is the same size as the rest of the document, located in the last paragraph of a relatively short document, and worded in clear and unambiguous language.") (citations omitted). Notably, in *Kenison v. Schellman & Co., LLC*, the court found enforceable a jury trial waiver contained within a 12-page employment agreement that the plaintiff signed electronically, where the waiver was in capital letters, bold type, and plain language. No. 8:20-CV-1139-MSS-JSS, 2020 WL 10354995, at *1 (M.D. Fla. Nov. 20, 2020). Finally, in *Balchunas v. Bank of Am., N.A.*, the Southern District of Florida granted the defendant's motion to strike a jury trial demand, finding the jury trial waiver was conspicuous when it was included in an entirely separate document than the acknowledgement. No. 2:20-CV-14106, 2020 WL 4718435, at *1 (S.D. Fla. Aug. 13, 2020) (jury trial waiver was contained in a depositor's agreement, which the plaintiff did not sign, instead signing a signature card on her account that itself made no mention of a jury trial waiver). *See Rivera*

---

[11] In *Countrywide*, the court noted that the jury trial waiver was located directly above the signatures, but did not require that for a court to find a waiver to be "knowing and voluntary." *Collins v. Countrywide Home Loans, Inc.*, 680 F.Supp. 2d at 1295.

*v. Aaron Rents, Inc*., No. 8:07-CV-2190T30TGW, 2008 WL 638353, at *4 (M.D. Fla. Mar. 5, 2008) (jury trial waiver provision was conspicuous and valid where it was included in a single page document, was in the same size font as the rest of the document, and stated in clear and unambiguous language that the plaintiff was waiving right to a jury trial)  (citing *Murphy v. Cimarron Mortg. Co.*, 2007 WL 294229 *2 (M.D.  Fla. Jan. 29, 2007) ("holding jury trial waiver to be conspicuous where it was in its own separate paragraph, was in the same size font as the rest of the document, was located in the last paragraph of a twelve page document, and stated in clear and unambiguous language that the plaintiffs were waiving their right to a jury trial.")).

Based on these authorities the Court should vacate the Order denying the motion to strike the jury trial waiver and enforce the Order, thus requiring a new bench trial of Plaintiff's § 1981 claim.

### H.    Reversal or Remittitur of Emotional Distress and Punitive Damages.

In addition to its motions challenging the weight and sufficiency of the evidence supporting the jury's verdict and the court's evidentiary admissions, Dynamic alternatively moves for judgment as a matter of law reversing the Court's award of compensatory and punitive damages or, alternatively, remittitur of both. The Eleventh Circuit has held that "[o]nce a defendant is found liable for the plaintiff's injury, the District Court has a great deal of discretion in deciding the level

of damages to be awarded." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999). "In general, a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence." *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985)(reviewing jury award of compensatory damages under the ADEA and citing *Howell v. Marmpegaso Compania Naviera, S.A.*, 536 F.2d 1032, 1034–35 (5th Cir. 1976) and *Natco, Inc. v. Williams Bros. Eng'g Co.*, 489 F.2d 639, 641 (5th Cir. 1974)).

> 1. <u>Judgment as a matter of law as to punitive damages because the decision-maker was not high enough in the corporate hierarchy, and higher management did not approve the decision.</u>

"[P]unitive damages are available only if 'the discriminating employee was high up the corporate hierarchy or ... higher management countenanced or approved his behavior.'" *Ash*, 664 F.3d at 900–01 (quoting *Miller*, 277 F.3d at 1280 (quotation marks omitted) (alteration and quotation marks omitted). "Moreover, 'in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with [§ 1981].'" *Id.* (citing *Kolstad*, 527 U.S. at 545 (quotation marks omitted); *see also Miller*, 277 F.3d at 1280 ("[T]he Supreme Court has held that employers may assert a good faith defense to vicarious liability for punitive damages where the employment decisions of managerial agents

... are contrary to the employer's good-faith efforts to comply with [§ 1981]." (quotation marks omitted)).

Applying the law established in all of those decisions, evidence did not present a jury question on the punitive damages issue.  This Court must distinguish the question of whether there was sufficient evidence that in deciding to not to offer other jobs to Plaintiff, Cureton retaliated against Plaintiff from the question of whether there was sufficient evidence to support an award of punitive damages against *Dynamic* —not against Cureton, the decision maker, but against Dynamic, the employer. *See Ash*, 664 F.3d at 901 (citing, *e.g., Kolstad*, 527 U.S. at 534–46, ("distinguishing between the facts that will support an award of compensatory damages and the additional facts required for an award of punitive damages"); *Miller*, 277 F.3d at 1275–81 ("analyzing the two issues separately and reversing the award of punitive damages while affirming the award of compensatory damages"); and *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1323 (11th Cir. 1999) ("same")).

The jury's award of punitive damages against Dynamic cannot stand because: 1) Plaintiff did not cannot refute the argument that Cureton was not far enough up in the corporate hierarchy to impute his actions to Dynamic, his employer; 2) Dynamic's owners were not informed of Cureton's purported retaliatory acts or that they approved of his behavior in any way; and 3) it is undisputed that Dynamic had

implemented several policies to prevent discrimination in promotion and hiring decisions. Kristal Riddle did not learn of Cureton's alleged failure to reassign Plaintiff until she received the lawsuit over two years later; further, to her knowledge, Cureton had offered Plaintiff two positions that Plaintiff declined. (Tr. Vol II, 188:17-20). In her own evidence, Plaintiff established that Dynamic has over 1300 employees in 13 states.

"The law does not allow a jury to impose punitive damages on an employer based on the decision of one who is not high enough in the corporate hierarchy simply because the jury wants to send a big corporation a big message." *Ash*, 664 F.3d at 903 (citing *Kolstad*, 527 U.S. at 529–30 ("Punitive damages are limited ... to cases in which the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." (quotation marks omitted) (emphasis added))). "Nor does the law allow a jury to impose punitive damages simply on the basis that the decision maker" bore responsibilities for the employer. (*Id.*) (punitive damages not imposed simply because the decision-maker "was in charge of one of the hundreds of plants and offices that the employer had worldwide.") Cureton was just one manager for Dynamic's employees in part of Alabama, whereas Dynamic had over 1300 employees in 13 states.

45

Plaintiff failed to offer any evidence that "higher management countenanced or approved" Cureton's decision or knew that Plaintiff alleged Dynamic failed to reassign Plaintiff until after the lawsuit was filed. And the undisputed evidence shows that Cureton was not high enough up in the corporate hierarchy at Dynamic to meet the *Dudley* requirement for imputing his discriminatory conduct to Dynamic. *Ash*, 664 F.3d at 904.

The Court should grant Dynamic's renewed motion for judgment as a matter of law also because the jury's decision to award punitive damages was contrary to Dynamic's "good faith efforts to comply with job discrimination laws." *Ash*, 664 F.3d at 904 ("[t]he legal premise for that reasoning is well established.") (citing *Kolstad*, 527 U.S. at 545; and *Miller*, 277 F.3d at 1280. "The *Kolstad* decision could not have been any clearer about it. In that decision the Supreme Court forthrightly held:

> In light of the perverse incentives that the Restatement's "scope of employment" rules create, we are compelled to modify these principles to avoid undermining the objectives underlying Title VII. Recognizing Title VII as an effort to promote prevention as well as remediation, and observing the very principles underlying the Restatements' strict limits on vicarious liability for punitive damages, we agree that, in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII .... [G]iving punitive damages protection to employers who make good-faith efforts to prevent discrimination in the workplace accomplishes

> Title VII's objective of motivating employers to detect and
> deter Title VII violations.

*Ash*, 664 F.3d at 901, n. 11 and 905 (quoting *Kolstad*, 527 U.S. at 545–46, 119 S.Ct.

at 2129 (alterations, citations, and quotation marks omitted) (emphasis added) (also

noting the analytical framework and rules about employer liability under Title VII

and § 1981 are the same.).

The evidence that Dynamic has established the *Kolstad* good faith defense in

this case is based on uncontradicted evidence – that Dynamic made "good-faith

efforts to comply with" the anti-discrimination laws. *See Ash*, 644 F.3d 905-06. *Ash*

held that evidence sufficient to satisfy this defense was "a written company policy

forbidding racial and other unlawful types of discrimination, communication of that

policy to all decision makers and other employees, and training on the policy," all

of which Dynamic established at trial by sufficient evidence.

Dynamic publishes anti-race discrimination, anti-harassment, and anti-retaliation

policies in various material provided to employees upon hire. Dynamic further

conducts annual training of supervisors and managers. First, the Security Officers'

Handbook provided to all newly hired employees contains a policy against racial

and other types of harassment in the workplace, provides a number to call to report

complaints, and articulates a policy against retaliation for making reports. (PX 17 at

43-44). Plaintiff Key acknowledged receipt of the Handbook on July 21, 2017. (DX

6). She also acknowledged on July 21, 2017, receipt of the Dynamic's Harassment

in the Workplace policy that provides a procedure for making complaints and guaranteeing against retaliation. (DX 13). On the same date, Plaintiff also signed the Workplace Rules Policy, which prohibits security officers from making racial, ethnic, sexual or otherwise demeaning comments.

Plaintiff received during training the Security Officer Handbook containing the anti-harassment policy. (DX 21; Tr. Vol. I-104:12-105:19). The evidence established that Dynamic publishes anti-discrimination and retaliation policies and conducts annual training to educate supervisors and managers on complying with employment laws, including laws against race discrimination and retaliation. (Tr. Vol. II-21:21-23:18) (See also DX 47, Tr. II-23:19-24:4; DX 50, Tr. II-24:5-25:3; DX 52, Tr. II-25-5-26:13).

> Title VII of the Civil Rights Act: This law makes it illegal to discriminate against someone on the basis of race, color, religion, national origin, or sex. *The law also makes it illegal to retaliate against a person because the person complained about discrimination, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit.* The law also requires that employers reasonably accommodate applicants' and employees' sincerely held religious practices, unless doing so would impose an undue hardship on the operation of the employer's business.

(DX 50) (emphasis added).

> Moreover, employees and applicants shall not be subjected to harassment, intimidation, threats, coercion or discrimination because they have filed a complaint,

assisted or participated in any investigation, opposed any
unlawful act or practice, or exercised any protected rights.

(DX 49). *See, e.g., Copley v. BAX Glob., Inc.*, 97 F. Supp. 2d 1164, 1171–74 (S.D.

Fla. 2000) (reducing punitive damages by $650,000.00 because, "[w]hile § 1981

does not impose a limit on the amount of punitive damages available, there is also

no evidence to suggest that Defendant has a history of engaging in the type illegal

discrimination that it was found to have committed in this case.")

Chief Legal Officer Kristal Riddle, who reported to Executive Vice-President

Scott Riddle, testified regarding Dynamic's policies in place to prevent

discrimination and harassment:

> Q. Ms. Riddle . . .[a]re you familiar with the company's policies?
> A. I am.
> Q. What steps does Dynamic Security take to attempt to prevent
> discrimination and retaliation in the workplace?
> A. Our steps to attempt to prevent retaliation in the workplace start
> with our training programs. We have annual training on EEOC
> policies, on sexual harassment, on religious discrimination. These are
> just a couple of examples. But we try to go through every single step
> that EEOC has covered. And I would say that the training is the
> biggest part of our attempts to make certain that our managers and
> our personnel know that we do not tolerate harassment or
> discrimination or retaliation in any form.
> Q. Are there policies that are provided to employees upon being
> hired?
> A. Yes. Q. And I think we've -- you've been in the court the entire
> time; right?
> A. Yes, sir.
> Q. And so you've seen some of those policies? You saw the
> standalone harassment policy that Ms. Key signed?
> A. I saw that.
> Q. And the security officer also has a harassment policy that is in it?

49

A. Yes.

Q. And is it accurate that both of those have antiretaliation provisions in them?

A. Yes, they do.

Q. And would those policies be given to individuals in Ms. Key's position?

A. Yes.

Q. Are there other policies that the company maintains that relate to equal employment opportunity and retaliation?

A. Yes. Dynamic has EEOC -- expanded EEOC policies. We have AA policies. Those are the ones that come to mind immediately.

Q. And where are those policies maintained?

A. Those policies are generally maintained in the policy manual. That's basically a three-ring binder that contains these policies. It's kept in the branch offices and it's always available.

Q. Okay. Well, how do employees have access to these policies?

A. They simply have to ask the office administrator to see them.

Q. And how are employees informed of these policies?

A. They're informed verbally during the time that they are in the hiring process where they're filling out their personnel packet.

(Tr. Vol. II-21:21-23:18) (See also DX 47, Tr. II-23:19-24:4; DX50, Tr. II-24:5-25:3; DX 52, Tr. II-25-5-26:13).

Plaintiff's counsel argued that punitive damages were necessary "to punish" Dynamic for not following its policies and the next time that "someone complains to them" that "they reassign to another job so that they support them." (Tr., III-59:19 - 60:9). Yet the only evidence that anyone may not have followed those policies was the one decision *Cureton* made to stop offering Plaintiff other jobs. Counsel urged the jury to assess punitive damages against Dynamic for the following reasons:

The last thing we're asking for is punitive damages. Punitive damages are intended to deter future misconduct so that

50

it doesn't happen again. They are intended to punish. And again, only you can find this amount. You're going to have to find an amount that's sufficient that Dynamic chooses to follow the law. We want you to choose an amount that's sufficient to make them to follow the law.

You want to choose an amount that's sufficient, and then next time someone complains to them, they don't build a file on them. They protect them. So the next time someone complains to them, they reassign them to another job so that they support them.

You need to find an amount that's sufficient to punish an employer that operates in 13 states with over 1300 employees. You need to send them a message not to do this again.

(Tr., III-59:19 - 60:9). The decision not to offer Plaintiff additional assignments because she complained of discrimination (although Dynamic has shown Plaintiff failed to establish insufficient evidence of protected activity or causation) could have only been made by Cureton, and acting with retaliatory motive would have been a decision contrary to Dynamic's policies and good faith efforts to prevent unlawful discrimination.  Even though upper management was not aware until Plaintiff served the lawsuit in January 2020 (doc. 6) of any claim she made that Dynamic retaliated against her (and even then, did not believe Count V was asserted against Dynamic), her counsel told the jury, "[y]ou need to find an amount that's sufficient to punish an employer that operates in 13 states with over 1300 employees."

2.   <u>Reversal, or in the alternative, remittitur of emotional distress damages awarded by the jury</u>.

51

In this case, the jury awarded damages for emotional distress damages in the amount of $214,864.00. (Doc. 186, p. 2, no. 6). In the case of emotional distress resulting from a constitutional violation, this Court is guided by the Supreme Court's decision in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), "which concluded that compensatory damages for emotional distress may not be presumed from every constitutional violation, but must be proven by competent, sufficient evidence." *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005) (setting aside jury award of compensatory emotional damages in a Title VII/§ 1981 case due to insufficient evidence). "[S]uch damages are "customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Akouri v. State of Fla. Dep't Transp.*, 408 F.3d at 1345 (quoting *Carey*, at 263–64). "[A]lthough a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress based on a constitutional violation, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages.'" *Id.* at 1254 (quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996) (holding that evidence of "'genuine injury' is necessary" to recover emotional damages) (quoting *Carey*, 435 U.S. at 264).

Here, the only evidence Key presented that could conceivably support an emotional distress compensatory damage award was not evidence of harm from the adverse employment action that the jury decided. She testified about harm suffered from Hyundai's decision to remove her from her assignment at the Hyundai plant and her distress from being told her hairstyle was not acceptable. She did not testify that she experienced emotional distress from Dynamic not reassigning her to another position, which is the sole adverse employment action she challenged at trial and on which the jury decided in her favor.

> A. I wanted to let her know that I did what she asked me to do; that she asked me to wear a hat, and then I did that. Like I - I felt like even though that I was an adult, I felt like a child trying to tell somebody like –"

(Tr., Vol. I, 60:23-61:1).

> Q. When did you say that this *discrimination* began?
> A. The first day of work on July 31st.
> Q. And how did it make you feel?
> A. Uncomfortable. Like – almost like you're not good enough or like – it's like you don't fit in and there's something wrong with you.
> Q. How did you tell Maurice Chambliss in this complaint that it made you feel?
> MR. REDMOND: Object to the hearsay. I'm not exactly sure what she's talking about, if she was asking what she told Mr. Chambliss, which sounds like it's separate and apart from the actual complaint that she said.
> THE COURT: Why don't you restate your question.
> MS. PALMER: Yes, Your Honor.
> Q. So in the handwritten complaint that you provided Mr. Chambliss, what did you state about how it made you feel?
> A. *That it made me feel threatened and like that I* <u>*would be*</u> *working in a hostile environment.*

(Tr, Vol. I, 67:4-21) (emphasis added). Plaintiff's testimony about how she felt was in response to what she perceived as *discrimination*, not in response to the alleged retaliatory adverse action of failure to reassign amounting to termination. Further, her testimony did not even specifying what type of discrimination made her feel threatened, since her written complaint to Chambliss complained about hair discrimination and pregnancy discrimination. The following testimony was about how she felt on August 1, 2017:

> Q. So let's go to the Dynamic Security office. Tell me what happens when you get there.
> A. So as soon as I got there, Mr. Cureton opened up the door, and he said, "Are you going to sue us?" And I kind of just looked at him because I was trying to figure out why he would ask me that question. And after that, I –you know, we sat in the lobby of the office, and I was beginning to tell him what had transpired. And he basically was, like, "Oh, I know Ms. Robinson. She would never do anything like that. I've known her for years." And, "No, you know, I don't think she would do that." He said, "I'm just a big fat white guy. What do I know about you feeling discriminated against?"
> Q. Wait a minute. He said he – what – he said he was a big fat white guy?
> A. Yes.
> Q. Did he tell you why he said that?
> A. No. He just said it.
> Q. Who all was there when you're talking to Mr. Cureton?
> A. Nicole Scavella, who was the office manager.
> Q. And were you able to go and sit down with him and speak to him in his office?
> A. No. He met me with me in just the foyer area. So when you walk into the Dynamic Security office, just the receiving area for anybody who comes into the office.

54

Q. Did he take any notes?

A. No.

Q. What, if anything, do you feel like Dynamic Security did to protect you from discrimination?

A. Nothing.

Q. Were you able to go back to Hyundai that day like Mr. Chambliss had said?

A. No. After then Mr. Cureton said *they don't want you back at the site. And I asked him why, and he said, "Because of your hair and something else."*

Q. Did he say what that something else was?

A. No.

Q. But he identified your hair?

A. Yes.

Q. *When you left the Dynamic Security office that day, did you understand that to be the end of your employment with Dynamic Security?*

A. *No.*

Q. Why?

A. Because Mr. Cureton, he told me, he said, "You know, we have -- we're going to be having some part-time positions available, and I'll let you know when they're available." And he said, "You know, you might not be making as much." And I said, "Beggars can't be choosers." That's exactly what I said. I said, well, "Beggars can't be choosers. He said, "Well, if a part-time position becomes available, I'll let you know, you know. I'll get in contact with you." But he never did.

Q. Did he offer you any position on August 1st?

MR. REDMOND: Object to leading, Your Honor.

THE COURT: Overruled.

A. No, he didn't.

Q. By the time you left the Dynamic Security office [on August 1], do you remember what time it was?

A. I'm not sure.

Q. Okay. What did you do when you left?

A. Well, I immediately left the parking lot, but I kind of drove around a little bit to try and, like, process everything

that happened. And, you know, I went home and sat in the
parking lot for a little bit, like, just -- I guess I just tried to
process what had just transpired.

Q. How were you feeling about what had happened?

A. Frustrated. I was upset. Almost like, is this real? Like,
is this real life? Is this something that really -- I guess
having something happen to you that you may not think
would happen. So kind of, like, trying to figure out, is this
really – did this really just happen?

Q. By the end of that day, had anyone from Dynamic
Security contacted you about your complaint?

A. No.

Q. Who, if anyone, contacted you from Dynamic Security
at any time about your complaint?

A. Nobody.

Q. When did Mr. Cureton contact you about another
position?

A. He never contacted me.

(Tr. Vol I, 68:15-71:17) (emphasis added). While Plaintiff testified that Cureton

never contacted her about another position, the feelings she described happened on

August 1, 2017, immediately after leaving the Dynamic office, which was before

she claims she experienced retaliation of not being reassigned to another job. The

feelings she described were in response to her being removed from the Hyundai plant

by HEA – because when she left the Dynamic office, she did not believe she had

been terminated.

Shortly thereafter, Plaintiff again referenced negative emotional feelings, but

her testimony was that such feelings were due to HEA having removed her from the

Hyundai plant – not the retaliation she challenged in this trial.

Q. Going back to August of 2017 when you realized Dynamic Security was *not protecting you from discrimination*, what effect, if any, did that have on you?

MR. REDMOND: Your Honor, I'm going to object to leading and assuming facts not in evidence.

THE COURT: Overruled.

A. It just -- it just made me feel like I just -- like it was something -- like -- it was like, is there something wrong with -- you know, with me? I felt like that they didn't see me as a person. So I was not able to demonstrate my work ethic. I was not able to demonstrate, you know, the type of employee that I am and that, you know, my past employers would say that I was. I felt like *they saw something that didn't fit into their standard of beauty or what was acceptable*, and it just kind of -- it just -- I just felt like, you know, am I good -- you know, am I good enough? Or what did -- what is wrong with me? *I'm wearing my hair how God created it. This is how my hair is naturally. And for me it's just, like, how you were made is unacceptable.*

Q. Can you identify for me any -- you know, we've talked about this monetary damage and the lost wages. Can you identify for me any nonmonetary damages that you experienced *from this*?

A. Just like -- it just goes back to not feeling like I was good enough. And to feel like -- like I can't help who I am. I can't help who I am. I mean, this is how I was made. This is how I was created. So I can't help that. But to have somebody look at a part of you and basically say it's something wrong with that part of you, or if you -- you have to change that part of you, which is something that, you know, like, that's you. That's you. My hair is who I am. So it's, like, for somebody to say you have to change that part of you to be accepted, like, it just -- it hurts. It's -- to me it's like an indescribable type of pain.

Q. Is it still affecting you today?

A. Yes. It's really hard to talk about it.

(Tr. Vol. I, 87:10-88:19). The above testimony by Plaintiff described how it felt to be discriminated against for Hyundai's refusal to permit her to wear her hair "how God created it." She testified She testified that the thing that hurt like an "indescribable type of pain" that still affects her today and that was, at trial, still hard

for her to talk about was when somebody told her she had to change her hair to be accepted.

In addition, the plaintiff's testimony must consist of more than just conclusory statements that the Plaintiff suffered emotional distress. *Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005). As demonstrated by *Ash v. Tyson*, 664 F.3d 883, 899-900 (11th Cir. 2011), the Plaintiff must come forward with some substantial evidence of emotional distress for a substantial award. In that case, the court affirmed a compensatory damage award of $300,000.00 when the plaintiff and his wife testified he became physically ill, lost 40 pounds in five months, lost self-esteem, heard jokes about his promotion, was degraded over having to train someone else for his job, withdrew from relationships with his family, and his relationships deteriorated. In contrast, the Plaintiff in this case has only testified that she was upset because she could not wear her hair in dreadlocks, which she described as its natural state. Based on these facts, the award of $214,000.00 in compensatory damages was excessive and contrary to the evidence. *See also Davis v. Fla. Agency for Health Care Admin.*, 612 Fed. Appx. 983, 987 (11th Cir. 2015) (Plaintiff presented "detailed evidence of her emotional harm," including evidence of weight fluctuations, that ceased going to events with friends, lost friends at work, was embarrassed and lost self-esteem when employee wore mask when leaving plaintiff's office, and co-workers were afraid to talk to her).

A review of the record reveals that Key did not describe any kind of harm, mental, emotional, or otherwise, arising from retaliation by Dynamic through its failure to reassign her to another position, and the harm she did describe was conclusory even had she testified it had been caused by not receiving a reassignment, which she did not. She described the pain of not being accepted for how she looked and for not being accepted because she wore her hair in dreadlocks. It is undisputed that she was removed from the Hyundai plant because she wore dreadlocks in contravention of Hyundai's grooming policy. (Tr., Vol. II, 129:12-22). And the evidence shows that Hyundai – not Dynamic – rejected Key from her assignment at the Hyundai plant. (*Id.*) Key's testimony above, which is the only testimony in which she described being emotionally impacted, does not satisfy the requirement that the plaintiff must show actual injury by sufficient evidence. She described how "the discrimination" about her hair impacted her. She did not describe any emotional impact because she was not reassigned to another site. *See Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338, 1345–46 (11th Cir. 2005) (Eleventh Circuit upheld the district court's reversal of a jury award of $511,000.00 in compensatory emotional damages because the plaintiff testified only vaguely that he suffered because of the adverse action at issue – denial of promotion). Accordingly, the jury's award of compensatory emotional of $211,864.00 (doc, 185 at 2) caused by Dynamic's failure to reassign her to another position is not supported by sufficient

evidence and must be reversed.  "Once a defendant is found liable for the plaintiff's injury, the District Court has a great deal of discretion in deciding the level of damages to be awarded." *Akouri*, at 1344 (citing *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999) (citing *Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir. 1985)).

The *Akouri* Court found that the plaintiff "failed to show any evidence regarding emotional distress" and reversed the jury award of compensatory damages in its entirety; however, had there been some evidence of emotional distress, the Court would have applied the following factors "to aid triers of fact in determining the propriety of awarding compensatory damages for emotional distress as well as appellate courts in reviewing sufficiency challenges to such awards: (1) whether the plaintiff lost the esteem of his/her peers; (2) whether the plaintiff suffered physical injury as a consequence of her emotional distress; (3) whether the plaintiff received psychological counseling or other medical treatment; (4) whether the plaintiff suffered a loss of income; (5) the degree of emotional distress; (6) the context of the events surrounding the emotional distress; (7) the evidence tending to corroborate the plaintiff's testimony; (8) the nexus between the challenged conduct and the emotional distress; and (9) any mitigating circumstances. *Akouri*, at 1345, n. 5 (citing *Price*, 93 F.3d at 1254).

Plaintiff failed to present any evidence that she received counseling for the pain she claimed to have suffered. The context of the events surrounding the emotional distress were about the alleged discrimination she suffered (a claim the Court dismissed at summary judgment). Plaintiff failed to present any witnesses or evidence to corroborate her painful feelings. The only factor Plaintiff can satisfy is that she lost $85,200.00 over a period of 5.5 years due to not being reassigned by Dynamic. (Doc. 185, at 2). And, most crucially,  Plaintiff's testimony regarding her feelings failed to establish any nexus between the emotional distress she described and the only challenged employment action at issue in the trial and upon with the jury found liability: Dynamic's failure to reassign her. *See Ash v. Tyson Foods, Inc.*, 129 F. App'x 529, 534–36 (11th Cir. 2005) (affirming district court's decision to order a new trial on punitive and compensatory damages on § 1981 claim and with regard to the compensatory damages, the plaintiff provided insubstantial evidence to support the jury's $250,000 compensatory damages award), vacated and remanded, 546 U.S. 454, 126 S. Ct. 1195, 163 L. Ed. 2d 1053 (2006), previous holding reinstated by 190 F. App'x 924, 927 (11th Cir. 2006). Therefore, to the extent the Court chooses to retain a finding of compensatory damages owed, it should be reduced to the extent the jury could conclude she experienced difficulty due to having to search for another job paying $13/hour.

        3.    <u>Remittitur of punitive damages award</u>.

a.    Insufficient evidence of punitive damages.

In this case, the jury assessed against Dynamic punitive damages in the amount of $511,200.00. (Doc. 185 at p. 2). "A plaintiff seeking punitive damages against an employer for job discrimination faces daunting obstacles under the law established by decisions of the Supreme Court and this Court. . . and [p]unitive damages are disfavored by the law and are awarded solely to punish defendants and deter future wrongdoing." *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 900 (11th Cir. 2011) (citing *Ferrill*, 168 F.3d at 476 (quotation marks omitted)). "[P]unitive damages are available under 42 U.S.C. § 1981 when an 'employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Ash v. Tyson Foods, Inc.*, 129 F. App'x 529, 534–36 (affirming district court's decision to order a new trial on punitive damages on § 1981 claim), vacated and remanded, 546 U.S. 454, 126 S. Ct. 1195, 163 L. Ed. 2d 1053 (2006), previous holding reinstated by 190 F. App'x 924, 927 (11th Cir. 2006) (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 529–30 (1999) (quotation omitted)). "The Supreme Court has directed that, for the issue of punitive damages to reach the jury in a section 1981 case, the plaintiff must come forward with substantial evidence that the employer acted with actual malice or reckless indifference to his federally protected rights." *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 900 (11th Cir. 2011) (quoting *Miller v. Kenworth of*

62

*Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002) (citing *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 536–37, 119 S.Ct. 2118, 2125–26, 144 L.Ed.2d 494 (1999)) (emphasis added in *Ash*)).

"'[M]alice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Ash,* 129 F. App'x*,* at 534 (quoting *Kolstad* at 535). "Malice means 'an intent to harm' and recklessness means 'serious disregard for the consequences of [one's] actions.' " *Ash,* 129 F. App'x at 534 (quoting *U.S. E.E.O.C. v. W & O, Inc.*, 213 F.3d 600, 611 (11th Cir. 2000) (citation omitted) (alteration in original). "Intentional discrimination will not rise to the level of maliciousness or recklessness where the employer: (1) is 'unaware of the relevant federal prohibition'; or (2) 'discriminates with the distinct belief that its discrimination is lawful.'" *Ash*, 129 F.App'x at 535 (quoting *Kolstad*, 527 U.S. at 536–37). An employer will not be held liable for punitive damages where "the discriminatory employment decisions of managerial agents ... are contrary to the employer's good-faith efforts to comply with [42 U.S.C. § 1981]." *Id*. (quoting *Kolstad* at 545) (quotation omitted). "In the absence of evidence of a good-faith effort to comply with § 1981, an employer will be liable for actions of its agent when the agent served the employer in a managerial capacity and committed the intentional discrimination at issue while acting in the scope of employment." *Id*. (citing *Kolstad* at 542–43).

In *Ash*, 129 F. App'x 529, the Court ordered a new trial on the basis of punitive damages due to insufficient evidence at trial that the  decision-maker knew he was violating federal law when he failed to promote the plaintiff and because the plaintiff failed to present sufficient evidence that the decision-maker acted with reckless indifference to his federal rights. *Id*. at 535-36. Here, Plaintiff Key failed to present any evidence that Cureton knew he was violating federal law when he did not reassign Plaintiff to another job or that he acted with reckless indifference to her federal rights.

b.   Constitutionally excessive punitive damages.

Awards of punitive damages are subject to constitutional limits. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). "The Supreme Court has held that due process forbids the imposition of grossly excessive or arbitrary awards of punitive damages." *Goldsmith v. Bagby Elevator Co*., 513 F.3d 1261, 1282–83 (11th Cir. 2008) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. at 562). Because a punitive damages award "is an exercise of government power, it must comport with constitutional due process." *Cote v. Philip Morris USA, Inc*., 985 F.3d 840, 846 (11th Cir. 2021) (citing *Action Marine, Inc. v. Continental Carbon Inc*., 481 F.3d 1302, 1318 (11th Cir. 2007). "A 'grossly excessive' punitive damages award is one that 'furthers no legitimate purpose and constitutes an arbitrary deprivation of property,' thereby violating due process." *State Farm Mut. Auto. Ins.*

*Co. v. Campbell*, 538 U.S. 408, 417, 123 S. Ct. 1513, 1520, 155 L.Ed.2d 585 (2003). In *Gore*, "the Supreme Court instructed courts reviewing punitive damages awards to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the ratio between the actual or potential harm suffered by the plaintiff (compensatory damages) and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Goldsmith v. Bagby Elevator Co*., at 1261 (citing *Gore* at 575).

The first guidepost considers the reprehensibility of the defendant's conduct, which is the "most important indicium of the reasonableness of a punitive damages award." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. at 419 (quotation marks omitted); see also *McGinnis v. Am. Home Mortg. Servicing, Inc*., 901 F.3d 1282, 1288 (11th Cir. 2018). There are five specific factors this Court should consider under the reprehensibility guidepost: "(1) whether 'the harm caused was physical as opposed to economic'; (2) whether 'the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others'; (3) whether 'the target of the conduct had financial vulnerability'; (4) whether 'the conduct involved repeated actions or was an isolated incident'; and (5) whether 'the harm was the result of intentional malice, trickery, or deceit, or mere accident.'" *Cote* at 847 (quoting *Myers v. Cent. Fla. Inv., Inc.*, 592 F.3d 1201, 1219 (11th Cir. 2010)).

65

There is no requirement that a certain number of the factors be present, but "reprehensibility grows more likely as more factors are present." *Id*. Plaintiff has presented no evidence to satisfy any of the reprehensibility factors. Plaintiff suffered no physical harm; there was no evidence of issues regarding health and safety of other; there is no evidence of financial vulnerability; no repeated conduct was reported; and there was no evidence of any intent to harm or trick the Plaintiff.

In this case, a six to one ratio[12] between back pay damages of $85,200.00 and punitive damages of $511,200.00 may be within a constitutionally acceptable range for other cases with different facts, but not in this case where there is insufficient evidence for the jury to have concluded that Dynamic engaged in highly reprehensible conduct to sustain a punitive damages award of that amount. Further, there is no evidence that Dynamic committed any acts that should be punished as sanctions for similar conduct.

Plaintiff presented evidence of emails between Sherry Spires and Ray Cureton, but those emails cannot support a punitive damages award for several reasons. First, they concerned complaints against Hyundai and two individuals, Cassandra Williams and Gloria Robinson. They did not reference complaints Plaintiff made against the company or its owner. Second, Ray Cureton testified his

---

[12] The ratio is six to one with the assumption that the Court reverses the jury award of compensatory damages due to lack of evidence to support it.

motivation in referring to and questioning Plaintiff's reassignment in emails with Sherry Spires was to ascertain the proper procedure. Third, at trial, Plaintiff and Cureton disputed whether he offered other jobs to Plaintiff. Finally, Cureton's testified that he did not extend Plaintiff a formal job offer because she had turned down other positions.

Weighing against reprehensibility is the evidence that Dynamic publishes anti-race discrimination, anti-harassment, and anti-retaliation policies in various material provided to employees upon hire and conducts annual training of supervisors and managers. *See* Sec. 2 above.  In *Copley*, the Court followed the reasoning in *Gore v. BMW* and looked to an analogous statute that imposed caps on punitive damages: "[i]n employment discrimination cases analogous to the facts of this case, but brought under Title VII, Congress has determined that $300,000.00 is an appropriate sanction for employers found to have willfully and knowingly discriminated," and thus reduced the punitive damages award from $1,000,000.00 to $350,000.00. 97 F. Supp. 2d at 1171–74.  Here, the analogous Title VII statutory cap would have been $300,000.00 for an employer with more than 500 employees, and, even if the court found sufficient evidence that punitive damages were justifiable, which it should not, the amount should be reduced to an appropriate sanction of no more than $300,000.00.

WHEREFORE, premises considered, Defendant Dynamic respectfully requests that this Court grant its renewed motion for judgment as a matter of law, vacate the judgment in favor of Plaintiff and enter judgment in favor of Dynamic dismissing Plaintiff's remaining claim against it.  Alternatively, Dynamic requests that the Court Order a new trial in this matter or remit the awards of compensatory and punitive damages.

Respectfully submitted,


*/s/Wesley C. Redmond*
Wesley C. Redmond
Susan W. Bullock
FordHarrison LLP
420 20th Street North, Suite 2560
Birmingham, AL  35203
wredmond@fordharrison.com
sbullock@fordharrison.com
Phone: 205-244-5905
          205-244-5904
Facsimile: 205-244-5901

*Counsel for Dynamic Security, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on 26th day of April, 2023, he electronically filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF System, and a true and correct copy to counsel of record:

Heather Leonard
Heather Leonard, P.C.
2105 Devereaux Cir., Suite 111
Birmingham, AL 35243

Leslie A. Palmer, LLC
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL  35233

*Counsel for Plaintiff*

*/s/ Wesley C. Redmond*
Wesley C. Redmond

WSACTIVELLP:13958684.1